No. 26-3196

IN THE

# United States Court of Appeals for the Sixth Circuit

KALSHIEX, LLC,

*Plaintiff-Appellant;*

v.

MATTHEW SCHULER, *et al.*,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Southern District of Ohio
No. 2:25-cv-1165 (Morrison, C.J.)

## KALSHIEX LLC'S EMERGENCY MOTION FOR AN INJUNCTION PENDING APPEAL OF THE DISTRICT COURT'S MARCH 9, 2026 ORDER

GRANT R. MAINLAND
ANDREW L. PORTER
NICOLE D. VALENTE
MILBANK LLP
55 Hudson Yards
New York, NY 10001

MICHAEL J. HUNTER
MATTHEW L. JALANDONI
FLANNERY | GEORGALIS, LLC
175 South Third Street, Ste. 1060
Columbus, OH 43215

March 24, 2026

NEAL KUMAR KATYAL
JOSHUA B. STERLING
WILLIAM E. HAVEMANN
MILBANK LLP
1101 New York Ave., N.W.
Washington, DC 20005
(202) 835-7505
nkatyal@milbank.com

*Counsel for Plaintiff-Appellant
KalshiEX LLC*

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................ 1

BACKGROUND ..................................................................................... 4

I.    LEGAL BACKGROUND .................................................................. 4

II.   FACTUAL AND PROCEDURAL BACKGROUND ............................... 7

LEGAL STANDARD ............................................................................ 9

ARGUMENT ........................................................................................ 10

I.    KALSHI IS LIKELY TO PREVAIL ON APPEAL .............................. 11

     A.    Kalshi's Contracts Fall Under The CFTC's Exclusive
        Jurisdiction ....................................................................... 11

     B.    Kalshi's Contracts Are Swaps ......................................... 15

     C.    The CEA Preempts State Regulation Of Kalshi's
        Contracts ........................................................................ 18

II.   KALSHI WILL SUFFER IRREPARABLE HARM ABSENT A STAY ................... 22

III.  THE EQUITIES STRONGLY FAVOR AN INJUNCTION ................................. 24

CONCLUSION ...................................................................................... 26

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**CASES:** Page(s)

*Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.,*
  977 F.2d 1147 (7th Cir. 1992) ..................................................................... 2

*CFTC v. Erskine,*
  512 F.3d 309 (6th Cir. 2008) .......................................................................17

*Chi. Mercantile Exch. v. SEC,*
  883 F.2d 537 (7th Cir. 1989) ......................................................................14

*Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.,*
  162 F.4th 631 (6th Cir. 2025) ...........................................................*passim*

*Coal. to Def. Affirmative Action v. Granholm,*
  473 F.3d 237 (6th Cir. 2006) ..................................................................... 10

*Cothran v. Ellis,*
  16 N.E. 646 (Ill. 1888) ................................................................................ 4

*Crosby v. Nat'l Foreign Trade Council,*
  530 U.S. 363 (2000) ................................................................................... 11

*Curran v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
  622 F.2d 216 (6th Cir. 1980) ......................................................................13

*Dickson v. Uhlmann Grain Co.,*
  288 U.S. 188 (1933) ..................................................................................... 4

*FTC v. Ken Roberts Co.,*
  276 F.3d 583 (D.C. Cir. 2001).....................................................................12

*Hughes v. Talen Energy Mktg., LLC,*
  578 U.S. 150 (2016) ................................................................................11, 12

*KalshiEX LLC v. CFTC,*
  2024 WL 4164694 (D.D.C. Sep. 12, 2024) ................................................. 7

*KalshiEX LLC v. Orgel,*
  2026 WL 474869 (M.D. Tenn. Feb. 19, 2026) ...............................*passim*

# TABLE OF AUTHORITIES—Continued

Page(s)

*Leist v. Simplot,*
638 F.2d 283 (2d Cir. 1980) ..............................................................5, 13

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,*
456 U.S. 353 (1982) ..........................................................................6, 12

*Mississippi v. Louisiana,*
506 U.S. 73 (1992) ................................................................................ 11

*Morales v. Trans World Airlines, Inc.,*
504 U.S. 374 (1992) .............................................................................. 22

*Nat'l Insts. of Health v. Am. Pub. Health Ass'n,*
145 S. Ct. 2658 (2025) ......................................................................... 23

*Oklahoma v. Castro-Huerta,*
597 U.S. 629 (2022)................................................................................ 2

*Overstreet v. Lexington-Fayette Urban Cnty. Gov't,*
305 F.3d 566 (6th Cir. 2002)............................................................ 9, 10

*Puerto Rico v. Franklin Cal. Tax-Free Tr.,*
579 U.S. 115 (2016) .............................................................................. 18

*Rasmussen v. Thomson & McKinnon Auchincloss Kohlmeyer, Inc.,*
608 F.2d 175 (5th Cir. 1979) ............................................................ 13, 14

*Transcon. Gas Pipe Line Co. v. Pa. Env't Hearing Bd.,*
108 F.4th 144 (3d Cir. 2024) ................................................................ 11

*United States v. Texas,*
144 S. Ct. 797 (2024) ............................................................................. 4

**STATUTES:**

7 U.S.C. § 1a(19)................................................................................5, 16

7 U.S.C. § 1a(47)(A) .......................................................................5, 6, 15

# TABLE OF AUTHORITIES—Continued

Page(s)

7 U.S.C. § 2(a)(1)(A) ...................................................................*passim*

7 U.S.C. § 6(c)................................................................................19

7 U.S.C. § 6c (1936) ......................................................................13

7 U.S.C. § 7(d)................................................................................ 6

7 U.S.C. § 7a-2(c)(1)........................................................................ 6

7 U.S.C. § 7a-2(c)(5)(C) ........................................................ 6, 16, 21

7 U.S.C. § 13a-2(7) ........................................................................20

7 U.S.C. § 16(e)(1)(B)......................................................................20

7 U.S.C. § 16(e)(2) ................................................................. 19, 20

31 U.S.C. § 5362(1)(A) ....................................................................21

31 U.S.C. § 5362(1)(E)(ii) ................................................................21

Ohio Rev. Code § 3775.03(A) ..........................................................14

Ohio Rev. Code § 3775.11(A) ..........................................................14

Ohio Rev. Code § 3775.12(A) ..........................................................14

**RULES AND REGULATIONS:**

17 C.F.R. § 38.4(b)........................................................................ 7

17 C.F.R. § 38.5(b) ..................................................................... 6, 7

17 C.F.R. § 38.151(b)................................................................ 4, 5, 6

17 C.F.R. § 38.251(a)...................................................................... 6

17 C.F.R. § 40.2(a)(1)...................................................................... 7

17 C.F.R. § 40.11 ....................................................................... 6, 7

# TABLE OF AUTHORITIES—Continued

Page(s)

Fed. R. App. P. 8(a) ................................................................ 10

*Further Definition of "Swap,"*
  77 Fed. Reg. 48,208 (Aug. 13, 2012).......................................17

*Prediction Markets,*
  91 Fed. Reg. 12,516 (Mar. 16, 2026) ...................................... 9

**LEGISLATIVE MATERIALS:**

120 Cong. Rec. 30,464 (Sep. 9, 1974)........................................13

H.R. Rep. No. 93-1383 (1974) (Conf. Rep.)................................... 1, 5, 3, 19

H.R. Rep. No. 106-711, pt. 2 (2000)........................................ 20

*Hearings Before the S. Comm. on Agric. & Forestry*, 93d Cong.,
  2d Sess. 249 (1974) ...................................................12

**OTHER AUTHORITIES:**

CFTC Amicus Br., *N. Am. Derivatives Exch. Inc. v. Nevada
  (Crypto)*, No. 25-7187 (9th Cir. Feb. 17, 2026),
  ECF 38.2, https://perma.cc/B2PF-3F2T .................................*passim*

Kevin T. Van Wart, *Preemption and the Commodity Exchange
  Act*, 58 Chi.-Kent L. Rev. 657 (1982) ...................................13

## INTRODUCTION

Defendants have threatened to prosecute KalshiEX LLC ("Kalshi") under Ohio gambling laws for offering contracts subject to the "exclusive jurisdiction" of the Commodity Futures Trading Commission ("CFTC"). 7 U.S.C. § 2(a)(1)(A). Although Defendants' efforts are preempted under the plain text of the Commodity Exchange Act ("CEA"), the district court below declined to grant Kalshi a preliminary injunction, splitting from another district court in this Circuit. Kalshi thus faces an imminent risk of civil or *even criminal* enforcement in Ohio under preempted state laws.

Kalshi is a CFTC-licensed and regulated exchange, known as a designated contract market ("DCM"). Federal law accordingly preempts state regulation of trading on Kalshi, as confirmed by every marker of legislative intent. The CEA's text grants the CFTC "exclusive jurisdiction" over trading on DCMs. 7 U.S.C. § 2(a)(1)(A). Congress in the CEA deleted the provision that had previously preserved concurrent state jurisdiction, noting its intent to "preempt the field." H.R. Rep. No. 93-1383, at 35 (1974) (Conf. Rep.). And Congress repeatedly reinforced the CEA's exclusive jurisdiction after courts uniformly and easily concluded that it preempts state regulation. Federal law therefore bars states from regulating Kalshi's contracts under straightforward preemption principles. If Ohio could enforce its gambling laws

1

against Kalshi, so could 49 other states, subjecting Kalshi to a patchwork of contradictory regulation, interfering with the CFTC's uniform oversight, conflicting with Kalshi's federal obligation to provide impartial access to its exchange, and resulting in "total chaos." *Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1156 (7th Cir. 1992) (quotation omitted).

Nonetheless, to avoid what it viewed as undesirable policy implications of preemption, the district court embraced an extra-textual reading of the CEA to allow Ohio to ban Kalshi contracts involving sports events. Brushing aside the CEA's text, the district court invoked various assumptions about Congress's "goals" to fashion an extratextual "gambling" exception to the CFTC's exclusive jurisdiction. Order, R.69, PageID#29-30. That holding hinges on "purported legislative intentions unmoored from any statutory text." *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 642 (2022). And it gets Congress's intent wrong. For as long as derivatives trading has existed in this country, states have sought to regulate it as a form of gambling. Congress was aware of these efforts and answered them by drawing a clear line: States may regulate off-exchange trading, but regulation of trading on DCMs is reserved for the CFTC.

The decision below contravenes recent precedent from this Court enjoining state gambling laws as preempted in a similar case. *See Churchill*

2

*Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.*, 162 F.4th 631 (6th Cir. 2025). It splits from a decision by the Middle District of Tennessee granting Kalshi a preliminary injunction, thus subjecting Kalshi to conflicting obligations within this Circuit. *See KalshiEX LLC v. Orgel*, 2026 WL 474869 (M.D. Tenn. Feb. 19, 2026). And it contravenes the position of the CFTC, which recently explained that "[s]tates cannot invade the CFTC's exclusive jurisdiction" "by re-characterizing swaps trading on DCMs as illegal gambling" and that the states' theory presents "a fundamental threat to Congress's statutory design." CFTC Br. at 2, *N. Am. Derivatives Exch. Inc. v. Nevada (Crypto)*, No. 25-7187 (9th Cir. Feb. 17, 2026) ("CFTC Br."), ECF 38.2, https://perma.cc/B2PF-3F2T. The CFTC's position, which the district court ignored, itself suffices to warrant relief.

Kalshi will face extensive irreparable harms absent relief pending appeal. If Kalshi declines to comply with preempted state laws, it faces the risk of criminal prosecution. But if it complies, it would suffer irreparable reputational harm, incur massive compliance costs that it could not recoup in damages, and risk violating its federal obligation to provide access to its exchange nationwide. This Court found that similar but less extreme harms justified preliminary relief in *Churchill Downs*. Defendants, by contrast, suffer no harm from complying with the Supremacy Clause.

3

Kalshi therefore respectfully requests that the Court grant Kalshi an injunction pending appeal, as well as an administrative stay while this motion is pending. *See United States v. Texas*, 144 S. Ct. 797, 798-99 (2024) (Barrett, J., concurring) (this type of "administrative" relief is a "flexible, short-term tool" designed "to minimize harm while an appellate court deliberates").

## BACKGROUND

### I.   LEGAL BACKGROUND

Before Congress regulated derivatives, many states prohibited futures trading as "gambling." *E.g.*, *Cothran v. Ellis*, 16 N.E. 646, 648 (Ill. 1888). Congress began regulating derivatives trading with the Grain Futures Act of 1922. Then, in 1936, Congress passed the CEA, extending the regulatory framework for grain futures to other commodities. Because these early statutes did not preempt state law, states remained free to regulate derivatives transactions, including by prohibiting "gambling in grain futures." *See Dickson v. Uhlmann Grain Co.*, 288 U.S. 188, 198 (1933).

That changed in 1974, when Congress passed sweeping amendments to the CEA. Congress created the CFTC and granted it "exclusive jurisdiction" over trading on DCMs, thus "supersed[ing]" state laws. 7 U.S.C. § 2(a)(1)(A). Congress's purpose was to "preempt the field insofar as futures regulation is

concerned."  H.R. Rep. No. 93-1383, at 35 (1974) (Conf. Rep.).  Courts immediately recognized the amendments' preemptive effect.  *E.g.*, *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980) (Friendly, J.) ("the CEA preempts the application of state law").

The 1974 amendments swept broadly but did not preempt *all* state derivatives regulation.  Section 2(a) made clear that, beyond the CFTC's "exclusive jurisdiction" over federal exchanges, the CEA did not "supersede or limit the jurisdiction" of "regulatory authorities under the laws … of any State."  7 U.S.C. § 2(a)(1)(A).

Congress gave the CFTC exclusive jurisdiction over "contracts of sale of a commodity for future delivery" (generally known as *futures* contracts), "option[s]," and "transactions involving swaps" traded on DCMs.  *Id.*  The value of futures and options is tied to an underlying commodity, including tangible commodities such as grain, but also intangibles such as interest rate benchmarks and "occurrence[s]."  *Id.* § 1a(19).

The CEA broadly defines "swap" to include an "option," or a contract tied to "the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence," or one of twenty-two enumerated types of agreements, or an agreement that "is" or "becomes commonly known to the trade as a swap," or any combination thereof.  *Id.*

5

§ 1a(47)(A). Like futures and options, swaps can be based on tangible or intangible commodities, including "event[s] or contingenc[ies]." *Id.*

This appeal concerns event contracts, a type of derivative subject to the CFTC's exclusive jurisdiction. The CEA refers to event contracts as "agreements, contracts, transactions, or swaps in excluded commodities that are based upon [an] occurrence." *Id.* § 7a-2(c)(5)(C). In 2010, Congress amended the CEA to add a "Special Rule" that allows the CFTC to review and prohibit event contracts within six categories—including contracts involving "gaming" or "activity that is unlawful under any Federal or State law"—if it concludes the contracts are "contrary to the public interest." *Id.* § 7a-2(c)(5)(C); 17 C.F.R. § 40.11. Absent an adverse public-interest determination, however, a DCM may list such contracts for trading.

The CEA sets out a "comprehensive regulatory structure" for entities seeking to offer derivatives. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 356 (1982) (citation omitted). Derivatives exchanges must become DCMs and comply with 23 "Core Principles" identified in the CEA and CFTC regulations. 7 U.S.C. § 7(d); 17 C.F.R. § 38.5(b). Among many requirements, DCMs must offer "impartial access" to their platforms, 17 C.F.R. § 38.151(b) and monitor for "manipulation," *id.* § 38.251(a).

The CEA also prescribes a detailed system for the approval and listing of contracts on DCMs. DCMs may list new contracts by self-certifying compliance with applicable requirements. 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. §§ 38.4(b), 40.2(a)(1). If the CFTC concludes that an event contract may fall within an enumerated category in the Special Rule, it may subject the contract to a 90-day public-interest review. 17 C.F.R. § 40.11(c). Following review, the CFTC "shall issue an order approving or disapproving" the contract. *Id.* § 40.11(c)(2). The CFTC also may require a DCM to submit a "written demonstration" that it is "in compliance" with one or more Core Principles. *Id.* § 38.5(b).

## II.  FACTUAL AND PROCEDURAL BACKGROUND

In 2020, the CFTC certified Kalshi as a DCM. *See KalshiEX LLC v. CFTC*, 2024 WL 4164694, at *4 (D.D.C. Sep. 12, 2024). Kalshi offers event contracts related to climate, technology, health, popular culture, economics, and more.

In January 2025, Kalshi began offering contracts on sports events. When Kalshi self-certified its sports contracts, the CFTC requested that Kalshi submit a written "[d]emonstration of [c]ompliance" with the CEA. Kalshi responded with detailed filings describing the contracts' compliance with applicable law. *Orgel*, 2026 WL 474869, at *55. The CFTC took no

7

further action with respect to Kalshi's sports contracts, thus allowing Kalshi to list them.

In March 2025, the Ohio Casino Control Commission sent Kalshi a cease-and-desist letter asserting that Kalshi's sports contracts are prohibited by Ohio gambling law and demanding that Kalshi immediately cease offering them in Ohio. The Commission reserved all rights to pursue criminal and civil actions based on Kalshi's past and future conduct within the state. Cease-and-Desist Letter, R.1-1, PageID#25-27. Kalshi then filed this suit on the grounds that the CEA preempts state regulation of Kalshi.

After preliminary injunction briefing was complete, the CFTC supported Kalshi's position in related litigation in the Ninth Circuit. *See generally* CFTC Br. The brief explained that "[s]tates cannot invade the CFTC's exclusive jurisdiction...by re-characterizing swaps trading on DCMs as illegal gambling"; that allowing states to regulate event contracts "is inconsistent with the text, structure, and history of the CEA"; and that the states' theory presents "a fundamental threat to Congress's statutory design" that would create "a seismic shift in the longstanding status quo between CFTC and state authority." *Id.* at 2. The CFTC also issued an Advance Notice of Proposed Rulemaking Related to Prediction Markets, in which it announced its intent

8

to further regulate sports-event contracts. *See Prediction Markets*, 91 Fed. Reg. 12,516, 12,516 (Mar. 16, 2026).

On February 20, 2026, the Middle District of Tennessee granted Kalshi a preliminary injunction in a similar case involving state efforts to regulate Kalshi. The court held that Kalshi was likely to succeed on the merits of its preemption argument, that Kalshi would suffer irreparable harm, and that the balance of equities favored Kalshi. *Orgel*, 2026 WL 474869, at \*7-10. In granting an injunction, the Tennessee district court followed this Court's decision in *Churchill Downs*, which affirmed the grant of a preliminary injunction against Michigan officials who sought to subject a company to preempted state gambling laws. *Id*. at \*9-10.

The court below reached the opposite conclusion shortly thereafter, denying Kalshi a preliminary injunction without oral argument.

Kalshi appealed. Because Defendants did not agree to withhold enforcement against Kalshi pending appeal, Kalshi asked the district court for an injunction pending appeal, which was denied on March 20. Kalshi now respectfully moves this Court for an injunction pending appeal.

## LEGAL STANDARD

"This Court has the power to grant an injunction pending appeal to prevent irreparable harm to the party requesting such relief during the pendency

9

of the appeal." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 572 (6th Cir. 2002); *see* Fed. R. App. P. 8(a).  This Court considers: "(1) whether the movant has shown a strong likelihood of success on the merits; (2) whether the movant will suffer irreparable harm if the injunction is not issued; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuing the injunction." *Overstreet*, 305 F.3d at 573 (quotation omitted).  "[A]ll four factors are not prerequisites but are interconnected considerations that must be balanced together." *Coal. to Def. Affirmative Action v. Granholm*, 473 F.3d 237, 244 (6th Cir. 2006).

## ARGUMENT

This case cries out for an injunction pending appeal.  The decision below creates a split within this Circuit on an important question of federal preemption.  The district court's decision rests on extratextual policy considerations, and its analysis cannot be reconciled with this Court's decision in *Churchill Downs*.  The decision also fails to account for the views of the CFTC itself, which has emphatically confirmed its exclusive jurisdiction to regulate Kalshi.  Without relief pending appeal, Kalshi will suffer irreparable harm, because it will be forced to choose between facing criminal liability under preempted state law or violating its federal obligations.

10

## I.    KALSHI IS LIKELY TO PREVAIL ON APPEAL.

### A.    Kalshi's Contracts Fall Under The CFTC's Exclusive Jurisdiction.

The Supremacy Clause sets out a "fundamental principle of the Constitution" that "Congress has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000).  Congress can preempt state law expressly in a statute; it can preempt an entire field of regulation; and it can preempt state law where compliance with both federal and state law is "impossible" or where state law stands as an "obstacle" to Congress's objectives.  *Id.* at 372-373.  These categories are not "rigidly distinct."  *Id.* at 372 n.6.  The CEA preempts state regulation of trading on DCMs in each of these respects.

Express preemption: The CEA's plain text gives the CFTC "*exclusive jurisdiction*" over swaps traded on DCMs.  7 U.S.C. § 2(a)(1)(A) (emphasis added).  "The explicit statutory conferral of exclusive jurisdiction ... over a particular subject matter is a form of express preemption."  *Transcon. Gas Pipe Line Co. v. Pa. Env't Hearing Bd.*, 108 F.4th 144, 151-152 (3d Cir. 2024).  That is because the "plain meaning of 'exclusive'" "necessarily denies jurisdiction" to other entities.  *Mississippi v. Louisiana*, 506 U.S. 73, 77-78 (1992).  A grant of "exclusive jurisdiction" to a federal agency preempts state

11

efforts to intrude on that "regulatory turf." *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 163 (2016).

This Court recently affirmed a preliminary injunction against state gambling regulators, holding that federal law preempted Michigan's licensing requirements applied to an interstate platform. *Churchill Downs*, 162 F.4th at 638-42. In doing so, the Court noted that where federal jurisdiction is "exclusive," states lack jurisdiction over the same subject—even where state regulation would otherwise apply. *Id.* The same logic applies here.

Field preemption: The CEA's express text resolves this case, but every other indicator of Congressional intent confirms that the CEA preempts the field of regulating trading on DCMs. Congress in the CEA created "a comprehensive regulatory structure" to oversee the "futures trading complex." *Curran*, 456 U.S. at 356 (citation omitted). That scheme leaves no room for parallel state regulation. The 1974 CEA amendments sought to "avoid unnecessary, overlapping and duplicative regulation" in the derivatives markets. *FTC v. Ken Roberts Co.*, 276 F.3d 583, 588 (D.C. Cir. 2001) (citation omitted). Congress sought to bring "the futures markets" "under Federal regulation" because "different State laws would just lead to total chaos." *Hearings Before the S. Comm. on Agric. & Forestry*, 93d Cong., 2d Sess. 249, 685 (1974) (statements of Sen. Clark). And the conference report

12

to the 1974 amendments emphasized Congress's intent to "preempt the field insofar as futures regulation is concerned." H.R. Rep. No. 93-1383, at 35 (1974) (Conf. Rep.).

When Congress considered the 1974 amendments, moreover, a provision of the CEA declined to impair any State law "applicable to any transaction" regulated by the statute. 7 U.S.C. § 6c (1936). Senate drafters accordingly "deleted" this clause "to assure that Federal preemption is complete." 120 Cong. Rec. 30,464 (Sep. 9, 1974) (statement of Sen. Curtis). This and other changes "wholly and unequivocally eliminated" each of the grounds on which the CEA had been found not to preempt state law before the 1974 amendments. Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657, 692-93 (1982). The changes would be incomprehensible if Congress intended to preserve state authority to regulate trading on DCMs.

This Court has therefore held that the CEA's exclusive-jurisdiction provision "ensure[d] that regulatory bodies other than the CFTC would not interfere with the orderly development and enforcement of commodities regulation." *Curran v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 622 F.2d 216, 232 (6th Cir. 1980). Other courts agree. *E.g.*, *Leist*, 638 F.2d at 322 ("the CEA preempts the application of state law"); *Rasmussen v. Thomson &*

13

*McKinnon Auchincloss Kohlmeyer, Inc.*, 608 F.2d 175, 178 (5th Cir. 1979) (state-law "commercial gambling" claim could not proceed because the CEA "preempts all state laws inconsistent with its provisions").

The CFTC also agrees. It has explained that "[s]tates cannot invade the CFTC's exclusive jurisdiction over" DCMs "by re-characterizing swaps trading on DCMs as illegal gambling" and that a contrary conclusion would represent "a seismic shift in the longstanding status quo between CFTC and state authority." CFTC Br. at 2. The CFTC has also initiated a rulemaking as part of its jurisdiction over these contracts. Where "the CFTC has jurisdiction, its power is exclusive." *Chi. Mercantile Exch. v. SEC*, 883 F.2d 537, 548 (7th Cir. 1989).

<u>Conflict preemption</u>: State regulation is also barred under principles of conflict preemption. Ohio requires any entity offering "sports wagers" to ensure that all sports wagers are initiated, received, and completed within the State. Ohio Rev. Code §§ 3775.03(A); 3775.11(A), 3775.12(A). Kalshi cannot run a nationwide exchange while requiring all transactions to come from within Ohio—to say nothing of compliance with 49 other state laws. As the CFTC recently explained, compliance with state law is an "impossibility" for DCMs, because they are "required by federal law to provide 'impartial access' to all eligible participants nationwide," but they "cannot fulfill [that] federal

14

mandate" if subject to state-by-state regulation. CFTC Br. at 26-27 (quoting 17 C.F.R. § 38.151(b)). In addition, "[a]pplying state-by-state local requirements to national commodity exchanges would" pose an "obstacle" to the CEA by creating "the very 'patchwork' that Congress set out to prevent." *Id.* at 27. And Ohio law would interfere with the "method" Congress prescribed to determine whether certain categories of event contracts should be permitted, which is to subject them to CFTC review under the Special Rule—not 50 states' laws. *See Churchill Downs*, 162 F.4th at 638.

## B.  Kalshi's Contracts Are Swaps.

The district court held otherwise on the ground that Kalshi's sports-event contracts are not swaps. That conclusion was wrong. The CEA defines "swap" to include any "contract" that provides for payment "dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). Kalshi's sports contracts operate like its other event contracts—they pay out based on events that are connected to significant financial consequences for a broad ecosystem of stakeholders, including team sponsors, advertisers, television networks, franchises, and more. As the CFTC explained, "sporting events are economic enterprises that generate billions of dollars in economic activity and materially affect both

15

regional and national markets."  CFTC Br. at 19.  These events are unques-tionably associated with *potential* financial consequences, which is all the CEA requires.  *Orgel*, 2026 WL 474869, at *8 ("Congress chose to use 'po-tential,' which is broad.").  And Kalshi's contracts are structured in the same way as other quintessential swaps like "one-touch barrier option[s]."  *Id.*

In holding to the contrary, the district court focused on what it perceived to be (at 11) the "purpose of the statute," concluding that the CEA's "goals are better achieved" by defining swap "as a transaction involving financial in-struments and measures that traditionally and *directly affect commodity prices*."  But that language appears nowhere in the statute—the court in-vented it.  The court's focus on "traditional[]" commodities is entirely at odds with Congress's decision to define swap to include anything that "in the fu-ture becomes … known as a swap."  7 U.S.C. §1a(47)(A)(iv).  What's more, under the CEA, an "occurrence" *is* one type of "commodity."  *Id.* § 1a(19)(iv).  Indeed, "[e]vent contracts" are "*swaps in excluded commodities*."  *Id.* § 7a-2(c)(5)(C).  ("Excluded commodity" is a CEA term of art for intangible com-modities).  And while the court stated that Kalshi's contracts cannot be swaps because they involve gaming, Congress specifically listed "[e]vent contracts" involving "gaming" as one type of "swap."  *Id.*

16

The district court worried (at 12) that treating Kalshi's sports contracts as derivatives would require all sports wagering to take place on DCMs. But nothing about Kalshi's position leads to that implausible result. The CEA preempts state law as to on-DCM trading but leaves states free to regulate off-DCM transactions like bets offered by sportsbooks. *Id.* § 2(a)(1)(A) (except for the CFTC's exclusive jurisdiction over *on-DCM* trading, "nothing" in the remainder of Section 2 shall "restrict" state authorities "from carrying out their duties and responsibilities in accordance with [state] laws").

Nor does it follow that if Kalshi's sports contracts are derivatives, run-of-the-mill sports bets are, too. Pursuant to an express delegation from Congress, the CFTC has explained that derivatives such as swaps must be "*traded* on organized markets and over the counter." *Further Definition of "Swap,"* 77 Fed. Reg. 48,208, 48,217 (Aug. 13, 2012) (emphasis added). But "consumer and commercial transactions" that "are not traded on an organized market or over-the-counter"—such as sports bets—are not swaps. *Id.* at 48,247. While the court wrongly dismissed this distinction as circular (at 13), the CFTC distinguishes insurance contracts from swaps on similar grounds—*i.e.*, they are "not traded" and are "regulated as insurance under applicable state law." *Id.* at 48,212-13. This Court has embraced similar reasoning. *CFTC v. Erskine*, 512 F.3d 309, 323-24 (6th Cir. 2008)

(distinguishing futures, which are "standardized," "fungible," and "traded on an exchange," from forwards, which are not).

## C.   The CEA Preempts State Regulation Of Kalshi's Contracts.

The district court acknowledged (at 17) it was "beyond dispute that the CEA has, and was intended to have, some preemptive effect," but concluded that the CEA does not preempt state gambling laws as to trading on DCMs. That conclusion is untenable.

*First*, it concluded (at 16) that this case is governed by a "strong presumption" against preemption. That conclusion conflicts with binding precedent. As the Supreme Court has explained, courts "do not invoke any presumption against-preemption" where, as here, a statute "contains an express pre-emption clause." *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016). This Court declined to apply a presumption against preemption in a similar case, explaining that "the presumption against preemption doesn't apply" because the "plain text" of the federal law at issue "forecloses Michigan's interpretation" and because "the regulation of *interstate* gambling isn't a traditional area of state regulation." *Churchill Downs*, 162 F.4th at 641 n.5. The district court did not address this precedent, even though the same logic applies here.

18

The court suggested (at 15) that Kalshi waived its argument that the CEA expressly preempts Ohio law.  But that is clearly incorrect.  Kalshi's opening papers explained that "[f]ield preemption can be either *express* or implied" and that "Congress has preempted the field of regulating trading on DCMs, both *expressly in the text of the CEA*" and impliedly.  PI Mot., R.11, PageID#226-228 (emphasis added).  After Defendants invoked the presumption in their opposition papers, Kalshi's reply explained that the presumption does not apply given the CEA's express preemption clause.  PI Reply, R.49, PageID#644.  It thus preserved the argument at every opportunity.

*Second,* the district court cited (at 17) the savings clause in Section 2(a), which provides that it does not "supersede" or "limit" the jurisdiction of "other regulatory authorities" under the laws "of any State."  But this clause contains a crucial proviso—"*[e]xcept as hereinabove provided*" by the grant of exclusive jurisdiction to the CFTC.  7 U.S.C. § 2(a)(1)(A) (emphasis added).  Congress added the proviso for the specific purpose of "clarifying" that "where applicable," the jurisdiction of the CFTC "supersedes State as well as Federal agencies."   H.R. Rep. No. 93-1383, at 35 (1974) (Conf. Rep.).  The savings clause thus reinforces that the CFTC's exclusive jurisdiction "supersede[s]" state authorities from regulating on-DCM transactions.

19

*Third,* the court cited (at 17-18) the preemption provision in Section 16(e)(2), but that provision also supports Kalshi. It was added to the CEA in 2000 along with the amendments allowing for "exempt" transactions. *See* 7 U.S.C. § 6(c). Because exempt transactions are not traded on DCMs, they fall outside the exclusive-jurisdiction provision. Congress enacted Section 16(e)(2) to "preempt" states from applying their gaming laws to certain exempted off-DCM transactions, just as states were already prevented from applying their gaming laws to on-DCM transactions. Indeed, Congress's decision to preempt state gaming law as to exempt transactions turned critically on its recognition that "*the current*" CEA already "supersedes and preempts" state laws "in the case of transactions conducted *on a registered entity,*" and the new provision clarified that "the CEA supersedes and preempts State gaming and bucket shop laws" as to exempt transactions as well. H.R. Rep. No. 106-711, pt. 2, at 71 (2000) (emphasis added).

*Fourth,* the court noted (at 17) that the CFTC's exclusive jurisdiction does not "cover the waterfront of DCM-related activity." That is true, but it follows from the CEA's text, not extratextual, policy-driven carveouts. State regulation of most off-exchange trading is not preempted, 7 U.S.C. § 16(e)(1)(B), nor are states' "general civil or criminal antifraud statute[s]," *id.* § 13a-2(7). Those limitations on the scope of preemption derive from the

20

CEA's text and do not suggest states may apply gambling laws to ban trading on DCMs—the entire preempted field.

*Fifth*, the court maintained (at 16) there was "no evidence that Congress intended to preempt state sports gambling laws." That is mistaken. The Special Rule's reference to "[e]vent contracts" involving "gaming" as one type of "swap" is irrefutable textual evidence that Congress understood that sports contracts would be subject to the CFTC's jurisdiction. 7 U.S.C. § 7a-2(c)(5)(C)(i). Congress, moreover, clearly intended the CFTC to regulate derivatives traded on DCMs although they may have attributes states view as gambling. In the Unlawful Internet Gambling Enforcement Act of 2006 ("UIGEA"), Congress generally adopted state-law definitions of "bet or wager" but expressly provided that "bet or wager" "does not include" "any transaction conducted on or subject to the rules of a" DCM. 31 U.S.C. § 5362(1)(E)(ii). UIGEA confirms Congress's judgment that on-DCM transactions—even those involving "a sporting event"—should be regulated by the CFTC rather than states. *Id*. § 5362(1)(A). By contrast, if the court were correct, nothing would stop states from prohibiting *all event contracts* or even *all futures trading* as a form of gambling—as dozens of states did a century ago. The theory that state gambling laws are exempt from CEA preemption

21

is not amenable to "any limiting principle," and "upend[s] decades of well-settled and Congressionally-mandated exclusive jurisdiction." CFTC Br. at 3.

*Finally*, the court erred in rejecting conflict preemption (at 20) on the ground that Kalshi could "comply with the CEA's core principles and Ohio's sports gambling laws at the same time."  It observed (at 20) there was no evidence "that the CFTC would view geographic restrictions predicated on compliance with state law as 'partial.'"  But the CFTC recently explained that compliance with state laws is an "impossibility" for DCMs because a DCM "cannot fulfill its federal mandate" if it imposes geographical state-by-state restrictions.  CFTC Br. at 26-27.  The district court's reasoning would mean that DCMs *must offer up to 50 different markets for the same contracts*, a "seismic shift."  *Id.* at 2.  The CFTC's position regarding impartial access is a materially new development since this case was briefed, and it strongly favors relief pending appeal.

## II.   KALSHI WILL SUFFER IRREPARABLE HARM ABSENT A STAY.

The district court (at 20) did not dispute that Kalshi would suffer irreparable harm absent relief. Nor could it.  As this Court explained in *Churchill Downs* "when constitutional rights are threatened or impaired, irreparable injury is presumed."  162 F.4th at 642 (citation omitted).  That presumption holds here.

22

Absent an injunction pending appeal, Kalshi faces a classic "Hobson's choice" entitling it to preliminary relief: It must either "violate" state law and "expose" itself "to potentially huge liability," or "suffer the injury of obeying the law during the pendency of the proceedings and any further review." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992). If Kalshi does not comply with Defendants' demands, it could be subject to prosecution under preempted state statutes. *See Orgel*, 2026 WL 474869, at *10 (finding "credible threat of imminent prosecution for a state violation that conflicts with federal law" is irreparable harm).

If, by contrast, Kalshi attempts to comply, it will face numerous other irreparable harms. Defendants have demanded that Kalshi block Ohio users from accessing its contracts through geofencing. Because it is a nationwide exchange, Kalshi does not geofence, and implementing geofencing technology would take months and cost millions. Sottile Decl., R.11-6, PageID#284. Although "the loss of money is not typically considered irreparable harm, that changes if the funds 'cannot be recouped.'" *Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658 (2025) (per curiam) (citation omitted). Defendants have immunity from damages, and anything Kalshi spends to implement geofencing pending appeal would not be recoverable even if Kalshi prevails.

23

Abruptly closing markets to users in Ohio would subject Kalshi to additional irreparable harms.  Kalshi has more than 35,000 users in Ohio.  Sottile Decl., R.11-6, PageID#291.  "[D]iscontinuing access to the nationwide exchange for its [users] would cause lost profits and reputational harm." *Orgel*, 2026 WL 474869, at *10-11.  And "courts can't easily compensate a movant for loss of competitive position and goodwill." *Churchill Downs*, 162 F.4th at 643.  This harm is especially acute given that closing contracts for users in Ohio would affect those users' counterparties in other states—including states like Tennessee where Kalshi has won preliminary injunctions.

Compliance with Ohio law would also require Kalshi to contravene its federal obligations—violating Kalshi's obligation to provide "impartial access" to its exchange, 17 C.F.R. § 38.151(b); *see* CFTC Br. at 26-27.  Complying with state law could accordingly jeopardize Kalshi's status as a DCM—an existential threat.

### III.  THE EQUITIES STRONGLY FAVOR AN INJUNCTION.

The irreparable harms Kalshi will suffer absent an injunction pending appeal easily outweigh any harms Defendants or the public would suffer if an injunction were granted.  This Court in *Churchill Downs* reaffirmed that where state law is preempted, "no cognizable harm results from stopping the conduct, and it's always in the public interest to prevent constitutional

24

violations." 162 F.4th at 642; *accord Orgel*, 2026 WL 474869, at *11. The district court did not address this holding.

The court invoked (at 21) Ohio's interest in "enforcing its duly-enacted laws." But *Churchill Downs* rejected a similar argument based on Michigan's asserted "interest in regulating gambling and its residents' interest in the protections of [state] law," noting that "Michigan didn't lose its ability to regulate gambling other than" what is preempted. 162 F.4th at 643. The same is true here, where Ohio retains its full authority to apply its gambling laws to off-DCM conduct.

Kalshi, moreover, is subject to rigorous regulations and oversight—just from the CFTC. And Kalshi has imposed many of the same consumer protection measures that Defendants have touted, such as allowing users to self-exclude from trading, take trading breaks, and set personal funding caps that limit deposits to Kalshi. Defendants have proffered no evidence that any Kalshi users in Ohio have suffered any harm from trading on Kalshi. The question is not whether Kalshi should be regulated, but rather by whom. Congress's clear answer is the CFTC.

## CONCLUSION

The Court should grant an injunction pending appeal.  Alternatively, the Court should grant an emergency administrative stay while this motion is pending.

Date: March 24, 2026                    Respectfully submitted,

                                        /s/ *William E. Havemann*

GRANT R. MAINLAND                       NEAL KUMAR KATYAL
ANDREW L. PORTER                        JOSHUA B. STERLING
NICOLE D. VALENTE                       WILLIAM E. HAVEMANN
MILBANK LLP                             MILBANK LLP
55 Hudson Yards                         1101 New York Ave., N.W.
New York, NY 10001                      Washington, DC 20005
                                        (202) 835-7505
MICHAEL J. HUNTER                       nkatyal@milbank.com
MATTHEW L. JALANDONI
FLANNERY | GEORGALIS, LLC               *Counsel for Plaintiff-Appellant*
175 South Third Street, Ste. 1060       *KalshiEX LLC*
Columbus, OH 43215

26

**CERTIFICATE OF COMPLIANCE**

This motion complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,200 words, excluding the parts of the motion exempted by Federal Rule of Appellate Procedure 27(a)(2)(B) and 32(f).  This brief also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Georgia font 14-point type face.

Date: March 24, 2026                 /s/ *William E. Havemann*

                                     William E. Havemann

## CERTIFICATE OF SERVICE

I hereby certify that, on March 24, 2026, I caused the foregoing to be electronically filed with the Clerk of the United States Court of Appeals for the Sixth Circuit by using the ACMS system.


Date: March 24, 2026                    /s/ *William E. Havemann*

                                        William E. Havemann

**ADDENDUM**

# TABLE OF CONTENTS

District Court Docket (as of Mar. 24, 2026) ........................................... A1

Kalshi's Notice of Appeal,
Dkt. No. 70 (Mar. 10, 2026) ............................................................ A16

Opinion & Order Denying Motion for Preliminary Injunction,
Dkt. No. 69 (Mar. 9, 2026) .............................................................. A19

Order Denying Kalshi's Motion for Injunction Pending Appeal,
Dkt. No. 73-1 (Mar. 20, 2026) ......................................................... A40

Commission Cease & Desist Letter to Kalshi,
Dkt. No. 1-1 (dated Mar. 31, 2025)................................................... A42

Kalshi's Motion for Preliminary Injunction,
Dkt. No. 11 (Oct. 7, 2025) ............................................................... A45

Kalshi's Reply in Support of Motion for Preliminary Injunction,
Dkt. No. 49 (Dec. 1, 2025)............................................................... A73

Declaration of Xavier Sottile in Support of Kalshi's Motion for
Preliminary Injunction,
Dkt. No. 11-6 (Oct. 7, 2025) ......................................................... A102

APPEAL,AttySealedAcc

# U.S. District Court
## Southern District of Ohio (Columbus)
## CIVIL DOCKET FOR CASE #: 2:25-cv-01165-SDM-CMV

Kalshiex LLC v. Schuler et al
Assigned to: Chief District Judge Sarah D. Morrison
Referred to: Magistrate Judge Chelsey M. Vascura
Case in other court: Sixth Circuit Court of Appeals, 26-03196
Cause: 28:1331 Fed. Question

Date Filed: 10/07/2025
Jury Demand: None
Nature of Suit: 950 Constitutional - State Statute
Jurisdiction: Federal Question

**Plaintiff**

**Kalshiex LLC**                    represented by     **Michael Jason Hunter**
Flannery Georgalis, LLC
175 S. Third Street
Suite 285
Columbus, OH 43215
614-324-4139
Fax: 614-526-0601
Email: mhunter@flannerygeorgalis.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrew Leighton Porter**
Milbank LLP
55 Hudson Yards
New York, NY 10001-2163
212-530-5000
Fax: 212-530-5219
Email: aporter@milbank.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Connor A. Organ**
Organ Law LLP
1330 Dublin Rd.
Columbus, OH 43215
614-869-3220
Email: corgan@organlegal.com
*TERMINATED: 10/24/2025*

**Grant R. Mainland**
Milbank LLP
55 Hudson Yards
New York City, NY 10001
212-530-5251
Email: gmainland@milbank.com
*PRO HAC VICE*

**A1**

*ATTORNEY TO BE NOTICED*

**Joshua Brooks Sterling**
Milbank LLP
1101 New York Avenue, NW
Washington, DC 20005
202-835-7535
Email: jsterling@milbank.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew L. Jalandoni**
Flannery Georgalis LLC
175 S. Third St.
Suite 285
Columbus, OH 43215
614-324-1329
Fax: 614-526-0601
Email: mjalandoni@flannerygeorgalis.com
*ATTORNEY TO BE NOTICED*

**Neal Kumar Katyal**
Milbank LLP
1101 New York Avenue, NW
Washington, DC 20005
202-835-7505
Email: nkatyal@milbank.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shawn J Organ**
Organ Law LLP
1330 Dublin Road
Columbus, OH 43215
614-481-0901
Email: sjorgan@organlegal.com
*TERMINATED: 10/24/2025*

**William Ernest Havemann**
Milbank LLP
1101 New York Avenue, NW
Washington, DC 20005
202-835-7518
Email: whavemann@milbank.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Matthew T Schuler**                        represented by    **Rajeev K. Adlakha**
Vorys, Sater, Seymour and Pease LLP
200 Public Square, Suite 1400

**A2**

Cleveland, OH 44114
216-479-6100
Fax: 216-479-6060
Email: rkadlakha@vorys.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Celina Jasmine Needle**
Vorys Sater Seymour & Pease LLP
52 E Gay Street
Columbus, OH 43215
614-464-5603
Email: cjneedle@vorys.com
*ATTORNEY TO BE NOTICED*

**Christopher Logan Ingram**
Vorys Sayer Seymour & Pease LLP
52 East Gay Street
P.O. Box 1008
Columbus, OH 43216
614-464-5480
Fax: 614-719-4606
Email: clingram@vorys.com
*ATTORNEY TO BE NOTICED*

**Garrett Michael Anderson**
Vorys, Sater, Seymour & Pease LLP
52 E. Gay St
Columbus, OH 43215
614-464-6457
Email: gmanderson@vorys.com
*ATTORNEY TO BE NOTICED*

**Kara Marie Mundy**
Vorys, Sater, Seymour and Pease, LLP
52 East Gay Street
PO Box 1008
Columbus, OH 43216
614-464-5669
Fax: 614-719-4709
Email: kmmundy@vorys.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Thomas J Stickrath**                    represented by   **Rajeev K. Adlakha**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Celina Jasmine Needle**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Christopher Logan Ingram**

A3

(See above for address)
*ATTORNEY TO BE NOTICED*

**Garrett Michael Anderson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kara Marie Mundy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Sheetal Bajoria**                    represented by   **Rajeev K. Adlakha**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Celina Jasmine Needle**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher Logan Ingram**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Garrett Michael Anderson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kara Marie Mundy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Scott P Borgemenke**                  represented by   **Rajeev K. Adlakha**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Celina Jasmine Needle**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Christopher Logan Ingram**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Garrett Michael Anderson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kara Marie Mundy**

**A4**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Keith Cheney**                          represented by   **Rajeev K. Adlakha**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Celina Jasmine Needle**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Christopher Logan Ingram**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Garrett Michael Anderson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kara Marie Mundy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Penelope Cunningham**                   represented by   **Rajeev K. Adlakha**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Celina Jasmine Needle**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Christopher Logan Ingram**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Garrett Michael Anderson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kara Marie Mundy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Christopher Smitherman**                represented by   **Rajeev K. Adlakha**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Celina Jasmine Needle**

A5

(See above for address)
*ATTORNEY TO BE NOTICED*

**Christopher Logan Ingram**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Garrett Michael Anderson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kara Marie Mundy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Triffon Callos**                    represented by   **Rajeev K. Adlakha**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Garrett Michael Anderson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Celina Jasmine Needle**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Christopher Logan Ingram**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kara Marie Mundy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Ohio Casino Control Commission**         represented by   **Rajeev K. Adlakha**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Celina Jasmine Needle**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Christopher Logan Ingram**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Garrett Michael Anderson**
(See above for address)

**A6**

*ATTORNEY TO BE NOTICED*

**Kara Marie Mundy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Dave Yost**                    represented by    **Mark N. Kittel**
Ohio Attorney General
Antitrust
30 E. Broad St.
26th Floor
Columbus, OH 43215
614-466-4328
Email: mark.kittel@ohioago.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher Logan Ingram**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Neema Ashou**
Office of the Ohio Attorney General
Employment Law Section
30 E. Broad St
16th Floor
Colmbus, OH 43215
614-644-7257
Fax: 614-752-4677
Email: ELSReview@OhioAGO.gov
*ATTORNEY TO BE NOTICED*

**Rachel V. Clark**
2540 Osceola Ave
Columbus, OH 43211
513-289-2883
Email: clark.2087@live.com
*ATTORNEY TO BE NOTICED*

**Amicus**

**Tribal Amici**                    represented by    **Ronald J Kozar**
Kettering Tower
Suite 2830
40 N Main Street
Dayton, OH 45423
937-222-6764
Email: ronald.kozar@gmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Bryan T. Newland**
Powers, Pyles, Sutter & Verville PC
4326 S. Bay Mills Point Rd, Br

A7

Brimley, MI 49715
517-862-5570
Email: bryan.newland@powerslaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elizabeth A. Bower**
1899 L Street NW
Suite 1200
Washington, DC 20036
434-996-0802
Email: ebower@hobbsstraus.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jens Wesley Camp**
Hobbs, Straus, Dean & Walker, LLP
1899 L St, NW
Suite 1200
Washington, DC 20036
202-822-8282
Email: jcamp@hobbsstraus.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph H. Webster**
Hobbs, Straus, Dean & Walker LLP
1899 L Street, NW
Ste 1200
Washington, DC 20036
202-822-8282
Fax: 202-296-8834
Email: jwebster@hobbsstraus.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael C. Hoenig**
Yuhaaviatam of San Manuel Nation
422 1st St SE
Washington, DC 20003
909-936-9684
Email: michael.hoenig@sanmanuel-nsn.gov
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Scott D. Crowell**
Crowell Law Offices
1487 W Sr 89 A
Suite 8
Sedona, AZ 86336
425-802-5390
Email: scottcrowell@clotag.net
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**A8**

| Date Filed | # | Docket Text |
|---|---|---|
| 10/07/2025 | 1 | COMPLAINT against All Defendants ( Filing fee $ 405 paid - receipt number: AOHSDC-10716406), filed by Kalshiex LLC. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8) (Organ, Shawn) (Entered: 10/07/2025) |
| 10/07/2025 | 2 | Corporate Disclosure Statement by Plaintiff Kalshiex LLC. (Organ, Shawn) (Entered: 10/07/2025) |
| 10/07/2025 | 3 | [Document was inadvertently filed and has been restricted. The party has re-filed the correct document as ECF # 4 ] - NOTICE by Plaintiff Kalshiex LLC *of Civil Cover Sheet.* (Organ, Shawn) Modified on 10/8/2025 (kk2). (Entered: 10/07/2025) |
| 10/07/2025 | 4 | NOTICE by Plaintiff Kalshiex LLC *of Civil Cover Sheet.* (Organ, Shawn) (Entered: 10/07/2025) |
| 10/07/2025 | 5 | MOTION for Leave to Appear Pro Hac Vice (Filing fee of $200 paid, receipt number AOHSDC-10716617) of William E. Havemann by Plaintiff Kalshiex LLC. (Attachments: # 1 Exhibit 1) (Organ, Shawn) (Entered: 10/07/2025) |
| 10/07/2025 | 6 | MOTION for Leave to Appear Pro Hac Vice (Filing fee of $200 paid, receipt number AOHSDC-10716627) of Neal Kumar Katyal by Plaintiff Kalshiex LLC. (Attachments: # 1 Exhibit 1) (Organ, Shawn) (Entered: 10/07/2025) |
| 10/07/2025 | 7 | MOTION for Leave to Appear Pro Hac Vice (Filing fee of $200 paid, receipt number AOHSDC-10716633) of Grant R. Mainland by Plaintiff Kalshiex LLC. (Attachments: # 1 Exhibit 1) (Organ, Shawn) (Entered: 10/07/2025) |
| 10/07/2025 | 8 | MOTION for Leave to Appear Pro Hac Vice (Filing fee of $200 paid, receipt number AOHSDC-10716636) of Andrew L. Porter by Plaintiff Kalshiex LLC. (Attachments: # 1 Exhibit 1) (Organ, Shawn) (Entered: 10/07/2025) |
| 10/07/2025 | 9 | MOTION for Leave to Appear Pro Hac Vice (Filing fee of $200 paid, receipt number AOHSDC-10716637) of Joshua B. Sterling by Plaintiff Kalshiex LLC. (Attachments: # 1 Exhibit 1) (Organ, Shawn) (Entered: 10/07/2025) |
| 10/07/2025 | 10 | REQUEST for Issuance of Summons. (Organ, Shawn) (Entered: 10/07/2025) |
| 10/07/2025 | 11 | MOTION for Preliminary Injunction by Plaintiff Kalshiex LLC. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Rule 65.1 Attestation) (Organ, Shawn) (Entered: 10/07/2025) |
| 10/08/2025 | 12 | NOTATION ORDER granting 5 , 6 , 7 , 8 , 9 Motions for Leave to Appear Pro Hac Vice of William E Havemann, Neal Kumar Katyal, Grant R Mainland, Andrew L Porter, and Joshua B Sterling as co-counsel. Co-counsel is directed to register for e-filing through PACER unless they have done so previously. Signed by Magistrate Judge Chelsey M. Vascura on 10/8/2025. (kk2) (Entered: 10/08/2025) |
| 10/08/2025 | 13 | Summons Issued as to Sheetal Bajoria, Scott P Borgemenke, Triffon Callos, Keith Cheney, Penelope Cunningham, Ohio Casino Control Commission, Matthew T Schuler, Christopher Smitherman, Thomas J Stickrath, and Dave Yost (kk2) (Entered: 10/08/2025) |
| 10/15/2025 | 14 | NOTICE of Appearance by Mark N. Kittel for Defendant Dave Yost (Kittel, Mark) (Entered: 10/15/2025) |
| 10/15/2025 | 15 | NOTICE of Appearance by Rachel V. Clark for Defendant Dave Yost (Clark, Rachel) (Entered: 10/15/2025) |

**A9**

| 10/15/2025 | 16 | NOTICE of Appearance by Neema Ashou for Defendant Dave Yost (Ashou, Neema) (Entered: 10/15/2025) |
|---|---|---|
| 10/15/2025 | 17 | NOTICE of Appearance by Kara Marie Mundy for Defendants Sheetal Bajoria, Scott P Borgemenke, Triffon Callos, Keith Cheney, Penelope Cunningham, Ohio Casino Control Commission, Matthew T Schuler, Christopher Smitherman, Thomas J Stickrath (Mundy, Kara) (Entered: 10/15/2025) |
| 10/15/2025 | | NOTICE of Appearance by Rajeev K. Adlakha, Christopher Logan Ingram, Garrett Michael Anderson, and Celina Jasmine Needle for Defendants Sheetal Bajoria, Scott P Borgemenke, Triffon Callos, Keith Cheney, Penelope Cunningham, Ohio Casino Control Commission, Matthew T Schuler, Christopher Smitherman, Thomas J Stickrath<br><br>**SEE DOCKET # 17 FOR DOCUMENT** (kk2) (Entered: 10/16/2025) |
| 10/21/2025 | 18 | NOTICE of Hearing:<br><br>Informal Conference pursuant to Rule 65.1 set for 11/3/2025 10:00 AM in Courtroom 132 - Columbus before Chief District Judge Sarah D. Morrison. (merc) (Entered: 10/21/2025) |
| 10/21/2025 | 19 | NOTICE of Appearance by Michael Jason Hunter for Plaintiff Kalshiex LLC (Hunter, Michael) (Entered: 10/21/2025) |
| 10/21/2025 | 20 | NOTICE of Appearance by Matthew L. Jalandoni for Plaintiff Kalshiex LLC (Jalandoni, Matthew) (Entered: 10/21/2025) |
| 10/23/2025 | 21 | MOTION to Substitute Attorney , MOTION to Withdraw as Attorney by Plaintiff Kalshiex LLC. (Organ, Connor) (Entered: 10/23/2025) |
| 10/23/2025 | 22 | Joint MOTION for Extension of Time to File Response/Reply re 11 MOTION for Preliminary Injunction by Defendants Sheetal Bajoria, Scott P Borgemenke, Triffon Callos, Keith Cheney, Penelope Cunningham, Ohio Casino Control Commission, Matthew T Schuler, Christopher Smitherman, Thomas J Stickrath. New date requested 11/7/2025. (Attachments: # 1 Text of Proposed Order) (Ingram, Christopher) Modified on 10/24/2025 to correct text, ECF filing event, and add missing document link (kk2) (Entered: 10/23/2025) |
| 10/24/2025 | 23 | NOTATION ORDER granting 22 Motion for Extension of Time to File Response/Reply re 11 MOTION for Preliminary Injunction . Responses due by 11/7/2025; Replies due by 12/1/2025. Signed by Magistrate Judge Chelsey M. Vascura on 10/24/2025. (agm) (Entered: 10/24/2025) |
| 10/24/2025 | 24 | NOTATION ORDER granting 21 Motion to Substitute Attorney. Attorneys Matthew Jaladoni and Michael Hunter to serve as Trial and Co-Counsel, respectively; granting 21 Motion to Withdraw as Attorney. Attorney Connor A. Organ and Shawn J Organ terminated. Signed by Magistrate Judge Chelsey M. Vascura on 10/24/2025. (agm) (Entered: 10/24/2025) |
| 10/27/2025 | 25 | NOTICE by Plaintiff Kalshiex LLC *of Designation of Trial Attorney* (Hunter, Michael) (Entered: 10/27/2025) |
| 10/31/2025 | 26 | Unopposed MOTION for Leave to File Excess Pages by Defendants Sheetal Bajoria, Scott P Borgemenke, Triffon Callos, Keith Cheney, Penelope Cunningham, Ohio Casino Control Commission, Matthew T Schuler, Christopher Smitherman, Thomas J Stickrath. (Attachments: # 1 Text of Proposed Order Proposed Order) (Ingram, Christopher) (Entered: 10/31/2025) |

**A10**

| | | |
|---|---|---|
| 10/31/2025 | 27 | WAIVER OF SERVICE Returned Executed. Waiver sent to All Defendants on 10/7/2025, answers due 12/08/2025. (Hunter, Michael) Modified on 11/3/2025 to add service and answer due dates (kk2) (Entered: 10/31/2025) |
| 11/02/2025 | 28 | NOTATION ORDER granting 26 Motion for Leave to File Excess Pages. Signed by Chief District Judge Sarah D. Morrison on 11/2/2025. (merc) (Entered: 11/02/2025) |
| 11/03/2025 | 29 | Notation Minute Entry for proceedings held before Chief District Judge Sarah D. Morrison: Informal Conference pursuant to Local Rule 65.1held on 11/3/2025. Appeared for the Plaintiff: William Havemann, Joshua Sterling, Matthew Jalandoni, Michael Hunter; For the Defendants: Christopher Ingram, Kara Mundy, Mark Nittel, Joseph Shamansky, Rachel Clark, Neema Ashou, Maggie Shaver. (Court Reporter: Allison Kimmel) (merc) (Entered: 11/03/2025) |
| 11/05/2025 | 30 | Transcript of Local Rule 65.1 Informal Hearing Proceedings held on November 3, 2025, before Chief Judge Sarah D. Morrison. Court Reporter/Transcriber Allison Lewis Kimmel, FAPR, RDR, CRR, Telephone number 614.719.3225. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.<br><br>NOTICE RE: REDACTION OF TRANSCRIPTS: Within 5 business days of this filing, each party shall inform the Court, by filing a Notice of Redaction, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ohsd.uscourts.gov (Forms - Electronic Availability of Transcripts). Please read this policy carefully.<br><br>For a complete copy of a transcript, please contact the Court Reporter or the Clerk's Office.. Redaction Request due 11/26/2025. Redacted Transcript Deadline set for 12/8/2025. Release of Transcript Restriction set for 2/3/2026. (ak) (Entered: 11/05/2025) |
| 11/07/2025 | 31 | RESPONSE in Opposition re 11 MOTION for Preliminary Injunction filed by Defendants Sheetal Bajoria, Scott P Borgemenke, Triffon Callos, Keith Cheney, Penelope Cunningham, Ohio Casino Control Commission, Matthew T Schuler, Christopher Smitherman, Thomas J Stickrath, Dave Yost. (Attachments: # 1 Exhibit Exhibit 1 - Schuler Declaration, # 2 Exhibit Exhibit 2 - Lake Declaration, # 3 Exhibit Exhibit 3 - CFTC Advisory, # 4 Exhibit Exhibit 4 - Nevada Advisory) (Ingram, Christopher) (Additional attachment(s) added on 11/10/2025: # 5 corrected response in opposition) (sem). (Entered: 11/07/2025) |
| 11/13/2025 | 32 | Unopposed MOTION for Leave to File Excess Pages by Plaintiff Kalshiex LLC. (Attachments: # 1 Text of Proposed Order) (Hunter, Michael) (Entered: 11/13/2025) |
| 11/14/2025 | 33 | NOTATION ORDER GRANTING Unopposed 32 Motion for Leave to File Excess Pages by Plaintiff Kalshiex. By Chief District Judge Sarah D. Morrison on 11/14/2025. (tb) (Entered: 11/14/2025) |
| 11/14/2025 | 34 | MOTION for Leave to File *to file amicus brief* by Defendant Tribal Amici. (Attachments: # 1 Exhibit 1) (Kozar, Ronald) (Entered: 11/14/2025) |
| 11/14/2025 | 35 | Corporate Disclosure Statement by Defendant Tribal Amici. (Kozar, Ronald) (Entered: 11/14/2025) |
| 11/14/2025 | 36 | MOTION for Leave to Appear Pro Hac Vice (Filing fee of $200 paid, receipt number AOHSDC-10764937) of Elizabeth A. Bower by Defendant Tribal Amici. (Attachments: # 1 Exhibit 1) (Kozar, Ronald) (Entered: 11/14/2025) |

**A11**

| 11/14/2025 | 37 | MOTION for Leave to Appear Pro Hac Vice (Filing fee of $200 paid, receipt number AOHSDC-10764960) of Jens W. Camp by Defendant Tribal Amici. (Attachments: # 1 Exhibit 1) (Kozar, Ronald) (Entered: 11/14/2025) |
| --- | --- | --- |
| 11/14/2025 | 38 | MOTION for Leave to Appear Pro Hac Vice (Filing fee of $200 paid, receipt number AOHSDC-10764971) of Scott D. Crowell by Defendant Tribal Amici. (Attachments: # 1 Exhibit 1) (Kozar, Ronald) (Entered: 11/14/2025) |
| 11/14/2025 | 39 | MOTION for Leave to Appear Pro Hac Vice (Filing fee of $200 paid, receipt number AOHSDC-10764979) of Michael C. Hoenig by Defendant Tribal Amici. (Attachments: # 1 Exhibit 1) (Kozar, Ronald) (Entered: 11/14/2025) |
| 11/14/2025 | 40 | MOTION for Leave to Appear Pro Hac Vice (Filing fee of $200 paid, receipt number AOHSDC-10764983) of Bryan T. Newland by Defendant Tribal Amici. (Attachments: # 1 Exhibit 1) (Kozar, Ronald) (Entered: 11/14/2025) |
| 11/14/2025 | 41 | MOTION for Leave to Appear Pro Hac Vice (Filing fee of $200 paid, receipt number AOHSDC-10764992) of Joseph H. Webster by Defendant Tribal Amici. (Attachments: # 1 Exhibit 1) (Kozar, Ronald) (Entered: 11/14/2025) |
| 11/17/2025 | 42 | NOTICE OF DEFICIENCY re 38 MOTION for Leave to Appear Pro Hac Vice (Filing fee of $200 paid, receipt number AOHSDC-10764971) of Scott D. Crowell filed by Tribal Amici: **Certificate of Good Standing**. The Certificate of Good Standing is not from the highest court of a State or the District of Columbia.<br><br>Deficiency Deadline due by 12/1/2025. (kk2) (Entered: 11/17/2025) |
| 11/17/2025 | 43 | NOTATION ORDER granting 36 , 37 , 39 , 40 , 41 Motions for Leave to Appear Pro Hac Vice of Elizabeth A Bower, Jens W Camp, Michael C Hoenig, Bryan T Newland, and Joseph H Webster as co-counsel. Co-counsel is directed to register for e-filing through PACER unless they have done so previously. Signed by Magistrate Judge Chelsey M. Vascura on 11/17/2025. (kk2) (Entered: 11/17/2025) |
| 11/19/2025 | 44 | NOTATION ORDER granting 38 Motion for Leave to Appear Pro Hac Vice of Scott David Crowell. PHV Counsel is directed to register for e-filing through PACER unless they have done so previously. Signed by Magistrate Judge Chelsey M. Vascura on 11/19/2025. (er) (Entered: 11/19/2025) |
| 11/26/2025 | 45 | MOTION to File Document Under Seal by Plaintiff Kalshiex LLC. (Attachments: # 1 Exhibit A - Declaration of Xavier Sottile, # 2 Text of Proposed Order) (Hunter, Michael) (Entered: 11/26/2025) |
| 11/26/2025 | 46 | MOTION for Leave to File *Instanter Defendants' Notice of Supplemental Authority* by Defendants Sheetal Bajoria, Scott P Borgemenke, Triffon Callos, Keith Cheney, Penelope Cunningham, Ohio Casino Control Commission, Matthew T Schuler, Christopher Smitherman, Thomas J Stickrath, Dave Yost. (Attachments: # 1 Exhibit Ex. 1 Defendants' Notice of Supplemental Authority, # 2 Exhibit Ex. A Hendrick II - Order Dissolving Preliminary Injunction) (Ingram, Christopher) (Entered: 11/26/2025) |
| 12/01/2025 | 47 | ORDER granting 45 Motion to File Document Under Seal. Plaintiff may file the two exhibits UNDER SEAL. Plaintiff must also file on the public docket a redacted version of the exhibits WITHIN SEVEN DAYS of making its filings under seal. Signed by Magistrate Judge Chelsey M. Vascura on 12/1/2025. (agm) (Entered: 12/01/2025) |
| 12/01/2025 | 48 | Unopposed MOTION for Extension of Time to File Answer by Defendants Sheetal Bajoria, Scott P Borgemenke, Triffon Callos, Keith Cheney, Penelope Cunningham, Ohio Casino Control Commission, Matthew T Schuler, Christopher Smitherman, Thomas J |

**A12**

| | | |
|---|---|---|
| | | Stickrath, Dave Yost. (Attachments: # 1 Text of Proposed Order) (Ingram, Christopher) Modified docket text on 12/3/2025 (sem). (Entered: 12/01/2025) |
| 12/01/2025 | 49 | REPLY to Response to Motion re 11 MOTION for Preliminary Injunction filed by Plaintiff Kalshiex LLC. (Attachments: # 1 Exhibit 1 - KalshiEX Letter to CFTC (Sealed), # 2 Exhibit 2 - Confidential Memorandum (Sealed)) (Hunter, Michael) (Entered: 12/01/2025) |
| 12/02/2025 | 52 | NOTATION ORDER granting 48 Motion for Extension of Time to Answer. Defendants' answer due within 21 days of the Court's ruling on Plaintiff's pending Motion for Preliminary Injunction (ECF No. 11 ). Signed by Magistrate Judge Chelsey M. Vascura on 12/2/2025. (agm) (Entered: 12/02/2025) |
| 12/08/2025 | 53 | NOTICE by Plaintiff Kalshiex LLC re 47 Order on Motion to File Document Under Seal, 49 Reply to Response to Motion, - *Notice of Filing of Redacted Exhibits* (Attachments: # 1 Exhibit 1 - Redacted KalshiEx Letter to CFTC, # 2 Exhibit 2 - Redacted Confidential Memorandum) (Hunter, Michael) (Entered: 12/08/2025) |
| 12/09/2025 | 54 | NOTATION ORDER Tribal Amici's 34 Motion for Leave to File is GRANTED. The Clerk is DIRECTED to separately filed Tribal Amici's Amicus Brief on the docket. Signed by Chief District Judge Sarah D. Morrison on 12/9/2025. (merc) (Entered: 12/09/2025) |
| 12/11/2025 | 55 | Amicus Brief by Tribal Amici. (merc) (Entered: 12/11/2025) |
| 12/18/2025 | 56 | NOTATION ORDER Defendants' 46 Motion for Leave to File is GRANTED. The Clerk is DIRECTED to separately file the Notice of Supplemental Authority on the docket.. Signed by Chief District Judge Sarah D. Morrison on 12/17/2025. (merc) (Entered: 12/18/2025) |
| 12/18/2025 | 57 | DEFENDANTS' NOTICE OF SUPPLEMENTAL AUTHORITY (See 56 Order on Motion for Leave to File) (Attachments: # 1 Exhibit A) (merc) (Entered: 12/18/2025) |
| 12/29/2025 | 58 | Unopposed MOTION to Withdraw as Attorney *for Limited Withdrawal as to the Representation of the Karuk Tribe* by Amicus Tribal Amici. (Attachments: # 1 Text of Proposed Order For Limited Withdrawal of Representation as to the Karuk Tribe) (Crowell, Scott) (Entered: 12/29/2025) |
| 12/30/2025 | 59 | NOTATION ORDER granting 58 Motion to Withdraw as Attorney. Attorney Scott Crowell is WITHDRAWN from representation of the Karuk Tribe. Signed by Magistrate Judge Chelsey M. Vascura on 12/30/2025. (agm) (Entered: 12/30/2025) |
| 12/31/2025 | 60 | MOTION for Leave to File *a Response to Defendants' Notice of Supplemental Authority* by Plaintiff Kalshiex LLC. (Attachments: # 1 Exhibit A - Plaintiff's Proposed Response to Defendants' Notice of Supplemental Authority) (Jalandoni, Matthew) (Entered: 12/31/2025) |
| 12/31/2025 | 61 | MOTION for Leave to File *Instanter Plaintiff's Notice of Supplemental Authority* by Plaintiff Kalshiex LLC. (Attachments: # 1 Exhibit 1 - Plaintiff's Notice of Supplemental Authority, # 2 Exhibit 2 - Churchill Downs Opinion) (Jalandoni, Matthew) (Entered: 12/31/2025) |
| 01/13/2026 | 62 | RESPONSE in Opposition re 60 MOTION for Leave to File *a Response to Defendants' Notice of Supplemental Authority* filed by Defendants Sheetal Bajoria, Scott P Borgemenke, Triffon Callos, Keith Cheney, Penelope Cunningham, Ohio Casino Control Commission, Matthew T Schuler, Christopher Smitherman, Thomas J Stickrath, Dave Yost. (Ingram, Christopher) (Entered: 01/13/2026) |
| 01/13/2026 | 63 | RESPONSE in Opposition re 61 MOTION for Leave to File *Instanter Plaintiff's Notice of Supplemental Authority* filed by Defendants Sheetal Bajoria, Scott P Borgemenke, Triffon Callos, Keith Cheney, Penelope Cunningham, Ohio Casino Control Commission, Matthew |

| | | T Schuler, Christopher Smitherman, Thomas J Stickrath, Dave Yost. (Ingram, Christopher) (Entered: 01/13/2026) |
|---|---|---|
| 01/23/2026 | 64 | MOTION for Leave to File *Notice of Supplemental Authority* by Defendants Sheetal Bajoria, Scott P Borgemenke, Triffon Callos, Keith Cheney, Penelope Cunningham, Ohio Casino Control Commission, Matthew T Schuler, Christopher Smitherman, Thomas J Stickrath, Dave Yost. (Attachments: # 1 Exhibit, # 2 Exhibit) (Ingram, Christopher) (Entered: 01/23/2026) |
| 01/27/2026 | 65 | NOTATION ORDER As explained in the Court's Standing Orders for Civil Cases, motions for leave to file supplemental authority are generally disfavored. (Standing Orders, § I.D.2.) Because Kalshi is pursuing several similar cases across the country, the Court will accept only a bare notice of new decisions in those cases such notice SHALL NOT contain any argument or other discussion of the decision(s). Any violations of this instruction will result in the striking of the notice.<br><br>To that end, the Court will not consider any arguments or discussion contained in Defendants previously filed 57 Notice of Supplemental Authority Plaintiff's 60 Motion for Leave to File a Response is DENIED.<br><br>Plaintiff's 61 Motion for Leave to File and Defendants' 64 Motion for Leave to File are GRANTED, but the Court will not consider any arguments or discussion contained in either filing. Signed by Chief District Judge Sarah D. Morrison on 1/27/2026. (merc) (Entered: 01/27/2026) |
| 02/05/2026 | 66 | MOTION for Leave to File *Instanter Plaintiff's Notice of Supplemental Authority* by Plaintiff Kalshiex LLC. (Attachments: # 1 Exhibit 1 - Plaintiff's Notice of Supplemental Authority, # 2 Exhibit 2 - Chairman Selig's Remarks, # 3 Exhibit 3 - CFTC's Feb. 4, 2026, Press Release) (Jalandoni, Matthew) (Entered: 02/05/2026) |
| 02/11/2026 | 67 | RESPONSE in Opposition to Motion re 66 MOTION for Leave to File *Instanter Plaintiff's Notice of Supplemental Authority* filed by Defendants Sheetal Bajoria, Scott P Borgemenke, Triffon Callos, Keith Cheney, Penelope Cunningham, Ohio Casino Control Commission, Matthew T Schuler, Christopher Smitherman, Thomas J Stickrath. (Ingram, Christopher) Modified on 2/12/2026 to clarify text (kk2). (Entered: 02/11/2026) |
| 02/24/2026 | 68 | MOTION for Leave to File *Instanter Plaintiff's Notice of Supplemental Authority* by Plaintiff Kalshiex LLC. (Attachments: # 1 Exhibit 1 - Plaintiff's Notice of Supplemental Authority, # 2 Exhibit 2 - M.D. Tenn Memorandum Opinion, # 3 Exhibit 3 - M.D. Tenn Order) (Jalandoni, Matthew) (Entered: 02/24/2026) |
| 03/09/2026 | 69 | OPINION AND ORDER denying Plaintiff's 11 Motion for Preliminary Injunction, and terminating 66 and 68 Motions for Leave to File. Signed by Chief District Judge Sarah D. Morrison on 3/9/2026. (merc) (Entered: 03/09/2026) |
| 03/10/2026 | 70 | NOTICE OF APPEAL (Filing fee $ 605 has been paid, receipt number AOHSDC-10933087) by Plaintiff Kalshiex LLC. (Hunter, Michael) (Entered: 03/10/2026) |
| 03/11/2026 | 71 | USCA Case Number 26-3196 for 70 Notice of Appeal filed by Kalshiex LLC; Appeal Case Manager, Monica (513-564-7021). (kh) (Entered: 03/12/2026) |
| 03/19/2026 | 72 | MOTION for an Immediate Injunction Pending Appeal by Plaintiff Kalshiex LLC. (Hunter, Michael) (Entered: 03/19/2026) |
| 03/20/2026 | 73 | ORDER denying Plaintiff's 72 Motion for an Immediate Injunction Pending Appeal. Signed by Chief District Judge Sarah D. Morrison on 3/20/2026. (merc) Corrected attachment on 3/20/2026 (merc). (Entered: 03/20/2026) |

**A14**

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 03/24/2026 08:17:16 | | | |
| **PACER Login:** | mthm1720 | **Client Code:** | 49130.00007 |
| **Description:** | Docket Report | **Search Criteria:** | 2:25-cv-01165-SDM-CMV |
| **Billable Pages:** | 15 | **Cost:** | 1.50 |

**A15**

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

<table>
<tr><td>

**KALSHIEX LLC,**

*Plaintiff,*

*v.*

**MATTHEW T. SCHULER,** *et al.,*

*Defendants.*

</td><td>

**Case No. 2:25-cv-1165**

**Chief Judge Sarah D. Morrison**

**Magistrate Judge Chelsey M. Vascura**

</td></tr>
</table>

## PLAINTIFF'S NOTICE OF APPEAL

Notice is hereby given that Plaintiff KalshiEX LLC ("Kalshi") hereby appeals to the United States Court of Appeals for the Sixth Circuit from the Court's Opinion and Order entered in this action on March 9, 2026, District Court's ECF No. 69, denying Kalshi's motion for preliminary injunction.


DATE: March 10, 2026.

Respectfully submitted,

/s/ Michael J. Hunter
Michael J. Hunter (0076815), *Trial Attorney*
Matthew L. Jalandoni (0087074)
**Flannery | Georgalis, LLC**
175 South Third Street, Ste. 1060
Columbus, OH 43215
Telephone: 614-324-4139
Fax: 614-526-0601
mhunter@flannerygeorgalis.com
mjalandoni@flannerygeorgalis.com

and

**A16**

Neal Katyal (*pro hac vice*)
Joshua B. Sterling (*pro hac vice*)
William E. Havemann (*pro hac vice*)
**Milbank LLP**
1101 New York Avenue NW
Washington D.C. 20005
Telephone: 202-835-7500
Facsimile: 202-263-7586

Grant R. Mainland (*pro hac vice*)
Andrew L. Porter (*pro hac vice*)
**Milbank LLP**
55 Hudson Yards
New York, NY 10001
Telephone: 212-530-5000
Facsimile: 212-530-5219

*Attorneys for Plaintiff*

2

**A17**

## <u>CERTIFICATE OF SERVICE</u>

I certify that on March 10, 2026, a copy of the foregoing was filed electronically.  Notice of this filing will be sent to all parties via the Court's CM/ECF electronic filing system.

/s/ *Michael J. Hunter*
MICHAEL J. HUNTER (0076815)

*Attorney for Plaintiff*

**A18**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**KALSHIEX, LLC,**

   **Plaintiff,**      :

            **Case No. 2:25-cv-1165**

  v.          **Chief Judge Sarah D. Morrison**

            **Magistrate Judge Chelsey M.**
            **Vascura**

**MATTHEW T. SCHULER,** *et al.*,   :

   **Defendants.**

## OPINION AND ORDER

KalshiEX, LLC operates a futures exchange specializing in event contracts. An event contract is a "form of derivatives contract" that allows "users" across the nation to "trade on the outcome of real-world events." (Compl., ECF No. 1, ¶¶ 29, 46.) In January 2025, Kalshi listed its first contract allowing traders to take positions on the outcome of a sporting event. Given the sports-event contracts' resemblance to sports betting, state gaming regulators began knocking on Kalshi's door; Ohio's Casino Control Commission was among them. After months of correspondence, the Commission concluded that Kalshi's provision of sports-event contracts to Ohio consumers violated state law; it threatened to initiate civil and criminal enforcement actions if Kalshi continued.

Kalshi initiated this suit to enjoin the Commission and the Ohio Attorney General from regulating contracts traded on Kalshi's exchange. (Compl.) The matter is before the Court on Kalshi's Motion for Preliminary Injunction. (Mot., ECF No. 11.) Ohio responded (Resp., ECF No. 31-5) and Kalshi replied (Reply, ECF

**A19**

No. 49). The Indian Gaming Association, National Congress of American Indians, Washington Indian Gaming Association, Arizona Indian Gaming Association, California Nations Indian Gaming Association, Oklahoma Indian Gaming Association, Minnesota Indian Gaming Association, United South and Eastern Tribes Sovereignty Protection Fund, San Manuel Gaming and Hospitality Authority, and twenty-two federally recognized Indian Tribes filed an Amicus Brief in support of Ohio's response to the Motion. (Amicus Br., ECF No. 55.) The parties have also made the Court aware of relevant authority issued since the Motion was filed. (ECF Nos. 57, 61, 64, 66, 68.)

For the reasons below, Kalshi's Motion for Preliminary Injunction is **DENIED.**

## I.      BACKGROUND

There is no dispute about the facts giving rise to this case. The Commodity Exchange Act ("CEA"), 7 U.S.C. § 1 *et seq.*, is "a comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 356 (1982) (quotation omitted). Subject to limited exceptions, the CEA gives the Commodity Futures Trading Commission ("CFTC") "exclusive jurisdiction" over "accounts, agreements . . . , and transactions involving swaps or contracts of sale of a commodity for future delivery . . . , traded or executed on" boards of trade or designated contract markets. 7 U.S.C. § 2(a)(1)(A). "Swaps" were only added to the CFTC's portfolio in 2010, by way of the Dodd-Frank Wall Street Reform and Consumer Protection Act developed

2

**A20**

in the aftermath of the 2008 financial crisis. *DTCC Data Repository (U.S.) LLC v. U.S. Commodity Futures Trading Comm'n*, 25 F. Supp. 3d 9, 11 (D.D.C. 2014).

Kalshi was first approved as a designated contract market ("DCM") in 2020. The company "specializes in event contracts," which are instruments that provide for payment based on the occurrence of an event or contingency. (Compl., ¶ 47.) *See also* 7 U.S.C. §§ 1a(47), 7a-2(c)(5)(C). As Kalshi describes it, an event contract

> identifies a future event with several possible outcomes, a payment schedule for the outcomes, and an expiration date. Most commonly, event contracts involve a binary question: Every "yes" position has an equal and opposite "no" position. For example, a . . . contract might center around whether an earthquake will take place in Los Angeles County before December 31, 2025. A purchaser may trade on either the "yes" or the "no" position on the contract. If an earthquake does take place in Los Angeles County before the end of the calendar year, then the "yes" positions would be paid out.

(Compl., ¶ 29.)

A DCM must conduct its business in accordance with certain "core principles," including that the DCM comply with the CEA and any CFTC rules and regulations. 7 U.S.C. § 7(d)(1)(A). A DCM can list new contracts for trading on its exchange in two ways: it can either request approval from the CFTC, 7 U.S.C. § 7a-2(c)(4), or it can "self-certify" that the contract complies with all applicable law and list the contract subject to an opportunity for CFTC review, 7 U.S.C. § 7a-2(c)(1). Event contracts are subject to an additional "Special Rule" for review and approval. 7 U.S.C. §§ 7a-2(c)(5)(C)(i), (ii). Under the Special Rule, the CFTC has explicit authority to conduct a public-interest review of newly listed event contracts that "involve" unlawful activity, terrorism, assassination, war, gaming, or other similar activity. *Id.* The CFTC has further authority to prohibit a DCM from listing an

3

**A21**

event contract that has been determined to be against the public interest. *Id*. The CFTC has, by rulemaking, concluded that event contracts involving the enumerated activities are contrary to the public interest and DCMs are thus prohibited from listing them. 17 C.F.R. § 40.11.

For five years, Kalshi offered a platform for trading event contracts on "an array of substantive areas" while complying with the CFTC's "extensive" regulatory framework. (*Id*., ¶¶ 40, 48.) Then, on January 22, 2025, Kalshi self-certified "the first of a number of sports contracts that are now available on its exchange." (*Id*., ¶ 49.) These contracts (which the Court will refer to as "sports-event contracts") "allow users to place positions on, for example, which teams will advance in certain rounds of the NCAA College Basketball Championship or who will win the U.S. Open Golf Championship." (*Id*.)

Two months later, the Ohio Casino Control Commission sent Kalshi a letter (i) warning the company that it appeared to be operating an "unlicensed sportsbook" and "facilitating bookmaking" in violation of Ohio civil and criminal law, and (ii) demanding that Kalshi cease offering sports-event contracts in Ohio without complying with Ohio's sports gambling laws. (ECF No. 1-1 (citing Ohio Rev. Code §§ 2915.02, 3775.02, 3775.99).)

Like many other states, Ohio legalized sports gambling after the Supreme Court struck down the federal prohibition on state-approved sports betting. *See, e.g., Commonwealth of Mass. v. KalshiEX, LLC*, No. 2584CV02525, 2026 WL 188019, at *3 (Mass. Super. Jan. 20, 2026) (noting that Massachusetts legalized

4

**A22**

sports betting in 2022) (citing *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453 (2018)). Even still, sports gambling "cannot be offered in Ohio without a license issued by the Commission." (ECF No. 1-1 (citing Ohio Rev. Code § 3775.03(A).) Licensees must then comply with Ohio Revised Code Chapter 3775. Among other things, Chapter 3775 prohibits sports gambling for people under age 21 and for identified problem gamblers. Ohio Rev. Code §§ 3775.13, 3775.99(A)(2). As the Commission pointed out in its letter, Kalshi does not have a sports gambling license and only age-gates its platform for those under 18. (ECF No. 1-1.) The Commission also sent a letter to sports gambling licensees advising that companies that offer sports-event contracts "are operating online sports gaming"; the Commission warned that a licensee's decision to affiliate with an unlicensed sports gaming operator may form the basis of Commission action against the licensee. (ECF No. 31-1, PAGEID # 428–29.)

The parties engaged in fact-finding and dialog for more than six months before the State demanded Kalshi comply with Ohio's sports gambling laws. (ECF Nos. 1-2, 1-3, and 1-4.) This suit followed.

## II.  LEGAL STANDARD

Federal Rule of Civil Procedure 65 governs the issuance of a preliminary injunction. "A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002); *see also EOG Res., Inc. v. Lucky Land Mgmt., LLC*, 134 F.4th 868, 874 (6th Cir. 2025) (quoting *Starbucks Corp. v. McKinney*, 602

**A23**

U.S. 339, 345–46 (2024)). "The purpose of a preliminary injunction, unlike a permanent one, is to prevent any violation of the plaintiff's rights before the district court enters a final judgment." *Resurrection Sch. v. Hertel*, 35 F.4th 524, 528 (6th Cir. 2022), *cert. denied*, 143 S. Ct. 372 (2022) (further quotation omitted).

Courts examine four factors when deciding whether to issue a preliminary injunction: (1) whether the plaintiff has established a strong likelihood of success on the merits; (2) whether the plaintiff would suffer irreparable injury without a preliminary injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the requested injunction. *EOG Res.*, 134 F.4th at 874 (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). While courts generally "balance" these four factors, a plaintiff must prove all four to prevail. *Id.* at 885 (citing *Winter*, 555 U.S. at 20).

## III.    ANALYSIS

This Court is not the first to hear a request from Kalshi to enjoin a state from applying its gaming regulations to sports-event contracts listed on Kalshi's exchange. The question has been considered by at least four other federal district courts and is pending before at least three courts of appeals. *See KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667 (D. Md. 2025) (denying Kalshi's motion for preliminary injunction), *appeal docketed*, No. 25-1892 (4th Cir. Aug. 6, 2025); *KalshiEX LLC v. Flaherty*, No. 25-cv-02152-ESK-MJS, 2025 WL 1218313 (D.N.J. Apr. 28, 2025) (granting Kalshi's motion for preliminary injunction), *appeal docketed*, No. 25-1922 (3d Cir. May 15, 2025); *KalshiEX, LLC v. Hendrick*, No. 2:25-cv-00575-APG-BNW, 2025 WL 1073495 (D. Nev. Apr. 9, 2025) (granting Kalshi's motion for preliminary

6

**A24**

injunction) (*Hendrick I*), *order dissolved*, 2025 WL 3286282, --- F. Supp. 3d --- (D. Nev. 2025) (dissolving the earlier order granting Kalshi's motion for preliminary injunction) (*Hendrick II*), *stay denied*, No. 25-7516 (9th Cir. Feb. 17, 2026); *KalshiEX LLC v. Orgel*, No. 3:25-cv-00034, 2026 WL 474869 (M.D. Tenn. Feb. 19, 2026) (granting Kalshi's motion for preliminary injunction). Having studied the parties' filings and the growing body of relevant case law, the Court concludes that the instant motion presents questions of law, not fact.[1] As such, no hearing is necessary to issue a ruling. *See Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 552–53 (6th Cir. 2007). For the reasons below, Kalshi fails to make a clear showing that it is entitled to the extraordinary preliminary injunctive relief it seeks.

### A. Likelihood of Success on the Merits

The merits of this case center on the Constitution's Supremacy Clause. U.S. CONST. art. VI, cl. 2. The Supremacy Clause "specifies that federal law is supreme in case of a conflict with state law." *Murphy*, 584 U.S. at 477. Said another way, when state and federal laws are "in conflict or at cross-purposes," "federal law wins out." *Churchill Downs Tech. Initiatives Co. v. Michigan Gaming Control Bd.*, 162 F.4th 631, 637 (6th Cir. 2025) (quoting *Arizona v. United States*, 567 U.S. 387, 399 (2012)).

---

[1] The parties represented to the Court at the Rule 65.1 Informal Conference that neither "discovery" nor "fact-finding" was necessary on the preliminary injunction. (ECF No. 30, PAGEID # 354–55.) They later declined the Court's invitation to convert the motion for preliminary injunction to a motion for judgment on the merits. (*See id.*, PAGEID # 367–68.)

**A25**

Kalshi argues that the CEA preempts Ohio's sports gambling laws and, as a result, Ohio cannot regulate the sports-event contracts either directly (by requiring Kalshi to apply for a license) or indirectly (by restricting Kalshi's ability to do business with Ohio licensees). In Kalshi's view, the CEA's grant of exclusive jurisdiction over DCMs and the event contracts they list gives the CFTC authority over the sports-event contracts. Ohio argues in response that sports-event contracts fall outside the CFTC's exclusive jurisdiction and that, in any case, Congress did not intend the CEA to preempt states from exercising their police power to regulate sports gambling.

### 1.    The CEA does not govern the sports-event contracts.

Before considering whether the CEA preempts Ohio's sports-gambling laws, the Court must ask whether the CEA even applies. The CEA grants the CFTC "exclusive jurisdiction" over "accounts, agreements . . . , and transactions involving swaps . . . traded or executed on a" DCM. 7 U.S.C. § 2(a)(1)(A). The CEA provides several definitions of "swap." *See* 7 U.S.C. § 1a(47)(A). Kalshi relies on subsection (ii), which defines a "swap" as a contract "that provides for . . . payment . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence[.]" 7 U.S.C. § 1a(47)(A)(ii). The CEA does not define the words comprising this definition. The parties disagree over whether the sports-event contracts constitute "swaps."[2]

---

[2] Kalshi engages in a painstaking effort to point out differences between traditional gambling and the sports-event contracts traded on its exchange. (*See*

**A26**

As the Supreme Court has recognized, "a statute's meaning does not always turn solely on the broadest imaginable definitions of its component words. Linguistic and statutory context also matter." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 523 (2018) (internal quotation marks and citation omitted). Where, as here, undefined terms lead to a dispute over a statute's meaning, courts walk the "well-trod path" of statutory interpretation. *United States v. Fitzgerald*, 906 F.3d 437, 442 (6th Cir. 2018). On the first pass, those terms are given their "ordinary and natural meaning." *Id.* (quoting *United States v. Miller*, 734 F.3d 530, 540 (6th Cir. 2013)). But if "a word in isolation is susceptible of multiple meanings," courts also consider the word's "placement and purpose in the statutory scheme." *Id.* (quoting *Miller* at 540). Finally, "working only within the range of 'textually permissible meanings,' [courts] consider which of those interpretations would serve, rather than frustrate, the statute's manifest purpose." *Id.* at 442–43 (quoting Antonin Scalia & Bryan A. Garner, Reading Law 57 (2012)). It follows that "courts should not construe a statute to produce an absurd result that [the court is] confident Congress did not intend." *Id.* at 447.

Kalshi gives the words comprising the "swap" definition broad meaning. It construes "occurrence of an event" to include the outcome of a sporting contest (*Who will win the NCAA football match-up between Northern Illinois University and Ohio University?*) and happenings within it (*Will the total number of points scored in that*

---

Mot., 7, 8; ECF No. 11-2, PAGEID # 248–49, 251; ECF No. 11-3, PAGEID # 260–61, ECF No. 11-6, PAGEID # 285.) Though tempting to engage with this question, it is the wrong one. The pertinent question here is not "Are sports-event contracts gambling?"—it is "Are sports-event contracts swaps?"

*game exceed 41?*). (*See* ECF No. 31-2, PAGEID # 446.) Kalshi also construes

"associated with a potential financial, economic, or commercial consequence" to

encompass all of sports business: ticket sales, hotel rooms, athlete sponsorships,

coaching staff salaries, broadcast rights, licensing and merchandising, and tourism.

(Reply, PAGEID # 639.)

Ohio urges a more limited construction of those words, hemmed in by the

statute's context. The State looks to subsections (i) and (iii) of the "swap" definition

to identify guideposts for interpreting subsection (ii). In full, subsections (i)–(iii)[3]

define "swap" to include any agreement, contract, or transaction

> (i)     that is a put, call, cap, floor, collar, or similar option of any kind
> that is for the purchase or sale, or based on the value, of 1 or more
> interest or other rates, currencies, commodities, securities,
> instruments of indebtedness, indices, quantitative measures, or
> other financial or economic interests or property of any kind;
>
> (ii)    that provides for any purchase, sale, payment, or delivery (other
> than a dividend on an equity security) that is dependent on the
> occurrence, nonoccurrence, or the extent of the occurrence of an
> event or contingency associated with a potential financial,
> economic, or commercial consequence; [or]
>
> (iii)   that provides on an executory basis for the exchange, on a fixed
> or contingent basis, of 1 or more payments based on the value or
> level of 1 or more interest or other rates, currencies, commodities,
> securities, instruments of indebtedness, indices, quantitative
> measures, or other financial or economic interests or property of
> any kind, or any interest therein or based on the value thereof,
> and that transfers, as between the parties to the transaction, in

---

[3] "Swap" also includes any agreement, contract, or transaction "that is an agreement, contract, or transaction that is, or in the future becomes, commonly known to the trade as a swap;" that is a security-based swap agreement "of which a material term is based on the price, yield, value, or volatility of any security or any group or index of securities, or any interest therein;" and "that is any combination or permutation of, or option on, any agreement, contract, or transaction described in any of clauses (i) through (v)." 7 U.S.C. §§ 1a(47)(iv)–(vi).

**A28**

> whole or in part, the financial risk associated with a future change in any such value or level without also conveying a current or future direct or indirect ownership interest in an asset (including any enterprise or investment pool) or liability that incorporates the financial risk so transferred[.]

7 U.S.C. §§ 1a(47)(A). Subsection (iii) goes on to list specific examples of swaps, including: an interest rate swap; a foreign exchange swap; an equity index swap; a debt swap; a credit spread; a weather swap; an energy swap; a metal swap; an agricultural swap; an emissions swap; and a commodity swap. Canons of statutory interpretation counsel courts to "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words[.]" *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995). Applying this canon to the CEA, Ohio argues that swaps are limited to "events and contingencies that have a . . . direct and inherent association with matters of financial, economic, or commercial consequence." (Resp., 12.)

Both interpretations of the CEA are textually permissible, but Ohio's better serves the purpose of the statute. By enacting the CEA, Congress sought to serve the national public interest of "managing and assuming price risks, discovering prices, or disseminating pricing information" by establishing a system to deter market disruptions, ensure financial integrity, avoid systemic risk, protect market participants from fraud and abuse, and promote responsible innovation. 7 U.S.C. § 5. These goals are better achieved when a "swap" is understood as a transaction involving financial instruments and measures that traditionally and directly affect

commodity prices. Currency exchange rates, the weather, and energy costs all do that; the number of points scored in the Huskies-Bobcats game does not.[4]

This conclusion is further supported by the Court's obligation to avoid absurdity. Ohio argues that absurd results would flow from defining a "swap" to include a sports-event contract. The Court agrees. The CEA makes it "unlawful for any person[5] . . . to enter into a swap" outside of a DCM. 7 U.S.C. § 2. Under Kalshi's construction, a sports-event contract is a swap because it is a contract for payment based on the outcome of a sporting event. But if that is true, then all contracts for payment based on the outcome of a sporting event—all sports bets—would be forced onto DCMs like Kalshi and every sportsbook in the country would be put out of business.[6] In the absence of congressional intent to effect such a sea

---

[4] The Middle District of Tennessee recently issued a decision granting Kalshi's motion for preliminary injunction after finding that the sports-event contracts constitute swaps. *Orgel*, 2026 WL 474869 at *7. But the court stopped short of considering whether Kalshi's or the state's interpretation of the CEA better served the statute's purpose. Instead, the court pointed to *United States v. Phillips*, 155 F.4th 102 (2d Cir. 2025) to support its conclusion that, under the plain language of the CEA, Kalshi's sports-event contracts are swaps. *Orgel* at *8. But the swap at issue in *Phillips* dealt with the exchange rate of the U.S. dollar to the South African rand—a financial measure that directly affects commodity prices.

[5] Eligible contract participants (institutional or other highly sophisticated investors) are permitted to enter into off-DCM swaps. *See* 7 U.S.C. § 1a(18) (defining "eligible contract participant").

[6] Further, as Amici argue (and Kalshi does not dispute), finding that sports-event contracts are swaps, and thus must be traded on DCMs would have a seismic impact on Indian tribes' authority to regulate gaming on tribal land. (Amicus Br., *generally*.) "Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

**A30**

change, that result is absurd. Kalshi resists this point, arguing that the CEA leaves Ohio "free to apply state laws to *off-DCM* transactions offered by traditional sportsbooks." (Reply, 9 (citing 7 U.S.C. § 2(a)(1)(A).) As the *Hendrick II* court aptly described it, Kalshi's argument boils down to this: "if contracts are not traded on an exchange, then they are not swaps that must be traded on an exchange." *Hendrick II*, 2025 WL 3286282 at *9. Like the District of Nevada, this Court finds Kalshi's logic "self-fulfilling, circular, and inconsistent with the statutory text." *Id.*

What's more, the CEA's legislative history indicates that at least some members of Congress believed that sports-event contracts would <u>not</u> be considered swaps. During a July 15, 2010 exchange with Senator Diane Feinstein, Senator Blanche Lincoln (who, as Chair of the Senate Agricultural Committee, was a principal contributor to the Dodd-Frank Wall Street Reform and Consumer Protection Act) acknowledged that "[i]t would be quite easy to construct an 'event contract' around sporting events such as the Super Bowl, the Kentucky Derby, and Masters Golf Tournament"—but that "[t]hese types of contracts would not serve any real commercial purpose. Rather, they would be used solely for gambling." 156 CONG. REC. S5906-07, 2010 WL 2788026 (daily ed. July 15, 2010).

Kalshi fails to clearly show that its sports-event contracts are subject to the CFTC's exclusive jurisdiction and thus fails to establish a likelihood of success on the merits.

13

**A31**

**2.** **Even if the CEA governs, Kalshi fails to establish that Ohio's sports gambling laws are preempted.**

Even if this Court were to find that sports-event contracts are swaps subject to the CFTC's exclusive jurisdiction, Kalshi has not shown that the CEA would necessarily preempt Ohio's sports gambling laws.

The Sixth Circuit recently explained the three ways federal law can preempt state law:

> Sometimes, Congress expressly withdraws specified powers from the states. [*Arizona v. United States*, 567 U.S. 387, 399 (2012).] Express preemption provisions indicate Congress's preemptive intent through language rather than through a statute's structure and purpose. *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008).

> Preemption can also be implied. There are two kinds of implied preemption: field and conflict.

> Field preemption is the principle that States may not regulate conduct "in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Arizona*, 567 U.S. at 399. A federally occupied field can cover a narrow subject, so long as Congress intended to exclusively regulate that field. *See Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 376, 390 (2015) (Natural Gas Act occupies the field of "wholesale sales and transportation of natural gas in interstate commerce," but preserves state-law antitrust claims based on gas price manipulation). And, in the context of field preemption, the Supreme Court has noted "the importance of considering the target at which the state law aims in determining whether that law is pre-empted." *Id.* at 385.

> Under the principle of conflict preemption, federal law preempts state law if the two "directly conflict." *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 617 (2011). That occurs when compliance with both is impossible, or when . . . state law "stand[s] as an obstacle to the accomplishment" of Congress's objectives. *Kansas v. Garcia*, 589 U.S. 191, 210–11 (2020); *Arizona*, 567 U.S. at 399.

*Churchill Downs*, 162 F.4th at 637–38 (citations simplified).

14

**A32**

Kalshi argues that Ohio's sports gambling laws are field and conflict preempted by the CEA when it comes to sports-event contracts traded on its exchange.[7] Congressional intent—as shown in a statute's language, structure, and purpose—is "the ultimate touchstone" of any implied preemption inquiry. *In re Ford Motor Co. F-150 & Ranger Truck Fuel Econ. Mktg. & Sales Pracs. Litig.*, 65 F.4th 851, 860 (6th Cir. 2023) (quoting *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992)). Kalshi fails to establish that Congress intended the CEA to preempt state laws on sports gambling.

### a)     Field Preemption

To examine the extent of the CEA's field preemption, the Court must first define the field in which the CEA has preemptive effect. Kalshi argues that the CEA preempts "the field of regulating trading on DCMs[.]" (Mot., 11.) Ohio asserts that framing is overbroad, and urges the Court to focus instead on whether Congress intended to preempt state laws regulating sports gambling. (Resp., 21.) The Supreme Court has "emphasize[d] the importance of considering the *target* at which [a] state law *aims* in determining whether that law is pre-empted." *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 385 (2015) (emphasis in original). Kalshi offers no compelling reason to upset the recognized and "coherent federal policy . . .

---

[7] Kalshi briefly argues in its reply that the CEA expressly preempts the application of Ohio's sports gambling laws. (Reply, 10–11.) The argument is made only in passing and is thus considered waived for purposes of the instant motion. *Cf. McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones.") (quotation and alteration omitted).

15

**A33**

respect[ing] the policy choices of the people of each State on the controversial issue of gambling." *Murphy*, 584 U.S. at 484. Instead, the Court finds several compelling reasons why the CEA does not disturb Ohio's sports gambling laws.

As in any implied preemption case, the Court starts with a presumption against preemption. "Because preemption can trammel upon state sovereignty, courts apply a 'strong presumption' against implied preemption in fields that States traditionally regulate." *Torres v. Precision Indus., Inc.*, 995 F.3d 485, 491 (6th Cir. 2021) (quoting *Merrick v. Diageo Ams. Supply, Inc.*, 805 F.3d 685, 694 (6th Cir. 2015)). The "enactment of gambling laws is clearly a proper exercise of the state's police power in an effort to promote the public welfare." *United States v. Washington*, 879 F.2d 1400, 1401 (6th Cir. 1989); *cf Churchill Downs*, 162 F.4th at 635 (noting that states "have traditionally regulated intrastate gambling activity like wagering on horseracing"). It would thus be "inappropriate" to treat the CEA as preempting Ohio's sports gambling laws without first finding that Congress had the "clear and manifest purpose" to do so. *Wellons v. Nw. Airlines, Inc.*, 165 F.3d 493, 494 (6th Cir. 1999) (quoting *New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995)).

History reveals no evidence that Congress intended to preempt state sports gambling laws. Consider the legal landscape in 2010, when Dodd-Frank amended the CEA to govern swaps. At the time, the Professional and Amateur Sports Protection Act ("PASPA"), 28 U.S.C. § 3701, *et seq.*, largely prohibited states from authorizing sports betting; it allowed only the handful of states that already

16

**A34**

regulated sports gambling to maintain their regimes. 28 U.S.C. §§ 3702, 3704(a). It was not until eight years after the passage of Dodd-Frank that the Supreme Court struck down PASPA. *Murphy*, 584 U.S. at 474. There is no evidence that Congress intended the CEA to preempt sports gambling laws in those few states where it was allowed under PASPA. In fact, all available evidence points to the contrary.

First, the CEA's text and structure support the conclusion that Congress did not intend to preempt state sports gambling laws. It is beyond dispute that the CEA has, and was intended to have, some preemptive effect. But it is just as clear that the CEA does not cover the waterfront of DCM-related activity. The language of 7 U.S.C § 2(a)(1)(A) illustrates the point. The statute gives the CFTC "exclusive jurisdiction" over swaps and futures traded on DCMs. It goes on to say that, outside of those swaps and futures, "nothing contained in this section shall . . . supersede or limit the jurisdiction at any time conferred on . . . other regulatory authorities under the laws of the United States or of any State[.]" *Id.* This language leaves ample room for states to legislate and regulate, as Ohio has, on matters tangential to trading swaps and commodity futures on DCMs.

Further, the CEA expressly preempts state gambling laws in certain limited circumstances. *See* 7 U.S.C. § 16(e)(2) (preempting "any State or local law that prohibits or regulates gaming or the operation of bucket shops" in the case of electronic trading facilities and agreements excluded or exempted from the CEA under enumerated provisions). But those circumstances do not cover the sports-event contracts at issue here. As other courts have recognized, this is "strong

17

**A35**

evidence" that Congress did not intend the CEA to preempt state sports gambling laws. *Martin*, 793 F. Supp. 3d at 681 (citing *Cipollone*, 505 U.S. at 517).

And finally, the CFTC has itself recognized Congressional intent to "prevent gambling through the futures markets." Provisions Common to Registered Entities, 76 Fed. Reg. 44776-01, 44786 (July 27, 2011). Indeed, that was the policy behind the Special Rule's public-interest review. *See* 156 CONG. REC. S5906-07, 2010 WL 2788026 (daily ed. July 15, 2010).

Kalshi thus fails to establish a likelihood of success on its field preemption theory.

### b) Conflict Preemption

Kalshi also argues that conflict preemption applies because Ohio law poses an obstacle to the accomplishment of Congress's purpose and because complying with both sets of law would be impossible. Both arguments fail.

Kalshi first argues that Ohio law poses an obstacle to the accomplishment of Congress's purpose in enacting the CEA. (Mot., 15.) In Kalshi's view, once the company "was approved as a CFTC-designated contract market, Kalshi was authorized to list its event contracts by self-certifying that these contracts comported with federal law. The CFTC had the authority to review that self-certification on the ground that these contacts were 'contrary to the public interest,' 7 U.S.C. § 7a-2(c)(5)(C)(i), but chose not to do so." (Mot., 16.) By extension, Ohio's attempt to regulate Kalshi's conduct "substantially interfere[s] with the CFTC's

18

**A36**

discretion," frustrating Congress's intent to centralize regulation of futures trading markets.[8] (*Id.*, 17.)

First, Kalshi overstates Congress's intent. As explained above, the CEA's text, structure, and history support the conclusion that Congress did not intend to preclude any and all state action relative to DCMs. *See, e.g.*, 7 U.S.C. §§ 7(a)(1)(A), 16(e)(1). And further, Kalshi overstates its authority. Though a DCM can list any contract that it self-certifies, the certification does not carry the force of law. Said another way, the DCM can certify, but cannot conclude, that the contract is lawful. That authority rests with the CFTC and, if in dispute, with the courts.

Here, in fact, the CFTC prohibits DCMs from listing any event contract "that involves, relates to, or references . . . gaming[.]" 17 C.F.R. § 40.11(a). That includes, by Kalshi's own admission (albeit in separate litigation), "a contract on who's going to win the Kentucky Derby" or "the point spread in the Super Bowl[.]" *KalshiEx LLC v. Commodity Futures Trading Comm'n*, D.D.C. Case No. 1:23-cv-3257-JMC (Oral Arg. Tr., ECF No. 40, 14:9–13). *Accord KalshiEx LLC v. Commodity Futures Trading Comm'n*, No. CV 23-3257 (JMC), 2024 WL 4164694, at *8, *10 (D.D.C. Sept. 12, 2024) (adopting Kalshi's position that "gaming" as used in the CEA "refers to playing games or playing games for stakes"). This Court does not endeavor to explain why the CFTC has not exercised its authority under the Special Rule or § 40.11(a) with respect to the sports-event contracts. But the agency's inaction is not

---

[8] Kalshi points out that the CEA seeks to establish nationwide standards for futures markets—but Congress has done the opposite with gambling, leaving that topic for the states to govern on a state-by-state basis.

proof that the sports-event contracts are regulated by or permissible under the CEA—and the Court has concluded they are not.

*Impossibility*. Kalshi also argues that it would be impossible to comply with the CEA's core principles and Ohio's sports gambling laws at the same time. CFTC regulations require DCMs to provide "impartial access to its markets and services." 17 C.F.R. § 38.151(b). Meanwhile, Ohio's sports gambling laws restrict licensees from accepting wagers made by individuals who are not physically present in Ohio. Ohio Rev. Code § 3775.11(A). In Kalshi's view, the CFTC's impartial-access rule is in direct conflict with Ohio's location-based requirements. But Kalshi offers nothing but its own *ipse dixit* that the CFTC would view geographic restrictions predicated on compliance with state law as "partial."

Kalshi fails to establish a likelihood of success on a conflict preemption theory.

### B. Irreparable Injury

Kalshi next asserts that it will face wide-ranging irreparable injury without an injunction, including: the threat of civil and criminal enforcement action, harm to customer goodwill and the company's reputation, and the cost of implementing geofencing technologies. Because Kalshi fails to carry its burden on the remaining three factors, analysis of irreparable injury is unnecessary.

### C. Balance of Equities

Because Kalshi seeks an injunction against a state government, the final two preliminary injunction factors (harm to third parties and the public interest) are considered together. *Churchill Downs,* 162 F.4th at 643. Kalshi argues that

**A38**

requiring "[i]mmediate compliance with Ohio law . . .will harm Kalshi's users in Ohio and impose intractable technological difficulties on a very short timeframe[,]" thus weighing in favor of the injunction. (Mot., 24.) These concerns are dwarfed by Ohio's interest in exercising its police power, enforcing its duly-enacted laws, and regulating sports gambling to promote the public welfare.[9] *See Maryland v. King*, 567 U.S. 1301, 1303 (2012) ("Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."). The balance of equities and public interest thus cut in favor of the State.

## IV.    CONCLUSION

Because the Court finds that Kalshi has not carried its burden to establish that the circumstances demand such extraordinary relief, the Motion for Preliminary Injunction is **DENIED**.

**IT IS SO ORDERED.**

/s/ Sarah D. Morrison
**SARAH D. MORRISON, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**

---

[9] This Court has not been called upon to pass judgment on the wisdom or morality of sports betting. But the Undersigned feels compelled to remark on the risk Kalshi's sports-event contracts pose for Ohioans ages 18 through 20. The General Assembly determined these individuals were too young to participate in legal sports gambling, *see* Ohio Rev. Code § 3775.99(A)(2), but they have unrestricted access to sports-event contracts on Kalshi's exchange. This population is particularly vulnerable to problem gambling (Schuler Decl., ECF No. 31-1, PAEGID # 423) and, when trading on Kalshi, is unprotected by Ohio's responsible gaming laws.

**A39**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

KALSHIEX, LLC,

      Plaintiff,             :

                                        Case No. 2:25-cv-1165

     v.                            Chief Judge Sarah D. Morrison

                                        Magistrate Judge Chelsey M.
Vascura

MATTHEW T. SCHULER, *et al.*,     :

      Defendants.

## <u>ORDER</u>

This matter is before the Court for consideration of Kalshi's Motion for an Immediate Injunction Pending Appeal. (ECF No. 72.) Kalshi moves under Federal Rule of Civil Procedure 62(d), which provides:

> While an appeal is pending from an interlocutory order or final judgment that grants, continues, modifies, refuses, dissolves, or refuses to dissolve or modify an injunction, the court may suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights.

"In determining whether to grant an injunction pending appeal, the court considers the same four factors it evaluated in resolving the original motion for preliminary injunctive relief." *Brown v. Yost*, No. 2:24-CV-1401, 2024 WL 1934615, at *1 (S.D. Ohio May 1, 2024) (Graham, J.) (citing *Dayton Christian Sch. v. Ohio C.R. Comm'n*, 604 F. Supp. 101, 103 (S.D. Ohio 1984)). Those are: (1) whether the plaintiff has established a strong likelihood of success on the merits; (2) whether the plaintiff would suffer irreparable injury without a preliminary injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public

**A40**

interest would be served by the requested injunction. *EOG Res., Inc. v. Lucky Land Mgmt., LLC*, 134 F.4th 868, 874 (6th Cir. 2025) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

In a March 9 Opinion and Order, this Court concluded that Kalshi failed to establish either a likelihood of success sufficient to warrant a preliminary injunction, or that the equities favored such an injunction. (ECF No. 69.) Kalshi now previews its disagreements with the Court's conclusion. (ECF No. 72.) But it does not persuade the Court to change its position.

The Motion (ECF No. 72) is **DENIED**.


**IT IS SO ORDERED.**


/s/ Sarah D. Morrison
**SARAH D. MORRISON, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**

2

**A41**

# Exhibit 1



**Casino Control Commission**

**CasinoControl.Ohio.gov**

**Mike DeWine,** *Governor*   **Jim Tressel,** *Lt. Governor*   **Thomas J. Stickrath,** *Chair*

March 31, 2025

Tarek Mansour
Chief Executive Officer
KalshiEX LLC, dba Kalshi
594 Broadway, Suite 407
New York, NY 10012

Eliezer Mishory
Chief Regulatory Officer and General Counsel
KalshiEX LLC, dba Kalshi
594 Broadway, Suite 407
New York, NY 10012

**Sent via Certified Mail, Regular Mail, and Email to:** Support@Kalshi.com **and**
Legal@Kalshi.com

Re: Cease-and-Desist: Event Contracts on Sporting Events Violate Ohio Sports Gaming Laws

Dear KalshiEX LLC,

The Ohio Casino Control Commission (the "Commission") is hereby putting you on notice that by offering "event contracts" on sporting events to citizens located within the State of Ohio, without a sports gaming license, KalshiEX LLC (hereafter referred to as "Kalshi") is violating Ohio law. For the reasons set forth below, Kalshi must immediately cease offering these sports wagering products unlawfully in Ohio.

Based on Kalshi's website, Kalshi is offering "event contracts," that give consumers the option to purchase contracts corresponding to one of two outcomes of an event. In a sporting event context, a consumer is purchasing a contract that reflects which team they believe will win or lose the matchup. The ultimate result is money being won or lost based on the outcome of a game. Plainly stated, Kalshi is operating online sports gaming.

Sports gaming cannot be offered in Ohio without a license issued by the Commission. R.C. 3775.03(A). A person or business offers sports gaming when it accepts wagers on sporting events. R.C. 3775.01(O)(1). Sporting events include, but are not limited to, professional and collegiate athletic events. R.C. 3775.01(N)(1). Further, the Ohio General Assembly defined wager as "to risk a sum of money or thing of value on an uncertain occurrence." R.C. 3775.01(DD). Therefore, a person or entity that accepts anything of value risked on the outcome of a sporting event without a valid license issued by the Commission is violating Ohio sports gaming laws.

It is a felony to offer sports gaming in the State in a manner that does not comply with Chapter 3775 of the Ohio Revised Code. R.C. 3775.99(B)(9). Further, an unlicensed sportsbook operating within Ohio is also facilitating bookmaking in violation of the Ohio Criminal Code. *See* R.C. Chapter 2915. Bookmaking is defined under Ohio law as "the business of receiving or paying off bets." R.C. 2915.01(A). The Code specifically defines "bet" as "the hazarding of anything of value upon the result

100 E. Broad St., 20th Floor        Phone: 614 l 387 5858
Columbus, OH 43215                   Fax: 614 l 485 1007

The State of Ohio is an Equal Opportunity Employer and Provider of ADA Services

of an event, undertaking, or contingency, but does not include a bona fide business risk." R.C. 2915.01(B). Kalshi's current March Madness and other sporting event offerings are clearly facilitating bookmaking in violation of Ohio civil and criminal law, exposing Kalshi to civil and criminal penalties. R.C. 2915.02, R.C. 3775.02, R.C. 3775.99.

Moreover, Kalshi's website constitutes a nuisance under Ohio law that is subject to abatement under R.C. Chapter 3767. R.C. 3775.99(B)(9). The Commission has the power to impose a civil penalty or fine in an amount equal to the money or value of the property that Kalshi has unlawfully obtained or retained by offering these event contracts on sporting events to the citizens of Ohio. *See* Ohio Admin. Code 3775-1-08. The Commission may also pursue additional civil and administrative remedies against Kalshi, its officers, directors, holding or parent companies, as applicable.

In addition, Kalshi's unlicensed and unlawful offering of sports gaming through event-based sporting contracts to individuals under the age of twenty-one is a flagrant disregard of Ohio's statutory gambling age limit. R.C. 3775.99(A)(2). To create a Kalshi account, a consumer is bound by Kalshi's Member Agreement, in which a consumer certifies they "are the age of majority in [their] state of residence." Section VI, Representations and Warranties. Ohio's age of majority is eighteen. R.C. 3109.01. Accordingly, an age group intentionally shielded by the Ohio legislature from sports gambling has unfettered access to sports wagering because of Kalshi.

While Kalshi may assert that the offerings are not sports gaming or gambling, Kalshi is trying to act like a regulated, licensed sportsbook. Recently, Kalshi announced that it was partnering with IC360, a prominent firm specializing in comprehensive monitoring and compliance solutions for sports and sports betting. Kalshi simultaneously heralded the "Consumer Protection Hub," which will feature voluntary opt-outs and other self-exclusion tools. Notably, Kalshi's attempt at offering an exclusion tool highlights that those Ohioans that have signed up for broad exclusion from all sports gaming through the TimeOut Ohio Program would still have unrestricted access to Kalshi's offerings. Kalshi is demonstrating that it considers its products akin to sports wagering by using similar features offered by the licensed and regulated sports gaming industry.

**Because Kalshi is offering unlicensed sports gaming and facilitating bookmaking in Ohio, the Commission demands that Kalshi cease and desist from offering, participating in offering, or facilitating those who offer these products in the State of Ohio. Kalshi shall notify the Commission in writing no later than April 14, 2025, that it has complied with this cease-and-desist notice.**

Kalshi's failure to abide by this notice may result in the Commission pursuing all legal remedies and actions against Kalshi, including, but not limited to, administrative, civil, or criminal sanctions pursuant to R.C. Chapters 2915 and 3775, and any rules adopted thereunder.

Sincerely,

Matthew T. Schuler
Executive Director

2

**A44**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| KALSHIEX LLC, | Case No.: 2:25-cv-1165 |
| *Plaintiff*, | |
| vs. | |
| MATTHEW T. SCHULER, in his official capacity as Executive Director of the Ohio Casino Control Commission; THOMAS J. STICKRATH, in his official capacity as Chair and Commissioner of the Ohio Casino Control Commission; SHEETAL BAJORIA, in her official capacity as Commissioner of the Ohio Casino Control Commission; SCOTT BORGEMENKE, in his official capacity as Commissioner of the Ohio Casino Control Commission; KEITH CHENEY, in his official capacity as Commissioner of the Ohio Casino Control Commission; PENELOPE CUNNINGHAM, in her official capacity as Vice Chair and Commissioner of the Ohio Casino Control Commission; CHRISTOPHER SMITHERMAN, in his official capacity as Commissioner of the Ohio Casino Control Commission; TRIFFON CALLOS, in his official capacity as Commissioner of the Ohio Casino Control Commission; OHIO CASINO CONTROL COMMISSION; and DAVE YOST, in his official capacity as Attorney General of Ohio, | **PLAINTIFF'S MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF A PRELIMINARY INJUNCTION**<br><br>**(ORAL ARGUMENT REQUESTED)** |
| *Defendant*s. | |

**A45**

## TABLE OF CONTENTS

**Page**

INTRODUCTION .......................................................................................................... 1

BACKGROUND ......................................................................................................... 3

    A.    The Exclusive Federal Scheme for Regulating Futures Markets on Regulated Exchanges. ..................................................................................... 3

    B.    Kalshi's Registration as a CFTC-Designated Contract Market Under Federal Law. .................................................................................................. 6

    C.    The Ohio Regulatory Scheme for Gambling. .......................................... 7

    D.    The Casino Commission's Cease-and-Desist Letter to Kalshi and Subsequent Threat to Kalshi's Business Partners. ................................... 8

ARGUMENT ............................................................................................................. 9

    A.    Kalshi Is Likely to Succeed Because Ohio's Direct and Indirect Efforts to Regulate Kalshi's Event Contracts Are Preempted by the CEA and Its Regulations. ................................................................................................ 10

        1.    Ohio Gambling Laws Are Field Preempted as Applied to Kalshi's Event Contracts. ........................................................................... 10

        2.    Ohio Laws Are Conflict-Preempted as Applied to Kalshi. ...................... 15

        3.    Defendants May Not Punish Kalshi's Partners for Affiliating with Kalshi. .......................................................................................... 18

    B.    Kalshi Will Suffer Irreparable Harm Without a Preliminary Injunction. ............ 21

    C.    The Balance of the Equities and Public Interest Favor a Preliminary Injunction. ..................................................................................................... 24

    D.    No Security—Or Only a *De Minimis* Security—Is Appropriate. ........................ 25

CONCLUSION ......................................................................................................... 25

**A46**

Plaintiff KalshiEX LLC ("Kalshi") moves this Court for a preliminary injunction against Defendants Matthew T. Schuler, Thomas J. Stickrath, Sheetal Bajoria, Scott Borgemenke, Keith Cheney, Penelope Cunningham, Triffon Callos, Ohio Casino Control Commission, and Dave Yost. This Motion is based upon the pleadings on file herein, including Plaintiff's Complaint, the memorandum of points and authorities contained in this document, all documents on file in this action including exhibits and declarations, and any further arguments presented.

## INTRODUCTION

The Ohio Casino Control Commission (the "Casino Commission") is unconstitutionally threatening to prohibit trading of event contracts on Kalshi's designated contract market, even though those contracts are federally authorized and Kalshi is overseen by the Commodity Futures Trading Commission ("CFTC")—the federal agency that Congress endowed with "exclusive jurisdiction" to regulate trading on exchanges like Kalshi. The Casino Commission's unlawful actions threaten irreparable harm to Kalshi in two respects: First, the Casino Commission has directly threatened Kalshi with criminal prosecution unless Kalshi accedes to the Casino Commission's unconstitutional demands. Second, the Casino Commission has attempted to cut off Kalshi's ability to operate by threatening to revoke the licenses of anyone who partners with Kalshi, even if the partnership occurs entirely in other states. Both threats violate the Commodity Exchange Act ("CEA") and subject Kalshi to irreparable harm that requires preliminary relief.

Federal district courts in two other states have already entered preliminary injunctions in Kalshi's favor based on similar—but less egregious—threats. *KalshiEX LLC v. Hendrick*, No. 2:25-cv-00575-APG-BNW, 2025 WL 1073495, at *6 (D. Nev. Apr. 9, 2025); *KalshiEX LLC v. Flaherty*, No. 25-cv-02152-ESK-MJS, 2025 WL 1218313, at *6 (D.N.J. Apr. 28, 2025). On April 9, 2025, the U.S. District Court for the District of Nevada granted Kalshi a preliminary injunction to prevent Nevada gaming authorities from enforcing state law against Kalshi's event contracts. Chief Judge Gordon found that the CEA establishes a comprehensive federal framework for regulating commodity futures trading, and because Kalshi is a CFTC-designated contract market, Kalshi "is subject to the CFTC's exclusive jurisdiction and state law is field preempted."

1

**A47**

*Hendrick*, 2025 WL 1073495, at *6. Chief Judge Gordon further noted that other States—like Ohio—have sent Kalshi cease-and-desist letters, which "highlights the problem of allowing the States to regulate a national exchange." *Id.* at *7. Preventing the "difficulties" that would arise from many different states subjecting Kalshi to conflicting rules "is the reason Congress granted the CFTC exclusive jurisdiction over CFTC-designated exchanges." *Id.* Several weeks later, the U.S. District Court for the District of New Jersey agreed, reasoning that "at the very least field preemption applies" to prevent states from regulating trading on designated contract markets like Kalshi. *Flaherty*, 2025 WL 1218313, at *6.

Much like the Nevada and New Jersey authorities, the Casino Commission has threatened Kalshi with criminal and civil penalties unless Kalshi halts access to event contracts for users in Ohio. *See* Ex. 1 at 2-3. And just as in Nevada and New Jersey, the Casino Commission is preempted from attempting to regulate trading on a federally regulated exchange. Kalshi's entitlement to relief from Defendants here is even clearer, because the Casino Commission has not only threatened Kalshi directly but has also threatened anyone who partners with Kalshi—a gambit that no other state has tried but that others will surely replicate if this Court allows it.

Immediate action is required to avoid irreparable harm to Kalshi, its representatives, and its users. The Casino Commission's cease-and-desist letter confronts Kalshi with a "Hobson's choice"—either face "civil and criminal liability" in Ohio, or "incur substantial economic and reputational harm as well as the potential existential threat of the CFTC taking action against it for violating the CFTC's Core Principles." *Hendrick*, 2025 WL 1073495, at *7. Furthermore, the separate threats by the Casino Commission against any company that partners with Kalshi are already subjecting Kalshi to immediate irreparable harm by thwarting Kalshi's partnership arrangements during a critical period for Kalshi's growth. Kalshi respectfully requests that this Court issue a preliminary injunction enjoining Defendants from enforcing preempted state law against Kalshi—either by directly threatening Kalshi or by indirectly threatening Kalshi's business partners.

***

2

**A48**

Kalshi has sought to reach an accommodation with the Casino Commission, but has no other option but to seek judicial relief. The Casino Commission's cease-and-desist letter demands that Kalshi cease operating in Ohio or face criminal liability. In a letter sent to Kalshi on October 6, 2025, the Casino Commission refused to withdraw its threats and demanded that Kalshi "comply with the Cease-and-Desist Letter and to notify the Commission in writing of such compliance by no later than October 20, 2025." Ex. 8 at 1. Thus, absent judicial relief, Kalshi faces the prospect of criminal enforcement in Ohio in less than two weeks from the date of this filing.

Counsel for Kalshi has informed counsel for the Casino Commission and the Ohio Attorney General's Office of Kalshi's intent to file this suit and to seek preliminary relief. Counsel for Kalshi also requested that counsel for the Casino Commission forbear any enforcement against Kalshi pending this Court's consideration of Kalshi's motion for a preliminary injunction. Counsel for the Casino Commission agreed, thus making it unnecessary for Kalshi to seek an emergency temporary restraining order. Kalshi thus respectfully requests that this Court enter a preliminary injunction.

## BACKGROUND

### A. The Exclusive Federal Scheme for Regulating Futures Markets on Regulated Exchanges.

Derivative contracts are financial tools that traders use to mitigate risk. *See KalshiEX LLC v. Commodity Futures Trading Comm'n*, No. CV 23-3257 (JMC), 2024 WL 4164694, at \*1-2 (D.D.C. Sept. 12, 2024) ("*KalshiEX*"). Event contracts are a type of derivative contract—they are financial instruments that identify a future event with several possible outcomes, a payment schedule for the outcomes, and an expiration date. *Id.* at \*2. Event contracts are typically traded on an exchange, and their value is determined by market forces. *Id.* This means that the price of an event contract fluctuates from the time of its creation to its expiration date in accordance with the changing likelihood of the event's occurrence, creating a uniquely sensitive financial instrument that tracks real-world market perceptions. *Id.* During the period of a contract, individuals can buy and sell the contract at its changing prices; no user is locked into a contract

and may trade her contract in accordance with her desire to hedge her economic risk. Compl. ¶¶ 30, 33. The ultimate value of an event contract is determined at its expiration date—most commonly, the event's occurrence or a set date upon which the contract terminates. *See KalshiEX*, 2024 WL 4164694, at *2. For example, a property owner on the Gulf Coast may place a position on whether a hurricane will strike the area around his property within the 2025 calendar year. *Id.* If a hurricane strikes, the property owner will receive the ultimate value of the contract and can thereby hedge risk by offsetting losses incurred due to the hurricane. *Id.*

Congress passed the CEA in 1936 to regulate derivatives exchanges, but chose not to preempt state regulation of those exchanges. In 1974, Congress amended the CEA to establish the CFTC as the federal agency empowered to oversee and regulate exchanges under the CEA and to grant the CFTC "exclusive jurisdiction" to regulate trading on the exchanges it oversees. These amendments were designed to "[b]ring[] all futures trading under federal regulation." *Commodity Futures Trading Commission Act: Hearings Before the S. Comm. on Agriculture & Forestry on S. 2485, S. 2578, S. 2837, and H.R. 13113,* 93d Cong. 848 (1974) (hereinafter "Senate Hearings"). Congress recognized that federal regulation would only be workable if it "prevent[ed] any possible conflicts over jurisdiction." *Hearings Before the House Comm. on Agriculture*, 93d Cong., 1st Sess., at 128 (1973). Subjecting exchanges to "different State laws would just lead to total chaos." Senate Hearings at 685 (statement of Sen. Clark).

Congress also deliberately reinforced the CFTC's exclusive jurisdiction. After House drafters introduced a state-law savings clause, the Senate added language making clear that the clause applied "except as hereinabove provided" in the grant of exclusive jurisdiction to the CFTC. S. Rep. No. 93-1131, at 31 (1974). The language ensured that "the Commission's jurisdiction, where applicable supersedes State as well as Federal agencies." *Id.* at 23. The Senate also "struck" the existing CEA provision that preserved states' authority to regulate derivatives transactions. H.R. Conf. Rep. No. 93-1383 at 35. As the conference report explained, the amendments were designed to "preempt the field insofar as futures regulation is concerned." *Id.*

**A50**

The CFTC's regulatory framework is extensive, comprehensive, and exclusive. To obtain approval from the CFTC, an exchange must first apply for and receive the CFTC's designation as a contract market. 7 U.S.C. §§ 2(e), 7(a); 17 C.F.R. §§ 38.3(a). The exchange's application must detail its capacity to comply with all CFTC rules and regulations through a series of written submissions and exhibits. 17 C.F.R. § 38.3(a)(2). The CFTC then reviews the application and renders a decision on the exchange's designation. *Id.*

Once the CFTC designates an entity as a contract market—known as a "DCM"—the CFTC has "exclusive jurisdiction" over derivatives traded on the market, including "accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an 'option', 'privilege', 'indemnity', 'bid', 'offer', 'put', 'call', 'advance guaranty', or 'decline guaranty'), and transactions involving swaps or contracts of sale of a commodity for future delivery." 7 U.S.C. § 2(a)(1)(A). This exclusive jurisdiction extends to "event contracts." *See id.* § 1a(47)(A)(ii), (iv), (vi).

DCMs are subject to the CFTC's extensive regulatory framework as set out in Part 38 of Title 17 of the U.S. Code and in CFTC regulations. Together, these provisions establish a comprehensive scheme for regulating DCMs. *See Hendrick*, 2025 WL 1073495, at *3-4 (summarizing CFTC's regulatory scheme).

The CEA prescribes a specific method by which the CFTC may approve new contracts on DCMs. A DCM that abides by the requirements set forth in the CEA may list contracts on its exchange without pre-approval from the CFTC by self-certifying that the contracts comply with CFTC requirements. 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a). The contracts are immediately effective unless and until the CFTC initiates review of any contract. *See* 7 U.S.C. § 7a-2(c)(2); 17 C.F.R. §40.11(c). The CFTC "shall approve a new contract" unless the CFTC finds that it would violate the CEA or CFTC regulations. 7 U.S.C. § 7a-2(c)(5)(B). If a DCM offers a contract in violation of the CEA or CFTC regulations, the CFTC has an array of enforcement mechanisms, including but not limited to revocation of licensing, civil penalties, and criminal enforcement.

5

**A51**

In 2010, Congress amended the CEA to add a "Special Rule" specifically addressing event contracts. The Special Rule authorizes the CFTC to review and prohibit specific types of event contracts that it determines to be "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i). The CEA specifically authorizes the CFTC to reject event contracts if the Commission deems them to be "contrary to the public interest" and if they "involve" an "activity that is unlawful under any Federal or State law," "terrorism," "assassination," "war," "gaming," or "other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest." *Id.*; *see also* 17 C.F.R. § 40.11(a) (implementing Special Rule). The decision to prohibit an event contract that falls within any of these categories is subject to the CFTC's evaluation of the "public interest." *See KalshiEX*, 2024 WL 4164694, at *3 ("the CFTC may determine that an agreement, contract, or transaction is contrary to the public interest only if it involves" one of the enumerated categories). The Special Rule further provides that no contract "determined by the Commission to be contrary to the public interest . . . may be listed or made available for clearing or trading on or through a registered entity." 7 U.S.C. § 7a-2(c)(5)(C)(ii).

**B. Kalshi's Registration as a CFTC-Designated Contract Market Under Federal Law.**

In 2020, the CFTC unanimously certified Kalshi as a DCM that offers event contracts, affirming that its platform complies with the CEA's regulatory requirements. *See KalshiEX*, 2024 WL 4164694, at *4. Because Kalshi is a DCM, its event contracts are subject to the "exclusive jurisdiction" of the CFTC. 7 U.S.C. § 2(a)(1)(A). Federal law requires Kalshi to comply with a host of federal requirements designed to ensure market integrity. An exchange's status as a DCM "imposes upon it a duty of self-regulation, subject to the Commission's oversight," requiring the exchange to "enact and enforce rules to ensure fair and orderly trading, including rules designed to prevent price manipulation, cornering and other market disturbances." *Am. Agric. Movement, Inc.*, *v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1151 (7th Cir. 1992).

Kalshi offers many kinds of event contracts related to climate, technology, health, crypto, popular culture, sports, politics, and economics. Compl. ¶ 48. For example, Kalshi's platform currently allows users to trade on whether India will meet its 2030 climate goals, or whether the

market share for electric vehicles will be above 50% in 2030.  As relevant here, Kalshi also offers sports-event contracts.  Kalshi self-certified and listed sports-related contracts on its exchange on January 24, 2025, allowing users to place positions on, for example, which teams will advance in certain rounds of the NCAA College Basketball Championship or who will win the U.S. Open Golf Tournament.  *Id.* ¶ 49.  Kalshi's sports-event contracts were immediately effective upon self-certification and the CFTC has declined to review them.  *Id.*  Thus, Kalshi's sports-event contracts are legal under federal law.  *Id.*  While federal law requires the CFTC to prohibit contracts it considers "gaming" if it concludes those contracts are contrary to the public interest, the CFTC has declined to prohibit Kalshi's contracts.

Kalshi's sports-related contracts involve sporting events, but there are crucial differences between Kalshi's exchange and a sportsbook that justify the different regulatory models under which they function.  A financial exchange is an investment marketplace where traders enter into contracts with other traders—not with a casino or "house" that stacks the odds in its own favor.  Ex. 6, Declaration of Xavier Sottile ¶¶ 26-27.  For that reason, federal law as enforced by the CFTC focuses on preventing market manipulation and disruption and ensuring market efficiency nationwide.  *See* 17 C.F.R. §§ 38.250, 38.152; *see Am. Agric. Movement*, 977 F.2d at 1156.

## C.  The Ohio Regulatory Scheme for Gambling.

The Ohio Casino Control Commission regulates gambling in the state of Ohio through a licensing regime.  Compl. ¶ 26.  It oversees licensing, regulating, investigating, and penalizing casino operators, management companies, holding companies, key employees, casino gaming employees, and gaming related vendors in Ohio.  *Id.*  As the state's gaming regulator, the Casino Commission has jurisdiction over all persons that participate in casino gaming.  *Id.*  Particularly relevant to the present dispute are Ohio's laws on gambling enterprises.  Ohio requires that any gambling enterprise that offers sports gaming—including wagers on sporting events—seek a license from the Casino Commission.  R.C. 3775.03(A).  Under Ohio law, a wager is defined as "risk[ing] a sum of money or thing of value on an uncertain occurrence."  R.C. § 3775.01(DD).  Ohio law only permits wagers to be made by individuals physically in the state.  R.C. §§

7

**A53**

3775.11(A), 3775.12(A).  Offering sports gaming in Ohio in a manner that violates the state's gaming laws constitutes a felony, exposing any violators to civil and criminal penalties.  R.C. §§ 3775.99(B)(9), 2915.02, 3775.02.

### D. The Casino Commission's Cease-and-Desist Letter to Kalshi and Subsequent Threat to Kalshi's Business Partners.

On March 31, 2025, the Casino Commission sent a cease-and-desist letter to Kalshi's counsel, claiming that "offering 'event contracts' on sporting events to citizens located within the State of Ohio, without a sports gaming license" violated Ohio law.  Ex. 1 at 2.  The Casino Commission demanded that Kalshi cease and desist its operations in Ohio by April 14, 2025, or else be subject to "administrative, civil, or criminal sanctions pursuant" to Ohio gambling laws. *See* Ex. 1 at 3; *see also* R.C. chs. 2915, 3775.  The Casino Commission also claims that Kalshi's website "constitutes a nuisance under Ohio law that is subject to abatement."  Ex. 1 at 3; *see also* R.C. ch. 3767; R.C. § 3775.99(B)(9).

Kalshi responded to the Casino Commission's cease-and-desist letter on May 15, 2025, explaining that Kalshi is a federally regulated DCM "no different from the Chicago Mercantile Exchange, the Intercontinental Exchange, or other more established derivatives markets" and that the event contracts it offers are "federally regulated derivatives contracts," not "wagers based on house odds."  Ex. 2 at 2–4.  As the letter explained, Kalshi is subject to the extensive, comprehensive, and exclusive jurisdiction of the CFTC, and individual states are preempted from regulating the operation of DCMs.  *Id.* at 7–8; 7 U.S.C. § 2(a)(1)(A).  The letter also highlighted the "fundamental mismatch between how Ohio regulates sports gaming and how federal law regulates Kalshi's exchange." *Id.* at 10.

On August 19, 2025, the Casino Commission replied to Kalshi's letter by asking for responses to specific factfinding demands.  Ex. 3.  Then, in an attempt to circumvent the CEA's exclusive jurisdiction, on August 25—six days after sending Kalshi its August 19 letter—the Casino Commission sent a letter to sports gaming licensees operating in Ohio (the "Sports Gaming Licensee Letter").  This letter threatened to "take administrative action against any licensee" that

"decides to associate, coordinate, or otherwise partner directly or indirectly with entities offering or facilitating the offering of sporting event contracts in Ohio." Ex. 5 at 4–5. The letter clarified that its threat applied "even if a sports-gaming licensee in Ohio geofences or takes other actions to restrict Ohioans from accessing sporting event contracts" offered entirely "outside Ohio." *Id.* Thus, any Ohio licensee that partners with Kalshi not just in Ohio, but in any other state, threatens to lose their license. The Sports Gaming Licensee Letter has chilled the licensees' interest in engaging in business with Kalshi out of fear of retaliation by the Casino Commission. Ex. 7, Declaration of Sara Slane ¶¶ 9-14.

On September 18, 2025, Kalshi responded to the Casino Commission's August 19 letter, *see* Ex. 4 at 2, addressing both the factfinding demands that the Commission had issued in that letter, and the Sports Gaming Licensee Letter. The Casino Commission responded with a letter of its own on October 6, 2025. In that letter, the Casino Commission stated that it "is unpersuaded that Ohio law is preempted by federal law as Kalshi contends," and that if "Kalshi chooses to continue to offer unlicensed and unregulated sports gaming in the form of sporting event contracts within Ohio, Kalshi will be violating Ohio law." Ex. 8 at 1. The letter also declined to withdraw the Sports Gaming Licensee Letter. *Id*. at 2. The letter demanded that Kalshi comply with the cease-and-desist latter "by no later than October 20, 2025," and threatened that if Kalshi declines "the Commission will be forced to address such violation of law directly." *Id*. at 1–2.

## **ARGUMENT**

Kalshi is entitled to a preliminary injunction. Federal Rule of Civil Procedure 65 governs the issuance of a preliminary injunction. *ABX Air, Inc. v. Int'l Bhd. of Teamsters, Airline Div.*, 219 F. Supp. 3d 665, 670 (S.D. Ohio 2016). To obtain a preliminary injunction, the moving party must demonstrate that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of relief; (3) the balance of equities tips in its favor; and (4) the injunction is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008). For the same reasons the Districts of Nevada and New Jersey recently granted Kalshi a preliminary injunction in similar cases, Kalshi meets each element of the inquiry.

**A55**

**A. Kalshi Is Likely to Succeed Because Ohio's Direct and Indirect Efforts to Regulate Kalshi's Event Contracts Are Preempted by the CEA and Its Regulations.**

A "fundamental principle of the Constitution" is that "Congress has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). Federal law can preempt state law either expressly or impliedly. One manner of preemption is known as field preemption, which occurs where Congress manifests an intent to exclusively occupy an entire field of regulation. *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982). Alternatively, federal law can preempt state law where compliance with both is impossible or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," known as conflict preemption. *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). It is well-settled that the CEA and its implementing regulations have "resulted in the preemption of all other would-be regulators at every level of government." Philip F. Johnson, *The Commodity Futures Trading Commission Act: Preemption as Public Policy*, 29 Vand. L. Rev. 1, 2 (1976). Ohio's gambling and nuisance laws are no exception.

1. <u>Ohio Gambling Laws Are Field Preempted as Applied to Kalshi's Event Contracts.</u>

Field preemption exists where a federal regulatory scheme is "so pervasive as to make reasonable the inference that [it] left no room for the States to supplement it." *de la Cuesta*, 458 U.S. at 153 (quotation omitted). Field preemption can be either express or implied. *See Crosby*, 530 U.S. at 372 n.6 (the preemption "categories" "are not 'rigidly distinct,'" and "'field' preemption may fall into any of the categories of express, implied, or conflict preemption"). "[T]he ultimate touchstone of pre-emption analysis" is the "purpose of Congress." *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992). Congress's intent to occupy a field can be apparent in the statutory text and history. *See, e.g.*, *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 203-13 (1983). Courts can also infer field preemption from a scheme of "federal statutory directives" that "provide a full set of standards . . . designed [to function] as a 'harmonious whole.'" *Arizona v. United States*, 567 U.S. 387, 401 (2012) (quoting

*Hines*, 312 U.S. at 72). "Where Congress occupies an entire field . . . even *complementary* state regulation is impermissible." *Id.* (emphasis added).

Congress has preempted the field of regulating trading on DCMs, both expressly in the text of the CEA and implicitly by creating a comprehensive structure for regulating DCMs that leaves no room for state regulation. As federal courts in New Jersey and Nevada have already held, the CEA clearly evidences Congress's intent to occupy the field of futures trading on CFTC-regulated exchanges. *Hendrick*, 2025 WL 1073495, at *6; *Flaherty*, 2025 WL 1218313, at *6. Every marker of congressional intent confirms that Congress has preempted the field.

*Statutory Text*: The text of the 1974 amendments to the CEA could hardly be clearer. Congress established the CFTC and granted it "*exclusive jurisdiction*" over all "accounts," "agreements," and "transactions involving swaps or contracts of sale of a commodity for future delivery" that are "traded or executed on a contract market designated" by the CFTC. 7 U.S.C. § 2(a)(1)(A) (emphasis added). Kalshi's event contracts are traded on a contract market designated by the CFTC, and the CFTC therefore has "exclusive jurisdiction" to regulate these contracts.

Congress in the 1974 Act did not preempt regulation of *all* derivatives contracts. Instead, Congress cabined federal preemption to contracts traded *on DCMs*. The statute preserves concurrent state regulation for commodities and futures contracts traded *outside of DCMs*. 7 U.S.C. § 2(a); § 16(e); H.R. Rep. No. 97-565, pt. 1, at 44 (1982) (acknowledging that federal and state agencies may police "those who offer fraudulent *off-exchange* investments" and other "transactions *outside* those preserved exclusively for the jurisdiction of the CFTC.") (emphasis added). Thus, federal preemption of the Ohio law as to Kalshi does not call into question the state's regulation of casinos or other gambling establishments, none of which are DCMs.

For CFTC-designated exchanges like Kalshi, however, the CFTC has "exclusive jurisdiction." 7 U.S.C. 2(a)(1)(A). Courts have easily found that statutes containing similar language preempt parallel state law regulation. *See Slaney v. The Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 594-95 (7th Cir. 2001). District courts in Nevada and New Jersey recently granted Kalshi a preliminary injunction on the ground that the statute's "plain and unambiguous language

11

**A57**

grants the CFTC exclusive jurisdiction" over contracts and swaps "that are traded or executed on exchanges that the CFTC has designated." *Hendrick*, 2025 WL 1073495, at *5; *see also Flaherty*, 2025 WL 1218313 at *6 (agreeing that "Kalshi's sports-related event contracts fall within the CFTC's exclusive jurisdiction").[1]

*Statutory Purpose*:  Congress in the 1974 Act sought to prevent exchanges from being subjected to fragmented regulatory demands that could differ from one jurisdiction to the next. One "aim" of the 1974 Act was to "avoid unnecessary, overlapping and duplicative regulation." *FTC v. Ken Roberts Co.*, 276 F.3d 583, 588 (D.C. Cir. 2001).  As one sponsor of the 1974 Act explained, "different State laws would just lead to total chaos."  Senate Hearings at 685 (statement of Sen. Clark).

Congress thus placed "all exchanges and all persons in the industry under the same set of rules and regulations for the protection of all concerned."  H.R. Rep. No. 93-975, at 79 (1974). The Conference Report confirmed Congress's intent to preempt the field:  "Under the exclusive grant of jurisdiction to the Commission, the authority in the Commodity Exchange Act (and the regulations issued by the Commission) *would preempt the field insofar as futures regulation is concerned.*"  H.R. Conf. Rep. No. 93-1383 at 35 (emphasis added).

Courts agree that Congress intended to preclude states from exercising parallel authority over commodity futures trading in exchanges designated by the CFTC.  Writing for the Second Circuit, for example, Judge Friendly explained that the CEA "preempts the application of state law" regarding trading on federal exchanges.  *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980); *see also Int'l Trading, Ltd. v. Bell*, 556 S.W.2d 420, 424 (Ark. 1977) (exclusive-jurisdiction clause "is a clear indication that Congress intended no regulation in this field except under the authority of the act"); *see, e.g.*, *Hendrick*, 2025 WL 1073495, at *6.  The Casino Commission's effort to regulate Kalshi's event contracts cannot be reconciled with that clear congressional purpose.

---

[1] A district court in Maryland reached a different conclusion, but Kalshi has appealed that decision to the Fourth Circuit.  *See KalshiEX LLC v. Martin*, No. 25-cv-1283-ABA, 2025 WL 2194908, at *1 (D. Md. Aug. 1, 2025), appeal docketed No. 25-1892 (4th Cir.).

*Drafting history*: The drafting history of the 1974 Act eliminates all doubt as to Congress's intent to preempt state laws like those Defendants have threatened to enforce against Kalshi. To "assure that Federal preemption is complete," the Senate deleted the provision the Supreme Court had previously interpreted to preserve the states' authority over futures trading. 120 Cong. Rec. 30,464 (Sept. 9, 1974) (statement of Sen. Curtis); *see Rice v. Bd. of Trade of Chi.*, 331 U.S. 247, 255 (1947). And after House drafters introduced a state-law savings clause, the Senate added language making clear that the clause applied "except as hereinabove provided" in the grant of exclusive jurisdiction to the CFTC. S. Rep. No. 93-1131, at 31 (1974). The language ensured that "the Commission's jurisdiction, where applicable supersedes State as well as Federal agencies." *Id.* at 23. These changes "wholly and unequivocally eliminated each of the bases" the Supreme Court had previously relied on "to hold that the CEA did not preempt state regulation." Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657, 692-93 (1982). "Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 442-43 (1987). The Senate's decision to omit provisions allowing concurrent state jurisdiction over trading on DCMs is yet further proof of Congress's intent to preempt parallel state regulation.

*Comprehensive regulatory scheme*: The comprehensive nature of the regulatory scheme Congress created for CFTC-authorized exchanges is further evidence that Congress intended to foreclose concurrent state jurisdiction. *See Arizona*, 567 U.S. at 401; *La. Pub. Serv. Comm'n v. FCC,* 476 U.S. 355, 368-69 (1986).

As the Supreme Court has found, the CEA establishes "a comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* 456 U.S. 353, 356 (1982) (quoting H.R. Rep. No. 93-975, at 1 (1974)). An exchange may only offer futures contracts after undergoing an extensive review process and receiving the CFTC's designation as a DCM. 7 U.S.C. §§ 2(e), 7(a); 17 C.F.R. § 38.100. Once an exchange is designated as a DCM, the CFTC enjoys "exclusive jurisdiction"

13

**A59**

over the derivatives traded on the market. 7 U.S.C. § 2(a)(1)(A). DCMs are subject to an extensive framework of CFTC oversight, involving recordkeeping requirements, 17 C.F.R. §§ 38.950, 1.31, reporting obligations, *id.* § 38.450, pt. 16, liquidity standards, *id.* § 38.1101(a)(2), and penalties for noncompliance, *id.* pt. 38. And Congress elected to allow DCMs to list contracts—including event contracts—by self-certifying that they comply with the CEA's requirements. 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a). Congress then gave the CFTC the back-end authority to conduct a review of a contract if it believes the contract may run afoul of any statute or regulation. *See* 7 U.S.C. § 7a-2(c)(2); 17 C.F.R. § 40.11(c). Failure to abide by the CFTC's contract determinations can result in civil and criminal penalties, which the CFTC may pursue at its discretion.

Of particular relevance here, the CEA specifically authorizes the CFTC to reject certain event contracts deemed to be "contrary to the public interest" *and* "involv[ing]" certain types of activities. 7 U.S.C. § 7a-2(c)(5)(C)(i). The statute is not mandatory—the CFTC "may" reject a contract involving a listed activity *or* it may determine that such a contract would not be contrary to the public interest. *Id.* Congress thus left the decision about the public interest to one federal authority—not 50 separate states and the District of Columbia.

Congress dictated an enforcement role for states—but that role expressly *excludes* the right to enforce state laws against DCMs. The CEA authorizes appropriate officials "of any State" to bring suit regarding "any act or practice constituting a violation of any provision of this chapter or any rule, regulation, or order of the [CFTC] thereunder"—but a proviso to this provision allows states to enforce the CEA against parties "*other than a [designated] contract market.*" 7 U.S.C. § 13a-2(1) (emphasis added). Congress added this proviso because it "wanted the power to enforce the CEA *with respect to organized exchanges* to remain solely in the CFTC." Van Wart, supra, at 708. Congress further made clear that the CEA does not "supersede or preempt" the application of state law to entities that are "required to be registered or designated" with the CFTC but "fail or refuse" to do so. 7 U.S.C. § 16(e). In other words, Congress granted the CFTC exclusive power to regulate contracts traded on the exchanges it oversees but permitted federal and state agencies to police "those who offer fraudulent *off-exchange* investments" and other "transactions *outside*

14

**A60**

those preserved exclusively for the jurisdiction of the CFTC." H.R. Rep. No. 97-565, pt. 1, at 44 (1982) (emphasis added). This comprehensive regulatory scheme for regulating trading on licensed exchanges evinces a strong congressional intent to preempt the field.

Indeed, the Ohio legislature itself has recognized that federal law preempts the field. Prior to 1972, Ohio had a "bucket shop" law that criminalized entry into contracts that were "closed, adjusted or settled according to, or upon the basis of, the public market quotations of prices made on any board of trade or exchange" that did not contemplate actual delivery of the subject of the contract. G.C. § 13079; R.C. §§ 2915.20, 21 (1958). Ohio repealed that law in 1972 and amended Section 2915.02 to make clear that it does not "prohibit conduct in connection with gambling expressly permitted by law." § 2915.02(C) (effective 1972); § 2915.20 (repealed in 1972). The clear import of these amendments is that Ohio has no authority to regulate trading that federal law expressly permits—even if the state considers the trading to be a form of gambling.

2. Ohio Laws Are Conflict-Preempted as Applied to Kalshi.

Ohio's gambling laws are also conflict-preempted as applied to Kalshi because it would be "impossible" for Kalshi "to comply with both state and federal law," and because Ohio's laws stand "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in the CEA. *Crosby*, 530 U.S. at 372-73. In at least three respects, subjecting Kalshi's event contracts to Ohio law would conflict with the CEA.

*First*, Congress passed the 1974 Amendments to the CEA to bring futures markets regulation "under a uniform set of regulations." *Am. Agric. Movement, Inc.*, 977 F.2d at 1156. "As Congress recognized in enacting the 1974 Act, a contract market could not operate efficiently, and perhaps not at all, if varying and potentially contradictory legal standards governed its duties to investors." *Id.* The Seventh Circuit has thus held that "[w]hen application of state law would directly affect trading on or the operation of a futures market, it would stand 'as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,' and hence is preempted." *Id.* at 1156-57 (citation omitted).

15

**A61**

Defendants' actions clearly conflict with Congress's goal to avoid subjecting regulated exchanges to multiple conflicting legal regimes. Defendants intend to deploy state laws to regulate Kalshi's contract market—exactly what Congress did not want states to regulate. The conflict is even clearer when considering the possibility that 49 other states and the District of Columbia might equally attempt to subject Kalshi to their own state laws. This outcome would erect "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines,* 312 U.S. at 67; *Hendrick, et al.*, 2025 WL 1073495 at *7 ("Preventing the difficulties" created by multiple state enforcement efforts "is the reason Congress granted the CFTC exclusive jurisdiction over CFTC-designated exchanges").

*Second*, a state law stands as an "obstacle" to a federal regulatory scheme if Congress chooses a specific enforcement method to achieve federal goals and a state law hampers "the careful balance struck by Congress." *Arizona*, 567 U.S. at 406. Where Congress "entrust[s]" the federal government with "discretion" over violations of federal law, a state regime that allows for state prosecutions of the same actions is "preempted by federal law." *Id.* at 407-10. Otherwise, a state could bring charges against an individual "even in circumstances where federal officials in charge of the comprehensive scheme determine that prosecution would frustrate federal policies." *Id.* at 402.

That is exactly the risk posed by Defendants' actions. Under federal law, once Kalshi was approved as a CFTC-designated contract market, Kalshi was authorized to list its event contracts by self-certifying that these contracts comported with federal law. The CFTC had the authority to review that self-certification on the ground that these contacts were "contrary to the public interest," 7 U.S.C. § 7a-2(c)(5)(C)(i), but chose not to do so. Compl. ¶ 49. The CFTC's Enforcement Division has authority to investigate and initiate enforcement actions seeking an array of penalties in federal court or administrative proceedings, but, again, chose not to do so. Congress thus gave the CFTC a variety of tools for enforcing federal law against federally designated contract markets and entrusted the CFTC with discretion to pursue the penalties it deems most appropriate.

16

**A62**

Subjecting federally regulated exchanges to state laws like Ohio's would disrupt "the congressional calibration of force." *Crosby*, 530 U.S. at 380. Ohio criminal law imposes penalties that would substantially interfere with the CFTC's discretion. For example, Ohio authorities threatened Kalshi with violations of statutes that carry penalties of fines and *imprisonment*. *See e.g.,* R.C. 2929.14(A)(4). The cease-and-desist letter also asserted that Kalshi's event contracts constitute a nuisance under Ohio law and violate state statutory gambling age limits. *See* Ex. 1 at 3. Absent a finding of preemption, the carefully calibrated federal enforcement scheme would be displaced by a blunt application of mandatory state criminal penalties.

*Third*, it is impossible for Kalshi to comply with the Casino Commission's demands while continuing to adhere to the Core Principles on which Kalshi's designation as a CFTC-approved market depends. To secure a license in Ohio, Kalshi would need to limit access to the exchange solely to persons making trades in Ohio. *See* R.C. §§ 3775.11(A), 3775.12(A). But the requirement to accept trades only within one state would be impossible for a nationwide exchange like Kalshi required by federal law to "provide its members, persons with trading privileges, and independent software vendors with *impartial access* to its markets and services." 17 C.F.R. § 38.151(b) (emphasis added); *see also* 17 C.F.R. § 38.150. Attempting to comply with Ohio's scheme would therefore present Kalshi with an impossible choice—either to accept trades exclusively from persons within Ohio or to close its exchange to Ohio in violation of its impartial access obligations. And subjecting Kalshi to state law would mean that 49 other states would be free to subject Kalshi to the same impossible choice, resulting in precisely the state-by-state patchwork that Congress in 1974 sought to avoid. This is a classic example of impossibility preemption—where federal law "forbids what the state law requires." *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 460 (2012).[2]

---

[2] Even if Kalshi could somehow exclude Ohio residents from participating in its exchange, CFTC's Core Principle 4 requires Kalshi to "establish and maintain risk control mechanisms to prevent and reduce the potential risk of *price distortions and market disruptions*." 17 C.F.R. § 38.255 (emphasis added). Abruptly closing Kalshi's event contracts to anyone located in Ohio as a result

**A63**

3. Defendants May Not Punish Kalshi's Partners for Affiliating with Kalshi.

Just as Defendants cannot punish Kalshi directly for offering sports-event contracts, they cannot make an end-run around preemption by punishing entities that partner with Kalshi. It is well settled that "a government official cannot do indirectly what she is barred from doing directly." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024). That prohibition extends to all regulation that threatens parties for "exercising their constitutional rights." *Am. Fed'n of Tchrs. v. Dep't of Educ.*, 779 F.Supp.3d 584, 609 (D. Md. 2025). Here, the Casino Commission's threat to revoke the license of any entity that partners with Kalshi is a transparent backdoor attempt to regulate Kalshi in defiance of the CEA. By forcing Kalshi's partners to choose between protecting their Ohio licenses and working with Kalshi, the Casino Commission is punishing Kalshi for doing exactly what the CEA permits it to do. The Casino Commission's threats against third parties are therefore just as unlawful as its threats against Kalshi itself.

Courts have easily invalidated similar efforts by state officials to do indirectly what the Constitution forbids them from doing directly. In *Vullo*, for example, the Supreme Court unanimously held that a state official could not suppress the NRA's speech in violation of the First Amendment by threatening "to wield her power against those refusing to aid her campaign to punish the NRA's gun-promotion advocacy." 602 U.S. at 194. The Seventh Circuit held similarly in a case where a sheriff threatened third parties unless they served ties with a disfavored website the sheriff could not regulate directly. *See Backpage.com, LLC v. Dart*, 807 F.3d 229, 231 (7th Cir. 2015) (Posner, J.). Much like here, the sheriff sought to "suffocat[e]" the website, depriving it of revenue "by scaring off" its partners. *Id.* at 231. "The analogy," the Seventh Circuit explained, "is to kill[] a person by cutting off his oxygen supply rather than by shooting him." *Id.* The court held that the sheriff could not "issue and publicize dire threats" against third parties "in an effort to throttle" an entity it had no right to regulate directly. *Id.* at 235.

---

of the Casino Commission's threats of criminal liability would constitute exactly that sort of market disruption.

The Supreme Court has reached the same conclusion in the preemption context, forbidding state officials from making an end-run around federal law by creative attempts to avoid preemption. In *Engine Manufacturers Ass'n v. South Coast Air Quality Management. Dist.*, 541 U.S. 246 (2004), for example, to circumvent a federal law prohibiting localities from adopting motor vehicle emissions standards, a locality sought to restrict *purchases* of motor vehicles that did not satisfy certain standards rather than restricting *sales* of those vehicles. The Court held that "treating sales restrictions and purchase restrictions differently for pre-emption purposes would make no sense" because a manufacturer's "right to sell federally approved vehicles is meaningless in the absence of a purchaser's right to buy them." *Id.* at 255. In *Rowe v. New Hampshire Motor Transport Ass'n*, 552 U.S. 364, 371 (2008), the Court held that a federal statute preempting state laws governing motor *carriers* similarly prevented states from imposing delivery standards for *shippers*, reasoning that while the state regulation "is less 'direct' than it might be . . . [n]onetheless, the effect of the regulation is that carriers will have to offer . . . delivery services that differ significantly from those that, in the absence of the regulation, the market might dictate." *Id.* In *North Natural Gas Co. v. State Corp. Commission of Kansas*, 372 U.S. 84, 86 (1963), the Court found that a state agency "encroach[ed] upon the exclusive regulatory jurisdiction of the Federal Power Commission" conferred by federal law when the agency directed a pipeline company to purchase gas from certain wells in Kansas, which made it impossible for the company to comply with federal law. *Id.* at 86–87. The Court explained that "[t]he federal regulatory scheme leaves no room either for direct state regulation of . . . wholesales of natural gas *or for state regulations which would indirectly achieve the same result*." *Id*. at 91 (emphasis added) (citation omitted).

The Sixth Circuit has ruled similarly. In *City of Eugene, Oregon v. FCC*, 998 F.3d 701, 715 (6th Cir. 2021), a city sought to circumvent the cap the Federal Communications Act imposes on "franchise fees" by invoking its police power to instead levy a higher "license fee." The Court held that the city's "license fee" was merely "the exercise of its franchise power by another name" and that such local regulation circumvents federal regulation by trying "to accomplish indirectly what franchising authorities are prohibited from doing directly." *Id.*

19

**A65**

Similarly, here, just as the CEA prohibits the Casino Commission from regulating Kalshi directly for offering sports-event contracts, the CEA likewise prohibits the Casino Commission from targeting Kalshi by threatening to revoke the license of any entity that partners with Kalshi. The threat operates as an indirect means to achieve what the Casino Commission is preempted from doing directly to Kalshi.

Two features of the threats against Kalshi's partners are especially troubling. First, by targeting Ohio gaming-license holders rather than Kalshi itself, Defendants have adopted an "intermediary strategy" that would allow them "to expand their regulatory jurisdiction" over an entity "that they have no direct control over." *Vullo*, 602 U.S. at 197-98. Ohio licensees have strong incentives to comply with Defendants' threats for fear of losing their licenses in Ohio, and they have little incentive to fight these threats and risk the retribution of their regulator. The fact that these threats are aimed at third parties therefore makes them more problematic, not less. And second, Defendants' threats have the effect of operating extraterritorially. The Casino Commission has made clear that a licensee who partners with Kalshi in offering sports-event contracts *outside of Ohio* will face punishment "*even if*" the licensee "geofences or takes other actions to restrict Ohioans from accessing sporting event contracts in the prediction markets that are otherwise offered to their patrons *outside Ohio*." Ex. 5 at 4 (emphasis added). Thus, Defendants' threats prohibit Ohio licensees from partnering with Kalshi even in states that deem Kalshi's sports-event contracts entirely lawful. Indeed, these threats prohibit Ohio licensees from partnering with Kalshi in Nevada and New Jersey, where Kalshi has obtained preliminary injunctions on the ground that its sports-event contracts are lawful. The extraterritorial reach of Defendants' threats raises serious additional concerns under the dormant Commerce Clause. *See Healy v. Beer Inst.*, 491 U.S. 324, 336 (1989) (a state "statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority").

**A66**

## B. Kalshi Will Suffer Irreparable Harm Without a Preliminary Injunction.

The Casino Commission's cease-and-desist letter threatens Kalshi with a classic "Hobson's choice" giving rise to irreparable harm—either "continually violate [state] law and expose [itself] to potentially huge liability," or "suffer the injury of obeying the law during the pendency of the proceedings and any further review." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992). As the district courts in Nevada and New Jersey recognized in similar circumstances, Kalshi suffers irreparable harm along several dimensions.

*First*, if Kalshi chooses not to comply with the Casino Commission's unconstitutional threats, Kalshi and its officers face the extraordinary harms associated with the threat of civil liability and criminal prosecution. The Supreme Court has recognized that a party facing the threat of imminent enforcement under a preempted state statute suffers "irreparable injury." *Id.* The Sixth Circuit agrees that "a finding of irreparable injury is mandated" when a court finds that a "constitutional right is being threatened or impaired." *ACLU v. McCreary Cnty.*, 354 F.3d 438, 445 (6th Cir. 2003); *see also Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) (plaintiff establishes a likelihood of irreparable harm when it demonstrates a "credible threat of prosecution" under a preempted state statute). The Casino Commission expressly threatened Kalshi with "pursuing all legal remedies and actions," including prosecution, if it failed to cease "offering, participating in offering, or facilitating those who offer" event contracts in Ohio, making clear that the threat of enforcement is imminent. Ex. 1 at 3. One other state recently commenced enforcement proceedings against Kalshi under state gaming laws, confirming that the threat of enforcement here is not speculative. *See Commonwealth of Mass. v. KalshiEX LLC*, No. 2584-cv-02525 (Mass. Sup. Ct.).

*Second*, attempting to comply with the Casino Commission's unconstitutional threat would subject Kalshi to extensive harms that could not be remedied even if it ultimately prevailed in this litigation. Kalshi has almost 35,000 users in Ohio, many of whom have open investments on the platform. Ex. 6, Declaration of Xavier Sottile ¶ 47. If Kalshi complied with the Casino Commission's unconstitutional threat during the pendency of this litigation, it would forego

21

**A67**

business in this market, with no prospect of recouping its losses even if it ultimately prevails. Moreover, it is not at all clear that Kalshi has the capacity to comply with the threat to cease "immediately" as the Casino Commission demands, and any attempt at complying would subject Kalshi to extraordinary technological challenges and costs. Kalshi has no need currently to comprehensively geolocate its users on a state-by-state basis because it is regulated federally. *Id.* ¶ 19. Attempting to implement geolocation capabilities would take months and cost tens of millions of dollars annually. *Id.* ¶¶ 21-22. And because the Eleventh Amendment permits only *injunctive relief* against state officials enforcing unconstitutional state law, *see Ex parte Young*, 209 U.S. 123, 155 (1908); *Zielasko v. Ohio*, 873 F.2d 957, 959 (6th Cir. 1989), Kalshi would have no clear way of seeking damages if it ultimately prevailed. *See California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018) (monetary harm "is irreparable here because the states will not be able to recover monetary damages" due to damages immunity).

*Third*, a preliminary injunction is needed not just to protect Kalshi, but also Kalshi's users. Users who trade on Kalshi's platform enter into contracts with other users. Immediately shuttering access to these contracts for Ohio users could require Kalshi unilaterally to terminate users' contracts and liquidate their positions, or to pause trading on these contracts pending the outcome of litigation months or more in the future. Ex. 6, Declaration of Xavier Sottile ¶ 29. Under either scenario, this would be an extraordinary and disruptive act, harming users not just in Ohio but nationwide, because cutting off access to users in one state would substantially distort the markets even for users in other states. Such an impairment of existing contractual obligations for Kalshi's users easily constitutes irreparable harm. *See Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 550 (6th Cir. 2007) ("likely interference with customer relationships" resulting from breach of contract constitutes irreparable harm.).

*Fourth*, Kalshi will face irreparable reputational harm if no injunction is granted. If Kalshi chooses not to comply on the ground that Ohio law is preempted, the threat of prosecution—not to mention being labelled a willful violator of Ohio law—would undermine the reputation that Kalshi has cultivated over many years and that resulted in Kalshi being the first event market

designated by the CFTC. But bowing to the Casino Commission's threat by abruptly ending its business in Ohio would undermine users' confidence in Kalshi's exchange and make them fear that their own investments are at risk. *See* Ex. 6, Declaration of Xavier Sottile ¶¶ 12, 30-32, 37, 47; Ex. 7, Declaration of Sara Slane ¶¶ 14-15. This loss of "goodwill" could not easily be regained even if Kalshi ultimately prevails and constitutes a distinct form of irreparable harm. *Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992). Moreover, the Casino Commission's demands jeopardize Kalshi's status as a CFTC-designated contract market—and thus pose an existential threat to Kalshi. Abruptly terminating its event-based contracts in Ohio would risk violating the CFTC Core Principles to which Kalshi is subject, including the obligation to provide "impartial access" to its markets, 17 C.F.R. § 38.151(b), and the obligation to reduce the risk of "market disruptions," *id.* § 38.255. Should the CFTC conclude that closing Kalshi's markets in Ohio violates federal law, it could respond by seeking to revoke Kalshi's designation. 7 U.S.C. § 8(b). A preliminary injunction is needed to prevent Kalshi from suffering irreparable harm during the pendency of this litigation.

*Fifth*, the Casino Commission's threats to revoke the licenses of Kalshi's partners further exacerbate Kalshi's harm. These threats are suffocating Kalshi's growth by impeding its ability to enter into critical partnerships and turning Kalshi into a business pariah. Worse, these threats have the effect of operating extraterritorially, because the Casino Commission has threatened to revoke the license of any entity that partners with Kalshi *even if that partnership occurs entirely out of state*. This harm is not speculative: certain prospective Kalshi partners have already expressed grave concerns to Kalshi about Ohio's threats, with a very real prospect of scuttling partnership agreements that were long in the works. And Kalshi's partners cannot avoid the problem by declining to offer event contracts in Ohio, because the Casino Commission has made clear that entities that partner with Kalshi elsewhere will face retribution in Ohio. Even if Kalshi ultimately prevails in this litigation, its growth will be irreparably hampered if it is treated like a business pariah for the many months or longer it could take this case to proceed to final judgment.

*See* Ex. 7, Declaration of Sara Slane ¶¶ 14-16.  In the absence of an injunction, Kalshi could not remedy those nationwide harms, even if it were to ultimately prevail in Ohio.

### C. The Balance of the Equities and Public Interest Favor a Preliminary Injunction.

The public has a first-order interest in ensuring that preempted Ohio laws are not enforced against federally regulated entities.  "It is in the public interest not to perpetuate the unconstitutional application of a statute." *Martin-Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 568 (6th Cir. 1982).  By the same token, if "the challenged law is unconstitutional, no substantial harm to others can be said to inhere in its enjoinment." *See Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*, 274 F.3d 377, 400 (6th Cir. 2001).  Both courts to have addressed the question in the related litigations have accordingly found that enjoining a preempted law comports with the public interest. *Hendrick,* 2025 WL 1073495, at *8; *Flaherty*, 2025 WL 1218313, at *7.  Ohio retains no reciprocal interest because it lacks any interest in enforcing a state law that is preempted. *See Arizona*, 567 U.S. at 401.

Beyond that, the failure to issue an injunction here would "reach beyond the parties involved directly in the suit and impact the public's right[s]." *Associated Builders & Contractors v. Mich. Dep't of Lab. & Econ. Growth*, 543 F.3d 275, 278 (6th Cir. 2008) (citation and internal quotation marks omitted).  Immediate compliance with Ohio law to avoid criminal penalties will harm Kalshi's users in Ohio and impose intractable technological difficulties on a very short timeframe. Ex. 6, Declaration of Xavier Sottile ¶¶ 12-28.  Abrupt cessation would make it difficult to inform users in Ohio of their rights and obligations regarding ongoing event contracts and would risk cutting off users' access to their investments on Kalshi's exchange. *Id*. ¶¶ 29-37.  Given that the Ohio laws are clearly preempted by federal law as applied to Kalshi, the balance of the equities and public interest firmly favor preliminary relief.

The issuance of a preliminary injunction would also serve the public interest of ensuring regulators cannot "do indirectly what [they are] barred from doing directly." *Vullo*, 602 U.S. at 190.  As detailed *supra* in Section (A)(3), not only are Defendants preempted from directly

punishing Kalshi for offering sports-events contracts, they also cannot make an end-run around preemption by indirectly punishing Kalshi through acting against Kalshi's partners. Yet, that threat alone is enough for Kalshi's partners to fear losing their licenses in Ohio and therefore opt to comply with the Casino Commission's demands even if they are unlawful. Granting injunctive relief would serve the public interest by preventing regulators from unilaterally and impermissibly expanding their jurisdictional authority, and also by allowing businesses to operate freely without having to hedge against a threat of unlawful enforcement.

### D. No Security—Or Only a *De Minimis* Security—Is Appropriate.

Federal Rule of Civil Procedure 65(c) requires a party seeking a preliminary injunction to "give[] security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." "[T]he amount of an injunction bond is within the sound discretion of the district court." *Aluminum Workers Int'l Union v. Consol. Aluminum Corp.,* 696 F.2d 437, 446 (6th Cir. 1982). Defendants will suffer no nonspeculative damage by halting enforcement against Kalshi during the pendency of this litigation. Accordingly, no security is needed. *See Doctor's Assocs., Inc. v. Stuart,* 85 F.3d 975, 985 (2d Cir. 1996) (affirming decision not to require bond). Alternatively, should the Court require a security, only a de minimis security is warranted. The District of Nevada, for example, ordered Kalshi to provide "a de minimis $10,000 bond." *Hendrick*, 2025 WL 1073495, at *8.

### <u>CONCLUSION</u>

For the foregoing reasons, the Court should grant a preliminary injunction.

Dated this 7th day of October, 2025.

Respectfully submitted,

 /s/ Shawn J. Organ
Shawn J. Organ, Esq. (0042052)
        *Trial Attorney*
Connor A. Organ, Esq. (0097995)
**Organ Law LLP**
1330 Dublin Road
Columbus, OH 43215
614.481.0900 (T)
614.481.0904 (F)
sjorgan@organlegal.com
corgan@organlegal.com

and

Neal Katyal (pro hac vice pending)
Joshua B. Sterling (pro hac vice pending)
William E. Havemann (pro hac vice pending)
**Milbank LLP**
1101 New York Avenue NW
Washington D.C. 20005
Telephone: 202-835-7500
Facsimile: 202-263-7586

Grant R. Mainland (pro hac vice pending)
Andrew L. Porter (pro hac vice pending)
**Milbank LLP**
55 Hudson Yards
New York, NY 10001
Telephone: 212-530-5000
Facsimile: 212-530-5219

*Attorneys for Plaintiff*

26
**A72**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| **KALSHIEX LLC,** | |
| **Plaintiff,** | **Case No. 2:25-cv-1165** |
| v. | **Chief Judge Sarah D. Morrison** |
| **MATTHEW T. SCHULER, *et al.*,** | **Magistrate Judge Chelsey M. Vascura** |
| **Defendants.** | |

## PLAINTIFF'S REPLY IN SUPPORT OF ITS
## MOTION FOR PRELIMINARY INJUNCTION

**A73**

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................... 1

ARGUMENT .............................................................................................................. 3

I.     KALSHI IS LIKELY TO SUCCEED ON THE MERITS. ................................... 3

       A.     Kalshi's Contracts Are Swaps Within the CFTC's Exclusive Jurisdiction. ............. 3

              1.     Defendants' Swaps Argument Is an Improper Collateral Attack on the CFTC's Oversight of Kalshi. ............................................................. 3

              2.     Kalshi's Contracts Are Swaps or Other CFTC-Regulated Derivatives. ....... 5

              3.     Treating Sports-Event Contracts as Swaps Would Not Make All Sports Wagering Unlawful. ...................................................................... 8

       B.     The CEA Preempts Ohio's Gaming Laws as Applied to Kalshi. ........................... 10

              1.     The Presumption Against Preemption Does Not Apply. ........................... 10

              2.     Ohio's Gambling Laws Are Expressly Preempted as Applied to Kalshi. .... 10

              4.     Ohio's Gambling Laws Are Conflict Preempted as Applied to Kalshi. ..... 14

              5.     Rule 40.11 Reinforces the CFTC's Exclusive Jurisdiction. ...................... 16

              6.     Defendants Fail to Justify the Commission's Indirect Regulation of Kalshi. ................................................................................... 18

II.    KALSHI WILL SUFFER IRREPARABLE HARM WITHOUT A PRELIMINARY INJUNCTION. ....................................................................... 18

III.   THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR KALSHI. ............ 20

CONCLUSION ........................................................................................................ 20

**A74**

# TABLE OF AUTHORITIES

**Cases**                                                                                                  **Page(s)**

*Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*,
977 F.2d 1147 (7th Cir. 1992) ............................................................................2, 12, 14

*Armour & Co. v. Ball*,
468 F.2d 76 (6th Cir. 1972) ............................................................................15

*Basicomputer Corp. v. Scott*,
973 F.2d 507 (6th Cir. 1992) ............................................................................20

*Big Lagoon Rancheria v. California*,
789 F.3d 947 (9th Cir. 2015) ............................................................................4

*California v. Azar*,
911 F.3d 558 (9th Cir. 2018) ............................................................................19

*CFTC v. Trade Exch. Network Ltd.*,
117 F. Supp. 3d 29 (D.D.C. 2015) ............................................................................7, 8

*Chi. Mercantile Exch. v. SEC*,
883 F.2d 537 (7th Cir. 1989) ............................................................................2, 14

*City of Columbus v. Ours Garage & Wrecker Serv., Inc.*,
536 U.S. 424 (2002) ............................................................................14

*Cothran v. Ellis*,
16 N.E. 646 (Ill. 1888) ............................................................................2, 12

*DeCanas v. Bica*,
424 U.S. 351 (1976) ............................................................................11

*Dickson v. Uhlmann Grain Co.*,
288 U.S. 188 (1933) ............................................................................12

*Douglas v. Indep. Living Ctr. of S. Cal., Inc.*,
565 U.S. 606 (2012) ............................................................................4

*Effex Cap., LLC v. Nat'l Futures Ass'n*,
933 F.3d 882 (7th Cir. 2019) ............................................................................12

*Free v. Bland*,
369 U.S. 663 (1962) ............................................................................15

*FTC v. Ken Roberts Co.*,
276 F.3d 583 (D.C. Cir. 2001) ............................................................................13

*Healy v. Beer Inst., Inc.*,
    491 U.S. 324 (1989).................................................................................................18

*Hughes v. Talen Energy Mktg., LLC*,
    578 U.S. 150 (2016).................................................................................................10

*KalshiEX LLC v. CFTC*,
    2024 WL 4164694 (D.D.C. Sept. 12, 2024) ........................................................7, 8

*KalshiEX LLC v. Flaherty*,
    2025 WL 1218313 (D.N.J. Apr. 28, 2025) ...............................................11, 18, 20

*KalshiEX, LLC v. Hendrick*,
    2025 WL 3286282 (D. Nev. Nov. 24, 2025) ...........................................................9

*Keen v. Helson*,
    930 F.3d 799 (6th Cir. 2019) .................................................................................11

*League of Women Voters of Ohio v. LaRose*,
    741 F. Supp. 3d 694 (N.D. Ohio 2024)..................................................................10

*Leist v. Simplot*,
    638 F.2d 283 (2d Cir. 1980)...............................................................................1, 10

*Medtronic, Inc. v. Lohr*,
    518 U.S. 470 (1996).................................................................................................10

*Morales v. Trans World Airlines, Inc.*,
    504 U.S. 374 (1992).................................................................................................19

*Mut. Pharm. Co., Inc. v. Bartlett*,
    570 U.S. 472 (2013).............................................................................................2, 16

*N. Am. Derivatives Exch., Inc. v. Nev. Gaming Control Bd.*,
    2025 WL 2916151 (D. Nev. Oct. 14, 2025) .............................................................6

*Nantahala Power & Light Co. v. Thornburg*,
    476 U.S. 953 (1986).................................................................................................11

*Oklahoma v. Castro-Huerta*,
    597 U.S. 629 (2022)...................................................................................................2

*Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*,
    305 F.3d 566 (6th Cir. 2002) .................................................................................19

*Polyweave Packaging, Inc. v. Buttigieg*,
    51 F.4th 675 (6th Cir. 2022) ....................................................................................4

**A76**

*Pub. Serv. Co. of Colo. v. Cont'l Cas. Co.*,
26 F.3d 1508 (10th Cir. 1994) ................................................................7

*Puerto Rico v. Franklin Cal. Tax-free Tr.*,
579 U.S. 115 (2016).............................................................................10

*Ritchie v. Williams*,
395 F.3d 283 (6th Cir. 2005) ........................................................10, 11

*Savel v. MetroHealth Sys.*,
96 F.4th 932 (6th Cir. 2024) ................................................................18

*Transcont'l Gas Pipe Line Co. v. Pa. Env't Hearing Bd.*,
108 F.4th 144 (3d Cir. 2024) ...............................................................11

*United States v. California*,
921 F.3d 865 (9th Cir. 2019) ...............................................................20

*United States v. Locke*,
529 U.S. 89 (2000)...............................................................................10

*United States v. Szoka*,
260 F.3d 516 (6th Cir. 2001) ...............................................................20

*Valle del Sol v. Whiting, Inc.*,
732 F.3d 1006 (9th Cir. 2013) .............................................................19

*Wisconsin Gas Co. v. FERC*,
758 F.2d 669 (D.C. Cir. 1985)..............................................................19

*Yates v. Ortho-McNeil-Janssen Pharms., Inc.*,
808 F.3d 281 (6th Cir. 2015) ...............................................................16

**Statutes**

5 U.S.C. § 551....................................................................................................3

5 U.S.C. § 702....................................................................................................4

5 U.S.C. § 706....................................................................................................4

7 U.S.C. § 1a..................................................................................................6, 8

7 U.S.C. § 2 .............................................................................................. *passim*

7 U.S.C. § 6......................................................................................................13

7 U.S.C. § 7a-2......................................................................................... *passim*

7 U.S.C. § 13a-2 ..................................................................................................12, 14

7 U.S.C. § 16 ...........................................................................................9, 12, 13, 14

31 U.S.C. § 5362 ................................................................................................9

R.C. 3775.04 ..................................................................................................16

R.C. 3775.05 ..................................................................................................16

R.C. 3775.10 ..................................................................................................16

R.C. 3775.11 ..................................................................................................16

**Other Authorities**

17 C.F.R. § 38.5 ..............................................................................................4

17 C.F.R. § 40.11 ......................................................................................16, 17

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) ..........................................................................................6

*Associated*, *Oxford English Dictionary* (3d ed. 2011) ...................................5

Concept Release, 73 Fed. Reg. 25,669 (May 7, 2008) ..................................9

*Contingency*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003) ......7

*Event*, Black's Law Dictionary (9th ed. 2009) ...............................................7

*Event*, Webster's Encyclopedic Unabridged Dictionary of the English Language: Deluxe Edition (1st ed. 2001) ........................................................6

*Event*, Webster's II New College Dictionary (3d ed. 2005) ...........................6

Event Contracts, 89 Fed. Reg. 48,968 (June 10, 2010) .........................4, 7, 17

Further Definition of "Swap," 77 Fed. Reg. 48,208 (Aug. 13, 2012).........8, 9

H.R. Rep. 106-711, pt. 2 (2000) ....................................................................13

H.R. Rep. No. 93-975 (1974)..........................................................................6

H.R. Rep. No. 93-1383 (1974)..................................................................1, 13

John V. Rainbolt II, *Regulating the Grain Gambler and His Successors*, 6 Hofstra L. Rev. 1 (1977) ..................................................................................12

*KalshiEX LLC v. CFTC*, Appellant Br..
    2024 WL 4512583 (D.C. Cir. Oct. 16, 2024) ...................................................................13, 17

*KalshiEX LLC v. Martin*, Kalshi Br.
    No. 25-1892 (4th Cir. Oct. 15, 2025)......................................................................................12

Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent
    L. Rev. 657 (1982) ..................................................................................................................10

Philip F. Johnson, *The Commodity Futures Trading Commission Act: Preemption
    as Public Policy*, 29 Vand. L. Rev. 1 (1976) ...........................................................................1

Provisions Common to Registered Entities, 76 Fed. Reg. 44,786 (July 27, 2011).......................17

S. Rep. No. 93-1131 (1974)...........................................................................................................14

**A79**

## **INTRODUCTION**

Ever since Congress granted the CFTC "exclusive jurisdiction" to regulate trading on federal exchanges in 1974, it has been settled that the Commodity Exchange Act ("CEA") "preempts the application of state law" to trading on those exchanges. *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980). Defendants' contrary arguments boil down to policy disagreements with the CFTC's oversight of Kalshi, but such policy arguments cannot defeat preemption.

Defendants' argument that Kalshi's contracts are not "swaps" is incorrect many times over. The CFTC regulates Kalshi's event contracts as swaps or other tradable derivatives, and the proper vehicle to challenge that regulation is an action under the Administrative Procedure Act ("APA") against the CFTC—not a collateral attack against Kalshi for offering contracts that its exclusive federal regulator has permitted. If the Court reaches that question, however, Congress intentionally and broadly defined "swaps" to include event contracts, and even if Kalshi's contracts were not swaps, they would be futures or options also subject to the CFTC's exclusive jurisdiction. Defendants' contrary argument—that treating Kalshi's contracts as swaps would federalize all sports betting—is emphatically incorrect. The CEA preempts state law as to <u>on-DCM</u> transactions while leaving states entirely free to regulate <u>off-DCM</u> transactions like sports bets.

As to preemption, overwhelming evidence starting with the CEA's text confirms that Congress intended to preempt state efforts to regulate trading on DCMs. Defendants do not address Congress's intentional decision to "preempt the field," H.R. Rep. No. 93-1383 at 35 (1974), and they ignore that, for many decades, the CFTC, along with every court and commentator to consider the question, concluded with no difficulty that the CEA "resulted in the preemption of all other would-be regulators at every level of government." Philip F. Johnson, *The Commodity Futures Trading Commission Act: Preemption as Public Policy*, 29 Vand. L. Rev. 1, 2 (1976). Defendants instead ask this Court to superimpose a "gambling" exception onto the CEA's

**A80**

unequivocal text, but courts cannot "replace the actual text with speculation as to Congress' intent." *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 642 (2022). Defendants' speculation is doubly misplaced given that states' practice of prohibiting futures as "gambling in grain," *Cothran v. Ellis*, 16 N.E. 646, 647 (Ill. 1888), is precisely what Congress in 1974 intended to preempt.

Nor can Defendants overcome conflict preemption. Subjecting exchanges to 50 different state schemes would "frustrate Congress' intent to bring the markets under a uniform set of regulations." *Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1156 (7th Cir. 1992). Defendants never explain how Kalshi could operate a nationwide exchange while complying with Ohio law requiring trades only from within Ohio. Defendants posit (at 28) that Kalshi could comply by "not offering sports-gaming contracts." But "if the option of ceasing to act defeated a claim of impossibility, impossibility pre-emption would be 'all but meaningless.'" *Mut. Pharm. Co., Inc. v. Bartlett*, 570 U.S. 472, 488 (2013). Defendants also claim Kalshi's contracts violate a CFTC regulation. That argument is wrong (the regulation is not a categorical ban), but even if it were right, it is a fatal concession. It concedes Kalshi's event contracts fall within the CFTC's jurisdiction. Where "the CFTC has jurisdiction, its power is exclusive." *Chi. Mercantile Exch. v. SEC*, 883 F.2d 537, 548 (7th Cir. 1989).

The equitable factors decisively favor a stay. Defendants threaten Kalshi with criminal penalties if it continues to offer sports-event contracts in Ohio, a clear irreparable harm. But succumbing to the threat would require Kalshi to forgo its federal right to offer contracts nationwide, subject Kalshi to the irreparable cost of geofencing, harm Kalshi users in Ohio and across the country, and force Kalshi out of compliance with its CFTC-imposed obligation to offer impartial access. That harm is compounded by Defendants' unlawful threats against companies that partner with Kalshi—even if that partnership occurs entirely outside of Ohio. And the public

2

**A81**

interest weighs against allowing Defendants to enforce preempted state laws. While Defendants warn about the harms of unregulated conduct, Kalshi is subject to extensive regulation by the CFTC, and provides many of the same consumer protections that Defendants tout as distinguishing features of Ohio's regulatory regime. The question is not whether Kalshi should be regulated, but by whom. Congress's clear answer is the CFTC.

## ARGUMENT

## I.     KALSHI IS LIKELY TO SUCCEED ON THE MERITS.

### A.  Kalshi's Contracts Are Swaps Within the CFTC's Exclusive Jurisdiction.

Defendants argue (at 11-17) that Kalshi's sports-event contracts are not swaps and thus are not subject to the CFTC's exclusive jurisdiction. That argument is mistaken on many grounds.

1.  Defendants' Swaps Argument Is an Improper Collateral Attack on the CFTC's Oversight of Kalshi.

Congress has delegated to the CFTC the authority to oversee the listing of contracts for trading on DCMs. Compl. ¶¶ 36-49. The CFTC "*shall* approve a new contract" unless it finds that the contract "would violate" the CEA or CFTC regulations. 7 U.S.C. § 7a-2(c)(5)(B) (emphasis added). If the CFTC determines that a contract is inconsistent with the regulations—including because it does not meet the definition of a "swap" or other derivative—the CFTC may notify the DCM that it objects to the listing. *Id.* § 7a-2(c)(3)(B)(ii). Thus, each time the self-certification process for a contract closes, the CFTC has decided either to object to the contract or to permit it. *Id.* § 7a-2(c)(2), (3)(B). When the CFTC does not block a contract, that itself constitutes agency action. *See* 5 U.S.C. § 551(13) ("agency action" includes "failure to act").

The CFTC unquestionably understands itself to possess jurisdiction over Kalshi's sports-event contracts. In 2024, the CFTC issued a proposed rule that rested critically on the premise that event contracts involving "the outcome" of a "sports game" qualify as "agreements, contracts,

3

**A82**

transactions, or swaps in excluded commodities" subject to the CFTC's exclusive jurisdiction. *Event Contracts*, 89 Fed. Reg. 48,968, 48,973-76 (June 10, 2024). Shortly after Kalshi self-certified its first sports-event contracts, the CFTC requested that Kalshi submit a demonstration of compliance with the CEA pursuant to 17 C.F.R. § 38.5(b). *See* **Ex. 1** at 1. Kalshi responded with lengthy memoranda detailing the listing's compliance with applicable rules and regulations and the CFTC's jurisdiction over sports-event contracts traded on DCMs. **Exs. 1-2**. The CFTC took no further action and has since allowed thousands of Kalshi's sports-event contracts to be listed, traded, and closed, with no hint that the agency views these contracts as falling outside of its jurisdiction. Had the CFTC deemed Kalshi's contracts impermissible, it would have had the responsibility to "object[]" to the contracts. 7 U.S.C. § 7a-2(c)(3)(B)(ii). But it did not.

Much of Defendants' opposition reflects dissatisfaction with how the CFTC has regulated Kalshi. But where, as here, a federal agency has authorized certain conduct, the APA provides the proper channel for the complaint. *See* 5 U.S.C. §§ 702, 706(2). Allowing parties to circumvent the APA subjects parties "to conflicting interpretations of federal law by several different courts (and the agency), thereby threatening to defeat the uniformity that Congress intended." *Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 565 U.S. 606, 615 (2012). If Defendants could bring charges directly against Kalshi for offering contracts the CFTC has allowed, it would "circumvent an exclusive-jurisdiction provision applicable to agency action." *Polyweave Packaging, Inc. v. Buttigieg*, 51 F.4th 675, 684 (6th Cir. 2022); *see Big Lagoon Rancheria v. California*, 789 F.3d 947, 953 (9th Cir. 2015) (en banc) (defendants may not "use a collateral proceeding to end-run the procedural requirements governing appeals of administrative decisions" (citation modified)).

Allowing states to use collateral proceedings to second-guess the CFTC's determination that a contract is a derivative properly traded on a DCM would allow them to exercise jurisdiction

over the exact same contracts as the CFTC—in clear conflict with Congress's grant to the CFTC of "exclusive jurisdiction" in this field. 7 U.S.C. § 2(a)(1)(A). That difficulty would be compounded 50-fold if each state could regulate DCMs based on their own definitions of "swap." And the difficulty would be compounded exponentially if states could scrutinize each of the tens of thousands of contracts traded on a DCM to decide whether each constituted a tradable swap— all subject to the threat of criminal prosecution if the state disagreed with the CFTC.

2. <u>Kalshi's Contracts Are Swaps or Other CFTC-Regulated Derivatives.</u>

*First*, Defendants err in contending (at 12) that sporting events are not "associated with" potential financial consequences. "Associated" commonly means "connect[ed]." *See Associated, Oxford English Dictionary* (3d ed. 2011). A swap thus requires an event connected to a potential financial, economic, or commercial consequence. Sports events have *actual* and *significant* financial consequences for a host of stakeholders—team sponsors, advertisers, television networks, local communities, and more. They readily meet the swap definition, which requires only a *potential* financial consequence. Defendants' argument is especially untenable given that they claim the authority to prohibit *all* Kalshi's sports-event contracts, which would require showing that *no* sports events are associated with even *potential* financial consequences.

Defendants maintain (at 12) that the event or contingency underlying a swap must have a "direct and inherent" association with financial consequences. But these words appear nowhere in the statute. Defendants argue that subpart (ii) of the swap definition must be construed in accordance with surrounding subparts, but this argument undercuts their position. Subpart (iii), for example, refers to a "weather swap" or "metal swap" even though neither the weather nor metal is "inherently" financial. And Defendants' proposed rewriting is irreconcilable with the Special Rule, which refers to "swap[s]" involving "terrorism," "war," and "gaming"—none of which are

5

**A84**

*inherently* financial. 7 U.S.C. § 7a-2(c)(5)(C)(i). The enumeration of these categories would make no sense if they did not encompass swaps or derivatives subject to CFTC jurisdiction.

Defendants argue (at 13) that a contrary reading of subpart (ii) would render "superfluous" other subparts of the swap definition, but overlap is not the same as superfluity, and overlap is equally inevitable under Defendants' proposed reading. Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 176-77 (2012) (noting that legislatures commonly use a "belt-and-suspenders approach"). Many (if not all) of the swaps listed in subpart (iii), for example, would meet Defendants' "inherently" financial definition. Subpart (iv) eliminates all doubt that Congress intended the definitions of swap to overlap, because it defines "swap" to include any agreement "that is, or in the future becomes, commonly known to the trade as a swap"—a category that encompasses most or all swaps listed in other subparts. *See* 7 U.S.C. § 1a(47)(A)(iv); *see* H.R. Rep. No. 93-975, at 55 (1974) (noting congressional purpose to ensure the CEA would cover "all futures trading that might now exist or might develop in the future").

*Second*, Defendants are mistaken that an event contract turning on an "outcome" cannot be the subject of a swap. A swap must be based on the occurrence or nonoccurrence of an "event" or "contingency." 7 U.S.C. § 1a(47)(A)(ii). Both terms comfortably encompass outcomes.

Dictionaries expressly define an "event" to include "outcome." *Event*, *Webster's II New College Dictionary* (3d ed. 2005) ("[t]he actual outcome or final result"). The District of Nevada concluded that "outcome" is an archaic definition, *N. Am. Derivatives Exch., Inc. v. Nev. Gaming Control Bd.*, 2025 WL 2916151, at *7 (D. Nev. Oct. 14, 2025), but many or most dictionaries do not treat this definition as archaic. *See, e.g.*, *Event*, *Webster's Encyclopedic Unabridged Dictionary of the English Language: Deluxe Edition* (1st ed. 2001) ("the outcome, issue, or result of anything"). Dictionaries also define "event" to mean "[s]omething that happens." *Event*,

*Black's Law Dictionary* (9th ed. 2009). An outcome is naturally understood to be "something that happens." For example, the 2024 Presidential Election was an event, but the outcome—President Trump's win—was also an event. Courts have thus recognized that an "event" is "the outcome or consequence of anything." *Pub. Serv. Co. of Colo. v. Cont'l Cas. Co.*, 26 F.3d 1508, 1514-15 (10th Cir. 1994). Similarly, "contingency" includes "something liable to happen as . . . [a] result of something else." *Contingency*, *Merriam-Webster's Collegiate Dictionary* (11th ed. 2003).

Courts and the CFTC agree that contracts turning on outcomes are subject to the CFTC's jurisdiction. "[E]vent contracts" are "a type of derivative contract whose payoff is based on the outcome of a contingent event." *KalshiEX LLC v. CFTC*, 2024 WL 4164694, at *1 (D.D.C. Sept. 12, 2024); *see CFTC v. Trade Exch. Network Ltd.*, 117 F. Supp. 3d 29, 32 (D.D.C. 2015) (CEA applies to contracts tied to "the outcome of real-world events"). In 2024, the CFTC noted "event contracts are generally understood to be a type of derivative contract . . . based on the *outcome* of an underlying occurrence or event." 89 Fed. Reg. at 48,969 (emphasis added). Defendants' argument that a contract turning on an outcome cannot be a swap conflicts with the CFTC's view. And a rule providing that event contracts cannot be based on outcomes would pose intractable interpretive difficulties, because almost any event can be framed as the outcome of another event.

*Third*, Defendants err in claiming (at 16-17) that "the CFTC does not believe" sports-event contracts are "swaps." To the contrary, the CFTC has repeatedly recognized that contracts involving the "outcome" of a "sports game" are "agreements, contracts, transactions, or swaps in excluded commodities" subject to CFTC jurisdiction. 89 Fed. Reg. at 48,972, 48,976. Defendants refer to a proposed rulemaking that would have determined that sports-event contracts are contrary to the public interest, but the very premise of that proposal was that the Special Rule's reference to "swap[s]" involving "gaming" *included* sports-event contracts. *Id.* at 48,975. The proposed

**A86**

rulemaking would be nonsensical if the CFTC did not believe sports-event contracts were swaps. And while the CFTC's *proposal* would have deemed sports-event contracts contrary to the public interest, Defendants neglect to note that the CFTC never *adopted* that rule. Defendants point (at 16-17) to a CFTC regulation noting that certain consumer "arrangements that historically have not been considered swaps" are not covered by the CEA. Further Definition of "Swap," 77 Fed. Reg. 48,208, 48,246-48 (Aug. 13, 2012). But they omit key language distinguishing non-swap consumer transactions from swaps based in part on whether they are "traded on an organized market." *Id.* at 48,247. Kalshi's contracts are so traded.

*Finally*, even if the Court accepts Defendants' reading of "swap," the CFTC's exclusive jurisdiction also extends to "future[s]" and "option[s]" on DCMs. 7 U.S.C. § 2(a)(1)(A). Among the commodities subject to the CFTC's jurisdiction are "excluded commodities." *See id.* § 1a(19); *id.* § 7a-2(c)(5)(C)(i). The events underlying Kalshi's contracts are excluded commodities, which include any "occurrence, extent of an occurrence, or contingency . . . that is . . . beyond the control of the parties to the relevant contract, agreement, or transaction; and . . . associated with a financial, commercial, or economic consequence." *Id.* § 1a(19)(iv). Event contracts like Kalshi's are therefore futures or options in excluded commodities. *KalshiEX*, 2024 WL 4164694, at *2 ("Event contracts are subject to regulation under the CEA as 'excluded commodities.'"); *Trade Exch.*, 117 F. Supp. 3d at 37-38 (rejecting claim that event contracts "did not involve a 'commodity' regulated under the CEA"). The CFTC recognized that "event contracts," including contracts on "the outcome of particular entertainment events," "can be designed to exhibit the attributes of either options or futures contracts." Concept Release, 73 Fed. Reg. 25,669, 25,669-70 (May 7, 2008).

        3.  <u>Treating Sports-Event Contracts as Swaps Would Not Make All Sports Wagering Unlawful.</u>

Defendants argue (at 14, 23) that Kalshi's position would require all sports betting to occur

on CFTC-regulated exchanges. Although that argument was largely the basis for the District of Nevada's recent ruling, *see KalshiEX, LLC v. Hendrick*, 2025 WL 3286282, at *14 (D. Nev. Nov. 24, 2025), it is mistaken. As Defendants concede (at 22-23), the CEA contains a savings clause clarifying that, except as provided by the grant of exclusive jurisdiction to the CFTC over *on-DCM* trading, "nothing" in the remainder of Section 2 shall "restrict" state authorities "from carrying out their duties and responsibilities in accordance with [state] laws." 7 U.S.C. § 2(a); *see id.* § 16(e)(1)(B)(i) ("Nothing" in the CEA "shall supersede or preempt" the application of state law to a transaction "that is not conducted on or subject to the rules of a registered entity"). States remain free to apply state laws to *off-DCM* transactions offered by traditional sportsbooks.

If there were any doubt, CFTC regulations would dispel it. The CFTC has explained that swaps are instruments "*traded* on organized markets and over the counter." 77 Fed. Reg. at 48,217 (emphasis added). But sports bets between a gambler and a sportsbook are *not* traded, i.e., parties to a sports bet cannot transfer their rights and obligations to a third party on an organized exchange. The CFTC has further noted that consumers enter transactions in their "personal lives that may have attributes that could be viewed as falling within the swap" definition, but that these arrangements are not swaps if "[t]hey are *not traded* on an organized market." *Id.* at 48,246-47 (emphasis added). Accordingly, treating *on-DCM* sports-event contracts as swaps would not require treating *off-DCM* sports bets as swaps.[1]

---

[1] Congress, too, has recognized that derivatives traded on DCMs may resemble gambling, and it intended the CFTC to regulate them on DCMs while allowing the states to regulate them off DCMs. In the Unlawful Internet Gambling Enforcement Act of 2006 ("UIGEA"), Congress generally adopted state-law definitions of "bet or wager" but provided that "bet or wager" "does not include" "any transaction conducted on or subject to the rules of a" DCM. 31 U.S.C. § 5362(1)(E)(ii). UIGEA reflects Congress's judgment that on-DCM transactions should be regulated by the CFTC, regardless of whether states view these transactions as gambling.

### B. The CEA Preempts Ohio's Gaming Laws as Applied to Kalshi.

None of Defendants' arguments call into doubt the overwhelming evidence that "the CEA preempts state bucket-shop laws and other anti-gambling legislation." Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657, 721 (1982).

#### 1. The Presumption Against Preemption Does Not Apply.

Defendants (at 17-18) cite *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996), to argue that a presumption against preemption applies. But, following *Medtronic*, the Supreme Court has held that the presumption does *not* apply in cases like this: Where a statute "contains an express pre-emption clause, [courts] do not invoke any presumption against pre-emption" because "the plain wording of the clause" "necessarily contains the best evidence of Congress' pre-emptive intent." *Puerto Rico v. Franklin Cal. Tax-free Tr.*, 579 U.S. 115, 125 (2016) (citation modified).

Defendants argue (at 18) that the "presumption applies [with] even greater force" because "regulation of gambling has long been within Ohio's police powers." But the determinative question is not whether *gambling* is traditionally regulated by states, but whether *trading on DCMs* is. No presumption applies "when the State regulates in an area where there has been a history of significant federal presence." *United States v. Locke*, 529 U.S. 89, 108 (2000). Here, the "federal government has been vitally concerned with [derivatives] trading" for over a century. *Leist*, 638 F.2d at 322. In any event, a presumption "can be overcome by the facts of the case." *League of Women Voters of Ohio v. LaRose*, 741 F. Supp. 3d 694, 718 (N.D. Ohio 2024). Just so here.

#### 2. Ohio's Gambling Laws Are Expressly Preempted as Applied to Kalshi.

The CEA grants the CFTC "exclusive jurisdiction" to regulate derivatives trading on DCMs. Myriad cases recognize that the grant of "exclusive jurisdiction" to a federal agency preempts state efforts to intrude on the same "regulatory turf." *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 163 (2016); *see Ritchie v. Williams*, 395 F.3d 283, 286 (6th Cir. 2005)

10

**A89**

("exclusive jurisdiction" of federal authority preempts state law). Defendants cite *Transcon. Gas Pipe Line Co. v. Pa. Env't Hearing Bd.* for the proposition that a grant of exclusive jurisdiction does not amount to express preemption, but that case holds the opposite: "The explicit statutory conferral of exclusive jurisdiction" to a federal authority "is a form of express preemption because it withdraws any concurrent jurisdiction" to state authorities over the same field. 108 F.4th 144, 151-52 (3d Cir. 2024). The same reasoning applies here.

### 3. Ohio's Gambling Laws Are Field Preempted as Applied to Kalshi.

The CEA "supersedes" "state regulatory authorities' jurisdiction for contracts on a CFTC-designated exchange." *KalshiEX LLC v. Flaherty*, 2025 WL 1218313, at *5 (D.N.J. Apr. 28, 2025). Defendants' contrary arguments fail.

*First*, Defendants concede (at 21) that "Congress may have had *some* intent to preempt *some* state law," but they argue that this field does not include "gambling." But Section 2(a)'s text sets out the field Congress occupied: The CFTC has "exclusive jurisdiction" over "transactions involving swaps" and "future[s]" contracts "traded or executed on a" DCM. 7 U.S.C. § 2(a)(1)(A). Defendants essentially ask this Court to rewrite the CEA to make the CFTC's jurisdiction exclusive *except for state gambling laws*. But "courts are not at liberty to rewrite a statute just because they believe that doing so would better effectuate Congress's purposes." *Keen v. Helson*, 930 F.3d 799, 806 (6th Cir. 2019). Where field preemption applies, it forbids a "case-by-case analysis" of which state laws Congress may have silently wished to preserve. *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 966 (1986). None of the cases Defendants cite supports their assertion that courts may create exceptions to field preemption based on extratextual speculation about congressional intent. *E.g.*, *DeCanas v. Bica*, 424 U.S. 351, 355 (1976) (state law not preempted only because it fell outside preempted field).

11

**A90**

History refutes Defendants' claim (at 24) that "there is no indication that Congress" intended to preempt state gambling laws. Before the CEA, many states regulated futures trading as unlawful "gambling in grain." *Cothran v. Ellis*, 16 N.E. at 647; *see also* John V. Rainbolt II, *Regulating the Grain Gambler and His Successors*, 6 Hofstra L. Rev. 1, 6 (1977) (documenting states' treatment of futures trading as unlawful gambling); Kalshi Br. at A1-16, *KalshiEX LLC v. Martin,* No. 25-1892 (4th Cir. Oct. 15, 2025) (listing dozens of pre-CEA state laws regulating futures trading as a type of "gambling" or "bucket shop"). These laws repeatedly reached the U.S. Supreme Court. *E.g.*, *Dickson v. Uhlmann Grain Co.*, 288 U.S. 188, 198 (1933) (CEA's predecessor "did not supersede . . . Missouri law making gambling in grain futures illegal"). Against that backdrop, Congress in 1974 unquestionably intended to preempt gambling laws when it granted the CFTC exclusive jurisdiction to regulate trading on federal exchanges. It is inconceivable that, despite having "*some* intent" to preempt state law in 1974 (at 21), Congress silently intended to allow states to apply their gambling laws.

*Second*, Defendants argue (at 21-22) that "the CEA's exclusive jurisdiction is limited" and not intended to "occupy completely the entire field of commodity futures regulation." That is correct. The CEA does not preempt state regulation of most *off-exchange* trading, 7 U.S.C. § 16(e)(1)(B), or prevent states from enforcing their own "general civil or criminal antifraud statute[s]," *id.* § 13a-2(7). But those limitations on the scope of field preemption are found in the CEA's text—clear evidence that when Congress intends to allow state law to operate in this space, it says so expressly. These provisions certainly do not suggest that states may apply their gambling laws to ban trading on DCMs—the heart of the preempted field. *Am. Agric.*, 977 F.2d at 1156-57 (any state law that "would directly affect trading on or the operation of a futures market" "is preempted"); *Effex Cap., LLC v. Nat'l Futures Ass'n*, 933 F.3d 882, 894 (7th Cir. 2019) (same);

12

**A91**

*FTC v. Ken Roberts Co.*, 276 F.3d 583, 590-91 (D.C. Cir. 2001) (the "CFTC's jurisdiction was 'to be exclusive with regard to the trading of futures *on organized contract markets*'"). The conference report to the 1974 amendments unambiguously states Congress's intent to "preempt the field." H.R. Rep. No. 93-1383, at 35 (1974) (Conf. Rep.). And the CFTC has stated that, "due to federal preemption, event contracts never violate state law when they are traded on a DCM." Appellant Br. at *27, *KalshiEX LLC v. CFTC*, 2024 WL 4512583 (D.C. Cir. Oct. 16, 2024).

*Third*, contrary to Defendants' suggestion (at 22), Section 16 strongly supports Kalshi. Section 16(e)(2) was added to the CEA alongside amendments allowing for "exempt" transactions that need not be traded on-exchange, 7 U.S.C. § 6(c), and that therefore fall outside the CFTC's exclusive jurisdiction. Congress enacted Section 16(e)(2) to prevent states from applying their gaming laws to these *off-DCM* transactions, just as states already could not apply their gaming laws to *on-DCM* transactions. *See* H.R. Rep. 106-711, pt. 2, at 71 (2000) (noting that "the current" CEA already "supersedes and preempts" state laws as to on-DCM transactions and what is now Section 16(e)(2) clarified that "the CEA supersedes and preempts State gaming and bucket shop laws" as to exempt transactions as well). Each of the transactions cross-referenced in Section 16(e)(2) *need not occur on DCMs*—that is why Congress had to specify that state laws are preempted. It would have been redundant and confusing to specify preemption as to transactions on DCMs; Section 2(a) already accomplished that. And Section 16(h) is not a preemption provision at all. It prohibits states from regulating swaps "as an insurance contract" even if the swap is traded over-the-counter rather than on an exchange. 7 U.S.C. § 16(h).

*Fourth*, Defendants argue (at 22-23) that Section 2(a)'s savings clause supports their view, but, crucially, it only applies "*[e]xcept as hereinabove provided*" by the grant of exclusive jurisdiction to the CFTC. 7 U.S.C. § 2(a)(1)(A) (emphasis added). That language enables a logical

13

**A92**

inference of preemption as to matters within the CFTC's jurisdiction. *See City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 429 (2002) (interpreting savings clause with "[e]xcept as provided" proviso). Congress added the proviso specifically to foreclose Defendants' interpretation, making clear that "the [CFTC's] jurisdiction, where applicable supersedes State as well as Federal agencies." S. Rep. No. 93-1131, at 6 (1974).

*Fifth*, Defendants make a dispositive concession. They agree (at 23) that Congress "allow[ed] the CFTC to prohibit event contracts contrary to the public interest, specifically those involving 'gaming.'" Thus, even under Defendants' theory, the CEA allows—*but does not require*—the CFTC to bar Kalshi's sports-event contracts. Where "the CFTC has jurisdiction, its power is exclusive." *Chi. Mercantile Exch.*, 883 F.2d at 548.

### 4. Ohio's Gambling Laws Are Conflict Preempted as Applied to Kalshi.

Even if field preemption did not apply, conflict preemption would, for numerous reasons.

*First*, Defendants do not dispute that state law conflicts with—and is preempted by—the CEA if it "would directly affect trading on or the operation of a futures market." *Am. Agric. Movement*, 977 F.2d at 1156-57. They instead argue (at 25) that "Ohio's sports-gaming laws are not regulating or directly affect[ing] trading on" a futures market because their effort to regulate derivatives is "indirect at best." But Defendants seek to use Ohio law to outright ban the trading of instruments on a DCM; it would be impossible for a state law to more directly affect trading on a DCM. The CEA expressly spells out states' authority to apply state law in the derivatives space, but that authority excludes the right to dictate what contracts a DCM may offer. *See* 7 U.S.C. § 13a-2(1) (permitting states to enforce the CEA against parties "other than a [designated] contract market"); *id*. § 16(e)(1) (permitting application of state law to off-exchange transactions or to entities that are "required to be registered or designated" with the CFTC but "fail or refuse" to do so). And while Defendants invoke state police power to justify application of their gambling laws,

14

**A93**

state law must yield to conflicting federal law no matter how "clearly within a State's acknowledged power" the state's law resides. *Free v. Bland*, 369 U.S. 663, 666 (1962).

*Second*, complying with the Defendants' demands concerning Kalshi's event contracts would conflict with the CFTC's oversight of the very same contracts. Defendants contend (at 14, 26) that enforcement of Ohio law would "complement" rather than conflict with federal law because the CEA "operates as a floor" that state law can surpass. But a federal law does not provide a "floor" where, as here, the "Act itself manifests a congressional intent to prescribe uniform standards." *Armour & Co. v. Ball*, 468 F.2d 76, 83 (6th Cir. 1972). Defendants invoke the Special Rule (at 25-30) to argue that Congress intended to prohibit contracts involving gaming, but even if Kalshi's contracts qualified, the key point is that Congress gave *the CFTC* discretion to determine whether such contracts are contrary to the public interest. The CFTC has made no such determination here. Allowing 50 different states to subject Kalshi to *criminal penalties* for offering contracts that the CFTC has allowed would render the CFTC's judgment utterly meaningless. And while Defendants assert (at 26) that Congress did not intend the CFTC to be the "sole arbiter" of whether particular contracts may be listed on DCMs, the CEA's grant of "exclusive jurisdiction" to the CFTC is irrefutable evidence that Congress intended exactly that.

Defendants cite (at 27-28) a CFTC advisory issued before the government shutdown noting that the CFTC has not yet affirmatively approved "the listing or trading of" sports-event contracts or subjected such contracts to review under the Special Rule. This is true, and shows that the CFTC has reserved its authority to subject sports-event contracts to public-interest review. But it also underscores that the CFTC understands these contracts to fall within its exclusive jurisdiction.

*Third*, Defendants argue (at 28) that it is not impossible for Kalshi to comply with both the CEA and Ohio law because Kalshi can "simply not offer[] sports-gaming contracts." The Supreme

15

**A94**

Court has rejected an identical argument. The preemption analysis "presume[s] that an actor seeking to satisfy both his federal- and state-law obligations is not required to cease acting altogether in order to avoid liability." *Bartlett*, 570 U.S. at 488. "Indeed, if the option of ceasing to act defeated a claim of impossibility, impossibility pre-emption would be all but meaningless." *Id.* The Sixth Circuit has reached the same conclusion. *See, e.g.*, *Yates v. Ortho-McNeil-Janssen Pharms., Inc.*, 808 F.3d 281, 300 (6th Cir. 2015) ("We reject this never-start selling rationale for the same reasons the Supreme Court in *Bartlett* rejected the stop-selling rationale.").

*Fourth*, Defendants suggest that Kalshi can get an Ohio gaming license, but have no answer to the fact that doing so would require Kalshi to limit access to its exchange solely to those making trades in Ohio. *See* R.C. 3775.11. Kalshi could not comply with that Ohio-only requirement because CFTC regulations require Kalshi to provide impartial access to users nationwide. Defendants declare (at 28) that "obtaining an Ohio license would not bar [Kalshi] from accepting trades from users outside of Ohio," but they fail to explain how that assertion can be reconciled with Ohio law. Instead, they cite (at 28) to other sections of the Ohio Code that have no bearing on the Ohio-only requirement. *See* R.C. 3775.04, 05, 10. Defendants interpret (at 28-29) impartial access as requiring "fair treatment among eligible participants," rather than nationwide availability "where the underlying activity is illegal," but that argument presumes that Kalshi's operations are illegal, which is the issue in dispute before the Court. And while Defendants point to (at 29) an agreement reached by a different DCM not to offer event contracts to Nevada residents, that agreement offers them no support. There can be no reasonable dispute that a nationwide DCM could not restrict access to *only* persons located in one state.

### 5. Rule 40.11 Reinforces the CFTC's Exclusive Jurisdiction.

Defendants argue (at 29-30) that the CFTC has already banned sports-event contracts in 17 C.F.R. § 40.11. This argument concedes that sports-event contracts are within the CFTC's

16

**A95**

exclusive jurisdiction.  But Defendants are wrong in any event.  While Defendants isolate language in subsection (a), subsection (c) provides for the CFTC's public-interest review process, which applies to all contracts in the enumerated categories, including those involving "gaming."  *See* Appellant Br. at *14, *KalshiEX LLC*, 2024 WL 4512583.  Unless the CFTC has initiated public-interest review of a contract, a DCM may list it under Section 40.11.

The adopting release for Section 40.11 makes clear that rule is not a categorical ban.  "[R]egistered entities *may always* certify products pursuant to the procedures in § 40.2," and if the CFTC determines "that the submission may violate the prohibitions in § 40.11(a)(1)-(2)," the CFTC "may" subject the contract to a 90-day review.  *Provisions Common to Registered Entities*, 76 Fed. Reg. 44776, 44,786 (July 27, 2011) (emphasis added).  The CFTC's proposed 2024 rulemaking (which was never adopted) confirmed that the CFTC "interprets [the Special Rule] to contemplate that the Commission engage in a two-step inquiry" rather than a categorical ban.  89 Fed. Reg. at 48,970-71.  In its since-overturned order seeking to ban Kalshi's elections contracts, the CFTC conducted this two-step inquiry and found: (1) the contracts involved "unlawful activity" and "gaming"; and (2) the contracts were "contrary to the public interest."  Appellant Br. at *11-12, *KalshiEX LLC*, 2024 WL 4512583.  The CFTC has followed this same two-step process in other reviews undertaken under 40.11, including a recent review involving sports-event contracts offered by a Kalshi competitor.[2]  The second step of the process would be wholly

---

[2] *See, e.g.,* CFTC Release 8345-20, *CFTC Announces Review of RSBIX NFL Futures Contracts Proposed by Eris Exchange, LLC* (Dec. 23, 2020), available at https://www.cftc.gov/PressRoom/PressReleases/8345-20; CFTC Release 8345-20, *CFTC Announces Review and Public Comment Period of KalshiEx Proposed Congressional Control Contracts Under CFTC Regulation 40.11* (Aug. 26, 2022), available at https://www.cftc.gov/PressRoom/PressReleases/8578-22; CFTC Release 9033-25, *CFTC's Review of Nadex Sports Contract Submissions* (Jan. 14, 2025), available at https://www.cftc.gov/PressRoom/PressReleases/9033-25.

unnecessary if Section 40.11 were a categorical ban.  Moreover, the CEA permits the CFTC to bar

contracts only if the CFTC "determine[s]" they are "contrary to the public interest," 7 U.S.C. § 7a-

2(c)(5)(C), but the CFTC has made no such determination on a categorical basis in Section 40.11.

> 6.  <u>Defendants Fail to Justify the Commission's Indirect Regulation of Kalshi.</u>

Defendants fail to justify their extraterritorial threats against Kalshi's partners.  Defendants

offer no basis to question the cases Kalshi cites, which hold that state officials may not achieve by

indirect threats what the Constitution prevents them from doing directly.  Nor do Defendants

answer the Dormant Commerce Clause problems with these threats.  Defendants claim (at 31) that

the threats protect Ohio consumers from "unregulated sports gaming," but fail to explain how that

purpose is served by punishing Kalshi's partners for *conduct undertaken entirely outside of Ohio*.

If Defendants were right, states could punish their residents for any conduct they undertake outside

of the state, even where that conduct is lawful—a quintessential Dormant Commerce Clause

violation.  *See Healy v. Beer Inst., Inc.*, 491 U.S. 324, 343 (1989) (invalidating law with the

"inherent practical extraterritorial effect of regulating" conduct entirely in other states).  And the

Court can readily reject Defendants' claim (at 31) that this argument is not ripe.  Where, as here,

a party "stops exercising their rights because they reasonably fear" retaliation, "the government

has already injured them."  *Savel v. MetroHealth Sys.*, 96 F.4th 932, 940 (6th Cir. 2024).

## II. KALSHI WILL SUFFER IRREPARABLE HARM WITHOUT A PRELIMINARY INJUNCTION.

As the District of New Jersey found, "Kalshi has identified harms to its reputation and

goodwill that are both likely without injunctive relief and not able to be remedied following trial."

*Flaherty*, 2025 WL 1218313, at *7.  Defendants' arguments do not call that harm into doubt.

Defendants claim (at 32) that Kalshi's harm is "speculative" because Kalshi will face

enforcement only if it chooses not to comply with the cease-and-desist letter.  But Kalshi will be

18

**A97**

harmed no matter how it responds. If it does not comply, it will "expose [itself] to potentially huge liability." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992). The cease-and-desist letter threatens Kalshi with "civil, or *criminal* sanctions," Compl. Ex. 1 (emphasis added), and Defendants conspicuously do not rescind that threat. By contrast, if Kalshi complies, it will "suffer the injury of obeying [state] law during the pendency of the proceedings" even though state law is preempted. *Morales*, 504 U.S. at 381. Such a "Hobson's choice" is quintessential irreparable harm. *Id.*; *see Valle del Sol v. Whiting, Inc.*, 732 F.3d 1006, 1029 (9th Cir. 2013) ("credible threat of prosecution under" preempted statute "establishe[s] a likelihood of irreparable harm").

Defendants claim (at 32) that the costs to Kalshi of geofencing are "speculative and conditional." But Defendants do not dispute that geofencing would cost Kalshi tens of millions of dollars, and they offer no contrary evidence. *See* Decl. of Xavier Sottile ¶¶ 14-28, ECF No. 11-6. Defendants note (at 32) that—for now[3]—they do not seek to regulate "every product Kalshi offers," but they cannot dispute that geofencing sports-event contracts would be costly. Because this is an *Ex parte Young* suit, immunity would bar Kalshi from recouping damages. Harm is irreparable where, as here, it "is not fully compensable by monetary damages." *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002); *see California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018). While Defendants cite *Wisconsin Gas Co. v. FERC* to argue that monetary loss is not irreparable unless it threatens Kalshi's "very business" (at 32), Defendants truncate the relevant quote stating "*[r]ecoverable* monetary loss" is irreparable "only where the loss threatens the very existence of the movant's business." 758 F.2d 669, 674 (D.C. Cir. 1985) (emphasis added). Kalshi's monetary loss is unrecoverable.

---

[3] Asked at the Rule 65.1 Conference whether Kalshi's non-sports contracts are permissible in Ohio, counsel for Defendants responded: "We're going to say no." L.R. 65.1 Conf. Tr. 16:16-19.

Defendants argue (at 32-33) that harm that would befall Kalshi's users is "not relevant." The Sixth Circuit disagrees—it requires that "harm to others" be considered in a preliminary injunction analysis. *United States v. Szoka*, 260 F.3d 516, 523 (6th Cir. 2001). Defendants' contention that "[n]o record evidence shows any imminent forced closure" of contracts for Kalshi's users contradicts Defendants' *own demand* that Kalshi "immediately" close all contracts in Ohio. Compl. Ex. 1. That Kalshi has emergency mechanisms for unwinding trades—generally reserved for serious cybersecurity incidents or physical disasters—does not undermine the fact that deploying those mechanisms for all users in Ohio would be catastrophically harmful both for Kalshi's users and Kalshi, which would suffer a loss of goodwill if it forced users to liquidate their positions. *See Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992) ("loss of customer goodwill often amounts to irreparable injury"). Similarly, Defendants' threats to Kalshi's business partners are not a "speculative chain of events" (at 33), but rather impose harms that are occurring in real time by deterring prospective partners from working with Kalshi for fear of retaliation.

## III. THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR KALSHI.

Defendants claim (at 34-35) that enjoining the enforcement of preempted state laws would undermine the public interest. But "the interests favor injunction" because "the public interest is not served by the enforcement of an unconstitutional law." *Flaherty*, 2025 WL 1218313, at *7 (citation modified); *United States v. California*, 921 F.3d 865, 893 (9th Cir. 2019) ("[P]reventing a violation of the Supremacy Clause serves the public interest."). And granting an injunction would not allow unregulated gaming. The question is not whether Kalshi should be regulated, but rather by whom. The answer is clear: The CFTC has "exclusive jurisdiction."

**CONCLUSION**

For the foregoing reasons, the Court should grant a preliminary injunction.

20

**A99**

Dated this 1st day of December 2025.

Respectfully submitted,

/s/ Michael J. Hunter
Michael J. Hunter (0076815)
  *Trial Attorney*
Matthew L. Jalandoni (0087074)
**Flannery | Georgalis, LLC**
175 S. Third Street, Suite 285
Columbus, OH 43215
T: (614) 324-4139 (Michael)
T: (614) 324-1329 (Matthew)
F: (614) 526-0601
mhunter@flannerygeorgalis.com
mjalandoni@flannerygeorgalis.com

Neal Katyal, Esq. (*pro hac vice*)
Joshua B. Sterling, Esq. (*pro hac vice*)
William E. Havemann, Esq. (*pro hac vice*)
**Milbank LLP**
1101 New York Avenue NW
Washington, DC 20005
T: (202) 835-7500
F: (202) 263-7586
nkatyal@milbank.com
jsterling@milbank.com
whavemann@milbank.com

Grant R. Mainland, Esq. (*pro hac vice*)
Andrew L. Porter, Esq. (*pro hac vice*)
**Milbank LLP**
55 Hudson Yards
New York, NY 10001
T: (212) 530-5361
F: (212) 530-5219
gmainland@milbank.com
aporter@milbank.com

*Attorneys for Plaintiff*

21
**A100**

**CERTIFICATE OF SERVICE**

I certify that on December 1, 2025, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties via the Court's CM/ECF electronic filing system. I further certify that a copy of the Exhibits in support of this Reply filed under seal in accordance with the Court's Order, ECF No. 47, will be served on counsel for the defendants via electronic mail.

/s/ *Michael J. Hunter*
Michael J. Hunter (0076815)

*Trial Attorney for Plaintiff*

22
**A101**

# Exhibit 6

**A102**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| KALSHIEX LLC,<br><br>Plaintiff,<br><br>vs.<br><br>MATTHEW T. SCHULER, in his official capacity as Executive Director of the Ohio Casino Control Commission; THOMAS J. STICKRATH, in his official capacity as Chair and Commissioner of the Ohio Casino Control Commission; SHEETAL BAJORIA, in her official capacity as Commissioner of the Ohio Casino Control Commission; SCOTT BORGEMENKE, in his official capacity as Commissioner of the Ohio Casino Control Commission; KEITH CHENEY, in his official capacity as Commissioner of the Ohio Casino Control Commission; PENELOPE CUNNINGHAM, in her official capacity as Vice Chair and Commissioner of the Ohio Casino Control Commission; CHRISTOPHER SMITHERMAN, in his official capacity as Commissioner of the Ohio Casino Control Commission; TRIFFON CALLOS, in his official capacity as Commissioner of the Ohio Casino Control Commission; OHIO CASINO CONTROL COMMISSION; and DAVE YOST, in his official capacity as Attorney General of Ohio,<br><br>Defendants. | Case No.: _____<br><br>**DECLARATION OF XAVIER SOTTILE** |

## DECLARATION OF XAVIER SOTTILE

1. I am the Head of Markets at KalshiEX LLC. In that role, I am responsible for the generation of new markets. I received an undergraduate degree in Economics from Yale University in 2020. Before joining Kalshi, I worked at the U.S. House of Representatives, Bridgewater Associates, and the Yale Program on Financial Stability.

**A103**

2. My duties include devising proposed new contracts and shepherding those proposals from inception to completion. I also facilitate the process by which our markets undergo the regulatory review cycle under the purview of the Commodity Futures Trading Commission ("CFTC"). This involves everything from personally notifying the CFTC of contracts that Kalshi has self-certified under Section 5c(c) of the Commodity Exchange Act and Section 40.2(a) of the CFTC regulations to maintaining records pursuant to their requirements, certifying that Kalshi's contracts comply with the Act, and communicating with Commission staff over the substance of contract filings.

3. The facts set forth herein are within my personal knowledge, and if called as a witness, I could and would competently testify to them.

4. I offer this Declaration to describe the extraordinary harm that Kalshi and its users will incur unless the court immediately prevents the Ohio Casino Control Commission (the "Casino Commission") from enforcing its demand that Kalshi "immediately" cease and desist from offering sporting event-based contracts in Ohio. Ex. 1 at 2. Without an injunction, Kalshi will be forced into an impossible choice. It must either decline to comply with the letter, subjecting itself and its representatives to the risk of criminal and civil liability. *Id.* at 3. Or it must attempt to comply with the letter, thereby subjecting itself and its users to a host of harms that could not be repaired even if Kalshi ultimately succeeds in this case. This Declaration reflects my preliminary analysis of Kalshi's harms. Other unanticipated harms are possible, and even likely, given the nature of the Casino Commission's letter and the uncharted territory into which it would lead.

### I.    Harms Resulting from Noncompliance

5. If Kalshi declines to comply with the letter and continues to offer sports event contracts in the state of Ohio, the company and its representatives risk criminal and civil jeopardy in Ohio.

6. Ohio authorities have threatened Kalshi and its representatives with "civil and criminal penalties." Ex. 1 at 3. The Casino Commission has expressed that it believes that Kalshi's

operations in Ohio are in violation of several Ohio statutes. *Id.* at 2-3. The Casino Commission expressly stated that violating one of these statues constitutes a felony. *Id.* at 2.

7. The Casino Commission stated that Kalshi's "failure to abide by [its] notice may result in the Commission pursuing all legal remedies and actions against Kalshi, including, but not limited to, administrative, civil, or criminal sanctions." Ex. 1 at 3.

8. Since Kalshi's designation as a CFTC-regulated contract market in 2020, the company has offered event contracts nationwide. As Head of Markets, I have assiduously complied with federal regulations with regard to all our contracts, including the sports-related contracts that Ohio authorities have highlighted in their letter. *See* Ex. 1 at 2. We have done our best to run the company according to our understanding of the regulatory framework under which we have been governed for almost five years.

9. Since receiving the cease-and-desist letter, Kalshi's operations—which are lawful under federal law—risk exposing the company and representatives to criminal and civil liability. It is terrifying and stressful to attempt to operate the company while the risk of criminal and civil jeopardy looms. I am deeply concerned that Ohio will make good on its threat to file criminal and civil charges against Kalshi, its representatives, and possibly even its contractual counterparties. That fear becomes all the more distressing given that Kalshi's only other alternative is compliance with the cease-and-desist letter, which would bring about a whole host of other harms to Kalshi and its users as I describe below.

## II. Harms Resulting from Attempted Compliance

10. Choosing to comply with the cease-and-desist letter would introduce a new set of barriers and challenges that themselves would subject Kalshi and its users to irreparable harm. Technical compliance with the cease-and-desist letter in short order would be exceedingly difficult. But even if Kalshi could implement a technical solution to comply with the letter, halting access to event contracts in Ohio would cause severe harm to Kalshi's existing user base. Compliance would also risk Kalshi's status as a designated contract market under the CFTC,

- 3 -

**A105**

throwing away years of efforts to earn and maintain its federal designation. All of these harms would be avoided by this Court's entry of immediate injunctive relief.

11. Kalshi's harms from attempting compliance can be categorized as follows: (a) harms imposed by technical barriers to compliance, (b) harms to Kalshi's users from abruptly ceasing operations in Ohio, (c) risk that complying with Ohio law would jeopardize Kalshi's CFTC designation, and (d) economic and reputational harm to Kalshi from ceasing event-based contracts in Ohio. I describe each of these categories in more detail below.

### a. Harms Resulting from Technical Barriers to Compliance

12. The cease-and-desist letter requires Kalshi to undertake technological changes that would be either difficult or impossible for Kalshi to implement "immediately," under the threat of imminent litigation. Ex. 1, at 2-3. Attempting to undertake these extraordinary technological changes would impose substantial and irreparable costs that could not be recouped even if Kalshi ultimately prevails in this case.

13. The Casino Commission's letter requires Kalshi to "immediately" cease all of its event contracts in Ohio under threat of imminent enforcement. Ex. 1 at 2-3. If Kalshi attempted to comply with this demand, it would be required to, first, undertake efforts to geolocate which of its users are in Ohio, and, second, cease all event contracts for those users. I have engaged in internal discussions with our leadership and technical team to determine the feasibility of compliance at both of these steps. Compliance would be difficult to implement even under a relaxed timeline and could not be done "immediately." *Id.* at 2.

#### i. Step One – Identifying Ohio Users

14. Because Kalshi is subject to uniform federal regulation rather than state-by-state laws, it currently lacks a mechanism to identify which of its users are located in any particular state at any particular time. Implementing such a mechanism would be incredibly costly and could not be done immediately.

15. Traditional web-based sports pools identify their users' whereabouts through a process called geolocation (or geo-positioning). Geolocation identifies and tracks an internet-connected

- 4 -

**A106**

device's location to provide real-time data as to the geographic position of the device. This technology is more sophisticated than merely identifying the device's IP address. Instead, geolocation uses a combination of location-identifiers like GPS coordinates, cell phone towers, WiFi access points, network connections, and Bluetooth beacons to triangulate location. While IP addresses can provide city-level location accuracy, geolocation is sensitive enough to track the exact moment that a device crosses state lines.

16. It is my understanding that geolocation is a multi-step and technically complex process even for stationary devices, and that the process is even more challenging when tracking real-time movement of devices.

17. The reason traditional sports pools deploy geolocation is to ensure that the bets and wagers that individuals place in their pools conform to state laws governing gaming and gambling. The precision of geolocation allows sports pools to make refined geographic determinations at the transaction level rather than the user level. Through geolocation, a company can allow and disallow certain transactions that take place in restricted areas rather than bluntly denying gamblers access to their platforms based on their residence irrespective of where they are located at the time of wager.

18. Kalshi is not a sports pool. As a CFTC-regulated contract market, Kalshi has never developed or implemented geolocation on its platform because it is subject to the CFTC's exclusive jurisdiction and is not subject to individual state laws governing gambling. Like the Chicago Mercantile Exchange and the Intercontinental Exchange, Kalshi does not distinguish between users or trades on the basis of geographic location. Instead, Kalshi is subject exclusively to federal law, which does not apply different standards to users of different states.

19. Kalshi keeps Know Your Customer (KYC) data on the traders that place positions on its platform. Kalshi knows the permanent residence and IP address of its users but does not geolocate its users and therefore does not know where a user's device is located at any point in time. Kalshi maintains a database of its traders' KYC data, which is available for CFTC inspection upon request.

20.  Kalshi has no evident way to comply immediately with the cease-and-desist letter.  If Kalshi sought to use its existing KYC data to identify Ohio-based users on its platform, this broad-brush approach would risk being deemed both under- and over-inclusive.  KYC data would capture all users who claim their permanent residence as Ohio even if they place positions when they are located outside of Ohio. Conversely, the KYC data could fail to capture users whose permanent residence is outside of Ohio but who travel to the state and place a position while there.

21.  If, alternatively, Kalshi sought to implement geolocation services across its platform, this process would be incredibly costly and time-consuming.  Kalshi lacks the capacity to implement this service in-house and would therefore need to contract with a cloud- or server-based geolocation platform.  I estimate that a partnership with a geolocation service provider would cost Kalshi up to tens of millions of dollars annually.  Thus, if it attempted compliance with the Casino Commission's letter, Kalshi would be forced to expend enormous financial resources on geolocating services, even if the court ultimately concludes that Ohio law does not apply to Kalshi.

22.  Based on my prior negotiations with other key partners, moreover, I estimate that negotiating a complex contract with a geolocation service provider alone could take months. Implementing and integrating the geolocation services into our existing platform would take longer still.  Thus, attempting to comply with the Casino Commission's letter could not feasibly be done quickly and, even if it could, would subject Kalshi to massive irrevocable costs.

ii.  Step Two - Geographical Cessation

23.  Only after identifying Kalshi users who are physically present in Ohio could Kalshi cease offering its event contracts to users in Ohio. It would be required to do so through a technical process called "geofencing." This process would involve creating a virtual geographic boundary, or geofence, around the state of Ohio. Again, this process would be technically challenging, time-consuming, and expensive.

- 6 -

**A108**

24. While geofencing might block *newcomers* from trading on the platform from Ohio, geographical cessation presents a host of additional difficulties for *existing* Kalshi users. As of today, there are 46,249 accounts on Kalshi that have registered with an Ohio address; 35,900 of those accounts have passed KYC protocols and become full-fledged Kalshi members. While the precise numbers are not public, these accounts have millions of dollars in open interest on the Kalshi platform, meaning Ohio users have millions of dollars' worth of open positions on Kalshi markets that have not yet been settled.

25. The Casino Commission's letter could be understood to require Kalshi to cease its contracts even with respect to these existing positions. But doing so would present intractable technical difficulties.

26. If the Casino Commission's letter is understood to require Kalshi to unilaterally liquidate all trades that originated in Ohio, compliance would either be impossible or irreparably harmful. To explain why, it is helpful to distinguish Kalshi's exchange from a sports pool or casino. A casino or sports pool operates by taking bets from gamblers on games where the house has a statistical advantage. In other words, gamblers bet against the "house," and when the house loses, it must pay the gambler on demand. Casinos and sports pools therefore maintain a high level of liquidity so that they can pay out those bets.

27. But Kalshi does not operate a casino or sports pool. Instead, it manages a federally-regulated contract market. In contrast to a casino, an exchange facilitates trades between different users on the platform. Traders do not bet against the house, but rather enter into contracts with other traders on an exchange. To ensure compliance with the CFTC regulations, Kalshi operates a CFTC-approved derivatives clearinghouse that holds traders' funds during the pendency of an open contract. But Kalshi does not have access to immediate liquidity like a sports pool or casino that it could use to refund the cost basis of a trader's investment. Attempting to facilitate those exits using Kalshi's own funds would be exceptionally expensive and require technical capabilities that Kalshi does not now have.

- 7 -

**A109**

28. Kalshi, moreover, would want to give its users reasonable notice to allow them to exit their positions voluntarily if they so choose. But the immediate threat of criminal and civil liability from Ohio state authorities raises serious questions about whether Kalshi could even engage in that basic diligence.

    *b. Irreparable Harms to Kalshi's Users*

29. Ceasing operations in Ohio would impose irreparable harm on Kalshi's existing user base. Ceasing operations could be understood to require either pausing current trades pending the outcome of the event that is the subject of the contract, or else liquidating user positions. Either option would impose severe harms on users.

    i. <u>Pausing Positions</u>

30. Pausing current positions on Kalshi pending the outcome of the event at issue would deny traders access to their property and threaten their economic expectations.

31. Pausing positions pending the outcome of the event would deny Ohio users access to their property. Users' capital would be locked on the Kalshi platform and users with significant investments on the platform would be unable to retrieve it. If the event at issue is months or years in the future, users' assets would be locked up for the duration. Given current market conditions and uncertainty, this lack of access funds could result in substantial losses.

32. Pausing positions would also cause a massive disruption to users' investment-backed expectations. Financial traders on Kalshi, like investors in other markets, expect to be able to alter their investments as facts on the ground change. Due to the unique market sensitivity of event contracts and the ease with which exchanges allow traders to place positions, traders capitalize on the opportunity to enter and exit their positions during the pendency of the contract. Traders also deploy well-recognized strategies like stop-loss orders and portfolio-wide loss mitigation strategies. Investors may invest in a contract expecting to sell if the contract price falls below a certain value or expecting to reinvest more if the investment proves especially sound. And while some contracts operate on short timelines, many of the contracts that Kalshi offers are long-term. For example, one of Kalshi's event contracts allows traders to place

positions on whether the electric vehicle market share will rise above 30% by 2030. Traders who have placed a position on this contract may be mitigating their risk on other investments by placing a position that effectively balances out the investment portfolio. As the market for electric vehicles changes, so does the price of the event contract. A trader may make an investment at 45 cents on the electric vehicle contract and institute a stop-loss order to sell the contract when the price dips below 30 cents because 30 cents is the breakeven point on the investment.

33. Traders are constantly engaged in the practice of ascertaining risk. As facts on the ground change, so do traders' strategies. Indeed, traders often do not place a position on a contract with the intent of seeing that contract through to its expiration date and risking the full amount of the entry price. Instead, they monitor market fluctuations during the lifetime of the event contract to determine when to cash out. In other words, traders do not necessarily value event contracts based on the ultimate value of the contract at its expiration date. They also value the flexibility that event contracts provide as a financial tool to mitigate risk in real-time.

34. Hitting pause on all Ohio-based trades would completely upend this investment strategy and destroy traders' expectations. If Kalshi were to pause all trades in Ohio, traders would no longer be able to take action on their existing contracts in accordance with their investment models. The flexible investment opportunity on which Kalshi users relied when entering into these contracts would be lost. A Kalshi user that entered into a contract on whether President Trump would place tariffs on copper imports to the United States before January 1, 2026, for example, would not be able to exit that contract even if facts on the ground change dramatically in the meantime.[1] Traders would be forced either to leave the state to change positions or suffer whatever losses they may endure as a result of being locked out.

35. Pausing all Ohio-based trades would not solely affect Ohio-based users and transactions; it would wreak havoc on the entire Kalshi exchange ecosystem. Again, exchanges

---

[1] This is a politics-based event contract that is currently offered through the Kalshi exchange. KalshiEX, *Will Trump launch tariffs on copper?*, https://kalshi.com/markets/kxtariffscopper/copper-tariffs.

do not operate like casinos where gamblers bet against the house. Instead, exchanges facilitate contracts between individual traders on the market. Traders on either side of a contract are often from different states, given that Kalshi does not distinguish between the geographic location of traders. If traders in Ohio are locked out of their positions, then their trading counterparts in other states will likewise be limited in whether and how often they can enter and exit their positions on the Kalshi exchange. Traders in California, for example, may expect to rely on traders in Ohio on contracts related to water availability in the American Southwest. But if the Ohio-based traders and transactions are all of a sudden restricted on the platform, that will have an equal and opposite effect on the market for traders in other states. Pausing transactions in Ohio would thus disrupt users' positions on the exchange nationwide, which they placed in reliance on their ability to flexibly enter and exit.

ii.     Liquidating Positions

36. Liquidating Ohio-based positions on Kalshi would similarly subject users to irreparable harm. This would require Kalshi to refund either the current value of users' existing positions or the original cost of their existing positions on their respective open contracts. Unilaterally settling traders' positions based on current market conditions or the original cost of the positions could lead to significant losses for users. A trader, for example, may have entered a long-term event contract at 80 cents, but market conditions may have caused his position to decline in value to 30 cents. Rather than allowing the trader to ride out the market dip, immediate liquidation at the market rate would force the trader to take a 50-cent loss on the contract through no fault of his own. Likewise, a trader who bought a contract during a market dip and is forced to exit at the original contract price would not be able to realize any gains that he earned over his holding period for the contract. And in either event, refunding users based either on the cost of their positions or the position's current value would be prohibitively expensive for Kalshi to execute.

37. By the same token, immediately liquidating Ohio-based users' positions would disrupt the market for out-of-state users by causing a false signal in the market. Event contract markets

- 10 -

**A112**

respond to market fluctuations. The immediate exit of a large portion of investors on a particular contract would have a distorting effect on the value of the contract, impairing other investors' ability to predict market changes and act accordingly. If, for example, Ohio traders make up a plurality of the trades on a particular contract, the immediate liquidation of all Ohio positions would indicate to the market that the contract's value has changed, causing a price change in response. Remaining traders would suffer from the market distortion, resulting in substantial financial losses even for Kalshi's non-Ohio users. Alternatively, Kalshi could liquidate the entire market for both Ohio and non-Ohio users by settling prices at either the current market price or the original contract price, but this would, again, be prohibitively expensive and likely occasion the end of our federally-regulated company simply to stave off potential criminal or civil liability.

### c. Harms to Kalshi Resulting from the Risk of CFTC Decertification

38. Compliance with Ohio state law would jeopardize Kalshi's status as a CFTC-designated contract market. It is difficult to overstate how harmful this would be to Kalshi.

39. As the Head of Markets at Kalshi, I oversee the entire regulatory review process for Kalshi's contract markets. In that role, I am responsible for ensuring that each of Kalshi's contracts complies with the nearly two dozen CFTC Core Principles that govern event contracts traded on CFTC-regulated exchanges. Complying with Ohio state law could be understood to put Kalshi out of compliance with these Core Principles, imperiling Kalshi's designation as a contract market under the CFTC's purview.

40. CFTC Core Principle 4 charges designated contract markets with the "responsibility to prevent manipulation, price distortion, and disruptions of the delivery or cash-settlement process." 17 C.F.R. § 38.250. Immediately liquidating or pausing traders' positions could be understood to lead to the very sort of price distortion and market manipulation that the CFTC regulations guard against. Pausing trades could cause "disruption[ ] of the delivery or cash-settlement process" and immediate liquidation could cause "price distortion."

**A113**

41. CFTC Core Principle 2 requires that designated contract markets provide their "members, persons with trading privileges, and independent software vendors with impartial access to its markets and services." 17 C.F.R. § 38.151(b). Pursuant to this regulation, "[a]ccess criteria" must be "impartial, transparent, and applied in a non-discriminatory manner." *Id.* Discrimination based on geographic location would conflict with this requirement, but that is exactly what Kalshi would have to do to comply with Ohio's cease-and-desist letter. Traders who execute positions in Ohio would be barred from accessing Kalshi's exchange and placing positions on Kalshi's contracts, whereas traders in any other state would have unlimited access to the platform.

42. Violation of these Core Principles could subject Kalshi to the panoply of enforcement mechanisms that the CFTC has at its disposal. Those tools range from civil monetary penalties to restitution to criminal liability.

43. Violating these principles could even jeopardize Kalshi's federal-contract-market status with the CFTC. The CFTC is authorized to suspend or revoke Kalshi's designation if Kalshi fails to comply with federal regulations. Kalshi has spent the better part of the last decade working to gain federal registration as a contract market under the CFTC and has scrupulously endeavored to comply with CFTC regulations to maintain that registration. Losing our federal license would be catastrophic for the company, even if Kalshi were to ultimately succeed in this suit against the state authorities in the long-term.

44. CFTC enforcement is not a mere theoretical risk. Several years ago, a CFTC-regulated exchange was charged with offering contracts on a discriminatory basis because it only allowed sportsbooks to trade on its platform. Discriminating on the basis of state residence could likewise subject Kalshi to federal repercussions. It is inconceivable, for example, to imagine a CFTC-designated contract market like the Chicago Mercantile Exchange abruptly closing its exchange to users in a particular state without serious federal repercussions. Yet that is what compliance with the Casino Commission's letter would require Kalshi to do.

- 12 -

**A114**

45. Compliance with Ohio law thus places Kalshi in a regulatory Catch-22: Either it complies with Ohio law and risks CFTC sanctions, or it continues operations in Ohio and subjects itself to state criminal and civil liability.

        *d. Economic and Reputational Harms to Kalshi*

46. Compliance with the cease-and-desist letter would also cause economic and reputational harm to Kalshi. Losses on both fronts would be irreparable even if Kalshi ultimately wins this case.

47. Kalshi has more than 35,000 users in Ohio with millions of dollars invested on the exchange. The market uncertainty created by abruptly closing its contracts in Ohio could lead many users to leave the platform—even users outside of Ohio. Traders must have confidence in the integrity of the market to invest in it, but market confidence would be deeply shaken by complying with the Casino Commission's order and the prospect that other states may to follow Ohio's lead. Even if Kalshi were to prevail in this lawsuit, regaining that market confidence would be difficult. Kalshi has expended enormous resources to advertise its platform, onboard traders, and maintain their business. Losing those traders would mean that many of those efforts were for naught. Thus, compliance would impose significant and irrevocable economic harm on the company.

48. The threat of state litigation also endangers Kalshi's established partnerships and relationships. One of Kalshi's banner partners, Robinhood, has already chosen not to list Kalshi's event contracts in some states because of state cease-and-desist letters. This is a massive disruption for Kalshi given Robinhood had agreed to list Kalshi's contracts to its millions of active users, but chose to deviate from that plan in direct response to a cease-and-desist letter similar to the one Ohio issued here. Other partners that help us comply with CFTC regulations by facilitating our digital investment platform and helping detect improper trading behavior may also seek to limit their exposure given the uncertainty of the application of state law to Kalshi.

49. The effects of Ohio's cease-and-desist letter are not limited to the state but instead threaten to open a Pandora's box of regulation for the 49 other states that may wish to impose

- 13 -

**A115**

their local laws on Kalshi's exchange. In the absence of a temporary restraining order and preliminary injunction, partners and users alike will be hesitant to engage with Kalshi given this potential for state litigation.

* * *

50. The Casino Commission's cease-and-desist letter imposes irreparable harms that Kalshi cannot avoid no matter how it responds. If Kalshi does not comply with the Casino Commission's demands, the company faces civil and criminal liability and its representatives face nothing short of imprisonment. But if Kalshi attempts to comply with the Casino Commission's demands, it would incur massive costs, its users would be harmed, its federal registration would be imperiled, and user confidence in the integrity of its market would be shaken. All of these harms are compounded by the real risk that other states will be emboldened by the Casino Commission's demands to follow Ohio's lead. And there are serious questions about whether Kalshi could implement the technical solutions on an expedited timeline. Kalshi has spent years cultivating its reputation and developing its userbase. Compliance with the Casino Commission's demands to ward off Ohio criminal and civil liability will lead to economic and reputational harm that will be difficult to regain.

51. I certify under penalty of perjury that the foregoing is true and correct.

At New York, New York, this 24th day of September, 2025.

_____
Xavier Sottile

- 14 -
**A116**