**No. 26-3196**
**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| KALSHIEX, LLC, | : | |
| Plaintiffs-Appellants, | : | On Appeal from the |
| | : | United States District Court |
| v. | : | for the Southern District of Ohio |
| | : | |
| MATTHEW T. SCHULER, ET AL., | : | District Court Case No. |
| Defendant-Appellee, | : | 2:25-cv-1165 |
| | : | |

---

**RESPONSE IN OPPOSITION TO**
**MOTION FOR INJUNCTION PENDING APPEAL**

---

DAVE YOST
Attorney General of Ohio

MATHURA J. SRIDHARAN*
Ohio Solicitor General
 *Counsel of Record*
ZACHERY P. KELLER
JOHN K. KERKHOFF
LAYNE H. TIESZEN
Deputy Solicitors General
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614.466.8980
Mathura.Sridharan@OhioAGO.gov

*Counsel for Appellees*
 *Matthew Schuler, et al.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..............................................................................ii

INTRODUCTION ........................................................................................... 1

STATEMENT ..................................................................................................3

    I.      Ohio strictly regulates gambling, including sports betting. .......................3

    II.     The federal government regulates derivatives markets............................4

    III.    Kalshi offers sports betting without regard for state law.........................5

    IV.    Kalshi sues Ohio officials and the district court denies a preliminary injunction...............................................................................................6

STANDARD OF REVIEW ..............................................................................7

ARGUMENT...................................................................................................7

    I.      Kalshi is unlikely to succeed on the merits. ..........................................8

        A.    Sports bets are not "swaps" under the Act, so Ohio's sports-betting regulations are not preempted. ..............................................8

        B.    Kalshi's counterarguments fail. ...................................................... 16

    II.     The remaining equities weigh in Ohio's favor. .......................................23

CONCLUSION...............................................................................................24

CERTIFICATE OF COMPLIANCE.................................................................26

CERTIFICATE OF SERVICE .........................................................................27

i

# TABLE OF AUTHORITIES

**Cases**                                                                **Page(s)**

*Ah Sin v. Wittman*,
    198 U.S. 500 (1905)..................................................................... 3, 12

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,
    594 U.S. 758 (2021) .......................................................................... 13

*Ariz. State Legis. v. Ariz. Indep. Redistricting Comm'n*,
    576 U.S. 787 (2015) ...........................................................................1

*Bond v. United States*,
    572 U.S. 844 (2014) ..........................................................................12

*Castillo v. Bondi*,
    140 F.4th 777 (2025) .........................................................................21

*Churchill Downs Tech. Initiatives Co. v. Michigan Gaming Control Bd.*,
    162 F.4th 631 (6th Cir. 2025) .....................................................17, 18

*Epic Sys. Corp. v. Lewis*,
    584 U.S. 497 (2018) ..........................................................................20

*Helix Energy Sols. Grp., Inc. v. Hewitt*,
    598 U.S. 39 (2024)............................................................................23

*Hobby Lobby Stores, Inc. v. Sebelius*,
    568 U.S. 1401 (2012)...........................................................................7

*Hoss v. Layton*,
    3 Ohio St. (1854) .........................................................................12, 15

*Kalshiex LLC v. Martin*,
    793 F.Supp.3d 667 (D. Md. 2025) ................................................... 15

*KalshiEx, LLC v. Hendrick*,
    No. 2:25-cv-00575, 2025 WL 3286282 (D. Nev. Nov. 24, 2025)...................... 15

*KalshiEX, LLC v. Schuler*,
    No. 2:25-cv-1165, 2026 WL 657004 (S.D. Ohio March 9, 2026) .................. 7, 23

ii

*Kentucky v. Biden*,
57 F.4th 545 (6th Cir. 2023) ...................................................................7

*King v. Burwell*,
576 U.S. 473 (2015) ............................................................................. 13

*Maryland v. King*,
567 U.S. 1301 (2012) ...........................................................................23

*Merrill Lynch, Pierce, Fenner & Smith v. Curran*,
456 U.S. 353 (1982) .......................................................................... 4, 15

*Mich. Coal. of Radioactive Material Users v. Griepentrog*,
945 F.2d 150 (6th Cir. 1991) ................................................................7

*Murphy v. NCAA*,
584 U.S. 453 (2018) .....................................................................*passim*

*NFIB v. OSHA*,
595 U.S. 109 (2022) ............................................................................. 13

*Power & Tel. Supply Co. v. SunTrust Banks, Inc.*,
447 F.3d 923 (6th Cir. 2006) ..............................................................10

*Pulsifer v. United States*,
601 U.S. 124 (2024) ...............................................................................9

*Rubin v. Islamic Republic of Iran*,
583 U.S. 202 (2018) ............................................................................. 14

*United States v. Phillips*,
155 F.4th 102 (2d Cir. 2025) .................................................................4

*United States v. Texas*,
144 S. Ct. 797 (2024).............................................................................3

*West Virginia v. EPA*,
597 U.S. 697 (2022) ....................................................................... 11, 13

*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001) ............................................................................. 12

iii

*Yates v. United States*,
574 U.S. 528 (2015) ................................................................ 15

## Statutes and Regulations

17 C.F.R. §40.11 ............................................................... 5, 21

75 Fed. Reg. 80572 (Dec. 22, 2010) .......................................22

77 Fed. Reg. 48208 (Aug. 13, 2012) .........................................5

89 Fed. Reg. 48968 (June 10, 2024) .........................................5

7 U.S.C. §1a .............................................................*passim*

7 U.S.C. §2 ............................................................ 5, 8, 15, 17

7 U.S.C. §7a-2 .................................................................. 19

7 U.S.C. §16 ...............................................................15, 18

18 U.S.C. §1084 ................................................................20

25 U.S.C. §2701 ................................................................20

31 U.S.C. §5362 ................................................................20

O.R.C. 3775.99 .................................................................23

## Other Authorities

Appellee Br., *Kalshiex LLC v. CFTC*, No. 24-5205 (D.C. Cir.) ...............................6

CFTC Amicus Br., *N. Am. Derivatives Exch. Inc. v. Nevada (Crypto)*,
No. 25-7187 (9th Cir. Feb. 17, 2026) ................................................22

John C. Hull, *Options, Futures, and Other Derivatives* (8th ed. 2012) .......................4

Kalshi Website, Sports .........................................................6

Krystal Hur, *Nevada Wins Temporary Ban on Sports Betting on Kalshi*,
The Wall Street Journal, March 22, 2026 .......................................24

Michael S. Selig, *States Encroach on Prediction Markets*, Wall Street
    Journal, Feb 17, 2026 ...................................................................................6

*Webster's Third New International Dictionary* (2025) .......................................... 9, 10

## INTRODUCTION

In 2018, the United States Supreme Court reaffirmed that the States retain authority over the "controversial subject" of "sports gambling." *Murphy v. NCAA*, 584 U.S. 453, 486 (2018). "What chumps," says Kalshi. *Ariz. State Legis. v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 825 (2015) (Roberts, C.J., dissenting). According to Kalshi, almost a decade prior and unbeknownst to the High Court and everyone else, Congress secretly smuggled away the States' traditional authority to regulate sports gambling through financial legislation enacted in response to the 2008 financial crisis. Specifically, Kalshi argues that the Commodity Exchange Act (the "Act") preempted Ohio sports-gambling laws since 2010 because sports bets count as (then-newly regulated) "swaps" within the meaning of the Act, under the exclusive jurisdiction of the Commodity Futures Trading Commission ("CFTC").

If that sounds like a "magic trick," *id.*, that is because it is. But Congress does not legislate through magic. When it makes such drastic changes of enormous political and economic significance, Congress says so through clear statements. None can be found here. For one, the text is clear in the *opposite* direction: "swaps" are financial instruments used to hedge "event[s]" tied to "economic … consequence[s]." 7 U.S.C. §1a(47)(A)(ii). Sports bets do not count; they are premised on future *outcomes*, not future *events*, because they are not noteworthy happenings.

1

And they are not tied to any relevant economic consequence. To conclude otherwise would open the narrowly defined term "swaps" to cover all future happenings however attenuated from economic consequence. And Kalshi's reading of the Act effectuates a massive economic and political shift of traditional regulatory authority from the States to the federal government. Such a seismic shift requires clear congressional authorization.

Hoping to sell its limitless interpretation, Kalshi pivots away from the on-point statutory definition of "swaps," invokes legislative history, and points to a CFTC amicus brief filed in a separate case. None offers Kalshi the life raft it seeks. Rather than identify the necessary clear statement ejecting the States from the sports-betting arena, Kalshi shepherds this Court into a statutory maze of vague, complex, and interconnected sections and subsections of derivatives law. At bottom, Kalshi wants the Court to ignore the major-questions doctrine and skip the federalism implications altogether to anoint the CFTC as the country's gambling czar. Without a clear claim to regulatory coverage under the Act for its events contracts, Kalshi's remaining arguments about preemption—express and otherwise—all fall short.

On top of being unlikely to succeed on the merits, Kalshi erroneously claims the equities run in its favor. The opposite is true—Ohio's sovereign interests *trump* Kalshi's alleged harms, especially because Kalshi has shown it can comply with

federal and state law by ceasing operations in another State (currently, Nevada). And Kalshi has no legitimate claim to a constitutional right to federal regulatory oversight, or, as Kalshi would have it, to remain effectively unregulated.

One point before proceeding: Kalshi's additional request for an "administrative stay" should be rejected off the cuff. As Kalshi tells it, this Court could pause proceedings now *before* applying the very high standards for injunctive relief. So what Kalshi really wants is a standardless injunction. *See United States v. Texas*, 144 S. Ct. 797, 798 (2024) (Barrett, J., concurring). In other words, there is nothing to stay here. Kalshi lost on its motion for a preliminary injunction, so the parties sit in *status quo ante*. Any order preventing enforcement now is an injunction, not a stay.

This Court should reject both of Kalshi's requests for extraordinary relief.

## STATEMENT

### I. Ohio strictly regulates gambling, including sports betting.

Gambling regulation is part of the States' traditional police powers. *Ah Sin v. Wittman*, 198 U.S. 500, 505–06 (1905). States "largely banned" sports betting for much of our country's history. *Murphy v. NCAA*, 584 U.S. 453, 458 (2018). While Ohio now allows some gambling, such activity is strictly regulated. *See, e.g.*, Schuler Decl., R.31-1, PageID#420–26. Recently, the Supreme Court confirmed that the

States are "free to act" on the "controversial subject" of "sports gambling." *Murphy*, 584 U.S. at 486.

## II.     The federal government regulates derivatives markets.

State gambling regulations have long coexisted with the federal derivatives-markets regulations. A "derivative" is a financial instrument that depends on another asset or commodity, such as the price of a stock or bushel of wheat. John C. Hull, *Options, Futures, and Other Derivatives*, 1 (8th ed. 2012). Parties generally use derivatives to "hedg[e]" against "risks in the economy." *Id.* Since 1921, the federal government has regulated these markets, initially focusing on things like grain futures. *Merrill Lynch, Pierce, Fenner & Smith v. Curran*, 456 U.S. 353, 360–62 (1982). In 1974, Congress created the CFTC through the Commodity Exchange Act and gave the CFTC "exclusive jurisdiction" over both agricultural and nonagricultural futures and options traded on designated contract markets. *Id.* at 362–66, 86.

Congress expanded the CFTC's jurisdiction in 2010, adding "swaps." Swaps operate as a hedging tool; they are a derivative in which two parties agree to exchange cash flows in the future. Hull, *Options, Futures, and Other Derivatives*, 148. "Trading in swaps exploded in the early 2000's leading up to the 2008 financial crisis." *United States v. Phillips*, 155 F.4th 102, 113 (2d Cir. 2025). In response, Congress enacted the Dodd-Frank Wall Street Reform and Consumer Protection Act, which

4

extended the CFTC's jurisdiction to "swaps," 7 U.S.C. §2(a)(1)(A), giving "swap" a six-part definition, 7 U.S.C. §1a(47)(A).  Dodd-Frank also made it generally "unlawful for any person ... to enter into a swap unless the swap is entered into on" a designated contract market.  7 U.S.C. §2(e); *see also* 7 U.S.C. §1a(18).

The CFTC has generally taken a limited view of its jurisdiction.  Shortly after Dodd-Frank, the CFTC promulgated a rule (which remains on the books) prohibiting designated contract markets from listing any contract "that involves, relates to, or references … gaming."  17 C.F.R. §40.11(a).  In 2012, the CFTC said "swaps" do not cover "customary business arrangements" that "historically have not been considered to involve swaps."  77 Fed. Reg. 48208, 48247 (Aug. 13, 2012).  And just two years ago, the CFTC acknowledged that "gambling is overseen by state regulators with particular expertise" and that federal derivatives law is not "aimed at protecting against gambling-specific risks and concerns."  89 Fed. Reg. 48968, 48982–83 (June 10, 2024).  The CFTC disclaimed having the "statutory mandate" or "specialized experience" necessary regulate the "rapidly evolving field" of gambling.  *Id.* at 48983.

## III.   Kalshi offers sports betting without regard for state law.

Kalshi offers online "events contracts."  Kalshi has previously acknowledged in litigation that offering sports events contracts would undercut the "basic purpose"

5

of designated contract markets, which is "to allow hedging of economic risk," unlike "sports gambling" which is "for diversion or amusement." Appellee Br.44–45, *Kalshiex LLC v. CFTC*, No. 24-5205 (D.C. Cir.), Doc. 2085055.

But Kalshi started offering sports-betting contracts in January 2025. Its website has an entire category dedicated to "sports" where users can make a variety of bets—ranging from who will win a game, to whether a team will cover a point spread, to how individual athletes will perform, to "prop" bets about what will happen in a game. *See* Kalshi Website, Sports, https://kalshi.com/sports/ (last accessed March 20, 2025).

Despite its previously limited view of its jurisdiction, the CFTC now sees itself as the country's sole sports-betting regulator. It recently swore in a new Chairman who quickly broadcast his view that all events contracts—including those about sports—are "swaps" within the CFTC's exclusive power. *See* Michael S. Selig, *States Encroach on Prediction Markets*, Wall Street Journal, Feb 17, 2026, available at https://web.archive.org/web/20260218182304/https://www.cftc.gov/Press-Room/SpeechesTestimony/seligstatement021726.

## IV.   Kalshi sues Ohio officials and the district court denies a preliminary injunction.

The Ohio Casino Control Commission sent Kalshi a cease-and-desist letter in March 2025. Letter, R.11-1, PageID#244–45. Kalshi filed this lawsuit in October.

6

Compl., R.1, PageID#1–24. It claims that the Act preempts Ohio's sports-betting laws. Kalshi moved for a preliminary injunction. P.I. Mot., R.11, PageID#215–42. The district court denied that motion, holding that "Kalshi fail[ed] to establish that Congress intended the [Act] to preempt state laws on sports gambling" and that "[t]he balance of equities and public interest … cut in favor of the State." *KalshiEX, LLC v. Schuler*, No. 2:25-cv-1165, 2026 WL 657004, *7, 10 (S.D. Ohio March 9, 2026). And the court denied Kalshi's subsequent motion for an injunction pending appeal under the same standard. Order, R.73-1, PageID#942–43.

## STANDARD OF REVIEW

An injunction pending appeal is "extraordinary relief." *Hobby Lobby Stores, Inc. v. Sebelius*, 568 U.S. 1401, 1403 (2012). When determining whether to grant one, this Court considers the movant's likelihood of success on the merits, possible irreparable harm without an injunction, an injunction's harm to others, and the public interest. *Mich. Coal. of Radioactive Material Users v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991). The last two considerations merge when the movant seeks to enjoin the government. *Kentucky v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023).

## ARGUMENT

Kalshi cannot demonstrate that it is likely to succeed on the merits or that the equities run in its favor. This Court should thus deny an injunction pending appeal.

7

## I.  Kalshi is unlikely to succeed on the merits.

Sports bets are not within the CFTC's exclusive jurisdiction because they are not "swaps" within the plain text of the Act.  Two clear-statement rules, along with the Act's structure and history, confirm that Congress did not secretly strip the States' traditional role as sports-betting regulators in a federal legislative response to the 2008 financial crisis.

### A.  Sports bets are not "swaps" under the Act, so Ohio's sports-betting regulations are not preempted.

The Act gives the CFTC "exclusive jurisdiction" over certain enumerated derivatives traded on designated contract markets, including "swaps."   7 U.S.C. §2(a)(1)(A).  Kalshi's sole argument in its motion is that its contracts are swaps that fall under the CFTC's authority (Kalshi makes no argument as to futures, options, or other types of derivatives), so state sports-betting regulations are preempted.  Not so.

1. Begin with the text.  The Act provides a six-part definition of "swap."  Kalshi relies on the second, which says:  "'swap' means any agreement, contract, or transaction … that provides for any purchase, sale, payment, or delivery … that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence."  7 U.S.C. §1a(47)(A)(ii).  Sports bets fall well outside this statutory

8

definition. First, sports bets pay out on the *outcome* of an event rather than on whether the "event or contingency" itself "occur[s]." Second, no potential economic consequences are "associated with" the supposed "event" at issue in a sports bet. Take each in turn.

*Events.* Start with "the occurrence … of an event or contingency." Because "occurrence" and "event" appear in the statute, the terms mean different things. *See Pulsifer v. United States*, 601 U.S. 124, 149 (2024). An "occurrence" is "something that takes place." *Webster's Third New International Dictionary* 1561 (2025). An event is "a noteworthy occurrence or happening." *Webster's Third New International Dictionary* 788 (2025). So "event," to be distinct from a mere "occurrence," must be a "noteworthy" happening.

Importantly, the statutory text does not say that "swaps" capture the occurrence of an "outcome." That matters because Kalshi's sports bets depend on *outcomes*, not *events*. An outcome is "something that comes out of or follows an activity or process: consequence, result." *Webster's Third New International Dictionary* 1601 (2025). Is Michigan beating Alabama by more than 10.5 points an "event" or an outcome? Normal usage indicates the latter. Winning by 11 points is noteworthy only because a company *created* the betting line to entice people to bet. So too for bets like "parlays," which pay out only if *all* legs of a multi-pronged wager go the

9

way a bettor predicts (e.g., a bettor can stake money that teams from Cincinnati, Cleveland, *and* Boston win their games). People do not ordinarily call that an "event."

Were it otherwise, *everything* would be an "event," and the definition of swap would be limitless. The number of points scored in a game. Whether an announcer uses the words "double double" during a basketball game. Whether Purdue or Texas is first to score ten points in their game. These are real bets on Kalshi, and none amounts to an "event." If these bets did count as events, then "event" would collapse into "occurrence." Even Kalshi has recognized as much, describing its sports-betting contracts as being "based on the *outcome*" of an "event." *E.g.*, Certification Submission, R.1-7, PageID#166.

***Economic Consequences.*** Not every event is a "swap." The predicate "event" must be "associated with a potential financial, economic, or commercial consequence." To "associate" means to "connect" or "join" together things in one's mind. *Webster's Third New International Dictionary* 132 (2025). "Swap" within the meaning of the Act thus refers to events that are inherently connected to potential economic consequences. That reading makes sense given the basic purpose of swaps: to allow traders to hedge against financial risks. *See Power & Tel. Supply Co. v. SunTrust Banks, Inc.*, 447 F.3d 923, 926 & n.1 (6th Cir. 2006). So the phrase

10

"associated with" captures events that, by their nature, are connected to potential economic consequences. Events tied to things like commodity prices or weather that can affect crop yields have economic consequences. They form the basis for a swap.

Sports bets flunk the connected-to-economic-consequences test. The occurrence, winner, or even score of a particular game has no direct connection to potential economic consequences. Common sense confirms. Nobody reasonably uses sports bets (e.g., whether LeBron James will score 20 or more points in a game), over/under wagers (e.g., whether the combined score in the annual Ohio State-Michigan football game will be over or under 50.5 points), or parlays (some combination of several bets where all bets must be correct to pay out) to hedge economic consequences. In major-questions cases like this one (*below* 13) courts should not read words "shorn of all context," particularly because doing so would make "swap" capable of meaning "almost anything." *See West Virginia v. EPA*, 597 U.S. 697, 732 (2022).

Ironically, Kalshi once agreed with all this. *Above* 6.

**2.** Because Congress speaks clearly when it intends a major change—like taking sports-betting regulating authority away from the States and giving it to the federal government—Kalshi needs to jump two clear-statement hurdles to win. It does not even try.

11

Congress does not use "vague terms or ancillary provisions" to fundamentally alter the law. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). Only crystal-clear statutory language can upset the state-federal relationship over major economic and political topics. Congress knows as much. That is why it legislates "against the backdrop" of this well-worn presumption. *Bond v. United States*, 572 U.S. 844, 857 (2014) (quotation omitted). Clear-statement rules thus play a vital role for Congress and for courts: they ensure a "fair reading of statutory text" that "demands awareness" of these background principles. *Id.* (quotation omitted). Two such rules prove critical here.

First, the federalism canon. Gambling regulation is "within the police powers of a State." *Ah Sin*, 198 U.S. at 505–06. And the States have long so regulated. *E.g.*, *Hoss v. Layton*, 3 Ohio St. at 352, 355–57 (1854). So Kalshi's theory—under which the States may not regulate sports betting on prediction markets—creates "a significant change in the sensitive relation between" the federal and state governments in an area of "traditional state authority." *See Bond*, 572 U.S. at 858–59 (quotation omitted). That implicates the federalism canon, triggering a clear-statement requirement with Congress. *Id.*

Next, the major-questions doctrine, which requires that statutes empowering federal agencies be read with "common sense as to the manner in which Congress would

12

have been likely to delegate" power. *West Virginia*, 597 U.S. at 722–23 (alteration accepted, quotation omitted). When an agency claims an "[e]xtraordinary grant[] of regulatory authority," courts look for unmistakable textual language providing such power because Congress does not give authority "through modest words, vague terms, or subtle devices." *Id.* at 723 (alteration accepted, quotation omitted).

Sports betting hits all the major-questions-doctrine prerequisites. It implicates billions of dollars. *See, e.g.*, *King v. Burwell*, 576 U.S. 473, 485–86 (2015); *NFIB v. OSHA*, 595 U.S. 109, 120 (2022) (*per curiam*). It is a major—and contested—political issue. *See, e.g.*, *Murphy*, 584 U.S. at 459–60, 486. And it intrudes on an area traditionally regulated by the States. *See, e.g.*, *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 764 (2021) (*per curiam*). And when, as here, "each of the signs the Court has found significant in the past is present," this is a "relatively easy case for the doctrine's application." *West Virginia*, 597 U.S. at 744 (Gorsuch, J., concurring).

Applying these "common sense" principles here, Congress did not remove the States' traditional authority over sports betting by adding "swaps" to the list of derivatives within the CFTC's exclusive jurisdiction in response to the housing crisis. This "modest," "vague" word cannot bear the weight Kalshi places on it. *West Virginia*, 597 U.S. at 723. Congress did not slyly give away all the States' historic powers

13

to the CFTC, without anyone noticing until today. That is especially so when, since then, States have passed comprehensive sports-gambling laws, the CFTC has disclaimed authority over gambling, and the Supreme Court has acknowledged that the issue was left to States. Today, though, Kalshi spins a tale that nestled deep within the United States Code, Congress empowered the CFTC to oversee all the nation's sports gambling. To tell that story is to refute it.

**3.** Last, context and history reinforce that sports bets are not swaps.

Start with context. The Act lists, in its six different definitions of "swaps," various types of "swaps." They include twenty-two different transactions that involve transfers of "financial risk" between parties, 7 U.S.C. §1a(47)(A)(iii), certain security-based swap agreements, *id.* §1a(47)(A)(v), and instruments that involve "financial or economic interests," *id.* §1a(47)(A)(i). If "events" and "associated with … potential economic consequences" means anything that *could* happen—as Kalshi would have it—specifying all these would be mere surplusage. But that runs afoul of a "basic" interpretive rule—that a statute should be read to give effect "to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Rubin v. Islamic Republic of Iran*, 583 U.S. 202, 213 (2018) (quotation omitted).

These definitions also reveal what *types* of financial instruments qualify as swaps. They "refer almost exclusively to financial measures, indices, or instruments" that

14

involve hedging against financial risks. *See KalshiEx, LLC v. Hendrick*, No. 2:25-cv-00575, 2025 WL 3286282, *7 (D. Nev. Nov. 24, 2025). Because statutory words are "known by the company" they keep, *Yates v. United States*, 574 U.S. 528, 543 (2015), "associated with" potential economic consequences must mean "that the event or contingency must be inherently associated with a potential financial consequence, not just that the event or contingency may have some potential downstream financial consequence," *Hendrick*, 2025 WL 3286282 at *7.

Looking at the Act from a different angle—through the exclusive-jurisdiction provision—confirms that sports bets are not swaps. The provision, which grants the CFTC exclusive jurisdiction over "swaps" but contains two separate saving clauses pushing any clear statement of preemption further out of reach. 7 U.S.C. §2(a)(1)(A). Notably, the second saving clause *unconditionally* preserves state-court jurisdiction. *Id.*; *see also Merrill Lynch*, 456 U.S. at 387. That includes pre-existing remedies for gambling violations under state law. *See*, *e.g. Hoss*, 3 Ohio St. at 355–57. And elsewhere, the Act contains an express preemption clause related to certain kinds of "gaming," but not sports betting. 7 U.S.C. §16(e)(2). This "is strong evidence that Congress did not intend to regulate so comprehensively as to exclude all state law." *Kalshiex LLC v. Martin*, 793 F.Supp.3d 667, 681 (D. Md. 2025).

15

History further shows that sports bets are not swaps. As detailed above, Congress added "swaps" to the CFTC's exclusive jurisdiction in 2010 as part of the Dodd-Frank Act. Dodd-Frank responded to the 2008 financial crisis, which is associated with unregulated trading of financial instruments like credit-default swaps. Nobody thought that "sports betting gone wrong" triggered the financial crisis. In fact, sports betting was mostly illegal at the time so it could not have instigated the crisis. *See Murphy*, 584 U.S. at 460–62. So pairing sports betting with "swaps" makes no historical sense. Indeed, eight years after Congress gave the CFTC jurisdiction over swaps, the Supreme Court declared the States "free to act" on sports betting as they saw fit. *Id.* at 486. It would be surprising for the Court to declare as much only for States to have already been constrained under the Act.

## B.    Kalshi's counterarguments fail.

Kalshi hopes in vain to persuade that Congress, in responding to the 2008 financial crisis by extending federal regulation over "swaps," surreptitiously eliminated the States' traditional role in regulating sports betting. It fails to grapple with any clear-statement rule. And Kalshi's remaining arguments about express, field, and conflict preemption founder, largely because they rise and fall on whether sports bets count as swaps under the Act. They do not.

16

**1.** Kalshi skips past the federalism canon and major-questions doctrine both of which confirm that "swaps" do not include sports bets, and attacks the district court's application of the "presumption against preemption." But Ohio does not need any such presumption to win when the text and both clear-statement rules establish that "swaps" cannot be read to include sports bets. *Above* 8–14.

Kalshi tries to salvage its limitless "swaps" definition by arguing that "run-of-the-mill sports bets" *could* still happen off designated contract markets and within the reach of state regulators. Doc.6, Kalshi Mot.17, 20. Another section makes it "unlawful … to enter into a swap unless the swap is entered into on" a designated contract market. 7 U.S.C. §2(e). So if Kalshi is right that sports bets are swaps, then it would be *unlawful* for them to be traded anywhere but designated contract markets under the CFTC's exclusive jurisdiction. §2(a)(1)(a). And anyway, *could* does not mean *would* if, after all, listing on Kalshi would mean avoiding state regulation. Indeed, reality belies these soft assurances: Kalshi's users already bet on whether Purdue will win by more or less than 7.5 points, and other more obscure sports bets, all of which lack any connection to economic consequences.

Kalshi's attempt to marshal a footnote from a recent decision of this Court, *Churchill Downs Tech. Initiatives Co. v. Michigan Gaming Control Bd.*, 162 F.4th 631, 641 n.5 (6th Cir. 2025), also falls short. *See* Doc.6, Kalshi Mot.18. A panel of this

17

Court explained there that any presumption against preemption would not apply to interstate wagers because States did not traditionally regulate interstate gambling. But the unreasoned footnote is *dicta*. Regardless, *Churchill Downs* was about the application of an unrelated statute on an unrelated regulatory scheme. *See* 162 F.4th at 635–37. It is thus inapposite.

Kalshi next twists §16(e)(2)—an express preemption clause prohibiting States from applying their gaming laws (but not sports-betting laws) to certain transactions happening off designated contract markets—as proof that Congress had incorporated such preemption to on-market transactions. Doc.6, Kalshi Mot.20. That goes in the wrong direction. The fact that Congress knew how to, and *did*, preempt state gaming laws for off-market transactions, but not as to the ones here, shows that Congress did not intend to preempt state gaming laws for on-market transactions.

**2.** Kalshi also throws a handful of preemption darts—arguing that express, field, and implied preemption applies to Ohio's sports-betting laws—hoping one will stick. None does.

***Express preemption.*** Kalshi argues that because the Act gives the CFTC "exclusive jurisdiction" over swaps listed on designated contract markets, it expressly preempts state law. Even if "exclusive jurisdiction" means exclusive *federal* jurisdiction (displacing States) and not exclusive *agency* jurisdiction (exclusive within the

federal government, without displacing States), the critical question remains:  Are sports bets swaps?  They are not.  *Above* 8–16.

Kalshi points to two other statutory sections as "evidence that Congress intended to preempt state sports gambling laws."  Doc.6, Kalshi Mot.21 (quotation omitted).  It first argues that the Special Rule, 7 U.S.C. §7a-2(c)(5)(C), that gives the CFTC the power to remove certain events contracts from a designated contract market, "is irrefutable textual evidence" that sports bets are swaps.  Doc.6, Kalshi Mot.21.

But the Special Rule acknowledges that "events contracts" can be "agreements, contracts, transactions, *or* swaps."  7 U.S.C. §7a-2(c)(5)(C) (emphasis added).  It does not follow, as Kalshi argues, that events contracts are *always* swaps—they could also be ordinary "agreements," "contracts," or "transactions."  And if Congress wanted to expand the scope of "swap" it would have done so directly in the statutory provision defining the word, *id.* §1a(47)(A), rather than backdoor it through an an-cillary provision above types of events contracts the CFTC is authorized to remove.  The Special Rule is merely a backstop to prevent improper trading on designated contract markets.

Kalshi also argues that the Unlawful Internet Gambling Enforcement Act ushered in exclusive federal jurisdiction over swaps.  The argument is as follows:  the Federal-Gambling Act adopted a general definition of "bet or wager" that included risking

something of value on "a sporting event," 31 U.S.C. §5362(1)(A), and because that definition said that it did not include "any transaction conducted on" a designated contract market, *id.* §5362(1)(E)(ii), Congress generally determined that all transactions on designated contract markets "should be regulated by the CFTC rather than the states." Doc.6, Kalshi Mot.21. That is a stretch on its own terms. And if it is right, then other important federal laws like the Indian Gaming Regulatory Act (25 U.S.C. §2701 *et seq.*) and the Wire Act (18 U.S.C. §1084) would be partially impliedly repealed. Under Kalshi's view, Tribes and States impliedly lose their authority under those Acts because the CFTC can unilaterally allow sports bets in their jurisdictions by allowing them on designated contract markets. Such "repeals by implication" are "disfavored." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) (quotation omitted). So it is unlikely that Congress impliedly repealed important parts of major statutes by granting the CFTC exclusive jurisdiction over "swaps."

In response to adverse textual holdings from the lower court, Kalshi offers only legislative history. Specifically, Kalshi cites House reports to dispute the district court's finding that the Act's saving clause and preemption clause weigh heavily against Kalshi's interpretation of the Act. *See* Doc.6, Kalshi Mot.19–20. Putting legislative history before a statute's text invoke a "bygone era" of statutory

20

interpretation. *See Castillo v. Bondi*, 140 F.4th 777, 786 (2025) (Thapar, J., concurring). And it reinforces that Congress did not clearly state its preemptive intent here.

*Field Preemption.*  Kalshi next argues that field preemption applies because "Congress … created a comprehensive regulatory structure to oversee the futures trading complex." Doc.6, Kalshi Mot.12–14 (quotation omitted). That misses the point. Even if such a regulatory structure exists, the critical question is still whether Congress placed sports betting in it. It did not.

*Conflict Preemption.*  Kalshi's conflict-preemption arguments are as unconvincing as they are brief. Quoting a CFTC amicus brief from a *different* case in a *different* court with *different* parties, Kalshi argues that it would be impossible to comply with both Ohio geographic requirements for sports betting and a federal rule requiring "impartial access" to designated contract markets. Doc.6, Kalshi Mot.3, 14–15, 22. That fails many times over.

*First,* it is possible to comply with both Ohio's sports-betting regulations and federal law because the latter prohibits sports betting on designated contract markets like Kalshi. The CFTC promulgated a rule that prohibits designated contract markets from listing "swap[s] … that involve[] … gaming." 17 C.F.R. §40.11(a)(1). Though the CFTC oddly chooses not to enforce this prohibition, that prohibition nonetheless harmonizes state and federal law. Any impossibility is illusory.

21

*Second*, Kalshi is wrong about what the impartial-access rule requires. Notwithstanding a single conclusory statement from the CFTC in different litigation, *see* Doc.6, Kalshi Mot.14–15, 22 (citing CFTC Amicus Br., *N. Am. Derivatives Exch. Inc. v. Nevada (Crypto)*, No. 25-7187 (9th Cir. Feb. 17, 2026), ECF 38.2), the impartial-access rule prevents wealth discrimination in designated contract markets, not geographic distinctions, 75 Fed. Reg. 80572, 80579 n.51 (Dec. 22, 2010).

*Third*, any *limited* conflict involving the three Ohio provisions Kalshi lists, Doc.6, Kalshi Mot.14, would not justify enjoining Ohio's *entire* scheme.

*Fourth*, Kalshi argues that Ohio's sports-betting regulations pose an "obstacle" to the Act's goals in two ways: (1) such regulations would create the kind of "patchwork" regulation of "national commodity exchanges" that the Act sought to prevent and (2) such regulations "would interfere with the 'method' Congress prescribed" to determine whether swaps are harmful to the public interest: "CFTC review under the Special Rule." Doc.6, Kalshi Mot.15. Both reasons assume that sports bets are "swaps" under the Act. Again, they are not. *Above* 8–16.

One last point. Kalshi argued below that the court could not decide whether sports bets are swaps in this preemption case. PI Reply, R.49, PageID#637–39. Kalshi does not repeat this meritless argument now, so it is forfeited.

22

## II.   The remaining equities weigh in Ohio's favor.

Ohio will be injured by the entry of any injunction more than Kalshi will be without one.

Any injunction would injure Ohio's sovereign interests "in exercising its police power, enforcing its duly-enacted laws, and regulating sports gambling to promote the public welfare." *KalshiEX, LLC*, 2026 WL 657004 at *10 (citing *Maryland v. King*, 567 U.S. 1301, 1303 (2012)).  For instance, though Ohio law seeks to protect vulnerable 18–20 year olds from addictive gambling, O.R.C. 3775.99(A)(2), betting on Kalshi would still be available to them, *KalshiEX, LLC*, 2026 WL 657004 at *10 n.9.  Kalshi argues that Ohio cannot rely on its interest in enforcing duly enacted laws because its laws are preempted and violate Kalshi's constitutional rights.  Doc.6, Kalshi Mot.22–25.  "That is" simply "a non-sequitur to end all non-sequiturs." *Helix Energy Sols. Grp., Inc. v. Hewitt*, 598 U.S. 39, 54 n.5 (2024).

Kalshi argues that without an injunction it would be forced either to operate in compliance with federal law and risk state enforcement, to operate in compliance with state law and risk federal enforcement, or to shut down altogether.  Kalshi Mot.22–24.  But "[t]hese concerns are dwarfed by Ohio's" more pressing sovereign injuries.  *KalshiEX, LLC*, 2026 WL 657004 at *10 (citing *King*, 567 U.S. at 1303).  And any harm asserted by Kalshi from pausing its unlawful operations is exaggerated

23

because Kalshi has demonstrated in Nevada that it can continue to operate in such conditions.  Krystal Hur, *Nevada Wins Temporary Ban on Sports Betting on Kalshi*, The Wall Street Journal, March 22, 2026, https://perma.cc/LXD2-GLRT.

And Kalshi's claim to a constitutional right is illusory.  Preemption is a rule of decision, not a substantive right.  *Murphy*, 584 U.S. at 477.  Though preemption is a constitutional *issue*, a private party cannot claim a constitutional *right* to be regulated by the federal government rather than the States.

## CONCLUSION

This Court should deny Kalshi's motion for an injunction pending appeal and its motion for an administrative stay.

24

Respectfully submitted,

DAVE YOST
Attorney General of Ohio

*/s/ Mathura J. Sridharan*
MATHURA J. SRIDHARAN*
Ohio Solicitor General
 *Counsel of Record*
ZACHERY P. KELLER
JOHN K. KERKHOFF
LAYNE H. TIESZEN
Deputy Solicitors General
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614.466.8980
Mathura.Sridharan@OhioAGO.gov

*Counsel for Appellees*
 *Matthew Schuler, et al.*

25

## CERTIFICATE OF COMPLIANCE

I hereby certify, in accordance with Rule 32(g) of the Federal Rules of Appellate Procedure, this brief complies with the type-volume requirements for a motion and contains 5,192 words. *See* Fed. R. App. P. 27(d)(2)(A).

I further certify that this brief complies with the typeface requirements of Federal Rule 32(a)(5) and the type-style requirements of Federal Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Equity font.

*/s/ Mathura J. Sridharan*
MATHURA J. SRIDHARAN

## CERTIFICATE OF SERVICE

I hereby certify that on March 31, 2026, this response was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/ Mathura J. Sridharan*
MATHURA J. SRIDHARAN