<u>**NOT RECOMMENDED FOR PUBLICATION**</u>

No. 26-3196

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

**FILED**
Apr 24, 2026
KELLY L. STEPHENS, Clerk

| | | |
|---|---|---|
| KALSHIEX LLC, | ) | |
| | ) | |
|     Plaintiff-Appellant, | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| v. | ) | THE SOUTHERN DISTRICT OF |
| | ) | OHIO |
| MATTHEW T. SCHULER, et al., | ) | |
| | ) | |
|     Defendants-Appellees. | ) | |

BEFORE: BATCHELDER, MURPHY, and RITZ, Circuit Judges.

**PER CURIAM**.  The Ohio Attorney General and Ohio Casino Control Commission have threatened to enforce Ohio's sports-betting laws against KalshiEX, LLC, for listing sports-related "event contracts" on its online prediction market.  After suing, Kalshi moved to preliminarily enjoin the enforcement of these state laws.  The district court denied its request for a preliminary injunction.  Kalshi appealed and now moves for an injunction pending appeal.  Kalshi has raised serious questions on the merits.  Indeed, several courts have reached conflicting conclusions about whether federal law preempts similar sports-betting laws.  At this early stage, however, Kalshi has shown at most only that the merits are in equipoise.  That showing does not suffice to enjoin Ohio's gambling laws pending appeal because of Ohio's strong interest in enforcing the laws and the underlying public interests that the laws serve.  We thus deny Kalshi's request for an injunction pending appeal.  That said, we order its appeal to be expedited before a merits panel.

No. 26-3196, *KalshiEX LLC v. Schuler, et al.*

I

Congress enacted the Commodity Exchange Act in 1936 to regulate futures contracts in agricultural commodities. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 360–62 (1982). These contracts allow parties (often farmers) to hedge against the risk that prices will change at the time that they deliver their crops. *See id.* at 358. Since then, though, the Act has expanded well beyond its agricultural-commodity roots. In 1974, Congress created the Commodity Futures Trading Commission (CFTC) and gave this agency the authority to regulate all futures contracts, including options, puts, and calls. *See* 7 U.S.C. § 2(a)(1)(A); Commodity Futures Trading Commission Act of 1974, Pub. L. No. 93-463, 88 Stat. 1389, 1395. The Act defined the word "commodity" to include not just actual commodities (such as wheat or livestock) but also "all services, rights, and interests . . . in which contracts for future delivery are presently or in the future dealt in." 7 U.S.C. § 1a(9). In the Dodd-Frank Act of 2010, Congress expanded the Act's reach to include so-called "swap[]" contracts. *Id.* § 2(a)(1)(A); *see* Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376, 1666–69, 1672 (2010). The Act defines a "swap" to include (as relevant here) contracts in which a party's "payment" depends on the "occurrence, nonoccurrence, or [] extent of the occurrence of an event" that is "associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii).

The Act now gives the CFTC "exclusive jurisdiction" "with respect to," among other covered contracts, "transactions involving swaps" "traded or executed on a contract market" that the agency has designated. *Id.* § 2(a)(1)(A). Financial entities that want to operate a federally regulated exchange in which parties can come together to enter covered futures contracts can "apply[] to the [CFTC] for designation as a contract market." *Id.* § 7(a). Once the CFTC

No. 26-3196, *KalshiEX LLC v. Schuler, et al.*

designates an entity as a contract market, the entity must comply with the Act's "core principle[s]" and the CFTC's regulations. *Id.* § 7(d)(1)(A). Of most note, the CFTC has promulgated regulations that govern the "access requirements" that a designated contract market must follow. *Id.* § 7(d)(2)(A)(i). These regulations require a designated contract market to "provide its members . . . with impartial access to its markets and services." 17 C.F.R. § 38.151(b); *see also id.* § 37.202(a). The contract market must both follow "[a]ccess criteria that are impartial, transparent, and applied in a non-discriminatory manner" and set "[c]omparable fee structures." *Id.* § 38.151(b); *see also id.* § 37.202(a).

In addition, the Act elsewhere adopts a "special rule" for what it calls "event contracts and swaps contracts." 7 U.S.C. § 7a-2(c)(5)(C). This special rule gives the CFTC the authority to prohibit a designated contract market from listing covered contracts for exchange on the market if those contracts meet certain conditions. Specifically, if a designated contract market lists contracts "in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency," the CFTC may identify the contracts as "contrary to the public interest" (and prohibit their listing) if they "involve" either "activity that is unlawful under any Federal or State law" or "gaming." *Id.* § 7a-2(c)(5)(C)(i)(I), (V). The Act's definition of the phrase "excluded commodity" resembles the relevant definition for swaps: "an occurrence, extent of an occurrence, or contingency" that is both "beyond the control of the parties to the relevant contract" and "associated with a financial, commercial, or economic consequence." *Id.* § 1a(19)(iv). Effective as of 2011, the CFTC has issued a regulation providing that a "registered entity shall not list for trading" any swap "that involves, relates to, or references . . . gaming, or an activity that is unlawful under any State or Federal law." 17 C.F.R. § 40.11(a)(1).

No. 26-3196, *KalshiEX LLC v. Schuler, et al.*

In 2020, the CFTC certified Kalshi as a designated contract market. This certification permitted Kalshi to begin offering what it calls "event contracts" on a CFTC-regulated contract market. Event contracts allow participants to take a position on whether or to what extent a future event will happen with the goal of earning a payout if the event comes to pass (or does not). They offer a binary choice—e.g., Will the Federal Reserve cut interest rates in 2026?—with one party taking the "yes" position and the other taking the "no." The correct party gets a payout.

Kalshi initially offered event contracts about technology, health, crypto, popular culture, politics, and economics. In January 2025, though, it began offering sports-related event contracts on its exchange. So a contract might ask: Will Michigan win the NCAA college basketball championship? Or it might ask: Will Michigan win by more than 7.5 points? Or will Michigan and UConn score more than a combined 144.5 points? Or will a specific player score more than 10 points? Or pretty much anything else that might happen during a sporting event. For example, Kalshi has self-certified "contracts involving multiple results related to sporting events in a single contract" using the formula: "Will <outcomes> occur in <events>?" Letter, R.1-6, PageID 70; Letter from KalshiEX LLC to Secretary, Commodity Futures Trading Commission (Sept. 2, 2025), https://www.cftc.gov/sites/default/files/filings/ptc/25/09/ptc09022529868.pdf.

These sports-related event contracts drew the attention of the Ohio Casino Control Commission. It sent Kalshi a cease-and-desist letter in March 2025. This letter instructed Kalshi to "cease offering [its] sports wagering products unlawfully in Ohio" or else face "administrative, civil, or criminal sanctions." Letter, R.11-1, PageID 244–45. Under Ohio law, to place a wager "means to risk a sum of money or thing of value on an uncertain occurrence." Ohio Rev. Code § 3775.01(DD). And before an entity can offer sports gaming, it must obtain an Ohio license. *Id.* § 3775.03(A)(1). Those who want to place wagers also must be "physically present in" the State.

4

No. 26-3196, *KalshiEX LLC v. Schuler, et al.*

*Id.* §§ 3775.11(A), 3775.12(A).  Yet Kalshi has not obtained an Ohio license.  So the Ohio Casino Control Commission views Kalshi as violating these state laws.

Kalshi responded by suing the Casino Control Commission, its members, and the Attorney General (collectively, "Ohio").  It alleges that its sports-related event contracts fall within the Act's definition of "swaps" and that the CFTC has exclusive jurisdiction to regulate them.  In Kalshi's view, then, the Act preempts Ohio's sports-gaming laws, and Ohio's attempt to enforce these laws violates the Supremacy Clause.  Kalshi also moved for a preliminary injunction to prevent Ohio from enforcing Ohio law against it.  The district court denied this motion.  *KalshiEX, LLC v. Schuler*, No. 2:25-cv-1165, 2026 WL 657004, at \*10 (S.D. Ohio Mar. 9, 2026).  It did not view Kalshi's event contracts as swaps subject to the CFTC's exclusive jurisdiction and did not view the Act as preempting Ohio's laws.  *See id.* at \*6–7, \*10.  Kalshi now requests an injunction pending appeal.

## II

In deciding whether to grant an injunction pending appeal, we ask the same questions we would for a preliminary injunction.  *See Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 16 (2020) (per curiam).  Has Kalshi shown that it will likely succeed on the merits, that it will likely suffer irreparable harm, that the balance of equities tips in its favor, and that an injunction is in the public interest?  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Two of the factors (likelihood of success and irreparable harm) are prerequisites.  *James B. Oswald Co. v. Neate*, 98 F.4th 666, 672 (6th Cir. 2024).  But if Kalshi shows some probability of success and some irreparable harm, we "balance" the factors against each other.  *EOG Res., Inc. v. Lucky Land Mgmt., LLC*, 134 F.4th 868, 883–86 (6th Cir. 2025) (citation omitted).  So Kalshi could obtain an injunction "with a lesser showing" on the likelihood-of-success factor if it can establish "severe

5

No. 26-3196, *KalshiEX LLC v. Schuler, et al.*

irreparable injury" in the absence of relief. *Tenn. Conf. of the NAACP v. Lee*, 105 F.4th 888, 895 (6th Cir. 2024) (per curiam). And because an injunction pending appeal "grants judicial intervention" that the district court has "withheld," we require "a significantly higher justification" than a stay pending appeal demands. *Respect Maine PAC v. McKee*, 562 U.S. 996 (2010) (per curiam) (quoting *Ohio Citizens for Responsible Energy, Inc. v. NRC*, 479 U.S. 1312, 1313 (1986) (Scalia, J., in chambers)); *see OPAWL - Bldg. AAPI Feminist Leadership v. Yost*, 118 F.4th 770, 774 (6th Cir. 2024).

Kalshi's likelihood of success on the merits presents a legal issue, so we review it de novo. *See Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.*, 162 F.4th 631, 637 (6th Cir. 2025). But we review the district court's overall decision to deny a preliminary injunction for abuse of discretion. *Id.*

A

To show a likelihood of success, Kalshi must prove two things on the merits. First, Kalshi must show that its event contracts qualify as "swaps" within the meaning of the Act's definition. Second, if the event contracts qualify as swaps, Kalshi next must show that the Act preempts Ohio's sports-betting laws as applied to sports-betting event contracts. We are content to assume (without deciding) that the event contracts qualify as swaps for purposes of this order. Even if they are, Kalshi has not met the likelihood-of-success standard that we believe it should have to meet to enjoin Ohio's sports-gaming laws during the short time that this appeal will take.

To be sure, judges from around the country have fractured on both questions that this appeal presents. The Third Circuit recently ruled in Kalshi's favor and found New Jersey's gaming laws preempted. *See KalshiEX, LLC v. Flaherty*, __ F.4th __, 2026 WL 924004, at *2–7 (3d Cir. Apr. 6, 2026). And a Tennessee district court in this circuit has also ruled for Kalshi. *See KalshiEX*

6

No. 26-3196, *KalshiEX LLC v. Schuler, et al.*

*LLC v. Orgel*, No. 3:26-cv-34, 2026 WL 474869, at *7–11 (M.D. Tenn. Feb. 19, 2026). Yet the Third Circuit's decision included a dissent. *See Flaherty*, 2026 WL 924004, at *7–14 (Roth, J., dissenting). And apart from the Ohio district court in this case, others have also ruled for the States. *See, e.g.*, *KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667, 675–87 (D. Md. 2025). This split of authorities leaves no doubt that Kalshi has raised serious questions on the merits. At least at this stage, though, we find the preemption arguments largely in equipoise (if not favoring Ohio).

Under the Supremacy Clause, federal law overcomes state law whenever the two collide. U.S. Const. art. VI, cl. 2. The Supreme Court has recognized three ways Congress might use its "power to preempt state law" under this clause. *Arizona v. United States*, 567 U.S. 387, 399 (2012). To start, Congress can "withdraw" a State's power to regulate a specified subject by including an "express preemption provision" in a statute. *Id.* Next, Congress can enact a "framework of regulation so pervasive" that it leaves "no room" for the States to regulate within that field. *Id.* (citation modified). Finally, federal law can impliedly preempt state law if compliance with both sets of laws "is a physical impossibility" or if the state law "stands as an obstacle" to the federal law's full purposes. *Id.* (citations omitted). Kalshi argues that all three of these preemption methods show that Congress preempted Ohio's state-gaming laws. We remain unconvinced—at least on the current preliminary briefing on these questions.

*Express Preemption*. At least at this stage, Kalshi has not shown that the Act's "express language" preempts Ohio's sports-gaming laws. *See Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008). In the provision on which Kalshi relies, Congress gave the CFTC "exclusive jurisdiction" over "transactions involving swaps" "executed" on a designated "contract market" like Kalshi. 7 U.S.C. § 2(a)(1)(A). This section, though, would represent an unusual express-preemption provision. The typical provision contains language that uses words like "preempt" or "supersede"

7

No. 26-3196, *KalshiEX LLC v. Schuler, et al.*

when it comes to state law.  Take the oft-litigated provision in the Employee Retirement Income Security Act of 1974 (ERISA).  That provision states that ERISA "shall *supersede* any and all State laws insofar as they . . . relate to any" covered benefit plan.  29 U.S.C. § 1144(a) (emphasis added); *see also, e.g.*, 8 U.S.C. § 1324a(h)(2); 21 U.S.C. § 360k(a); 49 U.S.C. § 41713(b).

The "exclusive jurisdiction" provision in this case, by comparison, says something different.  It identifies the governing *agency* (the CFTC rather than the SEC or a state regulator), not the governing *law* (whether federal or state).  7 U.S.C. § 2(a)(1)(A).  Indeed, as one of Kalshi's own cases shows, this type of "exclusive jurisdiction" language usually applies to *courts* rather than *agencies*.  *See Transcon. Gas Pipe Line Co. v. Pa. Env't Hearing Bd.*, 108 F.4th 144, 151–52 (3d Cir. 2024); *see also Exclusive Jurisdiction, Black's Law Dictionary* 981 (10th ed. 2014).  For example, the federal securities laws give "exclusive jurisdiction" to district courts (at the expense of state courts) over "violations" of those laws.  15 U.S.C. § 78aa(a).  But this provision does not thereby preempt state law.  That is why the securities laws contain express-preemption provisions. *See, e.g.*, *id.* § 78bb.

Two other factors make Kalshi's express-preemption argument more debatable.  For one thing, the exclusive-jurisdiction provision includes two savings clauses.  7 U.S.C. § 2(a)(1)(A). The first savings clause says that, "[e]xcept as hereinabove provided," the section shall not "supersede or limit the jurisdiction at any time conferred on the Securities and Exchange Commission or other regulatory authorities under the laws of the United States or of any State." *Id.*  So does the exclusive-jurisdiction provision simply give the CFTC the authority to enforce the Act and allow States to enforce state laws?  Or does it not only bar *enforcement* by state authorities but also the *underlying state law* too?  And what should we make of another section of the Act that gives state regulators (not just the CFTC) the jurisdiction to sue for certain violations of the Act?

No. 26-3196, *KalshiEX LLC v. Schuler, et al.*

*See id.* § 13a-2(1). The second savings clause says (without limitation) that "[n]othing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State." *Id.* § 2(a)(1)(A). So are state courts open to consider any state common-law claims (whether in contract or tort) involving swaps if those claims are brought by private parties (rather than "regulatory authorities")? *Cf. Kerr v. First Commodity Corp. of Boston*, 735 F.2d 281, 288 (8th Cir. 1984). For that matter, are contracts related to these designated contract markets subject to the most relevant state contract law or must the federal courts or CFTC create federal contract law from scratch? *Cf. Bernstein v. Lind-Waldock & Co.*, 738 F.2d 179, 184–85 (7th Cir. 1984).

For another thing, the Act elsewhere contains *express* preemption provisions. *See* 7 U.S.C. §§ 16(e)(2), 27f(b). One provision, for example, says that the Act "shall supersede and preempt the application of any State or local law that prohibits or regulates gaming or the operation of bucket shops (other than antifraud provisions of general applicability)" in two circumstances. *Id.* § 16(e)(2). Another says that States may not "regulate[]" a "swap" "as an insurance contract" under their insurance laws. *Id.* § 16(h)(2). Kalshi makes no claim that any of these express-preemption provisions apply to Ohio's regulation of their sports-related event contracts. And under basic interpretive principles, we presume that Congress's choice to expressly preempt *only* certain categories of state laws shows that it did not mean to "withdraw" the States' power to enact *all* such laws in other circumstances. *Arizona*, 567 U.S. at 399. Although this express provision does not bar us from invoking other *implied* preemption doctrines, *see Sprietsma v. Mercury Marine, a Div. of Brunswick Corp.*, 537 U.S. 51, 64–65 (2002), it does suggest that we should not read the Act to *expressly* preempt other state laws. We thus will turn to the two doctrines of implied preemption to measure Kalshi's likelihood of success at this stage.

9

No. 26-3196, *KalshiEX LLC v. Schuler, et al.*

*Field Preemption.* We find it equally debatable whether Congress's regulation of futures trading has preempted the field. The Supreme Court has explained that this "field" preemption can exist if a federal law adopts a comprehensive scheme of "exclusive" federal "governance" that leaves "no room" for state law (whether or not the state law complements or contradicts the federal legislation). *Arizona*, 567 U.S. at 399 (citation omitted). And the preemption can exist in an area in which courts view the "federal interest" served by the law as "so dominant" that Congress would not have wanted any state intervention. *Id.* (citation omitted). As an example of this type of broad preemption, the Court has held that the federal immigration laws occupy the field of immigrant registration and thus prohibit "even complementary state regulation" in this area. *Id.* at 401. Nevertheless, it has also said that this type of comprehensive preemption will exist only "[i]n rare cases." *Kansas v. Garcia*, 589 U.S. 191, 208 (2020).

At this stage, Kalshi has not shown that this case is one of those rare ones. A perusal of the Commodities Exchange Act shows that it often permits state regulation. To start, the presence of a savings clause usually signals that Congress does not mean to preempt the *field*. *See Farina v. Nokia Inc.*, 625 F.3d 97, 121 (3d Cir. 2010); *In re NOS Commc'ns*, 495 F.3d 1052, 1058 (9th Cir. 2007); *see also City of El Cenizo v. Texas*, 890 F.3d 164, 178 (5th Cir. 2018). And the Act has several savings clauses. As for the savings clauses that we have already discussed, *see* 7 U.S.C. § 2(a)(1)(A), the Seventh Circuit relied on them to hold that "Congress did not intend to preempt the field of futures trading." *Am. Agric. Movement, Inc. v. Bd. of Trade of City of Chi.*, 977 F.2d 1147, 1155 (7th Cir. 1992), *abrogated on other grounds by Time Warner Cable v. Doyle*, 66 F.3d 867, 875 n.7 (7th Cir. 1995); *see also Kerr*, 735 F.2d at 288. Many other examples exist. Another savings clause makes clear that we should not invoke any implied-preemption doctrines to supersede state laws regulating trades "not conducted on or subject to" a registered exchange or

10

No. 26-3196, *KalshiEX LLC v. Schuler, et al.*

individuals who must register but fail to do so. 7 U.S.C. § 16(e)(1). Still another permits state officials to enforce a "general civil or criminal antifraud statute" in state court. *Id.* § 13a-2(7). And as we have said, state contract law may overlay the Act. Kalshi's own rulebook explains that suits between Kalshi participants "will be governed by New York law" (not federal common law). Rulebook, R.1-6, PageID 148. Lastly, Congress's decision to allow state officials to enforce the Act also shows they have a role to play. *See* 7 U.S.C. § 13a-2(1).

*Conflict Preemption.* This leaves conflict preemption. That type of preemption comes in two varieties. A federal scheme will preempt a state law if the state law "creates an unacceptable 'obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Wyeth v. Levine*, 555 U.S. 555, 563–64 (2009) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). And a federal scheme will preempt a state law if "it is 'impossible for a private party to comply with both state and federal requirements.'" *Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 480 (2013) (quoting *English v. General Elec. Co.*, 496 U.S. 72, 79 (1990)).

Kalshi has shown (at most) equipoise on its conflict-preemption arguments (which its opening brief covered in all of a page). The company starts with a single obstacle-preemption challenge to Ohio's gaming laws. At the outset, though, "[t]he regulation of gambling enterprises lies at the heart of the state's police power." *Johnson v. Collins Ent. Co.*, 199 F.3d 710, 720 (4th Cir. 1999) (citing *Casino Ventures v. Stewart*, 183 F.3d 307, 310 (4th Cir. 1999)); *see Northville Downs v. Granholm*, 622 F.3d 579, 587 (6th Cir. 2010). Ohio seeks to promote the public welfare by limiting sports betting—not by targeting futures trading. *See* Ohio Rev. Code §§ 3775.11, 3775.12, 3775.99(A). We therefore must begin with the presumption that Congress did *not* mean to preempt Ohio's "historic police powers" unless the Commodities Exchange Act discloses that result as "the clear and manifest purpose of Congress." *Wyeth*, 555 U.S. at 565 (citation omitted).

11

No. 26-3196, *KalshiEX LLC v. Schuler, et al.*

Kalshi nevertheless claims that Ohio's gambling regulations would stand as an obstacle to the Act's primary goal of bringing uniformity to futures trading—as evidenced by its grant of "exclusive jurisdiction" to the CFTC. But "no statute yet known pursues its stated purpose at all costs," and the statutory limits on achieving the purpose often are just as critical to its passage as is the purpose itself. *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 89 (2017) (citation modified); *see Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 778–79 (2019) (Gorsuch, J., opinion); *Wyeth*, 555 U.S. at 601 (Thomas, J., concurring in the judgment). And the Act's "preservation of state regulation" through its many savings clauses shows that uniformity "is not to be accomplished at all costs" here too. *Pac. Gas & Elec. Co. v. State Energy Res. Conservation and Dev. Comm'n*, 461 U.S. 190, 222 (1983) (citation modified). So Kalshi's merits briefing will have to identify more than generic uniformity concerns to meet the "high threshold" required to establish obstacle preemption. *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 607 (2011) (citation omitted).

Kalshi thus turns to impossibility preemption. It argues that to comply with the physical-presence requirement in Ohio's gaming laws, *see* Ohio Rev. Code §§ 3775.11(A), 3775.12(A), it must violate the "impartial access" requirement in the CFTC's regulations, *see* 17 C.F.R. §§ 38.151(b), 37.202(a); *see also* 7 U.S.C. § 7(d)(2)(A)(i). At this stage, however, Kalshi has offered no arguments about what "impartial" means. And an ordinary speaker might understand the word as an anti-discrimination command, not as a limit on a facially neutral requirement. *See Impartial, Oxford English Dictionary* (2025 Online ed.). Indeed, the notice of proposed rulemaking for this impartiality requirement stated a purpose "to prevent" designated contract markets "from using discriminatory access requirements as a competitive tool against certain participants." Core Principles and Other Requirements for Designated Contract Markets, 75 Fed.

12

No. 26-3196, *KalshiEX LLC v. Schuler, et al.*

Reg. 80,572, 80,579 & n.51 (Dec. 22, 2010). And Kalshi would not discriminate against nonresidents of Ohio by complying with the State's gambling laws any more than a company would discriminate against nonresidents by charging Ohio sales tax for the nonresident's in-state purchases. *Cf. Garber v. Menendez*, 888 F.3d 839, 843 (6th Cir. 2018).

What is more, these impartial-access regulations do not appear to require a designated contract market like Kalshi to offer any "particular market" for the event contracts it lists. *Flaherty*, 2026 WL 924004, at *12 (Roth, J., dissenting) (citing *Just Puppies, Inc. v. Brown*, 123 F.4th 652, 664 (4th Cir. 2024)). They just require "impartial" "access" to whatever "market(s)" the entity offers. 17 C.F.R. §§ 37.202(a), 38.151(b). The Act's "special rule" for event contracts might confirm this point. It allows the CFTC to prohibit a designated contract market from listing a contract involving an "activity that is unlawful under any . . . State law." 7 U.S.C. § 7a-2(c)(5)(C)(i)(I); *see* 17 C.F.R. § 40.11(a)(1). This rule thus suggests that certain contracts may be listed in some state markets but not others. The contrary view would suggest that one State could effectively ban a contract in the other 49. Other companies have also complied with both the federal impartial-access requirement and state sports-gaming laws by using geofencing to create a market for participants in one State and then giving impartial access to those individuals. *See Flaherty*, 2026 WL 924004, at *12 n.53 (Roth, J., dissenting). True, geofencing may be "challenging, time-consuming, and expensive." Sottile Decl., R.11-6, PageID 282–86. But expensive does not mean impossible.

B

At day's end, we find the issues in this appeal close. And we have sometimes issued a preliminary injunction when a party has raised "serious questions going to the merits." *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985). But we are reluctant to apply this

13

No. 26-3196, *KalshiEX LLC v. Schuler, et al.*

serious-questions approach when a party seeks to "enjoin the implementation of a duly enacted state statute." *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 731–33 (8th Cir. 2008) (en banc); *Able v. United States*, 44 F.3d 128, 131 (2d Cir. 1995) (per curiam). After all, if we granted an injunction based on such a low probability, parties could circumvent "reasoned democratic processes" and thwart the enforcement of "presumptively" legitimate laws merely by raising plausible challenges. *Planned Parenthood*, 530 F.3d at 732–33 (citation omitted).

To get an injunction based on this weaker showing on the merits, a party at least must show that the other "three factors" all "strongly" favor relief. *DeLorean*, 755 F.2d at 1230; *see also Fam. Tr. Found. of Ky., Inc. v. Ky. Jud. Conduct Comm'n*, 388 F.3d 224, 227–28 (6th Cir. 2004); *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153–54 (6th Cir. 1991). Any lesser rule would risk running afoul of the Supreme Court's requirement that a party "seeking a preliminary injunction" must establish that it "is *likely* to succeed on the merits." *Winter*, 555 U.S. at 20 (emphasis added). And here, when we balance Kalshi's probability of success against the remaining factors, it has not met its burden to enjoin Ohio's "enforcement of a presumptively constitutional state legislative act." *Respect Maine*, 562 U.S. at 996.

We do not dispute that Kalshi will face potentially irreparable harm without an injunction. As it explained, it may have to engage in expensive geofencing of Ohio's market and likely could not recover its costs from Ohio even if successful in this litigation. Equally true, however, a State "suffers a form of irreparable injury" any time a court enjoins it "from effectuating statutes enacted by representatives of its people." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (citation omitted) (Roberts, C.J., in chambers); *see Abbott v. Perez*, 585 U.S. 579, 603 n.17 (2018); *Doe v. Lee*, 137 F.4th 569, 576 (6th Cir. 2025). This principle weighs heavy here because Ohio wants to enforce one of its longstanding police powers: the regulation of gambling. *See Murphy v. Nat'l Collegiate*

14

No. 26-3196, *KalshiEX LLC v. Schuler, et al.*

*Athletic Ass'n*, 584 U.S. 453, 458–60, 474 (2018); *Johnson*, 199 F.3d at 720; *Ah Sin v. Wittman*, 198 U.S. 500, 505–06 (1905).  An injunction would thus not only preclude Ohio from "enforc[ing] the will" of its legislature.  *L. W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 491 (6th Cir. 2023).  It would also impede the State from furthering its gaming laws' public-welfare considerations like protecting "young people" from "addictive" habits.  *Murphy*, 584 U.S. at 460.  The equities and public interest thus favor Ohio.

On this point, we remain mindful of the standard of review.  The district court found that Kalshi's financial harms are "dwarfed by Ohio's interest in exercising its police power, enforcing its duly-enacted laws, and regulating sports gambling to promote the public welfare."  *Schuler*, 2026 WL 657004, at *10.  And for the reasons just explained, we cannot conclude that Kalshi's harm "decidedly outweighs" the harm Ohio and the public will suffer.  *DeLorean*, 755 F.2d at 1229–30 (citation omitted).  So even if we think that Kalshi has raised serious questions on the merits, the district court did not abuse its discretion in finding that the equities favor Ohio.  *See Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312–13 (1982).  And if the equities favor Ohio, Kalshi needed to do more than raise serious questions.  *See Griepentrog*, 945 F.2d at 153–54.

Indeed, this procedural posture sets our case apart from the Third Circuit's *Flaherty* decision.  There, the district court *granted* a preliminary injunction against New Jersey's sports-betting laws.  *Flaherty*, 2026 WL 924004, at *1.  So the Third Circuit's abuse-of-discretion review *favored* Kalshi.  *Id.*  Here, by contrast, the standard favors Ohio.  And Kalshi needed to show a "significantly higher justification" for us to grant "judicial intervention" that the district court "withheld."  *Respect Maine*, 562 U.S. at 996 (quoting *Ohio Citizens for Responsible Energy*, 479 U.S. at 1313 (1986) (Scalia, J., in chambers)).  It has not done so.

15

No. 26-3196, *KalshiEX LLC v. Schuler, et al.*

\* \* \*

All told, Kalshi has failed to show enough at this stage for us to grant an injunction during the time that this appeal takes to complete. Its motion for injunction pending appeal is thus **DENIED**. Nevertheless, we order this appeal expedited. Kalshi's brief is currently due on May 5, and the State's on June 4. The clerk is hereby **DIRECTED** not to grant either party an extension of time absent extraordinary circumstances. Further, the clerk is **DIRECTED** to assign this case to a merits panel as soon as practicable.

ENTERED BY ORDER OF THE COURT

Kelly L. Stephens, Clerk