No. 26-3196

IN THE
# United States Court of Appeals
# for the Sixth Circuit

KALSHIEX LLC,

*Plaintiff-Appellant,*

v.

MATTHEW T. SCHULER; THOMAS J. STICKRATH; SHEETAL BAJORIA; SCOTT P. BORGEMENKE; KEITH CHENEY; PENELOPE R. CUNNINGHAM; CHRISTOPHER SMITHERMAN; TRIFFON CALLOS; OHIO CASINO CONTROL COMMISSION; DAYE YOST, OHIO ATTORNEY GENERAL,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Southern District of Ohio
No. 2:25-cv-1165
Hon. Sarah D. Morrison

## OPENING BRIEF FOR APPELLANT KALSHIEX LLC

GRANT R. MAINLAND
ANDREW L. PORTER
NICOLE D. VALENTE
MILBANK LLP
55 Hudson Yards
New York, NY 10001

MICHAEL J. HUNTER
MATTHEW L. JALADONI
FLANNERY | GEORGALIS LLC
175 S. Third St., Ste. 285
Columbus, OH 43215

NEAL KUMAR KATYAL
*Counsel of Record*
JOSHUA B. STERLING
COLLEEN E. ROH SINZDAK
WILLIAM E. HAVEMANN
SAMANTHA K. ILAGAN
MILBANK LLP
1101 New York Ave., NW
Washington, DC 20005
Telephone: (202) 835-7505
nkatyal@milbank.com

May 5, 2026

*Counsel for Plaintiff-Appellant*

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 26-3196          Case Name: KalshiEX LLC v. Matthew Schuler, et al.

Name of counsel:  William E. Havemann

Pursuant to 6th Cir. R. 26.1, KalshiEX LLC
*Name of Party*

makes the following disclosure:

1.    Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

Kalshi Inc., parent

2.    Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

No

CERTIFICATE OF SERVICE

I certify that on _____May 5, 2026_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/William E. Havemann
William E. Havemann
Milbank LLP

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

6CA-1
8/08                                                                                                    Page 1 of  2

# TABLE OF CONTENTS

Page

STATEMENT REGARDING ORAL ARGUMENT ............................................1

INTRODUCTION ........................................................................................ 2

JURISDICTIONAL STATEMENT................................................................ 4

STATEMENT OF ISSUES FOR REVIEW ....................................................... 5

STATEMENT OF THE CASE ....................................................................... 5

I.　　LEGAL BACKGROUND ..................................................................... 5

　　　A.　Pre-Commodity Exchange Act History ..................................... 6

　　　B.　The Commodity Exchange Act And Its Subsequent
　　　　　Amendments ........................................................................... 8

　　　C.　Congress's Expansion Of The Scope Of Covered Commodities
　　　　　To Include Event Contracts....................................................12

　　　D.　The CEA's Requirements For Designated Contract Markets ....18

II.　　FACTUAL BACKGROUND ......................................................... 20

III.　　PROCEDURAL BACKGROUND................................................... 22

SUMMARY OF ARGUMENT ..................................................................... 26

STANDARD OF REVIEW ......................................................................... 29

ARGUMENT ........................................................................................... 29

I.　　KALSHI IS LIKELY TO SUCCEED BECAUSE THE CEA PREEMPTS STATE
　　　GAMBLING LAWS AS APPLIED TO ANY TRANSACTION ON A DCM ............ 30

　　　A.　Ohio's Sports-Gambling Laws Are Expressly Preempted As
　　　　　Applied To Kalshi .................................................................31

## TABLE OF CONTENTS—Continued

Page

B. Ohio's Sports-Gambling Laws Are Field-Preempted As Applied To Kalshi ...................................................................... 38

C. Ohio's Sports-Gambling Laws Are Conflict-Preempted As Applied To Kalshi ...................................................................... 41

II. THE DISTRICT COURT'S CONTRARY CONCLUSIONS ARE UNPERSUASIVE.... 44

A. The District Court Erred In Concluding That Kalshi's Contracts Are Not Swaps Or Other Derivatives ........................................ 45

B. The District Court Erred In Concluding That State Law Is Not Preempted ............................................................................... 53

III. THE BALANCE OF HARMS AND PUBLIC INTEREST STRONGLY FAVOR KALSHI.................................................................................................. 64

CONCLUSION ........................................................................................ 66

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

ADDENDUM

# TABLE OF AUTHORITIES

Page(s)

**CASES:**

*Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.,*
977 F.2d 1147 (7th Cir. 1992) ...................................18, 37 41, 42 59, 61 62

*Am. Energy Corp. v. Rockies Express Pipeline LLC,*
622 F.3d 602 (6th Cir. 2010)......................................................................31

*Arizona v. United States,*
567 U.S. 387 (2012) ........................................................................30, 40 43

*Bd. of Trade of Chi. v. Christie Grain & Stock Co.,*
198 U.S. 236 (1905) ...............................................................................6, 7

*Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.,*
972 F.3d 83 (D.C. Cir. 2020) ................................................................ 45

*Bibbo v. Dean Witter Reynolds, Inc.,*
151 F.3d 559 (6th Cir. 1998) ............................................................... 30

*Boaz v. FedEx Customer Info. Servs., Inc.,*
725 F.3d 603 (6th Cir. 2013) ............................................................... 37

*California v. FERC,*
495 U.S. 490 (1990)............................................................................... 44

*CFTC v. Erskine,*
512 F.3d 309 (6th Cir. 2008).............................................................. 52

*CFTC v. Zelener,*
373 F.3d 861 (7th Cir. 2004) ............................................................. 52

*Chi. Mercantile Exch. v. SEC,*
883 F.2d 537 (7th Cir. 1989) ............................................................. 37

*Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.,*
162 F.4th 631 (6th Cir. 2025) ...................................................... 23, 54 65

# TABLE OF AUTHORITIES—Continued

Page(s)

*Cothran v. Ellis,*
  16 N.E. 646 (Ill. 1888) .......................................................... 6,7

*Crosby v. Nat'l Foreign Trade Council,*
  530 U.S. 363 (2000) ...................................................... 30, 38 41

*Dickson v. Uhlmann Grain Co.,*
  288 U.S. 188 (1933) .........................................................8, 60

*Duke Energy Trading & Mktg., L.L.C. v. Davis,*
  267 F.3d 1042 (9th Cir. 2001) ................................................. 32

*EOG Res., Inc. v. Lucky Land Mgmt., LLC,*
  134 F.4th 868 (6th Cir. 2025).......................................... 28, 29

*FTC v. Ken Roberts Co.,*
  276 F.3d 583 (D.C. Cir. 2001)................................................ 37

*Garcia v. United States,*
  469 U.S. 70 (1984) ....................................................... 38, 39

*Heart of Am. Grain Inspection Serv., Inc. v. Mo. Dep't of Agric.,*
  123 F.3d 1098 (8th Cir. 1997) ............................................... 55

*Hughes v. Talen Energy Mktg., LLC,*
  578 U.S. 150 (2016)........................................................31, 55

*In re Ford Motor Co.,*
  65 F.4th 851 (6th Cir. 2023) ................................................. 44

*Int'l Res., Inc. v. N.Y. Life Ins. Co.,*
  950 F.2d 294 (6th Cir. 1991)............................................. 32, 33

*KalshiEX LLC v. CFTC,*
  No. 23-3257, 2024 WL 4164694
  (D.D.C. Sep. 12, 2024) ................................................. 20, 62

*KalshiEX LLC v. Flaherty,*
  172 F.4th 220 (3d Cir. 2026) ...................3, 29, 41, 46 47, 53 54, 62 63, 64

# TABLE OF AUTHORITIES—Continued

Page(s)

*KalshiEX LLC v. Johnson,*
No. 2:26-cv-1715, 2026 WL 1223373
(D. Ariz. May 5, 2026) ............................................................ 22

*KalshiEX LLC v. Orgel,*
No. 3:26-cv-34, 2026 WL 474869
(M.D. Tenn. Feb. 19, 2026) ...................................... 21, 23 63

*Leist v. Simplot,*
638 F.2d 283 (2d Cir. 1980) .................................. 3, 10 36, 37

*Loper Bright Enters. v. Raimondo,*
603 U.S. 369 (2024) ................................................................ 38

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,*
456 U.S. 353 (1982) ........................................ 11, 14 17, 18 39

*Mississippi v. Louisiana,*
506 U.S. 73 (1992) .................................................................. 30

*Morales v. Trans World Airlines, Inc.,*
504 U.S. 374 (1992) ................................................................ 63

*Mut. Pharm. Co. v. Bartlett,*
570 U.S. 472 (2013) ................................................................ 62

*Nat'l Meat Ass'n v. Harris,*
565 U.S. 452 (2012) ................................................................ 43

*NIH v. Am. Pub. Health Ass'n,*
145 S. Ct. 2658 (2025) ............................................................ 64

*NLRB v. SW Gen., Inc.,*
580 U.S. 288 (2017) ................................................................ 49

*Oklahoma v. Castro-Huerta,*
597 U.S. 629 (2022) ................................................................ 48

# TABLE OF AUTHORITIES—Continued

Page(s)

*Omnipoint Commc'ns, Inc. v. City of Huntington Beach,*
738 F.3d 192 (9th Cir. 2013) .......................................... 32, 33

*PhRMA v. McCuskey,*
171 F.4th 675 (4th Cir. 2026) ................................................ 38

*Polyweave Packaging, Inc. v. Buttigieg,*
51 F.4th 675 (6th Cir. 2022) ................................................. 46

*Puerto Rico v. Franklin Cal. Tax-Free Tr.,*
579 U.S. 115 (2016) ............................................................. 53

*Rasmussen v. Thomson & McKinnon Auchincloss Kohlmeyer, Inc.,*
608 F.2d 175 (5th Cir. 1979) ................................................. 37

*Rice v. Bd. of Trade of Chi.,*
331 U.S. 247 (1947) ............................................................. 33

*Richardson v. Kruchko & Fries,*
966 F.2d 153 (4th Cir. 1992) ................................................. 32

*Sherfel v. Newsom,*
768 F.3d 561 (6th Cir. 2014) .............................................41, 42

*Slaney v. Int'l Amateur Athletic Fed'n,*
244 F.3d 580 (7th Cir. 2001) ................................................. 55

*Stryker Emp. Co. v. Abbas,*
60 F.4th 372 (6th Cir. 2023) ................................................. 29

*Transcon. Gas Pipe Line Co. v. Pa. Env't Hearing Bd.,*
108 F.4th 144 (3d Cir. 2024) .......................................32, 55 56

*United States v. Brien,*
617 F.2d 299 (1st Cir. 1980) ................................................. 37

*Winter v. Nat. Res. Def. Council, Inc.,*
555 U.S. 7 (2008) ................................................................ 29

# TABLE OF AUTHORITIES—Continued

Page(s)

**CONSTITUTION:**

U.S. Const. art. VI, cl. 2 ...................................................................30

**STATUTES:**

5 U.S.C. § 551(13)............................................................................ 45

7 U.S.C. §§:

   1a(9) ............................................................................... 12, 40

   1a(19).....................................................................................40

   1a(19)(i)..................................................................................13

   1a(19)(ii)................................................................................13

   1a(19)(iii)...............................................................................13

   1a(19)(iv) .................................................................13, 35, 50

   1a(40) .....................................................................................14

   1a(47).....................................................................................40

   1a(47)(A)(ii) .............................................................. 16, 46, 48

   1a(47)(A)(iii) ........................................................................ 48

   1a(47)(A)(iv)....................................................................16, 49

   1a(51)(A)..............................................................18, 19, 39, 42

   2(a)(1)(A) .....................2, 3, 9, 10, 14, 25, 31, 32, 45, 50, 51, 54, 56, 57, 59

   2(e) ................................................................................. 39, 50

   5(a) ....................................................................... 14, 19, 42

# TABLE OF AUTHORITIES—Continued

Page(s)

6(a) ................................................................................ 39

6a ................................................................................. 40

6b ................................................................................. 40

6c ............................................................................. 33, 40

7(a) ............................................................................... 39

7(d) ................................................................................18

7a-1 ...............................................................................18

7a-2(c)(1)........................................................................19

7a-2(c)(5)(B) ...................................................................19

7a-2(c)(5)(C) ................................................................... 40

7a-2(c)(5)(C)(i) ........................................ 16, 17, 27, 28, 43, 47, 48, 59, 60

7a-2(c)(5)(C)(ii) ...............................................................17

8(b)............................................................................... 20

9(10)(C)......................................................................... 20

13 ................................................................................ 20

13a-2............................................................................. 11

13a-2(1) ................................................... 11, 20, 34, 43, 46, 57

13a-2(7) ......................................................................... 34

16(e) ............................................................................. 59

16(e)(1) ........................................................................11, 12

# TABLE OF AUTHORITIES—Continued

Page(s)

16(e)(1)(B)(i) ...............................................................34, 35, 50, 51

16(e)(2).............................................................. 13, 14, 35, 51, 57

15 U.S.C. § 8302(d)(1) ...............................................................49, 51

28 U.S.C. § 1331 4

28 U.S.C. § 1292(a)(1)................................................................. 4

29 U.S.C. § 1144(b)(2)(A) ...................................................... 58

29 U.S.C. § 1144(b)(2)(B) ...................................................... 58

31 U.S.C. § 5362(1)(A) .........................................................36, 60

31 U.S.C. § 5362(1)(E)(ii) .....................................................36, 60

31 U.S.C. § 5362(10)(A) ......................................................... 36

49 U.S.C. § 41713(b)(1) ...........................................................58

49 U.S.C. § 41713(b)(4)...........................................................58

Commodities Exchange Act of 1936,
   Pub. L. No. 74-675, 49 Stat. 1491............................................. 8

Commodity Futures Modernization Act of 2000,
   Pub. L. No. 106-554, 114 Stat. 2763A-365......................................13, 35

Grain Futures Act of 1922,
   Pub. L. No. 67-331, 42 Stat. 998............................................... 8

Ohio Rev. Code Ann. § 3775.03(A) ............................................... 42

Ohio Rev. Code Ann. § 3775.11(A)................................................ 42

Ohio Rev. Code Ann. § 3775.12(A) ............................................... 42

x

## TABLE OF AUTHORITIES—Continued

Page(s)

**REGULATIONS:**

17 C.F.R. §§:

1.31(b)(1) ..................................................................................18

9a ............................................................................................40

12c ..........................................................................................40

16.00 *et seq.* ..................................................................... 39, 40

pt. 38 ......................................................................................18

38.4(b)....................................................................................19

38.5(b)................................................................................ 20, 21

38.150(b)............................................................................... 39

38.151(b) .....................................................................18, 43, 65

38.155(a) ............................................................................... 39

38.156.................................................................... 18, 39, 40

38.251(a) ................................................................................18

38.256 .....................................................................................18

38.450 ............................................................................ 18, 40

38.601 .....................................................................................18

38.950 .....................................................................................18

38.1101(a)(2).................................................... 18, 39, 40

40.2(a)(1) ...............................................................................18

# TABLE OF AUTHORITIES—Continued

Page(s)

40.3(b) ...................................................................................19

40.11 ......................................................................................17

40.11(a).................................................................................. 63

40.11(c)..................................................................................19

40.11(c)(2) ....................................................................... 19, 20

150 App. E ............................................................................40

150.2 ....................................................................................40

180.1 ....................................................................................40

180.2....................................................................................40

Concept Release,
   73 Fed. Reg. 25,669 (May 7, 2008) ............................. 15, 16, 50

Contract Market Designation,
   40 Fed. Reg. 25,849 (June 19, 1975) ......................................19

Further Definition of "Swap,"
   77 Fed. Reg. 48,208 (Aug. 13, 2012) ................................51, 52

Prediction Markets,
   91 Fed. Reg. 12,516 (Mar. 16, 2026) ............................... 24, 25

Provisions Common to Registered Entities,
   76 Fed. Reg. 44,776 (July 27, 2011)...................................... 63

**LEGISLATIVE MATERIALS:**

H.R. Rep. No. 74-421 (1935) ........................................................ 8

H.R. Rep. No. 93-975 (1974) .......................................................12

# TABLE OF AUTHORITIES—Continued

Page(s)

H.R. Rep. No. 93-1383 (1974) (Conf. Rep.) ..................... 3, 10, 26, 38, 39, 56

H.R. Rep. No. 97-565, pt. 1 (1982) ...............................................11, 12, 35, 59

H.R. Rep. No. 106-711, pt. 2 (2000)...................................................14, 36, 57

S. Rep. No. 93-1131 (1974)................................................................10, 33

*Review of Commodities Exchange Act and Discussion of Possible Changes: Hearings Before the H. Comm. on Agric.*, 93d Cong. (1973)............... 8, 9

*Commodity Futures Trading Commission Act: Hearings Before the S. Comm. on Agric. & Forestry on S. 2485, S. 2578, S. 2837, and H.R. 13113*, 93d Cong. (1974) .......................................................................... 9

120 Cong. Rec. 30,464 (Sep. 9, 1974).......................................................... 33

156 Cong. Rec. S5906 (daily ed. July 15, 2010) .......................................... 49

**OTHER AUTHORITIES:**

Allen B. Paul, *The Role of Cash Settlement in Futures Contract Specification*, in Futures Markets: Regulatory Issues 271 (Anne E. Peck ed., 1985)...................................................................................... 12, 13

Andrew Ross Sorkin et al., *Hedging, not betting, on sports via prediction markets*, N.Y. Times DealBook (Feb. 10, 2026), https://www.nytimes.com/2026/02/10/business/dealbook/epstein-lutnick-wasserman-starmer.htm.......................................................... 47

*Associated*, Oxford American Dictionary and Thesaurus (2d ed. 2009) .... 46

Brett Smiley, *Underdog Sports Preparing to Use Kalshi, Prediction Markets For Its Own Risk Management*, InGame (Oct. 22, 2025), https://perma.cc/BT4A-BK8T................................................................ 47

*Exclusive*, American Heritage Dictionary (5th ed. 2022)...........................31

*Impartial*, Oxford American Dictionary and Thesaurus (2d ed. 2009)...... 43

# TABLE OF AUTHORITIES—Continued

Page(s)

John H. Stassen, *The Commodity Exchange Act In Perspective*, 39 Wash. & Lee L. Rev. 825 (1982) ............................................................................7

John V. Rainbolt II, *Regulating the Grain Gambler and His Successors*, 6 Hofstra L. Rev. 1 (1977) ........................................................................6, 7

Kelly Cloonan, *Betting markets nailed Trump's decisive win — and it's a good reminder they can be more accurate than polls*, Bus. Insider (Nov. 9, 2024), https://perma.cc/5W7W-S76X ..............................................21

Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657 (1982) ........................................................... 10, 33, 34

Oral Argument, *KalshiEX LLC v. Assad*, No. 25-7516 (9th Cir. Apr. 16, 2026), https://www.youtube.com/watch?v=JOCrxsSR-OU ................. 63

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Sixth Circuit Rules 28(b)(1)(B) and 34(a), Plaintiff-Appellant KalshiEX LLC ("Kalshi") respectfully requests oral argument. This appeal presents novel questions in this Circuit concerning state efforts to intrude on the exclusive jurisdiction of the Commodity Futures Trading Commission ("CFTC") by levying criminal penalties against Kalshi for offering derivatives contracts permitted under federal law. The decision below conflicts with a recent Third Circuit decision involving identical issues, countermands the CFTC's own understanding of its exclusive jurisdiction, and creates a split within this Circuit. Oral argument would aid the Court in resolving the questions presented by this appeal.

## INTRODUCTION

In the seminal 1974 amendments to the Commodity Exchange Act ("CEA"), Congress created the Commodity Futures Trading Commission ("CFTC") and gave it "exclusive jurisdiction" to regulate nationwide derivatives exchanges. 7 U.S.C. § 2(a)(1)(A). Last year, Ohio officials flouted that "exclusive jurisdiction" by threatening to criminally prosecute Kalshi under state gaming laws for offering certain event contracts on its nationwide derivatives exchange. Because that assertion of concurrent regulatory jurisdiction squarely conflicts with the CEA's plain text, Kalshi is entitled to a preliminary injunction to prevent state officials from violating federal law. The district court's contrary holding cannot be reconciled with the statutory text, conflicts with the only appellate decision addressing the issue, splits from a decision of a different district court in this Circuit, and contravenes the CFTC's understanding of its own jurisdiction. This Court should reverse.

Kalshi is a CFTC-licensed and regulated exchange, known as a designated contract market ("DCM"). Federal law therefore preempts state regulation of trading on Kalshi, as confirmed by every conceivable marker of legislative intent. The CEA's text expressly preempts state law by granting the CFTC "exclusive jurisdiction" over on-DCM trading. 7 U.S.C.

§ 2(a)(1)(A).  Congress in 1974 deleted the provision that had previously preserved concurrent state jurisdiction, announcing its intent to "preempt the field."  H.R. Rep. No. 93-1383, at 35 (1974) (Conf. Rep.).  And Congress repeatedly reaffirmed—indeed, expanded—the CFTC's exclusive jurisdiction after courts uniformly recognized that the CEA "preempts the application of state law" regarding trading on federal exchanges.  *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980) (Friendly, J.).

The district court concluded otherwise, splitting from another court in this Circuit.  It issued its decision before the Third Circuit held that the CEA preempts state regulation of trading on Kalshi, *KalshiEX LLC v. Flaherty*, 172 F.4th 220 (3d Cir. 2026), and before the CFTC initiated lawsuits to end the "fundamental threat to Congress's statutory design" reflected by state efforts to regulate DCMs.  CFTC Amicus Br. 2, *N. Am. Derivatives Exch., Inc. v. Nevada*, No. 25-7187 (9th Cir. Feb. 17, 2026), Dkt. No. 38.2 ("CFTC Br.").  The court's decision bypasses the statutory text and conflicts with this Court's precedent holding state gambling laws preempted in similar circumstances.  It was driven by concern that a contrary ruling would revoke states' authority to regulate gambling, but that concern is unfounded.  The CEA's preemption of on-DCM trading leaves states entirely free to regulate

3

off-DCM transactions, including run-of-the-mill sports bets, which differ categorically from Kalshi's exchange-traded event contracts.

If affirmed, the district court's decision would decimate the CFTC's exclusive jurisdiction.  It would give state regulators free rein to regulate on-DCM trading as long as they argue that the instruments they seek to regulate are gambling rather than derivatives.  Many states prohibited derivatives trading as a form of gambling a century ago, but Congress in 1974 put an emphatic end to that practice.  The district court's decision would restore it, nullifying the CFTC's exclusive authority and undermining the nationwide uniformity necessary for derivatives markets to function.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331 because the action arises under the Supremacy Clause of the U.S. Constitution.  This Court has jurisdiction under 28 U.S.C. § 1292(a)(1). The district court denied a preliminary injunction in an opinion and order dated March 9, 2026. Op. & Order, R.69, PageID#894-914 ("Op.").   Kalshi timely appealed the following day.  Notice of Appeal, R.70, PageID#915.

4

## STATEMENT OF ISSUES FOR REVIEW

1. Whether Kalshi is likely to succeed on the merits of its claim that the CEA preempts Defendants from prohibiting the trading of Kalshi's sports-event contracts.

2. Whether the balance of harms and equities favor a preliminary injunction.

## STATEMENT OF THE CASE

### I.    LEGAL BACKGROUND

Speculation about the future is inherent to the human condition.  It undergirds myriad economic transactions—from purchasing insurance and extending credit, to trading stocks and bonds.  This case involves another such activity: derivatives trading under the Commodity Exchange Act.

Derivatives are tradeable financial instruments whose value depends on underlying commodities—which, under the CEA, can be anything from grain, to Cincinnati Reds jerseys, to interest rates, to occurrences. Derivatives themselves also come in a wide variety of forms.  "Futures" are contracts where a party agrees to sell a commodity at a fixed price now for delivery in the future.  "Options" are contracts that give a party the right (but not the obligation) to buy or sell a commodity at a future date at a fixed price. And, as most relevant here, "swaps" are contracts where parties trade revenue streams, liabilities, or promises to pay.  A seller of Reds merchandise

5

might, for example, enter into a revenue swap with a seller of Cubs merchandise, allowing each to offset losses that they would suffer if their team has a losing season.

Congress has made the scope of commodities and derivatives broad by design.  Risk-spreading is important to an ever-growing range of individuals and businesses whose livelihoods depend on uncertain future events. Derivatives have therefore evolved to accommodate varied hedging purposes.   Moreover, because derivatives prices vary with traders' predictions, publicly traded derivatives help society harness the wisdom of crowds.  The CEA maximizes these hedging and price-discovery benefits by establishing a uniform national framework for derivatives trading on federally designated contract markets, known as DCMs.

### A.    Pre-Commodity Exchange Act History

Derivatives trading has not always been federally regulated.  The first organized U.S. futures market was the Chicago Board of Trade, established in 1848.  Traders exchanged contracts for future delivery of commodities, settling in cash at day's end.  *Bd. of Trade of Chi. v. Christie Grain & Stock Co.*, 198 U.S. 236, 245 (1905).  The Board then telegraphed price information to interested parties nationwide.  *Id.* at 245-246.

6

The Board, however, was not initially subject to federal regulation. In fact, because futures contracts normally involved speculation without actual transfer of the underlying commodity, many states initially decried futures trading as "gambling in grain." *Cothran v. Ellis*, 16 N.E. 646, 647 (Ill. 1888); *see also* John V. Rainbolt II, *Regulating the Grain Gambler and His Successors*, 6 Hofstra L. Rev. 1, 6 (1977) (documenting states' treatment of futures trading as unlawful gambling). Many "anti-gaming" and "anti-bucket shop" laws were enacted to make it "as difficult as humanly possible to trade futures." John H. Stassen, *The Commodity Exchange Act In Perspective*, 39 Wash. & Lee L. Rev. 825, 826 (1982) (quotation marks omitted); Addendum B.

One early case alleged that the Chicago Board of Trade was nothing more than "the greatest of bucket shops"—an establishment set up for gambling on commodity prices. *Christie Grain*, 198 U.S. at 246. Writing for the Supreme Court, Justice Holmes rejected the challenge, explaining that futures trading could not be dismissed as unlawful gambling because it was "well known as a means of avoiding or mitigating catastrophes, equalizing prices, and providing for periods of want." *Id.* at 247. "[T]he quotations of prices from the market are of the utmost importance to the business world," so much so that they may be "clothed with a public use." *Id.* at 249. Justice

Holmes therefore distinguished the transactions on the Chicago Board of Trade from the gambling in grain outlawed by Illinois.

That holding, however, did not extinguish state efforts to invalidate futures trading, including under state gambling laws. Congress stepped in with the Grain Futures Act of 1922, which sought to centralize futures trading on federally approved "contract market[s]." Pub. L. No. 67-331, 42 Stat. 998, 1000-02. But the Act intentionally declined to preempt state laws. Thus, in 1933, the Supreme Court upheld the application of a "Missouri law making gambling in grain futures illegal," holding that derivatives transactions on federally regulated exchanges may nonetheless constitute illegal gambling under state law. *Dickson v. Uhlmann Grain Co.*, 288 U.S. 188, 198 (1933).

## B. The Commodity Exchange Act And Its Subsequent Amendments

In 1936, Congress enacted the original CEA, which subjected additional types of commodities to the framework governing grain futures and added anti-fraud protections for market participants. Pub. L. No. 74-675, 49 Stat. 1491, 1492-99. But Congress again stopped short of preemption, instead preserving "any State law applicable" to "transaction[s]" regulated by the Act. *Id.* at 1494. The drafters' "intention" was "not to occupy the field." H.R. Rep. No. 74-421, at 5 (1935).

8

Over the following decades, that decision produced a patchwork of regulations, leading exchanges to recommend that "federal policy ... be uniform throughout the United States" and not "subject to the vagaries" of different obligations in "different jurisdictions." *Review of Commodities Exchange Act and Discussion of Possible Changes: Hearings Before the H. Comm. on Agric.*, 93d Cong. 121 (1973) ("*House Hearings*").

Congress responded with the Commodity Futures Trading Commission Act of 1974, designed to "[b]ring[ ] all futures trading under federal regulation." *Commodity Futures Trading Commission Act: Hearings Before the S. Comm. on Agric. & Forestry on S. 2485, S. 2578, S. 2837, and H.R. 13113*, 93d Cong. 848 (1974) ("*Senate Hearings*"). Congress accomplished that goal by creating the CFTC, a federal agency with the broad power to regulate derivatives trading nationwide. *Id.* Congress vested the CFTC with "exclusive jurisdiction ... with respect to accounts, agreements ..., and transactions involving swaps or contracts of sale of a commodity for future delivery, ... traded or executed on a [designated] contract market" or other federally regulated "board of trade." 7 U.S.C. § 2(a)(1)(A). This broad grant of "exclusive jurisdiction" over instruments traded on federally regulated exchanges was intended to "prevent any possible conflicts over jurisdiction." *House Hearings* at 128. "[D]ifferent State laws would just lead

9

to total chaos" absent "preemption." *Senate Hearings* at 685 (statement of Sen. Clark).

The Senate was so concerned about preserving the CFTC's exclusive jurisdiction that—after House drafters introduced a state-law savings clause—the Senate added language making clear that the clause applied "except as hereinabove provided" in the grant of exclusive CFTC jurisdiction. S. Rep. No. 93-1131, at 31 (1974). The language ensured "the Commission's jurisdiction, where applicable, supersedes State as well as Federal agencies." *Id*. at 6. Further, the Senate "struck" the provision in the 1936 CEA that had preserved "any State law applicable" to derivatives transactions. H.R. Rep. No. 93-1383, at 35 (quotation marks omitted). The amendments were designed to "preempt the field insofar as futures regulation is concerned." *Id*. Congress did "not contemplate that there w[ould] be a need for any supplementary regulation by the States." *Id*. at 36.

Shortly thereafter, the Second Circuit explained that the amended CEA "preempts the application of state law" regarding trading on federal exchanges. *Leist*, 638 F.2d at 322. The CFTC likewise understood that the amendments preempted state laws that would otherwise bar futures as "illegal gambling contracts." Kevin T. Van Wart, *Preemption and the*

10

*Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657, 700 (1982) (citation omitted).

The 1974 amendments, however, did not preempt all state regulation of derivatives.  Section 2(a)'s savings clause made clear that, beyond the CFTC's "exclusive jurisdiction" over on-DCM trading, the CEA did not "supersede or limit the jurisdiction" of "regulatory authorities under the laws … of any State" or "restrict" state "authorities from carrying out their duties and responsibilities in accordance with such laws."  7 U.S.C. § 2(a)(1)(A).

Congress amended the CEA again in 1978 and 1982.  In 1978, Congress gave the states a role in policing violations of the CEA, allowing them to bring "*parens patriae* actions, seeking injunctive or monetary relief for certain violations of the CEA."  *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 366-367 (1982); *see* 7 U.S.C. § 13a-2.  But Congress specified that states' authority extends only to suits against defendants "*other than a [designated] contract market*."  7 U.S.C. § 13a-2(1) (emphasis added).

In 1982, Congress recognized that the 1974 amendments "bestowed on the CFTC exclusive jurisdiction to regulate futures trading" on DCMs, "thereby preempting any State regulatory laws."  H.R. Rep. No. 97-565, pt. 1, at 44 (1982).  But Congress was concerned about "off-exchange commodities

11

activities" and believed "States should be extensively involved in … policing transactions outside those preserved exclusively" for the CFTC. *Id.* Congress therefore added what is now Section 16(e)(1),[1] which provides that "[n]othing in this chapter shall supersede or preempt" the application of state law to a transaction "that is not conducted on or subject to the rules" of a DCM. Congress thus reaffirmed the grant of "exclusive CFTC jurisdiction over exchange-traded futures" while permitting states to police "transactions outside those preserved exclusively for the jurisdiction of the CFTC." H.R. Rep. No. 97-565, pt. 1, at 44-45.

### C.    Congress's Expansion Of The Scope Of Covered Commodities To Include Event Contracts

In 1974, Congress defined "commodity" to reach "all services, rights, and interests … in which contracts for future delivery are presently or in the future dealt in." 7 U.S.C. § 1a(9). That broad definition ensured the CFTC's exclusive jurisdiction would cover "all futures trading that might now exist or might develop in the future." H.R. Rep. No. 93-975, at 76 (1974). Since 1974, Congress has periodically revisited the instruments the CEA regulates. Two changes are relevant here.

---

[1] Statutory provisions are referred to by their section in the U.S. Code rather than their section in the CEA.

*First*, in the 1980s, the CFTC approved futures in intangible commodities, including interest-rate futures, stock-index futures, and weather futures. Allen B. Paul, *The Role of Cash Settlement in Futures Contract Specification, in* Futures Markets: Regulatory Issues 271, 280 (Anne E. Peck ed., 1985). In 2000, Congress amended the CEA in the Commodity Futures Modernization Act ("CFMA") to ratify those instruments by including a new term in the CEA: "excluded commodity." Excluded commodities include intangibles such as "interest rate[s]" and "commercial index[es]." 7 U.S.C. §§ 1a(19)(i)-(iii). Congress also expressly provided that an "excluded commodity" includes an "occurrence" or "contingency" that is "beyond the control of the parties" to the transaction and "associated with a financial, commercial, or economic consequence." *Id*. § 1a(19)(iv).

The term "excluded commodity" is a misnomer; the CFMA did *not* prohibit transactions in excluded commodities. They are "excluded" only from the requirement that contracts be entered into and traded on a DCM. Pub. L. No. 106-554, 114 Stat. 2763A-365, 2763A-377. The CFMA permitted sophisticated market participants to enter such transactions "over-the-counter"—*i.e.*, off-exchange. *Id*. at 2763A-366.

13

At the same time, Congress amended the existing CEA provision allowing states to regulate off-exchange transactions to ensure that state laws would not interfere with the over-the-counter transactions in excluded commodities the CFMA permitted.  Those amendments "supersede and preempt the application of any State or local law that prohibits or regulates gaming or the operation of bucket shops" as to certain transactions "excluded" from CEA coverage.  7 U.S.C. § 16(e)(2).  The Committee Report explained that then-"current" CEA already "supersede[d] and preempt[ed]" state laws "in the case of transactions conducted on a registered entity," such as a DCM.  H.R. Rep. No. 106-711, pt. 2, at 71 (2000); *see* 7 U.S.C. § 1a(40) (defining "registered entity" to include DCMs).  The new preemption provision clarified that the CEA likewise "supersedes and preempts State gaming and bucket shop laws" as to excluded off-DCM transactions.  H.R. Rep. No. 106-711, pt. 2, at 71.

*Second*, following Congress's expansion of the definition of commodities to include occurrences, instruments known as "event contracts" gained prominence.  Event contracts allow parties to hedge risks through agreements that pay out if the event does or does not occur. Farmers, for example, may buy contracts that pay out if there is a drought to

14

hedge crop losses.  Or a Reds jerseys retailer might purchase a contract that pays out if the Reds miss the playoffs.

The price each participant pays for the event contract reflects their predictions for the future.  Farmers pay more if they predict drought; sporting goods retailers pay more if they predict the Reds will underperform. Prices are therefore crowdsourced by parties with economic incentives to predict accurately.  In this respect, these contracts advance the national interests specified in the CEA—to "provid[e] a means for managing and assuming price risks, discovering prices, or disseminating pricing information through trading in liquid, fair and financially secure trading facilities."  7 U.S.C. § 5(a).

Like all derivatives instruments, event contracts attract parties seeking to hedge risk and speculators seeking profit.  A party's "ability to engage in hedging depends on the availability of investors willing to assume or to share the hedger's risk in the hope of making a profit."  *Curran*, 456 U.S. at 390. Congress thus recognized that speculators play a "crucial role in an effective and orderly futures market." *Id.*

In 2008, the CFTC solicited public comment regarding regulation of "event contracts," recognizing they may be based on "varied" eventualities, such as "the results of political elections, or the outcome of particular

15

entertainment events," and which "can be designed to exhibit the attributes of either options or futures contracts." Concept Release, 73 Fed. Reg. 25,669, 25,669-70 (May 7, 2008).  The CFTC explained that the CEA "supersedes and preempts other laws, including state and local gaming … laws, with respect to transactions executed on" DCMs. *Id.* at 25,673.  It therefore sought comments on "the implications of possibly preempting state gaming laws with respect to event contracts" by permitting them to be traded on-DCM. *Id.*

Before the CFTC's contemplated rulemaking was finalized, Congress stepped in, enacting the Dodd-Frank Act of 2010.  Dodd-Frank addressed event contracts by including them in the CEA's definition of "swaps" and placing exchange-traded swaps within the CFTC's "exclusive jurisdiction." Congress defined the term "swap" to encompass—among other things— contracts providing for payment "dependent on the occurrence … of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). Congress further defined "swap" to include any "transaction that is, or in the future becomes, commonly known to the trade as a swap." *Id.* § 1a(47)(A)(iv).

At the same time, Congress amended the CEA's "exclusive jurisdiction" provision to provide that the CFTC "shall have exclusive jurisdiction … with

16

respect to accounts, agreements …, and transactions *involving swaps* or contracts of sale of a commodity for future delivery, … traded or executed on a contract market designated" by the CFTC. *Id.* § 2(a)(1)(A).

Dodd-Frank also created a "Special [R]ule" regarding certain "agreements, contracts, transactions, or swaps in excluded commodities that are based upon … occurrence[s]"—*i.e.*, "[e]vent contracts." *Id.* § 7a-2(c)(5)(C)(i). Recognizing that certain event contracts might warrant closer CFTC scrutiny, Congress authorized the CFTC to review and prohibit six categories of contracts if it concludes they are "contrary to the public interest." *Id.* § 7a-2(c)(5)(C)(ii). The Special Rule provides that the CFTC "may"—but need not—"determine" that event contracts are contrary to the public interest if they "involve":

(I)    activity that is unlawful under any Federal or State law;
(II)   terrorism;
(III)  assassination;
(IV)   war;
(V)    gaming; or
(VI)   other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest.

*Id.* § 7a-2(c)(5)(C)(i); *see* 17 C.F.R. § 40.11. No such contract "determined by the Commission to be contrary to the public interest" may be listed on a DCM. 7 U.S.C. § 7a-2(c)(5)(C)(ii). Absent an adverse public-interest

17

determination, however, Congress did not bar event contracts involving the Special Rule's enumerated activities.

### D. The CEA's Requirements For Designated Contract Markets

The CEA today sets out a "comprehensive regulatory structure" for entities offering derivatives. *Curran*, 456 U.S. at 356 (citation omitted). The principal requirement is that exchanges become "designated" as contract markets, or "DCMs." *Id.* at 361-362. DCMs must comply with myriad obligations designed to ensure orderly trading and prevent "price manipulation, cornering and other market disturbances." *Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1151 (7th Cir. 1992).

To obtain CFTC designation, exchanges must prove they can comply with 23 "Core principles" identified in the CEA and CFTC regulations. *See* 7 U.S.C. § 7(d); 17 C.F.R. pt. 38. For instance, DCMs must make daily disclosures regarding market volume, 17 C.F.R. § 38.450; keep five years' worth of trading records, *id.* §§ 38.950, 1.31(b)(1); maintain capital reserves sufficient to cover "operating costs for a period of at least one year," *id.* § 38.1101(a)(2); maintain a "system capable of detecting and investigating potential trade practice violations," *id.* § 38.156; monitor for "manipulation," *id.* § 38.251(a); offer "impartial access" to their platforms, *id.* § 38.151(b); "have the ability to comprehensively and accurately reconstruct all trading"

18

on their exchanges, *id.* § 38.256; and use a CFTC-regulated clearinghouse to ensure sufficient liquidity, *id.* § 38.601; 7 U.S.C. § 7a-1.

Moreover, every DCM is a "trading facility," which the CEA defines as a system in which participants can trade contracts either "by accepting bids or offers made by other participants that are open to multiple participants," or "through the interaction of multiple bids or multiple offers within a system with a pre-determined non-discretionary automated trade matching and execution algorithm." 7 U.S.C. § 1a(51)(A). These provisions ensure that prices are set by market forces, as needed to serve DCMs' hedging and price-discovery purposes. *Id.* § 5(a). They also ensure that DCMs cannot establish, adjust, or manipulate contract prices to ensure their own profits.

The CEA also prescribes a detailed system for listing contracts on DCMs. Until 2000, the CEA required DCMs to obtain CFTC preapproval before listing a contract and subjected contracts to an "economic purpose" test. *See* Contract Market Designation, 40 Fed. Reg. 25,849, 25,850 (June 19, 1975). But this preapproval process proved onerous and inefficient, causing Congress in the CFMA to eliminate the test and allow DCMs to list contracts by self-certifying their compliance with applicable CEA requirements. 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. §§ 38.4(b), 40.2(a)(1). If, rather than self-certifying, a DCM seeks pre-approval, the CFTC "shall

19

approve a new contract" unless it determines the contract would violate the CEA or CFTC regulations. 7 U.S.C. § 7a-2(c)(5)(B); *see* 17 C.F.R. § 40.3(b).

If the CFTC concludes that an event contract may fall within an enumerated category in the Special Rule, it may subject the contract to a 90-day public-interest review. *See* 17 C.F.R. § 40.11(c). Following review, the CFTC "shall issue an order approving or disapproving" the contract. *Id.* § 40.11(c)(2). The CFTC also may require a DCM to submit a "written demonstration" that it is "in compliance" with the "core principles" on which its federal designation depends. *Id.* § 38.5(b).

If the CFTC finds that a DCM violates the CEA, it has recourse to an array of enforcement mechanisms, including but not limited to civil penalties, 7 U.S.C. § 9(10)(C), revocation of licensing, *id.* § 8(b), and referral for criminal enforcement, *id.* § 13. And, under the 1978 CEA amendments, appropriate officials "of any State" may also sue over violations of the CEA or its regulations, but those suits may be lodged only against parties "other than" a DCM. *Id.* § 13a-2(1).

## II.    FACTUAL BACKGROUND

In 2020, the CFTC designated Kalshi as a DCM. *See KalshiEX LLC v. CFTC*, No. 23-3257, 2024 WL 4164694, at *4 (D.D.C. Sep. 12, 2024). Since

20

then, Kalshi has been regulated under federal law alongside other DCMs like the Chicago Mercantile Exchange.

Kalshi offers many kinds of event contracts related to climate, technology, popular culture, economics, and agricultural and other tangible commodities. Each contract has a yes (the event will occur) and a no (it will not) position, allowing customers to hedge and trade on financially significant events. Prices fluctuate based on market participants' perceptions of the likelihood the event will occur, giving these contracts significant predictive value. Kalshi's contracts on the 2024 Presidential Election, for example, were more accurate than polling.[2]

In January 2025, Kalshi began offering contracts on sports events. When Kalshi first self-certified its sports-event contracts, the CFTC asked Kalshi to submit a "[d]emonstration of compliance" with the CEA. 17 C.F.R. § 38.5(b). Kalshi responded with detailed filings describing the contracts' compliance with the CEA and CFTC regulations. *KalshiEX LLC v. Orgel*, No. 3:26-cv-34, 2026 WL 474869, at *5 (M.D. Tenn. Feb. 19, 2026). The CFTC took no further action. It has since permitted Kalshi and other prediction markets to list tens of thousands of sports-event contracts without objection.

---

[2] Kelly Cloonan, *Betting markets nailed Trump's decisive win — and it's a good reminder they can be more accurate than polls,* Bus. Insider (Nov. 9, 2024), https://perma.cc/5W7W-S76X.

21

## III.   PROCEDURAL BACKGROUND

1. In March 2025, the Ohio Casino Control Commission sent Kalshi a cease-and-desist letter asserting that Kalshi's sports-event contracts are prohibited by Ohio law and demanding that Kalshi cease offering them in Ohio. The Commission reserved all rights to pursue criminal and civil actions based on Kalshi's past and future conduct within the state. Cease-and-Desist Letter, R.1, PageID#25-27. Kalshi filed this suit, explaining that the CEA preempts state regulation of Kalshi's on-DCM transactions.

After preliminary-injunction briefing was complete, the CFTC announced its support for Kalshi's position. In an amicus brief filed in a similar Ninth Circuit appeal, the CFTC explained that "[s]tates cannot invade the CFTC's exclusive jurisdiction … by re-characterizing swaps trading on DCMs as illegal gambling"; that allowing states to regulate sports-event contracts "is inconsistent with the text, structure, and history of the CEA"; and that the states' theory presents "a fundamental threat to Congress's statutory design" that would create "a seismic shift in the longstanding status quo between CFTC and state authority." *See* CFTC Br. 2. Since then, the CFTC has filed preemption suits against five states that have threatened to

22

enforce state law against DCMs, [3] and has secured a preliminary injunction against Arizona, *KalshiEX LLC v. Johnson*, No. 2:26-cv-1715, 2026 WL 1223373 (D. Ariz. May 5, 2026).

2. On February 20, 2026, the Middle District of Tennessee granted Kalshi a preliminary injunction in a similar case involving Tennessee's efforts to regulate Kalshi. The court held that Kalshi was likely to succeed on its preemption argument, that Kalshi would suffer irreparable harm, and that the balance of equities favored Kalshi. *Orgel*, 2026 WL 474869, at *7-11. The court relied in part on this Court's decision in *Churchill Downs Technology Initiatives Co. v. Michigan Gaming Control Board*, 162 F.4th 631 (6th Cir. 2025), which affirmed the grant of a preliminary injunction against state officials who sought to subject a company to preempted state gambling laws. *Orgel*, 2026 WL 474869, at *10.

3. The court below reached the opposite conclusion without oral argument. The court first determined that Kalshi's sports-event contracts do not fall within the CEA because they are not "swaps." Op., R.69, PageID#901-906. It acknowledged that Kalshi's argument is "textually

---

[3] *United States v. Arizona*, No. 2:26-cv-2246 (D. Ariz. Apr. 2, 2026); *United States v. Illinois*, No. 1:26-cv-3659 (N.D. Ill. Apr. 2, 2026); *United States v. Connecticut*, No. 3:26-cv-498 (D. Conn. Apr. 2, 2026); *United States v. New York*, No. 1:26-cv-3404 (S.D.N.Y. Apr. 24, 2026); *United States v. Wisconsin*, No. 2:26-cv-749 (E.D. Wis. Apr. 28, 2026).

permissible," but adopted Defendants' contention that an event underlying a swap must be "direct[ly] and inherent[ly]" associated with "matters of financial … consequence," because it believed that understanding "better serves the purpose of the statute." Op., R.69, PageID#904 (citation modified). And it found that sporting events—unlike, for example, weather events—are *not* directly and inherently associated with matters of financial consequence. Op., R.69, PageID#904-905.

The district court further concluded that Kalshi is unlikely to succeed in proving preemption. Applying a "strong presumption" against preemption, the court found that although the CEA has "some preemptive effect," no evidence showed Congress "intended to preempt state sports gambling laws" specifically. Op., R.69, PageID#909-910 (citation modified). The court also rejected conflict preemption, finding no evidence "that the CFTC would view geographic restrictions predicated on compliance with state law" as impermissible under CEA regulations requiring DCMs to provide "impartial access" to their exchange. Op., R.69, PageID#913. In reaching that conclusion, the court did not address the CFTC's position that compliance with state geographical restrictions would be an "impossibility" for DCMs. CFTC Br. 26-27.

The district court declined to address irreparable harm but found that the public interest weighed against an injunction because of Defendants' interest in enforcing Ohio laws.  Op., R.69, PageID#913-914.

4.   Shortly after the court's decision, the CFTC issued an Advance Notice of Proposed Rulemaking related to Prediction Markets, confirming that it has exclusive jurisdiction over event contracts, including sports-event contracts.  *See* Prediction Markets, 91 Fed. Reg. 12,516, 12,521 (Mar. 16, 2026).  The contemplated rule will provide further guidance about the types of event contracts that may be traded on DCMs and about the scope of the Special Rule.  *Id.*

5.   Kalshi appealed the denial of the preliminary injunction and sought an injunction pending appeal from this Court.  While this Court was considering the motion, Ohio initiated a process to subject Kalshi to a $5 million fine.  *See* 6th Cir. Dkt. No. 25-2.  The motions panel found "no doubt that Kalshi has raised serious questions on the merits," that the question was "close," and that "Kalshi will face potentially irreparable harm without an injunction," but declined to issue an injunction pending appeal because the equities did not sharply favor Kalshi "at this stage."  6th Cir. Dkt. No. 26-2, at 7, 13-14, 16 ("Injunction Order").

25

## SUMMARY OF ARGUMENT

**I.A.** The CEA's plain text expressly preempts state regulation of trading on DCMs like Kalshi. Section 2(a) grants the CFTC "exclusive jurisdiction" to regulate trading on DCMs, 7 U.S.C. § 2(a)(1)(A), which necessarily denies jurisdiction to state regulators. Congress deleted a provision that would have preserved state regulation and repeatedly amended the CEA to confirm that state regulation of on-DCM trading is preempted. For decades, courts have uniformly held that the CEA preempts state law.

**B.** Congress's avowed purpose in establishing a uniform set of rules for trading on DCMs was to "preempt the field." H.R. Rep. No. 93-1383, at 35. And the comprehensive regulatory framework Congress created to oversee futures trading leaves no room for parallel state regulation. Accordingly, the Third Circuit recently agreed that the CEA preempts the field of regulating trading on DCMs.

**C.** Ohio's sports-gambling laws are also conflict-preempted as applied to Kalshi. Allowing 50 states to regulate trading on DCMs would thwart Congress's objective of uniform federal regulation of DCMs. It would also be impossible for Kalshi to comply with Ohio law—which requires all sports wagers to be completed within the state—while complying with federal

26

obligations to provide impartial access to its nationwide exchange. Ohio's laws also create a conflict in enforcement because they criminalize conduct that the CFTC, exercising discretion expressly delegated by Congress, has permitted.

**II.** The district court's contrary conclusion was mistaken in multiple respects.

**A.** The district court erred in holding that Kalshi's contracts are not swaps. *First*, the CEA preempts states from regulating transactions on DCMs—full stop. The gravamen of Defendants' argument is the CFTC should prohibit Kalshi's contracts, but that is a dispute with the CFTC, and Defendants cannot circumvent the procedures for challenging agency decisions by bringing an enforcement action directly against Kalshi. *Second*, Kalshi's contracts are swaps under the CEA's intentionally broad definition. The district court's contrary conclusions—that the term "event" does not encompass outcomes and that a swap must "traditionally and directly *affect commodity prices*," Op., R.69, PageID#904-905—are flatly inconsistent with the CEA's text and decades of settled practice. *Third*, contrary to the district court's concerns, recognizing that Kalshi's contracts are swaps will not disturb state regulation of sports betting.

27

**B.**  The district court also erred in concluding that the CEA does not preempt state gambling laws as applied to trading on DCMs.  While the court relied on a strong presumption against preemption, no presumption applies where, as here, a statute contains an express preemption clause and where a state seeks to regulate *interstate* gambling.  The court created an extratextual carveout from preemption for state sports-gambling laws, but that analysis ignores the text in favor of policy arguments.  It also overlooks the clear evidence that Congress intended to preempt state gambling laws specifically.  The Special Rule's reference to "[e]vent contracts" involving "gaming" as one type of "swap[ ]," 7 U.S.C. § 7a-2(c)(5)(C)(i), is irrefutable textual evidence that Congress intended contracts involving gaming to fall within the CFTC's exclusive jurisdiction.  And while the court rejected conflict preemption on the ground that the CFTC would not view geographic restrictions as violating a DCM's impartial-access obligations, the CFTC has confirmed that such compliance with state laws is an "impossibility" for DCMs.  CFTC Br. 26-27.

**III.**  The district court did not dispute that Kalshi will suffer irreparable harm.  Kalshi will suffer numerous irreparable harms absent an injunction, including irreparable monetary harm and the jeopardization of its status as a DCM, to say nothing of the harms to Kalshi's users nationwide.  The court erred in holding that the balance of harms favored allowing Defendants to

prosecute Kalshi. Kalshi's irreparable harms outweigh any speculative harms to Defendants, and the public interest supports enforcing the Supremacy Clause.

## STANDARD OF REVIEW

"To secure a preliminary injunction, a plaintiff 'must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *EOG Res., Inc. v. Lucky Land Mgmt., LLC*, 134 F.4th 868, 874 (6th Cir. 2025) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). The district court's decision to "deny a preliminary injunction is reviewed for an abuse of discretion," with this Court reviewing "the district court's legal conclusions *de novo* and its factual findings for clear error." *Stryker Emp. Co. v. Abbas*, 60 F.4th 372, 380 (6th Cir. 2023) (citation omitted).

## ARGUMENT

The CEA's plain text and every other marker of congressional intent establish that only the CFTC may regulate trading on DCMs. The district court brushed the text aside to create an extratextual exception for Kalshi's sports-event contracts. It did so without the benefit of the only court of appeals decision to consider the question, which held "that both field and conflict preemption apply." *Flaherty*, 172 F.4th at 228. And it did so without

29

accounting for the CFTC's vehement defense of its exclusive jurisdiction. This Court should reverse.

## I. KALSHI IS LIKELY TO SUCCEED BECAUSE THE CEA PREEMPTS STATE GAMBLING LAWS AS APPLIED TO ANY TRANSACTION ON A DCM.

The Supreme Clause sets out a "fundamental principle of the Constitution" that "Congress has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000); *see* U.S. Const. art. VI, cl. 2. Express preemption "exists when Congress expresses a clear intent to pre-empt state law in the language of the statute." *Bibbo v. Dean Witter Reynolds, Inc.*, 151 F.3d 559, 562 (6th Cir. 1998). Field preemption exists where states regulate in a field that Congress "has determined must be regulated by its exclusive governance." *Arizona v. United States*, 567 U.S. 387, 399 (2012). Conflict preemption exists where compliance with both state and federal law is an "impossibility" or where state law stands as an "obstacle" to Congress's objectives. *Id.* (citations omitted). These "categories of preemption are not 'rigidly distinct.'" *Crosby*, 530 U.S. at 372 n.6 (citation omitted). Ohio gambling laws are preempted as applied to Kalshi under all three principles.

30

## A.    Ohio's Sports-Gambling Laws Are Expressly Preempted As Applied To Kalshi.

1. Section 2(a)'s plain and unambiguous language expressly preempts state law by granting the CFTC "exclusive jurisdiction ... with respect to accounts, agreements ..., and transactions involving swaps or contracts of sale of a commodity for future delivery" that are "traded or executed on a contract market designated" by the CFTC.   7 U.S.C. § 2(a)(1)(A).   That sweeping language prevents states from asserting *any* jurisdiction over *any* instrument traded or executed on a DCM.   Kalshi's sports-event contracts are instruments traded on a DCM, so no state may regulate them.

There is no other plausible reading of Congress's grant of "exclusive jurisdiction."   As the Supreme Court has explained, the "plain meaning of 'exclusive'" "necessarily denies jurisdiction" to other entities not named in that provision.  *Mississippi v. Louisiana*, 506 U.S. 73, 77-78 (1992); *see also Exclusive*, American Heritage Dictionary (5th ed. 2022) ("Not divided or shared with others"; "sole"; "incompatible").   A grant of "exclusive jurisdiction" to a federal agency preempts state efforts to intrude on the same "regulatory turf."  *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 163 (2016).

This Court agrees:  "Exclusive means exclusive."  *Am. Energy Corp. v. Rockies Express Pipeline LLC*, 622 F.3d 602, 605 (6th Cir. 2010).  And other

31

circuits, too, have repeatedly recognized "[t]he explicit statutory conferral of exclusive jurisdiction" to a federal authority "is a form of express preemption" because it "withdraws any concurrent jurisdiction" that state authorities may have. *Transcon. Gas Pipe Line Co. v. Pa. Env't Hearing Bd.*, 108 F.4th 144, 151-152 (3d Cir. 2024); *see Duke Energy Trading & Mktg., L.L.C. v. Davis*, 267 F.3d 1042, 1057 (9th Cir. 2001) (where there is "exclusive federal jurisdiction," "the States cannot have jurisdiction" (citation modified)); *Richardson v. Kruchko & Fries*, 966 F.2d 153, 158 (4th Cir. 1992) (state-law claims preempted where they fell within federal agency's "exclusive jurisdiction").

2.   Other features of Section 2(a)'s text confirm that it expressly preempts the application of state gambling laws to any transaction on a DCM. Section 2(a) contains a savings clause providing that it does not "supersede" the jurisdiction of "other regulatory authorities" under the laws "of any State." 7 U.S.C. § 2(a)(1)(A). Crucially, the clause applies "*[e]xcept as hereinabove provided*" by the grant of exclusive jurisdiction to the CFTC over on-DCM trading. *Id.* (emphasis added). That language enables a "logical inference" of preemption as to matters within the CFTC's exclusive jurisdiction. *See Omnipoint Commc'ns, Inc. v. City of Huntington Beach*, 738 F.3d 192, 194-196 (9th Cir. 2013) (interpreting savings clause with

32

"except as provided" proviso); *see also Int'l Res., Inc. v. N.Y. Life Ins. Co.*, 950 F.2d 294, 299 (6th Cir. 1991) (similar). Specifying that state law is *not* superseded as to *off-DCM* transactions confirms that state law *is* superseded as to *on-DCM* transactions. Indeed, Congress added the proviso to ensure that "the Commission's jurisdiction, where applicable, supersedes State as well as Federal agencies." S. Rep. No. 93-1131, at 6.

3. Statutory history reaffirms that the express-preemption provision means what it says. When Congress considered the 1974 amendments, the CEA did not "impair any State law applicable to any transaction" regulated by the statute. 7 U.S.C. § 6c (1936). The Supreme Court had explained that *without* this proviso, the CEA would "almost certainly" preempt state laws, but that this proviso "serve[d] the function of preventing supersedure and preserving state control." *Rice v. Bd. of Trade of Chi.*, 331 U.S. 247, 255 (1947). Senate drafters accordingly "deleted" this clause "to assure that Federal preemption is complete." 120 Cong. Rec. 30,464 (Sep. 9, 1974) (statement of Sen. Curtis). The Senate also qualified the state-law savings clause by clarifying that it applied "except as hereinabove provided" by the CFTC's exclusive jurisdiction over on-DCM trading. S. Rep. No. 93-1131, at 31. These changes "wholly and unequivocally eliminated each of the bases" the Supreme Court had previously relied on "to hold that the CEA did not

33

preempt state regulation."  Van Wart, *supra*, at 692-693.  They would be incomprehensible if Congress intended to preserve state authority to regulate trading on DCMs.

4.  Later-enacted provisions further confirm that the CFTC's exclusive jurisdiction over trading on DCMs preempts state regulation.  Following the 1974 amendments, Congress enacted other provisions relevant to the states' role, and each refutes the contention that states may apply their laws to DCMs.

The 1978 amendments, for example, authorize state officials to sue over "any act or practice constituting a violation of any provision of this chapter or any [CFTC] rule."  7 U.S.C. § 13a-2(1).  The amendments authorize states to enforce the CEA, related *federal* regulations, and general state "antifraud statute[s]"—but not state gambling laws.  *Id.* § 13a-2(7).  And they expressly provide that states may enforce the CEA *only* against a party "*other than a [designated] contract market.*"  *Id.* (emphasis added).  Congress included this limitation because it "wanted the power to enforce the CEA *with respect to organized exchanges* to remain solely in the CFTC."  Van Wart, *supra*, at 708.

Similarly, the 1982 amendments instruct that the CEA shall *not* "supersede or preempt" the application of state law to transactions "*not*

34

conducted on" a DCM.  7 U.S.C. § 16(e)(1)(B)(i) (emphasis added).  The only coherent inference of specifying no preemption as to off-DCM transactions is that Congress *did* intend preemption as to on-DCM transactions.  Indeed, Congress enacted this provision because the 1974 amendments already "bestowed on the CFTC exclusi[ve] jurisdiction to regulate futures trading" on DCMs, "thereby preempting any State regulatory laws."  H.R. Rep. No. 97-565, pt. 1, at 44.

The 2000 CFMA amendments are even more on-point.  That year, Congress first extended the CEA to cover event contracts by defining "excluded commodit[ies]" to include an "occurrence" or "contingency" that is "beyond the control of the parties" to the transaction and "associated with a financial, commercial, or economic consequence."  7 U.S.C. § 1a(19)(iv). Congress also provided that "excluded commodit[ies]" could be traded *off-*DCM by certain sophisticated market participants, known as "eligible contract participants." 114 Stat. at 2763A-377.  To ensure these off-exchange trades were not precluded by state gaming laws, Congress created a targeted exception that "supersede[s] and preempt[s]" "any State or local law that prohibits or regulates gaming" with respect to the exempted off-DCM transactions the CEA now permitted. 7 U.S.C. § 16(e)(2).  It would have made no sense for Congress to expressly preempt state gaming laws only with

respect to these *off*-DCM transactions unless it understood that *on*-DCM transactions were already protected by the CFTC's "exclusive jurisdiction." Thus, this provision reflected that "the current" CEA already "supersede[d] and preempt[ed]" state laws as to on-DCM transactions. H.R. Rep. No. 106-711, pt. 2, at 71.

A subsequent federal statute specifically governing gambling supports this conclusion. In the Unlawful Internet Gambling Enforcement Act of 2006 ("UIGEA"), Congress generally made gambling over the internet unlawful if the "bet or wager" is unlawful in the state where it is "initiated, received, or otherwise made." 31 U.S.C. § 5362(10)(A). Congress defined "bet or wager" to include risking "something of value upon the outcome of a contest of others," including "a sporting event." *Id.* § 5362(1)(A). But Congress expressly provided that "bet or wager" "does *not include*" "any transaction conducted on or subject to the rules of a" DCM. *Id.* § 5362(1)(E)(ii) (emphasis added). UIGEA confirms Congress's intent to prevent state gambling laws from applying to on-DCM transactions.

5. Precedent reinforces preemption. When Congress returned to the CEA in 2000 and again in 2010, courts of appeals had repeatedly and uniformly held that the CEA's exclusive jurisdiction over DCMs preempts other regulation. *Leist*, 638 F.2d at 322 ("the CEA preempts the application

36

of state law"); *Rasmussen v. Thomson & McKinnon Auchincloss Kohlmeyer, Inc.*, 608 F.2d 175, 178 (5th Cir. 1979) (state-law "commercial gambling" claim could not proceed because "the Commodity Exchange Act preempts all state laws inconsistent with its provisions"); *United States v. Brien*, 617 F.2d 299, 310 (1st Cir. 1980) ("Congress intended the CFTC to occupy the entire field of commodities futures regulation."); *FTC v. Ken Roberts Co.*, 276 F.3d 583, 590-591 (D.C. Cir. 2001) (the CFTC's jurisdiction is "exclusive with regard to the trading of futures *on organized contract markets*" (citation omitted)); *Am. Agric.*, 977 F.2d at 1157 (state-law claims "are preempted by the CEA" as applied to "the operation of a contract market"); *Chi. Mercantile Exch. v. SEC*, 883 F.2d 537, 548 (7th Cir. 1989) (where "the CFTC has jurisdiction, its power is exclusive").

This Court "presume[s] that Congress is aware of the law (including judicial precedent) relevant to legislation it enacts." *Boaz v. FedEx Customer Info. Servs., Inc.*, 725 F.3d 603, 607 (6th Cir. 2013). When it added event contracts to the CEA in 2000 and when it included them in the "swap" definition in 2010, Congress would have been aware of the uniform interpretation of every court that had addressed preemption. Congress would have understood that confirming the CFTC's jurisdiction over event contracts preempted state law as applied to trading those instruments on

37

DCMs. The CFTC shares this view. *See* CFTC Br. 21-24 (preemption was "part and parcel of Congress's intent" and "the very purpose" of the CFTC's exclusive jurisdiction); *see Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 388, 394, 402 (2024) (courts may account for an agency's "body of experience and informed judgment" in interpreting a statute (citation omitted)).

### B. Ohio's Sports-Gambling Laws Are Field-Preempted As Applied To Kalshi.

The CEA also preempts the field of on-DCM trading—both through its express text and by setting out a comprehensive scheme that displaces state regulation. *See Crosby*, 530 U.S. at 372 n.6 (field preemption can be express or implied).

Beginning with the text, for the reasons already noted, the grant of exclusive jurisdiction to the CFTC expressly preempts the field of regulating trading on DCMs. Congress used the phrase "exclusive jurisdiction" rather than specifying individual preempted state laws precisely because it sought broadly to preempt the field. *See PhRMA v. McCuskey*, 171 F.4th 675, 690-691 (4th Cir. 2026) ("If Congress has staked exclusive authority over a subject matter, whether expressly or impliedly, as in 'field' preemption, any state law that directly regulates that matter must yield."). And while this Court need not consider legislative history given the clear statutory text and

context, the conference report to the 1974 amendments confirms that Congress sought to "*preempt the field* insofar as futures regulation is concerned." H.R. Rep. No. 93-1383, at 35 (emphasis added); *see Garcia v. United States,* 469 U.S. 70, 76 (1984) (when resort to legislative history is warranted, committee reports are the "authoritative source").

The CEA's field-preemptive text is confirmed by Congress's adoption of "a comprehensive regulatory structure" to oversee the "futures trading complex." *Curran*, 456 U.S. at 356 (citation omitted). The CEA establishes a comprehensive scheme governing how DCMs must operate. DCMs are "trading facilit[ies]" required to provide trading "through the interaction of multiple bids or multiple offers within a system with a pre-determined non-discretionary automated trade matching and execution algorithm." 7 U.S.C. § 1a(51)(A). This means DCMs must provide for trading in a manner that guarantees that the market—rather than the DCM—sets the price of every contract.

Further, to list derivatives contracts, an exchange must receive CFTC designation. *See* 7 U.S.C. §§ 2(e), 6(a), 7(a). That process requires an application demonstrating myriad capabilities, including the capacities to detect and investigate actors who violate CFTC rules, 17 C.F.R. § 38.150(b), retain adequate compliance staff, *id.* § 38.155(a), surveil trades executed on

39

its platform, *id.* § 38.156, and more. Once the market becomes a DCM, it is subject to extensive oversight, including reporting obligations, *id.* §§ 38.450, 16.00 *et seq.*, liquidity standards, *id.* § 38.1101(a)(2), and penalties, 7 U.S.C. §§ 9a, 12c. And numerous statutory provisions govern how trading on the DCM may be carried out, including prohibitions on fraud, manipulation, and disruptive trading, as well as requirements for position-size limits in certain transactions. 7 U.S.C. §§ 6a, 6b, 6c, 9; *see* 17 C.F.R. §§ 150.2, 150 App. E, 180.1, 180.2.

The CEA also comprehensively regulates the transactions that occur on DCMs. The CEA contains an elaborate set of provisions defining what types of derivatives may be traded on DCMs and what qualifies as a commodity. *See* 7 U.S.C. §§ 1a(9), (19), (47); *id.* § 7a-2(c)(5)(C). As most relevant here, the CEA contains a detailed definition of the term "swap" that includes event contracts. *Id.* § 1a(47). It also contains a Special Rule providing that *the CFTC* (not the states) may decide whether "event contracts" involving "gaming" or conduct proscribed by state law should be barred from exchanges because they are "contrary to the public interest." *Id.* § 7a-2(c)(5)(C). This comprehensive regime leaves "no room for the States to supplement it." *Arizona*, 567 U.S. at 399 (citation omitted).

40

### C. Ohio's Sports-Gambling Laws Are Conflict-Preempted As Applied To Kalshi.

Even if express and field preemption did not bar Defendants from regulating Kalshi's event contracts, conflict preemption would. In at least three respects, complying with Ohio law would be "impossible" for Kalshi or pose an "obstacle" to the CEA's purposes. *Crosby*, 530 U.S. at 372-373 (citation modified).

1. Ohio's application of its gambling laws to Kalshi subverts Congress's aim of bringing futures markets "under a uniform set of regulations." *Am. Agric.*, 977 F.2d at 1156. As the Third Circuit recently held, Congress intended "to do away with the patchwork of state regulations and bring futures trading on DCMs under the exclusive jurisdiction of the CFTC." *Flaherty*, 172 F.4th at 230. Allowing states to enforce their gambling laws against Kalshi "would create an obstacle to executing the [CEA] because such state enforcement would prohibit Kalshi, which operates a licensed DCM under the exclusive jurisdiction of the CFTC, from offering its sports-related event contracts"—"exactly the patchwork that Congress replaced wholecloth by creating the CFTC." *Id.* The Seventh Circuit has likewise held that "[w]hen application of state law would directly affect trading on or the operation of a [DCM], it would stand 'as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,' and hence is

41

preempted." *Am. Agric.*, 977 F.2d at 1156-57 (citation omitted); *see Sherfel v. Newsom*, 768 F.3d 561, 568 (6th Cir. 2014) (finding conflict preemption where a state statute "interfere[d] with nationally uniform plan administration" under federal law (citation omitted)).

2.    In addition, compliance with both federal and Ohio law is impossible for Kalshi.  Ohio law requires any entity offering "wagers on sporting events" to ensure that all sports wagers are initiated, received, and completed within the State.  Ohio Rev. Code Ann. §§ 3775.03(A), 3775.11(A), 3775.12(A).  Ohio sportsbooks can comply with this requirement because they set the odds and bet against their customers.  But compliance with that geographic requirement is impossible for federally regulated DCMs that match traders with other traders nationwide through a "non-discretionary automated trade matching and execution algorithm."  7 U.S.C. § 1a(51)(A).  If Ohio is permitted to force all Ohio traders to be matched only *intra*state, 49 other states could equally attempt to subject DCMs to their geographic limitations.  That would create fragmented markets with separate liquidity pools, meaning that the same contracts would trade at different prices in different states.  Fifty different siloed markets would be anathema to the "interstate and international commerce" that informs the "national public interest" served by derivatives.  7 U.S.C. § 5(a).

42

Even if DCMs could overcome that hurdle, doing so would bring DCMs out of compliance with the CFTC's Core Principles. Core Principle 2 requires a DCM to provide "impartial access to its markets and services." 17 C.F.R. § 38.151(b). The plain meaning of "impartial" is "treating everyone equally; not biased." *Impartial*, Oxford American Dictionary and Thesaurus (2d ed. 2009). A DCM cannot treat all users equally if forced to discriminate based on their geography. Thus, the CFTC has made clear that "[i]f a state bans [a] contract, the DCM cannot fulfill its federal mandate to provide impartial national access." CFTC Br. 26-27. This is a quintessential case of impossibility preemption—where federal law "forbids what the state law requires." *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 460 (2012).

3. Allowing Defendants to criminally prosecute Kalshi would also conflict with Congress's chosen "method of enforcement." *Arizona*, 567 U.S. at 406. Congress in the Special Rule gave the CFTC authority to prohibit the trading of an event contract if it determines the contract involves "gaming" or an "activity" that is illegal under "State law" where *the CFTC* determines it is "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i). And Congress further provided that states' limited authority to enforce the CEA is confined to suits against entities "*other than a [designated] contract market.*" 7 U.S.C. § 13a-2(1) (emphasis added). Allowing states to effectively

43

ban certain transactions on a DCM therefore conflicts with Congress's chosen method of enforcement.

States may not take actions that "would disturb and conflict with the balance embodied" in a discretionary judgment Congress delegated to a federal agency. *California v. FERC*, 495 U.S. 490, 506 (1990). Statutes like the CEA require an agency to "balance" competing policy objectives, meaning that "regulatory situations in which an agency is required to strike a balance between competing statutory objectives lend themselves to a finding of conflict preemption." *In re Ford Motor Co.*, 65 F.4th 851, 861, 863 (6th Cir. 2023) (citation modified). Ohio seeks not just to ban Kalshi's contracts, but to subject Kalshi to *criminal* penalties for offering them. Allowing Ohio—not to mention 49 other states—to subject DCMs to criminal penalties for offering contracts that the CFTC has opted to permit would render the CFTC's judgment meaningless.

## II.   THE DISTRICT COURT'S CONTRARY CONCLUSIONS ARE UNPERSUASIVE.

The district court denied Kalshi a preliminary injunction on two grounds: that Kalshi's sports-event contracts are not "swaps," and that the CEA does not preempt state gambling laws as applied to trading on DCMs. Neither can be sustained.

44

### A.    The District Court Erred In Concluding That Kalshi's Contracts Are Not Swaps Or Other Derivatives.

The district court concluded that Kalshi's contracts do not fall within the CFTC's exclusive jurisdiction because they are not "swaps." That conclusion rested on multiple legal errors that compel reversal.

1. As a threshold matter, the CFTC's exclusive jurisdiction applies to *any* instrument traded on a DCM, not just swaps. The language of Section 2(a)(1)(A) broadly applies not just to "transactions involving swaps" that are "traded or executed on a" DCM, but to all "accounts" and "agreements" "traded or executed" on an exchange—full stop. It is therefore irrelevant whether sports-event contracts are "swaps" because they are undoubtedly "agreements" traded on a DCM, which suffices to bring them within the CFTC's exclusive authority.

That does not mean the CFTC's regulation of Kalshi is insulated from judicial review. States may bring suit under the Administrative Procedure Act ("APA") if they believe the CFTC is improperly enforcing (or failing to enforce) the CEA against Kalshi or any other DCM. *See* 5 U.S.C. § 551(13) ("agency action" includes "failure to act"); *Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*, 972 F.3d 83, 99 (D.C. Cir. 2020) (agency approval that "took the form of inaction" could be challenged under the APA). Moreover, the CFTC has recently initiated a rulemaking process for

45

prediction markets; states have the opportunity to comment during that process and may challenge the results through an APA action if they choose. But states cannot enforce these CEA requirements directly against Kalshi, because Section 13a-2(1) expressly prevents them suing "a contract market" to enforce the CEA. Defendants certainly may not "circumvent" the APA by bringing charges directly against Kalshi for offering contracts that Kalshi's exclusive federal regulator has permitted. *Polyweave Packaging, Inc. v. Buttigieg*, 51 F.4th 675, 684 (6th Cir. 2022).

2. In any event, Kalshi's contracts are swaps. The CEA defines swaps in a broad six-part definition, including any contract providing for payment "dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). A swap thus requires an event "connected with" a potential financial, economic, or commercial consequence. *See Associated*, Oxford American Dictionary and Thesaurus (2d ed. 2009).

As the Third Circuit held, a "plain reading of the Act's text suggests that Kalshi's sports-event contracts fit comfortably within the statutory definition." *Flaherty*, 172 F.4th at 227 (citation omitted); *see id.* at 233 (Roth, J., dissenting) (same). "The outcome of a sports event certainly can

46

be associated with a potential financial ... consequence" for a broad ecosystem of stakeholders, "including sponsors, advertisers, television networks, franchises, and local and national communities." *Id.* at 227-228. These events also have direct economic consequences for state-regulated sportsbooks themselves, which face substantial financial exposure associated with sports events. Companies are accordingly hedging millions of dollars in sports-related risks on Kalshi.[4]

The Special Rule confirms that Kalshi's event contracts are swaps. That provision gives the CFTC jurisdiction to review "agreements, contracts, transactions, *or swaps* in excluded commodities," including contracts that involve "gaming." 7 U.S.C. § 7a-2(c)(5)(C)(i) (emphasis added). Thus, even assuming Kalshi's contracts involve gaming, the Special Rule is unequivocal proof that Congress did not exclude these contracts from the CFTC's jurisdiction. Instead, Congress gave the CFTC—and the CFTC alone—authority to determine whether they are contrary to the public interest.

---

[4] Andrew Ross Sorkin et al., *Hedging, not betting, on sports via prediction markets*, N.Y. Times DealBook (Feb. 10, 2026), https://www.nytimes.com/2026/02/10/business/dealbook/epstein-lutnick-wasserman-starmer.htm; Brett Smiley, *Underdog Sports Preparing to Use Kalshi, Prediction Markets For Its Own Risk Management,* InGame (Oct. 22, 2025), https://perma.cc/BT4A-BK8T.

The district court acknowledged that Kalshi's position was "textually permissible" but concluded that the CEA's "purpose" is "better serve[d]" by limiting swaps to events with an "*inherent* association with matters of financial, economic, or commercial consequence." Op., R.69, PageID#904 (emphasis added) (citation modified). "The fundamental problem" with this interpretation "is that the text of the [CEA] says no such thing." *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 642 (2022). The CEA requires only that an underlying event be "associated with" "potential" financial consequences. 7 U.S.C. § 1a(47)(A)(ii). "Potential" is effectively the opposite of inherent. And the district court's understanding would exclude event contracts that the CEA expressly contemplates, including the "weather swap[s]" expressly enumerated in the "swap" definition, *id.* § (47)(A)(iii), and the swaps involving "gaming" contemplated by the Special Rule, *id.* § 7a-2(c)(5)(C)(i). Neither the weather nor gaming has an "inherent" association with financial consequences.

The district court suggested that the CEA's goals can be served by interpreting "swap" to mean "a transaction involving financial instruments and measures that *traditionally and directly affect commodity prices*." Op., R.69, PageID#904-905 (emphasis added). But that language likewise appears nowhere in the statute. Far from looking to history or "tradition[ ],"

48

Op., R.69, PageID#904, to confine the meaning of swap, the text defines the term to include any agreement "that is, *or in the future becomes,* commonly known to the trade as a swap," 7 U.S.C. § 1a(47)(A)(iv) (emphasis added). And Congress authorized the CFTC and SEC to "further define" swap by regulation, *see* 15 U.S.C. § 8302(d)(1), underscoring that it wanted a flexible definition that could evolve with the markets.

Citing a floor statement, the district court suggested "some members of Congress believed that sports-event contracts would *not* be considered swaps." Op., R.69, PageID#906. Floor statements "rank among the least illuminating forms of legislative history." *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 307 (2017). And the floor statement the court cited refutes the court's conclusion; it underscores that the Special Rule was intended to "restore *CFTC's* authority to prevent trading that is contrary to the public interest," 156 Cong. Rec. S5906 (daily ed. July 15, 2010) (emphasis added)—*not* to subject these contracts to concurrent state jurisdiction. While certain legislators had concerns with contracts involving gaming, Congress addressed those concerns *not* by categorically excluding those contracts, but

49

by granting *the CFTC* discretion to prohibit them if—and only if—it determines they are contrary to public interest.[5]

3.  The district court erred in concluding that "absurd results" would follow from treating Kalshi's contracts as swaps.  Op., R.69, PageID#905.  Citing the CEA provision making it unlawful for persons "to enter into a swap" outside of a DCM, 7 U.S.C. §2(e), the district court maintained that Kalshi's position would force "all sports bets" onto DCMs.  Op., R.69, PageID#905.  But nothing about Kalshi's position or the CEA leads to that implausible result.

The CEA preempts state law as to on-DCM trading but leaves states free to regulate off-DCM transactions like bets offered by sportsbooks.  Section 2(a) contains a savings clause making clear that, except as provided by the grant of exclusive jurisdiction to the CFTC over *on*-DCM trading, "nothing" in the remainder of Section 2 shall "restrict" state authorities "from carrying out their duties and responsibilities in accordance with [state]

---

[5] Kalshi's event contracts readily qualify as two other forms of "agreements" referenced in Section 2(a)(1)(A): "option[s]" and "future[s]" themselves.  7 U.S.C. §1a(19).  Since 2000, the CEA has included "occurrence[s]" that are "associated with a financial, commercial, or economic consequence" in the definition of "excluded commodit[ies]" that may form the basis of options and futures contracts.  *Id.* §1a(19)(iv).  The CFTC itself has therefore recognized that event contracts "can be designed to exhibit the attributes of either options or futures contracts."  73 Fed. Reg. at 25,670.

laws." 7 U.S.C. § 2(a)(1)(A); *see id.* § 16(e)(1)(B)(i) ("[n]othing" in the CEA "shall supersede or preempt" state law applied to off-exchange transactions). And Section 16(e)(2) defines precisely the extent to which the CEA "supersede[s] and preempt[s]" the application of state "gaming" laws to off-exchange transactions. By providing that those gaming laws cannot be applied to certain off-exchange transactions, Congress made clear that the CEA preserves states' ability to apply their gaming laws to other off-exchange transactions.

Moreover, holding that Kalshi's sports-event contracts are swaps does not mean that run-of-the-mill sports bets are also swaps. Like all derivatives regulated by the CFTC, swaps are financial instruments capable of being "traded or executed on a [designated] contract market." 7 U.S.C. § 2(a)(1)(A). Section 2(e) itself makes that clear, providing that swaps must be "entered into" or "subject to the rules of" a "board of *trade*" (emphasis added). That is why the CFTC and SEC have clarified that swaps must be "*traded* on organized markets and over the counter." Further Definition of "Swap," 77 Fed. Reg. 48,208, 48,217 (Aug. 13, 2012) (emphasis added); *see* 15 U.S.C. § 8302(d)(1) (requiring the CFTC and SEC to "further define" swap). By contrast, "consumer and commercial transactions" that "are not traded on an organized market or over-the-counter" are not swaps. 77 Fed.

51

Reg. at 48,247. Event contracts are tradeable instruments because the contract's terms are fixed at the outset to provide a set payout at a price established by the market according to supply and demand. Not so for sports bets, where the sportsbook is one party to the contract, sets the contract price, and retains power to change pricing as necessary to ensure profitability.

The district court criticized "Kalshi's logic" as "circular." Op., R.69, PageID#906 (citation modified). But it is not Kalshi's logic—it is Congress's. Similar logic explains the distinction between many other derivatives and state-regulated products. This Court, for example, has distinguished "forward contract[s]" (which are not derivative products and need not be traded on DCMs) from "futures" (which are and must), because futures are "standardized," "fungible," and "*traded on an exchange*." *CFTC v. Erskine*, 512 F.3d 309, 323-324 (6th Cir. 2008) (emphasis added); *see CFTC v. Zelener*, 373 F.3d 861, 864 (7th Cir. 2004) (similar). Credit-default swaps likewise resemble bond insurance—both pay out when an entity defaults on a bond—but bond insurance is not a swap principally because it was not "traditionally" traded on an exchange. 77 Fed. Reg. at 48,214-15.

To be sure, sports-event contracts resemble sports bets in that both can involve speculating about sports outcomes. But the same commonality exists

52

between weather-event contracts and flood insurance, or between political-event contracts and a bet on an election.  The fact that a transaction involves speculation does not make it a swap that must be executed on a DCM.

### B.   The District Court Erred In Concluding That State Law Is Not Preempted.

The district court concluded that the CEA does not preempt the application of state gambling laws to transactions on DCMs.  It reached that conclusion without accounting for the CFTC's view that state regulation of prediction markets would "present a fundamental threat to Congress's statutory design," CFTC Br. 2, and without the benefit of the Third Circuit's conclusion that state gambling laws are field and conflict preempted as applied to Kalshi.  The motions panel did not resolve the issue but concluded that preemption was "debatable."  Injunction Order 8.  This Court's review on a more complete record will establish without doubt that the CEA preempts state gaming laws as applied to on-DCM trading.

1. *Express Preemption*:  The district court began by erroneously applying a "strong presumption" against preemption.  Op., R.69, PageID#909 (citation omitted).  As the Supreme Court has explained, courts "do not invoke any presumption against pre-emption" where, as here, a statute "contains an express pre-emption clause."  *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016) (citation modified); *see Flaherty*,

172 F.4th at 230 (declining to apply a presumption given the CEA's plain text and that "the federal government has regulated the derivatives market for over a century"). The district court made no effort to reconcile its application of a presumption with this Court's *Churchill Downs* decision, which declined to apply the presumption in a similar case involving preempted state gambling laws. This Court explained that "the presumption against preemption doesn't apply" because the "plain text" of the federal law at issue "forecloses Michigan's interpretation" and because "the regulation of *interstate* gambling isn't a traditional area of state regulation." 162 F.4th at 641 n.5. Precisely the same logic applies here.

The district court suggested that Kalshi waived its express-preemption argument. Op., R.69, PageID#909 n.5. That is wrong. From the beginning, Kalshi has argued that any state enforcement effort is preempted by the CEA's express textual grant of "exclusive jurisdiction" to the CFTC. *See* Compl., R.1, PageID#21 ("Congress explicitly gave the CFTC 'exclusive jurisdiction'" over DCMs (citing 7 U.S.C. § 2(a)(1)(A)). That is an express-preemption argument. Were there any doubt, Kalshi's preliminary-injunction motion argued that "Congress has preempted the field of regulating trading on DCMs, ... *expressly in the text of the CEA*" and impliedly. Mot. for Prelim. Inj., R.11, PageID#226-228 (emphasis added).

54

Its complaint argued the same.  *See* Compl., R.1, PageID#22 ("Defendants' threatened actions are both expressly and impliedly field-preempted under the Supremacy Clause").  The district court's assertions of waiver are groundless.

The motions panel suggested that the exclusive-jurisdiction provision reflects an "unusual express-preemption provision." Injunction Order 7.  But Congress commonly preempts state law by granting federal authorities exclusive jurisdiction.  *See Transcon. Gas*, 108 F.4th at 151-152; *Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 595 (7th Cir. 2001) (statutory grant of "exclusive jurisdiction" to committee preempted state law); *Heart of Am. Grain Inspection Serv., Inc. v. Mo. Dep't of Agric.*, 123 F.3d 1098, 1103 (8th Cir. 1997) (similar).  The Supreme Court itself has held that state law is "preempted" by a statute making a federal agency's jurisdiction "exclusive." *Hughes*, 578 U.S. at 163.

The motions panel nonetheless found preemption "debatable" because exclusive-jurisdiction provisions, as in federal securities laws, often apply to "*courts* rather than *agencies*," meaning they prevent state courts from hearing cases rather than preempting the application of substantive state law.  Injunction Order 8.  But this reasoning elides the distinction between adjudicative and regulatory jurisdiction.  Granting "exclusive jurisdiction" to

55

federal courts prevents state courts from hearing cases because courts are adjudicative bodies.   Granting "exclusive jurisdiction" to the CFTC, by contrast, prevents state agencies from regulating because the CFTC is a *regulatory* body.   In any event, even in the adjudicatory context, an "explicit statutory conferral of exclusive jurisdiction to a federal court … *is a form of express preemption.*"   *Transcon. Gas*, 108 F.4th at 151-152 (emphasis added).

The motions panel invoked Section 2's savings clauses.   Injunction Order 8; *see also* Op., R.69, PageID#910-911 (similar).   But the savings clauses overwhelmingly support preemption.   The first provides that Section 2 does not "supersede or limit" the jurisdiction of "other regulatory authorities" under the laws "of any State," subject to a crucial proviso— "*[e]xcept as hereinabove provided*" by the grant of exclusive jurisdiction to the CFTC.   7 U.S.C. § 2(a)(1)(A) (emphasis added).   Congress added the proviso for the specific purpose of "clarifying" that "where applicable," the jurisdiction of the CFTC "supersedes State as well as Federal agencies."   H.R. Rep. No. 93-1383, at 35.   Thus, while the motions panel observed that "typical" express-preemption provisions use "words like 'preempt' or 'supersede,'" Injunction Order 7, Section 2(a) *does* use the word "supersede" to describe the CFTC's exclusive jurisdiction by specifying that Section 2 does

56

not "supersede" the jurisdiction of state regulatory authorities other than as "hereinabove provided." And the second savings clause merely provides that Section 2 does not limit state court "jurisdiction"—it says nothing about whether state regulation is preempted. 7 U.S.C. § 2(a)(1)(A).

Citing Section 13a-2, the motions panel noted that "Congress's decision to allow state officials to enforce the Act also shows they have a role to play." Injunction Order 11. But the role that Congress left for state officials intentionally *excludes* the right to enforce federal or state law against "a contract market." 7 U.S.C. § 13a-2(1).

The district court's and motions panel's reliance on the express-preemption provisions in Sections 16(e)(2) and 16(h) is similarly unavailing. As explained above, Section 16(e)(2) extends the CEA's preemption of state "gaming" law with respect to *on*-DCM transactions to a narrow class of exempted *off*-DCM transactions the CEA permits. That does not remotely suggest Congress intended for gaming laws to apply to on-DCM transactions. Rather, Congress's decision to preempt state gaming laws as to exempted transactions turned critically on Congress's recognition that "*the current*" CEA already "supersedes and preempts" state laws "in the case of transactions conducted *on a registered entity*." H.R. Rep. No. 106-711, pt. 2, at 71 (emphasis added). Section 16(h), in turn, clarifies that states cannot

regulate swaps as insurance, regardless of whether they occur on- or off-DCM.

Congress often structures statutes to include both a broad preemption provision and a narrower one with a different scope. *See* 29 U.S.C. § 1144(b)(2)(A) (ERISA preemption provision superseding "State laws insofar as they ... relate to any employee benefit plan"); *id.* § 1144(b)(2)(B) (narrower ERISA provision preempting certain state laws not covered by the broad preemption provision); *see also* 49 U.S.C. § 41713(b)(1) (Airline Deregulation Act preemption provision barring states from enacting laws "related to a price, route, or service of an air carrier"); *id.* § 41713(b)(4) (narrower Airline Deregulation Act provision preempting certain state laws not covered by the broad preemption provision). That these statutes contain two complementary express-preemption provisions has never been understood to mean that the broad provisions should not be given their true scope.

2. *Field Preemption*:  The district court's grounds for rejecting field preemption lack merit.  The court noted that the CFTC's exclusive jurisdiction does not "cover the waterfront of DCM-related activity." Op., R.69, PageID#910; *see also* Injunction Order 10 (noting the CEA "often permits state regulation").  But Section 2(a)'s express language *does* cover

58

the waterfront of "accounts," "agreements," and "transactions" "traded or executed on a contract market," which is enough to decide this case.  7 U.S.C. § 2(a)(1)(A).  The plain-text carveouts that give states a role in regulating *off*-DCM trading do not justify extratextual carveouts for *on*-DCM trading.

The motions panel noted the Seventh Circuit's holding that the CEA does not "preempt the field of futures trading."  Injunction Order 10 (quoting *Am. Agric.*, 977 F.2d at 1155).  That holding is correct:  The Seventh Circuit defined the field to include *all* futures trading, and Congress did not preempt that field because it authorized most state regulation of *off-DCM* transactions.  7 U.S.C. §§ 2(a)(1)(A), 16(e); H.R. Rep. No. 97-565, pt. 1, at 44 (acknowledging that federal and state agencies may police "those who offer fraudulent *off-exchange* investments" and other "transactions *outside* those preserved exclusively for the jurisdiction of the CFTC" (emphasis added)).  The Seventh Circuit proceeded to hold that state-law claims "are preempted by the CEA" as applied to "the operation of a contract market."  *Am. Agric.*, 977 F.2d at 1157.  That holding squarely supports Kalshi.

The district court found "no evidence that Congress intended to preempt state sports gambling laws" specifically.  Op., R.69, PageID#909.  Even if such speculation about legislative motives were appropriate, the court was mistaken.  The Special Rule's reference to "[e]vent contracts"

involving conduct that is "unlawful" under "State law" and "gaming" is irrefutable textual evidence that Congress understood that contracts involving such conduct would be subject to the CFTC's jurisdiction. 7 U.S.C. §7a-2(c)(5)(C)(i). In addition, Congress in UIGEA recognized that the phrase "bet or wager"—including a bet involving "a sporting event"—"does not include" "any transaction conducted on or subject to the rules of a" DCM. 31 U.S.C. §§5362(1)(A), (E)(ii). While the district court observed that a federal law prohibited most sports betting when Congress enacted Dodd-Frank, Op., R.69, PageID#909-910, that says nothing about Congress's intent to preempt state gambling laws with respect to on-DCM transactions.

Indeed, overwhelming evidence refutes the district court's speculation that Congress intended to allow state gambling laws to govern trading on DCMs. Dozens of states a century ago famously sought to regulate futures trading as "gambling in grain." *Dickson,* 288 U.S. at 197; *see* Addendum B. Thus, when Congress granted the CFTC exclusive jurisdiction over on-DCM trading in 1974, it was exceedingly clear that Congress was preempting state gaming laws as applied to those transactions. The district court's holding would undo that congressional choice by allowing state regulators to apply their gaming laws to any on-DCM transactions they view as gambling—a limitless proposition that would allow states to prohibit *all* event contracts

60

or even *all* futures contracts under state gambling laws. As the CFTC has explained, that theory "upend[s] decades of well-settled and Congressionally-mandated exclusive jurisdiction." CFTC Br. 3.

3. *Conflict Preemption*: The district court rejected conflict preemption on the ground that, while the CFTC indisputably mandates "impartial access" to contracts traded on a DCM, there was no evidence "the CFTC would view geographic restrictions predicated on compliance with state law as 'partial.'" Op., R.69, PageID#913; *see also* Injunction Order 12-13 (similar). But the CFTC recently confirmed that compliance with state laws is an "impossibility" because a DCM "*cannot fulfill its federal mandate*" if it imposes geographic state-by-state restrictions. CFTC Br. 26-27 (emphasis added). Such a state-by-state regulation is not "neutral," as the motions panel suggested, Injunction Order 12, but would subject traders in some states to different prices than traders in neighboring states, a form of geographic price discrimination. While the motions panel noted "[o]ther companies" have geofenced, Injunction Order 13, *other DCMs* have not.

The motions panel stated that "generic uniformity concerns" cannot show conflict preemption. Injunction Order 12. But Congress's commitment to uniformity in the regulation of DCMs is not generic; the very purpose of the 1974 amendments was to "bring the markets under a uniform set of

61

regulations." *Am. Agric.*, 977 F.2d at 1156. Allowing state-by-state regulation conflicts with that goal by creating "exactly the patchwork that Congress replaced wholecloth by creating the CFTC." *Flaherty*, 172 F.4th at 230.

The motions panel noted that the CEA does not require Kalshi to offer any "particular market." Injunction Order 13 (citation omitted). The Supreme Court has rejected a similar preemption defense, noting that "if the option of ceasing to act defeated a claim of impossibility, impossibility pre-emption would be all but meaningless." *Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 488 (2013) (citation modified). And while the panel suggested that the Special Rule's reference to activity that is unlawful under "State law" may mean that "certain contracts may be listed in some state markets but not others," Injunction Order 13, that provision authorizes only *the CFTC* to bar contracts on a nationwide basis, and applies only when *the CFTC* concludes they are contrary to the public interest. *See KalshiEX*, 2024 WL 4164694, at *12 (describing the contrary interpretation as not "plausible" given that "the CEA specifically preempts the application of state law over derivative markets").

The district court acknowledged that the Special Rule gives the CFTC "explicit authority to conduct a public-interest review of newly listed event

62

contracts that 'involve' … gaming" and to permit or prohibit the contract following review. Op., R.69, PageID#896. But the district court found no conflict between the Special Rule and Defendants' asserted power to criminalize contracts the CFTC has approved because—in the court's view— the CFTC already has a regulation prohibiting sports-event contracts. *See* Op., R.69, PageID#897 (citing 17 C.F.R. § 40.11(a)). That is wrong; the CFTC has confirmed the regulation does not prohibit sports-events contracts. *See* Oral Argument at 1:00:30-1:01:06, 1:11:45-1:13:14, *KalshiEX LLC v. Assad*, No. 25-7516 (9th Cir. Apr. 16, 2026).[6] That accords with Section 40.11(c)'s text, which preserves CFTC discretion to permit such contracts case-by-case. *See* Provisions Common to Registered Entities, 76 Fed. Reg. 44,776, 44,785-86 (July 27, 2011) (rule adopting Section 40.11 explaining that DCMs "may always" self-certify contracts and that review is available "on a case-by-case basis" notwithstanding Section 40.11(a)). More importantly, even the district court were right that the regulation prohibits sports-event contracts, that would only underscore the CFTC's jurisdiction, and would refute Defendants' claims of concurrent state jurisdiction.

---

[6] *Available at* https://www.youtube.com/watch?v=JOCrxsSR-OU.

63

### III.    THE BALANCE OF HARMS AND PUBLIC INTEREST STRONGLY FAVOR KALSHI.

The equities sharply favor an injunction.  The district court's contrary conclusion assumed Kalshi was unlikely to succeed on the merits.  If Kalshi succeeds on its merits burden, the remaining factors unquestionably favor an injunction.

*First,* the district court did not dispute that Kalshi will suffer irreparable harm absent an injunction.  Absent relief, Kalshi faces a "Hobson's choice": violate state law and "expose" itself "to potentially huge liability," or "suffer the injury of obeying the law during the pendency of the proceedings and any further review." *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 381 (1992); *see Orgel*, 2026 WL 474869, at \*10 ("credible threat of imminent prosecution for a state violation that conflicts with federal law" is irreparable harm (citation omitted)).  If Kalshi does not comply with Ohio law, it faces a $5 million fine and possible criminal liability.  But if Kalshi attempts to comply with Ohio law while this case proceeds, it will face millions in monetary losses associated with adopting geofencing technology, which Kalshi could not recoup given Defendants' immunity from damages liability.  *NIH v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2659 (2025) (per curiam) ("loss of money" is "irreparable" if the funds "cannot be recouped" (citation modified)).  Abruptly terminating trades in Ohio would additionally

64

harm Kalshi's users and, because Kalshi's exchange operates nationwide, would affect counterparties even in states where state law has been held preempted.   *Flaherty*, 172 F.4th at 231-232.   Courts cannot "easily compensate a movant for loss of competitive position and goodwill." *Churchill Downs*, 162 F.4th at 643.   And, as described above, compliance with Ohio law would jeopardize Kalshi's obligation to provide "impartial access" to its exchange.   17 C.F.R. § 38.151(b); *see* CFTC Br. 26-27.

*Second*, neither Defendants nor the public will suffer harm if this Court grants an injunction to prevent enforcement of preempted state laws.   As this Court has held, "it's 'always in the public interest to prevent' constitutional violations."   *Churchill Downs*, 162 F.4th at 642 (citation omitted).   The district court relied on Ohio's "interest in exercising its police power, enforcing its duly-enacted laws, and regulating sports gambling to promote the public welfare," Op., R.69, PageID#914, but this Court rejected a nearly identical argument in *Churchill Downs*, where Michigan invoked "its interest in regulating gambling and its residents' interest in the protections of Michigan law."   162 F.4th at 643.   As this Court explained, "Michigan didn't lose its ability to regulate gambling" outside of the preempted field.   *Id.*   The same is true of Ohio here.   Reversing the denial of the injunction will not

65

mean Kalshi's contracts are unregulated; it will instead mean they are regulated by the CFTC, just as Congress intended.

## CONCLUSION

The Court should reverse the district court's denial of a preliminary injunction.

Dated: May 5, 2026

Respectfully submitted,

/s/ *Neal Kumar Katyal*

NEAL KUMAR KATYAL
JOSHUA B. STERLING
COLLEEN E. ROH SINZDAK
WILLIAM E. HAVEMANN
SAMANTHA K. ILAGAN
MILBANK LLP
1101 New York Ave., NW
Washington, DC 20005
Telephone: (202) 835-7505
nkatyal@milbank.com

GRANT R. MAINLAND
ANDREW L. PORTER
NICOLE D. VALENTE
MILBANK LLP
55 Hudson Yards
New York, NY 10001

MICHAEL J. HUNTER
MATTHEW L. JALADONI
FLANNERY | GEORGALIS LLC
175 S. Third St., Ste. 285
Columbus, OH 43215

*Counsel for Plaintiff-Appellant*

66

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,899 words, excluding the items exempted by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(b).

This brief complies with the typeface and typestyle requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word for Office 365 in 14-point Georgia font.

May 5, 2026                                  */s/ Neal Kumar Katyal*
                                             Neal Kumar Katyal

                                             *Counsel for Plaintiff-Appellant*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system on May 5, 2026.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

May 5, 2026                              */s/ Neal Kumar Katyal*
                                        Neal Kumar Katyal

                                        *Counsel for Plaintiff-Appellant*

## DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

Pursuant to Sixth Circuit Rule 30(g), Plaintiff-Appellant KalshiEX LLC

hereby designates the following relevant district court documents:

| Record Entry Number | Description | PageID |
|---|---|---|
| 1 | Complaint | 1-24 |
| 1-1 | Cease-and-Desist Letter | 25-27 |
| 11 | Pl.'s Mot. & Memo. in Supp. of Prelim. Inj. | 215-242 |
| 69 | Op. & Order Denying Prelim. Inj. | 894-914 |
| 70 | Notice of Appeal | 915-917 |

**ADDENDUM A:**

**Pertinent Statutes and Regulations**

# TABLE OF CONTENTS

Provisions from the Commodity Exchange Act (as codified at 7 U.S.C.):

7 U.S.C. § 1a(9) ................................................................................... A1

7 U.S.C. § 1a(19) ................................................................................ A1

7 U.S.C. § 1a(27) ................................................................................ A2

7 U.S.C. § 1a(36) ................................................................................ A2

7 U.S.C. § 1a(47) ................................................................................ A2

7 U.S.C. § 2(a)(1)(A) .......................................................................... A7

7 U.S.C. § 2(e) ..................................................................................... A7

7 U.S.C. § 7a-2(c)(5)(C) ..................................................................... A8

7 U.S.C. § 13a-2 .................................................................................. A9

7 U.S.C. § 16(e) ................................................................................... A11

Provisions from the Commodity Futures Modernization Act of 2000
(Pub L. No. 106-554, Appendix E, 114 Stat. 2763A-365)

Section 103 - 114 Stat. at 2763A-377-378 ...................................... A12

Provisions from the Dodd-Frank Act of 2010
(Pub. L. No. 111-203, 124 Stat. 1376)

Section 712(d)(1) - 124 Stat. at 1644 .............................................. A12

Provisions from Title 17 of the Code of Federal Regulations:

17 C.F.R. § 38.4 .................................................................................. A13

17 C.F.R. § 38.5 .................................................................................. A14

17 C.F.R. § 40.2 .................................................................................. A15

17 C.F.R. § 40.3 .................................................................................. A17

17 C.F.R. § 40.11 ................................................................................ A20

## Provisions from the Commodity Exchange Act (as codified at 7 U.S.C.):

### 7 U.S.C. § 1a(9)

The term "commodity" means wheat, cotton, rice, corn, oats, barley, rye, flaxseed, grain sorghums, mill feeds, butter, eggs, Solanum tuberosum (Irish potatoes), wool, wool tops, fats and oils (including lard, tallow, cottonseed oil, peanut oil, soybean oil, and all other fats and oils), cottonseed meal, cottonseed, peanuts, soybeans, soybean meal, livestock, livestock products, and frozen concentrated orange juice, and all other goods and articles, except onions (as provided by section 13-1 of this title) and motion picture box office receipts (or any index, measure, value, or data related to such receipts), and all services, rights, and interests (except motion picture box office receipts, or any index, measure, value or data related to such receipts) in which contracts for future delivery are presently or in the future dealt in.

### 7 U.S.C. § 1a(19)

The term "excluded commodity" means—

(i) an interest rate, exchange rate, currency, security, security index, credit risk or measure, debt or equity instrument, index or measure of inflation, or other macroeconomic index or measure;

(ii) any other rate, differential, index, or measure of economic or commercial risk, return, or value that is—

(I) not based in substantial part on the value of a narrow group of commodities not described in clause (i); or

(II) based solely on one or more commodities that have no cash market;

(iii) any economic or commercial index based on prices, rates, values, or levels that are not within the control of any party to the relevant contract, agreement, or transaction; or

(iv) an occurrence, extent of an occurrence, or contingency (other than a change in the price, rate, value, or level of a commodity not described in clause (i)) that is—

(I) beyond the control of the parties to the relevant contract, agreement, or transaction; and

(II) associated with a financial, commercial, or economic consequence.

A1

## 7 U.S.C. § 1a(27)

The term "future delivery" does not include any sale of any cash commodity for deferred shipment or delivery.

## 7 U.S.C. § 1a(36)

The term "option" means an agreement, contract, or transaction that is of the character of, or is commonly known to the trade as, an "option", "privilege", "indemnity", "bid", "offer", "put", "call", "advance guaranty", or "decline guaranty".

## 7 U.S.C. § 1a(47)

(A) In general

Except as provided in subparagraph (B), the term "swap" means any agreement, contract, or transaction—

(i) that is a put, call, cap, floor, collar, or similar option of any kind that is for the purchase or sale, or based on the value, of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind;

(ii) that provides for any purchase, sale, payment, or delivery (other than a dividend on an equity security) that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence;

(iii) that provides on an executory basis for the exchange, on a fixed or contingent basis, of 1 or more payments based on the value or level of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind, or any interest therein or based on the value thereof, and that transfers, as between the parties to the transaction, in whole or in part, the financial risk associated with a future change in any such value or level without also conveying a current or future direct or indirect ownership interest in an asset (including any enterprise or investment pool) or liability that incorporates the financial risk so transferred, including any agreement, contract, or transaction commonly known as—

(I) an interest rate swap;

A2

(II) a rate floor;

(III) a rate cap;

(IV) a rate collar;

(V) a cross-currency rate swap;

(VI) a basis swap;

(VII) a currency swap;

(VIII) a foreign exchange swap;

(IX) a total return swap;

(X) an equity index swap;

(XI) an equity swap;

(XII) a debt index swap;

(XIII) a debt swap;

(XIV) a credit spread;

(XV) a credit default swap;

(XVI) a credit swap;

(XVII) a weather swap;

(XVIII) an energy swap;

(XIX) a metal swap;

(XX) an agricultural swap;

(XXI) an emissions swap; and

(XXII) a commodity swap;

(iv) that is an agreement, contract, or transaction that is, or in the future becomes, commonly known to the trade as a swap;

(v) including any security-based swap agreement which meets the definition of "swap agreement" as defined in section 206A of the Gramm-Leach-Bliley Act (15 U.S.C. 78c note) of which a material term is based on the price, yield, value, or volatility of any security or any group or index of securities, or any interest therein; or

(vi) that is any combination or permutation of, or option on, any agreement, contract, or transaction described in any of clauses (i) through (v).

A3

(B) Exclusions

The term "swap" does not include—

(i) any contract of sale of a commodity for future delivery (or option on such a contract), leverage contract authorized under section 23 of this title, security futures product, or agreement, contract, or transaction described in section 2(c)(2)(C)(i) of this title or section 2(c)(2)(D)(i) of this title;

(ii) any sale of a nonfinancial commodity or security for deferred shipment or delivery, so long as the transaction is intended to be physically settled;

(iii) any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities, including any interest therein or based on the value thereof, that is subject to—

(I) the Securities Act of 1933 (15 U.S.C. 77a et seq.); and

(II) the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.);

(iv) any put, call, straddle, option, or privilege relating to a foreign currency entered into on a national securities exchange registered pursuant to section 6(a) of the Securities Exchange Act of 1934 (15 U.S.C. 78f(a));

(v) any agreement, contract, or transaction providing for the purchase or sale of 1 or more securities on a fixed basis that is subject to—

(I) the Securities Act of 1933 (15 U.S.C. 77a et seq.); and

(II) the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.);

(vi) any agreement, contract, or transaction providing for the purchase or sale of 1 or more securities on a contingent basis that is subject to the Securities Act of 1933 (15 U.S.C. 77a et seq.) and the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.), unless the agreement, contract, or transaction predicates the purchase or sale on the occurrence of a bona fide contingency that might reasonably be expected to affect or be affected by the creditworthiness of a party other than a party to the agreement, contract, or transaction;

(vii) any note, bond, or evidence of indebtedness that is a security, as defined in section 2(a)(1) of the Securities Act of 1933 (15 U.S.C. 77b(a)(1));

(viii) any agreement, contract, or transaction that is—

A4

(I) based on a security; and

(II) entered into directly or through an underwriter (as defined in section 2(a)(11) of the Securities Act of 1933 (15 U.S.C. 77b(a)(11)) by the issuer of such security for the purposes of raising capital, unless the agreement, contract, or transaction is entered into to manage a risk associated with capital raising;

(ix) any agreement, contract, or transaction a counterparty of which is a Federal Reserve bank, the Federal Government, or a Federal agency that is expressly backed by the full faith and credit of the United States; and

(x) any security-based swap, other than a security-based swap as described in subparagraph (D).

(C) Rule of construction regarding master agreements

(i) In general

Except as provided in clause (ii), the term "swap" includes a master agreement that provides for an agreement, contract, or transaction that is a swap under subparagraph (A), together with each supplement to any master agreement, without regard to whether the master agreement contains an agreement, contract, or transaction that is not a swap pursuant to subparagraph (A).

(ii) Exception

For purposes of clause (i), the master agreement shall be considered to be a swap only with respect to each agreement, contract, or transaction covered by the master agreement that is a swap pursuant to subparagraph (A).

(D) Mixed swap

The term "security-based swap" includes any agreement, contract, or transaction that is as described in section 3(a)(68)(A) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(68)(A)) and also is based on the value of 1 or more interest or other rates, currencies, commodities, instruments of indebtedness, indices, quantitative measures, other financial or economic interest or property of any kind (other than a single security or a narrow-based security index), or the occurrence, non-occurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence (other than an event described in subparagraph (A)(iii)).

A5

(E) Treatment of foreign exchange swaps and forwards

(i) In general

Foreign exchange swaps and foreign exchange forwards shall be considered swaps under this paragraph unless the Secretary makes a written determination under section 1b of this title that either foreign exchange swaps or foreign exchange forwards or both—

(I) should be not be regulated as swaps under this chapter; and

(II) are not structured to evade the Dodd-Frank Wall Street Reform and Consumer Protection Act in violation of any rule promulgated by the Commission pursuant to section 721(c) of that Act.

(ii) Congressional notice; effectiveness

The Secretary shall submit any written determination under clause (i) to the appropriate committees of Congress, including the Committee on Agriculture, Nutrition, and Forestry of the Senate and the Committee on Agriculture of the House of Representatives.  Any such written determination by the Secretary shall not be effective until it is submitted to the appropriate committees of Congress.

(iii) Reporting

Notwithstanding a written determination by the Secretary under clause (i), all foreign exchange swaps and foreign exchange forwards shall be reported to either a swap data repository, or, if there is no swap data repository that would accept such swaps or forwards, to the Commission pursuant to section 6r of this title within such time period as the Commission may by rule or regulation prescribe.

(iv) Business standards

Notwithstanding a written determination by the Secretary pursuant to clause (i), any party to a foreign exchange swap or forward that is a swap dealer or major swap participant shall conform to the business conduct standards contained in section 6s(h) of this title.

(v) Secretary

For purposes of this subparagraph, the term "Secretary" means the Secretary of the Treasury.

(F) Exception for certain foreign exchange swaps and forwards

(i) Registered entities

A6

Any foreign exchange swap and any foreign exchange forward that is listed and traded on or subject to the rules of a designated contract market or a swap execution facility, or that is cleared by a derivatives clearing organization, shall not be exempt from any provision of this chapter or amendments made by the Wall Street Transparency and Accountability Act of 2010 prohibiting fraud or manipulation.

(ii) Retail transactions

Nothing in subparagraph (E) shall affect, or be construed to affect, the applicability of this chapter or the jurisdiction of the Commission with respect to agreements, contracts, or transactions in foreign currency pursuant to section 2(c)(2) of this title.

## 7 U.S.C. § 2(a)(1)(A)

The Commission shall have exclusive jurisdiction, except to the extent otherwise provided in the Wall Street Transparency and Accountability Act of 2010 (including an amendment made by that Act) and subparagraphs (C), (D), and (I) of this paragraph and subsections (c) and (f), with respect to accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an "option", "privilege", "indemnity", "bid", "offer", "put", "call", "advance guaranty", or "decline guaranty"), and transactions involving swaps or contracts of sale of a commodity for future delivery (including significant price discovery contracts), traded or executed on a contract market designated pursuant to section 7 of this title or a swap execution facility pursuant to section 7b-3 of this title or any other board of trade, exchange, or market, and transactions subject to regulation by the Commission pursuant to section 23 of this title. Except as hereinabove provided, nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred on the Securities and Exchange Commission or other regulatory authorities under the laws of the United States or of any State, or (II) restrict the Securities and Exchange Commission and such other authorities from carrying out their duties and responsibilities in accordance with such laws.  Nothing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State.

## 7 U.S.C. § 2(e)

It shall be unlawful for any person, other than an eligible contract participant, to enter into a swap unless the swap is entered into on, or subject to the rules of, a board of trade designated as a contract market under section 7 of this title.

**7 U.S.C. § 7a-2(c)(5)(C)**

(i) Event contracts

In connection with the listing of agreements, contracts, transactions, or swaps in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency (other than a change in the price, rate, value, or levels of a commodity described in section 1a(2)(i) of this title), by a designated contract market or swap execution facility, the Commission may determine that such agreements, contracts, or transactions are contrary to the public interest if the agreements, contracts, or transactions involve—

(I) activity that is unlawful under any Federal or State law;

(II) terrorism;

(III) assassination;

(IV) war;

(V) gaming; or

(VI) other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest.

(ii) Prohibition

No agreement, contract, or transaction determined by the Commission to be contrary to the public interest under clause (i) may be listed or made available for clearing or trading on or through a registered entity.

(iii) Swaps contracts

(I) In general

In connection with the listing of a swap for clearing by a derivatives clearing organization, the Commission shall determine, upon request or on its own motion, the initial eligibility, or the continuing qualification, of a derivatives clearing organization to clear such a swap under those criteria, conditions, or rules that the Commission, in its discretion, determines.

(II) Requirements

Any such criteria, conditions, or rules shall consider—

(aa) the financial integrity of the derivatives clearing organization; and

A8

> (bb) any other factors which the Commission determines may be appropriate.

(iv) Deadline

The Commission shall take final action under clauses (i) and (ii) in not later than 90 days from the commencement of its review unless the party seeking to offer the contract or swap agrees to an extension of this time limitation.

### 7 U.S.C. § 13a-2

(1) Whenever it shall appear to the attorney general of any State, the administrator of the securities laws of any State, or such other official as a State may designate, that the interests of the residents of that State have been, are being, or may be threatened or adversely affected because any person (other than a contract market, derivatives transaction execution facility, clearinghouse, floor broker, or floor trader) has engaged in, is engaging or is about to engage in, any act or practice constituting a violation of any provision of this chapter or any rule, regulation, or order of the Commission thereunder, the State may bring a suit in equity or an action at law on behalf of its residents to enjoin such act or practice, to enforce compliance with this chapter, or any rule, regulation, or order of the Commission thereunder, to obtain damages on behalf of their residents, or to obtain such further and other relief as the court may deem appropriate.

(2) The district courts of the United States, the United States courts of any territory, and the District Court of the United States for the District of Columbia, shall have jurisdiction of all suits in equity and actions at law brought under this section to enforce any liability or duty created by this chapter or any rule, regulation, or order of the Commission thereunder, or to obtain damages or other relief with respect thereto.  Upon proper application, such courts shall also have jurisdiction to issue writs of mandamus, or orders affording like relief, commanding the defendant to comply with the provisions of this chapter or any rule, regulation, or order of the Commission thereunder, including the requirement that the defendant take such action as is necessary to remove the danger of violation of this chapter or of any such rule, regulation, or order.  Upon a proper showing, a permanent or temporary injunction or restraining order shall be granted without bond.

(3) Immediately upon instituting any such suit or action, the State shall serve written notice thereof upon the Commission and provide the

A9

Commission with a copy of its complaint, and the Commission shall have the right to (A) intervene in the suit or action and, upon doing so, shall be heard on all matters arising therein, and (B) file petitions for appeal.

(4) Any suit or action brought under this section in a district court of the United States may be brought in the district wherein the defendant is found or is an inhabitant or transacts business or wherein the act or practice occurred, is occurring, or is about to occur, and process in such cases may be served in any district in which the defendant is an inhabitant or wherever the defendant may be found.

(5) For purposes of bringing any suit or action under this section, nothing in this chapter shall prevent the attorney general, the administrator of the State securities laws, or other duly authorized State officials from exercising the powers conferred on them by the laws of such State to conduct investigations or to administer oaths or affirmations or to compel the attendance of witnesses or the production of documentary and other evidence.

(6) For purposes of this section, "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, or any territory or possession of the United States.

(7) Nothing contained in this section shall prohibit an authorized State official from proceeding in State court on the basis of an alleged violation of any general civil or criminal antifraud statute of such State.

(8)

> (A) Nothing in this chapter shall prohibit an authorized State official from proceeding in a State court against any person registered under this chapter (other than a floor broker, floor trader, or registered futures association) for an alleged violation of any antifraud provision of this chapter or any antifraud rule, regulation, or order issued pursuant to the chapter.

> (B) The State shall give the Commission prior written notice of its intent to proceed before instituting a proceeding in State court as described in this subsection and shall furnish the Commission with a copy of its complaint immediately upon instituting any such proceeding.  The Commission shall have the right to (i) intervene in the proceeding and, upon doing so, shall be heard on all matters arising therein, and (ii) file a petition for appeal. The Commission or the defendant may remove such proceeding to the district court of the United States for the proper district by following the procedure for

A10

removal otherwise provided by law, except that the petition for removal shall be filed within sixty days after service of the summons and complaint upon the defendant.  The Commission shall have the right to appear as amicus curiae in any such proceeding.

**7 U.S.C. § 16(e)**

(1) Nothing in this chapter shall supersede or preempt—

(A) criminal prosecution under any Federal criminal statute;

(B) the application of any Federal or State statute (except as provided in paragraph (2)), including any rule or regulation thereunder, to any transaction in or involving any commodity, product, right, service, or interest—

(i) that is not conducted on or subject to the rules of a registered entity or exempt board of trade;

(ii) (except as otherwise specified by the Commission by rule or regulation) that is not conducted on or subject to the rules of any board of trade, exchange, or market located outside the United States, its territories or possessions; or

(iii) that is not subject to regulation by the Commission under section 6c or 23 of this title; or

(C) the application of any Federal or State statute, including any rule or regulation thereunder, to any person required to be registered or designated under this chapter who shall fail or refuse to obtain such registration or designation.

(2) This chapter shall supersede and preempt the application of any State or local law that prohibits or regulates gaming or the operation of bucket shops (other than antifraud provisions of general applicability) in the case of—

(A) an electronic trading facility excluded under section 2(e) of this title; and

(B) an agreement, contract, or transaction that is excluded from this chapter under section 2(c) or 2(f) of this title or sections 27 to 27f of this title, or exempted under section 6(c) of this title (regardless of whether any such agreement, contract, or transaction is otherwise subject to this chapter).

**Provisions from the Commodity Futures Modernization Act of 2000 (Pub L. No. 106-554, Appendix E, 114 Stat. 2763A-365)**

**Section 103 – 114 Stat. at 2763A-377-378**

Section 2 of the Commodity Exchange Act (7 U.S.C. 2, 2a, 3, 4, 4a) is further amended by adding at the end the following:

"(d) EXCLUDED DERIVATIVE TRANSACTIONS.—

"(1) IN GENERAL—Nothing in this Act (other than section 5b or 12(e)(2)(B)) governs or applies to an agreement, contract, or transaction in an excluded commodity if—

"(A) the agreement, contract, or transaction is entered into only between persons that are eligible contract participants at the time at which the persons enter into the agreement, contract, or transaction; and

"(B) the agreement, contract, or transaction is not executed or traded on a trading facility.

"(2) ELECTRONIC TRADING FACILITY EXCLUSION.—Nothing in this Act (other than section 5a (to the extent provided in section 5a(g)), 5b, 5d, or 12(e)(2)(B)) governs or applies to an agreement, contract, or transaction in an excluded commodity if—

"(A) the agreement, contract, or transaction is entered into on a principal-to-principal basis between parties trading for their own accounts or as described in section 1a(12)(B)(ii);

"(B) the agreement, contract, or transaction is entered into only between persons that are eligible contract participants described in subparagraph (A), (B)(ii), or (C) of section 1a(12)) at the time at which the persons enter into the agreement, contract, or transaction; and

"(C) the agreement, contract, or transaction is executed or traded on an electronic trading facility.".

**Provisions from the Dodd-Frank Act of 2010 (Pub. L. No. 111-203, 124 Stat. 1376):**

**Section 712(d)(1) – 124 Stat. at 1644**

IN GENERAL—Notwithstanding any other provision of this title and subsections (b) and (c), the Commodity Futures Trading Commission and the Securities and Exchange Commission, in consultation with the Board of

A12

Governors, shall further define the terms "swap", "security-based swap", "swap dealer", "security-based swap dealer", "major swap participant", "major security-based swap participant", "eligible contract participant", and "security-based swap agreement" in section 1a(47)(A)(v) of the Commodity Exchange Act (7 U.S.C. 1a(47)(A)(v)) and section 3(a)(78) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(78)).

**Provisions from Title 17 of the Code of Federal Regulations:**

**17 C.F.R. § 38.4**

(a) Request for Commission approval of rules and products.

(1) An applicant for designation, or a designated contract market, may request that the Commission approve under section 5c(c) of the Act, any or all of its rules and contract terms and conditions, and subsequent amendments thereto, prior to their implementation or, notwithstanding the provisions of section 5c(c)(4) of the Act, at any time thereafter, under the procedures of § 40.3 or § 40.5 of this chapter, as applicable.  A designated contract market may label a future, swap or options product in its rules as "Listed for trading pursuant to Commission approval," if the future, swap or options product and its terms or conditions have been approved by the Commission, and it may label as "Approved by the Commission" only those rules that have been so approved.

(2) Notwithstanding the timeline under §§ 40.3(c) and 40.5(c) of this chapter, the operating rules, and terms and conditions of futures, swaps and option products that have been submitted for Commission approval at the same time as an application for contract market designation or an application under § 38.3(b) of this part to reinstate the designation of a dormant designated contract market, as defined in § 40.1 of this chapter, or while one of the foregoing is pending, will be deemed approved by the Commission no earlier than when the facility is deemed to be designated or reinstated.

(b) Self-certification of rules and products.  Rules of a designated contract market and subsequent amendments thereto, including both operational rules and the terms or conditions of futures, swaps and option products listed for trading on the facility, not voluntarily submitted for prior Commission approval pursuant to paragraph (a) of this section, must be submitted to the Commission with a certification that the rule, rule amendment or futures, swap or options product complies with the Act or rules thereunder pursuant to the procedures of § 40.6 of this chapter, as

A13

applicable.  Provided, however, any rule or rule amendment that would, for a delivery month having open interest, materially change a term or condition of a swap or a contract for future delivery in an agricultural commodity enumerated in section 1a(9) of the Act, or of an option on such contract or commodity, must be submitted to the Commission prior to its implementation for review and approval under § 40-4 of this chapter.

(c) An applicant for designation, or a designated contract market, may request that the Commission consider under the provisions of section 15(b) of the Act any of the contract market's rules or policies, including both operational rules and the terms or conditions of products listed for trading.

## 17 C.F.R. § 38.5

(a) Requests for information.  Upon request by the Commission, a designated contract market must file with the Commission information related to its business as a designated contract market, including information relating to data entry and trade details, in the form and manner and within the time specified by the Commission in its request.

(b) Demonstration of compliance.  Upon request by the Commission, a designated contract market must file with the Commission a written demonstration, containing supporting data, information and documents, in the form and manner and within the time specified by the Commission, that the designated contract market is in compliance with one or more core principles as specified in the request, or that is requested by the Commission to show that the designated contract market satisfies its obligations under the Act.

(c) Equity interest transfers—

(1) Equity interest transfer notification.  A designated contract market shall file with the Commission a notification of each transaction that the designated contract market enters into involving the transfer of ten percent or more of the equity interest in the designated contract market.

(2) Timing of Notification.  The equity transfer notice described in paragraph (1) shall be filed electronically with the Secretary of the Commission at its Washington, DC headquarters at submissions@cftc.gov and the Division of Market Oversight at DMOSubmissions@cftc.gov, at the earliest possible time but in no event later than the open of business ten business days following the date upon which the designated contract market enters into a firm obligation to transfer the equity interest.

A14

(3) Rule filing.  Notwithstanding the foregoing, any aspect of an equity interest transfer described in paragraph (c)(1) of this section that necessitates the filing of a rule as defined in part 40 of this chapter shall comply with the requirements of 5c(c) of the Act and part 40 of this chapter, and all other applicable Commission regulations.

(d) Delegation of authority.  The Commission hereby delegates, until it orders otherwise, the authority set forth in paragraph (b) of this section to the Director of the Division of Market Oversight or such other employee or employees as the Director may designate from time to time.  The Director may submit to the Commission for its consideration any matter that has been delegated in this paragraph.  Nothing in this paragraph prohibits the Commission, at its election, from exercising the authority delegated in this paragraph.

## 17 C.F.R. § 40.2

(a) Submission requirements.  A designated contract market or a swap execution facility must comply with the submission requirements of this section prior to listing a product for trading that has not been approved under § 40.3.  A submission shall comply with the following conditions:

(1) The designated contract market or the swap execution facility has filed its submission electronically in a format and manner specified by the Commission;

(2) The Commission has received the submission by the open of business on the business day preceding the product's listing; and

(3) The submission includes:

(i) The information required by appendix D to this part;

(ii) A copy of the rules that set forth the contract's terms and conditions;

(iii) The intended listing date;

(iv) A certification by the designated contract market or the swap execution facility that the product to be listed complies with the Act and Commission regulations thereunder;

(v) A concise explanation and analysis that is complete with respect to the product's terms and conditions, the underlying commodity, and the product's compliance with applicable provisions of the Act, including core principles, and the

Commission's regulations thereunder.  This explanation and analysis shall either be accompanied by the documentation relied upon to establish the basis for compliance with applicable law, or incorporate information contained in such documentation, with appropriate citations to data sources;

(vi) A certification that the registered entity posted a notice of a pending product certification with the Commission and a copy of the submission, concurrent with the filing of a submission with the Commission, on the registered entity's website. Information that the registered entity seeks to keep confidential may be redacted from the documents published on the registered entity's website but must be republished consistent with any determination made pursuant to § 40.8(c)(4); and

(vii) A request for confidential treatment, if appropriate, as permitted under § 40.8.

(b) Additional information.  If requested by Commission staff, a registered entity shall provide any additional evidence, information or data that demonstrates that the contract meets, initially or on a continuing basis, the requirements of the Act or the Commission's regulations or policies thereunder.

(c) Stay.  The Commission may stay the listing of a contract pursuant to paragraph (a) of this section during the pendency of Commission proceedings for filing a false certification or during the pendency of a petition to alter or amend the contract terms and conditions pursuant to Section 8a(7) of the Act.  The decision to stay the listing of a contract in such circumstances shall not be delegable to any employee of the Commission.

(d) Class certification of swaps.

(1) A designated contract market or swap execution facility may list or facilitate trading in any swap or number of swaps based upon an "excluded commodity," as defined in section 1a(19)(i) of the Act, not including any security, security index, and currency other than the United States Dollar and a "major foreign currency," as defined in § 15.03(a) of this chapter, or an "excluded commodity," as defined in section 1a(19)(ii)-(iv) of the Act, provided the designated contract market or swap execution facility certifies, under paragraphs (a)(1) and (2) and (a)(3)(i), (iv), and (vi) of this section, the following:

A16

(i) Each particular swap within the certified class of swaps is based upon an excluded commodity specified in paragraph (d)(1) of this section;

(ii) Each particular swap within the certified class of swaps is based upon an excluded commodity with an identical pricing source, formula, procedure, and methodology for calculating reference prices and payment obligations;

(iii) The pricing source, formula, procedure, and methodology for calculating reference prices and payment obligations in each particular swap within the certified class of swaps is identical to a pricing source, formula, procedure, and methodology for calculating reference prices and payment obligations in a product previously submitted to the Commission and certified or approved pursuant to this section or § 40.3; and

(iv) Each particular swap within the certified class of swaps is based upon an excluded commodity involving an identical currency or identical currencies.

(2) The Commission may in its discretion require a registered entity to withdraw its certification under paragraph (d)(1) of this section and to submit each individual swap or certain individual swaps within the submission for Commission review pursuant to this section or § 40.3.

## 17 C.F.R. § 40.3

(a) Request for approval.  Pursuant to section 5c(c) of the Act, a designated contract market, a swap execution facility, or a derivatives clearing organization may request that the Commission approve a new product prior to listing the product for trading or accepting the product for clearing, or if a product was initially submitted under § 40.2 or § 39.5 of this chapter, subsequent to listing the product for trading or accepting the product for clearing.  A submission requesting approval shall:

(1) Be filed electronically in a format and manner specified by the Commission;

(2) Include the information required by appendix D to this part;

(3) Include a copy of the rules that set forth the contract's terms and conditions;

A17

(4) Include an explanation and analysis that is complete with respect to the product's terms and conditions, the underlying commodity, and the product's compliance with applicable provisions of the Act, including core principles, and the Commission's regulations thereunder.  This explanation and analysis shall either be accompanied by the documentation relied upon to establish the basis for compliance with the applicable law, or incorporate information contained in such documentation, with appropriate citations to data sources;

(5) Describe any agreements or contracts entered into with other parties that enable the registered entity to carry out its responsibilities;

(6) Include the certifications required in § 41.22 for product approval of a commodity that is a security future or a security futures product as defined in Sections 1a(44) or 1a(45) of the Act, respectively;

(7) Include, if appropriate, a request for confidential treatment as permitted under § 40.8;

(8) Include the filing fee required under appendix A to this part;

(9) Certify that the registered entity posted a notice of its request for Commission approval of the new product and a copy of the submission, concurrent with the filing of a submission with the Commission, on the registered entity's website.  Information the registered entity seeks to keep confidential may be redacted from the documents published on the registered entity's website but must be republished consistent with any determination made pursuant to § 40.8(c)(4); and

(10) Include, if requested by Commission staff, additional evidence, information or data demonstrating that the contract meets, initially or on a continuing basis, the requirements of the Act, or other requirement for designation or registration under the Act, or the Commission's regulations or policies thereunder.  The registered entity shall submit the requested information by the time specified by Commission staff, or at the conclusion of any extended period agreed to by Commission staff after timely receipt of a written request from the registered entity.

(b) Standard for review and approval.  The Commission shall approve a new product unless the terms and conditions of the product violate the Act or the Commission's regulations.

(c) Commission review.

(1) All products submitted for Commission approval pursuant to, and in compliance with the submission requirements of, paragraph (a) of this section shall be subject to review by the Commission for a period of 45 days after receipt by the Commission.

(2) The Commission may extend the initial 45-day review period for up to an additional 45 days if the product raises novel or complex issues that require additional time to analyze, the submission is incomplete or the requestor does not respond completely to Commission questions in a timely manner, in which case the Commission shall notify the submitting registered entity within the initial 45-day review period and shall briefly describe the nature of the specific issues for which additional time for review shall be required.

(3) At any time during its review of a proposed product under this section, the Commission may extend the review period for any period of time to which the registered entity agrees in writing.

(4) Any amendment or supplementation made by the registered entity to the submission will be treated as the filing of a new submission under this section and be subject to the initial 45-day review period in accordance with paragraph (c)(1) of this section, unless the amendment or supplementation is requested by the Commission or is made for correction of typographical errors, renumbering or other non-substantive revisions.

(5) If the review period described in paragraph (c)(1) of this section would end on a day that is not a business day, such review period shall instead be extended to end on the next business day.

(d) Commission Determination—

(1) Approval.  Any product submitted for Commission approval in compliance with paragraph (a) of this section shall be deemed approved by the Commission under section 5c(c) of the Act at the conclusion of the applicable review period under paragraph (c) of this section, unless the Commission issues a notice of non-approval to the registered entity under paragraph (d)(2) of this section within the applicable review period.

(2) Notice of non-approval.  Any time during its review under this section, the Commission may notify the registered entity that it will

not, or is unable to, approve the new product.  This notification will briefly specify the nature of the issues raised and the specific provision of the Act or the Commission's regulations, including the form or content requirements of this section, with which the new product is inconsistent or appears to be inconsistent with the Act or the Commission's regulations.

(e) Effect of non-approval.

(1) Notification to a registered entity under paragraph (d)(2) of this section of the Commission's determination not to approve a product does not prevent the entity from subsequently submitting a revised version of the product for Commission approval, or from submitting the product as initially proposed, in a supplemented submission; the revised or supplemented submission will be reviewed without prejudice.

(2) Notification to a registered entity under paragraph (d)(2) of this section of the Commission's determination not to approve a product shall be presumptive evidence that the entity may not truthfully certify under § 40.2 that the same, or substantially the same, product complies with the Act and the Commission's regulations thereunder.

**17 C.F.R. § 40.11**

(a) Prohibition.  A registered entity shall not list for trading or accept for clearing on or through the registered entity any of the following:

(1) An agreement, contract, transaction, or swap based upon an excluded commodity, as defined in Section 1a(19)(iv) of the Act, that involves, relates to, or references terrorism, assassination, war, gaming, or an activity that is unlawful under any State or Federal law; or

(2) An agreement, contract, transaction, or swap based upon an excluded commodity, as defined in Section 1a(19)(iv) of the Act, which involves, relates to, or references an activity that is similar to an activity enumerated in § 40.11(a)(1) of this part, and that the Commission determines, by rule or regulation, to be contrary to the public interest.

(b) [Reserved]

(c) 90-day review and approval of certain event contracts.  The Commission may determine, based upon a review of the terms or conditions of a submission under § 40.2 or § 40.3, that an agreement, contract,

A20

transaction, or swap based on an excluded commodity, as defined in Section 1a(19)(iv) of the Act, which may involve, relate to, or reference an activity enumerated in § 40.11(a)(1) or § 40.11(a)(2), be subject to a 90-day review. The 90-day review shall commence from the date the Commission notifies the registered entity of a potential violation of § 40.11(a).

(1) The Commission shall request that a registered entity suspend the listing or trading of any agreement, contract, transaction, or swap based on an excluded commodity, as defined in Section 1a(19)(iv) of the Act, which may involve, relate to, or reference an activity enumerated in § 40.11(a)(1) or § 40.11(a)(2), during the Commission's 90-day review period. The Commission shall post on the Web site a notification of the intent to carry out a 90-day review.

(2) Final determination. The Commission shall issue an order approving or disapproving an agreement, contract, transaction, or swap that is subject to a 90-day review under § 40.11(c) not later than 90 days subsequent to the date that the Commission commences review, or if applicable, at the conclusion of such extended period agreed to or requested by the registered entity.

A21

**ADDENDUM B:**

**State Gambling and Bucket-Shop Laws Regulating Futures Before the Commodity Exchange Act's Enactment in 1936**

**ALABAMA**

- "If any person, corporation, or other association of persons … shall establish or open an office or other place of business in this state for the purpose of carrying on or engaging in any business of making contracts to sell and deliver any cotton, Indian corn, wheat, rye, oats, tobacco, meal, lard, bacon, salt pork, salt fish, beef cattle, sugar, coffee, stocks, bonds, or choses … when … **it is not intended by the parties thereto that the articles or things so agreed to be sold and delivered shall be actually delivered or the value thereof paid,** but it is intended and understood by then, that money or other thing of value shall be paid to the one party by the other, … he shall be guilty of a misdemeanor." Ala. Code § 3579 (1928).

**ARKANSAS**

- "[T]he buying or selling or otherwise [dealing] in what is known as futures, either in cotton, grain or anything whatsoever, with a view to profit, is hereby declared to be **gambling**." Act of March 30, 1883, 1883 Ark. Acts 29.

**CALIFORNIA**

- Outlawing " '[b]ucketing' or 'bucket shopping,' " which "shall mean," in relevant part, "[t]he making of or offering to make any contract respecting the purchase or sale of any securities or commodities, wherein both parties thereto intend, or such keeper intends, that such contract shall be, or may be, terminated, closed, or settled according to or upon the basis of the public market quotations of prices made on any board of trade or exchange upon which said securities or commodities are dealt in and **without a bona fide purchase or sale of the same**." Cal. Gen. L., tit. 75, § 2 (1923).

**COLORADO**

- Outlawing bucket-shop transactions "respecting the purchase or sale … of any … commodities, … intending that such contract or other transaction shall be terminated, closed or settled according to, or upon the basis of the public market quotations of or prices made on any board of trade or exchange or market upon which such commodities … are dealt in, **and without intending a bona fide purchase or sale of the same**." Colo. L. ch. 57, § 1(a) (1931).

- "All contracts, agreements, trades or transactions of the nature described in Section 1 of this Act [on bucket shops]," including those

B1

"respecting the purchase or sale" of "commodities, not intending the actual bona fide receipt or delivery of any such ... commodities, but intending a settlement of such contract or other transaction based upon the difference in such public market quotations of or such prices at which said ... commodities are, or are asserted to be, bought or sold," "are hereby declared **gambling** and criminal Acts and absolutely null and void."  Colo. L., ch. 57, §§ 1(c), 5 (1931).

## CONNECTICUT

- Outlawing bucket shops, which are defined as, in relevant part, "office[s], store[s] or other place[s] wherein the proprietor or keeper thereof ... shall conduct the business of making or offering to make contracts, agreements, trades or transactions respecting the purchase or sale or purchase and sale of any ... grain, provisions or other commodity ..., wherein both parties thereto, or such proprietor or keeper, shall contemplate or intend that such contracts, agreements, trades or transactions shall be or may be closed, adjusted or settled according to, or upon the basis of, the public market quotations of prices made on any board of trade or exchange upon which the commodities ... referred to in such contracts, agreements, trades or transactions are dealt in, and **without a bona fide transaction on such board of trade or exchange**."  Conn. Gen. Stat. §§ 6345-6346 (1930).

## DISTRICT OF COLUMBIA

- Outlawing "'[b]ucketing' or 'bucket-shopping,'" which "shall mean," in relevant part, "[t]he making of or offering to make any contract respecting the purchase or sale ... of any ... commodities wherein both parties thereto intend, or such keeper intends, that such contract shall be, or may be, terminated, closed, or settled according to or upon the basis of the public market quotations of prices made on any board of trade or exchange upon which said ... commodities are dealt in and **without a bona fide purchase or sale of the same**." D.C. Code tit. 6, §§ 158-159 (1929).

## FLORIDA

- "[D]eclaring unlawful all the transactions conducted in and through a bucket shop," which is defined "to be an office, store, or other place wherein the proprietor or keeper thereof ... conducts the business of making or offering to make contracts, agreements, trades or transactions respecting the purchase or sale or purchase and sale of

B2

any … cotton, grain, provisions or other commodities … wherein both parties thereto, or said proprietor or keeper contemplated or intended that the contracts, agreements, trades or transactions shall be or may be closed, adjusted, or settled according to or on the basis of the market quotations or prices made on any board of trade or exchange upon which the commodities … referred to in such contracts, agreements, trades or transactions are dealt in and **without a bona fide transaction on such board of trade or exchange**.”  Fla. Comp. L. § 7899 (1927).

**GEORGIA**

- Futures contracts are valid when they are “(1) made in accordance with the rules of any board of trade, exchange, or similar institution, and (2) actually executed on the floor of such board of trade, exchange, or similar institution, and performed or discharged according to the rules thereof, and (3) when such contracts of sale are placed with or through a regular member in good standing of a cotton exchange, grain exchange, board of trade, or similar institution, organized under the laws of the State of Georgia or any other State.” Ga. Code Ann. § 4264(2) (1926 Code, 1930 Supp.).

- Outlawing bucket shops, which are “defined to be and mean any place of business where” persons make “any contract of sale for future delivery of cotton, grain, stocks, or other commodities, **where it is not the bona fide intention of parties that the things mentioned therein are to be delivered**, but which is to be settled according to or upon the basis of the public market quotations or prices made on any board of trade, exchange, or other similar institution, **without any actual bona fide execution and the carrying out of such contract upon the floor of such exchange, board of trade, or similar institution**, in accordance with the rules thereof.”  Ga. Code Ann. §§ 4264(3)-(4) (1926 Code, 1930 Supp.).

**ILLINOIS**

- “Whoever contracts to have or give to himself or another the option to sell or buy, at a future time, any grain, or other commodity … shall be fined not less than $10 nor more than $1,000, or confined in the county jail not exceeding one year, or both; and all contracts made in violation of this section shall be considered **gambling contracts,** and shall be void.”  Ill. Rev. Stat. Crim. Code § 130 (1874).

- Outlawing "any bucket-shop, office, store or other place wherein is conducted or permitted the pretended buying or selling of ... petroleum, cotton, grain, provisions or other produce ... **without any intention of receiving and paying for the property so bought, or of delivering the property so sold**."  Ill. Rev. Stat. ch. 38, §§ 317-318 (1931).

**INDIANA**

- Outlawing bucket shops, which are defined, in relevant part, "to be ... office[s], store[s] or other place[s] wherein the proprietor or keeper thereof ... conducts the business of making, or offering to make, contracts, agreements, trades or transactions respecting the purchase or sale, or purchase and sale, of any ... grain, provisions, or other commodity ... wherein both parties thereto, or said proprietor or keeper, contemplate or intend that such contracts, agreements, trades or transactions shall be, or may be closed, adjusted or settled according to, or upon the basis of, the public market quotations of prices made on any board of trade or exchange, upon which the commodities ... referred to in such contracts, agreements, trades or transactions are dealt in, and **without a bona fide transaction on such board of trade or exchange**."  Act of April 10, 1907 §§ 3837-3838.

**IOWA**

- Outlawing bucket shops, which are defined to include "office[s], store[s], or other place[s] wherein the proprietor or keeper thereof ... conducts the business of making, or offering to make, contracts, agreements, trades, or transactions respecting the purchase or sale, or purchase and sale, of any ... grain, provisions, cotton, or other commodity..." "[w]herein both parties thereto, or said proprietor or keeper, contemplate or intend that such contracts, agreements, trades, or transactions shall be, or may be closed, adjusted, or settled according to, or upon the basis of, the public market quotations of prices made on any board of trade or exchange, upon which the commodities ... referred to in such contracts, agreements, trades, or transactions are dealt in by competitive buying and selling, and **without a bona fide transaction on such board of trade or exchange**."  Iowa Code §§ 9895, 9899, 9901 (1931).

B4

**KANSAS**

- Outlawing bucket shops, which are defined, in relevant part, "to be … office[s], store[s] or other place[s] wherein the proprietor or keeper thereof … conducts the business of making or offering to make contracts, agreements, trades or transactions respecting the purchase or sale, or purchase and sale, of any … grain, provisions, cotton or other commodity … wherein both parties thereto, or said proprietor or keeper, contemplate or intend that the contracts, agreements, trades or transactions shall be, or may be, closed, adjusted or settled according to or upon the basis of the market quotations or price made on any board of trade or exchange where there is competitive buying and selling, and upon which the commodities … referred to in such contracts, agreements, trades or transactions are dealt in, and **without a bona fide transaction on such board of trade or exchange**." Kan. Rev. Stat. Ann., ch. 50, § 122 (1923) (citing Kan. L., ch. 121 § 2 (1909)).

- "All pretended purchases and sales or contracts and agreements for the pretended purchase and sale of the commodities aforesaid, in manner aforesaid, wherein there is, in fact, no actual purchase and sale or sale and purchase of such commodities for or on account of the party or parties thereto, are hereby declared **gambling** and criminal acts." Kan. Rev. Stat. Ann., ch. 50, § 123 (1923) (citing Kan. L., ch. 121 § 2 (1909)).

**MAINE**

- Outlawing bucket shops, which are defined, in relevant part, "to be … office[s], store[s], or other place[s] wherein the proprietor or keeper thereof … conducts the business of making, or offering to make, contracts, agreements, trades, or transactions respecting the purchase or sale of any … grain, provisions, or other commodity … wherein both parties thereto, or said proprietor or keeper, contemplate or intend that such contracts, agreements, trades, or transactions shall be, or may be closed, adjusted, or settled according to, or upon the basis of, the public market quotations of prices made on any board of trade or exchange, upon which the commodities … referred to in such contracts, agreements, trades, or transactions are dealt in, and **without a bona fide transaction on such board of trade or exchange**." Me. Rev. Stat., ch. 136, §§ 14-15 (1930).

B5

**MASSACHUSETTS**

- Outlawing bucket shops, which are defined to include places where "[t]he making of, or offering to make, any contract respecting the purchase or sale ... of any ... commodities, wherein both parties thereto intend, or such keeper intends, that such contract shall be, or may be, terminated, closed or settled according to, or upon the basis of, the public market quotations of prices made on any board of trade or exchange upon which said ... commodities are dealt in, and **without a bona fide purchase or sale of the same**" takes place. Mass. Gen. L., ch. 271, §§ 35-36 (1921).

**MICHIGAN**

- Outlawing bucket shops, which are defined, in relevant part, "to be ... office[s], store[s] or other place[s] wherein the proprietor or keeper thereof ... conducts the business of making or offering to make contracts, agreements, trades or transactions respecting the purchase or sale, or purchase and sale of any ... grains, provisions or other commodity ... wherein both parties thereto, or said proprietor or keeper contemplated or intended that the contracts, agreements, trades or transactions shall be, or may be closed, adjusted or settled according to or upon the basis of the market quotations or price made on any board of trade or exchange, upon which the commodities ... referred to in such contracts, agreements, trades or transactions are dealt in, and **without a bona fide transaction on such board of trade or exchange**." Mich. Acts, no. 328 §§ 126-128 (1931).

- The "pretended buying or selling of ... petroleum, cotton, grain, provisions or other produce, ... without any intention of receiving and paying for the property so bought or of delivering the property so sold" is "hereby declared **gambling** and [a] criminal act[]." Mich. Acts, no. 328 § 311 (1931).

**MINNESOTA**

- Outlawing bucket shops, which are defined, in relevant part, to be "office[s], store[s] or other place[s] wherein the proprietor or keeper thereof ... conducts the business of making, or offering to make, contracts, agreements, trades or transactions respecting the purchase or sale, or purchase and sale, of any ... grain, provisions, or other commodity ... wherein both parties thereto, or said proprietor or keeper, contemplates or intends that such contracts, agreement, trades or transactions, shall be, or may be, closed, adjusted or settled,

according to, or upon the basis of the public market quotations, of prices made on any board of trade or exchange, upon which the commodities ... referred to in said contracts, agreements, trades or transactions are dealt in, and **without a bona fide transaction on such board of trade or exchange**.”  Minn. Stat. §§ 10488-10489 (1927).

**MISSISSIPPI**

- As “**[g]ambling [c]ontracts**,” “contract[s] for the purchase or sale of a commodity of any kind, to be delivered at a future date, the parties not intending that the commodity is to be actually delivered in kind and the price paid, shall not be enforced by any court; nor shall any contract of the kind commonly called ‘futures’ be enforced ....” Miss. Code Ann., ch. 31, § 2034 (1927) (citing 1882 Miss. Laws 140).

**MISSOURI**

- Outlawing bucket shops, which are defined as “place[s] wherein the person carrying on the bucket shop, then and there, either as principal or agent, pretends to buy or sell, or goes through the form of buying or selling, to or for any other person or persons, ... petroleum, cotton, grain, provisions and other commodities, or any one or more of the same, at prices fixed or pretended to be fixed by trades or transactions made or offered to be made in same on boards of exchange or otherwise, but **wherein there is in fact no actual purchase and sale, or sale and purchase of such commodity for or on account of the party or parties thereto**.”  Mo. Rev. Stat. §§ 4316-4318 (1929) (citing Mo. Rev. Stat. § 3565 (1919)).

- “All pretended purchases and sales or contracts and agreements for the pretended purchase and sale of the commodities aforesaid, in manner aforesaid, wherein there is, in fact, no actual purchase and sale or sale and purchase of such commodities for or on account of the party or parties thereto, are hereby declared **gambling** and criminal acts.”  Mo. Rev. Stat. § 4318 (1929) (citing Mo. Rev. Stat. § 3566 (1919)).

**NEBRASKA**

- “All pretended purchases and sales or contracts and agreements for the pretended purchase and sale of the commodities aforesaid, in manner aforesaid, where there is, in fact, no actual purchase and sale or sale and purchase of such commodities for or on account of the

B7

party or parties thereto, are hereby declared **gambling** and criminal acts." Neb. Comp. Stat. § 9813 (1922) (citing Neb. Rev. Stat. § 8817 (1913)).

- Outlawing bucket shops, which are defined, in relevant part, to be "office[s], store[s], **board-of-trade room[s]**, or other place[s] wherein the proprietor or keeper thereof ... conducts the business of making or offering to make contracts, agreements, trades or transactions respecting the purchase or purchase and sale, of any ... grains, provisions, cotton or other commodity ... wherein said proprietor or keeper or patron contemplates or intends that the contracts, agreements, trades or transactions shall be or may be, closed, adjusted or settled according to or upon the basis of the market quotations or prices made on any board of trade or exchange where there is competitive buying and selling, and upon which the commodities ... referred to in such contracts, agreements, trades or transactions are dealt in, and **without a bona fide transaction on such board-of-trade**." Neb. Comp. Stat. §§ 28-955, 28-959 (1929).

**NEW HAMPSHIRE**

- Considered a form of "**[g]ambling**," "[n]o person or corporation shall keep, or cause to be kept, an office, store, or other place in which is conducted or permitted the pretended buying or selling of ... petroleum, cotton, grain, provisions, pork or other produce... without any intention of receiving and paying for the property so bought, or of delivering the property so sold, or in which is conducted or permitted the pretended buying or selling of such property on margins, or when the party buying, or offering to buy, such property, does not intend actually to receive the same if purchased, or deliver it if sold." N.H. Pub. L., ch. 384, § 23 (1925).

**NEW YORK**

- Outlawing bucket shops, which are defined to include places where a person "[m]ake[s] or offer[s] to make, or assist[s] in making or offering to make any contract respecting the purchase or sale ... of any ... commodities ... intending that such contract shall be terminated, closed or settled according to, or upon the basis of the public market quotations of prices made on any board of trade or exchange upon which such commodities ... are dealt in, and **without intending a bona fide purchase or sale of the same**." N.Y. Penal Law § 390 (1909).

**NORTH CAROLINA**

- "The test of the validity of a contract for 'future' which this section requires is the 'intention not to actually deliver' the articles bought or sold for future delivery.  No matter how explicit the words in any contract which may require a delivery, if in fact there is no intention to deliver, but the real understanding is that on the stipulated date the losing party shall pay to the other the difference between the market price and the contract price, this is a **gambling contract**." Ed.'s Note, N.C. Code Ann. § 2144 (1931).

**NORTH DAKOTA**

- Bucket shops, considered a "place for **gaming**," are "unlawful" where they are used for "the pretended buying or selling of grain, pork, lard or any mercantile or agricultural products on margins, without any intention of future delivery."  N.D. Comp. L. Ann. § 9699 (1913).

**OHIO**

- "[I]t shall be unlawful for any corporation, association, chamber of commerce, **board of trade**, copartnership or person to keep or cause to be kept within this state any bucket shop, office or other place wherein is conducted or permitted the pretended buying or selling of … petroleum, cotton, grain, provisions or other produce … **without any intention of receiving and paying for the property so bought, or of delivering the property so sold**." Ohio Gen. Code § 6934a-1 (1902).

- It is unlawful for a person to use a building for a "'bucket shop' or grain **gambling**."  Ohio Gen. Code § 6934a-5 (1902).

**OKLAHOMA**

- "[A]ll contracts of sales for future delivery of cotton, grain, stocks or other commodities" that are "(1) made in accordance with the rules of any board of trade, exchange or similar institution where such contracts of sale are executed and (2) actually executed on the floor of such board of trade, exchange or similar institution and performed or discharged according to the rules thereof; and (3) when such contracts of sale are placed with or through a regular member in good standing of a cotton, exchange, grain exchange, board of trade, or similar institution organized under the laws of the State of Oklahoma or any other State shall be, and they are hereby declared to be valid

B9

and enforceable in the courts of this State according to their terms." Okla. Comp. Stat. Ann. § 3883 (1921).

- Prohibiting bucket shops, which are "defined to be and mean any place of business wherein are made" "contract[s] of sale for the future delivery of cotton, grain, stocks or other commodities, which is to be settled according to or upon the basis of the public market quotations or prices made on any board of trade, exchange or similar institutions, upon which contracts of sale for future delivery are executed and dealt in **without any actual bonafide execution and the carrying out or discharge of such contracts upon the floor of such exchange, board of trade, or similar institution in accordance with the rules thereof**." Okla. Comp. Stat. Ann. §§ 3885-3888 (1921).

**OREGON**

- Outlawing when a person, "as broker," "[m]ake[s] or offer[s] to make, or assist[s] in making or offering to make any contract respecting the purchase or sale … of any … commodities, intending that such contract shall be terminated, closed or settled according to, or upon the basis of the public market quotations of or prices made on any board of trade or exchange or market upon which such commodities … are dealt in, and **without intending a bona fide purchase or sale of the same**." Ore. L., ch. 395, § 2 (1931).

**PENNSYLVANIA**

- Outlawing bucket shops, which are defined to include "an office, store, or other place, wherein the proprietor or keeper thereof … conducts the business of making, or offering to make, contracts, agreements, trades, or transactions respecting the purchase or sale, or purchase and sale, of any … grains, provisions, or other commodity … wherein both parties thereto, or said proprietor or keeper, contemplate or intend that such contracts, agreements, trades, or transactions shall be or may be closed, adjusted, or settled according to, or upon the basis of, the public market quotations of prices, made on any board of trade or exchange upon which the commodities … referred to in such contracts, agreements, trades, or transactions, are dealt in, and **without a bona fide transaction on such board of trade or exchange**." Dig. Pa. Stat. L. § 2413 (1920) (citing Act of June 1, 1907).

- "All contracts, agreements, trades, or transactions of the nature described in section one of this act [on bucket shops] are hereby declared **gambling**, and criminal acts, and absolutely null and void." Dig. Pa. Stat. L. § 2418 (1920) (citing Act of June 1, 1907).

### RHODE ISLAND

- Outlawing bucket-shopping, which includes "[t]he making of or offering to make any contract respecting the purchase or sale ... of any ... commodities, wherein both parties thereto intend, or such keeper intends, that such contract shall be, or may be, terminated, closed, or settled according to or upon the basis of the public market quotations of prices made on any board of trade or exchange upon which said securities or commodities are dealt in, and **without a bona fide purchase or sale of the same**." R.I. Gen. L., ch. 406, § 1 (1923) (citing R.I. Gen. L., ch. 353 (1909)).

### SOUTH CAROLINA

- "[A]ll contracts of sale for future delivery of cotton, grain, stocks, or other commodities, (1) made in accordance with the rules of any board of trade, exchange, or similar institution, and (2) actually executed on the floor of such board of trade, exchange or similar institution, and performed or discharged according to the rules thereof, and (3) when such contracts of sale are placed with or through a regular member in good standing of a cotton exchange, grain exchange, board of trade, or similar institution, organized under the laws of the State of South Carolina, or any other State, shall be and they hereby are declared to be valid and enforceable in the Courts of this State, according to their terms." S.C. Acts, no. 711 § 2 (1928).

- Bucket shops are unlawful; "[a]ny contract of sale for future delivery of cotton, grain, stocks, or other commodities **where it is not the bona *fide* intention of parties that the things mentioned therein are to be delivered** but which is to be settled according to or upon the basis of the public market quotations or prices made on any board of trade, exchange, or other similar institution, **without any actual bona *fide* execution and the carrying out of such contract upon the floor of such exchange, board of trade, or similar institution, in accordance with the rules thereof**, shall be null and void and unenforceable in any Court of this State, and no action shall be maintainable thereon at the suit of any party." S.C. Acts, no. 711 §§ 3-4 (1928).

B11

**SOUTH DAKOTA**

- Bucket shops, as a form of "**[g]ambling in [f]utures**," are unlawful where they are used for "the pretended buying or selling of grain, pork, lard or any mercantile, mining or agricultural products or corporation stocks, on margins, without any intention of future delivery, whether such pretended contracts are to be performed within or without the state." S.D. Comp. L. § 3925 (1929).

**TENNESSEE**

- "[H]ereafter any sale, contract or agreement for the sale of … grain, cotton or other produce, property, commodity, article or thing, for future delivery, where either of the contracting parties, buyer or seller, in dealing simply for the margin, or on the prospective rise or fall in the price of the article or thing sold, and where either of the said contracting parties have had no intention or purpose of making actual delivery or receiving the property or thing in specie, shall be deemed and is hereby declared **gambling**." Act of March 30, 1883, 1883 Tenn. Pub. Acts 331.

**VERMONT**

- As a form of "**[g]ambling**," a bucket shop is unlawful where it is used for "the pretended buying or selling of … petroleum, cotton, grain, provisions, pork or other produce … **without any intention of receiving and paying for the property so bought, or of delivering the property so sold**." Vt. Gen. L. § 7081 (1917).

**VIRGINIA**

- Outlawing "bucket-shopping," which includes "[t]he making of, or offering to make, any contract respecting the purchase or sale … of any … commodities wherein both parties thereto intend, or such keeper intends, that such contract shall be, or may be, terminated, closed or settled according to, or upon the basis of, the public market quotations of prices made on any board of trade or exchange, upon which said … commodities are dealt in, and **without a bona fide purchase or sale of the same**." Va. Code Ann. §§ 4714-4715 (1924).

**WASHINGTON**

- Outlawing bucket shops, which are "defined to be shed[s], tent[s], tenement[s], booth[s], building[s], float[s] or vessel[s], or any part

thereof, wherein may be made contracts respecting the purchase or sale … of any commodities … wherein both parties, intend that such contract shall or may be terminated, closed and settled" **(1) "[u]pon the basis of the market prices quoted or made on any board of trade or exchange upon which such commodities** … **may be dealt in," (2) "[w]hen the market prices for such commodities … shall reach a certain figure in any such board of trade or exchange,' or (3) "[o]n the basis of the difference in the market prices at which said commodities … are, or purport to be, bought and sold."** Wash. Code § 8932 (1919).

## WEST VIRGINIA

- "If any person shall carry on in this State what is commonly known as a bucket shop, or act as agent for any person, firm or corporation carrying on such business, or engage in transactions for the purchase or sale for others of grain, provisions, … or other property wherein the parties thereto or the broker intend that such transaction shall be settled according to the public market quotations on any board of trade or exchange, or intend that such transaction may be deemed terminated when such public market quotations shall reach a certain figure, or intend that such property shall be resold before or at the time fixed in such transaction for the delivery of such property and that the difference between the contract price and the market price thereof shall be paid or received **without the prior receipt or delivery of such property under the former sale**, he shall be guilty of a felony, and, upon conviction thereof, shall be confined in the penitentiary not less than two nor more than five years."  W. Va. Code, ch. 61, art. 10, § 18 (1930).

## WISCONSIN

- Outlawing bucket shops, which are "defined to be an office, store or other place wherein the proprietor or keeper thereof … conducts the business of making, or offering to make, contracts, agreements, trades or transactions respecting the purchase or sale, or purchase and sale, of any … grains, provisions or other commodity … wherein both parties thereto, or said proprietor or keeper, contemplate or intend that such contracts, agreements, trades or transactions shall be, or may be, closed, adjusted or settled according to, or upon the basis of, the public market quotations of prices made on any board of trade or exchange, upon which the commodities … referred to in such

B13

contract, agreements, trades or transactions are dealt in, and **without a bona fide transaction on such board of trade or exchange**.” Wis. Stat. §§ 348.175-348.178 (1929).

**WYOMING**

- It is “unlawful for any corporation, association, co-partnership or person to keep or cause to be kept within this state any bucket-shop, office, store or other place wherein is conducted or permitted the pretended buying or selling of the shares of stocks or bonds of any corporation, or petroleum … **without any intention of receiving and paying for the property so bought, or of delivering the property so sold** or wherein is conducted or permitted the pretended buying or selling of such property on margins.” Wyo. Rev. Stat. Ann. § 32-924 (1931).