No. 26-3196

# United States Court of Appeals for the Sixth Circuit

KALSHIEX, LLC,

Plaintiff-Appellant;

v.

MATTHEW T. SCHULER, THOMAS J. STICKRATH; SHEETAL BAJORIA; SCOTT P. BORGEMENKE; KEITH CHENEY; PENELOPE R. CUNNINGHAM; CHRISTOPHER SMITHERMAN; TRIFFON CALLOS; OHIO CASINO CONTROL COMMISSION; DAVE YOST, OHIO ATTORNEY GENERAL,

Defendants-Appellees.

On Appeal from the United States District Court
for the Southern District of Ohio,
No. 2:25-cv-1165 (Morrison, C.J.)

**AMICUS BRIEF OF U.S. COMMODITY FUTURES TRADING COMMISSION IN SUPPPORT OF APPELLANT AND IN SUPPORT OF REVERSAL**

TYLER S. BADGLEY
GENERAL COUNSEL
M. JORDAN MINOT
DEPUTY GENERAL COUNSEL
HENRY J. DICKMAN
SENIOR ASSISTANT GENERAL COUNSEL
ANNE STUKES
SENIOR ASSISTANT GENERAL COUNSEL

**U.S. COMMODITY FUTURES TRADING COMMISSION**
1155 21st Street, N.W.
Washington, DC 20581
(202) 418-5607
hdickman@cftc.gov

May 12, 2026

# TABLE OF CONTENTS

IDENTITY AND INTEREST OF AMICUS CURIAE ...............................................1

BACKGROUND ..................................................................................................3

I.    The CEA promotes robust commodities markets under the Commission's exclusive jurisdiction. ............................................................................3

    A. Early commodities trading............................................................................3

    B. Congress gave the Commission "exclusive" jurisdiction over futures trading, including swaps ...............................................................................5

II.    Event contracts have long traded subject to Commission oversight ................7

ARGUMENT ......................................................................................................9

I.    Event contracts traded on CFTC-regulated markets are swaps. ......................9

    A. The plain language of the CEA defines "swaps" to include event contracts............................................................................................9

    B. The district court's atextual reasoning should be rejected.........................14

II.    The CEA preempts state law as applied to event contracts on CFTC-regulated markets .......................................................................17

    A. The CEA expressly preempts state regulation of commodity derivatives transactions ............................................................................17

    B. The CEA occupies the field of regulating trading on a DCM. ...................21

    C. State law is conflict preempted by the CEA ..............................................23

III.    Subjecting derivatives listed on a CFTC-registered DCMs to state regulation would have destabilizing effects .....................................................26

CONCLUSION ..................................................................................................28

i

**TABLE OF AUTHORITIES**

<u>Cases</u>

*Alabama Power Co. v. Costle*,
636 F.2d 323 (D.C. Cir. 1979)............................................................................12

*American Agriculture Movement, Inc. v. Board of Trade of Chicago*,
977 F.2d 1147 (7th Cir. 1992) ............................................................................25

*Arizona v. United States*,
567 U.S. 387 (2012)......................................................................................17, 21

*Atlantic Richfield Co. v. Christian*,
590 U.S. 1 (2020)................................................................................................20

*Board of Trade of Chicago v. Christie Grain & Stock Co.*,
198 U.S. 236 (1905)..............................................................................................3

*Carson v. Milwaukee Produce Co.*,
113 N.W. 393 (Wis. 1907) ...................................................................................4

*Chamber of Commerce of United States v. Whiting*,
563 U.S. 582 (2011) ...........................................................................................17

*Churchill Downs Tech. Initiatives Co. v. Michigan Gaming Control Board*,
162 F.4th 631 (6th Cir. 2025).......................................................................21, 23

*Cohn v. Brinson*,
73 So. 59 (Miss. 1916)..........................................................................................4

*Cothran v. Ellis*,
16 N.E. 646 (Ill. 1888) .........................................................................................4

*Cunningham v. National Bank of Augusta*,
71 Ga. 400 (1883) ................................................................................................4

*Curran v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
622 F.2d 216 (6th Cir. 1980)..............................................................................18

*FTC v. Ken Roberts Co.*,
276 F.3d 583 (D.C. Cir. 2001).........................................................................6, 22

*Hughes v. Talen Energy Marketing, LLC*,
578 U.S. 150 (2016)................................................................................17

*KalshiEX LLC v. CFTC*,
119 F.4th 58 (D.C. Cir. 2024)................................................................12

*KalshiEX, LLC v. Flaherty*,
172 F.4th 220 (3d Cir. 2026) ........................................................*passim*

*KalshiEX LLC v. Johnson*,
__ F. Supp. 3d __, 2026 WL 1223373 (D. Ariz. May 5, 2026) ..........11, 21, 24, 25

*Kalshiex LLC v. Orgel*,
2026 WL 474869 (M.D. Tenn. Feb. 19, 2026) ...................................11, 12, 22, 24

*Kansas v. Garcia*,
589 U.S. 191 (2020)................................................................................21

*Leist v. Simplot*,
638 F.2d 283 (2d Cir. 1980) ...................................................2, 5, 18, 23

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
456 U.S. 353 (1982)................................................................1, 3, 5, 18, 27

*Merrill Lynch International v. XL Capital Assurance Inc.*,
564 F. Supp. 2d 298 (S.D.N.Y. 2008) ..................................................20

*Rice v. Board of Trade of City of Chicago*,
331 U.S. 247 (1947)................................................................................6

*Rumsey v. Berry*,
65 Me. 570 (1876).................................................................................4

*Taniguchi v. Kan Pacific Saipan, Ltd.*,
566 U.S. 560 (2012)...............................................................................10

*Union Pacific Railroad Co. v. Brotherhood of Locomotive Engineers &
Trainmen General Committee of Adjustment, Central Region*,
558 U.S. 67, 71 (2009)............................................................................26

*United States v. Phillips*,
155 F.4th 102 (2d Cir. 2025)...................................................................9

iii

*United States v. Phillips*,
  54 F.4th 374 (6th Cir. 2022)................................................................16

*United States v. Wilkinson*,
  986 F.3d 740 (7th Cir. 2021) ..............................................................15

Statutes

7 U.S.C. §§ 1-26, CEA §§ 1-23 ..............................................................1

7 U.S.C. § 1a(19), CEA § 1a(19) .........................................................15

7 U.S.C. § 1a(47)(A), CEA § 1a(47)(A).........................................*passim*

7 U.S.C. § 2(a)(1), CEA § 2(a)(1).................................................*passim*

7 U.S.C. § 5(b), CEA § 3(b)...................................................................3

7 U.S.C. § 7a-2(c)(5)(C), CEA § 5c(c)(5)(C) .................7, 14, 15, 25, 26

7 U.S.C. § 13a-2, CEA § 6d.................................................................19

7 U.S.C. § 16(e)(2), CEA § 12(e)(2)....................................................20

7 U.S.C. § 16(h), CEA § 12(h)..............................................................20

Commodity Futures Trading Commission Act of 1974,
  Pub. L. No. 93-463, 88 Stat. 1389 (1974).............................................5

Commodity Futures Modernization Act of 2000,
  Pub. L. No. 106-554, 114 Stat. 2763A-365 (2000)...............................7

Dodd-Frank Wall Street Reform and Consumer Protection Act,
  Pub. L. No. 111-203, 124 Stat. 1376 (2010)...................................7, 20

Futures Trading Practices Act of 1992,
  Pub. L. No. 102-546, 106 Stat. 3590 (1992).......................................20

Regulations

17 C.F.R. § 38.151(b), CFTC Rule 38.151(b) ......................................24

17 C.F.R. § 40.2, CFTC Rule 40.2.......................................................27

17 C.F.R. § 40.11, CFTC Rule 40.11 ..............................................25, 26

Commodity Options,
  77 Fed. Reg. 25320 (Apr. 27, 2012) .......................................................17

CFTC Concept Release on the Appropriate Regulatory Treatment of
Event Contracts,
  73 Fed. Reg. 25669, 25671 (May 7, 2008)......................................7, 8, 17

Legislative Materials

H.R. Rep. No. 93-1383 (1974) (Conf. Rep.) ...........................................22

S. Rep. No. 93-1131 (1974) ........................................................................1

120 Cong. Rec. S 30458, 30464 (daily ed. Sept. 9, 1974)
  (statement of Sen. Curtis) ......................................................................6

156 Cong. Rec. S5906-07 (daily ed. July 15, 2010)................................16

Commodity Futures Trading Act of 1974: Hearings Before the S. Comm. on Agric.
& Forestry on S. 2485, S. 2578, S. 2837, H.R. 13113, 93d Cong., 2d Sess. 685
(1974) (statement of Sen. Clark)..............................................................27

Other Authorities

CFTC, *Contracts & Products*,
  https://www.cftc.gov/IndustryOversight/ContractsProducts/index.htm .................7

CFTC, Designated Contracts Markets (DCMs),
  https://www.cftc.gov/IndustryOversight/IndustryFilings/TradingOrganizations?St
  atus=Designated&Date_From=&Date_To=&Show_All=1..................................27

CFTC, Futures Glossary,
  https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/
  CFTCGlossary/index.htm .........................................................................16, 17

CFTC, History of the CFTC,
  https://www.cftc.gov/About/HistoryoftheCFTC/history_precftc.html...................4

CFTC Staff Letter No. 93-66 (June 18, 1993), available at
  https://www.cftc.gov/sites/default/files/idc/groups/public/
  @lrlettergeneral/documents/letter/93-66.pdf..........................................................8

Order Prohibiting the Listing or Trading of Political Event Contracts
(Apr. 2, 2012), available at https://www.cftc.gov/stellent/groups/public/
@rulesandproducts/documents/ifdocs/nadexorder040212.pdf ...............................8

*Associate*,
Merriam-Webster, https://www.merriam-webster.com/dictionary/associate.........13

*Contingency*, Merriam-Webster,
https://www.merriam-webster.com/dictionary/contingency.................................10

*Contingency*, Oxford English Dictionary,
https://www.oed.com/dictionary/contingency_n?tab=meaning_
and_use#8448773........................................................................................................10

*Event*, Merriam-Webster,
https://www.merriam-webster.com/dictionary/event............................................10

*Event*, Oxford English Dictionary,
https://www.oed.com/dictionary/event_n?tab=meaning_and_use#5128817 ........10

*Impartial*, Merriam-Webster,
https://www.merriam-webster.com/dictionary/impartial......................................24

William W. Mansfield, *A Digest of the Statutes of Arkansas* § 1848
(U.M. Rose ed., 1884).................................................................................................4

## IDENTITY AND INTEREST OF AMICUS CURIAE

The Commodity Futures Trading Commission ("CFTC" or "Commission") is the federal agency charged with administering and enforcing the Commodity Exchange Act ("CEA" or "Act"), 7 U.S.C. §§ 1–26, and has authority to appear "in courts of law whenever appropriate," *id.* § 2(a)(4). Congress created the Commission in 1974 to establish a uniform national system for regulating futures trading after concluding that the existing patchwork of state-by-state regulation had critically impaired the development and functioning of national commodities markets. The CEA's "comprehensive regulatory structure" empowers the Commission to "oversee the volatile and esoteric futures trading complex." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 356 (1982).

The CEA is an enormously complex statute, but at least this much is plain: the Commission has "exclusive jurisdiction" to regulate futures, options, and swaps traded on federally regulated exchanges. 7 U.S.C. § 2(a)(1)(A). Accordingly, as numerous "circuits have held, the Act preempts state law purporting to regulate futures trading." *KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 229 (3d Cir. 2026) (collecting cases); *see* S. Rep. No. 93-1131, at 6 (1974) (stating that the Commission's "jurisdiction, where applicable, supersedes State as well as Federal agencies").

1

This appeal concerns Ohio's invocation of its gambling laws to prohibit sports-related "event contracts" that are traded on CFTC-registered designated contract markets (DCMs). Ohio is not alone: States across the country have tried to seize authority over DCMs as event contracts gain popularity among Americans. Yet as the Third Circuit held, these "event contracts are swaps under the [CEA]," and so it falls to the Commission—and *exclusively* the Commission—to regulate them. *Flaherty*, 172 F.4th at 229. States cannot invade the CFTC's exclusive jurisdiction by re-characterizing swaps trading on DCMs as illegal gambling. *Id.*

Ohio's jurisdictional overreach into the Commission's sphere threatens regulatory upheaval. For decades, event contracts on matters as diverse as electoral contests, corporate credit events, and the weather have traded as swaps or binary options subject to the Commission's oversight. If States can restrict event contracts on *sports*, the Commission's longstanding jurisdiction over these other event contracts could be imperiled too. And the fallout may well extend to other forms of derivatives trading that Congress assigned solely to the Commission's domain. All this flies in the face of "the basic pattern of all [congressional] regulation"—namely, "concentrating trading on central exchanges subject to the supervision and control of the federal government." *Leist v. Simplot*, 638 F.2d 283, 293 (2d Cir. 1980). The Court should enforce the Commission's exclusive jurisdiction and hold that Ohio cannot regulate event contracts traded on DCMs.

## BACKGROUND

### I.    The CEA promotes robust commodities markets under the Commission's exclusive jurisdiction

The CEA creates a framework for regulating derivatives markets in the United States. *See* 7 U.S.C. § 5(b). A derivative is a financial instrument, the value of which depends on (*i.e.*, is derived from) the value of some underlying asset, index, or other measure. In general, market participants use derivatives to hedge risks or speculate on commodity price movements.

### A. Early commodities trading

Commodities trading has its roots in agriculture. "When an entire crop was harvested and marketed within a short time-span, dramatic price fluctuations sometimes created severe hardship for farmers or for processors." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 357 (1982). Farmers could hedge these risks by entering into futures contracts with speculators, agreeing to sell their yields at predetermined prices and thereby insulating themselves from any price swings. *See Board of Trade of Chicago v. Christie Grain & Stock Co.*, 198 U.S. 236, 247–48 (1905) (a futures contract's "value [is] well known as a means of avoiding or mitigating catastrophes, equalizing prices and providing for periods of want."). Speculators absorbed the price risk, profiting if prices rose but bearing the loss if prices fell. Eventually, exchanges in major hubs like New York and Chicago

3

organized centralized markets, enabling greater price discovery, risk management, and liquidity.[1]

In the nineteenth and early twentieth centuries, States often failed to distinguish between futures trading and illegal "gambling" or "wagering." The Georgia Supreme Court described futures contracts for cotton as "speculation on chances, a wagering and betting between the parties." *Cunningham v. National Bank of Augusta*, 71 Ga. 400, 403 (1883). The Mississippi Supreme Court likewise characterized "the buying of cotton futures [as] a wager." *Cohn v. Brinson*, 73 So. 59, 62 (Miss. 1916). An Illinois statute provided that "the option to sell or buy at a future time any grain or commodity . . . shall be considered gambling contracts, and shall be void." *Cothran v. Ellis*, 16 N.E. 646, 648 (Ill. 1888). And so on. *See Carson v. Milwaukee Produce Co.*, 113 N.W. 393, 395 (Wis. 1907) (remanding for a new trial on whether grain contracts on a board of trade were void because "betting on future prices" amounted to unlawful gambling contracts"); *Rumsey v. Berry*, 65 Me. 570, 574 (Me. 1876) (finding futures contracts void as contrary to public policy); William W. Mansfield, *A Digest of the Statutes of Arkansas* § 1848 (U.M. Rose ed., 1884) (declaring that "[t]he buying or selling or otherwise dealing in what is known as futures . . . with a view to profit, is hereby declared to be gambling").

---

[1] *See* CFTC, History of the CFTC, https://www.cftc.gov/About/HistoryoftheCFTC/history_precftc.html.

Congress, by contrast, "has recognized the potential hazards as well as the benefits of futures trading," and it accordingly "has authorized the regulation of commodity futures exchanges for over [100] years," beginning with the Futures Trading Act of 1921. *Curran*, 456 U.S. at 360. The CEA was enacted in 1936, and ever since, "[t]he history of congressional concern with commodity futures trading has [ ] been one of steady expansion in coverage and strengthening of regulation." *Leist*, 638 F.2d at 296.

With their legitimacy enshrined in federal law, commodity exchanges grew and began to offer contracts for non-agricultural physical commodities, such as metals, oil, and gas. They later introduced cash-settled futures linked to intangible measures like interest rates and price indices.

## B. Congress gave the Commission "exclusive" jurisdiction over futures trading, including swaps

A key turning point in commodities regulation came in 1974 with the enactment of the Commodity Futures Trading Commission Act ("CFTC Act"). Pub. L. No. 93-463, 88 Stat. 1389. That Act established a unified, national regulatory structure by creating the Commission and granting it "exclusive jurisdiction with respect to accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an 'option' . . . ), and transactions involving contracts of sale of a commodity for future delivery, traded or executed on a contract market designated . . . or any other board of trade, exchange, or market." *Id.* § 201(b);

88 Stat. at 1395 (codified at 7 U.S.C. § 2(a)(1)). "The aim of this provision" was to "'avoid unnecessary, overlapping and duplicative regulation.'" *FTC v. Ken Roberts Co.*, 276 F.3d 583, 588 (D.C. Cir. 2001).

Preemption was an express goal of the CFTC Act. Apart from granting the Commission "exclusive jurisdiction" over commodities regulation, the Act also *removed* CEA language providing that "[n]othing in [existing sections of the CEA] shall be construed to impair any State law applicable to any transaction enumerated or described in such sections"—language the Supreme Court had construed as "preventing supersedure and preserving state control in two areas where state and federal law overlap." *Rice v. Board of Trade of Chicago*, 331 U.S. 247, 255 (1947). For the 1974 Congress, removal of this provision "assure[d] that Federal preemption is complete." 120 Cong. Rec. S 30458, 30464 (Sept. 9, 1974).

Congress has further expanded the preemptive reach of the CEA over time—particularly with respect to "swaps." A "swap" is a type of derivative that encompasses "any agreement, contract, or transaction . . . that provides for any . . . payment[ ] or delivery . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. §§ 1a(47)(A)(ii). In 2000, for instance, Congress excluded certain swap transactions from the CEA's exchange-trading requirements while preempting the application of state laws to

6

those "excluded" swap transactions. Pub. L. No. 106-554, Appendix E & § 103, 114 Stat. 2763A-365, 2763A-377 (2000). Then, in the 2010 Dodd-Frank Act, Congress extended the Commission's "exclusive jurisdiction" to encompass "accounts, agreements . . . , and transactions involving swaps." *See* Pub. L. No. 111-203, § 722(a)(1)(D), 124 Stat. 1376, 1672 (2010) (codified at 7 U.S.C. § 2(a)(1)(A)). It also added a "Special Rule" granting the Commission authority to prohibit certain swaps that it determined were contrary to the public interest. *Id.* § 745(a), 124 Stat. at 1736–37 (codified at 7 U.S.C. § 7a-2(c)(5)(C)).

## II.    Event contracts have long traded subject to Commission oversight

At issue in this case are "event contracts," which are "derivative contract[s] whose payoff is based on a specified event, occurrence, or value."[2] While event contracts have exploded in popularity with the American public in recent years, these contracts are not novel innovations. "Since 1992, Commission-regulated exchanges have listed for trading a variety of commodity futures and options contracts with payout terms based on" events "as diverse as regional insured property losses, the count of bankruptcies, temperature volatilities, corporate mergers, and corporate credit events." 73 Fed. Reg. 25669, 25671 (May 7, 2008). In 1993, the Commission issued a no-action letter to Iowa Electronic Markets, allowing the facility to list event

---

[2]    CFTC, *Contracts & Products*, https://www.cftc.gov/IndustryOversight/ContractsProducts/index.htm.

contracts tied to the 2008 U.S. presidential election cycle.[3] And by 2005, event contracts encompassed "the accomplishment of certain scientific advances, world population levels, the adoption of particular pieces of legislation," and even "the length of celebrity marriages." 73 Fed. Reg. at 25670. Event contracts relating to sports are the latest iteration of this burgeoning area of the derivatives industry.

To be sure, the Commission has occasionally taken a critical eye toward certain event contracts. It prohibited, for instance, the North American Derivatives Exchange from listing certain political event contracts, concluding that those contracts could potentially have an adverse effect on election integrity.[4] But such action only underscores the Commission's role as the regulator of these contracts.

Today, event contracts are listed on numerous CFTC-registered DCMs, whether they be relatively new markets like Kalshi and Gemini, or longstanding ones like CME Group. The Commission exercises its exclusive jurisdiction over these DCMs by monitoring their activity, reviewing event contracts they self-certify, and pursuing enforcement actions as appropriate.

---

[3]    CFTC    Staff    Letter    No.    93-66    (June    18,    1993),    available    at https://www.cftc.gov/sites/default/files/idc/groups/public/@lrlettergeneral/documents/letter/93-66.pdf.

[4] *See* Order Prohibiting the Listing or Trading of Political Event Contracts (Apr. 2, 2012), available    at    https://www.cftc.gov/stellent/groups/public/@rulesandproducts/documents/ifdocs/nadexorder040212.pdf.

**ARGUMENT**

States have no authority to regulate event contracts for two reasons. First, event contracts qualify as "swaps" under the CEA. Second, Congress gave the Commission comprehensive jurisdiction to regulate transactions involving swaps, thereby preempting state regulation.

## I. Event contracts traded on CFTC-regulated markets are swaps

### A. The plain language of the CEA defines "swaps" to include event contracts

Congress "defined 'swap' broadly." *United States v. Phillips*, 155 F.4th 102, 113 (2d Cir. 2025). The term encompasses "any agreement, contract, or transaction . . . that provides for any purchase, sale, payment, or delivery . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A), (A)(ii). Event contracts—including sports event contracts—straightforwardly qualify as "swaps" under this definition. *See Flaherty*, 172 F.4th at 227–28 (holding that "Kalshi's sports-related event contracts" are "'swaps' subject to the CFTC's jurisdiction"); *id.* at 233 (Roth, J., dissenting) ("A plain reading of the Act's text suggests that Kalshi's sports-event contracts fit comfortably within the statutory definition" of swaps.).

Ohio argues that sports-related event contracts do not satisfy this definition because (1) they are not dependent on the occurrence of an "event," and (2) they are

9

not associated with "potential financial, economic, or commercial consequence." Neither objection holds.

**1.** To qualify as a swap, the right to "payment" under the contract must be "dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an *event* or *contingency*." 7 U.S.C. § 1a(47)(A)(ii) (emphasis added). Neither "event" nor "contingency" is defined, and therefore, their ordinary meanings apply. *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012). An event is "something that happens: occurrence,"[5] or "[t]he outcome of an action or occurrence; a result, a consequence."[6] A "contingency" is an "event that may but is not certain to occur,"[7] "liable to happen or not in the future; uncertainty of occurrence or incidence" or "occurrence of anything without preordination."[8]

A participant's right to payment from an event contract is dependent on an "event." To use Ohio's example (Dkt. 17 at 9), consider an event contract in which a participant takes a "yes" position on Michigan beating Alabama. "[P]ayment" under that contract is plainly "dependent on the occurrence . . . of an event"— namely, Michigan beating Alabama. Likewise, a "yes" position on Michigan beating

---

[5] *Event*, Merriam-Webster, https://www.merriam-webster.com/dictionary/event.

[6] *Event*, Oxford English Dictionary, https://www.oed.com/dictionary/event_n?tab=meaning_and_use#5128817.

[7] *Contingency*, Merriam-Webster, https://www.merriam-webster.com/dictionary/contingency.

[8] *Contingency*, Oxford English Dictionary, https://www.oed.com/dictionary/contingency_n?tab=meaning_and_use#8448773.

Alabama by more than 10.5 points (*id.*) is "dependent on . . . the extent of the occurrence of an event"—the extent to which Michigan beats Alabama. *See KalshiEX LLC v. Johnson*, __ F. Supp. 3d __, 2026 WL 1223373, at *4 (D. Ariz. May 5, 2026) (explaining that the phrase "*extent of* the occurrence of an event or contingency" "reaches how an event unfolds, not just whether it happens").

Ohio disagrees, claiming that Kalshi's sports event contracts "depend on *outcomes*, not *events*." Dkt. 17 at 9. That distinction is artificial. As explained above, the ordinary meaning of the word "event" encompasses "outcomes." *See Johnson*, 2026 WL 1223373 at *4 (holding that the definitions of "event" and "occurrence" "are broad enough to encompass the result of a contest in addition to the contest itself"). Thus, it is not only the Michigan-versus-Alabama game that qualifies as an event; a Michigan victory over Alabama is *also* an event. *See Kalshiex LLC v. Orgel*, 2026 WL 474869, at *7 (M.D. Tenn. Feb. 19, 2026) (the fact of "a three-hour-long game, and the Titans' winning that game, are both occurrences of events"). As the District of Arizona aptly put it, "[t]hat an event or occurrence [*i.e.*, the outcome of a game] has an antecedent cause [*i.e.*, the game itself] does not mean it is not an event or occurrence." *Johnson*, 2026 WL 1223373, at *4.

Ohio protests that if swaps can capture the outcome of an event, "everything would be an 'event,' and the definition of swap would be limitless." Dkt. 17 at 10. But the definition of "swap" requires more than just an event, *see* 7 U.S.C.

11

§ 1a(47)(A)(ii), and more fundamentally, it is Ohio's narrow interpretation that has few limits. Excluding outcome-dependent event contracts from the definition of "swap" may logically exclude other event-based derivatives from the Commission's jurisdiction, including contracts tied to "the level of snowfall from a certain storm or the dollar amount of hurricane damage" that have traditionally been regulated by the Commission. *KalshiEX LLC v. CFTC*, 119 F.4th 58, 61 (D.C. Cir. 2024).

**2.** Further, the "event" on which payment is contingent must be "associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). Again, sports event contracts clear the bar. A sports event has the "potential" to affect "numerous . . . stakeholders, including sponsors, advertisers, television networks, franchises, and local and national communities." *Flaherty*, 172 F.4th at 227–28. Those "financial consequences" may not be felt "right away"— indeed, they may never *actually* occur—but "Congress chose to use [the qualifier] 'potential,' which is broad." *Orgel*, 2026 WL 474869, at *8; *see Alabama Power Co. v. Costle*, 636 F.2d 323, 353 (D.C. Cir. 1979) (recognizing that "potential . . . will always and inherently exceed actual").

Ohio's answer is to ratchet up the standard. "The occurrence, winner, or even score of a particular game," it says, "has no *direct* connection to potential economic consequences." Dkt. 17 at 11 (emphasis added). But the statute does not contain a "direct connection" requirement. Rather, the event need only be *associated* with

potential economic or commercial consequences, a term that means "to join or connect together" or "to bring together or into relationship in any of various intangible ways."[9] Ohio then claims that if an event contract is not used "to hedge economic consequences," it "flunk[s] the connected-to-economic-consequences test." Dkt. 17 at 11. Again, the statute contains no "use-for-hedging" requirement; it looks simply to whether the payment-triggering event can be associated with potential economic consequences. So to use Ohio's examples, "whether LeBron James will score 20 or more points in a game" or "whether the combined score in the annual Ohio State-Michigan football game will be over or under 50.5 points" (*see id.*) *can* be associated with potential economic consequences—how many LeBron James jerseys are sold, how many viewers stay tuned into the Ohio State-Michigan game, ticket prices for future events, and so on.

**3.** The CEA's "Special Rule" for "event contracts" underscores that sports-related event contracts here are swaps. The Special Rule provides that "[i]n connection with the listing of agreements, contracts, transactions, or *swaps* in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency . . . , by a [DCM] or swap execution facility, the Commission may determine that such agreements, contracts, or transactions are contrary to the public interest if the agreements, contracts, or transactions involve" various subject matter,

---

[9] *Associate*, Merriam-Webster, https://www.merriam-webster.com/dictionary/associate.

including "gaming." 7 U.S.C. § 7a-2(c)(5)(C)(i) (emphasis added). The Special Rule thus confirms the Commission's jurisdiction over event contracts that involve "gaming," and that such contracts can be "swaps." Even if Ohio is correct that Kalshi's "event contracts" are "online sports gaming" (*see* Cease-and-Desist Letter, R.1-1, PageID#26), those event contracts are swaps traded on a DCM, and so it falls to the Commission to determine whether they are contrary to the public interest.

Ohio's arguments about the definition of "swap," moreover, cannot be squared with this Rule. An event contract that involves "gaming" is necessarily based on the *outcome* of a gaming event. An event contract about a poker tournament, for example, turns on who wins the poker tournament—just as an event contract about a football game turns on who wins the game. So if, as Ohio contends, event contracts based on "outcomes" are not swaps, the contracts on "gaming" that the Commission may evaluate against the public interest would be a null set. Likewise, even accepting that sports event contracts are swaps "involv[ing]" "gaming," Ohio's argument that sports events lack financial, commercial, or economic consequences is incompatible with Congress's recognition that event contracts based on "gaming" can be "swaps" within the Commission's jurisdiction.

## B. The district court's atextual reasoning should be rejected

For its part, the district court found it "textually permissible" to conclude that sports event contracts are swaps, but it nonetheless held that the CEA's "goals are

14

better achieved when a 'swap' is understood as a transaction involving financial instruments and measures that traditionally and directly *affect commodity prices*," like "[c]urrency exchange rates, the weather, and energy costs." Opinion and Order, ("Op."), R.69, PageID#904–05. But the CEA defines the term "excluded commodity"—which *is* a type of commodity[10]—to encompass "an occurrence, extent of an occurrence, or contingency (other than a change in the price, rate, value, or level of a commodity not described in clause (i)) that is—(I) beyond the control of the parties to the relevant contract, agreement, or transaction; and (II) associated with a financial, commercial, or economic consequence." 7 U.S.C. § 1a(19). Sports event contracts are (I) based on an "occurrence" or the "extent of an occurrence" that is "beyond the control of the parties to the [event] contract" and (II), as explained above, are "associated with" financial, economic, or commercial consequences. *Id.*

Further, Congress defined the term "swap" to include "an agreement, contract, or transaction that is, *or in the future becomes*, commonly known to the trade as a swap." 7 U.S.C. § 1a(47)(A)(iv) (emphasis added). Congress thus recognized that the definition of "swap" would come to encompass contracts that, at the time of enactment, may not have been perceived as such.

---

[10] *See United States v. Wilkinson*, 986 F.3d 740, 745 (7th Cir. 2021) (futures that are "excluded commodities" "remain 'commodities' under the Act as a whole"); *see also* 7 U.S.C. § 7a-2(c)(5)(C)(i) (granting Commission jurisdiction over event contracts "in excluded commodities").

15

The district court also concluded that "absurd results would flow from defining a 'swap' to include a sports-event contract" because "all sports bets" would be "forced" onto DCMs and "every sportsbook in the country would be put out of business." Op., R.69, PageID#905. "But the absurdity canon, if it ever applies, is for 'rare and exceptional circumstances' when the absurdity is 'so gross as to shock the general moral or common sense.'" *United States v. Phillips*, 54 F.4th 374, 394 (6th Cir. 2022) (Larsen, J., concurring in the judgment). There is nothing of the sort here. To the contrary, when debating the addition of the Special Rule in 2010, Senator Blanche Lincoln—then the Chair of the Commission's authorizing committee—stated that "[i]t would be quite easy to construct an 'event contract' around sporting events such as the Super Bowl, the Kentucky Derby, and Masters Golf Tournament." *See* 156 Cong. Rec. S5906-07 (daily ed. July 15, 2010). It was thus clearly contemplated that a market might develop around sports event contracts that would fall within the Commission's jurisdiction. The district court's predictions about unrealized consequences are therefore no reason to deviate from the plain text of the CEA, which classifies event contracts—including sports event contracts—as "swaps."[11]

---

[11] While not addressed below, event contracts also qualify as "swaps" under § 1a(47)(A)(i), which includes "any agreement contract or transaction . . . that is a[n] . . . *option of any kind* that is for the purchase or sale, or based on the value, of 1 or more . . . commodities . . . , or other financial or economic interests or property of any kind." 7 U.S.C. § 1a(47)(A)(i). Event contracts are binary options, or "option[s] whose payoff is either a fixed amount or zero." CFTC, Futures Glossary,      https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/CFTCGlossary/

16

## II.    The CEA preempts state law as applied to event contracts on CFTC-regulated markets

Under the Constitution's Supremacy Clause, "federal law preempts contrary state law." *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 162 (2016). Most straightforwardly, Congress can "express[ly]" withdraw specified powers from the States. *Arizona v. United States*, 567 U.S. 387, 399 (2012). In addition, "States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by . . . exclusive [federal] governance." *Id.* "[S]tate laws are [also] preempted when they conflict with federal law." *Id.*

Whether on express, field, or conflict preemption grounds, federal law precludes Ohio from applying its gambling laws to swaps traded on DCMs.

### A. The CEA expressly preempts state regulation of commodity derivatives transactions

**1.** Congress conferred on the Commission "exclusive jurisdiction" to regulate "transactions involving swaps" traded on CFTC-regulated DCMs. 7 U.S.C. § 2(a)(1)(A). That expression of preemptive intent could hardly be plainer. *See Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 594 (2011) ("[T]he plain wording of the clause . . . contains the best evidence of Congress' preemptive intent."). As

---

index.htm#B; *see also* 73 Fed. Reg. 25669, 25670 (May 7, 2008) ("A significant number of event contracts are structured as all-or-nothing binary transactions commonly described as binary options."); 77 Fed. Reg. 25320, 25321 n.6 (Apr. 27, 2012) ("[T]he swap definition . . . includes options . . . ."). And as described above, event contracts are based on a "commodity"—specifically, an "excluded commodity." *Supra* 15. They must accordingly be conducted in compliance with the CEA and the Commission's regulations related to swaps.

17

this Court has put it, "the thrust of the [CEA's exclusive-jurisdiction] provision was to ensure that regulatory bodies other than the CFTC would not interfere with the orderly development and enforcement of commodities regulation." *Curran v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 622 F.2d 216, 232 (6th Cir. 1980), *aff'd*, 456 U.S. 353 (1982). Since the Commission has "exclusive jurisdiction . . . with respect to" the swaps that Kalshi offers, other regulatory authorities—including the States— have no "jurisdiction" to interfere. 7 U.S.C. § 2(a)(1)(A).

The balance of § 2(a)(1)(A) solidifies that default rule. It states that "[e]xcept *as hereinabove provided*," Congress did not "supersede or limit the jurisdiction at any time conferred on . . . regulatory authorities under the laws of . . . any State" or "restrict" State authorities "from carrying out their duties and responsibilities. *Id.* (emphasis added). The CEA thus contemplates States retaining their regulatory jurisdiction "[e]xcept" with respect to "transactions involving swaps" traded on DCMs. *Id.*

**2.** The motions panel questioned the applicability of express preemption because § 2(a)(1)(A) uses the language "exclusive jurisdiction" rather than "preempt" or "supersede." Dkt. 26-2 at 7–8. But Congress need not use magic words to preempt state law and, in any event, the phrase "exclusive jurisdiction" accomplishes the same end. *See Leist*, 638 F.2d at 322 ("[C]ourts have held that [§] 2(a)(1) of the CEA preempts the application of state law."). Ohio's Casino

18

Control Commission is attempting to wrest regulatory jurisdiction over Kalshi from the Commission by shoehorning sports event contracts into Ohio law governing traditional gambling transactions, like those on sportsbooks. That attempt to prohibit "transactions involving swaps" on DCMs is not within the "jurisdiction" of a state regulatory commission; rather, "exclusive jurisdiction" over these transactions is vested in the Commission. 7 U.S.C. § 2(a)(1)(A).

The motions panel also pointed to other sections of the CEA (Dkt. 26-2 at 8–9), but those only reinforce the primacy of federal law. Section 13a-2(1), for instance, empowers a state to file suit to enjoin violations of the CEA or a Commission regulation—language that, by negative implication, indicates that States generally lack authority to apply their *own* laws to CFTC-regulated transactions.[12] And even when purporting to enforce the CEA, States cannot sue "a contract market," 7 U.S.C. § 13a-2(1), doubling the inference that States cannot enforce their gambling laws against a DCM like Kalshi.

Section 16(e)(1) insulates various laws and actions from preemption, including state laws applicable to certain *off-exchange* transactions or unregistered persons. Yet Congress omitted any potential for state law to apply to *on-exchange* transactions—further reinforcing that state law has no application to DCMs.

---

[12] States may sue in state court for "an alleged violation of any general civil or criminal antifraud statute of such State." 7 U.S.C. § 13a-2(7). Again, the implication is that States cannot sue for alleged violations of *other* state laws, such as gambling laws.

19

Section 16(e)(2) "supersede[s] and preempt[s] the application of any State or local law that prohibits or regulates gaming . . . in the case of" certain transactions. 7 U.S.C. § 16(e)(2). Granted, swaps are not mentioned. *Id.* But § 16(e)(2) was adopted in 1992 to clarify that state laws were preempted even as to certain *off-exchange* derivatives transactions that (at the time) did not fall within the "exclusive jurisdiction" provision in Section 2(a)(1). *See* Pub L. No. 102-546, § 502(c), 106 Stat. 3590, 3631. *On-exchange* swaps became subject to the Commission's "exclusive jurisdiction" provision in 2010, *see* Pub. L. No. 111-203, § 722(a), 124 Stat. 1672, thus accomplishing preemption. Nothing about § 16(e)(2) indicates that the Commission's post-2010 jurisdiction over swaps traded on DCMs is less than "exclusive."

Finally, § 16(h) provides that a swap "shall not be considered to be insurance" and accordingly "may not be regulated as an insurance contract under the law of any State." 7 U.S.C. § 16(h). This language was enacted in the aftermath of the 2008 financial crisis, which many in Congress attributed to credit default swaps—"an arrangement similar to an insurance contract." *Merrill Lynch Int'l v. XL Cap. Assur. Inc.*, 564 F. Supp. 2d 298, 300 (S.D.N.Y. 2008). Under the circumstances, Congress's use of a "belt-and-suspenders approach to make sure that *all*" swaps were governed by federal law is a perfectly "likely" inference, *see Atlantic Richfield Co. v. Christian*, 590 U.S. 1, 14 n.5 (2020), far more "likely" than the notion that Congress

20

only preempted state insurance law as to swaps but implicitly left other state law intact (all whilst giving the Commission "exclusive jurisdiction" over swaps).

## B. The CEA occupies the field of regulating trading on a DCM

"Field preemption is the principle that States may not regulate conduct 'in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance.'" *Churchill Downs Tech. Initiatives Co. v. Michigan Gaming Control Bd.*, 162 F.4th 631, 638 (6th Cir. 2025) (quoting *Arizona*, 567 U.S. at 399). State law must give way where there is "a framework of regulation so pervasive that Congress left no room for the States to supplement it," or where "there is a federal interest so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Arizona*, 567 U.S. at 399.

Field preemption, "like all [forms of] preemption, must be grounded 'in the text and structure of the statute at issue.'" *Kansas v. Garcia*, 589 U.S. 191, 208 (2020). Here, Congress gave the Commission "exclusive jurisdiction" over "swaps . . . traded or executed on a [DCM]." 7 U.S.C. § 2(a)(1)(A). DCMs, moreover, are subject to extensive Commission regulation. They must, among other things, register with the Commission, *id.* § 7(a); comply with "core principle[s]" governing trading, *id.* § 7(d); and self-certify compliance with the CEA and the Commission's regulations, *id.* § 7a-2(c)(1). "These provisions regulate every aspect of DCMs, . . . leaving no room for state regulation." *Johnson*, 2026 WL 1223373, at *6.

21

Congress understood this when it created the Commission, explaining in the Conference Report that its "exclusive grant of jurisdiction" would "preempt the field insofar as futures regulation is concerned," and that "if any substantive State law regulating futures trading was contrary to or inconsistent with Federal law, the Federal law would govern." H.R. Rep. No. 93-1383, at 35–36 (1974). "[A]t the very least," then, Congress has field preempted "the regulation of trading on a DCM," which encompasses "Kalshi's sports-related event contracts." *Flaherty*, 172 F.4th at 228–29.

The motions panel pointed to various CEA savings clauses that leave room for State involvement. But the question is not whether State regulation can ever overlap with the CEA. *Cf. Orgel*, 2026 WL 474869, at *10 ("[S]tates can share power with the CFTC over activities that lie outside its exclusive jurisdiction."). Rather, it is whether States can "regulat[e] trading on federally designated contract markets" that are within the Commission's exclusive jurisdiction. *Flaherty*, 172 F.4th at 225. No savings clause gives a State that authority; that field belongs entirely to the Commission. Accordingly, appellate courts have repeatedly concluded that the CEA's conferral of "exclusive jurisdiction" over futures and swaps traded on a DCM "preempts the application of state law." *Leist*, 638 F.2d at 322; *see also, e.g.*, *Ken Roberts*, 276 F.3d at 591 (observing that "the CFTC was created to regulate all commodities and commodities *trading*").

22

As for the district court's rejection of field preemption, it concluded that "Congress did not intend the CEA to preempt state sports gambling laws." Op., R.69, PageID#911. But as the Third Circuit held, the inquiry is not whether the CEA occupies the field of "all sports gambling," but rather whether Congress preempted state regulation of "trading on federally designated contract markets." *Flaherty*, 172 F.4th at 225. The district court also determined that § 2(a)(1)(A)'s "savings clause" leaves "ample room" for States to legislate "on matters tangential to trading swaps and commodity futures on DCMs." Op., R.69, PageID#910. But Ohio is not attempting to regulate "tangential" matters—it is trying to prohibit the very *trading* of swaps, which lies at the heart of the Commission's exclusive jurisdiction.

**C. State law is conflict preempted by the CEA**

Finally, "conflict preemption . . . prohibits [a state] from regulating sports-related event contracts on CFTC-licensed DCMs." *Flaherty*, 172 F.4th at 229. Conflict preemption comes in two varieties: "when compliance with both [state and federal law] is impossible" or when "state law stands as an obstacle to the accomplishment of Congress's objectives." *Churchill Downs*, 162 F.4th at 638. Both apply here.

**1.** For starters, compliance is impossible because a DCM is required by federal law to provide "impartial access to its markets and services" to all its "members," and to provide "[a]ccess criteria that are impartial, transparent, and applied in a non-

23

discriminatory manner." 17 C.F.R. § 38.151(b). If state gambling laws cover event contracts, however, then DCMs will only be able to offer those contracts in States that do not seek to prohibit them. That would violate the requirement of "impartial" and "non-discriminatory" access. *See Johnson*, 2026 WL 1223373, at *8 (holding that if event contracts are prohibited under Arizona law, "a DCM operator must exclude Arizona residents from trading event contracts on its platform, in violation of 17 C.F.R. § 38.151(b) and (b)(1)").

The district court disagreed, concluding that "Kalshi offers nothing but its own *ipse dixit* that the CFTC would view geographic restrictions predicated on compliance with state law as 'partial.'" Dkt. 69 at 20, PageID#913. But the word "impartial" means "treating or affecting all equally,"[13] and it is necessarily the case that if DCMs are permitted to offer event contracts to residents of some States but not others, then DCMs are not offering market access that "affect[s] all equally." The Commission thus views Ohio's attempt to enforce its gambling laws against DCMs as a violation of the impartial-access requirement. *Orgel*, 2026 WL 474869, at *9.

**2.** If nothing else, subjecting CFTC-regulated markets to state-by-state requirements would stand as an obstacle to federal regulation. "As Congress recognized in enacting the [CFTC] Act, a contract market could not operate efficiently, and perhaps not at all, if varying and potentially contradictory legal

---

[13] *Impartial*, Merriam-Webster, https://www.merriam-webster.com/dictionary/impartial.

standards governed its duties to investors." *American Agric. Movement, Inc. v. Board of Trade of Chicago*, 977 F.2d 1147, 1156 (7th Cir. 1992); *see Johnson*, 2026 WL 1223373, at \*8 ("If states could prosecute DCM operators for offering event contracts, the operators would face the prospect of fifty different regulators, each capable of restricting which contracts may be listed on each exchange."). So where, as here, "application of state law would directly affect trading on or the operation of a futures market, it would stand 'as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *American Agric.*, 977 F.2d at 1156–57.

**3.** Commission Rule 40.11 does not mitigate the conflict; it exacerbates it. *See* 17 U.S.C. § 40.11. That regulation is derived from the statutory Special Rule authorizing the Commission to review and prohibit certain swaps, including event contracts involving "gaming," that the Commission determines to be "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i)–(ii). As the statute makes clear, *the Commission* determines whether such contracts are contrary to the public interest, *id.*, and the regulation prescribes a procedure for the Commission to review and approve such contracts, 17 C.F.R. § 40.11(c). If the Commission disapproves an event contract under Rule 40.11, then that contract may not be listed at all. The effect of a disapproval is not that the contract is somehow removed from the exclusive jurisdiction conferred by Congress—agencies, after all, cannot add to or subtract

25

from jurisdiction conferred by Congress. *See Union Pac. R. Co. v. Bhd. of Locomotive Eng'rs & Trainmen Gen. Comm. of Adjustment, Cent. Region*, 558 U.S. 67, 71 (2009) ("Congress alone controls the [agency's] jurisdiction."). And disapproval certainly does not mean that regulatory jurisdiction devolves upon a *State*.

As the motions panel observed (Dkt. 26 at 13), the Special Rule also allows the Commission to prohibit event contracts involving an underlying "activity that is unlawful under any . . . State law," 7 U.S.C. § 7a-2(c)(5)(C)(i)(I), but that does not obviate the conflict either. First, the Special Rule does not apply simply because an event contract *itself* violates state law; rather, the Rule applies where the event contract "involve[s]" an underlying activity that violates state law—for instance, an event contract whose payoff is dependent on a cockfight. *Id.* § 7a-2(c)(5)(C)(i); 17 C.F.R. § 40.11(a). Second, even where the event contract involves unlawful activity, the Commission—not the States—retains statutory authority to decide whether that contract is contrary to the public interest.

## III. Subjecting derivatives listed on CFTC-registered DCMs to State regulation would have destabilizing effects

Ohio's attempt to regulate swap transactions listed on CFTC-registered DCMs threatens a massive short-circuiting of the Commission's jurisdiction. First, it would call into question the Commission's regulation of non-sports event contracts, of which there are many. At least eight DCMs have collectively self-certified with the

26

Commission more than 3,000 event-based contracts pursuant to 17 C.F.R. § 40.2, with a notable increase in such filings during the last two years.[14] Many of these contracts are tied to non-sport outcomes—including cryptocurrency price levels and related indices, GDP releases, benchmark interest-rate decisions, election outcomes, temperature forecasts, electricity usage, and far more.[15] These event contracts (and analogous offerings) have traded on DCMs for decades. *Supra* 7–8.

Ohio's power-grab would also threaten the Commission's exclusive jurisdiction over derivatives transactions generally. After all, if the phrase "exclusive jurisdiction" does not give the Commission sole authority to regulate "transactions involving swaps," States may well flex their own laws at other "contracts of sale of a commodity for future delivery." 7 U.S.C. § 2(a)(1)(A). That, in turn, could re-introduce the "total chaos" Congress sought to prevent by providing the Commission with exclusive jurisdiction over futures trading in 1974.[16]

The Court should tolerate none of this. Congress created "a comprehensive regulatory structure" over "futures trading," *Curran*, 456 U.S. at 356, and it vested jurisdiction over swap trading on DCMs—including event contracts—exclusively

---

[14] *See* CFTC, Designated Contact Market Products, available at https://www.cftc.gov/IndustryOversight/IndustryFilings/TradingOrganizationProducts?Organizat ion=CM.

[15] *Id.*

[16] *See* Commodity Futures Trading Act of 1974: Hearings Before the S. Comm. on Agric. & Forestry on S. 2485, S. 2578, S. 2837, H.R. 13113, 93d Cong., 2d Sess. 685 (1974) (statement of Sen. Clark).

with the Commission. Those contracts have accordingly traded subject to Commission oversight for decades. The fact that contracts where the underlying event involves sports have become increasingly popular does not give the States newfound authority to become derivatives regulators.

## CONCLUSION

The Commission respectfully submits that this Court should reverse the judgment of the District Court and remand with instructions to enter a preliminary injunction.

Dated: May 12, 2026

Respectfully Submitted,
*/s/ Henry J. Dickman*
D.C. Bar 1724459
Tyler S. Badgley, General Counsel
M. Jordan Minot, Deputy General Counsel
Henry J. Dickman, Sr. Assistant General Counsel
Anne Stukes, Sr. Assistant General Counsel
Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, N.W.
Washington, D.C. 20581
hdickman@cftc.gov
(202) 418-5607

28

## CERTIFICATE OF COMPLIANCE

I certify that, pursuant to Fed. R. App. 29(a)(5), the foregoing brief complies with the type-volume limitations, in that it has 6,490 words (excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 6th Cir. R. 32(b)(1)).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and type-style requirements of Fed. R. App. P. 32(a)(6) because this brief was prepared in proportionally spaced typeface using Microsoft Word 365 and is set in 14-point sized Times New Roman type style.

*/s/ Henry J. Dickman*

# CERTIFICATE OF SERVICE

I certify that on May 12, 2026, I electronically filed this Brief with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the CM/ECF system and thereby served all participants in the case who are registered CM/ECF users.

*/s/ Henry J. Dickman*
