No. 26-3196
# IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

KALSHIEX, LLC,

    Plaintiff-Appellant,

    v.

MATTHEW T. SCHULER, et al.,

    Defendants-Appellees.

: On Appeal from the
: United States District Court
: for the Southern District of Ohio
:
: District Court Case No.
: 2:25-cv-1165
:

## BRIEF OF APPELLEES

DAVE YOST
Attorney General of Ohio

MATHURA J. SRIDHARAN*
Ohio Solicitor General
 *Counsel of Record
ZACHERY P. KELLER
JOHN F. KERKHOFF
LAYNE H. TIESZEN
Deputy Solicitors General
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614.466.8980
Mathura.Sridharan@OhioAGO.gov

*Counsel for Appellees*
 *Matthew Schuler, et al.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .............................................................................iii

STATEMENT REGARDING ORAL ARGUMENT ............................................xi

JURISDICTIONAL STATEMENT ....................................................................1

STATEMENT OF THE ISSUES.........................................................................2

INTRODUCTION .............................................................................................3

STATEMENT ....................................................................................................4

    I.    The States have long regulated sports betting. .........................................4

    II.    For many decades, state gambling regulations co-existed with the CEA.........................................................................................................6

    III.    Kalshi offers sports betting without regard for state law........................ 11

    IV.    Kalshi sued Ohio officials, the District Court denied an injunction, and this Court denied relief pending appeal. ................................................. 16

SUMMARY OF THE ARGUMENT .................................................................. 18

STANDARD OF REVIEW ..............................................................................22

ARGUMENT...................................................................................................23

    I.    Kalshi is unlikely to succeed on the merits. ...........................................23

        A.    Federal preemption turns on the statutory text, and two binding clear-statement rules govern the textual analysis here.......................24

        B.    The Commodity Exchange Act's text does not preempt the States' authority over sports betting. ...........................................................30

            1.    Sports-betting event contracts are not swaps or trading in excluded commodities. ................................................................ 31

i

2. The CFTC's "exclusive jurisdiction" does not preempt the field of sports betting, either expressly or impliedly. .....................46

C. Ohio's sports-gambling laws do not conflict with federal law. ...........52

D. Kalshi's reading of the Commodity Exchange Act renders other federal laws ineffective. ...................................................................55

E. Kalshi's remaining arguments are unpersuasive. ...............................57

F. The Court should be wary of the CFTC's new position. ....................60

II. The balance of harms weighs heavily in Ohio's favor. ...........................63

CONCLUSION ............................................................................................63

CERTIFICATE OF COMPLIANCE ...................................................................65

CERTIFICATE OF SERVICE ..........................................................................66

DESIGNATION OF DISTRICT COURT RECORD .........................................67

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Abramski v. United States*,
573 U.S. 169 (2014) ...................................................................... 37, 38, 40

*Ah Sin v. Wittman*,
198 U.S. 500 (1905).............................................................................4, 19, 27

*Ala. Ass'n of Realtors v. HHS*,
594 U.S. 758 (2021) ..................................................................... 26, 27, 29

*Altria Group, Inc. v. Good*,
555 U.S. 70 (2008) ....................................................................................59

*Am. Agric. Movement v. Bd. of Trade*,
977 F.2d 1147 (7th Cir. 1992) ...................................................... 46, 49, 52

*Am. Energy Corp. v. Rockies Express Pipeline LLC*,
622 F.3d 602 (6th Cir. 2010) ........................................................................ 51

*Ariz. State Legis. v. Ariz. Indep. Redistricting Comm'n*,
576 U.S. 787 (2015) ...................................................................................23

*Arizona v. United States*,
567 U.S. 387 (2012)............................................................................49, 52, 53

*Biden v. Nebraska*,
600 U.S. 477 (2023) ....................................................................................23

*Bond v. United States*,
572 U.S. 844 (2014) .........................................................................18, 25, 26, 28

*Chevron USA Inc. v. Plaquemines Par.*,
146 S. Ct. 1052 (2026)..........................................................................33, 44, 57

*Churchill Downs Tech. Initiatives Co. v. Michigan Gaming Control Bd.*,
162 F.4th 631 (6th Cir. 2025) ........................................................................59

*City of Pontiac Retired Emps. Ass'n v. Schimmel*,
751 F.3d 427 (6th Cir. 2014).............................................................................22

*CSX Transp. v. Easterwood*,
507 U.S. 658 (1993) ................................................................. 26

*Duke Energy Trading & Mktg., LLC v. Davis*,
267 F.3d 1042 (9th Cir. 2001) ................................................ 52

*Edwards v. Aetna Life Ins. Co.*,
690 F.2d 595 (6th Cir. 1982) ................................................. 40

*EPA v. EME Homer City Generation, L.P.*,
572 U.S. 489 (2014) ................................................................. 4

*Epic Sys. Corp. v. Lewis*,
584 U.S. 497 (2018) ........................................................ 21, 55

*Facebook, Inc. v. Duguid*,
592 U.S. 395 (2021) ............................................................... 31

*FCC v. Consumers' Rsch.*,
606 U.S. 656 (2025) ............................................................... 50

*Fischer v. United States*,
603 U.S. 480 (2024) ............................................................... 38

*FTC v. Ken Roberts Co.*,
276 F.3d 583 (D.C. Cir. 2001) ............................................... 52

*Greater New Orleans Broadcasting Ass'n, Inc. v. United States*,
527 U.S. 173 (1999) ......................................................... 28, 57

*Hencely v. Fluor Corp.*,
146 S. Ct. 1086 (2026) ........................................................... 24

*Henson v. Santander Consumer USA Inc.*,
582 U.S. 79 (2017) .......................................................... 35, 53

*Hoss v. Layton*,
3 Ohio St. 352 (1854) .......................................................... 5, 48

*Hughes v. Talen Energy Mktg., LLC*,
578 U.S. 150 (2016) ............................................................... 52

*KalshiEX LLC v. Martin*,
   793 F. Supp. 3d 667 (D. Md. 2025) ................................................. 15

*KalshiEX LLC v. Schuler*,
   No. 26-3196, 2026 WL 1295806 (6th Cir. Apr. 24, 2026)..........................*passim*

*Kalshiex, LLC v. Flaherty*,
   172 F.4th 220 (3rd Cir. 2026)....................................................15, 45

*KalshiEx, LLC v. Hendrick*,
   817 F. Supp. 3d 1014 (D. Nev. 2025)..................................... 15, 34, 39

*Kansas v. Garcia*,
   589 U.S. 191 (2020) ................................................................*passim*

*Kentucky v. Biden*,
   57 F.4th 545 (6th Cir. 2023) .......................................................22

*King v. Burwell*,
   576 U.S. 473 (2015)............................................................19, 27, 29

*Learning Res., Inc. v. Trump*,
   148 S. Ct. 628 (2026) (Roberts, C.J., op.).......................................27

*Leist v. Simplot*,
   638 F.2d 283 (2d Cir. 1980) .......................................................52

*Loper Bright Enters. v. Raimondo*,
   603 U.S. 369 (2024) ............................................................22, 60

*Merrill Lynch, Pierce, Fenner & Smith v. Curran*,
   456 U.S. 353 (1982)........................................................... 7, 46, 48

*Mills-Jennings of Ohio, Inc. v. Dep't of Liquor Control*,
   70 Ohio St. 2d 95 (1982)..............................................................4

*Mississippi v. Louisiana*,
   506 U.S. 73 (1992).................................................................. 51

*Murphy v. NCAA*,
   584 U.S. 453 (2018) ................................................................*passim*

*Oklahoma v. Castro-Huerta*,
  597 U.S. 629 (2022) ...................................................................54

*Puerto Rico v. Franklin Cal. Tax-Free Tr.*,
  579 U.S. 115 (2016) ...................................................................58

*Richardson v. Kruchko & Fries*,
  966 F.2d 153 (4th Cir. 1992) .....................................................52

*Rubin v. Islamic Republic of Iran*,
  583 U.S. 202 (2018) ...................................................................38

*SEC v. Chenery Corp.*,
  318 U.S. 80 (1943) .....................................................................22

*Thompson v. DeWine*,
  976 F.3d 610 (6th Cir. 2020) .....................................................63

*Transcon. Gas Pipe Line Co., LLC v. Pa. Env't Hearing Bd.*,
  108 F.4th 144 (3d Cir. 2024) ................................................47, 51

*United States v. Arizona*,
  No. 2:26-cv-2246 (D. Ariz) ........................................................16

*United States v. Arthrex, Inc.*,
  594 U.S. 1 (2021) .......................................................................43

*United States v. Phillips*,
  155 F.4th 102 (2d Cir. 2025) .......................................................9

*Va. Uranium, Inc. v. Warren*,
  587 U.S. 761 (2019) ...................................................................25

*West Virginia v. EPA*,
  597 U.S. 697 (2022) .............................................................*passim*

*Whitman v. Am. Trucking Ass'ns*,
  531 U.S. 457 (2001) ...................................................................25

*Winter v. NRDC, Inc.*,
  555 U.S. 7 (2008) .......................................................................22

*Wyeth v. Levine*,
  555 U.S. 555 (2009)..........................................................22, 26, 57, 61

*Yates v. United States*,
  574 U.S. 528 (2015)...........................................................................39

**Statutes, Regulations, and Constitutional Provisions**

U.S. Const. amend. X ..........................................................................26

U.S. Const. art. VI, cl. 2......................................................................24

Ohio Const. art. XV, §6 .........................................................................4

17 C.F.R. §38.4 ....................................................................................10

17 C.F.R. §38.8 ....................................................................................10

17 C.F.R. §38.151 ................................................................................55

17 C.F.R. §40.11..................................................................................10

17 C.F.R. §40.11(a)(1) ....................................................................54, 57

54 Fed. Reg. 30694 (July 21, 1989) .......................................................9

75 Fed. Reg. 80572 (Dec. 22, 2010).....................................................55

76 Fed. Reg. 44776 (July 27, 2011) ......................................................11

77 Fed. Reg. 48208 (Aug. 13, 2012)......................................................11

89 Fed. Reg. 48968 (June 10, 2024) ................................................11, 30

91 Fed. Reg. 12516 (Mar. 16, 2026) .....................................................16

7 U.S.C. §1a..................................................................................*passim*

7 U.S.C. §2 ...................................................................................*passim*

7 U.S.C. §5 ...................................................................................*passim*

7 U.S.C. §7a-2................................................................................*passim*

7 U.S.C. §13a-2 ........................................................................................... 51

7 U.S.C. §16 ............................................................................. 8, 20, 48, 51

7 U.S.C. §19 ............................................................................................ 32

15 U.S.C. §8302 ...................................................................................... 45

18 U.S.C. §1084 ............................................................................... 21, 55

25 U.S.C. §2701 ...................................................................................... 56

30 U.S.C. §1254 ...................................................................................... 47

31 U.S.C. §5361 ...................................................................................... 56

31 U.S.C. §5362 ...................................................................................... 56

31 U.S.C. §5363 ...................................................................................... 56

Ohio Rev. Code §§3769.01-.28 ................................................................ 5

Ohio Rev. Code §§3770.01-.99 ................................................................ 5

Ohio Rev. Code §§3772.01-.99 ................................................................ 5

Ohio Rev. Code §§3774.01-.09 ................................................................ 5

Ohio Rev. Code §3775.01 ......................................................................... 5

Ohio Rev. Code §§3775.01–.99 ................................................................ 5

Ohio Rev. Code §3775.02 ......................................................................... 6

Ohio Rev. Code §3775.03 ......................................................................... 6

Ohio Rev. Code §3775.10 ................................................................... 6, 54

Ohio Rev. Code §3775.11 ....................................................................... 54

Ohio Rev. Code §3775.12 ....................................................................... 54

Ohio Rev. Code §3775.13 ......................................................................... 6

Ohio Rev. Code §3775.99 ................................................................................6

Pub. L. 111-203, 124 Stat. 1376 (2010) ......................................................9

**Other Authorities**

156 Cong. Rec. S5902 (daily ed. July 15, 2010) ......................................58

Alicia Park, *Kalshi Billionaire Cofounders Double Their Net Worths With Another Funding Round*, Forbes (May 7, 2026) ........................... 14, 28

Am. Gaming Ass'n, *State of the States 2025: The AGA Analysis of the Commercial Casino Industry* (May 2025) ............................................ 5, 6

Appellee Br., *Kalshiex LLC v. CFTC*, No. 24-5205 (D.C. Cir.) (Nov. 15, 2024) ............................................................................ 34, 35

Brandon Gustafson, *2024: A year of growth for sports betting revenue*, CBS Sports (Mar. 28, 2025) ................................................................28

CFTC, *Designated Contract Market Products—KEX* ......................... 12, 40

Dustin Gouker, *Kalshi Was Promoting A 30-Leg Parlay To Users On Tuesday*, Event Horizon (Apr. 1, 2026) ...................................... 14, 34

Dustin Gouker, *Ten Times Kalshi Said People Could Bet On Things*, Event Horizon (April 3, 2025) ......................................................12, 13

Hannah Vanbiber & Dan Santaromita, *What is the craziest Super Bowl bet on prediction markets?  Bad Bunny outfits, Taylor Swift and more*, The Athletic (Feb. 8, 2026) .........................................................14

John C. Hull, *Options, Futures, and Other Derivatives* (8th ed. 2012) ..........6, 8, 9, 31

Kalshi Website, Combos .............................................................................14

Kalshi Website, Help Center: Trading; Fees .............................................12

Kalshi Website, Pistons at Cavaliers: Total Points (May 9, 2026) .........13

Kalshi Website, Sports ...............................................................................13

Ken Sweet, *Trump administration backs Kalshi and Polymarket as states move to ban prediction markets*, PBS News (Feb. 17, 2026).................................. 14

Laya Neelakandan, *Kalshi says Super Bowl trading volume surpassed $1 billion*, CNBC (Feb. 10, 2026) .......................................................................... 14

*Oxford English Dictionary* (2025) ............................................................. 62

Rena S. Miller, *Derivatives Regulation and Legislation Through the 111th Congress*, Congressional Research Services (Jan. 30, 2012) ................................ 8

*Webster's New World Dictionary* (3rd College ed. 1988) .............................. 32, 36, 62

*Webster's Third New International Dictionary* (2002) ....................................... 36, 62

X Post, @Kalshi (May 29, 2026) ......................................................... 12

**STATEMENT REGARDING ORAL ARGUMENT**

Kalshi wishes to offer sports betting free from state regulations.  It thus posits an aggressive preemption theory under which Congress subtly removed the States' authority over sports betting.  If accepted, Kalshi's theory would strip Ohio and other States of their ability to protect citizens from the dangers of sports betting.  The State Defendants believe oral argument will assist the Court.  The Court has scheduled oral argument for July 30, 2026.  *See* Notice of Oral Argument, Doc.35.

# JURISDICTIONAL STATEMENT

The State Defendants agree with Kalshi's jurisdictional statement.

## STATEMENT OF THE ISSUES

1.  Is Kalshi's claim that the Commodity Exchange Act preempts Ohio's historic sports-betting authority likely to succeed?

2.  Did the District Court abuse its discretion in balancing the preliminary-injunction factors?

## INTRODUCTION

Medical students learn that when they hear hoofbeats, they should think horses, not zebras.  The point being, in medicine, the obvious answer is usually the right one.  The same goes for law.  When reading statutes, courts do not expect the unexpected.  The opposite—courts require that Congress speak clearly if it intends major changes to this nation's balance of power.

This matters because States have traditionally regulated the "controversial subject" of "sports gambling."  *Murphy v. NCAA*,  584 U.S. 453, 486 (2018).  In 2018, the Supreme Court confirmed as much.  *See id.* at 458.  So one expects that any major changes to that established federal-state power balance happen through clear congressional authorization.  "Too bad" says Kalshi, a prediction market that offers sports betting in violation of Ohio law.  According to Kalshi, the Commodity Exchange Act ("CEA")—a complex statutory scheme about financial derivatives—secretly displaced the States' authority over sports betting.  And, supposedly, Congress made this seismic but silent change almost a decade before *Murphy* as part of legislation responding to the 2008 financial crisis (which had nothing to do with sports betting, which was mostly illegal then).  Apparently, nobody noticed for years, including the High Court in *Murphy*.  Tellingly, Kalshi's "Look Ma, no hands!"

approach has no room for, or citation to, *Murphy*. *EPA v. EME Homer City Genera-tion, L.P.*, 572 U.S. 489, 525 (2014) (Scalia, J., dissenting).

All this sounds wrong because it is. Kalshi starts from behind on intuition alone. In fact, the CEA's text does not support, much less *clearly* support, Kalshi's extreme position. Again, the obvious answer is usually the right one. And the obvious answer here is that Congress did *not* stealthily remove the States' traditional authority over sports betting without mentioning the topic. The District Court correctly rejected Kalshi's implausible theory; this Court should affirm.

## STATEMENT

### I. The States have long regulated sports betting.

**A.** Gambling regulation falls within the States' traditional police powers. *Ah Sin v. Wittman*, 198 U.S. 500, 505–06 (1905). For much of this country's history, the States "largely banned" gambling. *Murphy*, 584 U.S. at 458. Today, most States allow some gambling. But they heavily regulate it.

Ohio's experience tracks this broader history. Even before Ohio's statehood, leaders in the Northwest Territory prohibited gambling. *Mills-Jennings of Ohio, Inc. v. Dep't of Liquor Control*, 70 Ohio St. 2d 95, 99 (1982). Early Ohio laws similarly made gambling illegal. *Id.* Gradually, Ohio legalized some gambling, ranging from bingo to casinos. *Id.* at 101; Ohio Const. art. XV, §6(C). But Ohio comprehensively

regulates gambling activities. *E.g.*, Ohio Rev. Code §§3769.01–.28, 3770.01–.99, 3772.01–.99, 3774.01–.09.

**B.** Like other gambling, sports betting was illegal throughout the States for much of this country's history. *See Murphy*, 584 U.S. at 460–61. Ohio, for example, has long imposed "criminal punishment" on "gamesters" betting on sports. *Hoss v. Layton*, 3 Ohio St. 352, 356 (1854).

In the twentieth century, a few States began permitting some sports betting. *See Murphy*, 584 U.S. at 462. Congress, however, through the Professional and Amateur Sports Protection Act of 1992, attempted to bar the States from authorizing additional sports betting. *Id.* at 461. In 2018, *Murphy* held that Act unconstitutional. *Id.* at 458, 480. Thus, just eight years ago, the Supreme Court left the States free to legalize-and-regulate sports betting. *Id.* at 486. After *Murphy*, some States kept sports betting illegal. But most now permit regulated sports betting. Am. Gaming Ass'n, *State of the States 2025: The AGA Analysis of the Commercial Casino Industry*, at 12–13 (May 2025), perma.cc/J27S-WLSB.

Today, Ohio authorizes "sports gaming" under a State-regulated process. *See* Ohio Rev. Code §§3775.01–.99; Schuler Decl., R.31-1, PageID#421. Under Ohio law, "sports gaming" means accepting wagers on sporting events. Ohio Rev. Code §3775.01(O)(1). To offer sports gaming, businesses must obtain licenses from the

Ohio Casino Control Commission. Ohio Rev. Code §3775.03(A)(1). To obtain licenses, businesses must prove they are suitable to facilitate sports betting. *Id.* at (B).

Ohio's sports-betting laws protect Ohioans in many ways. Because sports betting is riskier for young people, Ohio limits sports betting to those twenty-one and older. Ohio Rev. Code §3775.99(A)(2). Ohio's exclusion program allows people to place themselves on a voluntary exclusion list. Ohio Rev. Code §3775.02(B)(11). Ohio law also shields against improper sports-betting practices. *E.g.*, Ohio Rev. Code §§3775.10(B)(3), 3775.13(F).

## II.    For many decades, state gambling regulations co-existed with the CEA.

**A.** While the States have long regulated gambling, the federal government has long regulated financial derivatives. A "derivative" is a financial instrument the value of which depends on another more basic asset or commodity, such as the price of stocks or the cost of hogs. John C. Hull, *Options, Futures, and Other Derivatives*, 1 (8th ed. 2012). Parties use derivatives to "hedg[e]" against "risks in the economy." *Id.* A "futures contract" involves "an agreement between two parties to buy or sell an asset at a certain time in the future for a certain price." *Id.* at 7. Similarly, an "option" gives its holder the choice to buy or sell an asset by a certain date at a certain price. *Id.* Derivatives like futures and options are traded on organized markets, often called exchanges. *Id.* at 2, 7.

The federal government has regulated financial derivatives since 1921. Initially, federal regulation focused on grain futures and set requirements for "designated contract markets" to protect against "disseminating misleading information and manipulating prices." *Merrill Lynch, Pierce, Fenner & Smith v. Curran*, 456 U.S. 353, 362 (1982). Then, in 1936, Congress increased the scope of federal regulation through the CEA, which expanded federal coverage to other agricultural commodities and set new rules against fraud on designated contract markets. *Id.* at 362.

In 1974, Congress again increased federal regulation over derivative markets. It expanded federal oversight to cover non-agricultural commodities. *See id.* at 365 & n.29. And it created the Commodity Futures Trading Commission ("CFTC") to "separate the functions of the [CFTC] from those of the Securities and Exchange Commission and other regulatory agencies" and "consolidate federal regulation of commodity futures trading in" one agency. *Id.* at 365–66 & 386–87. Congress gave the CFTC "exclusive jurisdiction" over agreements and transactions "involving … contracts of sale of a commodity for future delivery … traded or executed on a [designated] contract market." 7 U.S.C. §2(a).

Concerned that some might overread the CFTC's power, Congress included two saving clauses in the exclusive-jurisdiction provision. The first says that "except as … provided" within the provision, the CEA does not "limit the jurisdiction" of

7

"regulatory authorities under the laws … of any State." §2(a)(1)(A). The second says that "[n]othing in the" provision "shall supersede or limit the jurisdiction conferred on courts of … any State." *Id.*

Congress has modified the CEA over the years. The CEA includes express-preemption clauses, which block state regulations in certain confined scenarios. *See* §16(e)(2), (h). Congress also introduced the term "excluded commodity" to address intangible commodities. *See* §1a(19)(iv). And, in 2000, Congress provided that the "transactions" subject to the CEA provide a "means for managing and assuming price risks, discovering prices, or disseminating pricing information." §5(a).

**B.** Another change to the CEA involves derivatives known as "swaps." Swaps are transactions in which two parties agree to exchange cash flows in the future. Hull, *Derivatives*, 148. Like other derivatives, swaps allow parties to hedge against financial risks. *Id.* at 148–175, 733. The "most common" swap is an interest-rate swap in which "a company agrees to pay cash flows equal to interest at a predetermined" rate over several years and, in return, receives interest at a floating rate over the same period. *Id.* at 148. Another example is a "credit-default swap," which mitigates the creditors' risk of a debtor's defaulting. For instance, a "company that supplies auto parts to General Motors" might "purchase a credit default swap on a GM bond to hedge against the risk of a GM default." Rena S. Miller, *Derivatives*

8

*Regulation and Legislation Through the 111th Congress*, Congressional Research Services, at 2 (Jan. 30, 2012).

Swaps first emerged in the 1980s. Hull, *Derivatives*, 148. For many years, the CFTC did not regulate them. *United States v. Phillips*, 155 F.4th 102, 112 (2d Cir. 2025); *see also* 54 Fed. Reg. 30694 (July 21, 1989). Without regulation, "[t]rading in swaps exploded in the early 2000s." *Phillips*, 155 F.4th at 113. Many blamed unregulated swaps for the 2008 financial crisis. *Id.*

Congress responded by passing the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"). Pub. L. 111-203, 124 Stat. 1376 (2010). Dodd-Frank extended the CFTC's jurisdiction to "swaps." *See* 7 U.S.C. §2(a)(1)(A). The CEA included a six-part definition of "swap," capturing different types. §1a(47)(A). Relevant here, the second definition says that swaps include "any agreement, contract, or transaction … that provides for any purchase, sale, payment, or delivery … that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." *Id.*

Dodd-Frank also created a "Special Rule" to safeguard against improper trading on federal markets. §7a-2(c)(5)(C). Under the rule, the CFTC may prohibit "event contracts" from being listed on designated contract markets if they involve certain

9

activities like terrorism, war, or gaming. *Id.* The Special Rule uses the phrase "event contracts" as a general label to describe "agreements, contracts, transactions, *or* swaps." *Id.* (emphasis added). So, although swaps are a type of event contract, event contracts are *not* always swaps.

Dodd-Frank strictly limited swaps trading. The legislation made it generally "unlawful for any person ... to enter into a swap unless the swap is entered into on" a CFTC-regulated contract market. §2(e); *see* §1a(18) (defining exempt parties, including banks and insurance companies). Thus, ordinary consumers who wish to trade in "swaps" must do so on designated contract markets.

A designated contract market seeking to list a new contract for trading may self-certify that the contract complies with federal requirements. §7a-2(c)(1). Within the certification, the market must supply the contract's details. 17 C.F.R. §38.4(b); *see also* 17 C.F.R. §38.8 (imposing additional requirements for swaps). The CFTC may disallow contracts that fail to satisfy federal requirements. §7a-2(c). But if the CFTC does not act, a self-certified contract becomes effective for trading. *See id.*

**C.** The CFTC long took a constrained view of its jurisdiction. Shortly after Dodd-Frank, for example, the CFTC issued a rule prohibiting designated contract markets from listing contracts "that involve[], relate[] to, or reference[] … gaming." 17 C.F.R. §40.11(a)(1). This rule, the CFTC explained, promoted "Congress's

10

intent to prevent gambling through the futures markets." 76 Fed. Reg. 44776, 44786 (July 27, 2011) (quotation omitted). This prohibition remains on the books.

The CFTC exercised similar caution in later actions. In a 2012 joint rulemaking with the SEC, the CFTC explained that "swaps" would not disrupt "customary business arrangements" that "historically have not been considered to involve swaps." 77 Fed. Reg. 48208, 48247 (Aug. 13, 2012). Swaps, the CFTC stressed, "involve risk-shifting arrangements with financial entities." *Id.* at 48248. Thus, the CFTC did not read the term "swaps" to capture transactions or arrangements involving "personal or family activities" that ordinary "consumers" regularly partake in. *Id.* at 48247.

Two years ago, a CFTC-proposed rule contrasted state gambling regulation with federal derivatives regulation. While "gambling is overseen by state regulators with particular expertise," the CFTC recognized that federal-derivatives law is not "aimed at protecting against gambling-specific risks and concerns." 89 Fed. Reg. 48968, 48983 (June 10, 2024). The CFTC acknowledged that it lacked a "statutory mandate" to regulate the "rapidly evolving field" of gambling. *Id.*

### III.    Kalshi offers sports betting without regard for state law.

**A.** This case concerns Kalshi, a designated contract market that began operating in 2020. Compl., R.1, PageID#12. Kalshi says it offers online event contracts. *Id.*

11

These contracts identify future circumstances and allow users to bet on whether those circumstances will happen.  Kalshi boasts that users may "[t]rade on anything."  *See* X Post, @Kalshi, https://x.com/Kalshi (last accessed May 29, 2026). To profit, Kalshi collects a transaction fee from each contract.  *See* Kalshi Website, Help Center: Trading; Fees, https://perma.cc/UKJ2-EGE7.  And while Kalshi does not directly engage in trading on its exchange, it uses "trading affiliate[s]" as "market maker[s]."  *See* Letter, R.11-2, PageID#249 n.2.

Kalshi began offering sports-related contracts in January 2025.  Compl., R.1, PageID#13.  In CFTC filings, Kalshi self-certified these sports-related contracts as "swap[s]."  *See* CFTC, *Designated Contract Market Products—KEX*, https://tinyurl.com/2s36bpkk (last assessed May 29, 2026).

To consumers, Kalshi's sports-related contracts mirror classic sports betting.  *See* Lake Decl., Exs. B–D, R.31-2, PageID#443–48.  Kalshi has advertised as much.  *See* Dustin Gouker, *Ten Times Kalshi Said People Could Bet On Things*, Event Horizon (April 3, 2025), perma.cc/CWK2-TZCV.  Take, for instance, this ad from last year's March Madness tournament:



*Id.*

Kalshi's website confirms the point. It includes an entire category dedicated to "sports" where users can make all types of bets—ranging from who will win a game, to whether a team will cover a point spread, to "prop" bets about the granular details of what will happen within a game (such as a player's performance). *See* Kalshi Website, Sports, https://kalshi.com/sports/all-sports (last accessed May 29, 2026). A month ago, for example, users could bet on whether the Detroit Pistons and Cleveland Cavaliers would combine for over 208.5 total points in their game. Kalshi Website, Pistons at Cavaliers: Total Points (May 9, 2026), https://perma.cc/YQ5R-CKDJ.

Kalshi also offers parlays (or "combos"), which allow users to combine two or more wagers into a single bet. To illustrate, Kalshi's website describes a combined bet on whether Russell Westbrook will have 10 or more assists, Demar DeRozan will

score 20 or more points, and Precious Achiuwa will have 10 or more rebounds within a basketball game. *See* Kalshi Website, Combos, https://perma.cc/8YSR-UDWQ. Parlays do not pay out unless each individual wager is correct. Users may build these parlays, but Kalshi also promotes pre-built ones—some with 30 combined bets. Dustin Gouker, *Kalshi Was Promoting A 30-Leg Parlay To Users On Tuesday*, Event Horizon (Apr. 1, 2026), https://perma.cc/3CC2-6N3B.

Kalshi has grown exponentially through sports betting. Recent data reflects that Kalshi is worth $22 billion and facilitates roughly $178 billion in annualized trading. Alicia Park, *Kalshi Billionaire Cofounders Double Their Net Worths With Another Funding Round*, Forbes (May 7, 2026), https://perma.cc/MGE6-DZL4. Roughly 90 percent of trading on Kalshi involves sports. Ken Sweet, *Trump administration backs Kalshi and Polymarket as states move to ban prediction markets*, PBS News (Feb. 17, 2026), https://perma.cc/3K9P-CQJ6. Indeed, Kalshi recently reported over a billion dollars in trading on Super Bowl Sunday. Laya Neelakandan, *Kalshi says Super Bowl trading volume surpassed $1 billion*, CNBC (Feb. 10, 2026), https://perma.cc/PS9A-2K76. Bets included whether announcers would say "tush push." Hannah Vanbiber & Dan Santaromita, *What is the craziest Super Bowl bet on prediction markets?  Bad Bunny outfits, Taylor Swift and more*, The Athletic (Feb. 8, 2026), https://perma.cc/WH97-NJNG.

14

**B.**  To defend its sports-betting activities, Kalshi argues that the CEA preempts state laws.  Kalshi's precise theory has been a moving target.  But its most-used argument has been that its contracts are "swaps" within the CFTC's exclusive jurisdiction.  *E.g.*, Letter, R.11-2, PageID#248.  Kalshi is litigating this theory across the country.

Results have been "fractured" so far.  *KalshiEX LLC v. Schuler*, No. 26-3196, 2026 WL 1295806, at *3 (6th Cir. Apr. 24, 2026) (*per curiam*).  A divided Third Circuit panel recently affirmed a preliminary-injunction ruling in Kalshi's favor. *KalshiEX, LLC v. Flaherty*, 172 F.4th 220 (3rd Cir. 2026).  But several district courts have rejected Kalshi's arguments.  *E.g.*, *KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667 (D. Md. 2025); *KalshiEx, LLC v. Hendrick*, 817 F. Supp. 3d 1014 (D. Nev. 2025).

**C.**  This past September, the CFTC issued an advisory about sports betting on derivatives markets.  CFTC Advisory, R.31-3, PageID#450–54.  The advisory warned that those offering sports-betting event contracts should account for the possibility that state law will "result in the termination" of such contracts.  *Id.*, PageID#451.

The CFTC has since changed its tune.  It recently swore in a new Chairman who, without public input, announced his belief that all event contracts are swaps—including those about sports.  The CFTC has since filed amicus briefs supporting

15

prediction markets in this and other cases. *E.g.*, CFTC Br., Doc.31. The CFTC has also brought litigation itself. *E.g.*, *United States v. Arizona*, No. 2:26-cv-2246 (D. Ariz). The CFTC has further signaled its intent to propose new regulations. 91 Fed. Reg. 12516 (Mar. 16, 2026).

## IV.   Kalshi sued Ohio officials, the District Court denied an injunction, and this Court denied relief pending appeal.

**A.** In March 2025, the Ohio Casino Control Commission sent Kalshi a cease-and-desist letter warning Kalshi that its conduct violated Ohio law. Letter, R.11-1, PageID#244–45. Kalshi ultimately filed this lawsuit and sought a preliminary injunction. Compl., R.1, PageID#1–24; P.I. Mot., R.11, PageID#215–42. Kalshi claims that the CEA preempts Ohio's sports-betting laws.

The District Court denied preliminary relief. Op., R.69, PageID#895. It rejected Kalshi's premise that sports-betting event contracts are "swaps." *Id.*, PageID#901–06. The court also found it unlikely—even assuming that sports-betting event contracts are swaps—that "Congress intended," through Dodd-Frank, to preempt the States' regulatory authority. *Id.*, PageID#907–10. The court also rejected Kalshi's conflict-preemption arguments. *Id.*, PageID#911–13. Finally, the court concluded that the balance of equities favored Ohio. *Id.*, PageID#914.

**B.** Kalshi asked this Court for an injunction pending appeal, which was denied. *Schuler*, 2026 WL 1295806. A motions panel assumed "without deciding" that

16

sports-betting event contracts are swaps. *Id.* at \*3. But the panel remained "unconvinced" by Kalshi's arguments, finding the merits "largely in equipoise (if not favoring Ohio)." *Id.*

The panel was skeptical that the CFTC's "exclusive jurisdiction" amounted to express preemption. *Id.* at \*4. The "typical" express-preemption provision, the panel observed, "uses words like 'preempt' or 'supersede' when it comes to state law." *Id.* The panel further stressed that the CEA's saving clauses and express-preemption clauses both cut against the idea that Congress "*expressly* preempt[ed] other state laws." *Id.*

Kalshi's field-preemption arguments were "equally debatable." *Id.* at \*5. The panel doubted that this was the "rare" case where federal interests were "so dominant that Congress would not have wanted any state intervention." *Id.* (quotation omitted).

The panel was also wary of Kalshi's conflict-preemption arguments. *Id.* at \*5–6. The "regulation of gambling enterprises," the panel explained, "lies at the heart of the state's police power." *Id.* at \*5 (quotation omitted). And Ohio seeks to "limit[] sports betting," not "target[] futures trading." *Id.* Thus, the panel presumed that if Congress meant to preempt Ohio's historic powers, that intent would be clear. *Id.* Applying that standard, the panel found Kalshi's arguments lacking. Kalshi, for

17

example, failed to show that Ohio's gambling regulation "would stand as an obstacle" to the CEA; it identified nothing more than "generic uniformity concerns." *Id.* at \*6. The panel rejected that it was "impossible" for Kalshi to comply with state and federal law simultaneously. *Id.* Although it might be expensive for Kalshi to comply with Ohio law, "expensive does not mean impossible." *Id.*.

The balance of harms also favored Ohio. Ohio would be harmed, the panel explained, if an injunction precluded Ohio from enforcing its laws. *Id.* at \*7.

## SUMMARY OF THE ARGUMENT

**I.** Kalshi is unlikely to succeed on the merits.

**A.** Under the Supremacy Clause, federal statutes may override state laws. But preemption is primarily a question of statutory interpretation. *See Kansas v. Garcia*, 589 U.S. 191, 208 (2020). When courts read statutes, they expect Congress to speak clearly when making dramatic changes. The federalism canon thus requires a clear statement for Congress to remove the States' traditional powers. *Bond v. United States*, 572 U.S. 844, 857–59 (2014). The major-questions doctrine similarly requires that Congress speak clearly to give federal agencies vast power over significant topics. *West Virginia v. EPA*, 597 U.S. 697, 721–23 (2022).

The federalism canon and the major-questions doctrine both apply here. Kalshi's position would deprive the States of their historic authority over sports betting. *See*

*Ah Sin*, 198 U.S. at 505–06.  And Kalshi's position would give the CFTC unparalleled power over a multi-billion-dollar industry involving millions of Americans.  *See King v. Burwell*, 576 U.S. 473, 485–86 (2015).  Kalshi's position, therefore, demands a clear statement.

**B.**  The text comes nowhere close.  The CEA covers financial instruments that serve meaningful economic interests, such as hedging against risk.  7 U.S.C. §5(a).  The CFTC thus has "exclusive jurisdiction" over only certain derivatives—most relevant here, "swaps."  *See* §2(a)(1)(A).  The CEA offers six different definitions of swaps.  The second definition says that a "swap" includes contracts that depend on "the occurrence of an event … associated with a potential financial, economic, or commercial consequence."  §1a(47)(A)(ii).  That means, for Kalshi to win, two things must be *clearly* true:  (1) sports-betting contracts are "swaps" under the CEA, and (2) the CEA preempts state-gambling laws.  Neither is true, much less clearly so.

Kalshi's sports-betting contracts are not "swaps."  Sports bets do not bear a sufficiently close relationship to external economic consequences.  Wagers on point spreads, player props, and multi-leg parlays do not hedge against economic risks.  *See* §5(a).  And Kalshi's sports-betting contracts do not actually depend on the

occurrence of a sporting event (the game itself). They instead depend on the outcome of—or sub-outcomes within—the sporting event.

Context and history support this reading. Reading the second definition of swap as broadly as Kalshi does—to capture anything with some conceivable downstream economic consequence—renders the remaining five definitions of swap largely meaningless. *See* §1a(47)(A)(i), (iii)–(vi). It also makes no historical sense to think that Congress—when enacting Dodd-Frank to respond to the 2008 financial crisis—intended to legalize sports betting nationwide.

Because Kalshi's sports-betting contracts are not swaps, they do not fall within the CFTC's exclusive jurisdiction. But even assuming otherwise, Kalshi must show that the CFTC's jurisdiction "preempts Ohio's sports-betting laws as applied to sports-betting event contracts." *Schuler*, 2026 WL 1295806, at *3. Several aspects of the CEA show that Kalshi's broad preemption theory fails. *See id.* at *4–6. For example, the CEA contains saving clauses that preserve state authority. *See* §2(a)(1)(A). And it contains narrow express-preemption clauses not implicated here. *See* §16(e)(2), (h).

**C.** Kalshi fails to identify any conflict between federal and state law. Ohio's sports-betting laws do not pose an obstacle to any purpose discernible from the CEA's text. Kalshi's generic regulatory-uniformity concern does not result in

20

preemption. *See Schuler*, 2026 WL 1295806, at *6. And while Kalshi complains about the expense of complying with Ohio law, that does not make compliance impossible. *See id.*

**D.** Kalshi's broad reading of the CEA would put federal law "at war" with itself. *Contra Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 502 (2018). For example, through the Wire Act, Congress chose to *promote* state law governing sports betting. *See* 18 U.S.C. §1084(a)–(c). That choice becomes functionally meaningless under Kalshi's position.

**E.** Kalshi's contrary arguments are unpersuasive and deviate from the text. For instance, Kalshi says that the CFTC's exclusive jurisdiction covers *any* agreement on a designated contract market. Kalshi Br.45. That sweeping position ignores the text and grammar of the statute, which limits the CFTC's "exclusive jurisdiction" to agreements and transactions "involving swaps" or trading in a "commodity." §2(a)(1)(A). Kalshi also runs from the consequences of its theory. If sports bets are swaps, then sports bets are generally "unlawful" unless they occur on a federally regulated market. §2(e). Thus, Kalshi is wrong to suggest that—under its reading— the States retain authority over sports bets occurring off-market. Kalshi Br.33.

**F.** The CFTC's late-breaking endorsement of Kalshi's position deserves no weight. The CFTC has no "special competence" to interpret statutes about its

21

authority. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400–01 (2024).  And the CFTC developed its new position for litigation, without public input.  Thus the position is "inherently suspect." *Wyeth v. Levine*, 555 U.S. 555, 577 (2009); *accord SEC v. Chenery Corp.*, 318 U.S. 80, 87, 92 (1943).

**II.**  The balance of harms favors Ohio.  If Ohio's sports-betting laws are enjoined, the State and its citizens will be irreparably harmed.  That harm far outweighs Kalshi's monetary interests.

## STANDARD OF REVIEW

To obtain a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008).  The last two factors merge when the government is the defendant. *Kentucky v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023).  This Court reviews a plaintiff's likelihood of success *de novo* and the balancing of preliminary-injunction factors for abuse of discretion. *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (*en banc*) (*per curiam*).

## ARGUMENT

Kalshi's position does not justify preliminary relief on either the merits or the equities.

### I.    Kalshi is unlikely to succeed on the merits.

Kalshi tells a tall tale: Congress secretly took away the States' traditional authority to regulate sports betting, without anyone noticing for over a *decade*. Not even the Supreme Court. After all, the laws relevant here were in place when the Supreme Court reaffirmed that the States are "free to act" on the "controversial subject" of "sports gambling." *Murphy*, 584 U.S. at 486. According to Kalshi, those were wasted words; indeed, Kalshi could not be concerned with even *citing Murphy*. *See generally* Kalshi Br. And that kind of "magic trick," *Ariz. State Legis. v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 825 (2015) (Roberts, C.J., dissenting)—here, one that grabs unheralded power over an area traditionally regulated by the States— triggers two binding clear-statement rules.

Unfortunately for Kalshi, the CEA "provides no authorization" for Kalshi's position "even when examined using the ordinary tools of statutory interpretation— let alone [the] clear congressional authorization" required to satisfy the clear-statement-rule trigger. *Biden v. Nebraska*, 600 U.S. 477, 506 (2023) (quotation omitted). As a prior motions panel recognized, Kalshi needs "two things" to win: its event

contracts need to be "swaps" under the CEA, and the CEA needs to preempt Ohio's authority to regulate them. *See Schuler*, 2026 WL 1295806, at *3. It is not, as Kalshi claims, that some preemption over something (traditional derivatives) means all preemption over everything, including sports bets. The motions panel foreshadowed this moment—even spotting Kalshi the significant premise that sports bets are swaps, without deciding the issue, the panel remained "unconvinced" by Kalshi's arguments. *Id*. Kalshi's misdirection through a dizzying array of statutory provisions remains as unpersuasive as it was before.

**A.   Federal preemption turns on the statutory text, and two binding clear-statement rules govern the textual analysis here.**

**1.** Under the Supremacy Clause, federal law is "the supreme Law of the Land." U.S. Const. art. VI, cl. 2. So, when Congress acts within its enumerated powers, it may displace state laws. Such preemption can take different forms: federal statutes sometimes preempt expressly; other times they preempt by implication. *Kansas*, 589 U.S. at 202–03. "But, there is no federal pre-emption *in vacuo*, without a constitutional text or a federal statute to assert it." *Hencely v. Fluor Corp.*, 146 S. Ct. 1086, 1093 (2026) (alteration accepted, quotation omitted). That means that "all preemption arguments," no matter their form, "must be grounded" in text. *Kansas*, 589 U.S. at 208.

24

Preemption thus depends on statutory interpretation. *Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 767 (2019) (Gorsuch, J., op.). Courts apply standard interpretative principles to decide federal law's "preemptive effect." *Id.* "Part of a fair reading of statutory text is recognizing that Congress legislates against the backdrop of certain unexpressed presumptions." *Bond*, 572 U.S. at 857 (quotation omitted). To "correctly read[]" statutory law, courts must remain "aware[] of certain presuppositions" about the traditional division of powers. *Id.* (quotation omitted).

Congress, moreover, does not "hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). That is, when Congress seeks to alter the "fundamental" nature of existing law, it does not use "vague terms or ancillary provisions." *Id.* Requiring such clarity ensures "that the legislature has in fact faced, and intended to bring into issue," the major change at stake. *Bond*, 572 U.S. at 858 (quotation omitted). The Supreme Court has synthesized these expectations—about how Congress legislates—into several clear-statement rules that guide how courts read statutes. *West Virginia*, 597 U.S. at 736–37 (Gorsuch, J., concurring). Two rules prove critical here.

The first is the federalism canon. The canon arises from "basic principles of federalism embodied in the Constitution." *Bond*, 572 U.S. at 859. The Constitution gives the federal government "only limited powers; the States and the people retain

25

the remainder." *Id.* at 854; *see* U.S. Const. amend. X. That scheme leaves the States with significant police powers, which they exercise for the public good. *Bond*, 572 U.S. at 854. Against that "backdrop," any statute that displaces or limits significant state power constitutes a major change. *See id.* at 857 (quotation omitted). And Congress must speak clearly when doing so. Thus, absent a "clear statement," courts should not assume "a significant change in the sensitive relation between" the federal and state governments in areas of "traditional state authority." *Id.* at 858–59 (quotation omitted); *accord Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 764 (2021) (*per curiam*).

The federalism canon also helps explain why courts sometimes speak of a "presumption" against preemption. *E.g.*, *Wyeth*, 555 U.S. at 565 & n.3. Removing the States' historic powers implicates the "sensitive relation" between this country's sovereigns. *Bond*, 572 U.S. at 858 (quotation omitted). Thus, in areas "traditionally governed by state law," courts should avoid "interpreting a federal statute" to bring about "*unintended* encroachment on the authority of the States." *CSX Transp. v. Easterwood*, 507 U.S. 658, 664 (1993) (emphasis added).

The second pertinent clear-statement rule is the major-questions doctrine. The doctrine teaches courts to employ "common sense as to the manner in which Congress would have been likely to delegate" power to federal agencies. *West Virginia*,

26

597 U.S. at 722–23 (alteration accepted, quotation omitted). "Extraordinary grants of regulatory authority," the Supreme Court has said, "are rarely accomplished through modest words, vague terms, or subtle devices." *Id.* at 723 (alteration accepted, quotation omitted). Accordingly, if an agency claims "broad, expansive power on an uncertain statutory basis," courts should be skeptical. *Learning Res., Inc. v. Trump*, 148 S. Ct. 628, 639 (2026) (Roberts, C.J., op.).

The major-questions doctrine applies to matters of great economic or political significance. *West Virginia*, 597 U.S. at 721. The doctrine thus kicks in when agencies claim expansive power over matters involving "billions of dollars" and implicating "millions of people." *King*, 576 U.S. at 485. In *Alabama Association of Realtors*, for example, the Supreme Court viewed $50 billion in "economic impact" as implicating the doctrine. 594 U.S. at 764. The agency there was also intruding "into an area that is the particular domain of state law," so the need for a clear statement was doubly apparent. *Id.*

**2.** This case implicates both the federalism canon and the major-questions doctrine. Begin with the federalism canon. As the Supreme Court has long recognized, gambling regulation fits neatly "within the police powers of a state." *Ah Sin*, 198 U.S. at 505–06. The States thus have a long track record of regulating gambling, including sports betting. *Above* 4–6. And the federal government has historically

27

"defer[red] to, and even promote[d], differing gambling policies in different States." *See Greater New Orleans Broadcasting Ass'n, Inc. v. United States*, 527 U.S. 173, 187 (1999).  It follows that Kalshi's theory—under which the States effectively lose their sports-betting authority—would be "a significant change in the sensitive relation between" the federal and state governments in an area of "traditional state authority." *See Bond*, 572 U.S. at 858–59 (quotation omitted).

This case also triggers the major-questions doctrine.  Sports betting is a politically and historically significant topic.  The practice has been illegal for much of this country's history, and it remains illegal in many States.  *Above* 4–5.  And the sports-betting industry has undoubted economic significance.  It has quickly ballooned into a multi-billion-dollar industry involving millions of Americans.  Over the last year, over one-in-five adults bet on sports. John Gramlich, *Americans increasingly see legal sports betting as a bad thing for society and sports*, Pew Research Center (Oct. 2, 2025), perma.cc/9WPS-4UYT.  Americans wagered almost $150 billion on sports in 2024. Brandon Gustafson, *2024: A year of growth for sports betting revenue*, CBS Sports (Mar. 28, 2025), https://tinyurl.com/yje8srnp.  Today, Kalshi alone facilitates roughly $178 billion in annualized trading volume.  Park, *Kalshi Billionaire Cofounders Double Their Net Worths With Another Funding Round*.  Sports betting thus easily

meets the major-questions doctrine's economic thresholds. *See King*, 576 U.S. at 485; *Ala. Ass'n of Realtors*, 594 U.S. at 764.

Kalshi's theory would lead to an immense shift in power. To understand why, the Court should consider the interaction between the definition of swaps, 7 U.S.C. §1a(47)(A), and the prohibition on off-market trading, 7 U.S.C. §2(e). If sports-betting event contracts are swaps, then sports bets cannot be treated otherwise, regardless of how they are packaged or traded. Under federal law, a swap covers "any" type of "agreement, contract, or transaction" that satisfies certain conditions. §1a(47)(A). If an "agreement, contract, or transaction" satisfies those conditions, it becomes generally "unlawful for any person" to enter into the arrangement except via a CFTC-regulated contract market. §2(e). Thus, if sports bets are swaps, they *must* take place on federal markets. Under Kalshi's reading, Ohio and other States would retain no power to authorize sports betting through "off-market," state-regulated processes.

The CFTC's recent power grab cements this case's major-questions status. The CFTC has had jurisdiction over swaps for more than fifteen years. And it has had jurisdiction over other derivatives for half a century. But until recent months, the CFTC never claimed that its jurisdiction was broad enough to cover sports betting. In fact, just two years ago, the CFTC recognized that "gambling is overseen by state

29

regulators" and that there is no "statutory mandate" to the contrary. 89 Fed. Reg. at 48982–83. Nonetheless, the Commission now claims to have discovered, within fifteen-year-old statutory text, "an unheralded power" that would drastically expand its authority. *See West Virginia*, 597 U.S. at 724 (quotation omitted). That should sound the alarm.

> **B.**  **The Commodity Exchange Act's text does not preempt the States' authority over sports betting.**

Given the above analysis, Kalshi's position works only if the CEA clearly preempts the States' sports-betting authority. The text falls well short.

Almost all Kalshi's arguments rest on the CEA's exclusive-jurisdiction provision. In relevant part, that provision says:

> The Commission shall have exclusive jurisdiction … with respect to accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an "option", "privilege", "indemnity", "bid", "offer", "put", "call", "advance guaranty", or "decline guaranty"), and transactions involving swaps or contracts of sale of a commodity for future delivery (including significant price discovery contracts), traded or executed on a contract market designated pursuant to section 7 of this title …

§2(a)(1)(A). So, "two things" must be true for Kalshi to succeed. *Schuler*, 2026 WL 1295806, at *3.

*First*, sports-betting event contracts must "qualify as 'swaps'" or another listed derivative. *See id.* The text limits the CFTC's "exclusive jurisdiction" to only certain "accounts, agreements, … and transactions." §2(a)(1)(A). Specifically, the

30

phrase "involving swaps or contracts of sale of a commodity for future delivery" modifies the earlier list of nouns ("accounts, agreements, … and transactions"). §2(a)(1)(A); *see Facebook, Inc. v. Duguid*, 592 U.S. 395, 402–03 (2021) (discussing the series-qualifier canon). Thus, the only agreements and transactions within the CFTC's "exclusive jurisdiction" are those involving "swaps" or futures trading in "commodit[ies]." *See* §2(a)(1)(A).

*Second*, even if Kalshi's contracts involve swaps or commodities, "Kalshi next must show that" the CEA preempts Ohio's authority "as applied to sports-betting event contracts." *Schuler*, 2026 WL 1295806, at *3. The CFTC's "exclusive juris-diction"—a phrase the statutory scheme leaves largely unexplained—must clearly signal Congress's intent to displace the States' traditional sports-betting authority.

Kalshi shows neither.

### 1. Sports-betting event contracts are not swaps or trading in excluded commodities.

**a.** Kalshi says its sports-betting contracts are swaps. Kalshi is wrong.

To understand why, start with the goal of derivatives. Derivatives are financial instruments that parties use for price discovery or to hedge against economic risks. *See* Hull, *Derivatives*, 1. The CEA embraces that notion. It says that the "transac-tions subject to" its terms are those that provide "a means for managing and

31

assuming price risks, discovering prices, or disseminating pricing information through trading." §5(a); *see also* §19(a)(2).

With those purposes in mind, turn to the statutory definition of "swaps." The definition has *six* different parts. §1a(47)(A). They are all relevant here, *see below* 38–39, but the second definition is most directly at issue:

[T]he term "swap" means any agreement, contract, or transaction …

(ii) that provides for any purchase, sale, payment, or delivery (other than a dividend on an equity security) that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence.

§1a(47)(A)(ii). Contracts must satisfy two conditions to be swaps under this definition. They must depend on the occurrence of something that is "associated with a potential financial, economic, or commercial consequence." *Id.* And the occurrence must be significant enough to be classified as "an event." *Id.* Kalshi's sports-betting contracts satisfy neither condition.

***Economic consequences.*** The first problem is that Kalshi allows betting on things that are not sufficiently connected to economic consequences. The critical statutory phrase is "associated with." §1a(47)(A)(ii). To "associate" means to naturally "connect" or "join" things together. Webster's New World Dictionary 83 (3rd College ed. 1988). The statutory definition thus refers to events that bear a close or inherent relationship to potential economic consequences. Other parts of the CEA

32

reinforce that understanding.  As discussed above (at 19), the "transactions subject" to the CEA must serve meaningful risk-management or price-discovery interests. *See* §5(a).  As detailed below (at 38), the surrounding swap definitions involve financial instruments with real economic stakes.  *See* §1a(47)(A)(i), (iii), (v).

This reading of "associated with" makes particular sense because "the good textualist is not a literalist." *Chevron USA Inc. v. Plaquemines Par.*, 146 S. Ct. 1052, 1061 (2026) (quotation omitted) (interpreting "relating to").  If the Court reads "associated with" too broadly, it becomes "meaningless." *See id.* at 1060 (quotation omitted).  After all, "everything" is associated with "everything else" in some loose sense. *See id.* at 1060–61 (quotation omitted).   But that cannot be what Congress meant.  The more natural reading is to require "a connection that is not tenuous, remote, or peripheral." *See id.* at 1061 (quotation omitted).  Said in reverse, the text requires "a close relationship between" the purported event and the potential economic consequences. *See id.*

Sports bets flunk this economic-consequences requirement.  Sports are big business, but the economics of that business do not depend on the outcome of each isolated game.  A game's final score is not an occurrence people use for price discovery or to hedge against economic risk.  *Contra* §5(a).  Worse still for Kalshi, most sports bets it offers are far more obscure than "which team wins":  they involve things like

whether a team covers a point spread, the total combined points in a game, or the statistical performance of players. *See above* 19–20.  Nobody outside the sports-betting world uses such arbitrary sports bets (like whether Lebron James will score more than 20 points on Tuesday, or whether Ohio State and Michigan will combine for more than 50.5 points) to protect against financial risks.  There is no meaningful economic consequence to *these* occurrences alone.  Recall also that Kalshi offers parlays, which allow users to combine *dozens* of different bets within a single wager.  As one commentator put it, if you think such parlays are "a meaningful financial instrument, you're not a serious person."  Gouker, *Kalshi Was Promoting A 30-Leg Parlay To Users On Tuesday*.

Tellingly, during earlier litigation about election-related contracts, Kalshi openly admitted this disconnect between sports betting and economic consequences.  *Hendrick*, 2025 WL 3286282, at \*7 n.3 (collecting litigation statements).  A "game," Kalshi said then, is a "thing that doesn't have intrinsic economic significance."  *Id.*  Kalshi also acknowledged that offering contracts about sports would go against the basic purpose of designated contract markets.  Appellee Br.44–45 in *Kalshiex LLC v. CFTC*, No. 24-5205 (D.C. Cir.) (Nov. 15, 2024), Doc. 2085055.  The purpose of such markets, Kalshi explained, "is to allow hedging of economic risk."  *Id.* at 45

34

(quotation omitted). Whereas "sports gambling" is an activity "for diversion or amusement." *Id.* at 44–45 (quotation omitted).

One further point about economic consequences. Kalshi apparently wants a preliminary injunction halting *any* enforcement of Ohio law against it. *See* P.I. Mot., R.11, PageID#241. To justify that broad relief, Kalshi must show that *every* sports bet it offers falls within the CEA. Even if the Court thinks some sports bets have sufficient economic consequences, that does not justify enjoining Ohio law in all applications. Kalshi must run the table and establish preemption as to everything it does.

That last point sets up an easy path to affirmance. If this Court finds that at least some of the obscure sports bets Kalshi offers are not sufficiently associated with economic consequences, then Kalshi loses.

*Outcomes versus events.* The next problem for Kalshi: not everything that happens is important enough to be called "an event." That matters here because, to satisfy the swap definition, a contract must depend on "the occurrence" of "an event." §1a(47)(A)(ii).

The statute uses different words, "occurrence" and "event," to describe different happenings. Because Congress chose to use different words, they presumably have distinct meanings. *See Henson v. Santander Consumer USA Inc.*, 582 U.S. 79,

86 (2017). "[O]ccurrence is the general word for anything that happens or takes place." *Webster's New World Dictionary* 937 (3rd College ed. 1988). An "event" is also "an occurrence," but one of greater "relative significance." *Id.* Thus, an event is "a noteworthy occurrence." *Webster's Third New International Dictionary* 788 (2002). The word "event" therefore *limits* the word "occurrence." That makes sense: if swaps could be about anything that happens (no matter how unimportant), swaps would cease to be meaningful financial instruments. *Contra* §5(a).

In effect, the statutory definition forces readers to distinguish between things that happen (occurrences) and things that are particularly noteworthy (events). Such line drawing is simple for sports. When people discuss a sporting event, they are ordinarily referring to "a particular contest" (like a baseball game), not to isolated occurrences within the contest (like each pitch or run scored). *See Webster's New World Dictionary* 471 (3rd College ed. 1988).

The statutory definition does not say that "swaps" capture the occurrence of an "outcome." "Outcome" has a more specific meaning than the word "event." It normally refers to a "result" that "comes out of or follows an activity." *Webster's Third New International Dictionary* 1601 (2002). For a contract to be a swap, the contract's payment must depend on whether that identified "event," *itself*, occurs.

36

§1a(47)(A)(ii). A contract that takes as a given that an event is going to occur, and instead depends on the outcome of the event, does not satisfy the definition.

This distinction between event-dependent contracts and outcome-dependent contracts is illustrative for sports betting. Kalshi's sports-betting contracts depend on the outcomes of games, not on whether the game (itself) takes place. For example, people do not ordinarily refer to Kentucky beating Tennessee by more than 10.5 points as an "event." And they certainly do not refer to hitting on every leg of a multi-pronged parlay as an "event." Kalshi seems to appreciate this. It describes its sports-betting contracts as being "based on the outcome" of an "event." *E.g.*, Certification Submission, R.1-7, PageID#166.

If this Court reads "event" too broadly, then everything becomes the basis for a swap. The number of points scored. Whether a basketball announcer uses the words "double double." Whether Purdue or Texas is first to score ten points in their game. These were real bets on Kalshi, and none involves an occurrence that is significant enough to be an "event." If such things count as events, then "event" collapses into "occurrence," making Congress's word choice all for naught.

***Context.*** Courts do not interpret statutory text "in a vacuum." *Abramski v. United States*, 573 U.S. 169, 179 (2014). Rather, context and structure are important

37

"tools of divining meaning." *Id.* These considerations reinforce that sports bets are not swaps.

Remember that the statutory definition of "swap" has six parts. §1a(47)(A). While this case focuses on the second part, the other five provide useful context. For example, one of the surrounding definitions lists 22 different transactions—including "weather swap[s]" and "credit default swap[s]"—that parties commonly use to transfer "financial risk." §1a(47)(A)(iii). Another definition zeros in on certain security-based swap agreements that parties use to counteract market "volatility." §1a(47)(A)(v). Still another definition covers financial instruments that involve "financial or economic interests" such as "rates, currencies, commodities, securities, instruments of indebtedness, indices, [or] quantitative measures." §1a(47)(A)(i). These surrounding definitions matter for two reasons.

*First*, it is "basic" that a statute should be read in a way that gives effect "to all its provisions, so that no part will be inoperative." *Rubin v. Islamic Republic of Iran*, 583 U.S. 202, 213 (2018) (quotation omitted). Courts thus read statutes with "the common sense intuition that Congress would not ordinarily introduce a general term that renders meaningless the specific text that accompanies it." *Fischer v. United States*, 603 U.S. 480, 487 (2024).

38

Here, none of the six definitions of "swap" should be read so broadly as to swallow the others. The second definition thus requires caution. If that definition captures any imaginable occurrence that "could happen" and "might have some conceivable financial consequence" downstream, then the other swap definitions become superfluous. *See Hendrick*, 817 F. Supp. 3d at 1027. Under that limitless reading, for instance, there would be no need to individually list many of the swaps identified in the third definition. *See* §1a(47)(A)(iii).

*Second*, the surrounding definitions also matter because words are "known by the company" they keep. *Yates v. United States*, 574 U.S. 528, 543 (2015) (plurality op.). The "words immediately surrounding" a phrase can thus serve to "cabin the contextual meaning of that" phrase. *Id.* Here, the surrounding swap definitions list financial instruments designed to manage "financial risk," protect against market "volatility," and serve "financial or economic interests." *See* §1a(47)(A)(i), (iii), (v). So the second definition must be limited to meaningful financial instruments. More precisely, the surrounding language supports limiting swaps to events "inherently associated with a potential financial consequence" rather than events with any conceivable "downstream financial consequence." *Hendrick*, 817 F. Supp. 3d at 1028.

***History.***  Statutory interpretation also considers history.  *Abramski*, 573 U.S. at 179.  History further signals that sports-betting event contracts are not swaps.  Congress added "swaps" to the CFTC's exclusive jurisdiction in 2010, as part of Dodd-Frank.  That legislation responded to the 2008 financial crisis, which many associated with unregulated trading of certain financial instruments, such as credit-default swaps.  Nobody thought that "sports betting gone wrong" caused the financial crisis.  Sports betting was mostly illegal at the time.  *See Murphy*, 584 U.S. at 460–61.  And Congress had tried to keep it that way.  *Id.* at 461.  Thus, including sports betting within the confines of "swaps" makes no historical sense.

**b.**  Apart from swaps, transactions may also fall within the CFTC's "exclusive jurisdiction" if they involve "contracts of sale of a commodity for future delivery."  §2(a)(1)(A).  Kalshi, however, has certified its sports-betting contracts as "swaps" to the CFTC.  *See* CFTC, *Designated Contract Market Products—KEX*, https://tinyurl.com/2s36bpkk.  And "swap[s]" do *not* include "contract[s] of sale of a commodity for future delivery."  §1a(47)(B)(i).  So, given its past actions, Kalshi cannot now say that its contracts are instead commodities trades.  *See Edwards v. Aetna Life Ins. Co.*, 690 F.2d 595, 599 (6th Cir. 1982) (suggesting that judicial estoppel applies to positions taken before agencies).

Regardless, Kalshi's sports-betting contracts do not involve the sale or delivery of commodities.  To begin, Kalshi's contracts do not involve the sale or delivery of any item listed within the statutory definition of "commodity."  §1a(9).  Nor do Kalshi's contracts involve the sale or delivery of an "excluded commodity."  The statutory scheme defines "excluded commodity" to include "an occurrence" that is "beyond the control of the parties to the relevant contract" and "associated with a financial, commercial, or economic consequence."  §1a(19)(iv).  As established above (at 32–35), Kalshi's sports-betting contracts are not associated with potential economic consequences.  Thus, Kalshi also fails to meet the more stringent "associated with" requirement within the excluded-commodity definition, which omits the word "potential."

**c.**  Kalshi claims sports-betting contracts are everything (at times agreements, other times trades in excluded commodities, sometimes swaps), everywhere (because anything that happens eventually connects to everything else), all at once.  Its atextual arguments are unpersuasive.

Kalshi first claims that the CFTC's exclusive jurisdiction covers all "agreements" traded on designated contract markets, regardless of whether they are "swaps."  Kalshi Br.31, 45.  That argument makes a mess of the text. Applying the series-qualifier canon, the phrase "involving swaps or contracts of sale of a

41

commodity for future delivery" modifies the accounts, agreements, and transactions over which the CFTC has jurisdiction. *Above* 30–31. The CFTC's exclusive jurisdiction is thus limited to instruments that fit within those categories.

The Court can also reject Kalshi's all-agreements-traded-on-market argument without diving into grammar. Within the exclusive-jurisdiction provision, "agreements" is followed by a parenthetical list clarifying the types of agreements (including "option[s]") that fall within the CFTC's exclusive jurisdiction. §2(a)(1)(A). That list would be pointless if all agreements on designated contract markets were automatically within the CFTC's exclusive jurisdiction. Under any principled reading, the CFTC has exclusive jurisdiction only as to certain listed derivatives. In arguing otherwise, Kalshi departs from the text.

Kalshi tries another statutory sleight-of-hand that is equally clumsy. It repeatedly suggests that event contracts are *always* swaps. Kalshi Br.16, 40, 47. That is wrong on multiple levels. For one thing, the CEA comprehensively defines "swap." §1a(47)(A). No statutory definitions say a transaction becomes a swap simply because it is an event contract. For another thing, the CEA's Special Rule uses "event contracts" as a broader term than "swap." *See* §7a-2(c)(5)(C). Event contracts may consist of "agreements, contracts, transactions, *or* swaps." *Id.* (emphasis added). As the disjunctive clarifies, event contracts are not always swaps; they can also be

other "agreements, contracts, [or] transactions." *Id.* Not all event contracts, it follows, are within the CFTC's exclusive jurisdiction. *See* §2(a)(1)(A).

Finally, in a three-sentence footnote, Kalshi suggests that its sports-betting contracts may be trades in excluded commodities. Kalshi Br.50 n.5. "[B]ut its heart is plainly not in it." *United States v. Arthrex, Inc.*, 594 U.S. 1, 17 (2021). Kalshi has not preserved the argument. Regardless, it fails for the reasons discussed above (at 41).

Kalshi eventually makes it to the statutory definition of "swap," but its arguments fail. Kalshi discusses the relevant text only briefly, and it never offers any rule for what counts as an event. *See* Kalshi Br.46–47. Kalshi also never explains why point spreads, player props, or multi-leg parlays are events. *See id.* This boundless approach comes as no surprise: when users may "trade on anything," *above* 12, one should not expect a limiting principle.

Kalshi's economic-consequences argument is similarly limitless. Kalshi stresses that the statutory definition requires only "potential" economic consequences. Kalshi Br.48. It says that the outcomes of sports games have potential economic consequences because they might bear some ethereal connection to things like advertising or television. *See* Kalshi Br.46–47. In making this argument, Kalshi stays at a high level of abstraction, never explaining how multi-leg parlays implicate economic consequences. It knows any explanation would get silly.

43

Kalshi's "everything" can be connected to "everything else" approach cannot be right. *See Plaquemines Par.*, 146 S. Ct. at 1060–61. The statute's use of "potential" undoubtedly signals that an event may lay the foundation for a swap even if economic consequences are not guaranteed. But that does not bless Kalshi's arguments. The statutory definition still requires that an event be "associated with" potential economic consequences. §1a(47)(A)(ii). And for "associated with" to have meaning, it must require something beyond a "tenuous, remote, or peripheral" connection. *See Plaquemines Par.*, 146 S. Ct. at 1061 (quotation omitted). Everything has *some* theoretical and attenuated potential economic consequences, but much less is in fact naturally "associated with" such consequences. Kalshi fails to appreciate the difference.

Kalshi presents only one real-life example of its sports-betting contracts used to hedge against economic risk. It claims that "sportsbooks themselves" have used Kalshi to offset financial risks from the sports betting they facilitate. Kalshi Br.47. Perhaps so—but that if-you-build-it-they-will-come argument does not transform a sports bet into a "swap." After all, all bets involve financial risk. But the CEA does not regulate financial instruments that defray *any* possible risk; it only covers swaps that regulate "economic" risks stemming from "*events*."

44

Kalshi fares no better on statutory context. It acknowledges the "six-part defini-tion" of swaps, Kalshi Br.46, but it never details how its broad reading of the second definition leaves work for the others. Rather than explaining the limits of its position, Kalshi suggests that Ohio's reading of the second definition might exclude weather-related swaps. Kalshi Br.48. That is a non-issue: the third statutory definition lists "weather swap[s]," so it does not matter if they satisfy the second. *See* §1a(47)(A)(iii). Kalshi also stresses that the statutory definitions are "flexible." Kalshi Br.49. That is true in some sense. The statutory definitions recognize the possibility that "future" instruments might become "commonly known" as swaps in financial markets. §1a(47)(iv). And the statute gives the CFTC some latitude to "further define" swap by regulation. 15 U.S.C. §8302(d)(1). But none of that helps Kalshi. It does not argue that sports bets have organically become known as swaps. And its swaps argument does not arise from any regulation.

Kalshi also presses the Third Circuit's decision in *Flaherty*. 172 F.4th 220. There, a divided panel affirmed relief in Kalshi's favor. But in concluding that sports-betting event contracts are swaps, the majority spent little time analyzing text, context, structure, or history. *Id.* at 224–32. The majority further admitted that its reading had no "limiting principle." *Id.* at 229. In short, the majority's meager anal-ysis of a complex statutory scheme lacks persuasive value.

**2.    The CFTC's "exclusive jurisdiction" does not preempt the field of sports betting, either expressly or impliedly.**

**a.** Even if Kalshi's sports-betting contracts are swaps, Kalshi must still show that the CEA "preempts Ohio's sports-betting laws as applied to" those contracts. *Schuler*, 2026 WL 1295806, at *3. Kalshi must thus show more than *some* preemption; it must show that preemption is broad enough to capture the States' sports-betting authority. Kalshi cannot make that showing.

Return to the CEA's exclusive-jurisdiction provision. §2(a)(1)(A). Kalshi argues that this is an express-preemption clause. But that text "would represent an unusual express-preemption provision." *Schuler*, 2026 WL 1295806, at *4. The provision blends the CFTC's "exclusive jurisdiction" with two saving clauses preserving state authority. §2(a)(1)(A). Even for traditional derivatives, that combination leaves murky whether and to what extent preemption applies to States. *See Am. Agric. Movement v. Bd. of Trade*, 977 F.2d 1147, 1155 (7th Cir. 1992) (observing that the text "provides no clue" about how to draw preemption lines for "futures trading"), *abrogated on other grounds by Freightliner Corp. v. Myrick*, 514 U.S. 280 (1995). Reference to the CFTC's "exclusive" role is arguably more about the relationship between federal actors: its "purpose," the Supreme Court has said, "was to separate the functions of the Commission from those of the Securities and Exchange Commission and other regulatory agencies." *Merrill Lynch*, 456 U.S. at 386.

46

Congress speaks more directly through the "typical" express-preemption provision. *Schuler*, 2026 WL 1295806, at *4 (discussing examples); *see also* 30 U.S.C. §1254(a), (g) (conferring "exclusive jurisdiction" to an agency but then *separately* "preempt[ing]" state law). Indeed, Kalshi itself speaks of a "logical inference of preemption." Kalshi Br.32 (quotation omitted). But an "inference" connotes implied preemption, not express.

Even if the CEA results in some preemption, "courts still must examine the scope of the preemption." *Transcon. Gas Pipe Line Co., LLC v. Pa. Env't Hearing Bd.*, 108 F.4th 144, 152 (3d Cir. 2024) (quotation omitted). For example, preemption as to civil-court proceedings does not extend to administrative-agency proceedings. *Id.* Likewise here, preemption of state regulation of traditional derivatives does not mean preemption as to sports betting. Several parts of the CEA cut against extending preemption that far.

Take the CEA's two saving clauses. §2(a)(1)(A). The first reflects that the CEA leaves untouched some relevant "regulatory authorities under" state law. *See id.* The second saving clause is even stronger. It says "without limitation," *Schuler*, *Schuler*, 2026 WL 1295806, at *4 , that "*[n]othing*" in the exclusive-jurisdiction provision "shall supersede or limit the jurisdiction conferred on courts of the United States or any State." §2(a)(1)(A) (emphasis added). The Supreme Court has

47

already explained that this language preserves federal-court claims that predate the CFTC's jurisdiction. *Merrill Lynch*, 456 U.S. at 379, 381–82, 386–87. But the second saving clause also preserves "the jurisdiction conferred on courts of … any State." §2(a)(1)(A). So, applying *Merrill Lynch*, this language also preserves state-court claims that predate the CFTC's jurisdiction. If nothing else, therefore, the second saving clause preserves the use of state-court proceedings to combat illegal sports betting. *Cf. Hoss*, 3 Ohio St. at 355, 357 (noting Ohio's historic power to punish illegal sports betting in state court).

The CEA elsewhere contains other express-preemption clauses. §§16(e)(2), (h)(2), 27f(b). One provision says that the CEA "preempt[s]" state law as to only certain types of "gaming." §16(e)(2). Another says that a "swap" may "not be regulated as an insurance contract under [state] law." §16(h). Kalshi does not argue that Ohio's regulations fall within either of these provisions.

These express-preemption clauses matter for two reasons. First, the clauses reinforce that the Court "should not read" other parts of the CEA "to expressly preempt other state laws." *Schuler*, 2026 WL 1295806, at *4 (emphasis deleted). Second, "Congress's choice to expressly preempt only certain categories of state laws," implies that Congress "did not mean to 'withdraw' the States' power to

48

enact all such laws in other circumstances." *Id.* (quoting *Arizona v. United States*, 567 U.S. 387, 399 (2012) (emphasis deleted)).

This is also not the rare field-preemption case in which a federal scheme is so comprehensive as to leave no room for the States. *See Kansas*, 589 U.S. at 208; *Arizona*, 567 U.S. at 399. The CEA "often permits state regulation" and thus leaves the States "a role to play." *Schuler*, 2026 WL 1295806, at *5 (discussing the CEA's other saving clauses). It follows that "Congress did not intend to preempt the field of futures trading." *See Am. Agric.*, 977 F.2d at 1155.

Finally, reading the CFTC's jurisdiction too broadly creates a contract-law oddity. *Schuler*, 2026 WL 1295806, at *5. If the mere use of the word "exclusive" is enough to displace state gambling law, then it must displace state contract law too. Does the CFTC then "create federal contract law from scratch?" *Id.* at *4. Even Kalshi thinks that is far-fetched: it says New York law governs lawsuits against it. Rulebook, R.1-6, PageID#148.

**b.** Kalshi's field-preemption arguments leave much to be desired. Begin with Kalshi's take on the two saving clauses within §2(a)(1)(A). Kalshi mentions the second saving clause (about state-court jurisdiction) only in passing; and Kalshi develops no explanation as to what the clause preserves. *See* Kalshi Br.56. As for the first saving clause (about state regulatory authority), Kalshi stresses that the clause

49

signals some level of preemption.  *E.g.*, Kalshi Br.32.  But Kalshi never explains which state "regulatory authorit[y]," §2(a)(1)(A), the clause preserves.

True, Kalshi promises that its position would leave the States with power to regulate sports betting that occurs off federally regulated markets.  Kalshi Br.33.  The promise is illusory.  For ordinary consumers, swaps *cannot* be traded off market.  §2(e).  So, if sports bets qualify as swaps, *see* §1a(47)(A)(ii), the States *cannot* allow them to occur via state regulated processes, *see* §2(e).  Simply put, sports bets cannot be "swaps" for on-market purposes but then "not swaps" for off-market purposes.  By ignoring this statutory interaction (between definition and prohibition), Kalshi runs from its position's extreme consequences.

Kalshi also puts much stock in the Special Rule.  That rule allows the CFTC to prohibit certain event contracts—about things like war, terrorism, and gaming—from being listed on designated contract markets as against the public interest.  §7a-2(c)(5)(C).  Kalshi says the Special Rule, by giving the CFTC this discretion, strips the States of concurrent authority.  Kalshi Br.40.  That is wrong.   Under the nondelegation doctrine, if Congress had meant to delegate that much discretion to the CFTC—to decide whether gambling is good policy for the whole country—it would have supplied an "intelligible principle" to guide that discretion.  *See FCC v. Consumers' Rsch.*, 606 U.S. 656, 673 (2025).  The Special Rule does not do so.  It is much

better read as a backstop that supplements state law and protects against improper gambling on derivatives markets.  Also, not all event contracts are swaps.  *Above* 42–43.  So the CFTC's special-rule authority over event contracts is *not* a proper surrogate for discerning the CFTC's exclusive jurisdiction over swaps.

Neither is §13a-2(1).  Kalshi Br.34, 43.  That section excludes States from enforcing the CEA against contract markets.  But Ohio wants to enforce its own laws, not the CEA, so the provision is inapposite.

Counterintuitively, Kalshi also says that the federal scheme's use of narrow express-preemption clauses favors broad preemption.   Kalshi's idea is that, because one of the express-preemption clauses addresses off-market transactions, state regulation of on-market transactions must already be preempted.  Kalshi Br.35.  But that rough logic does not explain the express-preemption provision about insurance.  *See* §16(h).  That provision preempts state insurance law as to "swap[s]" regardless of their on- or off-market status.  *Id.*

Caselaw does not save Kalshi's field-preemption arguments.  Kalshi cites several "exclusive jurisdiction" passages from cases dealing with the interrelationship between courts.  *See, e.g.*, *Mississippi v. Louisiana*, 506 U.S. 73, 77–78 (1992); *Am. Energy Corp. v. Rockies Express Pipeline LLC*, 622 F.3d 602, 605 (6th Cir. 2010); *Transcon.*, 108 F.4th at 151–52.  Those cases deal with courts, so they do not say that

51

"exclusive jurisdiction" for agencies always leads to preemption.   Kalshi's other cases are also inapposite:  they do not involve statutes with "exclusive jurisdiction" language.  *See, e.g.*, *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 163 (2016); *Duke Energy Trading & Mktg., LLC v. Davis*, 267 F.3d 1042, 1056–58 (9th Cir. 2001); *Richardson v. Kruchko & Fries*, 966 F.2d 153, 158 (4th Cir. 1992).

Kalshi also cites cases suggesting that the CEA has *some* preemptive effect.  Kalshi Br.36–37.  But those involve traditional futures trading.  None comes anywhere close to holding that preemption covers sports betting.   *E.g.*, *Leist v. Simplot*, 638 F.2d 283, 286 (2d Cir. 1980) (potato futures); *Am. Agric.*, 977 F.2d at 1151 (soybean futures).   One of the cases even rejected, as "specious," an argument much like Kalshi's.  *FTC v. Ken Roberts Co.*, 276 F.3d 583, 591 (D.C. Cir. 2001).  The D.C. Circuit disagreed with the notion that "whatever the [CFTC] may regulate, it regulates exclusively."  *Id.*  Such an argument, the D.C. Circuit explained, ignores the "imperfect overlap between" the CFTC's exclusive jurisdiction and its other authority. *Id.*

### C.     Ohio's sports-gambling laws do not conflict with federal law.

Preemption also occurs when state law conflicts with federal law.  *Arizona*, 567 U.S. at 399.  A conflict exists when (1) state law poses an obstacle to achieving

Congress's full purpose or (2) it is impossible to comply with federal and state law simultaneously. *Id.* Kalshi argues both obstacle and impossibility preemption. Both fail.

***Obstacle.*** Courts should be cautious with obstacle preemption. Preemption must stem from the text; it is not a freewheeling inquiry by which courts guess at Congress's objectives. *Kansas*, 589 U.S. at 202. No statute, moreover, pursues its purpose at all costs. *Henson*, 582 U.S. at 89.

This Court should make quick work of Kalshi's obstacle-preemption claim. Kalshi says that Ohio law is an obstacle to Congress's uniformity purpose. *See* Kalshi Br.41–42. The argument merely repackages earlier arguments about the CFTC's exclusive jurisdiction, which fail, as discussed above. To the extent this argument offers anything new, it is to invoke "generic uniformity concerns." *See Schuler*, 2026 WL 1295806, at *6. Those concerns are not enough "to meet the high threshold required to establish obstacle preemption." *Id.* (quotation omitted).

Kalshi's next obstacle-preemption claim is even weaker. Quoting an immigration case, Kalshi says that enforcing Ohio law would obstruct "Congress's chosen 'method of enforcement.'" Kalshi Br.43–44 (quoting *Arizona*, 567 U.S. at 406). That is nonsense. Federal and state governments often exercise concurrent

jurisdiction to enforce their laws. *See Oklahoma v. Castro-Huerta*, 597 U.S. 629, 650–51 (2022). That is not conflict in our federalist system.

*Impossibility.* Kalshi's impossibility-preemption claims also lack merit. Ohio law places certain physical-presence requirements on those that facilitate sports betting. *See* Ohio Rev. Code §§3775.11(A), 3775.12(A). Kalshi says those requirements make it impossible to comply with both Ohio and federal law. Kalshi Br.42. That is wrong—Ohio allows some interstate wagers done through state-licensed entities. *See* Ohio Rev. Code §3775.10(C), (D). And it is misplaced—under federal law, it remains illegal to offer swaps involving gaming on designated contract markets. 17 C.F.R. §40.11(a)(1). Because federal law itself prohibits Kalshi's activities, any purported conflict disappears.

Kalshi's impossibility arguments fail on other grounds too. Kalshi first claim is about §1a(51)(A)(ii), which concerns the definition of "trading facility." Kalshi did not properly preserve this claim below. *See* P.I. Mot., R.11, PageID#231–33. Regardless, Kalshi never develops an argument for how Ohio law renders compliance impossible. Kalshi instead complains that Ohio law is bad for business. *See* Kalshi Br.42. But "expensive does not mean impossible." *Schuler*, 2026 WL 1295806, at *6.

54

Kalshi's other impossibility claim likewise fails. The claim involves 17 C.F.R. §38.151(b), a regulation requiring designated contract markets to provide "impartial access to its markets." The regulation is an anti-discrimination command, not a limit on neutral geographic requirements. *See* 75 Fed. Reg. 80572, 80579 & n.51 (Dec. 22, 2010). The impartial-access regulation also does not "require a designated contract market like Kalshi to offer any 'particular market' for the event contracts it lists." *See Schuler*, 2026 WL 1295806, at *6 (quotation omitted).

One final conflict point. Even if this Court were to find a conflict with Ohio's physical-presence requirements, the solution would be to enjoin *those* requirements, not Ohio's *entire* statutory scheme.

### D.   Kalshi's reading of the Commodity Exchange Act renders other federal laws ineffective.

While this case involves Ohio law, Kalshi's position also implicates other federal laws. That proves significant because courts have a "duty to interpret Congress's statutes as a harmonious whole." *Epic Sys.*, 584 U.S. at 502. Courts thus employ a strong presumption against implied repeals. *Id.* at 510.

Kalshi's broad reading of the CEA would damage other federal laws. The Wire Act, for example, prohibits the use of interstate wire communications to facilitate sports betting unless such bets accord with the laws of the sending and receiving State. 18 U.S.C. §1084(a)–(b). But if Congress legalized interstate sports betting

under the CEA (regardless of state law), then the Wire Act's prohibition loses almost all of its practical meaning. Along similar lines, the Indian Gaming Regulatory Act gives Tribes the "exclusive right" to decide their gambling policies. *See* 25 U.S.C. §2701(5). But if the CFTC truly calls the shots, that right vanishes as to sports betting.

Consider also the Professional and Amateur Sports Protection Act. That Act prohibited the States from further legalizing sports betting. *Murphy*, 584 U.S. at 461. That prohibition was in place at the time of Dodd-Frank, and the Supreme Court had not yet found it unconstitutional. There is no reason to think Congress attempted to make that prohibition meaningless. But, under Kalshi's reading of Dodd-Frank, that is what Congress did. If Dodd-Frank legalized sports betting and occupied the field, then any independent bar on the States no longer mattered.

Kalshi counters with the Unlawful Internet Gambling Enforcement Act. That Act makes it a crime to fund illegal online betting. 31 U.S.C. §5363. Kalshi stresses that this Act defines "bet or wager" to exclude transactions on designated contract markets. *Id.* at §5362(1)(E)(ii). But that definition is limited to the relevant "subchapter" of the Federal Code; it does nothing to "alter[]" or "limit[]" other federal or state "gambling" laws. *See id.* at §5361(b). So that limited definition does *not* mean that transactions on designated contract markets can never be sports betting.

56

Read as a whole, federal law promotes state gambling regulations. *See Greater New Orleans*, 527 U.S. at 187. Kalshi's position does the opposite, which is yet another sign it is wrong.

### E.    Kalshi's remaining arguments are unpersuasive.

Kalshi scatters other arguments throughout its brief. None is convincing.

*Administrative challenge.* With little development, Kalshi argues that allowing Ohio to enforce state law would circumvent the Administrative Procedure Act. If Ohio wants Kalshi regulated, the argument goes, then it must sue the CFTC. *See* Kalshi Br.45–46.

This argument fails on both procedure and substance. Procedurally, Kalshi did not raise this argument until its reply below. *See* Reply, R.49, PageID#637–39. Substantively, the argument is meritless. Ohio is not challenging the CFTC's failure to enforce its own regulations. *See* 17 C.F.R. §40.11(a)(1). Rather, Ohio seeks to enforce Ohio law directly against Kalshi. Whether Ohio may do so turns on whether federal statutes preempt Ohio law. That is a matter for courts to decide, not the CFTC. *See Wyeth*, 555 U.S. at 576 (refusing, even during the *Chevron* era, to defer "to an agency's *conclusion* that state law is preempted").

*Legislative history.* Any preemption here must arise from statutory text, not legislative history. *See Kansas*, 589 U.S. at 208. Even so, Kalshi spends much of its

brief discussing legislative history. *See* Kalshi Br.xii–xiii (cataloging legislative history). At most, the cited legislative materials indicate that the CEA has *some* preemptive effect. But it does not follow that preemption sweeps so broadly as to capture sports betting. In fact, in the lead up to Dodd-Frank, lawmakers expressed their desire to prevent "gambling through supposed 'event contracts'" on derivatives markets. *See* 156 Cong. Rec. S5902, S5906–07 (daily ed. July 15, 2010). Thus, to the extent legislative history is relevant, it favors Ohio.

***Betting structure.*** Trying to soften its position, Kalshi stresses an irrelevant distinction. It says that its event contracts are different from normal sports betting because unlike a normal sportsbook, Kalshi is not a party to the bet. Kalshi Br.51–52.

The distinction does not matter. The relevant definition of swap captures "*any* agreement, contract, or transaction" that meets certain requirements. §1a(47)(A) (emphasis added). And none of those requirements focus on the specific parties to, or structure of, the transaction. *See id.* Whether Kalshi participates in its sports bets is irrelevant.

***Clear-statement rules.*** Kalshi also tries to sidestep clear-statement rules. Citing *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115 (2016), Kalshi argues that no presumption against preemption applies to its express-preemption arguments. Kalshi overstates *Puerto Rico*: in that bankruptcy case, the Supreme Court did not

"invoke any presumption against preemption" because the language of an express-preemption provision was "plain." *Id.* at 125. *Puerto Rico*, however, did nothing to revoke the federalism canon or the major-questions doctrine. Those rules are *not* atextual presumptions; they are binding canons of statutory interpretation. Thus, for matters within "the historic police powers of the States," a clear statement remains necessary when "addressing questions of express or implied" preemption. *Altria Group, Inc. v. Good*, 555 U.S. 70, 77 (2008) (quotation omitted).

Here, the motions panel was correct that gambling regulation—including sports betting—falls within Ohio's historic police powers. *Schuler*, 2026 WL 1295806, at *5. To argue otherwise, Kalshi cites *dicta* from *Churchill Downs Tech. Initiatives Co. v. Michigan Gaming Control Bd.*, 162 F.4th 631 (6th Cir. 2025). There, this Court found preemption of a Michigan horseracing law "clear" because of the "plain text" of a different federal scheme (the Interstate Horseracing Act). *Id.* at 641. In a footnote, the Court suggested without explanation that "the regulation of *interstate* gambling isn't a traditional area of state regulation." *Id.* at 641 n.5. The Court should not extend that unreasoned footnote. The footnote's suggestion oversimplifies gambling history: the reason why there has not been an been an interstate market for sports betting in this country is that nearly all States outlawed the activity. *See*

*Murphy*, 584 U.S. at 458.  And to the extent that some States (like Nevada) have allowed sports betting, *they have* regulated gambling involving games in other States.

Finally, Kalshi resorts to a historical non-sequitur.  It recalls a time when some decried classic futures trading (in grain) as gambling.  Kalshi Br.7–8.  From there, Kalshi concludes that classic gambling (sport betting) must really be futures trading too.  Kalshi Br.60.  But those are different kettles of fish.

### F.    The Court should be wary of the CFTC's new position.

**1.**  Under new leadership, the CFTC now supports Kalshi's arguments.  The CFTC has filed amicus briefs saying so, and it has even sued some States itself.  None of that, however, changes the analysis.

The CFTC's new position deserves no special weight.  This case turns on statutory interpretation, and the CFTC has "no special competence" to answer statutory questions about "the scope of" its own jurisdiction.  *See Loper Bright*, 603 U.S. at 400–01. Because the CFTC's fresh reading of statutes exalts its own authority, this case presents a scenario where "abdication in favor of the agency is *least* appropriate." *See id.* at 401.

The CFTC's new position also lacks any "particular power to persuade."  *See id.* at 402 (quotation omitted).  The position was prepared for litigation, without input from the public or the States.  The position is inconsistent with the CFTC's past

guidance, including guidance offered much closer in time to the enactment of the relevant statutory text. *Above* 11.  And the position does not arise from any special expertise as to sports betting.  All that makes the CFTC's position "inherently suspect."  *See Wyeth*, 555 U.S. at 577.

**2.**  In substance, the CFTC's reading of "swap" has the same flaws as Kalshi's. Like Kalshi, the CFTC imagines a world in which every point scored counts as a significant event that can be loosely connected to economic consequences.  *See* CFTC Br.10–13.  In making these limitless arguments, the CFTC shows surprisingly little respect for the CEA's boundaries:  the CEA reaches only meaningful financial instruments.  *See* §5(a).  The CFTC's position, moreover, would render pointless the other statutory definitions of "swap."  *See* §1a(47)(A)(i), (iii)–(vi).

The CFTC mostly parrots Kalshi, but a few points warrant quick discussion.  The CFTC suggests that because the second statutory definition of "swap" refers to that "*extent of* the occurrence of an event," people may bet on any detail as to how a game unfolds.  *See* CFTC Br.10–11 (quotation omitted).  Not so.  Even if the definition extended to unfulfilled events, "extent of" cannot turn an otherwise non-event into an "event."  Rather, it recognizes that events sometimes occur only in part.  In the sports context, for example, teams might be able to play only five innings of a baseball game (the event) due to rain.  That does not mean that every pitch or run within the

61

game becomes its own event. And it does nothing to separately answer the economic-consequences requirement for a swap.

The CFTC also argues that "the word 'events' encompasses 'outcomes.'" CFTC Br.11. That literalist reading clashes with ordinary speech: using "event" to mean "outcome" is a "rare" or "[a]rchaic" use of the term. *E.g.*, *Webster's New World Dictionary* 470–71 (3rd College ed. 1988); *Webster's Third New International Dictionary* 788 (sense 2.b) (2002); *Oxford English Dictionary* (sense I.1) (2025), https://www.oed.com/dictionary/event_n?tl=true.

The CFTC also wrongly argues that Ohio's reading of "swap" deprives the Special Rule of meaning. Because that rule mentions both swaps and gaming, the CFTC reasons, it must be that swaps can properly involve sports bets. CFTC Br.14. The argument ignores that the Special Rule covers transactions besides swaps (like agreements or contracts) and topics besides gaming (like war or terrorism). *See* §7a-2(c)(5)(C). The argument also ignores that the Special Rule's point is to keep *improper* transactions (packaged to look like derivatives) off federal markets.

The CFTC ends its brief with consequentialism, but the arguments are difficult to take seriously. The CFTC vaguely warns that Ohio's position would "have destabilizing effects." CFTC Br.26. But Ohio and other States have regulated sports

62

betting for centuries without toppling derivatives markets. *See above* 4–8. Kalshi and the CFTC are the ones seeking a sea change, not Ohio.

## II.   The balance of harms weighs heavily in Ohio's favor.

The balance of harms also favors Ohio. *See Schuler*, 2026 WL 1295806, at *6–7. Ohio's elected representatives have chosen to protect Ohioans from gambling risks in various ways. *Above* 6. If Ohio's duly enacted laws are enjoined, the State and its citizens will suffer irreparable harm. *Id.* at *7 (collecting authority). The economic burdens to Kalshi of complying with the law carry far less weight. And it is always in the public interest to "give effect to the will of the people" of the State. *Thompson v. DeWine*, 976 F.3d 610, 619 (6th Cir. 2020).

## CONCLUSION

The Court should affirm.

Respectfully submitted,

DAVE YOST
Attorney General of Ohio

*/s/ Mathura J. Sridharan*
MATHURA J. SRIDHARAN*
Ohio Solicitor General
 *Counsel of Record*
ZACHERY P. KELLER
JOHN F. KERKHOFF
LAYNE H. TIESZEN
Deputy Solicitors General
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614.466.8980
Mathura.Sridharan@OhioAGO.gov

*Counsel for Appellees*
 *Matthew Schuler, et al.*

64

## CERTIFICATE OF COMPLIANCE

I hereby certify, in accordance with Rule 32(g) of the Federal Rules of Appellate Procedure, this brief complies with the type-volume requirements for a principal brief and contains 12,995 words.  *See* Fed. R. App. P. 32(a)(7)(B)(i).

I further certify that this brief complies with the typeface requirements of Federal Rule 32(a)(5) and the type-style requirements of Federal Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Equity font.

*/s/ Mathura J. Sridharan*
MATHURA J. SRIDHARAN

## CERTIFICATE OF SERVICE

I hereby certify that on June 4, 2026, this brief was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

_/s/ Mathura J. Sridharan_
MATHURA J. SRIDHARAN

## DESIGNATION OF DISTRICT COURT RECORD

Appellees, pursuant to Sixth Circuit Rule 30(g), designate the following filings

from the District Court's electronic records:

### *KalshiEX, LLV v. Schuler*, 2:25-cv-1165

| Date Filed | R. No.; PageID# | Document Description |
|---|---|---|
| 10/7/2025 | R.1; 1–24 | Complaint |
| 10/7/2025 | R.1-6; 148 | KalshiEX LLC Rulebook |
| 10/7/2025 | R.1-7; 166 | Certification Submission |
| 10/7/2025 | R.11; 215–42 | Motion for Preliminary Injunction |
| 10/7/2025 | R.11-1; 244–45 | Cease-and-Desist Letter |
| 10/7/2025 | R.11-2; 248–49 | Response to Cease-and Desist Letter |
| 11/7/2025 | R.31-1; 421 | Declaration of Matthew T. Schuler |
| 11/7/2025 | R.31-2; 443–48 | Exhibits to Declaration of Jessica Lake |
| 11/7/2025 | R.31-3; 450–54 | CFTC Advisory Letter |
| 12/1/2025 | R.49; 637–39 | Reply in Support of Motion for Preliminary Injunction |
| 3/9/2026 | R.69; 895, 901–14 | Opinion and Order |
| 3/10/2026 | R.70; 915–17 | Notice of Appeal |