**No. 26-3196**
**(consolidated with No. 26-5235 for oral argument only)**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

KALSHIEX LLC,

*Plaintiff–Appellant*,

v.

MATTHEW T. SCHULER; THOMAS J. STICKRATH; SHEETAL BAJORIA; SCOTT P. BORGEMENKE; KEITH CHENEY; PENELOPE R. CUNNING-HAM;CHRISTOPHER SMITHERMAN; TRIFFON CALLOS; OHIO CASINO CONTROLCOMMISSION; DAVE YOST, OHIO ATTORNEY GENERAL,

*Defendants–Appellees.*

On Appeal from the United States District Court
for the Southern District of Ohio at Columbus,
Case No. 2:25-cv-1165, Hon. Sarah D. Morrison

**BRIEF OF BETTER MARKETS, INC. AS AMICUS CURIAE**
**SUPPORTING DEFENDANTS-APPELEES AND AFFIRMANCE**

Dennis M. Kelleher
Dominick V. Freda
Better Markets, Inc.
2000 Pennsylvania Ave., NW
Suite 408
Washington, DC 20006
(301) 437-4343
dkelleher@bettermarkets.org
dfreda@bettermarkets.org

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure ("FRAP") and Rule 26.1 of the Local Rules of this Court ("Local Rules"), Better Markets, Inc. ("Better Markets") states that it has no parent or affiliate corporation and there is no publicly held corporation or affiliate that owns any stock in Better Markets. Better Markets further states that there is no publicly owned corporation or affiliate that is aligned with Better Markets for which there is insurance, a franchise agreement, or indemnity agreement that would create a substantial financial interest in the outcome of the litigation.

## STATEMENT AS TO AUTHORSHIP AND FUNDING

In accordance with FRAP 29(a)(4)(E), Better Markets states that (i) no counsel for any party authored this brief in whole or in part; (ii) no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and (iii) no person—other than Better Markets, its members (of which there are none), or its counsel—contributed money that was intended to fund preparing or submitting this brief.

ii

# TABLE OF CONTENTS

**Page(s)**

Table of Authorities ................................................................ iv

I.  Kalshi's sports gambling contracts are not subject to the CFTC's exclusive jurisdiction ................................................................ 5

   A.  Text, structure, and history defeat express preemption. ............... 5

      1.  Sports wagers are not "swaps." ............................................. 6

      2.  The CEA expressly prohibits listing "gaming" contracts on the derivatives markets. ............................................. 10

      3.  The CFTC's historical treatment confirms that sports wagers are not swaps that lawfully can be traded on DCMs ............................................................................. 13

      4.  Legislative context and history confirm that sports wagers are prohibited from listing or trading on DCMs. ....... 16

   B.  Congress sought to enlarge the role of state law in financial regulation, not to preempt gaming regulation. ........................... 17

   C.  The district court correctly held that conflict preemption does not apply because the CFTC banned gaming contracts, and because Kalshi's sports gambling platform does not require uniform regulation. ........................................................ 18

II.  Preempting state regulation of Kalshi's sports betting threatens to harm millions of Americans, election integrity, and the derivatives markets themselves. ........................................................ 20

   A.  Preempting state law would erase important protections for Ohio's residents and those who reside in states with similar laws. ............................................................................................ 20

   B.  Preemption would also threaten election integrity. ..................... 22

   C.  The CFTC lacks the authority, expertise, and resources to oversee sports gambling, and it has a core mission that Americans depend on it to fulfill. ................................................ 24

Conclusion ................................................................................ 27

Certificate of Service ............................................................... 29

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arizona v. United States*, 567 U.S. 387 (2012).............................................2

*Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168 (2d Cir. 2004). ........................................................................6

*Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561 (1995) ....................................7

*KalshiEX LLC v. Flaherty*, 172 F.4th 220 (3d Cir. 2026).....................10, 19

*KalshiEX LLC v. Hendrick*, 817 F. Supp. 3d 1014 (D. Nev. 2025).... 4, 8, 11, 17, 23, 24, 26

*KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667 (D. Md. 2025) .....................4

*KalshiEX LLC v. Orgel*, — F. Supp. 3d —, 2026 WL 474869 (M.D. Tenn. Feb. 19, 2026).................................................................................7

*KalshiEX LLC v. Schuler*, — F. Supp. 3d —, 2026 WL 657004 (S.D. Ohio Mar. 9, 2026) ..................................... 2, 7, 8, 10, 13, 16, 18, 19

*Kentucky v. EPA*, 123 F.4th 447 (6th Cir. 2024) ......................................16

*Murphy v. NCAA*, 584 U.S. 453 (2018) ......................................................2

*N. Am. Derivatives Exch., Inc. v. Nevada*, 815 F. Supp. 3d. 1169 (D. Nev. 2025)............................................................................................... 4, 16

*Skidmore v. Swift*, 323 U.S. 134 (1944) ...................................................16

*United States v. Phillips*, 690 F. Supp 3d 268 (S.D.N.Y. 2023) ...................7

**Statutes**

7 U.S.C. § 1a(47)(A) ...................................................................................6

7 U.S.C. § 1a(47)(A)(ii) ...........................................................................3, 7

7 U.S.C. § 2(e).........................................................................................10

7 U.S.C. § 5(a).......................................................................................9, 15

7 U.S.C. § 6(a).........................................................................................10

7 U.S.C. § 6c(c) .......................................................................................10

7 U.S.C. § 7a-2(c)(5)(C)(i).....................................................................3, 11

## TABLE OF AUTHORITIES—continued

Page(s)

7 U.S.C. § 7a-2(c)(5)(C)(ii) .................................................................... 11

Cal. Penal Code §§ 330-337z .................................................................... 21

Dodd-Frank Wall Street Reform and Consumer Protection Act, P.L. 111-203 (July 21, 2010) ................................................................................ 2

Tex. Penal Code Ann. § 47.01-14 .............................................................. 21

**Other Authorities**

156 Cong. Rec. S5906-07, 2010 WL 2788026 (daily ed. July 15, 2010) .... 16

Aislinn Keely, *Robinhood, Susquehanna take over exchange LedgerX in prediction markets push*, Reuters (Nov. 26, 2025) ................................. 26

Alan White *et al.*, *The Impact of Federal Preemption of State Anti-predatory Lending Laws on the Foreclosure Crisis*, 21 Cornell J. of Pol'y Anal. & Mgmt. 247 (2011) ...................................................................... 18

Andrew Yang, *Sports Betting Hurts American Men. Time To Rethink Its Regulation*, Newsweek (Dec. 3, 2024) ..................................................... 21

Arthur E. Wilmarth Jr., *The Dodd-Frank Act's Expansion of State Authority to Protect Consumers of Financial Services*, 36 J. CORP. L. 893 (2011) ........................................................................................................ 18

Benjamin Schiffrin, Op-Ed, *The U.S. Already Has a Gambling Epidemic—24 Hour Stock Trading Would Only Make It Worse*, Fortune Magazine (Dec. 13, 2024) .......................................................................................... 21

Benjamin Schiffrin, *Sports Betting Scandals Show the Perils of Prediction Markets*, Better Markets (Nov. 20, 2025) ................................................. 19

Br. of Appellee 41, *KalshiEX LLC v. CFTC*, No. 24-5205, 2024 WL 4802698 (D.C. Cir. Nov. 15, 2024), Doc. No. 2085055. ............................................. 9

*Certification by KalshiEX LLC of Derivatives Contracts with Respect to Political Control of the U.S. Senate and U.S. House of Representatives*, CFTC Order, at 15-19 (Sept. 22, 2023) ........................................ 8, 14, 23

*CFTC Seeks Public Comment on Notice of Proposed Rulemaking Concerning Event Contracts Involving Enumerated Activities* (June 10, 2026) ........................................................................................................... 4

CFTC, Contracts and Products ................................................................... 12

**TABLE OF AUTHORITIES—continued**

**Page(s)**

CFTC, President's Budget: FY2026 ...........................................................25

Chairman Rostin Benham, *Statement Regarding CFTC Order To Prohibit Kalshi Political Control Derivatives Contracts*, CFTC (Sept. 22, 2023) . 24

Charles Fain Lehman, *Legalizing Sports Gambling Was a Huge Mistake— The evidence is convincing: The betting industry is ruining lives*, The Atlantic (Sept. 23, 2024) ..............................................................21

Clark Schultz, *Kalshi saw record sports trading volume during the Masters golf tournament*, Seeking Alpha (Apr. 13, 2026) .....................22

*Concept Release on the Appropriate Regulatory Treatment of Event Contracts*, 73 Fed. Reg. 25669 (May 7, 2008) .................................. 14, 15

Cong. Rsch. Serv., R41350, *The Dodd-Frank Wall Street Reform and Consumer Protection Act* (2017) ...............................................................6

*Crypto Legislation: An Overview of H.R. 3633, the CLARITY Act*, Congress.gov (Sept. 30, 2025) ..............................................................25

Dan Bernstein & Eben Novy-Williams, *Kalshi's Trading Arm Muddles 'Peer-to-Peer' Claims*, Sportico (Sept. 11, 2025) .....................................20

Daniel Wallach, *CFTC's Failure To Enforce 'Gaming' Contract Ban Could Still Upend Kalshi Sports Betting Lawsuits*, Forbes (May 27, 2025) ..... 12

Declan Harty, *POLITICO Pro Q&A: Cboe CEO Craig Donohue*, POLITICOPRO (Apr. 6, 2026) .............................................................. 9

Dennis M. Kelleher & Stephen Hall, *Report: More than Ever, Americans Must Look to the States for Protection Against Financial Fraud and Abuse*, Better Markets (Sept. 9, 2025) ...................................................18

Department of the Treasury, Financial Regulatory Reform, A New Foundation: Rebuilding Financial Supervision and Regulation (2009).... 6

Di Wu *et al.*, *Spillover Effects of Financial Deregulation: The Unintended Consequences of the OCC Preemption Rule on Mortgage Lending Practices*, 95 Int'l Rev. of Fin. Anal., Part C (Oct. 2024) ........................17

*Event Contracts,* 89 Fed. Reg. 48968 (June 10, 2024) ............... 4, 15, 23, 24

*Event Contracts; Withdrawal of Proposed Regulatory Action*, 91 Fed. Reg. 5386 (Feb. 6, 2026) ..........................................................................4

## TABLE OF AUTHORITIES—continued

**Page(s)**

Frank D'Souza, et al., *Illuminating the Need for Regulation in Dark Markets: Proposed Regulation of the OTC Derivatives Market,* 12 U. Pa. J. Bus. L. 473 (2010) ..................................................................6

*Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap Agreement"; Mixed Swaps; Security-Based Swap Agreement Recordkeeping*, 77 Fed. Reg. 48208 (Aug. 13, 2012)...........14

Ganesh Setty, *Betting, Trading Platforms Form Prediction Market Alliance*, Law360 (Dec. 12, 2025) ..........................................................26

Hurubie Meko, *A Police Chief Had a $4.5 Million Gambling Problem. No One Knew.*, N.Y. Times (Apr. 14, 2026) ..................................................20

Kyle Chouinard, *As prediction markets boom, Nevada fights to protect betting base*, Las Vegas Sun (Feb. 15, 2026).........................................22

Letter from six U.S. Senators to Acting CFTC Chair Caroline Pham (Sept. 30, 2025)...................................................................................12

Lydia Beyoud, *Staff Cuts and Turmoil Hit the CFTC While the Crypto It Oversees Booms*, Bloomberg (Aug. 21, 2025).........................................25

Mem. of Law in Support of Plaintiff's Mot. for Summary Judgment at 30, *KalshiEX, LLC v. CFTC*, No. 23-cv-03257 (D.D.C. Jan. 25, 2024), Doc. No. 17-1. ......................................................................................8

Members of Congress Br., *KalshiEX v. Flaherty*, No. 25-1922 (3d Cir. July 31, 2025), Doc. No. 66...............................................................16

Press Release, CFTC, Acting Chairman Pham Announces First-Ever Listed Spot Crypto Trading on U.S. Regulated Exchanges (Dec. 4, 2025).........25

Provisions Common to Registered Entities, 76 Fed. Reg. 44776 (July 27, 2011)............................................................................... 11, 13

*Provisions Common to Registered Entities*, 76 Fed. Reg. at 44786 ...........14

Rae Ann Varona, *Sens. Urge CFTC To Probe 'Unusual' Oil Trading Patterns*, Law360 (Apr. 10, 2026).........................................................26

Sharon LaFraniere & David Yaffe-Bellany, *How Prediction Markets and Crypto Firms Steamrolled a Watchdog Agency*, N.Y. Times (May 24, 2026).............................................................................22, 25

**TABLE OF AUTHORITIES—continued**

**Page(s)**

*The Financial Crisis Inquiry Report*, Fin. Crisis Inquiry Comm'n (Off. Gov't Ed., Jan. 2011)..................................................................................18

**Regulations**

17 C.F.R. § 33.3(a) ...............................................................................10

17 C.F.R. § 40.11(a)(1)..........................................................................11

17 C.F.R. § 40.2 ....................................................................................13

17 C.F.R. § 40.3 ....................................................................................13

## INTERESTS OF THE *AMICUS CURIAE*

**Better Markets files this brief with the parties' consent.** Better Markets is a nonprofit, nonpartisan, and independent organization that promotes the public interest in the financial markets through comment letters on proposed rules, *amicus* briefs, independent research, public advocacy, and congressional testimony. It fights to protect investors and consumers from fraud and abuse, prevent financial crashes, and make the financial system more equitable for all Americans. Better Markets also supports the important role of state regulators as they strive to protect their citizens from harmful financial products and services.

Since Better Markets' founding in 2010, Better Markets' staff has included experts in derivatives, and a large proportion of the organization's advocacy has focused on the Commodity Futures Trading Commission ("CFTC") and its oversight of the derivatives markets. Better Markets' work includes over 130 comment letters filed with the CFTC on a wide range of topics, including the "swap" definition. Better Markets has also devoted a significant body of advocacy to the threats posed by the burgeoning event contracts industry, including two comment letters, seven *amicus* briefs, and other materials. *See generally* www.bettermarkets.org (containing advocacy materials).

Better Markets has a strong interest in this case. The district court correctly recognized Ohio's authority to regulate KalshiEX LLC's ("Kalshi") sportsbook, thus furthering several of Better Markets' public interest concerns—protecting consumers from sports wagers masquerading as *bona fide*

1

financial instruments; ensuring that state officials retain their authority to address other threats posed by gambling, including harm to election integrity; and preserving the CFTC's ability to focus its scarce resources on oversight of the legitimate derivatives markets. Those markets are vital to maintaining stable prices for the food, fuel, and durable goods on which Americans depend. Affirming the decision will help secure those benefits, while reversing will exacerbate the harms presented. Better Markets urges affirmance.

## SUMMARY OF ARGUMENT

By dressing up sports wagers as the esoteric financial derivatives known as "swaps," Kalshi asks this Court to hold that Congress silently displaced state consumer-protection laws, legalized gambling nationwide, and anointed the CFTC as national gambling regulator when it passed the Dodd-Frank Wall Street Reform and Consumer Protection Act, P.L. 111-203 (July 21, 2010) ("Dodd-Frank"). As the district court correctly recognized, "[i]n the absence of congressional intent to effect such a sea change, that result is absurd." *KalshiEX LLC v. Schuler*, — F. Supp. 3d —, 2026 WL 657004, at *6 (S.D. Ohio Mar. 9, 2026). There is simply no basis to conclude that, in that landmark law or elsewhere in the Commodity Exchange Act ("CEA"), Congress evinced a "clear and manifest" purpose to preempt Ohio and other states from exercising their "historic police powers" to regulate gambling. *Arizona v. United States*, 567 U.S. 387, 400 (2012). *See also Murphy v. NCAA*, 584 U.S. 453 (2018) (leaving legality of sports wagering to the states).

2

Express preemption fails. The CFTC has "exclusive jurisdiction" over transactions involving 1) "swaps" that are 2) "traded or executed" on a "designated … contract market" ("DCM") 7 U.S.C. § 2(a)(1)(A). But Kalshi's sports wagers are neither—they are not "swaps" because they are not based on the "occurrence" of an "event" that is "associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). Nor can they be traded lawfully on a DCM. Sports wagers are prohibited "transactions [that] are contrary to the public interest" under the CEA as implemented by CFTC Regulation 40.11(a)(1) because they "involve" both an "activity that is unlawful under … State law" and "gaming." 7 U.S.C. § 7a-2(c)(5)(C)(i)-(ii).

Field and conflict preemption are equally inapplicable. Congress enacted Dodd-Frank in the wake of the devastating 2008 financial crash precipitated by, among other things, the dismantling of state consumer protections. Congress intended to regulate the financial instruments at the heart of the financial crisis, not to promote gaming and displace state and tribal regulation of sportsbooks. Dodd-Frank's only mention of "gaming" is in a provision identifying the types of instruments subject to being *prohibited* from trading on the derivatives markets. Far from preempting the field, it gave state law a greater role in financial regulation—including in the provisions governing event contracts at issue here. Given the prioritization of state law and the overriding concern with protecting—not harming—consumers, it "is absurd to think that Congress" silently intended to transform the derivatives markets "into nationwide gambling venues on every topic under the sun to

3

the exclusion of state regulation and with no comparable federal regulator[.]" *KalshiEX LLC v. Hendrick*, 817 F. Supp. 3d 1014, 1031 (D. Nev. 2025).[1]

Lacking consistency or even a persuasive rationale, the CFTC's contrary views are entitled to little, if any, weight. Rather, they constitute an unexplained capitulation to Kalshi and other betting platforms to allow nationwide sports gambling masquerading as derivatives trading. The agency has not squared its newfound exuberance with its own rules or its utter lack of capacity for its self-anointed role as federal gambling czar. Nor has the CFTC explained what occurred in the last two years to justify its change of heart since professing that it "is not a gaming regulator" and possesses neither "the statutory mandate nor specialized experience" to be one. *Event Contracts,* 89 Fed. Reg. 48968, 48982-83 (June 10, 2024).[2]

---

[1] *Accord N. Am. Derivatives Exch., Inc. v. Nevada*, 815 F. Supp. 3d. 1169, 1185 (D. Nev. 2025) ("Had Congress intended such a sea change in the regulatory landscape, it surely would have said so."); *KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667, 684 (D. Md. 2025) ("[T]he weight of the evidence strongly confirms that Congress did not intend for Dodd-Frank to constitute legislation not only legalizing sports betting nationwide, but displacing states' authority to regulate it[.]").

[2] The CFTC recently withdrew its *Event Contracts* proposal in a two-page release. *Event Contracts; Withdrawal of Proposed Regulatory Action*, 91 Fed. Reg. 5386, 5387 (Feb. 6, 2026). That proposal would have clarified and fortified the current prohibitions on gaming and other event contracts. On June 10, 2026, the CFTC issued a rule proposal to formally adopt its newfound view and allow Kalshi and others unfettered access to online gambling markets. *CFTC Seeks Public Comment on Notice of Proposed Rulemaking Concerning Event Contracts Involving Enumerated Activities* (June 10, 2026), https://www.cftc.gov/PressRoom/PressReleases/9249-26.

A decision in favor of Kalshi would thus have dramatic consequences for consumers and the broader public interest. It would deprive Ohio's residents of important protections under the state's gaming laws and would threaten other state laws that protect the public, including those that have prohibited gambling on elections since the 19th century. And it would call upon the CFTC to serve as the nation's gaming commissioner and election supervisor—roles that the agency has heretofore admitted it lacks the expertise, resources, or mandate to perform. By supporting unregulated nationwide gambling on the markets it is entrusted with policing, the CFTC risks diverting attention from its core mission—regulating the *bona fide* derivatives markets for the benefit of the American people, who depend on those markets for stable prices in the essential goods they rely on in everyday life.

## ARGUMENT

### I.    Kalshi's sports gambling contracts are not subject to the CFTC's exclusive jurisdiction.

Express preemption cannot be squared with the CEA's text, structure, and history. Field preemption is also inapplicable because the legislative context demonstrates that Congress intended to enlarge the states' role in consumer regulation—including the oversight of event contracts—not preempt it. And state regulation and federal law do not conflict since federal law categorically bans the trading of gaming event contracts.

### A.    Text, structure, and history defeat express preemption.

Congress granted the CFTC "exclusive jurisdiction" over transactions involving 1) "swaps" that are 2) "traded or executed" on a DCM. 7 U.S.C. § 2(a)(1)(A). Sports wagers satisfy neither of these criteria.

### 1.   Sports wagers are not "swaps."

A "swap" is a form of a hedging agreement whereby two counterparties transfer (or swap) risk from a particular economic activity, like the possibility that a third party defaults on a loan. *See, e.g., Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 172 (2d Cir. 2004). Congress added "swaps" to the CEA's coverage due to the outsized role that unregulated "credit default swaps" played in the 2008 financial crisis. Cong. Rsch. Serv., R41350, *The Dodd-Frank Wall Street Reform and Consumer Protection Act* 18-19 (2017).[3] The Act's "swap" definition has six parts, consisting of a long list of complex financial instruments, linked to various financial measures and indices like interest rates, currencies, commodities, securities, instruments of indebtedness, and other risk-transferring instruments. 7 U.S.C. § 1a(47)(A).

Kalshi relies on § 1a(47)(A)(ii)'s definition of "swap," which consists of "any agreement, contract, or transaction … that provides for any purchase, sale, payment, or delivery … that is dependent on the occurrence,

---

[3] *See also* Department of the Treasury, Financial Regulatory Reform, A New Foundation: Rebuilding Financial Supervision and Regulation 6-7, 47 (2009) (discussing the "disastrously clear" "downside" to "lax regulatory regime for … credit default swaps" before the financial crisis), https://www.govinfo.gov/content/pkg/GOVPUB-T-PURL-LPS113933/pdf/GOVPUB-T-PURL-LPS113933.pdf; Frank D'Souza, *et al., Illuminating the Need for Regulation in Dark Markets: Proposed Regulation of the OTC Derivatives Market,* 12 U. Pa. J. Bus. L. 473, 475-78 & n.13 (2010) ("By 2005, the notional value of derivatives was $454.4 trillion … more than ten times the global gross domestic product and three times the size of all financial assets combined.").

nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(i)-(ii). Kalshi has claimed that a sports wager is a swap under this definition because it provides for a payment "dependent" of the "occurrence" of an "event" or "contingency"— the Knicks beating the Spurs, for instance. That can't be right.[4]

For one thing, Kalshi's interpretation is contrary to the principle that "a word is known by the company it keeps." *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 575 (1995). This canon guards against "giving unintended breadth to the Acts of Congress" by "ascribing to one word"—here, occurrence, event, or contingency—"a meaning so broad that it is inconsistent with its accompanying words[.]" *Id.* (cleaned up). None of the CEA's six-part swap definition's "accompanying words" reference gaming or sports wagers. Rather, those "accompanying words" demonstrate the types of events or contingencies that Congress envisioned—things like interest rates, currencies, commodities, and securities—which bear no resemblance to a bet on whether the Spurs beat the Knicks. A "swap" is thus best "understood as a transaction involving financial instruments and measures that traditionally and directly affect commodity prices. Currency exchange rates, the weather, and energy

---

[4] In the companion case, *KalshiEX LLC v. Orgel*, — F. Supp. 3d —, 2026 WL 474869 (M.D. Tenn. Feb. 19, 2026), the district court placed great weight on *United States v. Phillips*, 690 F. Supp 3d 268 (S.D.N.Y. 2023). But, as the district court here correctly reasoned, "*Phillips* dealt with the exchange rate of the U.S. dollar to the South African rand—a financial measure that," unlike sports wagers, "directly affects commodity prices." *Schuler*, 2026 WL 657004, at *10 n.4.

costs all do that; the number of points scored in the Huskies-Bobcats game does not." *Schuler*, 2026 WL 657004, at *6.

The same goes for the definition's only limiting principle—that the event outcomes must be "associated with a potential financial, economic, or commercial consequence." *Hendrick*, 817 F. Supp. 3d at 1026-27. A "potential financial, economic, or commercial consequence" likewise shares the character of those detailed lists in the definition's neighboring sub-clauses— *i.e.*, interest rates, currencies, commodities, *etc.* But the outcome of a sporting event falls well outside this universe as well. Whether bettors win or lose money on their wagers, or whether a game's result produces other indirect downstream financial consequences, is insufficient. The text negates any notion that sports wagers are swaps.

Indeed, Kalshi admitted as much in challenging a CFTC order prohibiting Kalshi from listing election event contracts because they were contrary to the public interest. *Certification by KalshiEX LLC of Derivatives Contracts with Respect to Political Control of the U.S. Senate and U.S. House of Representatives*, CFTC Order, at 15-19 (Sept. 22, 2023) ("2023 Kalshi Order").[5] Kalshi contrasted elections from sporting events like "horseraces" or "boxing matches," which "are staged purely for entertainment and to facilitate betting." Mem. of Law in Support of Plaintiff's Mot. for Summary Judgment at 30, *KalshiEX, LLC v. CFTC*, No. 23-cv-03257 (D.D.C. Jan. 25, 2024), Doc. No. 17-1. Kalshi explained that sports wagers "have no independent

---

[5] https://www.cftc.gov/sites/default/files/filings/documents/2023/orgkexkalshiordersig230922.pdf

significance; *their outcomes carry no economic risks.*" *Id.* (emphasis added). On appeal, Kalshi conceded that "Congress did not want sports betting to be conducted on derivatives markets." Br. of Appellee 41, *KalshiEX LLC v. CFTC*, No. 24-5205, 2024 WL 4802698 (D.C. Cir. Nov. 15, 2024), Doc. No. 2085055. Of course, now that it has started offering sports wagering, Kalshi has changed its tune. But the language and intent of the rule prove that Kalshi's original position—that "Congress did not want sports betting … on derivatives markets" because sporting contests are "purely for entertainment," lack "independent significance," and have "outcomes [that] carry no economic risks"—was undoubtedly correct.

That conclusion finds support in the CEA's purpose to regulate transactions "affected with a national public interest by providing a means for managing and assuming price risks, discovering prices, or disseminating pricing information." 7 U.S.C. § 5(a). Aside from "bookies" or a sports figure illegally betting on his or her own performance, no one with a straight face could reasonably claim to be utilizing Kalshi's sports wagers to "manage" or "discover" price risks and information. And "[t]he fact that you could find one person in the universe who may be able to make some plausible hedging or risk transfer argument doesn't mean it's a hedging and risk transfer market." Declan Harty, *POLITICO Pro Q&A: Cboe CEO Craig Donohue*, POLITICOPRO (Apr. 6, 2026).[6] Unable to point to any legitimate non-gambling purpose for its offerings, Kalshi's "swaps" argument falls apart.

---

[6] https://subscriber.politicopro.com/article/2026/04/politico-pro-q-a-cboe-ceo-craig-donohue-00860708

What's more, Kalshi's boundless conception of a "swap" leads to absurd results. Under Kalshi's interpretation, all sports wagers would qualify as "swaps." And the CEA *requires* that all consumer swaps must be traded on a DCM. 7 U.S.C. §§ 2(e), 6(a), 6c(c); 17 C.F.R. § 33.3(a). If, as Kalshi contends, trading on a DCM (even illegally) subjects a swap to the CFTC's exclusive jurisdiction under § 2(a)(1)(A), then this means that Congress preempted *all* state gaming laws in Dodd-Frank—silently, without anyone ever noticing until now. It also means that all the *legal* sportsbooks—and their millions of customers—have been violating federal law because the sportsbooks have not registered as DCMs. "In the absence of congressional intent to effect such a sea change," the district court recognized, "that result is absurd." *Schuler*, 2026 WL 657004, at *6.[7]

### 2. The CEA expressly prohibits listing "gaming" contracts on the derivatives markets.

Kalshi's interpretation elides that the CFTC's "exclusive jurisdiction" applies only to swaps that are "traded or executed" on a DCM. 7 U.S.C. § 2(a)(1)(A). In Dodd-Frank, Congress adopted the so-called "Special Rule," a statutory provision that authorizes the CFTC to ban certain contracts that "involve ... activity that is unlawful under any ... State law," as well as those

---

[7] This fact helps to explain the court's error in ruling in favor of Kalshi in *KalshiEX LLC v. Flaherty*, 172 F.4th 220 (3d Cir. 2026). The court rejected New Jersey's argument that Kalshi's position would preempt all state gambling laws as resulting from "pil[ing] inference upon inference." *Id.* at 228. But, as the dissenting judge pointed out, the argument "rel[ies] on no inferences whatsoever. I simply apply the definition to the real world and articulate the ramifications as I see them." *Id.* at 233 (Roth, J., dissenting).

involving "gaming." 7 U.S.C. § 7a-2(c)(5)(C)(i). Congress further declared that no such "agreement, contract, or transaction determined by the Commission to be contrary to the public interest … may be listed or made available for clearing or trading on or through" a DCM. 7 U.S.C. § 7a-2(c)(5)(C)(ii). Under this authority, the CFTC adopted a regulation that categorically prohibits DCMs from listing any event contracts that "involve, relate to, or reference" "gaming" or an activity that is "unlawful under … State law." 17 C.F.R. § 40.11(a)(1). Kalshi's contracts fall squarely under this prohibition.

There is no serious dispute that Kalshi's sports wagers "involve" "gaming": "These are sports wagers and everyone who sees them knows it." *Hendrick*, 817 F. Supp. 3d at 1029. Kalshi admitted as much when it contrasted its election contracts from sports betting (before it started offering sports betting, that is). *See supra* 8-9.

Astonishingly, the CFTC (Br. 14, 25) now has adopted Kalshi's view, arguing that sports wagers can be traded as "swaps" and subject to exclusive CFTC jurisdiction so long as they are traded on a DCM—whether lawfully or not. But Congress prohibited *all* such contracts from being "listed" or "trad[ed]" on a DCM. 7 U.S.C. § 7a-2(c)(5)(C)(ii). That is why Rule 40.11 is styled as a "prohibition"—"a registered entity shall not list for trading" any of the enumerated contracts. *Id*. In adopting the rule, the CFTC explained that "its prohibition of certain 'gaming' contracts is consistent with Congress's intent to 'prevent gambling through the futures markets' and to 'protect the public interest from gaming and other events contracts.'" *Provisions Common to Registered Entities*, 76 Fed. Reg. 44776, 44786 (July 27, 2011).

11

Despite its recent position change, the CFTC's website still explains that "Regulation 40.11 prohibits event contracts that reference terrorism, assassination, war, gaming, or an activity that is unlawful under any State or Federal law." CFTC, Contracts and Products[8]; *see also* Letter from six U.S. Senators to Acting CFTC Chair Caroline Pham (Sept. 30, 2025) (questioning why the CFTC is "not enforcing its clear regulatory mandate promulgated under Regulation 40.11")[9]; Daniel Wallach, *CFTC's Failure To Enforce 'Gaming' Contract Ban Could Still Upend Kalshi Sports Betting Lawsuits*, Forbes (May 27, 2025) (quoting former CFTC commissioners Pham and Quintenz regarding Rule 40.11's prohibition on gambling event contracts).[10]

The CFTC's newfound view (Br. 25) that, even if it *disapproves* a contract for listing, that contract is not "removed from the exclusive jurisdiction conferred by Congress," thus flies in the face of its own "exclusive jurisdiction" provision—which by its terms applies only to those derivatives "traded or executed" on a DCM. 7 U.S.C. § 2(a)(1)(A). Just to be clear, according to the CFTC, Congress preempted states from regulating all sportsbooks, whether that sportsbook lists its wagers on a DCM or not, without mentioning sports betting at all.

---

[8] https://www.cftc.gov/IndustryOversight/ContractsProducts/index.htm (last visited 06/10/2026)

[9] https://news.bloomberglaw.com/securities-law/senators-slam-cftc-over-event-contracts-used-for-sports-betting

[10] https://www.forbes.com/sites/danielwallach/2025/05/27/cftcs-failure-to-enforce-gaming-contract-ban-could-still-upend-kalshi-sports-betting-lawsuits/

And as the CFTC well knows, while its rules include separate provisions governing self-certification and preapproval of some contracts, those provisions do not negate the Special Rule's prohibition. 17 C.F.R. §§ 40.2, 40.3. They address instances where the nature of a contract is in doubt, including contracts that share attributes with prohibited ones. In its adopting release, the CFTC explained that, subject to further rulemaking on gaming contracts, the CFTC will, "[i]n the meantime," prohibit contracts based upon the statutory enumerated activities and "consider individual product submissions on a case-by-case basis under § 40.2 or § 40.3." 76 Fed. Reg. at 44785. Nor does the CFTC's failure to enforce its own rules somehow negate the prohibition, since, as the CFTC tells us (Br. 25-26) "agencies, after all, cannot add to or subtract from jurisdiction conferred by Congress." The district court said it better: "the agency's inaction is not proof that the sports-event contracts are regulated by or permissible under the CEA[.]" *Schuler*, 2026 WL 657004, at *9.

### 3. The CFTC's historical treatment confirms that sports wagers are not swaps that lawfully can be traded on DCMs.

The CFTC's newfound view that it has exclusive jurisdiction over sports wagers—whether or not lawfully traded on DCMs—is not only demonstrably wrong, but also contrary to its own historical treatment of event contracts. Until recently, the CFTC viewed all event contracts warily because they generally lack the hedging or price discovery attributes of legitimate derivatives. The CFTC severely restricted election gambling contracts in the 1990s, limiting them to the realm of academic research because they lacked "hedging

13

or price-basing utility." *See* 2023 Kalshi Order at 15 & n.33. In 2008, the CFTC sought input on the "appropriate regulatory treatment" of event contracts, including how it should "address the potential gaming aspects of some event contracts" given public interest concerns. *Concept Release on the Appropriate Regulatory Treatment of Event Contracts*, 73 Fed. Reg. 25669 (May 7, 2008) ("*Concept Release*").

Following Dodd-Frank, that answer was clear. The CFTC adopted Rule 40.11 in 2011 to effectuate "Congress's intent to prevent gambling through the futures markets and to protect the public interest from gaming and other events contracts." *Provisions Common to Registered Entities*, 76 Fed. Reg. at 44786 (cleaned up). And in 2012, the CFTC added more inherently financial instruments (like cross-currency swaps, currency options, and foreign exchange rate agreements) to the swap definition—thus further negating any characterization of sports wagers as swaps. 17 C.F.R. § 1.3. Nowhere in the 159-page adopting release does the CFTC indicate that sport wagers are swaps. *Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap Agreement"; Mixed Swaps; Security-Based Swap Agreement Recordkeeping*, 77 Fed. Reg. 48208 (Aug. 13, 2012).

Rather, the CFTC's discussion confirms that sports wagers lack the swap's essential attributes. Swaps typically involve "risk-shifting arrangements with financial entities," *id.* at 48248, a characteristic that is absent from sports wagers. Sports wagers thus resemble contracts entered primarily for "personal, family, or household purposes" that are *excluded* from the swap definition. *Id.* at 48246. Like those other excluded contracts, sports

14

event contracts do not serve the "two critical functions" underlying the derivatives markets—"hedging and price basing." *Concept Release*, 73 Fed. Reg. at 25672; *see also* 7 U.S.C. § 5(a) (citing management of price risks, price discovery, and price dissemination as CEA's purpose).

In its 2024 rule proposal more precisely defining gaming, the CFTC explained that wagers on contests cannot serve these dual purposes because their economic impact is "generally too diffuse and unpredictable to correlate to direct and quantifiable changes in the price of commodities or other financial assets or instruments, limiting the hedging and price-basing utility of an event contract involving such an occurrence." *Event Contracts*, 89 Fed. Reg. at 48981. Event contracts traded "to enable gambling" thus cannot reasonably be expected to be "used for hedging and/or price basing on more than an occasional basis." *Id.* at 48982. Additionally, such event contracts rest on unreliable pricing information that is derived not from an underlying cash market with "bona fide economic transactions" to provide pricing information, but from opaque and unregulated sources. *Id.* This stands in marked contrast to pricing information on which the swaps markets depend, including government research and analysis, market-derived supply and demand data, and other reliable economic markers. *Id.*

The CFTC barely even nods to this history and offers no explanation for its about-face on sports gambling. As such, the CFTC's new position is not entitled to even a modicum of deference. The degree of deference given to an agency's position "depend[s] upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later

pronouncements, and all those factors which give it power to persuade." *Skidmore v. Swift*, 323 U.S. 134, 140 (1944). By ignoring its own treatment of sports wagering event contracts, much less explaining its dramatic departure from that regulatory history, the CFTC has provided no basis to defer to its views. "[W]hile the agency can make a 'U-turn,' it cannot make an unexplained one[.]" *Kentucky v. EPA*, 123 F.4th 447, 468 (6th Cir. 2024).

### 4.   Legislative context and history confirm that sports wagers are prohibited from listing or trading on DCMs.

While debating the "Special Rule," Senators Lincoln and Feinstein engaged in a colloquy emphasizing the CFTC's need for authority to protect the public interest by banning event contracts based, for example, on sporting events. The Senators' exchange demonstrates that such contracts serve "no commercial purpose" and are offered "solely for gambling" rather than "commercial" or "hedging" uses. 156 Cong. Rec. S5906-07, 2010 WL 2788026, at *S5906-07 (daily ed. July 15, 2010). Courts, such as the district court here, have cited the colloquy as evidence that "at least some members of Congress believed that sports-event contracts would *not* be considered swaps." *Schuler*, 2026 WL 657004, at *6; *accord, e.g., N. Am. Derivatives Exch.*, 815 F. Supp. 3d. at 11586.[11]

---

[11] Former Sen. Lincoln submitted an *amicus* brief in the New Jersey case claiming that Congress *intended* the CFTC to exercise exclusive jurisdiction over sport gambling event contracts (an argument that the CFTC now adopts as its own, Br. 16). As the former senator admitted in her brief, she is a paid consultant to Kalshi. Members of Congress Br., *KalshiEX v. Flaherty*, No. 25-1922 (3d Cir. July 31, 2025), Doc. No. 66, at 2 n.2. Regardless, the former senator's 2010 statement that "sports gambling" lacked the

The historical context confirms that "Congress was bringing risky financial products out of the shadows ... not enabling nationwide gambling on CFTC-designated exchanges." *Hendrick*, 817 F. Supp. 3d at 1031. In Dodd-Frank, Congress intended to address the causes of the 2008 crash—like unregulated swaps—and adopt reforms to prevent a recurrence. It is implausible in the extreme to suggest that, as part of that effort, Congress intended to establish or facilitate nationwide sports gambling platforms insulated from state regulation, a "reform" that would exacerbate consumer abuse while doing nothing to stabilize the financial system or prevent a future crisis.

### B. Congress sought to enlarge the role of state law in financial regulation, not to preempt gaming regulation.

In addition to suffering from the same lack of textual and structural support, Kalshi's field preemption argument also flies in the face of what Congress was trying to achieve in Dodd-Frank. Preemption of state anti-predatory lending laws by federal banking regulators contributed significantly to the 2008 financial crisis. That preemption nullified state laws that restricted the aggressive mortgage terms national banks could offer, such as balloon payments, negative amortization schedules, and high fees—and led to much riskier lending. *See* Di Wu *et al.*, *Spillover Effects of Financial Deregulation: The Unintended Consequences of the OCC Preemption Rule on Mortgage Lending Practices*, 95 Int'l Rev. of Fin. Anal., Part C (Oct. 2024). Riskier lending led to more defaults, exacerbating the subprime meltdown

---

"commercial purpose" to trade as a swap is more persuasive evidence regarding Congress's intent in adopting Dodd-Frank. The notion that this colloquy can be viewed as anything more is pure sophistry.

and foreclosure crisis. *See* Alan White *et al.*, *The Impact of Federal Preemption of State Anti-predatory Lending Laws on the Foreclosure Crisis*, 21 Cornell J. of Pol'y Anal. & Mgmt. 247 (2011); *The Financial Crisis Inquiry Report*, Fin. Crisis Inquiry Comm'n, 112 (Off. Gov't Ed., Jan. 2011).[12]

"To correct the problems created by federal preemption, Dodd-Frank enlarge[d] both the lawmaking and law enforcement authority of the states in the area of consumer financial protection." Arthur E. Wilmarth Jr., *The Dodd-Frank Act's Expansion of State Authority to Protect Consumers of Financial Services*, 36 J. Corp. L. 893, 896 (2011); *see also* Dennis M. Kelleher & Stephen Hall, *Report: More than Ever, Americans Must Look to the States for Protection Against Financial Fraud and Abuse* 15-22, Better Markets (Sept. 9, 2025).[13] There is no reason to think that, in so doing, Congress also silently preempted state and tribal gambling laws and regulation—a result dramatically at odds with what Congress had set out to achieve.

### C. The district court correctly held that conflict preemption does not apply because the CFTC banned gaming contracts, and because Kalshi's sports gambling platform does not require uniform regulation.

The district court correctly held that Ohio's gaming laws conflict with the CEA. *Schuler*, 2026 WL 657004, at *7. By categorically prohibiting all gaming event contracts, Rule 40.11 disposes of the conflict preemption claim: there can be no tension between state laws governing those contracts

---

[12] https://www.govinfo.gov/content/pkg/GPO-FCIC/pdf/GPO-FCIC.pdf

[13] https://bettermarkets.org/wp-content/uploads/2025/09/BetterMarkets_State_Action_Protection_Report_09-09-2025.pdf

and any provision of the CEA that would regulate their trading *if* they weren't unlawful. *Schuler*, 2026 WL 657004, at \*9.

Moreover, the rationale for conflict preemption is absent. Kalshi is not an exchange on which financial instruments are traded so that businesses and industries can manage their price risks or obtain pricing benchmarks—the role that derivatives play—so it lacks the derivatives markets' need for national uniformity. Kalshi's betting platform has no distinctive attributes that call for a regulatory model other than state gaming laws. *See* Benjamin Schiffrin, *Sports Betting Scandals Show the Perils of Prediction Markets*, Better Markets (Nov. 20, 2025) (citing New York Times report illustrating that the betting experience on prediction markets is identical to that on the sportsbook FanDuel); *Flaherty*, 172 F.4th at 235 (Roth, J., dissenting) ("Kalshi's sports related offerings are a dead ringer for the products offered by state-regulated online sportsbooks[.]").[14] By Kalshi's own admission (*supra* 8-9), its contracts can be regulated as sports wagers since they are consumer transactions used for entertainment rather than commercial hedging or price discovery.

Kalshi has attempted to recast its gaming platform as something more than a sportsbook by claiming that bettors deal with each other, instead of "the house." Public reports question the accuracy of that claim, since Kalshi has an affiliate that acts as a market-maker by "mak[ing] transactions on the marketplace and provid[ing] liquidity to the exchange." Dan

---

[14] https://bettermarkets.org/wp-content/uploads/2025/11/Prediction-Markets-Fact-Sheet-11.20.25.pdf

19

Bernstein & Eben Novy-Williams, *Kalshi's Trading Arm Muddles 'Peer-to-Peer' Claims*, Sportico (Sept. 11, 2025).[15] But that distinction is beside the point since the swap definition does not rise or fall on whether a financial intermediary stands between the parties on either side of a transaction. An intermediary that "regularly" trades swaps "with counterparties … for its own account" is actually a "swap dealer." 7 U.S.C. § 1a(49).

## II. Preempting state regulation of Kalshi's sports betting threatens to harm millions of Americans, election integrity, and the derivatives markets themselves.

### A. Preempting state law would erase important protections for Ohio's residents and those who reside in states with similar laws.

Reversing the district court's judgment would eliminate Ohio's protections for its residents who gamble, without providing a meaningful substitute. And it would increase the likelihood that courts in other states will enjoin enforcement of other state and tribal gaming laws. This matters because Kalshi's sports wagers pose the same threats of financial harm and degraded quality of life as do identical bets offered by other sportsbooks.

That threat is substantial. Nary a day goes by without another report of someone allegedly engaging in criminal behavior to support a gambling addiction. *See, e.g.,* Hurubie Meko, *A Police Chief Had a $4.5 Million Gambling Problem. No One Knew.*, N.Y. Times (Apr. 14, 2026).[16] Problem

---

[15] https://www.sportico.com/business/sports-betting/2025/kalshi-trading-exchange-peer-house-1234870465/

[16] https://www.nytimes.com/2026/04/14/nyregion/police-chief-sports-gambling-new-haven.html

gambling is increasing nationally. *See* Benjamin Schiffrin, Op-Ed, *The U.S. Already Has a Gambling Epidemic—24 Hour Stock Trading Would Only Make It Worse*, Fortune Magazine (Dec. 13, 2024).[17] And sports gambling has proven to be financially and emotionally destructive for many Americans. *See* Charles Fain Lehman, *Legalizing Sports Gambling Was a Huge Mistake—The evidence is convincing: The betting industry is ruining lives*, The Atlantic (Sept. 23, 2024).[18] Sports betting leads to reduced household savings, increased personal bankruptcies, and spikes in domestic violence. *See* Andrew Yang, *Sports Betting Hurts American Men. Time To Rethink Its Regulation*, Newsweek (Dec. 3, 2024).[19]

Ohio and other states have used their longstanding police power to mitigate this harm by establishing important protections. Ohio Rev. Code § 3775.03(A) *et seq.*, mandates that offering sports gambling requires a license issued by the Ohio Casino Control Commission. Ohio also prohibits sports gambling for people under age 21 and for identified problem gamblers. Ohio Rev. Code § 3775.13, 3775.99(A)(2). Other states have adopted similar protections, and eleven states—including America's most populous—ban it entirely. Cal. Penal Code §§ 330-337z; Tex. Penal Code Ann. § 47.01-14.

---

[17] https://fortune.com/2024/12/13/the-u-s-already-has-a-gambling-epidemic-24-hour-stock-trading-would-only-make-it-worse/.

[18] https://www.theatlantic.com/ideas/archive/2024/09/legal-sports-gambling-was-mistake/679925/

[19] https://www.newsweek.com/sports-betting-hurts-american-men-time-rethink-its-regulation-opinion-1994180

21

The need for these state-level protections is only increasing. This year's Masters golf tournament was the most-bet sporting event in Kalshi's history. *See* Clark Schultz, *Kalshi saw record sports trading volume during the Masters golf tournament*, Seeking Alpha (Apr. 13, 2026).[20] Kalshi and Polymarket, the two largest prediction-market platforms, "took in a total of $50 billion in trades in 2025" and "took in that much in just March and April" this year. Sharon LaFraniere & David Yaffe-Bellany, *How Prediction Markets and Crypto Firms Steamrolled a Watchdog Agency*, N.Y. Times (May 24, 2026).[21] Prediction markets are not just expanding sports gambling, they are also taking market share from regulated sportsbooks, having, for example, taken in more than 10 times the amount of bets on the 2026 Super Bowl than Nevada's regulated sportsbooks. *See* Kyle Chouinard, *As prediction markets boom, Nevada fights to protect betting base*, Las Vegas Sun (Feb. 15, 2026).[22]

### B.    Preemption would also threaten election integrity.

Kalshi's preemption theory threatens other types of harm far beyond the realm of sports wagering. Kalshi and similar firms are offering the opportunity to bet on a vast array of events, including elections. These wagers

---

[20] https://seekingalpha.com/news/4574252-kalshi-saw-record-sports-trading-volume-during-the-masters-golf-tournament

[21] https://www.nytimes.com/2026/05/24/us/how-prediction-markets-and-crypto-firms-steamrolled-a-watchdog-agency.html?smid=nytcore-ios-share

[22] https://lasvegassun.com/news/2026/feb/15/as-prediction-markets-boom-nevada-fights-to-protec/

risk undermining the integrity of our elections and the public's faith in the electoral process. Corruption in sports gambling foreshadows the risk of wagering on elections. *See Hendrick*, 817 F. Supp. 3d at 1031 n.7.

That is why states like Ohio condemn election gambling. *See* 2023 Kalshi Order at 11-12 nn.26 & 27 (collecting dozens of state prohibitions on election wagering). The CFTC's 2023 Order cited overwhelming opposition to Kalshi's election wagering contract from commenters as well as members of Congress, who warned that "[e]stablishing a large-scale, for-profit political event betting market in the United States … would profoundly undermine the sanctity and democratic value of elections." *Id.* at 19-20. The CFTC's Gaming Proposal also addressed these concerns. It cited multiple ways in which wagering on elections can inflict harm, including manipulation of elections to profit on wagers, or the use of wagers to influence elections—with all of it increasingly tied to the deployment of AI. *Event Contracts*, 89 Fed. Reg. at 48983.

Given state laws banning election gambling, Kalshi would undoubtedly insist that its election wagering contracts are swaps being traded on a DCM, shielded from state prohibitions by virtue of preemption. But as here, such arguments fail. Election wagers fall outside the "exclusive jurisdiction" provision in Section 2. They lack the necessary financial significance; they do not serve as reliable risk hedging or price discovery mechanisms; and they are not based on reliable data. 2023 Kalshi Order, at 15-21. And they are similarly banned under 17 C.F.R. § 40.11 as gaming and activity that violates state law. The Congress that passed Dodd-Frank did not intend to sweep

23

aside nearly 200 years of state laws and court decisions condemning election gambling.

### C. The CFTC lacks the authority, expertise, and resources to oversee sports gambling, and it has a core mission that Americans depend on it to fulfill.

Affirmance here would place the CFTC in the untenable position of attempting to police the gaming industry and thousands of elections. The CFTC cannot possibly provide protections that are comparable to those that the dozens of state gaming laws and commissioners provide to their citizens. And allowing for trading of "political event contracts … would require the CFTC to exercise its oversight and enforcement authorities in the manner of an election cop" overseeing the countless elections that take place throughout the country to ensure that gambling does not corrupt election outcomes. Chairman Rostin Benham, *Statement Regarding CFTC Order To Prohibit Kalshi Political Control Derivatives Contracts*, CFTC (Sept. 22, 2023).[23]

The CFTC has freely admitted that it lacks the legal tools necessary to regulate sports gambling or election wagering. *Event Contracts*, 89 Fed. Reg at 48982-83 (CFTC lacks statutory mandate and specialized experience to oversee gambling); *id.* at 48983 (CFTC lacks the specialized experience appropriate for investigating election outcomes); *see also Hendrick*, 817 F. Supp. 3d at 1036 ("[N]either DCMs nor the CFTC is equipped to address [the harm from problem gambling] the same way state gaming regulators and

---

[23] https://www.cftc.gov/PressRoom/SpeechesTestimony/behnamstatement092223

licensed entities are."). The current CFTC has not acknowledged these statements, let alone justified its about-face.

Even if it had a statutory mandate and the requisite expertise, the CFTC lacks the staff and budget to fill those roles. The CFTC ranks among the smallest regulatory agencies, with a budget of only $365 million, CFTC, President's Budget: FY2026, at 4,[24] and a staff that has been reduced from 760 in 2015 to approximately 550 this year. LaFraniere & Yaffe-Bellany, *supra*. Regardless, the agency already oversees a futures and swaps market with a notional value of nearly $400 trillion dollars. The CFTC also assumes responsibility for parts of the crypto market, with additional jurisdiction looming. *See* Press Release, CFTC, Acting Chairman Pham Announces First-Ever Listed Spot Crypto Trading on U.S. Regulated Exchanges (Dec. 4, 2025)[25]; *Crypto Legislation: An Overview of H.R. 3633, the CLARITY Act*, Congress.gov (Sept. 30, 2025) (explaining that the "Clarity Act" would give the CFTC "a central role in regulating digital commodities and related intermediaries").[26]

Assuming those roles will only weaken the CFTC's ability to discharge its core mission: to maintain the integrity and efficiency of the derivatives markets to enable commercial enterprises to safely and reliably hedge price risk in the raw materials they use and the products they sell. For example, two senators urged the CFTC to probe unusual trading patterns in oil futures

---

[24] https://www.cftc.gov/sites/default/files/CFTC_FY2026_Presidents_Budget.pdf

[25] https://www.cftc.gov/PressRoom/PressReleases/9145-25

[26] https://www.congress.gov/crs-product/IN12583

that took place "right before President Donald Trump announced talks with Iran, including the recently announced ceasefire." Rae Ann Varona, *Sens. Urge CFTC To Probe 'Unusual' Oil Trading Patterns*, Law360 (Apr. 10, 2026).[27] The CFTC should focus on that core mission to help ensure that Americans can access stable prices for the countless products they need in their daily lives, rather than spreading itself thin championing nationwide sports gambling that benefits only unregulated prediction markets.

These issues are urgent, with prediction markets rapidly expanding in size and complexity. Kalshi and other platforms offer betting on sports, elections, and a variety of other events. Traditional sportsbooks like FanDuel and DraftKings plan to adopt Kalshi's strategy for evading state gaming laws by seeking CFTC designation as contract markets. *See Hendrick*, 817 F. Supp. 3d at 1036. And the prediction-market industry is building a trade association. *See* Ganesh Setty, *Betting, Trading Platforms Form Prediction Market Alliance*, Law360 (Dec. 12, 2025); Aislinn Keely, *Robinhood, Susquehanna take over exchange LedgerX in prediction markets push*, Reuters (Nov. 26, 2025).[28] As the industry expands, cases involving preemption continue to multiply. Rejecting such arguments and affirming in this case will not only preserve important state-level consumer protections but also establish an important precedent—one that will help prevent more widespread harm

---

[27] https://www.law360.com/articles/2464289/sens-urge-cftc-to-probe-unusual-oil-trading-patterns

[28] https://www.reuters.com/sustainability/boards-policy-regulation/robinhood-susquehanna-take-over-exchange-ledgerx-prediction-markets-push-2025-11-26/

from unregulated sports gambling and other event contracts posing even greater threats to the public interest.

## CONCLUSION

The district court's order should be affirmed.

June 11, 2026                                    Respectfully submitted,

                                          /s/ *Dominick V. Freda*
                                        Dennis M. Kelleher
                                        Dominick V. Freda
                                        BETTER MARKETS, INC.
                                        1825 K Street, NW, Suite 1080
                                        Washington, DC 20006
                                        (301) 437-4343
                                        dkelleher@bettermarkets.org
                                        dfreda@bettermarkets.org

27

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

**6th Cir. Case Number(s)** <u>26-3196</u>

I am the attorney or self-represented party.

**This brief contains <u>6,498</u> words,** including <u>0</u> words manually counted in any

visual images, and excluding the items exempted by FRAP 32(f). The brief's type

size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R.
    29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select
    only one)*:
        [ ] it is a joint brief submitted by separately represented parties.
        [ ] a party or parties are filing a single brief in response to multiple briefs.
        [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature** <u>s/ *Dominick V. Freda*_____</u>    **Date** <u>06/11/2026_____</u>
*(use "*s/[typed name]*" to sign electronically-filed documents)*

## CERTIFICATE OF SERVICE

On June 11, 2026, I filed an electronic copy of this brief with the Clerk of the Sixth Circuit using the CM/ECF system. That system sends a Notice of Docket Activity to all registered attorneys in this case. Under 6 Cir. R. 25(f)(1)(A), "[t]his constitutes service on them and no other service is necessary."


/s/ *Dominick V. Freda*
Dominck V. Freda