**No. 26-3196**

# In the United States Court of Appeals for the Sixth Circuit

KALSHIEX LLC,

*Plaintiff – Appellant*,

*v.*

MATTHEW T. SCHULER; THOMAS J. STICKRATH; SHEETAL BAJORIA; SCOTT P. BORGEMENKE; KEITH CHENEY; PENELOPE R. CUNNINGHAM; CHRISTOPHER SMITHERMAN; TRIFFON CALLOS; OHIO CASINO CONTROL COMMISSION; DAVE YOST, OHIO ATTORNEY GENERAL,

*Defendants – Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO, NO. 2:25-CV-1165

**BRIEF OF AMICUS CURIAE AMERICAN GAMING ASSOCIATION IN SUPPORT OF DEFENDANTS-APPELLEES AND AFFIRMANCE**

Bruce Bennett
Benjamin Sovocool
COVINGTON & BURLING LLP
30 Hudson Yards
New York, NY 10001

Kevin F. King
  *Counsel of Record*
Matthew J. Glover
Scott Garfing
Sameer Aggarwal
Hassan Ahmad
Jacob A. Rinear
COVINGTON & BURLING LLP
850 Tenth Street NW
Washington, DC 20001
(202) 662-6000
kking@cov.com

*Counsel for Amicus Curiae*
June 11, 2026                      *American Gaming Association*

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations
# and Financial Interest

Sixth Circuit
Case Number:  26-3196_____          Case Name:  KalshiEX LLC v. Matthew T. Schuler_____

Name of counsel:  Kevin F. King_____

Pursuant to 6th Cir. R. 26.1,  American Gaming Association_____
*Name of Party*

makes the following disclosure:

1.    Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

No

2.    Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

No

---

CERTIFICATE OF SERVICE

I certify that on _____June 11, 2026_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Kevin F. King_____

_____

_____

---

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... iii

INTEREST OF AMICUS CURIAE ........................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ......................... 2

ARGUMENT ......................................................................................... 4

I.   Kalshi Offers Sports Bets ............................................................ 4

II.  Kalshi's Arguments Defy Settled Legal Principles and
     Common Sense. ......................................................................... 14

     A.   Kalshi's Sports Bets Are Not "Swaps." ............................... 14

     B.   Kalshi's Preemption Arguments Fail. .................................. 24

III. Licensed Gaming Operators and States Partner to Make
     Legal Sports Betting Effective. ................................................. 29

IV.  Kalshi's Vision Would Upend the Longstanding Framework
     Governing Sports Betting. ......................................................... 31

CONCLUSION ..................................................................................... 35

CERTIFICATE OF COMPLIANCE ...................................................... 36

CERTIFICATE OF SERVICE ............................................................... 37

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Churchill Downs Tech. Initiatives Co. v. Mich.*
*Gaming Control Bd.*,
162 F.4th 631 (6th Cir. 2025) ..............................................................25

*City of Chicago v. Fulton*,
592 U.S. 154 (2021).............................................................................21

*Commonwealth v. KalshiEX, LLC*,
2026 WL 188019 (Mass. Super. Ct. Jan. 20, 2026) ....................5, 6, 10

*Dubin v. United States*,
599 U.S. 110 (2023)..............................................................................18

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000)..............................................................................18

*Fenner v. Gen. Motors, LLC*,
113 F.4th 585 (6th Cir. 2024) ...........................................................4, 24

*Gregory v. Ashcroft*,
501 U.S. 452 (1991)..............................................................................25

*Ho-Chunk Nation v. Kalshi, Inc.*,
2026 WL 1284077 (W.D. Wis. May 5, 2026)........................................5

*KalshiEX, LLC v. Flaherty*,
172 F.4th 220 (3d Cir. 2026)..............................................5, 10, 27, 28

*KalshiEX, LLC v. Hendrick*,
817 F.Supp.3d 1014 (D. Nev. 2025)....................... 5, 10, 13, 15, 16, 21

*KalshiEX LLC v. Martin*,
793 F.Supp.3d 667 (D. Md. 2025) ......................................................28

*KalshiEX LLC v. Schuler*,
2026 WL 1295806 (6th Cir. Apr. 24, 2026) ....................14, 25, 26, 28

iii

*Kansas v. Garcia,*
589 U.S. 191 (2020)..................................................................26

*Loper Bright Enters. v. Raimondo,*
603 U.S. 369 (2024)..................................................................23

*Medtronic, Inc. v. Lohr,*
518 U.S. 470 (1996)..................................................................25

*Meister v. U.S. Dep't of Agric.,*
623 F.3d 363 (6th Cir. 2010)...................................................27

*Murphy v. NCAA,*
584 U.S. 453 (2018)...................................... 3, 4, 22, 24, 29

*NFIB v. OSHA,*
595 U.S. 109 (2022).......................................................... 23, 24

*Northville Downs v. Granholm,*
622 F.3d 579 (6th Cir. 2010)...................................................24

*Pulsifer v. United States,*
601 U.S. 124 (2024)..................................................................18

*QCX LLC v. Nessel,*
2026 WL 1166362 (W.D. Mich. Mar. 10, 2026) .................20

*Quarles v. United States,*
587 U.S. 645 (2019)..................................................................16

*Salazar v. Paramount Glob.,*
133 F.4th 642 (6th Cir. 2025) .................................................20

*State v. Lipkin,*
84 S.E. 340 (N.C. 1915)...........................................................13

*Utility Air Regul. Grp. v. EPA,*
573 U.S. 302 (2014)............................................................. 4, 22

*Waite v. Press Pub. Ass'n,*
155 F. 58 (6th Cir. 1907).........................................................13

*Whitman v. Am. Trucking Ass'ns,*
    531 U.S. 457 (2001) ........................................................................ 3

*Yates v. United States,*
    574 U.S. 528 (2015) ...................................................................... 19

**Statutes**

7 U.S.C. § 1a ....................................................... 15, 16, 17, 19, 20, 21, 23

7 U.S.C. § 2 .......................................................................... 23, 25, 26

7 U.S.C. § 7a-2 ...................................................................... 21, 27, 28

7 U.S.C. § 13a-2 ............................................................................ 26

7 U.S.C. § 16 ................................................................................ 26

18 U.S.C. § 1084 ............................................................................ 29

18 U.S.C. § 1955 ............................................................................ 29

31 U.S.C. § 5362 ............................................................................ 29

31 U.S.C. § 5363 ............................................................................ 29

Ohio Rev. Code § 3772.031 ................................................................ 33

Ohio Rev. Code § 3775.04 ................................................................. 30

Ohio Rev. Code § 3775.99 ................................................................. 31

Ohio Rev. Code § 5753.021 ............................................................... 30

Ohio Rev. Code § 5753.031 ............................................................... 31

Tenn. Code Ann. § 4-49-104 .............................................................. 30

Tenn. Code Ann. § 4-49-117 .............................................................. 30

v

## Regulations

17 C.F.R. § 40.11 ...................................................................... 21, 22, 27

Ohio Admin. Code 3775-9-03 .................................................................. 33

Ohio Admin. Code 3772-12-06 .................................................................. 33

Ohio Admin. Code 3775-16-08 .................................................................. 32

Ohio Admin. Code 3775-17-01 .................................................................. 32

## Other Authorities

American Gaming Ass'n, *Commercial Gaming Revenue Hits $78.7 Billion in 2025, Driving Record $18.1 Billion in Gaming Taxes Nationwide* (Feb. 26, 2026) ........................................... 4

American Gaming Ass'n, *Gaming by the Numbers: Ohio* (Dec. 31, 2024).............................................................. 30

American Gaming Ass'n, *State of the States 2026: The AGA Analysis of the Commercial Casino Industry* (May 2026)............ 22, 30

Ben Blatt & Amy Fan, *Is Sports Betting Illegal in Your State? Not If You Call It a 'Prediction Market.'*, N.Y. Times (Oct. 5, 2025) ....................................................................... 6

Dan Bernstein & Lev Akabas, *Kalshi Retail Bettors Have Lost $100M+ on Parlays this Year*, Sportico (May 13, 2026)...................... 9

David Propper, *NYC Bar Will Give Fans $100 Off Tabs if Knicks Win Game 1 of NBA Finals Thanks to Owner's Clever Bet*, N.Y. Post (June 2, 2026).................................................. 16

David Purdum, *Notable Bets: Mattress Mack and the Wildest Wagers and Betting Tales of 2022*, ESPN (Jan. 2, 2023) ................... 17

Dustin Gouker, *Kalshi Is Advertising That 'Sports Betting' Is Legal in California, Texas*, Event Horizon (Sep. 17, 2025)................ 10

Dustin Gouker, *Kalshi Posts Second-Biggest Day Ever: $700M In Volume*, Event Horizon (Apr. 27, 2026) .......................................... 12

Dustin Gouker, *Kalshi Says It's 'Kind of Addicting' in Instagram Post*, Event Horizon (Oct. 21, 2025) ................................. 32

Dustin Gouker, *Kalshi Was Promoting a 30-Leg Parlay to Users on Tuesday*, Event Horizon (Apr. 1, 2026) ................................. 8

Dustin Gouker, *Most of Kalshi's Recent Volume Growth Comes from Parlays*, Event Horizon (May 6, 2026) .......................... 12

Dustin Gouker, *Yes, Kalshi Is Still Marketing Itself as a Betting Platform*, Event Horizon (Aug. 27, 2025) ............................. 10

Emily Nicolle & Bernard Goyder, *Kalshi Completes First Block Trade, Backed by Jump Trading*, Bloomberg (Apr. 28, 2026) .................................................................... 13

Event Contracts, 89 Fed. Reg. 48,968 (June 10, 2024) ................................................. 34

Jacob Stern, *You've Never Seen Super Bowl Betting Like This Before*, The Atlantic (Feb. 5, 2026) ....................................................... 11

Kalshi, *Responsible Trading Tools* ........................................................ 33

Kalshi, *Signing Up as an Individual* ..................................................... 31

Kalshi, *Trading Break* ............................................................................ 33

Letter from Xavier Sottile, Head of Markets, KalshiEX LLC, to CFTC (Jan. 16, 2026) ............................................................. 7

Michael J. de la Merced, *Kalshi, the Prediction Market, Is Now Valued at $22 Billion*, N.Y. Times (May 7, 2026) ...................... 12

Neil Mehta, Katherine Long & Caitlin Ostroff, *Why Almost Everyone Loses—Except a Few Sharks—on Prediction Markets*, Wall St. J. (May 3, 2026) ............................................ 12, 13

vii

Oral Argument, *N. Am. Derivatives Exch., Inc. v. Nevada*, No. 25-7187 (9th Cir. Apr. 16, 2026) ..................................................... 11

Sam McQuillan, *Kalshi Parlay Volume Surges, But Sports Prediction Economics Still Lag Sportsbooks*, Legal Sports Report (Mar. 24, 2026) ........................................................................ 9

U.S. Trademark Application Serial No. 99488100 (filed Nov. 10, 2025) .......................................................................... 11

Virginia Gandolfo, *How to Display Sportsbook Odds at Kalshi: View American Odds*, RotoGrinders (2026) ............................ 5

## INTEREST OF AMICUS CURIAE[1]

The American Gaming Association (AGA) is a non-profit trade association whose members represent the full spectrum of the legal, regulated gaming industry—including commercial and tribal casino operators, suppliers, and sports betting operators.  AGA's members participate in gaming markets throughout the United States; the industry generates $53 billion in annual tax revenue and supports 1.8 million jobs nationwide.  On behalf of its members, AGA works with law enforcement, elected officials, state agencies, and tribal leaders to combat illegal gambling and promote next-generation regulatory regimes.

AGA submits this brief to address the disruptive effects that Kalshi's unlicensed sports bets have had and will continue to have on the longstanding regulatory framework in Ohio, Tennessee, and other states.  As the premier trade group representing the commercial gaming industry, AGA has a strong interest in orderly application of federal law, which complements and facilitates state gaming regulations.

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), counsel certifies that no entity or person, aside from amicus curiae or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief, that undersigned counsel authored the brief in full, and that all parties have consented to the filing of this brief.

1

## INTRODUCTION AND SUMMARY OF ARGUMENT

For decades, Congress and the States have worked together to establish a regulatory framework for gaming that elevates local policy choices, protects consumers, and safeguards the integrity of sporting events. Licensed gaming operators, including AGA members, have built their businesses around this framework and partner with states to make it effective. That cooperative model has delivered enormous benefits: capital investments, jobs, tax revenues, and a safe and transparent marketplace where every operator plays by the same rules.

Kalshi's theory would eviscerate that longstanding regulatory structure. Seeking to avoid the compliance burdens of state laws, Kalshi masks its wagers as derivatives contracts governed exclusively by the Commodity Exchange Act (CEA) and Commodity Futures Trading Commission (CFTC). But as is obvious to anyone who visits Kalshi's platform, "sports-event contracts" are hardly novel financial instruments—they are sports bets. Kalshi offers point spreads, over/under bets, proposition bets, and parlays, all of which are standard sportsbook fare, and it presents these bets through the same user interface as prominent online sportsbooks. Kalshi's own advertisements

2

reinforce the point by touting the company's "sports betting" options. Kalshi thus engages in precisely the type of conduct that Ohio's and Tennessee's laws expressly prohibit: unlicensed sports betting.

Embracing Kalshi's legal fiction would lead to practical problems as well. Consumers would have fewer and weaker protections than under state law. And States would lose the tax revenue, jobs, and other benefits provided by cooperation between States and licensed gaming operators.

According to Kalshi and the CFTC, Congress accepted those risks— and authorized nationwide sports betting—when it enacted the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank) in 2010. Supreme Court precedent forecloses that audacious claim. Congress, the Court has emphasized, "does not … hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). A nationwide rule on the "controversial subject" of sports betting, *Murphy v. NCAA*, 584 U.S. 453, 486 (2018), undeniably qualifies as an elephant, yet Kalshi and the CFTC rely on obscure derivatives provisions that say nothing about overriding state gambling laws. Those statutory mouseholes are particularly inadequate given the related rules that Congress must "speak clearly if it wishes to assign to an agency decisions

3

of vast 'economic and political significance,'" *Utility Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (citation omitted), and that a "presumption against preemption" applies when Congress legislates in a field that "the States have traditionally occupied," *Fenner v. Gen. Motors, LLC*, 113 F.4th 585, 594 (6th Cir. 2024) (citation omitted). The sports betting market has long involved "important policy choice[s]" by state governments, *Murphy*, 584 U.S. at 486, and generated more than $165 billion in transactions in 2025 alone.[2] Congress cannot delegate such a major question to the CFTC—or preempt laws so central to states' police powers—without speaking far more clearly than it has here.

Because Kalshi has not met the demanding test for a preliminary injunction, this Court should affirm.

## ARGUMENT

### I. Kalshi Offers Sports Bets.

Kalshi's arguments seek to obfuscate a simple truth: it operates a sportsbook. As the *Orgel* district court observed, "a user would find Kalshi's offerings similar, if not identical, to a sportsbook." *Orgel* Order,

---

[2] *See* American Gaming Ass'n, *Commercial Gaming Revenue Hits $78.7 Billion in 2025, Driving Record $18.1 Billion in Gaming Taxes Nationwide* (Feb. 26, 2026), https://perma.cc/67YZ-VMBN.

RE 48, PageID #878-79; *see Schuler* Order, RE 69, PageID #894 (Kalshi's contracts "resembl[e]" legal sports bets). Other courts across the country have reached the same conclusion. *See, e.g.*, *KalshiEX, LLC v. Hendrick*, 817 F.Supp.3d 1014, 1029 (D. Nev. 2025) (Kalshi's contracts "are sports wagers and everyone who sees them knows it."); *KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 232 (3d Cir. 2026) (Roth, J., dissenting) (Kalshi's "offerings are virtually indistinguishable from the betting products available on online sportsbooks.").

Kalshi knows it is offering sports bets. In multiple courts, Kalshi has conceded the point. *See Commonwealth v. KalshiEX, LLC*, 2026 WL 188019, at *3 (Mass. Super. Ct. Jan. 20, 2026) ("Kalshi does not argue that its sports-related event contracts do not meet the definition of sports wagering in the Commonwealth."); *Ho-Chunk Nation v. Kalshi, Inc.*, 2026 WL 1284077, at *4 (W.D. Wis. May 5, 2026) ("Kalshi does not appear to dispute that … its sports event contracts qualify as 'class III gaming.'").

Kalshi also allows users to view its offerings in "[s]ports fan mode,"[3] which displays markets in a manner that "mirrors" garden-variety sports

---

[3] Virginia Gandolfo, *How to Display Sportsbook Odds at Kalshi: View American Odds,* RotoGrinders (2026), https://perma.cc/Y99F-GTZG.

bets.  *Commonwealth*, 2026 WL 188019, at *2.  The graphic below—published in a news article regarding Kalshi's sports betting expansion—illustrates this approach.[4]  The first image shows betting options for an NFL game on a state-regulated online sportsbook; the second shows betting options on Kalshi for the same game.  Both use the same format, offer bets on the same point spread, and offer bets on the same over/under for the number of points scored.



---

[4] Ben Blatt & Amy Fan, *Is Sports Betting Illegal in Your State? Not If You Call It a 'Prediction Market.'*, N.Y. Times (Oct. 5, 2025), https://perma.cc/JZ9K-7HX8.

Kalshi also offers bets that have long been standard sportsbook fare, such as proposition bets and parlays.  Proposition bets are wagers on statistics and other in-game outcomes.  For example, Kalshi offers bets on the total number of corner kicks in an English Premier League soccer match between Manchester City and Aston Villa:[5]



---

[5] Counsel for the AGA took a screenshot of this page on the Kalshi mobile application on May 20 at 10:58 PM ET.  Kalshi likewise offers bets on the speed of the fastest serve in a tennis match.  *See* Letter from Xavier Sottile, Head of Markets, KalshiEX LLC, to CFTC, *Notification Regarding the Initial Listing of the "Will the fastest serve in <tennis match> be <above/below/exactly/at least/between><count><speed>?" Contract* (Jan. 16, 2026), https://perma.cc/SGE5-NT5N.

Kalshi also allows users to create custom parlays, which it dubs "Combo[s]," that combine several different wagers and pay off only if *all* the listed outcomes occur.  And Kalshi does not restrict these parlay bets to a single game, or even to matchups within a single sport.  For instance, Kalshi promotes parlays that rely on 30 different outcomes across multiple games within a single sport,[6] and 21-leg parlays that rely on outcomes in separate games across multiple sports in multiple cities: [7]

---

[6] Dustin Gouker, *Kalshi Was Promoting a 30-Leg Parlay to Users on Tuesday*, Event Horizon (Apr. 1, 2026), https://perma.cc/V34F-4WAU.

[7] Counsel for the AGA took a screenshot of this parlay on the Kalshi mobile application on May 12 at 10:15 AM ET.

8



Kalshi makes no effort to show that these parlays—which are "surging" on Kalshi[8] and "a growing share of [its] volume"[9]—are anything other than sports bets. Instead, Kalshi embraces the comparison, for

---

[8] Sam McQuillan, *Kalshi Parlay Volume Surges, But Sports Prediction Economics Still Lag Sportsbooks*, Legal Sports Report (Mar. 24, 2026), https://perma.cc/XF4N-RGRZ.

[9] Dan Bernstein & Lev Akabas, *Kalshi Retail Bettors Have Lost $100M+ on Parlays this Year*, Sportico (May 13, 2026), https://perma.cc/Y7HK-ZC5N.

example by advertising "legal sports betting in all 50 states," *Hendrick*, 817 F.Supp.3d at 1029 (citation omitted), including in states like Utah where sports betting is illegal:[10]

 

*See also Flaherty*, 172 F.4th at 235 (Roth, J., dissenting) (additional marketing screenshots); *Commonwealth*, 2026 WL 188019, at *2 ("Kalshi referred to itself in advertisements as 'the first nationwide legal sports betting platform,' and its CEO has referred to its offerings as 'bets'").

---

[10] Dustin Gouker, *Kalshi Is Advertising That 'Sports Betting' Is Legal in California, Texas*, Event Horizon (Sep. 17, 2025), https://perma.cc/8NJ4-HFUR; Dustin Gouker, *Yes, Kalshi Is Still Marketing Itself as a Betting Platform*, Event Horizon (Aug. 27, 2025), https://perma.cc/QEH6-YA3L.

Beyond its advertisements, Kalshi represented to the U.S. Patent & Trademark Office, in its application to trademark the term "prediction market," that its services are associated with "Bookmaking services, namely, providing of information related to sports betting; organizing, arranging, conducting sports betting and gambling tournaments, competitions and contests."[11] At bottom, Kalshi tells the world that it offers sports bets, but asks this Court to ignore that reality and conclude otherwise based on a novel reading of the CEA. *See infra* at 14-24. As one judge assessing Kalshi's arguments observed, this is "sophistry to the nth degree." Oral Argument at 8:31, *N. Am. Derivatives Exch., Inc. v. Nevada*, No. 25-7187 (9th Cir. Apr. 16, 2026).[12]

Unsurprisingly, the data confirms what the marketing makes clear: Kalshi operates a sportsbook. Sports betting accounts for "more than 90 percent" of Kalshi's volume.[13] That volume is growing at a staggering pace, with annualized volume now $178 billion and more than $14.8

---

[11] U.S. Trademark Application Serial No. 99488100 (filed Nov. 10, 2025), https://tsdr.uspto.gov/documentviewer?caseId=sn99488100&docId=APP 20251110143106#docIndex=3&page=1.

[12] https://youtu.be/JOCrxsSR-OU?si=tVEGQA5J7ZuJzP8e&t=511.

[13] Jacob Stern, *You've Never Seen Super Bowl Betting Like This Before*, The Atlantic (Feb. 5, 2026), https://perma.cc/T3GJ-QKYA.

billion in April alone.[14]  On a single day in April, Kalshi "eclipsed $700 million in trading volume" of which "[m]ore than 92%" came from sports and parlays, and parlays alone were responsible for $189 million of volume.[15]

Kalshi claims that its sports bets differ from "run-of-the-mill sports bets" because the "price[s] [are] established by the market," while traditional sportsbooks are themselves "party to the contract."  Kalshi *Schuler* Br. 3-4, 52.  That is a distinction without a difference.  Kalshi partners with "market makers"—professional trading firms that run algorithmic strategies to execute hundreds of millions of dollars' worth of trades each week—to serve the same role as the house in a traditional sportsbook.[16]  Kalshi operates one of these firms (Kalshi Trading), it "rebat[es] some market makers' fees," and it "sometimes even pay[s]

---

[14] Michael J. de la Merced, *Kalshi, the Prediction Market, Is Now Valued at $22 Billion*, N.Y. Times (May 7, 2026), https://perma.cc/8B83-983L; Dustin Gouker, *Most of Kalshi's Recent Volume Growth Comes from Parlays*, Event Horizon (May 6, 2026), https://perma.cc/4D3W-3H26.

[15] Dustin Gouker, *Kalshi Posts Second-Biggest Day Ever: $700M In Volume*, Event Horizon (Apr. 27, 2026), https://perma.cc/3GZU-CRJS.

[16] Neil Mehta, Katherine Long & Caitlin Ostroff, *Why Almost Everyone Loses—Except a Few Sharks—on Prediction Markets*, Wall St. J. (May 3, 2026), https://perma.cc/S676-47AL.

them for providing liquidity."[17]  At least one market maker "owns a small stake in Kalshi in exchange for providing liquidity on its event contracts."[18]

The straightforward conclusion is that, although "Kalshi characterizes its sports-related event contracts" as futures, "at bottom, they are sports wagers." *Hendrick*, 817 F.Supp.3d at 1029.  That finding accords with the century-old tradition of courts—including this Court—rejecting creative schemes to evade state gaming law. *Waite v. Press Pub. Ass'n*, 155 F. 58, 62 (6th Cir. 1907) ("guessing contest" offered by newspaper on presidential election results was "within the terms of the Michigan law" prohibiting lotteries "and the mischief at which it was aimed"); *see also, e.g.*, *State v. Lipkin*, 84 S.E. 340, 343 (N.C. 1915) (courts must "look to the substance and not to the form" of a gaming scheme). The same reasoning controls here.  Approving Kalshi's nationwide sports betting ploy would elevate form over substance, to the detriment of Ohio's historic police power to regulate gaming within its borders.

---

[17] *Id.*

[18] Emily Nicolle & Bernard Goyder, *Kalshi Completes First Block Trade, Backed by Jump Trading*, Bloomberg (Apr. 28, 2026), https://perma.cc/M7CM-FQAB.

## II. Kalshi's Arguments Defy Settled Legal Principles and Common Sense.

Kalshi's core argument fails for two independent reasons grounded in settled law.  *First,* Kalshi's sports bets are not "swaps" under the CEA and Dodd-Frank.  Kalshi's contrary arguments lack any limiting principle and would give the CFTC exclusive jurisdiction over all sports betting nationwide.  *Second*, Kalshi cannot overcome the presumption against preemption, which applies here given the States' traditional role in regulating gaming.  As a motions panel of this Court already demonstrated, Congress's decision to bring "swaps" under the CFTC's regulatory jurisdiction did not designate the CFTC as the nation's sole sportsbook regulator.  *KalshiEX LLC v. Schuler*, 2026 WL 1295806, at *1 (6th Cir. Apr. 24, 2026).

### A.   Kalshi's Sports Bets Are Not "Swaps."

Kalshi seeks a preliminary injunction that would enjoin state law regarding *all* its sports bets—past, present, and future.  It therefore must show that *all* of them qualify as "swaps" under the CEA.  Kalshi does not come close to carrying that heavy burden.

Starting with the text, Kalshi's arguments falter because a "swap" must be based on the "occurrence, nonoccurrence, or the extent of the

14

occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). That does not describe Kalshi's sports bets. Take the parlays described above, for example: *No one* faces potential economic consequences from the outcome of a 21- or 30-leg parlay based on outcomes, point spreads, and player performances in a hodgepodge of different sporting events played in different cities.[19]   These wagers constitute a significant proportion of Kalshi's volume, yet neither Kalshi nor the CFTC has even *attempted* to show that they satisfy the statutory criteria. To the contrary, Kalshi acknowledged in prior litigation that "a game has 'no inherent economic significance'" and lacks "'economic consequences outside of the game itself.'" *Hendrick*, 817 F.Supp.3d at 1028 n.3 (citations omitted).

Kalshi has suggested that a handful of its other wagers are "swaps" because they allow a sportsbook to hedge the risk presented by its open

---

[19] It is not sufficient for the parlays themselves to involve potential economic consequences, because the CEA requires the underlying events—not the swap—to be "associated with" such consequences. 7 U.S.C. § 1a(47)(A)(ii).   The word "potential" does not modify this requirement; instead, the statute requires an *actual* association with one or more such potential consequences.

15

wagers. *See* Kalshi *Schuler* Br. 47. But that's just a lawyerly way of saying that Kalshi offers sports bets to those who have already placed them. The underlying occurrence—e.g., the number of corner kicks in a soccer game—does not become associated with "potential" "economic consequences" merely because someone has bet on it. Otherwise, every occurrence in the universe (including coin flips) would qualify, rendering the requirements in section 1a(47)(A)(ii) meaningless. *See Hendrick*, 817 F.Supp.3d at 1028, 1030-31 & n.3. The Court "should not lightly conclude that Congress enacted a self-defeating statute." *Quarles v. United States*, 587 U.S. 645, 654 (2019).

Kalshi further errs in arguing that its sports bets are "swaps" because they allow companies to "hedg[e] millions of dollars in sports-related risks." Kalshi *Schuler* Br. 47. For example, Kalshi recently partnered with a New York bar on a promotion that awarded customers a $100 credit on their bill if the New York Knicks won Game 1 of the NBA Finals.[20] That promotion does not support Kalshi's argument for several reasons. *First*, the bar owner did not face any pre-existing economic risk

---

[20] David Propper, *NYC Bar Will Give Fans $100 Off Tabs if Knicks Win Game 1 of NBA Finals Thanks to Owner's Clever Bet*, N.Y. Post (June 2, 2026), https://perma.cc/SRV4-UXT8.

based on the outcome of the Knicks game—he voluntarily decided to make $100 bets with each customer. The risk he faced was thus manufactured and synthetic, distinguishing it from the inherent risks addressed by genuine "swaps." Unlike farmers and bankers, whose business models involve organic risk exposure to commodity prices and interest rates, the bar owner *created* risk that otherwise would not have existed by placing wagers with his customers. The underlying outcome— the score of the Knicks game—thus was not "associated with" any economic risk for the bar owner, as Congress used that term in section 1a(47)(A)(ii). *Second*, gamblers already use sportsbooks to offset similar risks, as evidenced by a furniture salesman who created marketing "promotion[s]" based on the results of sporting events and "regularly use[d] the betting market to mitigate risk from furniture giveaways at his store."[21]

Kalshi's hedging argument also fails because it has no limiting principle. Under Kalshi's logic, a bet on any outcome can be converted into a "swap" as long as the person placing it makes a second bet on the

---

[21] David Purdum, *Notable Bets: Mattress Mack and the Wildest Wagers and Betting Tales of 2022*, ESPN (Jan. 2, 2023), https://perma.cc/9BNL-S5EF.

17

opposite outcome.  A bet in Las Vegas that the Knicks will win would thus become a "swap" if the bettor places a second wager in Atlantic City that the Knicks will lose.  By Kalshi's logic, that formula—two bets equals one swap—applies to *any* sports wager, including the 30-leg parlays discussed above.  Kalshi cites no precedent for that sweeping interpretation, and as far as AGA is aware, none exists.

The *Orgel* district court held that Kalshi's bets are "swaps"— without conducting any meaningful examination of particular wagers or classes of wagers—because the CEA uses "broad" language like "associated with" and "potential" financial consequences.  *Orgel* Order, RE 48, PageID #884-85; *see also* CFTC *Schuler* Br. 10-11.  That reading, however, flouts the well-established principle that courts should not interpret statutory phrases "in isolation" or based "on the broadest imaginable definitions of [their] component words."  *Dubin v. United States*, 599 U.S. 110, 120 (2023) (citation omitted).  The proper approach is to interpret the CEA "by reviewing [its] text in context," *Pulsifer v. United States*, 601 U.S. 124, 133 (2024), and in a way that "fit[s] all parts" of the statute "into an harmonious whole," *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (citation omitted).

18

Here, every contextual indicator shows that Congress sought to regulate quintessential financial-market transactions when it enacted Dodd-Frank. For example, the CEA's definition of swaps refers to "option[s] … for the purchase or sale" of "currencies, commodities, securities" and the like, "interest rate swap[s]," instruments to hedge "financial risk," and "foreign exchange swap[s]." 7 U.S.C. § 1a(47)(A); *see* Dodd-Frank Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010). Those traditional financial instruments bear no resemblance to a 30-leg parlay or a wager on the number of corner kicks in a soccer game.

Read in light of the context and structure of the CEA, an event contract has the requisite "financial, economic, or commercial consequence[s]" if it has the same kinds of effects as the other types of financial transactions described in section 1a(47)(A)—*i.e.*, if the underlying event itself has real-world economic effects and presents a bona fide need to hedge risk exposure, which the swap provides. *See, e.g.*, *Yates v. United States*, 574 U.S. 528, 543 (2015) (narrowing meaning of "tangible object" because courts must "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress" (citation

19

omitted)); *Salazar v. Paramount Glob.*, 133 F.4th 642, 650-51 (6th Cir. 2025) (declining to construe statute in an "atomisti[c]" manner based on "the pure definitional meaning of words in isolation," and instead relying on "context" and "common sense" to discern its meaning (citation omitted)).

The *Schuler* district court correctly applied these principles. It concluded that the CEA's purpose is "better achieved when a 'swap' is understood as a transaction involving financial instruments and measures that traditionally and directly *affect commodity prices*" like "[c]urrency exchange rates, the weather, and energy costs,"—not "the number of points scored in the Huskies-Bobcats game." *Schuler* Order, RE 69, PageID #904-05. Another court in this Circuit recognized that the interpretation advanced by Kalshi "extend[s] [the CEA's] reach to any and all things that happen," and the States' narrower reading "keeps … § 1a(47)(A)(ii) in line with its surrounding provisions, which refer almost exclusively to financial measures, indices, or instruments." *QCX LLC v. Nessel,* 2026 WL 1166362, at *2-3 (W.D. Mich. Mar. 10, 2026) (citation omitted). Indeed, Kalshi's reading of "swap" in section 1a(47)(A)(ii) would swallow the separate (and differently worded) "swap" definitions

20

in sections 1a(47)(A)(i) and (iii), rendering them superfluous. *City of Chicago v. Fulton*, 592 U.S. 154, 159 (2021) ("The canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme.").

Those conclusions accord with history and experience. When Congress enacted Dodd-Frank to "brin[g] risky financial products out of the shadows," no one had *ever* offered a sports bet on a CFTC-registered exchange. *Hendrick*, 817 F.Supp.3d at 1031. To help ensure that no one would, Dodd-Frank included a "Special [R]ule" that allows the CFTC to prohibit contracts that involve "gaming" or any "activity that is unlawful under any Federal or State law." 7 U.S.C. § 7a-2(c)(5)(C).[22] The following year, the CFTC exercised that authority by adopting a regulation commanding that DCMs "shall not list for trading" any contract that "involves" the activities enumerated in the Special Rule—including "gaming" and "activity that is unlawful under any State or Federal law." 17 C.F.R. § 40.11(a)(1). Despite the CFTC's newfound litigation position

---

[22] Because the Special Rule encompasses "agreements, contracts, transactions, *or* swaps," 7 U.S.C. § 7a-2(c)(5)(C)(i) (emphasis added), the reference to "gaming" does not prove that Congress envisioned gaming-based swaps.

(CFTC *Schuler* Br. 25-26), section 40.11(a) remains in effect and serves to *prohibit*—not authorize—gaming contracts on DCMs.

Kalshi's arguments also run headlong into the major-questions doctrine. Courts are "skeptic[al]" "[w]hen an agency claims to discover in a long-extant statute an unheralded power" over questions of vast economic and political significance. *Utility Air*, 573 U.S. at 324. That is precisely what Kalshi and the CFTC seek to do here by reinterpreting the CEA to give the agency authority to regulate the $17 billion, 35-state commercial sports betting market.[23] As the Supreme Court recognized in *Murphy*, the "legalization of sports gambling" has long been "a controversial subject" that involves "important policy choice[s]." 584 U.S. at 486. Under Kalshi's view, however, *Murphy* was unnecessary because Congress silently empowered the CFTC to oversee sports betting in 2010. The "lack of historical precedent" for federally authorized nationwide sports betting, "coupled with the breadth of authority that the [CFTC] now claims, is a telling indication that the [newfound policy] extends

---

[23] American Gaming Ass'n, *State of the States 2026: The AGA Analysis of the Commercial Casino Industry*, 10 (May 2026), https://perma.cc/E9RR-XPDN.

beyond the agency's legitimate reach." *NFIB v. OSHA*, 595 U.S. 109, 119-20 (2022) (citation omitted).[24]

The implications of Kalshi's and the CFTC's position are extreme. If, in fact, sports wagers qualify as "swaps," the CEA would require *all* sports bets—including those placed on the Las Vegas Strip—to be traded on DCMs. This is so because the CEA makes it "unlawful for any person, other than an eligible contract participant,[25] to enter into a swap unless the swap is entered into on, or subject to the rules of" a DCM. 7 U.S.C. § 2(e). Kalshi insists that its arguments apply only to "on-DCM" trading and would leave the States with authority to regulate "off-DCM" sports betting. But there is no statutory basis for that gerrymandered approach: The CEA does not contain an exception for bets placed at retail sportsbooks, and its "swap" definition does not turn on whether a contract is listed on a DCM. *See* 7 U.S.C. § 1a(47)(A)(ii). There is, in short, no

---

[24] The absence of sports betting in CFTC-regulated markets from the agency's inception in 1974 through 2025 is in itself powerful evidence against Kalshi's position. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024).

[25] The CEA defines "eligible contract participant[s]" as "financial institution[s]," "insurance compan[ies]," and similar sophisticated entities and high-net-worth individuals. 7 U.S.C. § 1a(18).

23

plausible statutory basis to distinguish retail sports bets from identical wagers placed on Kalshi—if the latter are swaps, the former must be as well. In other words, the unavoidable consequence of Kalshi's argument is that Congress made the CFTC the Nation's sole sports betting regulator when it enacted Dodd-Frank. Precedent counsels against attributing such a sweeping interpretation to technical provisions regarding swaps transactions. *See NFIB*, 595 U.S. at 117.

## B.    Kalshi's Preemption Arguments Fail.

Even if Kalshi's sports bets fit the CEA's definition of "swap," nothing in the statute precludes Ohio from regulating them. Because "the States are independent sovereigns in our federal system," this Court applies a "presumption against preemption" of state law. *Fenner*, 113 F.4th at 594 (citation omitted). And that presumption "operates with special force in cases in which Congress has legislated in a field which the States have traditionally occupied," such as gaming. *Id.* (cleaned up); *see Murphy*, 584 U.S. at 484 (the "general federal approach" is to "respect the policy choices of the people of each State on the controversial issue of gambling"); *Northville Downs v. Granholm*, 622 F.3d 579, 587 (6th Cir. 2010) (recognizing gaming regulation as "a legitimate state interest" and

24

a "proper exercise of the state's police power"). Kalshi therefore must show that it was Congress's "clear and manifest purpose" to displace Ohio's power over sports betting.[26] *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (citation omitted); *see also Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) ("[I]f Congress intends to alter the 'usual constitutional balance between the States and the Federal Government,' it must make its intention to do so 'unmistakably clear in the language of the statute.'" (citation omitted)). Because the CEA says nothing about restricting states' authority to regulate sports wagering, Kalshi cannot clear that high bar.

Even beyond the presumption, Kalshi's arguments fail given the CEA's text and structure. Starting with express preemption, the statutory language Kalshi invokes—the CEA's conferral of "exclusive jurisdiction," 7 U.S.C. § 2(a)(1)(A)—"would represent an unusual express-preemption provision." *Schuler*, 2026 WL 1295806, at *4.

---

[26] *Churchill Downs Technology Initiatives Co. v. Michigan Gaming Control Board*, 162 F.4th 631 (6th Cir. 2025), does not change this conclusion. In *Churchill*, "the plain text" of the statute was held to preempt a state gambling regulation, so the Court's observation (in a footnote) that "*interstate* gambling" does not trigger the presumption against preemption was dicta. *Id.* at 641 n.5.

25

Indeed, even in the CEA itself, Congress elsewhere employed traditional express preemption language. *See* 7 U.S.C. § 16(e)(2) ("This chapter shall supersede and preempt the application of any State or local law"); *id.* § 16(h) ("A swap … may not be regulated as an insurance contract under the law of any State."). Those provisions, which are not applicable here, underscore that Congress did not expressly preempt state gaming law in section 2(a). *See Schuler*, 2026 WL 1295806, at *4.

Kalshi's implied-preemption arguments fare no better. Field preemption, for instance, applies only in "rare cases" where Congress has "legislated so comprehensively in a particular field that it left no room for supplementary state legislation." *Kansas v. Garcia*, 589 U.S. 191, 208 (2020) (cleaned up). But the CEA leaves considerable "room" for supplemental regulation, allowing states to subject DCMs to everything from common-law suits to statutory antifraud actions. *See* 7 U.S.C. § 2(a)(1)(A) (preserving the "regulatory authorities … of any State" with respect to swaps traded on DCMs); 7 U.S.C. § 13a-2(7) (permitting "State official[s]" to "proceed[] in State court on the basis of an alleged violation of any general civil or criminal antifraud statute of such State."). In other words, the "Swiss cheese-like field" that Congress created "cannot

26

preempt state law because field preemption requires *complete* occupation on the part of the federal government." *Flaherty*, 172 F.4th at 238 (Roth, J., dissenting).

As for conflict preemption, Ohio's sports wagering laws are aligned with federal objectives—after all, the Special Rule subjects contracts involving "gaming" and activity that violates state law to special scrutiny, 7 U.S.C. § 7a-2(c)(5)(C), and federal regulations expressly "[p]*rohibit*[]" DCMs from offering such contracts, 17 C.F.R. § 40.11(a) (emphasis added). The CFTC ignores these provisions. But "[i]t is an elemental principle of administrative law that agencies are bound to follow their own regulations," and no one disputes that section 40.11(a) is a legislative rule binding on the CFTC. *Meister v. U.S. Dep't of Agric.*, 623 F.3d 363, 371 (6th Cir. 2010) (citation omitted).

The import of section 40.11(a) is not, as the CFTC suggests, that contracts involving "gaming" or unlawful activity are "somehow removed from the exclusive jurisdiction conferred by Congress." CFTC *Schuler* Br. 25. It is that such contracts have *never* been within the CFTC's sole domain. Even if Congress reserved some "field" or hinted at some "objective" related to trading on DCMs (it did not), that protection would

27

not reach contracts *unlawfully* listed on DCMs.  *See KalshiEX LLC v. Martin,* 793 F.Supp.3d 667, 676-79 (D. Md. 2025).

Despite all this textual evidence, a divided Third Circuit panel held that the CEA covers the "field" of on-DCM trading and establishes an "objectiv[e]" to "do away with [a] patchwork of state regulations." *Flaherty*, 172 F.4th at 229-30.  But the premise underlying that assessment—that the CEA demands uniformity regarding trading on DCMs—does not withstand scrutiny given the CEA's "several savings clauses" that "often permi[t] state regulation."  *Schuler*, 2026 WL 1295806, at *5.  And even where the CEA does authorize federal regulatory action—such as in the statutory Special Rule—state law still shapes the exercise of the CFTC's authority.  *See* 7 U.S.C. § 7a-2(c)(5)(C)(i).[27]

Kalshi's preemption theories are especially strained given Congress's longstanding choice to embrace state gambling regulation.

---

[27] The Special Rule also undermines the *Orgel* district court's "impartial access" theory of impossibility preemption.  *Orgel* Order, RE 48, PageID #887-88.  If the "impartial access" regulation requires DCMs to offer the same contracts in all fifty states—a novel reading the CFTC supports with only a dictionary definition, *see* CFTC *Schuler* Br. 24—the CFTC could not meaningfully police contracts involving "activity that is unlawful under any … State law."  7 U.S.C. § 7a-2(c)(5)(C).

Congress has consistently eschewed comprehensive federal gaming regulation in favor of targeted statutes that incorporate, rather than supersede, state law. The Unlawful Internet Gambling Enforcement Act, for instance, prohibits knowingly accepting payments for "unlawful internet gambling" but defines that term with reference to *state* law. 31 U.S.C. §§ 5362(10)(A), 5363; *see also* 18 U.S.C. § 1955(b)(1) (defining "illegal gambling business" as one that "is a violation of the law of a *State* … in which it is conducted" (emphasis added)). Similarly, the Wire Act's prohibition on transmitting sports wagers creates exceptions for intrastate wagers and wagers between individuals in states where wagering is legal. *See* 18 U.S.C. § 1084(b). This consistent practice makes it exceedingly unlikely that Dodd-Frank preempted scores of state gambling laws without saying so clearly.

## III. Licensed Gaming Operators and States Partner to Make Legal Sports Betting Effective.

The final two preliminary injunction factors—harm to third parties and the public interest—further undercut Kalshi's arguments. *Schuler Order*, RE 69, PageID #913-14. Since *Murphy*, States have made different choices about whether and how to offer sports betting. Some states prohibit sports betting altogether, but others, like Ohio and

29

Tennessee, have adopted regulatory frameworks to permit licensed operators to offer sports betting. Operators have invested accordingly and work with state regulators to ensure that consumers can enjoy gaming as a safe, responsible form of entertainment.

Ohio and Tennessee, for instance, require prospective gaming operators to apply—and pay a substantial fee[28]—to state regulators for a license. After regulators' review and authorization, licensed operators must pay taxes on their gross revenues or total handle; comply with state rules; and periodically renew their licenses. *See, e.g.*, Tenn. Code Ann. § 4-49-104; Ohio Rev. Code § 5753.021.

In 2025, nationwide commercial gaming revenue reached $78.62 billion, including $16.89 billion from sports betting, and produced $17.86 billion in direct gaming tax revenue.[29] In Ohio, licensed gaming operators support nearly 34,000 local jobs and generate approximately $1 billion in gaming tax revenue.[30] These revenues support public

---

[28] *See* Ohio Rev. Code § 3775.04(E)(1) (fees up to $2.5 million); Tenn. Code Ann. § 4-49-117(b)(10) (up to $750,000).

[29] *State of the States, supra* note 23, at 8-10.

[30] American Gaming Ass'n, *Gaming by the Numbers: Ohio* (Dec. 31, 2024), https://perma.cc/4VLK-QDH2.

programs, such as public education. *See, e.g.*, Ohio Rev. Code § 5753.031(A)(3).

There is a bargain at the heart of this framework. Operators are licensed and regulated by the States in which they operate. They provide States with revenue, jobs, and investments, while States, in return, provide a fair market in which all competitors are subject to the same standards. That level playing field has created settled expectations for regulators and operators alike.

## IV. Kalshi's Vision Would Upend the Longstanding Framework Governing Sports Betting.

Kalshi's legal theory would allow prediction markets to circumvent state restrictions on sports betting that protect minors, regulate advertising, provide meaningful responsible-gaming safeguards, and generate considerable tax revenues.

***Age Limits.*** In most states, persons under age 21 are prohibited from placing sports wagers. *See, e.g.*, Ohio Rev. Code § 3775.99(A)(2). But Kalshi offers sports bets to all users 18 or older,[31] despite states'

---

[31] *See* Kalshi, *Signing Up as an Individual* (Mar. 10, 2026), https://perma.cc/GA9G-8PRW.

31

contrary judgments that wagers by young users would present unacceptable risks. *See Schuler* Order, RE 69, PageID #914 n.9.

*Geofencing.* State laws require licensed operators to employ geofencing technology to confine wagering to authorized jurisdictions and to verify a bettor's location. *See, e.g.*, Ohio Admin. Code 3775-17-01, 3775-9-03. Geofencing allows a sportsbook to tailor its wagers to each state's rules. Kalshi also bypasses these requirements. It offers sports wagers nationwide without regard for whether a State has prohibited sports betting.

*Advertising.* States also restrict gaming advertising. Licensed operators must avoid targeting minors and individuals who have self-excluded from gaming, and they are required to include prominent responsible gaming messages in their advertisements. *See, e.g.*, Ohio Admin. Code 3775-16-08.

Kalshi's advertising is not similarly tailored. Its advertisements describe the company's wagers as "kind of addicting"[32] and do not include responsible gaming messages. *See supra* at 9-10. Nor is there evidence

---

[32] Dustin Gouker, *Kalshi Says It's 'Kind of Addicting' in Instagram Post*, Event Horizon (Oct. 21, 2025), https://perma.cc/5W6T-5UZK.

that Kalshi prevents its advertisements from reaching minors and self-excluded individuals.

***Responsible Gaming.*** States also require robust responsible-gaming protections, including voluntary limits and self-exclusion from *all* licensed gaming operations and advertising. *See, e.g.*, Ohio Rev. Code § 3772.031.

Kalshi does not participate in state self-exclusion programs, instead offering narrower tools that fall short of industry standards,[33] and noting that "it is ultimately [the trader's] responsibility not to trade."[34] Consistent with that hands-off approach, there is no evidence that Kalshi monitors for indicators of problem gaming or contacts users who exhibit signs of irresponsible use—steps that state-licensed operators must take. *See* Ohio Admin. Code 3772-12-06. To the contrary, Kalshi *encourages* irresponsible wagering, promoting ads featuring users who say they were "about to be unable to pay [their] rent" but for a last-ditch bet.[35]

---

[33] Kalshi, *Responsible Trading Tools* (accessed May 11, 2026), https://perma.cc/RA53-GT69.

[34] *See* Kalshi, *Trading Break* (Mar. 10, 2026), https://perma.cc/4NZS-28FB.

[35] Mehta, *supra* note 16.

***Gaming Taxes.*** Finally, state-regulated sports betting generates billions of dollars in tax payments to states, as outlined above. *See supra* at 30-31. Kalshi offers sports bets without paying these taxes, inflicting serious damage to the public fisc.

\*     \*     \*

Kalshi's approach would substantially weaken the core rules that States have used to govern sports betting. Instead, Kalshi would force the CFTC to serve as the Nation's sports-betting regulator even though the agency, by its own admission, "is not a gaming regulator" and lacks "the statutory mandate" and "specialized experience appropriate to oversee" the sports betting market. Event Contracts, 89 Fed. Reg. 48,968, 48,982-83 (June 10, 2024). This dramatic shift would result in fewer protections for consumers, reduced revenues for States, and a competitive imbalance for licensed gaming operators. There is no indication—let alone clear and manifest intent, *supra* at 24-25—that Congress designed federal commodities law to produce such upheaval.

34

## CONCLUSION

The Court should reject Kalshi's brazen attempt to circumvent state gaming laws and affirm.

Respectfully submitted,

/s/ Kevin F. King

Bruce Bennett
Benjamin Sovocool
COVINGTON & BURLING LLP
30 Hudson Yards
New York, NY 10001

Kevin F. King
  *Counsel of Record*
Matthew J. Glover
Scott Garfing
Sameer Aggarwal
Hassan Ahmad
Jacob A. Rinear
COVINGTON & BURLING LLP
850 Tenth Street NW
Washington, DC 20001
(202) 662-6000
kking@cov.com

*Counsel for Amicus Curiae*
*American Gaming Association*

June 11, 2026

35

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because this brief contains 6,499 words, including the 388 words in the images on pages 6, 7, 9, and 10, but excluding the parts of the brief exempted by Rule 32(f).  This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point, Century Schoolbook font.

/s/ *Kevin F. King*
Kevin F. King

June 11, 2026

## CERTIFICATE OF SERVICE

I hereby certify that, on June 11, 2026, I caused a true and correct copy of the foregoing brief to be filed with the Clerk of Court for the United States Court of Appeals for the Sixth Circuit using the CM/ECF system.  I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Kevin F. King*
Kevin F. King