**Case No. 26-3196**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

KALSHIEX LLC,

*Plaintiffs-Appellant,*

v.

MATTHEW T. SCHULER, *et al.*,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Southern District of Ohio

**FORMER CFTC CHAIRMAN GARY GENSLER'S BRIEF
AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANTS-APPELLEES**

---

Aitan S. Goelman
Alyssa Howard
Ross Slaughter
ZUCKERMAN SPAEDER LLP
2100 M Street NW, Suite 400
Washington, DC 20037
202-778-1800
agoelman@zuckerman.com
ahoward@zuckerman.com
rslaughter@zuckerman.com

Victor Suthammanont
Kostelanetz LLP
7 World Trade Center, 34th FL
New York, NY 10007
212-808-8100
vsuthammanont@kostelanetz.com

*Counsel for Amicus Curiae*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................... ii

INTERESTS OF *AMICUS CURIAE* ...................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ......................................3

ARGUMENT ........................................................................................................8

    I.    Structure, History, and Purpose Demonstrate Congress Did Not Regulate Sports Betting When It Amended the CEA in 2010. ..............8

        A.    Federal Commodity Derivatives Regulation Prior to Dodd-Frank ...........................................................................8

        B.    Dodd-Frank Was Aimed at the Causes of the Financial Crisis, Not Sports Betting. ...........................................13

    II.    Sports Bets Are Not Swaps ...................................................16

    III.  No One in Congress Called for Preempting State Gaming Laws, Nor Did Dodd-Frank Do So. ...............................................21

    IV.  The Special Rule Does Not Imply That Sports Bets Fall Within the Swaps Definition ..................................................24

    V.   CFTC Lacks Experience and Appropriations to Regulate Sports Betting ...............................................................27

    VI.  Preemption Elephants Are Not Hidden in Definitional Mouseholes. ...........................................................28

CONCLUSION ...................................................................................................29

# TABLE OF AUTHORITIES

**CASES**

*Alabama Ass'n. of Realtors v.*
  *Dep't. of Health & Hum. Servs.*,
  594 U.S. 758 (2021) ...............................................................................28

*Bd. of Trade of City of Chicago v.*
 *Christie Grain & Stock Co.*,
  198 U.S. 236 (1905) ..................................................................................9

*Carter v. Carter Coal Co.*,
  298 U.S. 238 (1936) ................................................................................27

*CFTC v. Banc de Binary*,
  No. 13-CV-00992 (D. Nev. Feb. 26, 2016)..............................................18

*Ebu v. U.S. Citizenship & Immigr. Servs.*,
  134 F.4th 895 (6th Cir. 2025)........................................................ 7, 8, 16

*F.D.A. v. Brown & Williamson*,
  529 U.S. 120 (2000) ................................................................................28

*Inv. Co. Inst. v. CFTC*,
  720 F.3d 370 (D.C. Cir. 2013) ..................................................................8

*KalshiEX LLC v. CFTC*,
  No. 24-5205 (D.C. Cir. Nov. 15, 2024) ..................................................18

*King v. Burwell*,
  576 U.S. 473 (2015) ................................................................................28

*Learning Resources, Inc. v. Trump*,
  146 S. Ct. 628 (2026) ..............................................................................28

*MCI v. A.T.&T.*,
  512 U.S. 218 (1994) ................................................................................28

*Merrill Lynch, Pierce,*
*Fenner & Smith, Inc. v. Curran*,
  456 U.S. 353 (1982) ................................................................................17

*Murphy v. N.C.A.A.*,
584 U.S. 453 (2018) ........................................................................ *passim*

*U.S. v. Phillips*,
155 F.4th 102 (2d Cir. 2025) ................................................... 13, 14, 15

*Whitman v. Am. Trucking Ass'ns.*,
531 U.S. 457 (2001) .........................................................................7, 28

**STATUTES**

15 U.S.C. §78bb(a) ...........................................................................22

28 U.S.C. § 3702(1) ..........................................................................23

7 U.S.C. § 16(e) ...................................................................... 5, 11, 22

7 U.S.C. § 16(h) ................................................................................22

7 U.S.C. § 1a(18) ................................................................................5

7 U.S.C. § 1a(47) ...................................................... 14, 15, 17, 18

7 U.S.C. § 1a(49) ..............................................................................18

7 U.S.C. § 2(a)(1)...............................................................................28

7 U.S.C. § 5 .....................................................................................4, 16

7 U.S.C. § 6(a) ..................................................................................15

7 U.S.C. § 7a-2(c)(5)(C) ...................................................................24

7 U.S.C. § 27f(b)................................................................................27

Commodity Futures Modernization Act of 2000,
Pub. L. No. 106-554, App. E, 114 Stat. 2763A-365 .................................. *passim*

Commodity Futures Trading Commission Act of 1974,
Pub. L. No. 93-463, 88 Stat. 1389................................................................9, 10

Futures Trading Practices Act of 1992,
Pub. L. No. 102-546, 106 Stat. 3590................................................................10

Gramm-Leach-Bliley Act of 1999,
   Pub. L. No. 106-102, 113 Stat. 1338 ................................................ 1, 2, 11, 14, 16

Interstate Wire Act of 1961,
   Pub. L. No. 87-216, 75 Stat. 491 ..........................................................................6

Professional and Amateur
Sports Protection Act of 1992,
   Pub. L. No. 102-559, 106 Stat. 4227 ............................................................. *passim*

Sarbanes-Oxley Act of 2002,
   Pub. L. No. 107-204, 116 Stat. 745 .......................................................................1

## REGULATIONS

17 C.F.R. § 40.11 ..............................................................................................6, 26

Exemption for Certain Swap Agreements,
   58 Fed. Reg. 5587 (Jan. 22, 1993) .....................................................................10

Concept Release on the Appropriate
   Regulatory Treatment of Event Contracts,
   73 Fed. Reg. 25669 (May 7, 2008) .................................................... 12, 13, 19, 25

Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap
   Agreement"; Mixed Swaps; Security-Based Swap Agreement Recordkeeping,
   76 Fed. Reg. 29818 (May 23, 2011) ....................................................................20

Provisions Common to Registered Entities,
   76 Fed. Reg. 44776 (July 27, 2011) ...................................................................26

Provisions Common to Registered Entities,
   76 Fed. Reg. at 44785 (July 27, 2011) ...............................................................27

Further Definition of "Swap Dealer," "Security-Based Swap Dealer," "Major
   Swap Participant," "Major Security-Based Swap Participant" and" Eligible
   Contract Participant,"
   77 Fed. Reg. 30596 (May 23, 2012) ....................................................................20

Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap
   Agreement"; Mixed Swaps; Security-Based Swap Agreement Recordkeeping
   77 Fed. Reg. 48208 (August 13, 2012) ...............................................................20

De Minimis Exception to the Swap Dealer Definition,
  83 Fed. Reg. 56666 (Nov. 13, 2018) .....................................................................21

Policy Statement Concerning Swap Transactions,
  54 Fed. Reg. 30694 (July 21, 1989) .....................................................................10

**OTHER AUTHORITIES**

Board of Governors of the Federal Reserve System, *et al.*, *Joint Report on Retail Swaps* (Dec. 2001), https://perma.cc/MLA3-KJ39 ....................................12

Carl Hulse, *Pentagon Prepares a Futures Market on Terror Attacks*, New York Times (July 29, 2003), https://www.nytimes.com/2003/07/29/us/threats-responses-plans-criticisms-pentagon-prepares-futures-market-terror.html .........12

CFTC, *Comments for Proposed Rule 76 FR 29818*, https://comments.cftc.gov/publiccomments/CommentList.aspx?id=1032&ctl00_ctl00_cphContentMain_MainContent_gvCommentListChangePage=15 ......................................................20

CME Chapter 13, https://www.cmegroup.com/rulebook/CME/I/13.pdf ................16

CME Group, Comment for Proposed Rule 75 Fed. Reg. 67282 at 6, (Jan. 3, 2011), https://comments.cftc.gov/PublicComments/ViewComment.aspx?id=26867&SearchText=.....................................................................................................26

Department of the Treasury, *A New Foundation: Rebuilding Financial Supervision and Regulation* 46-48 (June 17, 2009), https://perma.cc/LVS6-6RCK ...............14

*Derivative*, Black's Law Dictionary (12th ed. 2024).................................................8

Financial Crisis Inquiry Comm'n, *The Financial Crisis Inquiry Report* (Jan. 2011), https://www.govinfo.gov/content/pkg/GPO-FCIC/pdf/GPO-FCIC.pdf ..............15

Fred R Bleakley, *Rate Swaps Draw Concern*, N.Y. Times (Feb. 7, 1985), https://www.nytimes.com/1985/02/07/business/rate-swaps-draw-concern.html................................................................10

*Harry Reid,* Biographical Directory of the U.S. Congress, https://bioguide.congress.gov/search/bio/r000146.................................................3

Jewson and Brix, *Weather Derivative Valuation* (2005), https://perma.cc/KR7H-2UVB ..............................................................................11

John Bresnahan & Carrie Budoff Brown, *Lincoln Wall Street bill tacks left*, Politico, (Apr. 13, 2010), https://www.politico.com/story/2010/04/lincoln-wall-street-bill-tacks-left-035752 ...................................................................25

Milla Jovanovic, *US Sports Betting in 2025 Reaches Record Highs, Driven by New York and Illinois*, SportsHandle (Feb 26, 2026), https://perma.cc/6JW7-D6X8.......................7

Remarks of Chairman Gensler Before IMF Conference (March 20, 2013) https://www.cftc.gov/PressRoom/SpeechesTestimony/opagensler-137................9

156 Cong. Rec. S5906-07 (dailey ed. July 15, 2010) .............................................25

156 Cong. Rec. S2816 (daily ed. April 29, 2010) ...................................................................29

Testimony of CFTC Chairman Gary Gensler Before the House Financial Services Committee (July 22, 2009), https://www.cftc.gov/PressRoom/SpeechesTestimony/gensler-7 .......................14

Testimony of Chairman J. Christopher Giancarlo Before the Senate Committee on Appropriations Subcommittee on Financial Services and General Government (May 8, 2019), https://www.cftc.gov/PressRoom/ SpeechesTestimony/opagiancarlo71 ....................................................................27

Treasury Under Secretary Gary Gensler Testimony Before the House Committee on Banking and Financial Services (May 6, 1999), https://perma.cc/V5PS-V4LW .2

## INTERESTS OF AMICUS CURIAE

Gary Gensler served as Commodity Futures Trading Commission ('CFTC') Chairman from 2009 to 2014, as Securities and Exchange Commission ('SEC') Chair from 2021 to 2025, as Under Secretary and Assistant Secretary of the Treasury between 1997 and 2001, and as Senior Adviser to Senator Paul Sarbanes. Prior to his public service, *Amicus* gained extensive experience in finance and derivatives at Goldman Sachs for 18 years. *Amicus* is currently Professor of the Practice of Global Economics and Management and Professor of the Practice of Finance at the Massachusetts Institute of Technology Sloan School of Management and co-hosts the *Power and Consequences* podcast.[1]

During his government service, *Amicus* worked with Congress and negotiated on behalf of the Administration twice amending the Commodity Exchange Act ('CEA'), through the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ('Dodd-Frank') and the Commodity Futures Modernization Act of 2000 ('CFMA'). As Chairman, he led the CFTC's implementation of Dodd-Frank, including adoption of 67 rules, orders, and guidance. In other roles, he was directly involved in (a) completion of multiple SEC security-based swaps rules, (b) drafting of the Sarbanes-Oxley Act of 2002, and (c) drafting of the Gramm-Leach-Bliley Act

---

[1] Other than *Amicus* and his counsel, no party authored this brief in whole or in part or contributed money to the preparation or submission of this brief. The parties have consented to filing this brief.

1

('GLBA') swaps provisions. He also coordinated Treasury's response to the 1998 collapse of hedge fund Long-Term Capital Management (with its $1.3 trillion notional derivatives exposures).[2]

As a Goldman Sachs partner, *Amicus* oversaw fixed income, currency and derivatives trading in Japan and later led worldwide Controller and Treasury functions, including accounting, funding, and risk management for the firm's derivatives desks. He also advised the National Football League in 1990 on the sale of their broadcast rights.

*Amicus* submits this brief to share historical context for Dodd-Frank and CFMA in light of his direct involvement in their passage and the CFTC's regulatory implementation of Dodd-Frank. *Amicus*'s interest is to accurately describe the historical record of colleagues in the Executive Branch and Congress who worked on Dodd-Frank in the wake of the 2008 financial crisis, in particular the late Senate Majority Leader Harry Reid of Nevada.

---

[2] *See* Treasury Under Secretary Gary Gensler Testimony Before the House Committee on Banking and Financial Services (May 6, 1999), https://perma.cc/V5PS-V4LW.

## INTRODUCTION AND SUMMARY OF ARGUMENT

This case boils down to the question of what, if anything, Congress did in Dodd-Frank with regard to sports betting. Kalshi contends that, by encompassing some event contracts within the statutory definition of swap, Congress purposefully made the CFTC a nationwide sports betting regulator and denied states their traditional police power to regulate gaming, including sports betting. The answer—from someone who was there—is that Congress did nothing of the sort.

To put the argument in the plainest real-world terms: Senate Majority Leader Harry Reid of Nevada would never have consented to or passively accepted legislation displacing an activity so critical to his state's economy and politics by permitting sports betting only under CFTC auspices. No one working on Dodd-Frank—in the Executive Branch or Legislative Branch—was attempting to put a curve ball by the Senate Majority Leader to legalize a national sports-betting regime or preempt the Nevada Gaming Commission, a Commission Majority Leader Reid had chaired (1977–1981).[3] He would not have allowed it. Nor did Congress do so.

*First*, the structure, history, and purpose of federal commodity derivatives markets and laws have nothing to do with sports betting. Since the advent of derivatives markets in the United States in the 1850s, the purpose of such markets

---

[3]  *See* Harry Reid, Biographical Directory of the U.S. Congress, https://bioguide.congress.gov/search/bio/r000146.

3

has been to enable farmers, ranchers, and merchants—and later traders in metals, energy, financial, and other commercial interests—to hedge price risk against market fluctuations. As Congress states in the CEA, "[t]he transactions subject to [this Act] are entered into regularly in interstate and international commerce and are affected with a national public interest by providing a means for managing and assuming price risks[,]" and "it is the purpose of [the Act] to serve [those] public interests." 7 U.S.C. § 5. These findings and purpose are core to understanding the scope and limits of Congress's design for federal regulation of derivatives markets.

In the 1980s, a new form of over-the-counter ('OTC') derivatives, swaps, developed for institutions to engage in customized bilateral hedging transactions. In 2000, after years of debates and uncertainties as to the legal status of swaps, Congress passed the CFMA so that swaps (and a limited category of event contracts) would not be subject to regulation as futures.

In the wake of the then-unregulated OTC derivatives market's contribution to the 2008 financial crisis, Congress and the Obama administration focused on reversing much of the CFMA and establishing a regulatory regime for swaps (including certain event contracts that CFMA incorporated in the definition of swap) in Dodd-Frank. In so doing, it prohibited non 'eligible contract participants' ('ECPs')[4] from entering into off-exchange swaps under 7 U.S.C. § 2(e)—meaning,

---

[4] An ECP is a financial, commercial or governmental entity or an individual that has

4

in effect, that "retail" participants may not enter into swaps except on CFTC-licensed exchanges.

*Second*, Congress did not include sports betting contracts within the statutory Dodd-Frank definition of swap. Such contracts do not fit the CEA's purpose or the statutory language defining swap, which focus on hedging economic risk. Sports bets are very rarely, if ever, about hedging. Moreover, if Kalshi were correct that sports bets were swaps, then *all* off-exchange retail sports bets since October 2012— in every state—have been illegal because under 7 U.S.C. § 2(e), non-ECP swaps *must* be traded on exchanges. There was no mention of sports betting during *Amicus's* fifty-four times testifying before Congress as CFTC Chairman, nor did anyone involved in drafting Dodd-Frank speak of making the CFTC a national sports-betting regulator. Further, none of the public comments on the joint CFTC/SEC rules further defining swaps and swaps dealers refer to sports betting contracts.

*Third*, nobody involved in Dodd-Frank's passage called for preempting states or their gaming commissions' authorities over sports betting. Congress could have, but did not, amend the CFMA's limited provision preempting state gaming laws (*see* 7 U.S.C. § 16(e)(2)) to cover event contracts or sports betting. Further, preempting state sports betting authorities would have nullified statutory schemes

---

over $10 million invested assets ($5 million if hedging). 7 U.S.C. § 1a(18).

5

(the Professional and Amateur Sports Protection Act ('PASPA') and the Interstate Wire Act of 1961) which in 2010 generally prohibited sports betting except for Nevada casinos and a few state lotteries. Yet none of the sophisticated parties involved in *Murphy v. NCAA*, 584 U.S. 453 (2018), claimed Congress had already gutted PASPA eight years earlier.

In a system where only Congress can preempt state authority, Kalshi's and the CFTC's position—that a private actor's self-certification or an Executive Branch agency's mere assertion of jurisdiction can preempt states' traditional police power—stands in stark contrast. Further, it is incorrect to argue that preemption would be limited to sports betting on federal exchanges and would not displace state-regulated sports betting.

*Fourth*, Dodd-Frank's "Special Rule," by text and design, does not define sports bets as swaps. The Special Rule's purpose was to give the CFTC authority to prohibit "agreements, contracts, or transactions" that involve "gaming," unlawful activity, terrorism, war, or assassination from being listed on regulated markets, which the CFTC did unanimously in 2011 through notice-and-comment rulemaking. 17 C.F.R. § 40.11(a). Thus, there is no conflict between federal and state laws preventing sports betting on DCMs. In light of PASPA, it would have made little sense for Congress to stealthily preempt state regulation of sports betting and shift

6

all regulatory authority to the CFTC to allow sports betting while providing the agency authority to ban gaming contracts.

*Fifth*, the CFTC did not ask Congress for staffing or appropriations to regulate millions of sports betting transactions either when Dodd-Frank passed or after *Murphy*, and it lacks the experience to do so.

*Sixth*, Congress does not make fundamental changes in the balance of state and federal power in isolated snippets of text. As the Court has said, Congress does not "hide elephants in mouseholes." *Ebu v. U.S. Citizenship & Immigr. Servs.*, 134 F.4th 895, 901 (6th Cir. 2025) (quoting *Whitman v. Am. Trucking Ass'ns.*, 531 U.S. 457, 468 (2001)). Preempting state authority over sports betting—an over $165 billion per year industry—has major implications for states' power to protect their residents.[5] It's not the kind of thing Congress hides in a subpart of a definition—a mousehole too small for the Supreme Court to notice in *Murphy*. If Dodd-Frank had preempted the states on sports betting, it would have been one of the biggest stories about Dodd-Frank at the time. But nobody ever mentioned it.

---

[5] *See* Milla Jovanovic, *US Sports Betting in 2025 Reaches Record Highs, Driven by New York and Illinois*, SportsHandle (Feb 26, 2026), https://perma.cc/6JW7-D6X8.

## ARGUMENT

I. **Structure, History, and Purpose Demonstrate Congress Did Not Regulate Sports Betting When It Amended the CEA in 2010.**

To best understand the heart of this case, one must review the structure, history, and purpose of the CEA (a highly technical regulatory statute) and the changes Congress made in response to the 2008 financial crisis. *See Ebu*, 134 F.4th at 898.

### A. Federal Commodity Derivatives Regulation Prior to Dodd-Frank

1. *Congress passed CEA and created CFTC to foster hedging and price discovery functions of derivatives.*

U.S. derivative markets developed in the 1850s as a way for farmers, when planting their fields, to get price certainty for their potential crops. Farmers and producers also benefited from prices established in a central market, rather than relying on competition for their crops among local merchants.

A "derivative" is a financial contract that derives its value from a "secondary source such as an underlying bond, currency, or commodity" or an underlying price or index. *Derivative*, Black's Law Dictionary (12th ed. 2024); *Inv. Co. Inst. v. CFTC*, 720 F.3d 370, 372 (D.C. Cir. 2013). Well-functioning derivatives markets are essential for end-users seeking to hedge future price risk and focus on what they do best—efficiently producing goods and services for the economy.

Hedging requires counterparties, often speculators hoping to profit from market risks that others want to hedge. As Justice Holmes explained, "[s]peculation

of this kind by competent men is the self-adjustment of society to the probable. Its value in well known as a means of avoiding or mitigating catastrophes, equalizing prices, and providing for periods of want." *Bd. of Trade of City of Chicago v. Christie Grain & Stock Co.*, 198 U.S. 236, 247 (1905).

Fostering hedging and price discovery functions has been at the heart of federal derivatives regulation for more than a century. In 1922, Congress passed the Grain Futures Act, finding that commodity futures were "affected with a national public interest," because they were used as "a basis for determining prices" and for "hedging . . . against possible loss through fluctuations in price." Pub. L. 22-331, § 3, 42 Stat. 998. Congress required futures in specified agricultural grains to be traded on exchanges "designated" by the Secretary of Agriculture. *Id.* § 4.

The purpose of facilitating commodity hedging carried over to the Commodity Exchange Act of 1936, which strengthened anti-fraud and anti-manipulation provisions and expanded the list of commodities to include certain non-grain commodities such as cotton, rice, mill feeds, butter, eggs, and Irish potatoes. Pub. L. 74-675, §§ 3, 5, 49 Stat. 1491.

In 1974, Congress amended the CEA to establish the CFTC and foster broader futures derivatives markets so commercial interests could hedge price risk in the metals, energy, and financial markets.[6] *See* Commodity Futures Trading

---

[6] Remarks of Chairman Gensler Before IMF Conference (March 20, 2013)

Commission Act of 1974, Pub. L. No. 93-463, 88 Stat. 1389. Importantly, it provided that contract markets were required to seek approval from the CFTC before listing new futures contracts. *See id.* § 207 (amending then Section 5 of the CEA). As amended, the CEA provided that all futures contracts were required to be traded on a designated contract market and gave CFTC exclusive jurisdiction over such contracts, except for specified federal and state authorities.

2.    *Congress responds to the emergence of swaps with CFMA.*

In the early 1980s, a new form of derivatives contracts emerged as a way for institutions to engage in customized bilateral hedging transactions: swaps.[7]

To address questions about the legal status of swaps under the CEA, Congress passed the Futures Trading Practices Act of 1992, which granted the CFTC authority to exempt "any agreement, contract, or transaction" from the CEA's requirements. Pub. L. No. 102-546, § 502, 106 Stat. 3590. The CFTC shortly thereafter used that authority to exempt certain customized off-exchange swaps bilaterally negotiated between institutional investors. 58 Fed. Reg. 5587 (Jan. 22, 1993). As the OTC

---

https://www.cftc.gov/PressRoom/SpeechesTestimony/opagensler-137.

[7] *See Policy Statement Concerning Swap Transactions*, 54 Fed. Reg. 30694, 30695 (July 21, 1989) (describing swaps as "an agreement between two parties to exchange a series of cash flows"); Fred R Bleakley, *Rate Swaps Draw Concern*, N.Y. Times (Feb. 7, 1985), https://www.nytimes.com/1985/02/07/business/rate-swaps-draw-concern.html.

derivatives markets grew, though, debate continued (including through a 1998 CFTC concept release) as to if and how they should be regulated.[8]

In 2000, to provide legal certainty about the status of swaps, Congress passed the CFMA, which excluded swap transactions in excluded commodities between ECPs from CFTC regulation. *See* Pub. L. No. 106–554-Appendix E, §§ 103 & 105(b), 114 Stat. 2763A-365. The CFMA also added a new definition of "swap agreement" to the GLBA. *Id.* § 301 (adding GLBA § 206A). As a matter of legislative convenience, that amendment defined "swap agreement" to include, among other things, certain event contracts "associated with a potential financial, economic, or commercial consequence." *Id*. Congress included this language against a backdrop of the then-emerging market for OTC weather derivatives used to hedge weather-related commercial risks, including hurricanes.[9]

At the same time, Congress preempted the application of state laws that "regulate gaming or the operation of bucket shops" for an enumerated list of transactions, including swaps in excluded commodities entered into by ECPs. *Id.* § 117 (codified at 7 U.S.C. § 16(e)(2) (amended again in Dodd-Frank)). Congress did not exclude from CFTC jurisdiction nor preempt state laws with respect to 'retail'

---

[8] *See* Rose and Lane, *Lessons Learned? Brooksley Born & the OTC Derivatives Market*, Harvard Business School (2010), https://perma.cc/6RPT-9NGH.

[9] *See* Jewson and Brix, *Weather Derivative Valuation* (2005), https://perma.cc/KR7H-2UVB.

11

swap transactions. Instead, it directed the Federal Reserve, the Treasury, the CFTC, and the SEC to study "issues involving the offering of swap agreements to persons other than" ECPs, *id.* § 105(c), resulting in a 2001 Joint Report on Retail Swaps ('2001 Joint Report').[10] Nobody in the 2001 Joint Report suggested swaps be used for sports betting.

        3.    *The CFTC explored whether certain event contracts could function as options or futures while noting many event contracts were ill-suited for hedging or price discovery.*

In the aftermath of the September 11, 2001, attacks, in 2003, the Defense Department's Defense Advanced Research Projects Agency ('DARPA') proposed a Policy Analysis Market that would trade event contracts based on possible political developments in the Middle East. The opposition to markets involving assassination, terrorism and war was swift from Senators and members of President George W. Bush's administration.[11]

Subsequently, in 2008, the CFTC issued a "Concept Release on the Appropriate Regulatory Treatment of Event Contracts" ('2008 Concept Release') to address whether "financial agreements that may primarily function as information

---

[10] Board of Governors of the Federal Reserve System, *et al.*, *Joint Report on Retail Swaps* (Dec. 2001), https://perma.cc/MLA3-KJ39.

[11] *See* Carl Hulse, *Pentagon Prepares a Futures Market on Terror Attacks*, New York Times (July 29, 2003), https://www.nytimes.com/2003/07/29/us/threats-responses-plans-criticisms-pentagon-prepares-futures-market-terror.html.

aggregation vehicles" were within CFTC's jurisdiction. 73 Fed. Reg. 25669, 25670 (May 7, 2008). The word "swap" is nowhere to be found.

The CFTC recognized that most event contracts are not suited to the purposes of hedging and price discovery central to the CEA. The CFTC stated that event contracts "generally take the form of financial agreements linked to eventualities or measures that neither derive from, nor correlate with, market prices or broad economic or commercial measures." *Id.*

## B. Dodd-Frank Was Aimed at the Causes of the Financial Crisis, Not Sports Betting.

Trading in unregulated swaps boomed in the early 2000s, contributing to the 2008 financial crisis. *See United States v. Phillips*, 155 F.4th 102, 113 (2d Cir. 2025).

In the aftermath, Congress and the Executive Branch got to work on reforms that culminated in Dodd-Frank. A key administration focus was on reversing many of the CFMA's provisions and establishing a regulatory regime for swaps. In May 2009, Treasury Secretary Timothy Geithner sent and publicly released a letter to Senate Majority Leader Harry Reid with the Executive Branch's recommendations "to enable the government to regulate the OTC derivatives markets[,]" *e.g.*, swaps, to achieve four objectives, including promoting efficiency and transparency of the swaps markets, lowering systemic risk, preventing manipulation and fraud, and

ensuring that swaps "are not marketed inappropriately to unsophisticated parties."[12] *Amicus*, testifying to Congress many times, focused on the need for swaps markets reform, including central clearing, exchange trading and pre-trade transparency for standardized swaps as well as registration of swap dealers, post-trade transparency, and business-conduct rules for customized off-exchange swaps entered into by ECPs. Off-exchange non-ECP swaps were to be prohibited.[13]

In response, Congress passed comprehensive reforms in Title VII of Dodd-Frank. *Phillips*, 155 F.4th at 113. In defining "swap," the third prong of the CEA's resulting six-prong definition listed 22 types of agreements, contracts, or transactions commonly known as swaps—from interest rate swaps to commodity swaps. 7 U.S.C. § 1a(47)(A)(iii). Once again, as a matter of legislative convenience, the statutory swap definition included (from the original 2000 GLBA provisions, *supra* Section I.A.2) agreements not typically considered "swaps," i.e., (1) price-related options (put, call, cap, floor, collar, or similar option), *id.* § 1a(47)(A)(i), and (2) a limited category of event contracts "associated with potential financial,

---

[12] *See* Letter from Timothy Geithner, Secretary of the U.S. Treasury to Senator Harry Reid (May 13, 2009), https://perma.cc/QUG5-HTD4. *See also* Department of the Treasury, *A New Foundation: Rebuilding Financial Supervision and Regulation* 46-48 (June 17, 2009), https://perma.cc/LVS6-6RCK.

[13] Testimony of CFTC Chairman Gary Gensler Before the House Financial Services Committee (July 22, 2009), https://www.cftc.gov/PressRoom/SpeechesTestimony/gensler-7.

economic, or commercial consequences." *Id.* § 1a(47)(A)(ii). The best way to read subparagraphs (i) and (ii) is that, for consistent treatment, Congress added to the transactions regulated as "swaps" those options and event contracts that function similarly to the traditional swaps listed in subparagraph (iii) by facilitating hedging of commercial risk.

Moreover, Dodd-Frank notably did not define swaps as a subset of futures, which would have required *all* swaps to trade on Designated Contract Markets ('DCM'.) *See* 7 U.S.C. § 6(a). Rather, while allowing ECPs to trade customized swaps OTC, Congress extended the off-exchange futures prohibition to swaps traded by non-ECPs. *Id.* § 2(e). Further, Dodd-Frank regulated swaps dealers, mandated central clearing of certain swaps, and imposed reporting requirements on participants in the swaps market. *See Phillips*, 155 F.4th at 113.

Sports betting was not part of the 2008 financial crisis or the response to it.[14] Nowhere in the Executive Branch's list of priorities, in *Amicus*'s 54 appearances before Congress, in any statement of a member of Congress, or in the text of Dodd-Frank was there any indication Congress sought to revise sports betting regulation.

---

[14] *See* Financial Crisis Inquiry Comm'n, *The Financial Crisis Inquiry Report* (Jan. 2011), https://www.govinfo.gov/content/pkg/GPO-FCIC/pdf/GPO-FCIC.pdf.

15

## II.    Sports Bets Are Not Swaps.

Kalshi treats the swap definition as if it includes sports betting, or at least sports bets listed on a DCM.[15] That reading, though, is inconsistent with the purpose of the CEA, the statutory context of the swap definition, and the regulatory understanding of the relationship between sports bets, events contracts, and swaps.

As discussed, the purpose of the CEA is to improve commodities markets by facilitating hedging and price discovery. "[T]ransactions subject to" the CEA "provid[e] a means for managing and assuming price risks, discovering prices, or disseminating pricing information through trading in liquid, fair and financially secure trading facilities." 7 U.S.C. § 5(a). Extending the definition of swap to include sports betting does not serve those purposes. Nor, at the time of Dodd-Frank, were sports bets "entered into regularly in interstate and international commerce." *Id*.

When Congress used language for the CEA swap definition originally adopted in GLBA in 2000 , it had no reason to think that the definition of "swap" in GLBA included sports betting. *See supra* Sections I.A.2 and I.B. That GLBA definition as carried forward to the CEA reflects the purposes of hedging and price discovery common to the CEA's regulatory scheme.

---

[15] Kalshi is mistaken that CFTC's exclusive jurisdiction extends to "any instrument" listed on a DCM. (Opening Br. for Appellant at 31, 45). DCMs can and do list contracts other than futures, options and swaps. *See, e.g.,* CME Chapter 13, https://www.cmegroup.com/rulebook/CME/I/13.pdf.

16

Nevertheless, Kalshi now contends that § 1a(47)(A)(ii) includes sports bets. Each prong of § 1a(47)(A), though, must be considered in relation to the other subparagraphs as well as the history and purpose of derivatives legislation—hedging economic risks, principally related to price. Kalshi's alternative reading of subparagraph (ii) makes the list of swaps in subparagraph (iii) superfluous, because the event-contract category would be so broad that it would include the entire list. *See* Br. of Appellees ("Ohio Br.") at 31-32.

The CFTC (*Amicus* Br. of CFTC at 13) now posits hedging theories for some sports bets that are at best only tenuously connected to reliable hedges of commercial risks. That connection, however, is crucial, as Congress included only those event contracts that hedge risks in a manner similar to a swap and are sufficiently "associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). Read otherwise, there would be no limiting principle on the statutory language. Congress did not consider bets on outcomes of sporting events, how many points a player would score in a quarter, or sportsbook-style parlays to be swaps. These contracts do not have hedgers meeting speculators to lay off risk. *Cf. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 357–58 (1982). Indeed, Kalshi itself said as much to the D.C. Circuit, conceding that "at least in

17

general, contracts relating to games—again, activities conducted for diversion or amusement—are unlikely to serve any 'commercial or hedging interest.'"[16]

Moreover, sports bets, even if labeled "binary options" by some, don't meet § 1a(47)(A)(i)'s definition "put, call, cap, floor, collar, or similar option of any kind that is for the purchase or sale, or based on the value" because they are not for a holder to purchase or sell a commodity nor based on a price.[17]

Further, nothing in the statutory definition of swap (or the "further definition" rules, *see infra*) limits the scope to agreements between two customers rather than between a customer and the "house."[18] In fact, Congress specifically provided that the "house," i.e., a party making markets in swaps—like a casino does if sports bets were to be considered swaps—be regulated as a swap dealer. *See* 7 U.S.C. § 1a(49)(A) (defining "swap dealer" as any person who, among other things, "makes a market in swaps" or "regularly enters into swaps with counterparties as an ordinary course of business for its own accounts"). Nor does the CEA swap definition depend

---

[16] Brief of Appellee at 45, *KalshiEX LLC v. CFTC*, No. 24-5205 (D.C. Cir. Nov. 15, 2024).

[17] The CFTC has asserted jurisdiction over true binary options, contracts that bundle opposing option positions that allow a purchaser to choose between opposing outcomes. True binary options, unlike Kalshi's sports betting contracts, involve a right to buy or sell an asset, or are based on a price. *See* Consent Order, *CFTC v. Banc de Binary*, No. 13-CV-00992 (D. Nev. Feb. 26, 2016).

[18] The CFTC does not join Kalshi in arguing that sports betting against a house is not a swap.

on the venue in which it is entered into—on-exchange or off-exchange. It is the terms of the instrument, not the type of counterparties that enter into it or the venue in which it is entered, that determines whether it is a swap.

More jarring, as noted, 7 U.S.C. § 2(e) makes it "unlawful" for any person (other than ECPs) to enter into swaps other than on a DCM. If *Amicus*, Ohio, and 38 other states are wrong, and Congress swept sports betting into the swap definition, then *all* off-exchange retail sports bets since October 2012 have been illegal. That is every sports wager placed in a casino, on an online sports book, or between two friends at a bar. This would include sports wagers ostensibly permitted by PASPA. *See Murphy*, 584 U.S. at 462. Moreover, somehow, everybody—every Nevada casino and sportsbook, the Supreme Court in *Murphy*—missed this for at least a decade. Stating the proposition demonstrates its unlikelihood.

The regulatory history also precludes the broad reading. In the 2001 joint report to Congress on retail swaps, the Federal Reserve, Treasury, CFTC, and SEC—based in part on market participant interviews—didn't mention sports betting as a potential use of swaps.[19] When the CFTC in 2008 examined event contracts, it considered whether they might be structured as options or futures with no mention of swaps. 73 Fed. Reg. at 25671.

---

[19] *See infra* n. 10.

In 2012, when the CFTC and SEC issued two mandated joint rules further defining swaps and swap dealers, none of the comments suggested that swaps could be used for sports betting. *See* 77 Fed. Reg. 30596 (May 23, 2012). In further defining swap, the Commissions excluded, among other things, certain consumer and commercial agreements, insurance contracts, and forward contracts. *See* 77 Fed. Reg. 48208 (Aug. 13, 2012).

Yet, of all of the comments received during the joint rulemaking process, seeking to exclude certain types of transactions from the swap definition, none contain the word "sport," "sports," or "gamble."[20] And event contracts were only mentioned once in the rule—in a footnote related to credit default swaps. *Id.* at 48273 n. 756. Surely, if a sports wager were considered a swap at the time, someone would have sought clarification in the further definition—especially as such wagers would, by operation of Dodd-Frank, have been required to be placed only on DCMs or limited to ECPs. *See* 7 U.S.C. § 2(e).

Further, though sports betting handle grew to over $165 billion in 2025, the CFTC has not required any sports betting company making markets in "sports bets"

---

[20] *See* CFTC, *Comments for Proposed Rule 76 FR 29818*, https://comments.cftc.gov/publiccomments/CommentList.aspx?id=1032&ctl00_ctl00_cphContentMain_MainContent_gvCommentListChangePage=15. The word "gaming" appears only twice—both times in reference to "gaming" the system, not gambling or betting.

to register as swap dealers.[21] Not FanDuel, DraftKings, principal trading firms making markets on prediction markets, nor any major casino—though their activity may exceed the trigger for registration ($8 billion aggregate gross notional amount of swap dealing over a rolling 12-month period). *See* 83 Fed. Reg. 56666 (Nov. 13, 2018).

While it is not a question, as a matter of law, whether the definition of swap includes some event contracts, that category is much narrower than Kalshi or the CFTC acknowledge, and Congress in 2000 or 2010 did not include sports betting.

### III.    No One in Congress Called for Preempting State Gaming Laws, Nor Did Dodd-Frank do so.

Kalshi argues that when Congress brought swaps under the oversight of the CFTC in response to the 2008 financial crisis, it impliedly preempted all state laws regulating sports betting. As stated above in section I B, though, sports betting was not part of the 2008 financial crisis, the response to it, or the Executive Branch's list of priorities. Nor were there any calls from Congress to preempt the traditional state police powers over gaming to establish nationwide sports betting under CFTC auspices. To the contrary, as discussed below in Section IV, Congress gave the CFTC authority to ban DCMs from listing event contracts involving "gaming."

---

[21] *See* Jovanovic, *supra* n. 5.

21

If they wanted to do so, Congress and the Executive Branch knew how to preempt state gaming and bucket shop laws. Just ten years earlier in the CFMA, Congress had done so in the case of an enumerated list of certain financial agreements, contracts, or transactions excluded by select CFMA provisions or exempted by the Commission under section 6(c) authority. *See* CMFA § 117 (codified as amended at 7 U.S.C. § 16(e)(2)). This provision was specifically included in the CFMA to ensure states didn't regulate specific financial instruments which were being excluded from CFTC jurisdiction. In passing Dodd-Frank, Congress did not add to this enumerated preemption list any reference to contracts involving sports or gaming.

Other aspects of Dodd-Frank and its implementation reinforce the conclusion that Dodd-Frank did not make the CFTC the nation's sports betting regulator. Congress did not address the overlap between state and federal law—as it had in the CFMA for insurance. *See* 7 U.S.C. § 16(h). Further, though Dodd-Frank expressly amends the Securities Exchange Act of 1934 to preempt state regulation of security-based swaps, other than for hybrid instruments, it did nothing comparable about swaps in the CEA. *See* Dodd-Frank § 767 (amending 15 U.S.C. §78bb(a)); 7 U.S.C. § 27f(b).

The absence of any such provisions or discussion is especially telling. The CFTC's current position on preemptions also leads to an unconstitutional result that

22

private parties—just by listing a contract—can preempt state law. *See Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936).

Further, if Congress preempted state sports betting regulations through Dodd-Frank, it would have represented a sea-change in federal policy. At the time, PASPA, made it unlawful for states to "'authorize . . . betting, gambling, or wagering . . . based . . . on' competitive sporting events." *Murphy*, 584 U.S. at 461 (quoting 28 U.S.C. § 3702(1)). Notably, PASPA did not apply to the few instances of sports betting that were permitted by states at the time of its enactment, including sports betting in Nevada casinos. *Id.* at 462. If, as argued by Kalshi, Congress had given the CFTC exclusive jurisdiction and preempted the states' jurisdiction to regulate sports betting, it would have (a) repudiated a decades-old federal policy against sports betting, (b) implicitly repealed PASPA, and (c) preempted the state laws prohibiting sports betting Congress had relied upon to carry out that policy. *See* Ohio Br. 55-56.

Indeed, seven years after Dodd-Frank, when the Supreme Court took up New Jersey's challenge to PASPA's constitutionality, no one argued to the Court that Congress had already repudiated PASPA and turned nationwide sports betting over to the CFTC.

23

**IV.    The Special Rule Does Not Imply That Sports Bets Fall Within The Swaps Definition.**

Dodd-Frank's "Special Rule" by design does not place "agreements, contracts, or transactions" that involve "gaming" within the statutory definition of swap. To the contrary, the purpose of the Special Rule was to give the CFTC authority to determine that certain event contracts are contrary to the public interest and to prohibit CFTC-regulated exchanges from listing or trading such contracts. The Special Rule permits the CFTC to "determine that . . . agreements, contracts, or transactions are contrary to the public interest if [they] involve—(I) activity that is unlawful under any Federal or State law; (II) terrorism; (III) assassination; (IV) war; (V) gaming; or (VI) other similar activity." 7 U.S.C. § 7a-2(c)(5)(C)(i). The operative sentence did not define "agreements, contracts, or transactions" involving this list of activities as "swaps."

The text of the Special Rule makes clear that it applies to all "agreements, contracts, or transactions . . . in excluded commodities," not merely "swaps" in excluded commodities. *Id.* No determination that an event contract is a swap is implicit in an application of the Special Rule. The CFTC may forbid *any* event contract, swap or not, if it involves one of the statutory categories.

The Special Rule provision originated in an amendment proposed by Senate Majority Leader Reid, Senator Chris Dodd and Senator Blanche Lincoln on April

24

29, 2010.[22] The senators proposed the Special Rule as they were seeking the 60 votes needed for cloture and to accommodate members for whom such prohibitions were important.[23] *Amicus*, as CFTC Chairman at the time, provided technical assistance in drafting the Special Rule and specifically recalls discussions with Senate Majority Leader Reid's office regarding the inclusion of "gaming" within the list of activities under the rule.

The list of prohibited activities was included because a number of senators wanted to ban certain agreements, contracts, or transactions, particularly those considered by DARPA, that would have provided markets on terrorist attacks, assassinations, and coups, as well as certain types of event contracts as addressed in the 2008 Concept Release, including those that are "the functional equivalent of gambling" and those "based on assassinations or terrorist activities." 73 Fed. Reg. at 25673. Further, Congress curtailed the impact of the CFMA's contract self-certification provision by giving the CFTC broad public-interest authority to prohibit certain agreements, contracts, and transactions in excluded commodities from being listed.

---

[22] 156 Cong. Rec. S2816, S2889 (daily ed. April 29, 2010) (proposing SA 3739 to S. 3217).

[23] *See* John Bresnahan & Carrie Budoff Brown, *Lincoln Wall Street bill tacks left*, Politico, (Apr. 13, 2010), https://www.politico.com/story/2010/04/lincoln-wall-street-bill-tacks-left-035752.

The only known reference to sports betting in the Dodd-Frank legislative history makes it clear that key members of Congress expected the CFTC to forbid all sports betting on exchanges it regulated. Senator Lincoln explained, in a colloquy with Senator Dianne Feinstein, 156 Cong. Rec. S5906-07 (July 15, 2010):

> Chairman Dodd and I maintained this provision . . . to assure that the Commission has the power to prevent the creation of futures and swaps markets that would allow citizens to profit from devastating events and also prevent gambling through futures markets. . . .

> The Commission needs the power to, and should, prevent derivatives contracts that are contrary to the public interest because they exist predominantly to enable gambling through supposed "event contracts." It would be quite easy to construct an "event contract" around sporting events such as the Super Bowl, the Kentucky Derby, and Masters Golf Tournament. These types of contracts would not serve any real commercial purpose. Rather, they would be used solely for gambling.

While *Amicus* was Chairman, the bipartisan CFTC used the power Congress granted it and unanimously finalized Rule 40.11 in July 2011, prohibiting listing contracts involving gaming, along with the other activities enumerated in the Special Rule. 76 Fed. Reg. 44776, 44799. The only public comment that discussed gaming merely requested the CFTC further define gaming so as to "avoid confusion" about the line between permissible speculation and "gaming-type activities."[24]

---

[24] *See* Comment for Proposed Rule 75 Fed. Reg. 67282 at 6 (Jan. 3, 2011), https://comments.cftc.gov/PublicComments/ViewComment.aspx?id=26867&SearchText=.

Importantly, Rule 40.11(a) prohibits listing "any" contract involving gaming. The purpose of CFTC review of an event contract under Rule 40.11(c) is simply to determine whether a particular contract involves a prohibited category, i.e., whether it involves gaming, war, terrorism, assassination, or unlawful activity. *See* 76 Fed. Reg. at 44785. No contract-specific "public interest" determination is required because the CFTC already concluded in 2011 that all event contracts within these categories are not in the public interest. Thus, if a contract involves gaming, that is the end of the matter.

## V.    CFTC Lacks Experience and Appropriations to Regulate Sports Betting.

Congress did not displace historical state police powers over sports betting through Dodd-Frank and give it to a small federal regulatory agency with no expertise in gaming regulation. The CFTC, and *Amicus* as Chairman, did not think at the time it had become—nor did it seek appropriations to be—the nation's sports-betting regulator.[25] Nor did CFTC Chairman Giancarlo ask for such resources after the Supreme Court struck down PASPA's federal prohibition on sports betting in 2018.[26] It is telling that neither Congress nor the Executive Branch took needed steps

---

[25] *See, e.g.*, *Financial Services and General Government Appropriations for Fiscal Year 2012*: Hearing on S. 1573 Before the Subcomm. of the Senate Appropriations Comm., 112th Cong. 45 at 54-60 (2011), https://perma.cc/3CNJ-2NCX.

[26] *See, e.g.*, Testimony of Chairman J. Christopher Giancarlo Before the Senate Committee on Appropriations Subcommittee on Financial Services and General Government    (May    8,    2019),    https://www.cftc.gov/PressRoom/

27

or appropriated funds as if the CFTC was to address the unique problems of being the national sports betting regulator.

## VI.   Preemption Elephants Are Not Hidden in Definitional Mouseholes.

The Supreme Court has long disapproved of taking obscure statutory language out of context and reading it as delegating massive executive power—what Justice Scalia referred to as hiding elephants in mouseholes. *Whitman v. American Trucking Ass'ns, Inc.*, 531 U.S. at 468 (2001); *see also MCI v. AT&T*, 512 U.S. 218, 229 (1994) (rejecting a theoretically possible interpretation of the word "modify" because it would upend the overall statutory scheme); *FDA v. Brown & Williamson*, 529 U.S. 120, 160 (2000); *King v. Burwell*, 576 U.S. 473, 485-86 (2015); *Learning Resources, Inc. v. Trump*, 146 S. Ct. 628, 638-39 (2026) (plurality op.). This canon of interpretation clearly applies to the CFTC's attempt to upend state gaming regulation based on a portion of a statutory definition that nobody—either at the time Dodd-Frank was enacted or eight years later when the Supreme Court ruled in *Murphy v. NCAA*—claimed that Congress had shifted sports betting regulatory authority to the CFTC.

Such an interpretation is precluded when it would have a major impact on the constitutional balance in our federal system. *See Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 764 (2021) (declining to find statutory

---

SpeechesTestimony/opagiancarlo71.

28

authority for executive action that "intrude[d] into an area that is the particular domain of state law: the landlord-tenant relationship"). Because 7 U.S.C. § 2(e) requires retail swaps to be listed on DCMs, if Kalshi were right that 7 U.S.C. § 2(a)(1)(A) put sports betting under CFTC's exclusive jurisdiction, there wouldn't be any off-exchange sports betting for states to regulate. The impact on state policies—that regulate and derive revenue from gaming, as well as those that ban it or (like Ohio) that limit it to residents older than 21—would be immense.

Yet Kalshi contends that a Senate led by Majority Leader Reid passed legislation intruding into an area that was of particular importance to Nevada and other states' laws.

The absence of evidence in statutory text or context that Congress intended to preempt state gaming laws, override the federal policy of PASPA, and mandate that the CFTC undertake a regulatory function for which it's ill-equipped preclude reading Dodd-Frank as preempting Ohio's laws.

## CONCLUSION

For the reasons stated above, the District Court's order should be affirmed.

29

Dated: June 11, 2026                    Respectfully submitted,

                                        */s/ Alyssa Howard*
                                        Aitan D. Goelman
                                        Alyssa Howard
                                        Ross M. Slaughter
                                        ZUCKERMAN SPAEDER LLP
                                        2100 L Street, NW, Suite 400
                                        Washington, DC 20037
                                        Tel: 202-778-1800
                                        Fax: 202.822.8106
                                        agoelman@zuckerman.com
                                        ahoward@zuckerman.com
                                        rslaughter@zuckerman.com

                                        Victor Suthammanont
                                        Kostelanetz LLP
                                        7 World Trade Center, 34th FL
                                        New York, NY 10007
                                        212-808-8100
                                        vsuthammanont@kostelanetz.com

                                        *Attorneys for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies, in accordance with Rule 32(g)(1) of the Federal Rules of Appellate Procedure, that this amicus brief complies with the type-volume requirements and contains 6,478 words. *See* Fed. R. App. P. 29(a)(5).

The undersigned further certifies that this brief complies with the typeface requirements of Federal Rule 32(a)(5) and the type-style requirements of Federal Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

*/s Alyssa Howard*
Alyssa Howard

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and accurate copy of the foregoing has been served on all parties via their counsel of record through the Court's ECF system this 11th day of June 2026.

/s *Alyssa Howard*
Alyssa Howard