No. 26-3196

## UNITED STATES COURT OF APPEALS
### FOR THE SIXTH CIRCUIT

KALSHIEX LLC, *Plaintiff-Appellant*,

v.

MATTHEW T. SCHULER; THOMAS J. STICKRATH; SHEETAL BAJORIA; SCOTT P. BORGEMENKE; KEITH CHENEY; PENELOPE R. CUNNINGHAM; CHRISTOPHER SMITHERMAN; TRIFFON CALLOS; OHIO CASINO CONTROL COMMISSION; DAVE YOST, OHIO ATTORNEY GENERAL,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Southern District of Ohio at Columbus
Dist. Ct. No. 2:25-cv-1165
Hon. Sarah D. Morrison

**BRIEF OF *AMICI CURIAE* NEVADA, UTAH, 37 OTHER STATES, AND THE DISTRICT OF COLUMBIA SUPPORTING DEFENDANTS-APPELLEES**

AARON D. FORD
Attorney General
HEIDI PARRY STERN
Solicitor General
JESSICA WHELAN
Chief Deputy Solicitor General -
Litigation
Office of the Nevada Attorney General
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
HStern@ag.nv.gov

*Counsel for Amici States*

DEREK BROWN
Attorney General
STANFORD E. PURSER
Solicitor General
MARK C. GILLESPIE
Assistant Solicitor General
Utah Attorney General's Office
160 E. 300 S., 5th Floor
P.O. Box 140858
Salt Lake City, UT 84114-0858

*Counsel for Amici States*

*(Additional Counsel listed after signature block)*

**TABLE OF CONTENTS**

**Page(s)**

TABLE OF AUTHORITIES ................................................................ iii

STATEMENT OF AMICI INTEREST ...................................................1

BACKGROUND ...................................................................................1

    I.     States have traditionally have regulated gambling, including sports betting ......................................................................................1

    II.    In 2010, Congress amended the Commodity Exchange Act in the wake of the 2008 financial crisis .........................................3

    III.   Kalshi claims that Congress – in responding to the 2008 financial crisis – legalized sports betting nationwide ...........................7

ARGUMENT .......................................................................................11

    I.     When Congress makes major changes to the existing state of the law, it does so clearly, not obscurely ....................................12

          A.    Kalshi's position violates the federalism canon .......................13

          B.    Kalshi's position violates the major-questions doctrine ...........16

    II.    Kalshi's position would leave sports betting largely unregulated and endanger the States' citizens .......................................19

          A.    States are experienced in regulating sports betting and its many potential harms ................................................................19

          B.    Existing federal regulation is an insufficient substitute for the States' robust gaming regulations .......................................23

          C.    The CFTC lacks the States' experience in regulating gambling ..................................................................................26

i

**TABLE OF CONTENTS, cont'd.**

**Page(s)**

III.   The CFTC's reading of federal statutes deserves no special weight ...................................................................................27

CONCLUSION ......................................................................................30

ADDITIONAL COUNSEL ....................................................................31

CERTIFICATE OF COMPLIANCE ......................................................33

STATEMENT OF RELATED CASES ...................................................34

CERTIFICATE OF SERVICE ...............................................................35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ah Sin v. Wittman*,
  198 U.S. 500 (1905)..................................................................................1, 14

*Alaska v. Fed. Subsistence Bd.*,
  544 F.3d 1089 (9th Cir. 2008) ...................................................................28

*Altria Grp., Inc. v. Good*,
  555 U.S. 70 (2008)......................................................................................28

*Ariz. State Legis. v. Ariz. Indep. Redistricting Comm'n*,
  576 U.S. 787 (2015).....................................................................................25

*Artichoke Joe's Cal. Grand Casino v. Norton*,
  353 F.3d 712 (9th Cir. 2003) .....................................................................14

*Bowen v. Georgetown Univ. Hosp.*,
  488 U.S. 204 (1988).....................................................................................28

*Cipollone v. Liggett Grp., Inc.*,
  505 U.S. 504 (1992).....................................................................................16

*CSX Transp., Inc. v. Easterwood*,
  507 U.S. 658 (1993)............................................................................. 14, 28

*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000).....................................................................................15

*Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Centro de Periodismo Investigativo, Inc.*,
  598 U.S. 339 (2023).....................................................................................12

*Greater New Orleans Broadcasting Ass'n, Inc. v. United States*,
  527 U.S. 173 (1999).....................................................................................14

*Inv. Co. Inst. v. CFTC*,
  720 F.3d 370 (D.C. Cir. 2013)......................................................................4

# TABLE OF AUTHORITIES, cont'd.

**Page(s)**

*KalshiEX LLC v. Martin*,
  793 F. Supp. 3d 667 (D. Md. 2025)........................................................10

*Kalshiex, LLC v. Flaherty,*
  172 F.4th 220 (3d Cir. 2026) ................................................................10

*Kalshiex, LLC v. Hendrick*,
  No. 2:25-cv-00575, 2025 WL 3286282 (D. Nev. Nov. 24, 2025) ........................9

*Kalshiex, LLC v. Schuler et al.,*
  Case No.2:25-cv-1165 (S.D. Ohio March 9, 2026)....................................9

*Kansas v. Garcia*,
  589 U.S. 191 (2020)............................................................................11

*Learning Res., Inc.*,
  2026 WL 477534 (Roberts, C.J., op.)....................................................19

*Loper Bright Enterprises v. Raimondo*,
  603 U.S. _____ (2024)......................................................... 27, 28

*Massachusetts v. KalshiEX, LLC*,
  No. 2584CV02525 (Mass. Sup. Ct. Jan. 20, 2026) ..............................10

*Merrill Lynch, Pierce, Fenner & Smith v. Curran*,
  456 U.S. 353 (1982)...............................................................................4

*Murphy v. NCAA*,
  584 U.S. 453 (2018)................................................................. passim

*Our Children's Earth Found. v. U.S. EPA*,
  527 F.3d 842 (9th Cir. 2008) .............................................................29

*United States v. Phillips*,
  155 F.4th 102 (2d Cir. 2025) ................................................................5

*Wyeth v. Levine*, 555 U.S. 555 (2009) ....................................... 16, 28, 29

iv

# TABLE OF AUTHORITIES, cont'd.

**Page(s)**

**Statutes, Regulations, and Constitutional Provisions**

U.S. Const. amend. X.................................................................................13

U.S. Const. art. VI...................................................................................11

Ohio Const. art. XV ...................................................................................2

17 C.F.R. §§38.100–.1200 ........................................................................24

17 C.F.R. §38.700 (disciplinary procedures)............................................24

17 C.F.R. §38.750 (dispute resolution).....................................................24

17 C.F.R. §38.850 (conflicts of interest) ..................................................24

17 C.F.R. §40.11(a)......................................................................... 6, 26, 27

54 Fed. Reg. 30694 (July 21, 1989)............................................................5

76 Fed. Reg. 44776 (July 27, 2011).............................................................6

77 Fed. Reg. 48208 (Aug. 13, 2012).....................................................7, 29

89 Fed. Reg. 48968 (June 10, 2024) ....................................... 7, 25, 26, 27

7 U.S.C. §1a ...........................................................................................6, 18

7 U.S.C. §2 ......................................................................................... *passim*

7 U.S.C. §7a-2 ...................................................................................... 25, 27

7 U.S.C. §16 ..............................................................................................16

N.J. Stat. Ann. §§5:12-84 (casino license) ......................................... 24, 25

N.J. Stat. Ann. Sec. 5:12A-11 (sports wagering license) .........................24

## TABLE OF AUTHORITIES, cont'd.

**Page(s)**

N.J. Stat. Ann. §5:12A-11(e) ................................................................ 22, 23, 24, 25

N.J. Stat. Ann. §9:17B-3 .................................................................................. 22, 23

Ohio Rev. Code §§3109.01 ......................................................................................22

Ohio Rev. Code §3775.02 ........................................................................................20

Ohio Rev. Code §3775.03 ........................................................................................20

Ohio Rev. Code §3775.09 ........................................................................................20

Ohio Rev. Code §3775.13 ........................................................................................21

Ohio Rev. Code §3775.99 ........................................................................................22

Pub. L. 111-203, 124 Stat. 1376 (2010)..................................................................6

Tenn. Code Ann. §4-49-106(a)................................................................................2

Tenn. Pub. Acts, ch. 507 (2019) .........................................................................2, 3

## Other Authorities

Akabas, Lev, *Kalshi's Volume Has Been 90% Sports During Football Season*,
Sportico (Oct. 3, 2025), perma.cc/X5WL-8LGM ...............................................18

Am. Gaming Ass'n, *State of the States 2025: The AGA Analysis of the Commercial Casino Industry* (May 13, 2025), perma.cc/J27S-WLSB..................................2, 3

Carleton, Jennifer, et al., *Chapter 14: Nevada*,
The Gambling Law Review 147 (Carl Rohsler ed. 2016), perma.cc/3BSY-UYMZ....................................................................................................................2

CFTC Letter No. 25-36, Advisories (Sept. 20, 2025),
https://www.cftc.gov/PressRoom/ PressReleases/9137-25 .................................10

# TABLE OF AUTHORITIES, cont'd.

**Page(s)**

Fenich, George G., *A Chronology of (Legal) Gaming in the U.S.*,
3 UNLV Gaming Rsch. & Rev. J. 65 (1996) ........................................................1

Fin. Crisis Inquiry Comm'n, *The Financial Crisis Inquiry Report: Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States* (2011),
perma.cc/C54L-RZVE ..........................................................................................5

Goshay, Charita M., *Ohio offers Voluntary Exclusion List for problem gamblers as calls to helpline rise*,
Canton Repository (Sept. 2, 2024), perma.cc/BQY6-YBC3................................21

Gottsacker, Erin, *A statewide telehealth service is changing the game for Ohioans with gambling addictions*,
The Ohio Newsroom (Nov. 18, 2024), perma.cc/E4ZU-U3MN..........................21

Gouker, Dustin, *Kalshi Rolls Out Same-Game Parlays For Monday Night Football Games*, Event Horizon (Sept. 30, 2025), perma.cc/V3M9-L59R ..........................9

Gouker, Dustin, *Ten Times Kalshi Said People Could Bet On Things*, Event Horizon (April 3, 2025), perma.cc/CWK2-TZCV ..................................................8

Gramlich, John, *Americans increasingly see legal sports betting as a bad thing for society and sports*,
Pew Research Center (Oct. 2, 2025), perma.cc/9WPS-4UYT .............................18

Gustafson, Brandon, *2024: A year of growth for sports betting revenue*,
CBS Sports (Mar. 28, 2025), https://tinyurl.com/yje8srnp .................................18

Hill, John C., *Options, Futures, and Other Derivatives*, 1 (8th ed. 2012) ...........3, 4

Kalshi Member Agreement
(November 4, 2025), https://perma.cc/ZH3B-2G9P ...........................................22

Kalshi Website, Sports,
https://kalshi.com/sports/all-sports (last accessed January 21, 2025) ...............8, 9

# TABLE OF AUTHORITIES, cont'd.

**Page(s)**

Kennedy, Kelly, *'I didn't care who was playing': Has the legalization of sports betting impacted problem gambling in Ohio?*,
Cleveland 19 News (July 18, 2024), perma.cc/JG9G-P7QT.................................21

Morik, Ryan, *Ohio governor calls for an end to player prop betting amid investigation into Guardians pitchers*,
Fox Business (July 31, 2025), perma.cc/CA26-SA28..........................................23

Nat'l Gambling Impact Study Comm'n, Final Report (1999)...................... 3, 21, 22

Nerkar, Santul, et al., *U.S. Charges N.B.A. Coach and Players in Gambling Schemes*,
The New York Times (Oct. 23, 2025), https://tinyurl.com/yux8k2nk.................23

Nower, Lia, et al., *The Prevalence of Online and Land-Based Gambling in New Jersey*,
Rutgers University: Center for Gambling Studies (2023),
perma.cc/V3KH-BPHC .................................................................................22

Richardson, Randi, *Online gambling has fueled an industry boom that threatens public health, commission finds*,
NBC News (Oct. 24, 2024), perma.cc/XL7W-QS2L..........................................21

Selig, Michael S., *States Encroach on Prediction Markets*,
Wall Street Journal (Feb 16, 2026),
https://web.archive.org/web/20260218182304/https://www.cftc.gov/
PressRoom/SpeechesTestimony/seligstatement021726................................. 11, 29

Stone, Matt, *Risk of Gambling Addiction Up 30%*,
21-WFMJ (Feb. 16, 2025), perma.cc/76KG-5ZGS.............................................22

Withers, Tom, *Cavs coach Bickerstaff says he received threats from gamblers, feels sports betting 'gone too far'*,
AP News (Mar. 20, 2024), perma.cc/4KR5-3F56................................................23

X Post, @Kalshi, https://x.com/Kalshi
(last accessed January 21, 2026).......................................................................7

## STATEMENT OF AMICI INTEREST

*Amici* consist of Nevada, Utah, 37 other States, and the District of Columbia. *Amici* are interested in this case because Kalshi's aggressive theory of preemption threatens the States' longstanding ability to protect their citizens. The *amici* States submit this brief under Federal Rule of Appellate Procedure 29(a)(2).

## BACKGROUND

Kalshi's preemption argument rests on an unrealistic premise: that, when responding to the 2008 financial crisis, Congress quietly chose to make sweeping changes to this country's gambling laws. A review of the United States' regulatory history, both as to gambling and derivatives markets, proves that this is highly unlikely.

## I.    States have traditionally regulated gambling, including sports betting.

**A.**    States have a lengthy history of regulating gambling. *See Ah Sin v. Wittman*, 198 U.S. 500, 505–06 (1905) (recognizing gambling as "concededly within the police powers of a state").

Opposition to gambling and gambling regulation trace back to before the Founding. *See* George G. Fenich, *A Chronology of (Legal) Gaming in the U.S.*, 3 UNLV Gaming Rsch. & Rev. J. 65, 66 (1996). In fact, "gambling was largely banned throughout the country" by the late 1800s. *Murphy v. NCAA*, 584 U.S. 453, 458 (2018).

1

But in the twentieth century, many States loosened gambling prohibitions. *Id.* at 458–59. For example, Ohio legalized bingo and state-conducted lotteries in the 1970s. *See Mills-Jennings of Ohio, Inc. v. Dep't of Liquor Control,* 70 Ohio St. 2d 95, 101 (1982). And, about fifteen years ago, a slim majority of Ohio voters approved a constitutional amendment allowing for casino gaming. *See* Ohio Const. art. XV, §6(C). In 2019, the Tennessee General Assembly legalized "interactive sports wagering" and later created the Tennessee Sports Wagering Council (SWC) to police it. *See* 2019 Tenn. Pub. Acts, ch. 507; Tenn. Code Ann. §4-49-106(a). Today, forty-eight States permit some form of gambling. *See* Am. Gaming Ass'n, *State of the States 2025: The AGA Analysis of the Commercial Casino Industry*, at 12–13 (May 13, 2025), perma.cc/J27S-WLSB.

**B.**     Like other forms of gambling, sports betting was illegal throughout the States for much of this country's history. *See Murphy*, 584 U.S. at 458. That started to change in the mid-twentieth century. Nevada began permitting some sports betting with the passage of the Gaming Control Act of 1949. *See* Jennifer Carleton et al., *Chapter 14: Nevada*, in The Gambling Law Review 147 (Carl Rohsler ed. 2016), perma.cc/3BSY-UYMZ.

In the early 1990s, Congress passed the Professional and Amateur Sports Protection Act, purporting to bar States from authorizing any additional sports betting. *Murphy*, 584 U.S. at 461. In 2018, however, the Supreme Court held this

barrier was unlawful. *Id.* at 458, 480. *Murphy* left States "free to act" as they wished on the "controversial subject" of "sports gambling." *Id.* at 486.

After *Murphy*, eleven States—Alabama, Alaska, California, Georgia, Hawaii, Idaho, Minnesota, Oklahoma, South Carolina, Texas, and Utah—have kept sports betting illegal. *See* Am. Gaming Ass'n, *State of the States 2025*, at 12–13. But most States have chosen legalization. Today, thirty-nine States, along with the District of Columbia, permit some form of sports betting. *Id.*

**C.**    Gambling, where legal, is highly regulated. States' "authorization of legalized gambling" over the years "has almost always been accompanied by the establishment of a corresponding regulatory regime and structure." The Nat'l Gambling Impact Study Comm'n, Final Report, 3-1 (1999), perma.cc/UF4R-2UXH.

**II.    In 2010, Congress amended the Commodity Exchange Act in the wake of the 2008 financial crisis.**

**A.**    The States' regulation of gambling has long co-existed with federal regulation of derivatives markets. Parties come together in these markets to trade derivative financial contracts in standardized form on "exchanges." John C. Hull, *Options, Futures, and Other Derivatives*, 1 (8th ed. 2012). A "derivative" is a financial contract whose value depends on, and usually derives from, another, more basic asset such as the value of a stock or the price of hogs. John C. Hull, *Options, Futures, and Other Derivatives*, 1 (8th ed. 2012). A "futures contract" is a type of

derivative in which "an agreement between two parties to buy or sell an asset at a certain time in the future for a certain price." *Id.* at 7.

"Swaps" are a type of derivative in which two parties agree to exchange cash flows in the future. *Id.* at 148; *see Inv. Co. Inst. v. CFTC*, 720 F.3d 370, 373 (D.C. Cir. 2013). The "most common" swap is an interest-rate swap in which "a company agrees to pay cash flows equal to interest at a predetermined" rate over a number of years and, in return, receives interest at a floating rate over the same period of time. Hull, *Options, Futures, and Other Derivatives*, 148.

**B.**    From as early as 1921, Congress regulated trades of certain derivatives in commodities markets. *Merrill Lynch, Pierce, Fenner & Smith v. Curran*, 456 U.S. 353, 360 (1982). In 1936, Congress enacted the Commodity Exchange Act to expand federal oversight to different commodities and to increase regulation over futures contracts. *Id.* at 362. Among other things, the Act authorized federal officials "to fix limits on the amount of permissible speculative trading in a futures contract." *Id.* at 362–63.

A few decades later, Congress created the Commodity Futures Trading Commission ("CFTC"). *Id.* at 365–66. It gave the CFTC "exclusive jurisdiction over commodity futures trading." *Id.* at 386. But lawmakers worried that some might overread the CFTC's jurisdiction. *Id.* Thus, the statute detailing the CFTC's

exclusive jurisdiction contains two saving clauses, which protect the States' "regulatory authorities" and "the jurisdiction" of state courts. 7 U.S.C. §2(a)(1)(A).

**C.**     Until 2010, the CFTC lacked authority to regulate "swaps." *United States v. Phillips*, 155 F.4th 102, 112 (2d Cir. 2025). That is likely because for many years, swaps were perceived as a narrow category of derivatives with little potential for mischief. In 1989, for instance, the CFTC issued guidance distinguishing unregulated "swap transactions" from regulated "futures contracts." *See* 54 Fed. Reg. 30694, 30694 (July 21, 1989). The commission stressed that swaps were "predominantly" confined to "commercial and institutional participants." *Id.* at 30695. A swap, moreover, typically involved parties acting "in conjunction with" their "line of business." *Id.* at 30697. The CFTC further emphasized that unregulated swaps were not "marketed to the public." *Id.*

In the absence of regulation, "[t]rading in swaps exploded in the early 2000s" and immediately began to cause problems. *Phillips*, 155 F.4th at 113. Many blamed swaps for the 2008 financial crisis. *Id.* A congressionally authorized investigation found that credit-default swaps helped "fuel the housing bubble." Fin. Crisis Inquiry Comm'n, *The Financial Crisis Inquiry Report: Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States* at xxiv (2011), perma.cc/C54L-RZVE.

In response to the role of swaps in the 2008 financial crisis, Congress enacted the Dodd-Frank Wall Street Reform and Consumer Protection Act—extending the CFTC's jurisdiction to "swaps." Pub. L. 111-203, 124 Stat. 1376 (2010); 7 U.S.C. §2(a)(1)(A). The Act defined a "swap" to include "any agreement, contract, or transaction … that provides for any purchase, sale, payment, or delivery … that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. §1a(47)(A). And the Act made it generally "unlawful for any person ... to enter into a swap unless the swap is entered into on" a CFTC-regulated contract market. 7 U.S.C. §2(e); *see also* 7 U.S.C. §1a(18). Thus, an ordinary consumer who wishes to trade in a "swap" must do so on a designated contract market.

**D.**    The CFTC's rulemakings have been cautious and have recognized the States' role in regulating gambling. Shortly after its jurisdiction increased, the CFTC promulgated a rule prohibiting designated contract markets from listing any contract "that involves, relates to, or references … gaming." 17 C.F.R. §40.11(a). The CFTC explained that this prohibition matched "Congress's intent to prevent gambling through the futures markets." 76 Fed. Reg. 44776, 44786 (July 27, 2011). The prohibition remains in effect today. *See* 17 C.F.R. §40.11(a).

6

In 2012, as part of a rule jointly promulgated with the SEC, the CFTC refused to read the term "swaps" in a way that would disrupt "customary business arrangements" that "historically have not been considered to involve swaps." 77 Fed. Reg. 48208, 48247 (Aug. 13, 2012). "Swaps," according to the CFTC, "involve risk-shifting arrangements with financial entities." *Id.* at 48248. "Swaps" are not transactions or arrangements involving "personal or family activities" that ordinary "consumers" regularly engage in. *Id.* at 48247.

Just two years ago, the CFTC issued a proposed rule that directly confronted the relationship between state-gambling regulation and federal-derivatives regulation. The CFTC acknowledged that "gambling is overseen by state regulators with particular expertise" and that federal-derivatives law is "not aimed at protecting against gambling-specific risks and concerns." 89 Fed. Reg. 48968, 48982–83 (June 10, 2024). The CFTC further disclaimed having the "statutory mandate" or "specialized experience" necessary to exercise jurisdiction over the "rapidly evolving field" of gambling. *Id.* at 48983.

## III. Kalshi claims that Congress—in responding to the 2008 financial crisis—legalized sports betting nationwide.

Kalshi boasts that users may "[t]rade on anything" regardless of state law. X Post, @Kalshi, https://x.com/Kalshi (last accessed January 21, 2026). Its format is a designated contract market that offers online "events contracts" to users. Contracts

7

traded on Kalshi identify a future circumstance and allow users to bet on whether the circumstance will happen. If users bet correctly, they are paid out.

Many of the "contracts" Kalshi lists, however, are indistinguishable from sports betting. *See* Dustin Gouker, *Ten Times Kalshi Said People Could Bet On Things*, Event Horizon (April 3, 2025) perma.cc/CWK2-TZCV. Kalshi has said so itself. Consider, for instance, this ad from the 2025 March Madness college basketball tournament:



*Id.*

A quick trip to Kalshi's website solidifies the point that Kalshi is essentially offering sports betting. Its website has an entire category dedicated to "sports" where users can make a variety of bets—ranging from who will win a game, to whether a team will cover a point spread, to how individual athletes will perform. *See generally* Kalshi Website, Sports, https://kalshi.com/sports/all-sports (last accessed January 21, 2025). Users can even bet on whether particular players—say, Aaron Rodgers or

8

Travis Kelce—will retire before the next season. Kalshi Website, Sports: Football; Events, https://kalshi.com/sports/football/all/events (last accessed January 21, 2026). Kalshi also offers parlays, which combine two or more wagers into a single bet. *See* Dustin Gouker, *Kalshi Rolls Out Same-Game Parlays For Monday Night Football Games*, Event Horizon (Sept. 30, 2025), perma.cc/V3M9-L59R.

To support its claim that nationwide sports betting is now permitted regardless of States' laws, Kalshi argues that events contracts about sports are "swaps"—and are thus within the CFTC's exclusive jurisdiction. *See* Kalshi's Opening Brief ("Kalshi Br.") at 45-52. Kalshi is litigating this theory across the country. In addition to this Court, lawsuits are ongoing in Arizona, Connecticut, Iowa, Illinois, Maryland, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Jersey, New Mexico, New York, Ohio, Rhode Island, Tennessee, Utah, Washington, and Wisconsin.

Several courts have found Kalshi's theory unlikely. The Southern District of Ohio ruled that Kalshi's sports-related prediction contracts amount to sports betting rather than federal "swaps." *Kalshiex, LLC v. Schuler et al.,* No. 2:25-cv-1165 (S.D. Ohio March 9, 2026). The court recognized that finding otherwise would result in an "absurd" regulatory sea change. *Id.* A Nevada district court has likewise rejected the premise that sports wagers qualify as swaps under federal law. *Kalshiex, LLC v. Hendrick,* No. 2:25-cv-00575, 2025 WL 3286282, at *3 (D. Nev. Nov. 24, 2025). That court emphasized that "Kalshi's proposed reading" would upend the "the

traditional balance between state and federal regulation of gaming" without an "expressed congressional intent to do so"; all while leaving "no federal gaming regulator to replace the states' regulatory infrastructures." *Id.* at \*8. A Maryland district court has laid out many different reasons why the statutory text does not signal the necessary preemptive intent. *See KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667, 675–86 (D. Md. 2025). And a Massachusetts state court has also rejected the idea that sports wagers qualify as swaps. *Massachusetts v. KalshiEX, LLC*, No. 2584CV02525, slip op. at 13 (Mass. Sup. Ct. Jan. 20, 2026); *but see Kalshiex, LLC v. Flaherty,* 172 F.4th 220 (3d Cir. 2026).

Until very recently, the CFTC specifically refused to endorse Kalshi's claims or activities. In September 2025, the CFTC issued a staff advisory directed at platforms (like Kalshi) offering sports-related events contracts. CFTC Letter No. 25-36, Advisories (Sept. 20, 2025), https://www.cftc.gov/PressRoom/PressReleases/9137-25. The CFTC warned that it had never "taken any official action to approve" the listing of such contracts. *Id.* at 2 n.4. It further explained that it "has not, to date, made a determination regarding whether any such contracts involve an activity enumerated or prohibited under" the Commodity Exchange Act. *Id.* The advisory recognized the validity of state law, warning that those offering sports-related events contracts must be prepared for the possibility that state law will "result in the termination" of such contracts. *Id.* at 2.

10

In recent months, a newly installed CFTC Chairman has staked out a new position for the CFTC. Without public input or comment, the new Chairman has broadcast his view that all events contracts—including those about sports—are "swaps" within the CFTC's exclusive power. *See, e.g.*, Michael S. Selig, *States Encroach on Prediction Markets*, Wall Street Journal (Feb 16, 2026), https://web.archive.org/web/20260218182304/https://www.cftc.gov/PressRoom/SpeechesTestimony/seligstatement021726. The CFTC has filed an amicus brief in this Court embracing this new position. *See* Amicus Brief of the CFTC ("CFTC Br.").

The CFTC now argues that its exclusive jurisdiction over swaps covers contracts involving any uncertain outcome that can be loosely tied to potential economic consequences. CFTC Br. at 17-24. Under this interpretation, sports bets on the "final score" of games (or other comparable wagers) qualify as "swaps." *Id.* at 9-13. The CFTC then argues that the States have no "concurrent jurisdiction" over this activity. *Id.*

## ARGUMENT

When Congress acts within its enumerated powers, it may preempt state law through federal statutes expressly or by implication. *See* U.S. Const. art. VI, cl. 2 (federal law is "the supreme Law of the Land"); *Kansas v. Garcia*, 589 U.S. 191, 202–03 (2020). But preemption always turns on the text of federal law. *Id.* at 202.

11

And "Congress legislates against the backdrop" of certain presumptions. *Bond v. United States*, 572 U.S. 844, 857 (2014) (quotation omitted).

In this case, two presumptions—the federalism canon and major-questions doctrine—render Kalshi's position untenable. Practical considerations reinforce the point.

**I.    When Congress makes major changes to the existing state of the law, it does so clearly, not obscurely.**

When Congress seeks to change the "fundamental" nature of existing law, it does not use "vague terms or ancillary provisions." *Whitman v. Am. Trucking Ass'ns,* 531 U.S. 457, 468 (2001). Textual arguments that suggest otherwise "ultimately founder." *See id.*

The Supreme Court has reiterated this clear-statement rule in various contexts over time. For example, if Congress wishes to abrogate a government body's sovereign immunity, it "must use unmistakable language." *Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Centro de Periodismo Investigativo, Inc.*, 598 U.S. 339, 342 (2023). And "absent a clear statement from Congress," courts presume that federal statutes are inapplicable outside the United States. *Bond*, 572 U.S. at 857. These and other "clear-statement rules help courts act as faithful agents of the Constitution." *West Virginia v. EPA,* 597 U.S. 697, 736 (2022) (Gorsuch, J., concurring) (quotation omitted).

### A. Kalshi's position violates the federalism canon.

The Constitution gives the federal government "only limited powers; the States and the people retain the remainder." *Bond*, 572 U.S. at 854; *see* U.S. Const. amend. X. This federalism setup leaves the States with considerable police powers, which they exercise for the public good. *Bond*, 572 U.S. at 854. Congress legislates against this default ordering of sovereign authority. *Id.* at 857–58. Any statute that displaces or limits a significant amount of state power constitutes a major change. *See id.* at 857.

Congress must speak clearly when effecting a major change. *Id.* Absent a "clear statement," courts should not assume that Congress intends "a significant change in the sensitive relation between" the federal and state governments in an area of "traditional state authority." *Id.* at 858–59. This approach ensures that Congress "has in fact faced, and intended to bring into issue, the critical matters involved." *Id.* at 858 (quotation omitted).

The federalism canon applies with particular force to preemption. Preemption necessarily triggers the "sensitive relation between federal and state" authority. *Id.* at 858–59. Courts thus need "to be certain of Congress' intent before finding that federal law overrides the constitutional balance of federal and state powers." *Id.* at 858 (quotation omitted). Courts should be especially "reluctant to find" preemption

13

in an area "traditionally governed by state law." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993).

Traditionally, gambling has been an area indisputably governed by state law. Given its many dangers, the regulation of gambling fits neatly "within the police powers of a State." *Ah Sin*, 198 U.S. at 505–06. In fact, "the regulation of gambling lies at the heart of the state's police power." *Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 737 (9th Cir. 2003) (quotation omitted). The States accordingly have a lengthy history of gambling regulation—including the regulation of sports betting. And federal law historically has "defer[red] to, and even promote[d], differing gambling policies in different States." *Greater New Orleans Broadcasting Ass'n, Inc. v. United States*, 527 U.S. 173, 187 (1999).

Given this history of state gambling regulation, Kalshi's theory must fail unless Congress made a "clear statement" signaling that it intended "a significant change in the sensitive relation between" the federal and state governments as to gambling. *See Bond*, 572 U.S. at 858–59; *accord Ah Sin*, 198 U.S. at 505–06. Kalshi identifies no clear statement within federal law. Instead, Kalshi offers a roundabout theory under which Congress—fifteen years ago, when sports betting was mostly illegal—supposedly made a subtle-but-drastic change to gambling laws by inserting the word "swap" into a pre-existing regulatory scheme aimed at financial regulation. *See* Kalshi Br. at 12-16.

14

Kalshi's position mimics other proposed readings that have failed in past clear-statement cases. For instance, in 2000, the Supreme Court stopped a dramatic expansion of federal regulatory authority by refusing to read the word "drug"—in the context of the Food, Drug, and Cosmetic Act—to include tobacco. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125 (2000). In *Bond*, the Supreme Court refused to read the term "chemical weapon" in an "improbably broad" and "boundless" way that would have reached "purely local crimes" and "intrude[d] on the police power of the States." *Bond*, 572 U.S. at 860. This Court should likewise refuse to read the term "swaps"—a term of art describing particular financial instruments used to hedge against economic risk—in an improbably broad and boundless way that usurps the States' police power over sports betting.

Just a few years after Dodd-Frank, the Supreme Court itself recognized that States are "free to act" as they wish on the "controversial subject" of "sports gambling." *Murphy*, 584 U.S. at 486. That would make little sense if, as Kalshi posits, the CFTC controls all sports gambling so long as it is cleverly structured as an "events contract."

If the statutory text clearly signals anything here, it is the *lack* of any intent to preempt sports-betting regulations. The exclusive-jurisdiction provision on which Kalshi heavily relies includes not just one, but two saving clauses, both of which signal preservation of state authority. 7 U.S.C. §2(a)(1)(A). The statutory scheme

15

also includes two express preemption clauses. 7 U.S.C. §16(e)(2), (h). One of those clauses preempts state gaming laws as to a limited category of "excluded" transactions not applicable in this case. §16(e)(2). Importantly, that clause does not cover sports betting in a form at issue here. Congress's inclusion of a specific preemption provision tailored to gaming of certain transactions inapplicable here indicates a lack of preemptive intent as to the sports betting at issue. *See Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 517 (1992).

Finally, the CFTC's exclusive jurisdiction over *derivatives markets* is nowhere close to the "clear and manifest" statement required to supersede "the historic police powers of the States" to regulate *gambling*, including sports gambling. *See Wyeth v. Levine*, 555 U.S. 555, 565 (2009). Courts do not expect Congress to "cavalierly" remove traditional state authority, so the federalism canon focuses on "the historic presence of state law," not "the absence of federal regulation." *See id.* Any claim by the CFTC of unbridled authority over the gambling markets at issue here misunderstands the federalism canon and must be rejected. *Id.* at 565 n.3.

**B.     Kalshi's position violates the major-questions doctrine.**

The major-questions doctrine teaches that courts—when reading statutes empowering federal agencies—should employ "common sense as to the manner in which Congress would have been likely to delegate" power. *West Virginia*, 597 U.S.

16

at 722–23 (alteration accepted, quotation omitted). "Extraordinary grants of regulatory authority," the Supreme Court has explained, "are rarely accomplished through modest words, vague terms, or subtle devices." *Id.* at 723.

The major-questions doctrine thus requires a clear statement whenever a federal agency claims broad and novel authority over matters of great economic and political significance. *See id.* at 721, 724. In these situations, a "colorable textual basis" is not enough to support a major grant of federal-agency authority. *Id.* at 722. Rather, an assertion of broad authority must arise from "clear congressional authorization." *Id.* at 724.

This case implicates the major-questions doctrine because sports betting is an issue of political and economic significance—and one on which "Americans have never been of one mind." *Murphy*, 584 U.S. at 458. Like other major questions, sports betting involves "billions of dollars" and affects "millions of people." *King v. Burwell*, 576 U.S. 473, 485 (2015). In the last year, over one-in-five adults in this country bet money on sports. John Gramlich, *Americans increasingly see legal sports betting as a bad thing for society and sports*, Pew Research Center (Oct. 2, 2025), perma.cc/9WPS-4UYT. Americans wagered almost $150 billion on sports in 2024. Brandon Gustafson, *2024: A year of growth for sports betting revenue*, CBS Sports (Mar. 28, 2025), https://tinyurl.com/yje8srnp. Kalshi alone now reports wagering volumes of over $1 billion a month, 90% of which comes from sports

17

betting. Lev Akabas, *Kalshi's Volume Has Been 90% Sports During Football Season*, Sportico (Oct. 3, 2025), perma.cc/X5WL-8LGM.

Beyond those staggering figures, the regulation of sports betting is politically and historically significant. Sports betting has been illegal under state law for much of this country's history. It remains illegal in eleven States. And States that do allow sports betting have made different decisions about what to allow. Kalshi's position—that sports bets packaged as events contracts qualify as "swaps" and fall under the CFTC's exclusive jurisdiction—would grant the CFTC an incredible and unexpected amount of power. *See* Kalshi Br. 45–46; 7 U.S.C. §2(a)(1)(A).

Enormous consequences flow from Kalshi's interpretation of the statutory language. If sports bets qualify as swaps within the CFTC's exclusive jurisdiction, then sports bets cannot be treated in any other fashion. A "swap" is any type of "agreement, contract, or transaction" that satisfies certain conditions. 7 U.S.C. §1a(47)(A). If an agreement satisfies those conditions, it is "*unlawful* for any person" to enter into such an agreement except via a CFTC-regulated contract market. 7 U.S.C. §2(e) (emphasis added). Kalshi is not simply arguing that sports betting *may* occur on designated contract markets. Kalshi is arguing that sports betting *must* occur on those markets. Thus, States that authorize sports betting via state-regulated processes—about forty States at present—are facilitating illegal activity under federal law.

The CFTC seems to realize these implications. Its brief declares that the States have no role in this area. CFTC Br. at 17-23. Instead, the CFTC seeks to be crowned this country's only regulator of sports betting. *See id.* at 21-26. But "Congress would not have delegated" such "'highly consequential power' through ambiguous language." *See Learning Res., Inc. v. Trump*, 2026 WL 477534, at *7 (U.S. Feb. 20, 2026) (Roberts, C.J., op.) (quoting *West Virginia*, 597 U.S. at 723–24). Kalshi and the CFTC's attenuated theory of preemption relies on a contextless brand of textualism that is "colorable" at best. *See West Virginia*, 597 U.S. at 724 (quotation omitted). A merely colorable textual theory is not enough for such a massive change. *Id.*

Revisiting Dodd-Frank's history hammers this point home. As Kalshi would have it, Congress preempted state gambling laws as part of its response to the 2008 financial crisis. But that makes no historical sense. Nobody thought that "sports gambling gone wrong" caused the financial crisis. Sports betting was, after all, mostly illegal at that time. *See Murphy*, 584 U.S. at 458. Congress was instead responding to a much different problem involving derivatives like credit-default swaps. Thus, employing even an ounce of "common sense as to the manner in which Congress would have been likely to delegate" power, *see West Virginia*, 597 U.S. at 722–23, Kalshi's argument crumbles. Congress did not sneak sports-gambling preemption into the Dodd-Frank Act, and this Court should confirm as much.

19

**II.    Kalshi's position would leave sports betting largely unregulated and endanger the States' citizens.**

Practical concerns make Kalshi's position even less tenable. Congress is "especially unlikely" to delegate broad power to an agency that "has no expertise" crafting "policy" on a given subject. *King*, 576 U.S. at 486. This Court should thus be "especially" reluctant to transfer authority over sports betting from experienced state regulators to an inexperienced federal commission. *Id.*

**A.    States are experienced in regulating sports betting and its many potential harms.**

**1.**    States that allow sports betting comprehensively regulate that activity. For example, Ohio prohibits companies from offering sports betting without a license. Ohio Rev. Code §3775.03(A). That requires a company to establish that it can responsibly facilitate such gambling. *See* Ohio Rev. Code §3775.09(A)-(B). Ohio also facilitates an exclusion program whereby people worried about their sports gambling habits may place themselves on a voluntary exclusion list. *See* Ohio Rev. Code §3775.02(B)(11). To enforce that list, sports gaming proprietors are required to "employ commercially reasonable methods to prevent any person who is participating in the sports gaming voluntary exclusion program from engaging in sports gaming." Ohio Rev. Code §3775.13(C)(1).

**2.**    These and other regulations protect States' citizens and mitigate the risks of gambling. While gambling is entertaining for many, it is dangerous for some.

20

Millions of Americans qualify as problematic or pathological gamblers. Nat'l Gambling Impact Study Comm'n, Final Report, 4-1; Charita M. Goshay, *Ohio offers Voluntary Exclusion List for problem gamblers as calls to helpline rise*, Canton Repository (Sept. 2, 2024), perma.cc/BQY6-YBC3. And research has linked gambling to many other problems—substance abuse and psychological distress, to name a few. *See* Randi Richardson, *Online gambling has fueled an industry boom that threatens public health, commission finds*, NBC News (Oct. 24, 2024), perma.cc/XL7W-QS2L.

Some gamble to the point of financial ruin. *See* Kelly Kennedy, *'I didn't care who was playing': Has the legalization of sports betting impacted problem gambling in Ohio?*, Cleveland 19 News (July 18, 2024), perma.cc/JG9G-P7QT. Others place gambling over the health of loved ones. *See* Erin Gottsacker, *A statewide telehealth service is changing the game for Ohioans with gambling addictions*, The Ohio Newsroom (Nov. 18, 2024), perma.cc/E4ZU-U3MN. Still others gamble to the point of suicide. *See* Matt Stone, *Risk of Gambling Addiction Up 30%*, 21-WFMJ (Feb. 16, 2025), perma.cc/76KG-5ZGS. With the growing ease of gambling, these problems are on the rise. *See id.*

Minors are particularly vulnerable, as online sports betting attracts a younger crowd. A recent New Jersey-based survey reflected that nearly one in every five people surveyed between the ages of 18 and 24 was at high risk of a gambling

21

problem. *See* Lia Nower, et al., *The Prevalence of Online and Land-Based Gambling in New Jersey*, Rutgers University: Center for Gambling Studies, at 33 (2023), perma.cc/V3KH-BPHC. And research reflects that those who start gambling at a young age run a higher risk of problematic gambling. *See* Nat'l Gambling Impact Study Comm'n, Final Report, 4-12.

Despite proven dangers to the young, Kalshi's position would effectively lower the gambling age in many States. According to Kalshi's membership agreement, the company's services are open to anyone of the age of majority in their State. Kalshi Member Agreement (November 4, 2025), https://perma.cc/ZH3B-2G9P. In many if not most States, the age of majority is eighteen. *See, e.g.*, N.J. Stat. Ann. §9:17B-3; Ohio Rev. Code §3109.01. But many States have decided to limit gambling (or at least certain types of gambling) to those twenty-one or older. *See, e.g.*, N.J. Stat. Ann. §5:12A-11(e); Ohio Rev. Code §3775.99(A). That discrepancy is no small matter because those who begin gambling at a young age face a higher risk of long-term problems. That might be good for Kalshi's bottom line, but it is bad for the States' citizens.

Unregulated sports betting also undermines the integrity of sporting events. Just months ago, the federal government indicted dozens of people—including current and former NBA players—alleging unlawful betting on professional basketball games. Santul Nerkar, et al., *U.S. Charges N.B.A. Coach and Players in*

22

*Gambling Schemes*, The New York Times (Oct. 23, 2025), https://tinyurl.com/yux8k2nk. And last year, it took only a few pitches during baseball games to spark controversy over prop bets in Ohio. *See* Ryan Morik, *Ohio governor calls for an end to player prop betting amid investigation into Guardians pitchers*, Fox Business (July 31, 2025), perma.cc/CA26-SA28. Before that, gamblers even threatened a coach of the Cleveland Cavaliers. Tom Withers, *Cavs coach Bickerstaff says he received threats from gamblers, feels sports betting 'gone too far'*, AP News (Mar. 20, 2024), perma.cc/4KR5-3F56. Such risks warrant robust state involvement.

**B.　　Existing federal regulation is an insufficient substitute for the States' robust gaming regulations.**

Contrary to Kalshi's suggestions, federal regulation of the derivatives marketplace is no cure-all. *See* Kalshi Br. at 64-65. The CFTC's present regulatory requirements in particular provide no comfort. Those requirements—the "core principles"—are outlined within the federal code. *See* 17 C.F.R. §§38.100–.1200. They cover topics like dispute resolution, 17 C.F.R. §38.750, conflicts of interest, 17 C.F.R. §38.850, and disciplinary procedures, 17 C.F.R. §38.700. These regulations are geared toward participants in the financial markets. They do not regulate sports betting. And they do not replace the States' regulatory schemes, which are specifically designed to combat problems associated with gambling.

Adopting Kalshi's position would severely impair States' ability to protect their citizens from predatory practices and other problematic behavior.

Moreover, relying on federal regulation alone forces a one-size-fits-all regime, eliminating the States' ability to experiment with approaches geared toward addressing statewide concerns. New Jersey illustrates the gap that would result from a federal-only regime. The State has over a century's experience in regulating gambling and has developed robust procedures for determining the suitability of any person involved in the gaming industry in New Jersey. *See, e.g.,* N.J. Stat. Ann. §§5:12-84 (requirements for a casino license); 5:12A-11 (requirements for a sports wagering license). As it relates to sports wagering, only casinos and racetracks may obtain licenses to "operate a sports pool" in accordance with state law and regulations. N.J. Stat. Ann. §5:12A-11(a). The sports-wagering-license applicant must satisfy the Division of Gaming Enforcement that the applicant is of "good character, honesty and integrity" and has "financial stability, integrity and responsibility." N.J. Stat. Ann. §5:12A-11(a). The holder of a sports wagering license may then "authorize an internet sports pool operator" to "operate an online sports pool on its behalf provided the terms of the agreement are approved by the [D]ivision [of Gaming Enforcement]." N.J. Stat. Ann. §5:12A-11(a); *see id.* §5:12-104(a)(12), (13). In this way, New Jersey takes care to screen out potentially predatory, bad actors from its system of legalized gambling.

The Commodity Exchange Act offers no comparator to New Jersey's or other States' gaming suitability laws and procedures. The Commodity Exchange Act and "Commission regulations are focused on regulating financial instruments and markets, and do not include provisions aimed at protecting against gambling-specific risks and concerns, including customer protection concerns inherent to gambling." 89 Fed. Reg. 48968, 48982 (June 10, 2024). Worse still, designated contract markets like Kalshi may list new types of events contracts on their exchange without pre-approval, simply by self-certifying to the CFTC that the new contract complies with federal law. *See* 7 U.S.C. §7a-2(c)(1). Such loose processes will allow individuals who would be unable to clear state-law hurdles to run de facto sports books, immune from States' regulation.

One critical benefit of our constitutional structure is that the States act "as laboratories" of democracy, "devising solutions" to new and difficult problems. *Ariz. State Legis. v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 817 (2015). That flexibility is a particularly good thing here since "Americans have never been of one mind about gambling." *Murphy*, 584 U.S. at 458. States are in the best position to implement innovative regulatory schemes responsive to particularized concerns that arise within their borders, thereby protecting the public and promoting confidence in the gaming industry.

25

### C.    The CFTC lacks the States' experience in regulating gambling.

Congress is "especially unlikely" to delegate broad power to a federal agency that "has no expertise" crafting "policy" on a given subject. *King*, 576 U.S. at 486. That makes preemption especially unlikely here, given the stark difference in experience between the States and the CFTC. The CFTC has no special expertise in regulating gambling, has recognized as much, and has promulgated 17 C.F.R. §40.11 precisely to exclude gambling.

As the CFTC itself has previously conceded, the States have "particular expertise" addressing the "risks and concerns associated with gambling," including sports betting. 89 Fed. Reg. at 48982–83. The CFTC has no history of offering similar protections. By its own admission, the CFTC lacks "specialized experience appropriate to oversee" gambling. 89 Fed. Reg. at 48983. Its regulations "are focused on regulating financial instruments and markets, and do not include provisions aimed at protecting against gambling-specific risks and concerns, including customer protection concerns inherent to gambling." *Id.* Consistent with the CFTC's inexperience in gambling, Congress allowed the CFTC to prohibit contracts involving "gaming" from being listed on CFTC-regulated markets. 7 U.S.C. §7a-2(c)(5)(C). The CFTC promulgated a regulation making clear "[a] registered entity shall not list for trading" a "swap based upon an excluded commodity" that

26

"involves, relates to, or references," among other things, "gaming." 17 C.F.R. §40.11(a)(1).

Another feature of the federal scheme exacerbates the problem. Federal law allows prediction markets to self-certify the contracts they list, with no pre-approval from the CFTC. *See* 7 U.S.C. §7a-2(c)(1). That hands-off approach, combined with an inexperienced regulator, is a sure formula for irresponsible sports betting. It is improbable, to say the least, that Congress would have left such a gap.

## III.   The CFTC's reading of federal statutes deserves no special weight.

The Supreme Court recently overruled *Chevron* deference, under which the judiciary sometimes deferred to federal agencies' interpretation of federal statutes. *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024). It is the role of judges, *Loper Bright* explained, "to determine the best reading of" federal statutes. *Id.* at 400. The Supreme Court thus held that judges "must exercise their independent judgment in deciding whether" a matter fits within an agency's "statutory authority." *Id.* at 412.

For preemption purposes, *Loper Bright* built on top of an existing foundation. Even during the *Chevron* era, the Supreme Court stressed that "agencies have no special authority to pronounce on pre-emption absent delegation by Congress." *Wyeth*, 555 U.S. at 577. Courts, therefore, were not permitted to "defer[] to an agency's *conclusion* that state law is pre-empted." *Id.* at 576. Separate caselaw also

27

taught that Courts should be "reluctant to find" preemption in areas "traditionally governed by state law." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993); *accord Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008).

Agency positions "developed during the course" of litigation are naturally questionable. *See Alaska v. Fed. Subsistence Bd.*, 544 F.3d 1089, 1095 (9th Cir. 2008). Similarly, when an agency opines on preemption "without offering States or other interested parties notice or opportunity for comment," the agency's opinion is "inherently suspect." *Wyeth*, 555 U.S. at 577, *see also Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212 (1988).

The CFTC's new position on its expanded authority deserves no special weight. The preemption analysis in this case turns on interpreting federal statutes, including the statutory provision giving the CFTC "exclusive jurisdiction" over certain listed derivatives. *See* 7 U.S.C. §2(a)(1)(A). The CFTC has "no special competence" to perform this statutory analysis about the "scope of" its "own power." *See Loper Bright*, 603 U.S. at 400–01. Rather, because the CFTC reads federal statutes in a manner that aggrandizes its own power, this is an "occasion on which abdication in favor of the agency is *least* appropriate." *See id.* at 401, *see also Our Children's Earth Found. v. U.S. EPA*, 527 F.3d 842, 846 n.3 (9th Cir. 2008).

The CFTC's thoughts on preemption were formed "without offering States or other interested parties notice or opportunity for comment." *Wyeth*, 555 U.S. at 577.

28

The CFTC's present view of "swaps" is *inconsistent* with the CFTC's earlier views, which the Commission offered much closer in time to the relevant statutory amendments. Indeed, just two years after gaining jurisdiction over "swaps," the CFTC refused to read the term so broadly as to capture ordinary consumer transactions—concerning "personal" activities—that did not "involve risk-shifting arrangements" and "historically have not been considered to involve swaps." 77 Fed. Reg. at 48247–48. The CFTC also formed its present position for the purposes of litigation. *See* Selig, *States Encroach on Prediction Markets*, Wall Street Journal (indicating that the CFTC's brief responds to "legal attacks on the CFTC's authority"). The CFTC's opinion on preemption is thus "inherently suspect" and should be treated with the same caution as any argument from a self-interested party. *See Wyeth*, 555 U.S. at 577.

/ / /

/ / /

/ / /

29

## CONCLUSION

The Court should affirm the decision of the district court denying Kalshi's motion for preliminary injunction.

DATED this 11th day of June, 2026.

AARON D. FORD
Attorney General

By: /s/ *Heidi Parry Stern*
HEIDI PARRY STERN
 Solicitor General
JESSICA WHELAN
 Chief Deputy Solicitor General -
 Litigation
Office of the Nevada Attorney General
1 State of Nevada Way
Suite 100
Las Vegas, NV 89119

DEREK BROWN
Attorney General

By: /s/ *Stanford E. Purser*
STANFORD E. PURSER
 Solicitor General
MARK C. GILLESPIE
 Assistant Solicitor General
Utah Attorney General's Office
160 E. 300 S., 5th Floor
P.O. Box 140858
Salt Lake City, UT 84114-0858

## ADDITIONAL COUNSEL

STEVE MARSHALL
Alabama Attorney General

CORI MILLS
Alaska Acting Attorney General

KRISTIN K. MAYES
Arizona Attorney General

TIM GRIFFIN
Arkansas Attorney General

ROB BONTA
California Attorney General

PHIL WEISER
Colorado Attorney General

KATHLEEN JENNINGS
Delaware Attorney General

BRIAN L. SCHWALB
District of Columbia Attorney General

ANNE E. LOPEZ
Hawai'i Attorney General

RAÚL R. LABRADOR
Idaho Attorney General

KWAME RAOUL
Illinois Attorney General

THEODORE E. ROKITA
Indiana Attorney General

BRENNA BIRD
Iowa Attorney General

KRIS W. KOBACH
Kansas Attorney General

RUSSELL COLEMAN
Kentucky Attorney General

LIZ MURRILL
Louisiana Attorney General

AARON M. FREY
Maine Attorney General

ANTHONY G. BROWN
Maryland Attorney General

ANDREA JOY CAMPBELL
Massachusetts Attorney General

DANA NESSEL
Michigan Attorney General

KEITH ELLISON
Minnesota Attorney General

LYNN FITCH
Mississippi Attorney General

MICHAEL T. HILGERS
Nebraska Attorney General

JENNIFER DAVENPORT
New Jersey Attorney General

## ADDITIONAL COUNSEL, cont'd.

RAÚL TORREZ
New Mexico Attorney General

JEFF JACKSON
North Carolina Attorney General

DAN RAYFIELD
Oregon Attorney General

PETER F. NERONHA
Rhode Island Attorney General

MARTY JACKLEY
South Dakota Attorney General

JAY JONES
Virginia Attorney General

JOSH KAUL
Wisconsin Attorney General

LETITIA JAMES
New York Attorney General

GENTNER DRUMMOND
Oklahoma Attorney General

DAVID W. SUNDAY, JR.
Pennsylvania Attorney General

ALAN WILSON
South Carolina Attorney General

CHARITY R. CLARK
Vermont Attorney General

NICK BROWN
Washington Attorney General

KEITH G. KAUTZ
Wyoming Attorney General

## CERTIFICATE OF COMPLIANCE

This brief complies with the Court's type-volume limitations because it contains 6,379 words, excluding portions omitted from the Court's required word count.

This brief complies with the Court's typeface requirements because it has been prepared in Microsoft Word using fourteen-point Times New Roman font.

/s/ *Heidi Parry Stern*
HEIDI PARRY STERN
Nevada Solicitor General

## STATEMENT OF RELATED CASES

There are no related cases currently pending in this Court.


/s/ *Heidi Parry Stern*
HEIDI PARRY STERN
Nevada Solicitor General

34

**CERTIFICATE OF SERVICE**

On June 11, 2026, I filed an electronic copy of this brief with the Clerk of the Sixth Circuit using the CM/ECF system. That system sends a Notice of Docket Activity to all registered attorneys in this case. Under 6 Cir. R. 25(f)(1)(A), "[t]his constitutes service on them and no other service is necessary."

/s/ Heidi Parry Stern
HEIDI PARRY STERN
Nevada Solicitor General

35