No. 26-3196

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

KALSHIEX LLC,

*Plaintiff-Appellant*,

v.

MATTHEW T. SCHULER, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Ohio
No. 2:25-cv-1165
Hon. Sarah D. Morrison

**BRIEF OF INDIAN GAMING ASSOCIATION, NATIONAL CONGRESS OF AMERICAN INDIANS, UNITED SOUTH AND EASTERN TRIBES SOVEREIGNTY PROTECTION FUND, SAN MANUEL GAMING AND HOUSING AUTHORITY, NATIVE AMERICAN FINANCE OFFICERS ASSOCIATION, NATIONAL TRIBAL GAMING COMMISSIONERS AND REGULATORS, ARIZONA INDIAN GAMING ASSOCIATION, CALIFORNIA NATIONS INDIAN GAMING ASSOCIATION, MINNESOTA INDIAN GAMING ASSOCIATION, OKLAHOMA INDIAN GAMING ASSOCIATION, WASHINGTON INDIAN GAMING ASSOCIATION, AND 30 FEDERALLY RECOGNIZED TRIBES AS *AMICI CURIAE* IN SUPPORT OF DEFENDANTS-APPELLEES**

Joseph H. Webster
Elizabeth A. Bower
Jens W. Camp
Alexandra K. Holden
HOBBS, STRAUS, DEAN & WALKER LLP
1899 L Street NW, Suite 1200
Washington, DC 20036
(202) 822-8282
jwebster@hobbsstraus.com
ebower@hobbsstraus.com
jcamp@hobbsstraus.com
aholden@hobbsstraus.com

*Counsel for Tribal Amici*

Bryan Newland
POWERS, PYLES, SUTTER & VERVILLE PC
1250 Connecticut Ave NW, 8th Floor
Washington, DC 20036
(202) 349-4265
Bryan.Newland@powerslaw.com

*Counsel for Bay Mills Indian
Community, Mohegan Tribe of Indians
of Connecticut, Rincon Band of Luiseño
Indians, and Santa Ynez Band of
Chumash Mission Indians*

Scott Crowell
CROWELL LAW OFFICE
TRIBAL ADVOCACY GROUP PLLC
1487 W Stae Rte 89A, Suite 8
Sedona, AZ 86336
(425) 802-5369
scottcrowell@clotag.net

*Counsel for Rincon Band of Luiseño
Indians, Santa Ynez Band of Chumash
Mission Indians, and Spokane Tribe
of the Spokane Reservation*

Michael Hoenig
YUHAAVIATAM OF SAN MANUEL
NATION
422 1st Street SE
Washington, DC 20003
(909) 936-9684
Michael.Hoenig@sanmanuel-nsn.gov

*Counsel for Yuhaaviatam of San
Manuel Nation and San Manuel
Gaming and Hospitality Authority*

June 11, 2026

# CORPORATE DISCLOSURE STATEMENT

In accordance with Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1 of the United States Court of Appeals for the Sixth Circuit, *Amici Curiae* disclose that they have no parent corporations and that no publicly held corporations hold 10% or more of stock in any of the *Amici Curiae*.

DATE: June 11, 2026

/s/ Joseph H. Webster
Joseph H. Webster

/s/ Scott Crowell
Scott Crowell

/s/ Bryan Newland
Bryan Newland

/s/ Michael Hoenig
Michael Hoenig

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ........................................................ i

IDENTITY AND INTERESTS OF AMICI ................................................................ 1

INTRODUCTION ................................................................................................ 4

ARGUMENT ...................................................................................................... 7

I.    Congress Did Not Impliedly Repeal IGRA. ............................................ 7

    A.   IGRA's Structure ........................................................................ 7

    B.   Congress Did Not Repeal IGRA When It Enacted the CEA's Definition of "Swap" in 2010. ................................................................ 8

    C.   Kalshi's Theory Does Not Meet the Standard for Implied Repeals. .... 12

        1.   Kalshi's sports-betting contracts are not "swaps." ........................... 13

        2.   Congress did not manifest clear intent to repeal key provisions of IGRA or to make the CFTC a gaming regulator. .............................. 15

        3.   The Indian Canons of Construction require this Court to resolve any ambiguity in favor of tribes. .......................................................... 19

    D.   IGRA Regulates Online Gaming on Tribes' Indian Lands, Including Kalshi's Sports-Betting Contracts ........................................................ 19

II.   The Major Questions Doctrine Forecloses Kalshi's Theory. .................... 21

III.   Kalshi's Preemption Argument Would Violate the Private Nondelegation Doctrine. .................................................................................................. 27

CONCLUSION .................................................................................................... 29

CERTIFICATE OF COMPLIANCE ...................................................................... 31

CERTIFICATE OF SERVICE .............................................................................. 32

# TABLE OF AUTHORITIES

**Cases**

*Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*,
 121 F.4th 1314 (D.C. Cir. 2024)................................................................28

*Artichoke Joe's Cal. Grand Casino v. Norton*,
 353 F.3d 712 (9th Cir. 2003) ....................................................................23

*Bevan & Assocs., LPA, Inc. v. Yost*,
 929 F.3d 366 (6th Cir. 2019) ....................................................................28

*Bryan v. Itasca Cnty.*,
 426 U.S. 373 (1976).................................................................................19

*California v. Cabazon Band of Mission Indians*,
 480 U.S. 202 (1987)............................................................................ 6, 24

*California v. Iipay Nation of Santa Ysabel*,
 898 F.3d 960 (9th Cir. 2018) ....................................................................21

*Carter v. Carter Coal Co.*,
 298 U.S. 238 (1936)............................................................................ 27, 29

*CFTC v. Arizona*,
 No. 2:26-cv-02246 (D. Ariz. filed Apr. 2, 2026)..........................................18

*CFTC v. Connecticut*,
 No. 3:26-cv-00498 (D. Conn. filed Apr. 2, 2026)........................................18

*CFTC v. Illinois*,
 No. 1:26-cv-03659 (N.D. Ill. filed Apr. 2, 2026) ........................................18

*CFTC v. New York*,
 No. 1:26-cv-03404 (S.D.N.Y. filed Apr. 24, 2026)......................................18

*CFTC v. Wisconsin*,
 No. 2:26-cv-00749 (E.D. Wis. filed Apr. 28, 2026)......................................18

*Chicken Ranch Rancheria of Me-Wuk Indians v. California*,
 42 F.4th 1024 (9th Cir. 2022) ...................................................................8

*Crypto.com v. Nevada*,
No. 25-7187 (9th Cir.) ................................................................................18

*Epic Sys. Corp. v. Lewis*,
584 U.S. 497 (2018) ................................................................................12

*FCC v. Consumers' Rsch.*,
606 U.S. 656 (2025) ................................................................................27

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) ......................................................... 22, 24, 25

*Grand Traverse Band of Ottawa & Chippewa Indians v. U.S. Att'y. W. Div. of
Mich.*, 369 F.3d 960 (6th Cir. 2004) ................................................19

*Ho-Chunk Nation v. Kalshi Inc.*,
No. 3:25-cv-00698, 2026 WL 1284077 (W.D. Wis. May 11, 2026) 8, 12, 20, 21

*KalshiEX LLC v. CFTC*,
No. 24-5205 (D.C. Cir.) ..........................................................................16

*KalshiEX LLC v. Martin*,
No. 25-1892 (4th Cir.) ............................................................................19

*KalshiEX, LLC v. Assad*,
No. 25-7516 (9th Cir.) ..............................................................................8

*KalshiEX, LLC v. Flaherty*,
172 F.4th 220 (3d Cir. 2026) (Roth, J., dissenting) ...........................14

*KalshiEX, LLC v. Hendrick*,
817 F. Supp. 3d 1014 (D. Nev. 2025) ............................. 9, 10, 14, 26

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ................................................................................18

*Michigan v. Bay Mills Indian Cmty.*,
572 U.S. 782 (2014) ................................................................................13

*Morton v. Mancari*,
417 U.S. 535 (1974) ........................................................... 19, 24

*Murphy v. NCAA*,
  584 U.S. 453 (2018)............................................................... 23, 25

*N. Am. Derivatives Exch., Inc. v. Nev. Gaming Control Bd.*,
  815 F. Supp. 3d 1169 (D. Nev. 2025)........................................ 9, 10

*Santa Clara Pueblo v. Martinez*,
  436 U.S. 49 (1978)......................................................................13

*Shoshone-Bannock Tribes of Fort Hall Rsrv. v. U.S. Dep't of the Interior*,
  153 F.4th 748 (9th Cir. 2025) ....................................................19

*Solid Waste Agency v. U.S. Army Corps of Eng'rs*,
  531 U.S. 159 (2001)....................................................................23

*Swinomish Indian Tribal Cmty. v. BNSF Ry. Co.*,
  951 F.3d 1142 (9th Cir. 2020) ...................................................19

*Utility Air Reg. Grp. v. EPA*,
  573 U.S. 302 (2014)....................................................................22

*W. Flagler Assocs., Ltd. v. Haaland*,
  71 F.4th 1059 (D.C. Cir. 2023)............................................ 20, 24

*West Virginia v. EPA*,
  597 U.S. 697 (2022)............................................................. 21, 22

*Whitman v. Am. Trucking Ass'ns*,
  531 U.S. 457 (2001)....................................................................13

**Statutes & Regulations**

17 C.F.R. § 40.11(a)(1) ....................................................... 15, 17, 18

17 C.F.R. § 40.11(c)...................................................................16

18 U.S.C. § 1084 ........................................................................21

18 U.S.C. § 1166(d) ...................................................................11

18 U.S.C. § 1952(a) ...................................................................21

18 U.S.C. § 1955.........................................................................21

25 C.F.R. § 293.26 ...........................................................................20

25 C.F.R. § 502.4(c) ................................................................ 7, 8, 10

25 U.S.C. § 2701(5) ........................................................ 6, 10, 11, 24

25 U.S.C. § 2702 .................................................................................7

25 U.S.C. § 2702(1) ...........................................................................5

25 U.S.C. § 2702(2) ..................................................................... 6, 24

25 U.S.C. § 2703(5) ...........................................................................3

25 U.S.C. § 2710(b)(2)(A) ..................................................................7

25 U.S.C. § 2710(d) ............................................................... 7, 10, 11

25 U.S.C. § 2710(d)(1) .......................................................................7

25 U.S.C. § 2710(d)(2)(A) ..................................................................7

25 U.S.C. § 2710(d)(8) .......................................................................7

31 U.S.C. § 5361(b) ..........................................................................20

31 U.S.C. § 5362 ...............................................................................20

7 U.S.C. § 16(e) ................................................................................24

7 U.S.C. § 1a(47)(A)(ii) ....................................................................13

7 U.S.C. § 2(e) ....................................................................................9

7 U.S.C. § 5(a)–(b) ...................................................................... 8, 26

7 U.S.C. § 7a-2(c)(5)(C)(i)–(ii) ........................................................15

Ohio Rev. Code § 3775.01(O)(2) ........................................................9

## Other Authorities

156 Cong. Rec. 13173 (2010) ..................................................... 11, 15

Event Contracts, 89 Fed. Reg. 48968 (June 10, 2024) ......................17

*Farewell Address of Commissioner Kristin N. Johnson*, CFTC (Sep. 3, 2025)......28

Nat'l Indian Gaming Comm'n, *FY 2023 Gross Gaming Revenue Report* 4–5 (Jul. 2024) ........................................................................................................5

Provisions Common to Registered Entities, 76 Fed. Reg. 44776 (July 27, 2011) ..16

**IDENTITY AND INTERESTS OF AMICI**

The Indian Gaming Association ("IGA"), National Congress of American Indians ("NCAI"), United South and Eastern Tribes Sovereignty Protection Fund ("USET SPF"), San Manuel Gaming & Hospitality Authority ("SMGHA"), Native American Finance Officers Association ("NAFOA"), National Tribal Gaming Commissioners and Regulators ("NTGCR"), Arizona Indian Gaming Association ("AIGA"), California Nations Indian Gaming Association ("CNIGA"), Minnesota Indian Gaming Association ("MIGA"), Oklahoma Indian Gaming Association ("OIGA"), Washington Indian Gaming Association ("WIGA"), and 30 federally recognized Indian tribes ("Amici Tribes")[1] (collectively, "Tribal Amici") respectfully ask this Court to affirm the U.S. District Court for the District of

---

[1] The Amici Tribes include: Agua Caliente Band of Cahuilla Indians; Bay Mills Indian Community; Elk Valley Rancheria; Grand Traverse Band of Ottawa and Chippewa Indians; Hannahville Indian Community; Iowa Tribe of Oklahoma; Jamestown S'Klallam Tribe; Jamul Indian Village of California; Karuk Tribe; Kickapoo Traditional Tribe of Texas; Lytton Rancheria; Mashantucket Pequot Tribal Nation; Mohegan Tribe of Indians of Connecticut; Morongo Band of Mission Indians; Nottawaseppi Huron and of the Potawatomi; Oneida Nation; Pechanga Band of Indians; Pokagon Band of Potawatomi Indians; Pueblo of Acoma; Pueblo of Sandia; Rincon Band of Luiseño Mission Indians; Santa Rosa Rancheria Tachi Yokut Tribe; Santa Ynez Band of Chumash Mission Indians; Seminole Tribe of Florida; Shingle Springs Band of Miwok Indians, Shingle Springs Rancheria (Verona Tract); Spokane Tribe of the Spokane Reservation; Table Mountain Rancheria; Wilton Rancheria; Yavapai-Apache Nation; and Yuhaaviatam of San Manuel Nation.

Ohio's decision denying KalshiEX, LLC's ("Kalshi") motion for preliminary injunction.

IGA is an inter-tribal non-profit organization comprised of 124 federally recognized Indian tribes that operate gaming enterprises throughout Indian Country. IGA's mission is to advance tribal economic, social, and political interests, and to preserve and promote tribal sovereignty, self-sufficiency, and economic development by advocating for tribally owned governmental gaming enterprises.

NCAI is the oldest and largest national organization comprised of American Indian and Alaska Native tribal governments and their citizens. NCAI advises and educates the public, tribes, state governments, and the federal government on issues involving tribal sovereignty, self-government, treaty rights, and policies affecting tribes, including gaming issues.

USET SPF is a non-profit, inter-tribal organization advocating on behalf of 33 federally recognized tribes. USET SPF is dedicated to promoting, protecting, and advancing the inherent sovereign rights and authorities of tribes and works to educate federal, state, and local governments about the unique historic and political status of tribes.

SMGHA is a governmental instrumentality of Yuhaaviatam of San Manuel Nation created to independently carry out the investment in, and ownership and

2

management of, gaming and hospitality businesses outside of the San Manuel Reservation.

NAFOA is a national non-profit organization of tribal officers, controllers, treasurers, accountants, auditors, and financial advisors. NAFOA's mission is to foster development of financial and business expertise among tribal governments and their businesses by providing educational forums and resources, and by instilling finance and accounting best practices.

NTGCR is a national non-profit trade organization established to serve as a unified voice for tribal regulators and to promote consistent regulatory standards across Indian Country. NTGCR's mission is to empower tribal gaming regulators through education, collaboration, and regulatory enforcement enhancements.

AIGA, CNIGA, MIGA, OIGA, and WIGA are regional non-profit associations representing federally recognized Indian tribes within their respective regions on gaming-related matters. They advance tribal sovereignty and support their member tribes on Indian gaming legislative, policy, legal, and educational matters.

The Amici Tribes are 30 federally recognized Indian tribes within the meaning of the Indian Gaming Regulatory Act ("IGRA"). *See* 25 U.S.C. § 2703(5). Each of the Amici Tribes is a separate and distinct tribal government with the sovereign authority to conduct and regulate gaming activities on its Indian

3

lands. The Amici Tribes all have a direct and immediate interest in maintaining their sovereign rights over gaming on their Indian lands.

Together, the Tribal Amici have a shared interest in this case because of its potential to have a significant impact on their or their member tribes' rights regarding gaming on Indian lands, as well as tribal governmental revenue as a whole.[2]

## INTRODUCTION

KalshiEX, LLC ("Kalshi") asks this Court to override and abandon the long-standing national policy of state and tribal regulation of sports betting and undermine decades of federal law. The Court should not do so.

America's history is replete with prospectors taking resources from Indian lands without permission from tribes. But Congress put a stop to that practice long ago. Yet Kalshi would have this Court believe that, without so much as a whisper of legislative intent, Congress gave it permission to enter Indian lands and siphon gaming revenues away from tribes over their objections. Congress did no such thing.

---

[2] No person (including a party or party's counsel) other than Tribal Amici and their counsel authored this brief in whole or in part or contributed money to fund the preparation or submission of this brief. Additionally, counsel for both parties have consented to the timely filing of this brief.

When Congress adopted the Indian Gaming Regulatory Act ("IGRA"), it sought to "promot[e] tribal economic development, self-sufficiency, and strong tribal governments[.]" 25 U.S.C. § 2702(1).  IGRA has been incredibly successful on that front.[3]  Since IGRA's passage in 1988, tribes across the United States have lifted entire generations out of poverty through tribal gaming.  Gaming revenue supports thousands of jobs in hundreds of communities, and provides critical funding to tribal, state, and local governments through revenue-sharing agreements, taxes, and economic stimulus.

Yet now, Kalshi has brazenly entered onto state and tribal lands across the nation to conduct unregulated gaming with its so-called "legal sports betting" app.  In doing so, Kalshi is siphoning away vital tribal and state governmental revenue to its owners' pockets.

For tribes, gaming is not just an economic endeavor but an existential one.  Tribes have primary jurisdiction over their lands and activities occurring thereon.  Tribes, like states, also have a strong sovereign interest in determining what gaming activities may take place on their lands.  Thus, tribal jurisdiction extends to

---

[3] *See, e.g.*, Nat'l Indian Gaming Comm'n, *FY 2023 Gross Gaming Revenue Report* 4–5 (Jul. 2024), https://www.nigc.gov/wp-content/uploads/2025/02/GGR23_Final.pdf.

gaming, which the Supreme Court has long recognized. *See California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 218–22 (1987); 25 U.S.C. § 2701(5). In 1988, Congress enacted IGRA to provide a "statutory basis for the regulation of gaming by an Indian tribe … to ensure that the Indian tribe is the primary beneficiary of the gaming operation, and to assure that gaming is conducted fairly and honestly by both the operators and players[.]" 25 U.S.C. § 2702(2).

Kalshi now asks this Court to subvert this longstanding and comprehensive regulatory regime. The consequences of Kalshi's arguments would amount to a *sub silentio* reversal of congressional policy and Supreme Court precedent; undermine existing tribal-state gaming compacts and regulatory frameworks; allow Kalshi—not states or tribes—to regulate its own sports-betting activity on state and tribal lands; permit Kalshi to siphon gaming revenues from tribal and state governments; and diminish tribal self-determination. As the district court properly held, Kalshi's theory would "have a seismic impact on Indian tribes' authority to regulate gaming on tribal land." *See* Op. & Order Denying Prelim. Inj., R. 69, PageID # 905 n.6.

Accordingly, this Court should affirm the district court's decision to deny Kalshi's motion for preliminary injunction.

**ARGUMENT**

**I.     Congress Did Not Impliedly Repeal IGRA.**

**A.     IGRA's Structure**

In IGRA, Congress explicitly stated that no class III gaming can occur on "Indian lands" unless it is authorized by the tribal government and is in a state that permits such gaming.  25 U.S.C. § 2710(d).  Class III gaming—including sports betting—is authorized on Indian lands only where tribes and states have entered into a compact to regulate that gaming.  *Id.* § 2710(d)(1); *see also* 25 C.F.R. § 502.4(c).  The Secretary of the Interior must review and approve these agreements in order for lawful class III gaming to occur on tribal lands.  25 U.S.C. § 2710(d)(8).  These core provisions have remained unchanged since 1988.

Under this regime, regulation of class III gaming on Indian lands is shared between tribes, states, and the federal government.  Congress crafted this comprehensive regulatory regime to advance clearly-articulated policy goals to: (1) "promot[e] tribal economic development, self-sufficiency and strong tribal governments"; (2) "provide a statutory basis for regulation" that protects tribes' ability to be the primary beneficiary of gaming on their lands; and, (3) create a federal regulatory agency to adopt federal standards and protect tribal gaming as a means of generating tribal revenue.  25 U.S.C. § 2702.  Congress made it abundantly clear that *tribes*—not private entities—must benefit from any gaming

7

conducted on their Indian lands.  *See, e.g.,* 25 U.S.C. §§ 2710(b)(2)(A), (d)(2)(A).

For many tribal governments, gaming is essential to their self-determination.  *See*

*Chicken Ranch Rancheria of Me-Wuk Indians v. California*, 42 F.4th 1024, 1032

(9th Cir. 2022).

Kalshi's sports-betting activities fall squarely within IGRA's scope when

they occur on Indian lands.  *See* 25 C.F.R. § 502.4(c) (classifying sports betting as

class III gaming); *see also Ho-Chunk Nation v. Kalshi Inc.*, No. 3:25-cv-00698,

2026 WL 1284077, at *4–10 (W.D. Wis. May 11, 2026).

**B.      Congress Did Not Repeal IGRA When It Enacted the CEA's Definition of "Swap" in 2010.**

Kalshi has made no attempt to ensure that its sports betting activities on

Indian lands comply with IGRA.  Instead, Kalshi argues that Congress's definition

of a single term—"swaps"—within a statute whose entire purpose is to address the

risk, discovery, and dissemination of commodity prices, 7 U.S.C. § 5(a)–(b),

preempts the field of what is unequivocally sports betting, and therefore effectively

repealed core provisions of IGRA.  *See* Appellant Br. at 30–40, Dkt. No. 28.

Under Kalshi's theory, Congress silently stripped away tribes' and states'

longstanding authority over sports betting[4] while allowing for-profit companies like Kalshi to run internet casinos pursuant to their own private oversight.

Contrary to what Kalshi maintains, if sports-betting contracts are "swaps" subject to the exclusive jurisdiction of the Commodity Futures Trading Commission ("CFTC"), then the Commodity Exchange Act ("CEA") governs all sports betting—including sports betting conducted by tribes under IGRA. *See KalshiEX, LLC v. Hendrick*, 817 F. Supp. 3d 1014, 1021 (D. Nev. 2025), *appeal filed sub. nom. KalshiEX, LLC v. Assad*, No. 25-7516 (9th Cir.). Kalshi's interpretation of the term "swaps" within the CEA is so broad that it necessarily consumes all sports betting (and potentially other kinds of gaming). And with one inapplicable exception, the CEA prohibits off-market swaps. *See* 7 U.S.C. § 2(e). Consequently, if all sports-betting contracts are swaps, "then all sports betting must be done on a [Designated Contract Market ('DCM')]." *N. Am. Derivatives Exch.,*

---

[4] Kalshi has also previously suggested that its sports-event contracts are not sports betting because there is no betting against the house. *See, e.g.*, Appellant's Br. at 19, *KalshiEX, LLC v. Assad*, No. 25-7516 (9th Cir. Dec. 26, 2025), Dkt. No. 20.1. Not so. Kalshi operates "Kalshi Klear," a clearinghouse that places wagers *on Kalshi's exchange.* Further, a "house" is not a necessary element of gaming. For example, pari-mutuel wagering—a type of betting system where all bets or wagers are pooled and players bet against each other rather than a "house"—is considered gaming. *See, e.g.*, Ohio Rev. Code § 3775.01(O)(2).

*Inc. v. Nev. Gaming Control Bd.* (*Crypto.com*), 815 F. Supp. 3d 1169, 1185 (D. Nev. 2025), *appeal filed*, No. 25-7187 (9th Cir.).

Kalshi's argument thus does double violence. First, by permitting Kalshi to offer sports betting on Indian lands, its argument sweeps aside Congress's recognition that "Indian tribes have the exclusive right to regulate gaming activity on Indian lands." 25 U.S.C. § 2701(5). Second, it would prohibit tribes from offering sports betting that IGRA plainly authorizes. *Id.* § 2710(d); s*ee also* 25 C.F.R. § 502.4(c).

Moreover, the reach of Kalshi's definition would extend beyond sports betting to encompass other forms of gaming because it depends on embracing an interpretation of "swap" that has "no limiting principle." *Hendrick*, 817 F. Supp. 3d at 1027; *Crypto.com*, 815 F. Supp. 3d at 1184. Kalshi's definition of "an event or contingency associated with a potential financial, economic, or commercial consequence" is so broad that it necessarily includes betting on other casino games. This means that virtually all gaming activity across the country must be offered on a DCM and regulated by the CFTC. *See* R. 69, PageID # 905 ("But if [Kalshi's theory] is true, then all contracts for payment based on the outcome of a sporting event—all sports bets—would be forced onto DCMs like Kalshi and every sportsbook in the country would be put out of business."). The irony of this result is that the gaming conducted pursuant to tribal-state gaming compacts or state law

provides significantly more consumer protection than Kalshi's unregulated sports betting, which allows users as young as 18 years old to engage in practically limitless betting with few, if any, guardrails. *See id.* at PageID # 914 n.9.

Further, if the CEA governs Kalshi's sports-betting contracts on Indian lands, then Congress must have intended to repeal key provisions of IGRA that expressly grant regulatory authority over such activity to tribes, states, the National Indian Gaming Commission, Department of the Interior, and Department of Justice. *See* 25 U.S.C. §§ 2701(5), 2710(d); 18 U.S.C. § 1166(d). Congress also must have intended to completely override the entire purpose and function of IGRA, which is to recognize tribal sovereignty to conduct and regulate gaming activity that occurs on Indian lands. *See* 25 U.S.C. § 2701(5). No amount of judicial gymnastics can turn the insertion of the term "swap" in the CEA into such a radical transformation of IGRA.

This Court should therefore reject Kalshi's boundless interpretation of a "swap" and give effect to both statutes by excluding sports-betting contracts such as Kalshi's from the CEA's definition of "swap." In any event, such an interpretation is more faithful to the CEA's plain language and legislative intent:

> [It] is our intent … [that the Special Rule] prevent derivatives contracts that … exist predominantly to enable gambling through supposed "event contracts." It would be quite easy to construct an "event contract" around sporting events such as the Super Bowl, the Kentucky

> Derby, and Masters Golf Tournament. These types of contracts would not serve any real commercial purpose. Rather, they would be used solely for gambling.

156 Cong. Rec. 13173 (2010) (statement of Sen. Lincoln).

### C. Kalshi's Theory Does Not Meet the Standard for Implied Repeals.

Kalshi's preemption argument, which relies on an overly broad interpretation of "swap," must be rejected because it would manufacture an implied repeal where none exists. Kalshi cannot meet the heavy burden of proving Congress intended to repeal key provisions of IGRA because there is a reasonable interpretation of the CEA that gives full effect to both statutes: the CEA's definition of "swap"—and thus the CFTC's jurisdiction over such transactions—simply does not extend to Kalshi's sports bets.

Courts apply the "strong presumption that repeals by implication are disfavored and that Congress will specifically address pre-existing law when it wishes to suspend its normal operations in a later statute." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) (citation modified). Congress's intent to repeal must be "clear and manifest." *Id.* "Congress does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Id.* at 515 (citation modified); *see also Ho-Chunk Nation*, 2026 WL 1284077, at *10 ("Neither are courts to find Congress repealed its own laws 'by implication,' nor abrogate tribal sovereign authority

12

without expressly and unequivocally saying it is doing so.  All of these conditions appear particularly apt here, given that accepting Kalshi's position 'would have a seismic impact on Indian tribes' authority to regulate gaming on tribal land[.]'" (citation modified) (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001); *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 790 (2014); *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 59 (1978); R. 69, PageID # 905)).

Here, there is no "clear and manifest" congressional intent, and IGRA and the CEA can easily be harmonized by reading the CEA to exclude sports betting, consistent with longstanding CFTC regulations.

### 1. Kalshi's sports-betting contracts are not "swaps."

As relevant here, the CEA defines "swap" as "any agreement, contract, or transaction … that provides for any purchase, sale, payment, or delivery … that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence."  7 U.S.C. § 1a(47)(A)(ii).  Kalshi's sports-betting contracts simply do not fall under this definition and Congress therefore could not have intended to repeal key provisions of IGRA.[5]

---

[5] This Court recently denied Kalshi's motion for injunction pending appeal, finding (without deciding) that even if Kalshi's event contracts qualified as swaps—which,

13

First, Kalshi's sports-betting contracts are not dependent on the *occurrence, nonoccurrence, or extent of the occurrence* of a sports event—i.e., whether the sports event occurs—but rather on the *outcome* of the sports event (or parts thereof)—i.e., which team wins. The Nevada District Court recently held that sports bets are not swaps for precisely this reason. *Hendrick*, 817 F. Supp. 3d at 1023, 1026–32.

Second, there is no "financial, commercial, or economic consequence" associated with Kalshi's sports-betting contracts.[6] Aside from whether the purchaser wins or loses their bet, Kalshi's sports-betting contracts have no direct financial consequences for the purchaser. To constitute a swap, the underlying event itself "must be inherently associated with a potential financial consequence."

---

as established below, they do not—Kalshi still failed to establish a likelihood of success on the merits of its preemption claims because it failed to show that the CEA either expressly preempts, field preempts, or conflict preempts Ohio's gaming laws. Order at 6–13, Dkt. No. 26-2. Thus, while this Court has not considered whether the CEA preempts or impliedly repeals key provisions of IGRA, its same reasoning can alternatively be applied here.

[6] Holding that Kalshi's sports-betting contracts meets this bar would defy rationality because "Kalshi's proffered definition [of 'swap'] would likely encompass virtually every kind of wager that could exist, including classic casino games and charity raffles," and "any individual who engages in gambling outside of a DCM would commit a felony were we to take the definition of swaps to its logical extreme." *KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 233 (3d Cir. 2026) (Roth, J., dissenting) (emphasis in original). Clearly, "Congress could not have intended for such a rationality-defying outcome." *Id.*

*Hendrick*, 817 F. Supp. 3d at 1028. "[E]xternalities like whether people bet on the event or contingency, or whether the event's occurrence or nonoccurrence causes downstream financial consequences, are not sufficient." *Id.* As the district court correctly held, Congress's goals in enacting the CEA "are better achieved when 'swap' is understood as a transaction involving financial instruments and measures that traditionally and directly <u>affect commodity prices</u>. Currency exchange rates, the weather, and energy costs all do that; the number of points scored in the Huskies-Bobcats game does not." R. 69, PageID # 904–05 (emphasis in original). Kalshi's sports-betting contracts therefore do not qualify as swaps.

> 2. *Congress did not manifest clear intent to repeal key provisions of IGRA or to make the CFTC a gaming regulator.*

Congress did not repeal key provisions of IGRA and grant the CFTC the exclusive authority to regulate nationwide sports betting. In fact, Congress expressed the opposite intent and went out of its way to prevent event-contract markets from being used to conduct gambling. *See* 156 Cong. Rec. 13173 (2010) (colloquy between Sens. Feinstein and Lincoln). Specifically, Congress enacted the "Special Rule" authorizing the CFTC to "determine that such agreements, contracts, or transactions are contrary to the public interest" and to *disallow* any "gaming" activity on DCMs at all. *See* 7 U.S.C. § 7a-2(c)(5)(C)(i)–(ii). The CFTC acted consistently with Congress's intent by promulgating its blanket

15

prohibition of event contracts involving gaming.  17 C.F.R. § 40.11(a)(1).  In promulgating its rule, the CFTC explained that its "prohibition of certain 'gaming' contracts is consistent with Congress's intent to 'prevent gambling through the futures markets' and to 'protect the public interest from gaming and other events contracts.'"  Provisions Common to Registered Entities, 76 Fed. Reg. 44776, 44786 (July 27, 2011). And although the CFTC may review a contract to determine if it relates to gaming or one of the other subjects prohibited by CFTC regulations as against the public interest, per the CEA, it may not approve the contract for listing if it does.  17 C.F.R. § 40.11(c).  Thus, the CFTC recognized that the Special Rule reinforced Congress's existing policy *against* sports betting.

Kalshi even acknowledged this fact before the D.C. Circuit, stating, "An event contract thus involves 'gaming' if it is contingent on a game or game-related event.  The classic example is a contract on the outcome of a sporting event; as the legislative history directly confirms, *Congress did not want sports betting to be conducted on derivatives markets*."  *See* Appellee Br. at 41, *KalshiEX LLC v. CFTC*, No. 24-5205 (D.C. Cir. Nov. 15, 2024) (emphasis added).  The Special Rule and the CFTC's regulations undermine any claim that Congress intended to repeal key provisions of IGRA and legalize sports betting.  That the CEA and

16

IGRA overlap here is due only to Kalshi's backdoor attempt to evade comprehensive gaming regulations.[7]

Furthermore, Kalshi (a private company with a direct financial interest in offering unregulated sports betting), not Congress, claims that the CEA's definition of "swap" displaces tribal, state, and federal regulation of sports betting. The text and legislative history of the 2010 CEA amendments confirm that the CFTC was not established to regulate sports betting, let alone assume the role of the nation's sole sports-betting regulator. And, historically, the CFTC likewise did not assert such authority itself. *See* Event Contracts, 89 Fed. Reg. 48968, 48982–83 (June 10, 2024) ("The [CFTC] is not a gaming regulator … and the [CFTC] does not believe that it has the statutory mandate nor specialized experience appropriate to oversee [gambling], or that Congress intended for the [CFTC] to exercise its jurisdiction or expend its resources in this manner.").

---

[7] Under Kalshi's theory, it can simply call a sports wager a "swap"—regardless of whether it is actually a valid "swap"—and list it for trade on a DCM, which automatically grants the CFTC exclusive jurisdiction, to the detriment of all other regulatory authorities. *See* Appellant Br. at 19, 45, Dkt. No. 28. What, then, would prevent Kalshi from calling "contracts" on other traditional forms of gaming, like roulette and lotteries, "swaps" and subjecting them to the CFTC's exclusive jurisdiction? According to Kalshi, CFTC inaction—despite banning "gaming" contracts via 17 C.F.R. § 40.11(a)(1)—is all that is required to bless illegal event contracts blatantly designed for no other purpose than to enable gambling.

Though the CFTC's recent participation in ongoing litigation (including this appeal) and its decision to file suit against several state gaming regulators broadly defend Kalshi's arguments, its claims are unpersuasive and should be rejected. *See* Amicus Br. of CFTC, Dkt. No. 31; *CFTC v. Arizona*, No. 2:26-cv-02246 (D. Ariz. filed Apr. 2, 2026); *CFTC v. Connecticut*, No. 3:26-cv-00498 (D. Conn. filed Apr. 2, 2026); *CFTC v. Illinois*, No. 1:26-cv-03659 (N.D. Ill. filed Apr. 2, 2026); *CFTC v. New York*, No. 1:26-cv-03404 (S.D.N.Y. filed Apr. 24, 2026); *CFTC v. Wisconsin*, No. 2:26-cv-00749 (E.D. Wis. filed Apr. 28, 2026); Amicus Br. of CFTC at 19, *Crypto.com v. Nevada*, No. 25-7187 (9th Cir. Feb. 17, 2026), Dkt. No. 37.2. Strikingly, in defending the legality of sports-betting contracts, the CFTC fails to acknowledge that it has already promulgated regulations effecting a blanket ban of gaming contracts like Kalshi's in 17 C.F.R. § 40.11(a)(1). *See* Amicus Br. of CFTC at 25–26, Dkt. No. 31. Moreover, the CFTC fails to acknowledge that Kalshi's preemption argument necessarily means the implied repeal of key provisions of IGRA and other applicable federal laws. Finally, the power to interpret statutes ultimately belongs to the courts, not the CFTC. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 385–86 (2024).

This Court should reject Kalshi's efforts to expand the CFTC's jurisdiction to a vast new area of regulation.

*3.     The Indian Canons of Construction require this Court to resolve any ambiguity in favor of tribes.*

Even if there were ambiguity as to whether Congress intended to repeal key provisions of IGRA when it amended the CEA (there is not), the Indian Canons of Construction require courts to resolve statutory ambiguities in favor of tribes. *See, e.g.*, *Bryan v. Itasca Cnty.*, 426 U.S. 373, 392 (1976); *Grand Traverse Band of Ottawa & Chippewa Indians v. U.S. Att'y. W. Div. of Mich.*, 369 F.3d 960, 971 (6th Cir. 2004). Federal courts have consistently applied these canons to ensure that later-enacted statutes of general applicability cannot repeal earlier-enacted legislation specifically designed to advance the United States' special relationship with tribes without a clear statement from Congress. *See, e.g.*, *Morton v. Mancari*, 417 U.S. 535, 550–51 (1974); *Swinomish Indian Tribal Cmty. v. BNSF Ry. Co.*, 951 F.3d 1142, 1159–60 (9th Cir. 2020); *Shoshone-Bannock Tribes of Fort Hall Rsrv. v. U.S. Dep't of the Interior*, 153 F.4th 748, 765 (9th Cir. 2025).

This Court should therefore reject Kalshi's preemption argument requiring an implied repeal of IGRA.

**D.     IGRA Regulates Online Gaming on Tribes' Indian Lands, Including Kalshi's Sports-Betting Contracts.**

Kalshi has tried to argue that IGRA is not relevant because its online activity does not occur on "Indian lands." *See* Appellant Br. at 55, *KalshiEX LLC v. Martin*, No. 25-1892 (4th Cir. Oct. 15, 2025), Dkt. No. 16. However, this is

19

plainly wrong. IGRA allows states and tribes to allocate jurisdiction over the regulation of internet gaming conducted by a tribe throughout the state, including on its Indian lands. *See W. Flagler Assocs., Ltd. v. Haaland*, 71 F.4th 1059, 1061–62, 1066 (D.C. Cir. 2023), *cert. denied*, 144 S. Ct. 2671 (2024). IGRA's implementing regulations also expressly state that tribes can regulate online gaming pursuant to the terms of their IGRA compacts. *See* 25 C.F.R. § 293.26.

Kalshi has also argued that the Unlawful Internet Gaming and Enforcement Act ("UIGEA"), not tribal-state gaming compacts or state gaming law, solely governs the online gaming aspect of its sports-betting contracts, and UIGEA excludes DCM transactions from its definition of "bet or wager." *See* Appellant Br. at 36, 60, Dkt. No. 28 (citing 31 U.S.C. § 5362). But this ignores UIGEA's own language that "[n]o provision of this subchapter shall be construed as altering, limiting, or extending any Federal or State law or Tribal-State compact prohibiting, permitting, or regulating gambling within the United States." 31 U.S.C. § 5361(b); *Ho-Chunk Nation*, 2026 WL 1284077, at *8 ("[A]t most, UIGEA allows for internet gambling that is otherwise legal; it neither creates nor even addresses a system in which a 'bet or wager' is illegal where it is 'initiated' or 'received,' including gaming on Indian lands. … [J]ust because Kalshi's conduct is not *prohibited* by the UIGEA, does not make its offering of sports betting contracts legal anywhere, much less on Indian lands where it is expressly prohibited.").

20

Ultimately, "UIGEA is a non-substantive, payment processing law that Congress narrowly tailored to prohibit using certain kinds of financial transactions to fund gaming that is already unlawful; and [UIGEA] neither creates any substantive prohibitions for gaming itself, nor supersedes other gaming law." *Ho-Chunk Nation*, 2026 WL 1284077, at *9; *see also California v. Iipay Nation of Santa Ysabel*, 898 F.3d 960, 965 (9th Cir. 2018).

## II.    The Major Questions Doctrine Forecloses Kalshi's Theory.

In 2010, federal law—namely, the Professional and Amateur Sports Protection Act ("PASPA")—largely prohibited sports betting nationwide.  Kalshi's position thus requires interpreting the CEA not only to eradicate state and federal gaming laws by preemption or implied repeal, but also to reverse the federal policy that, at the time, prohibited sports betting—turning it instead into a nationwide authorization of such betting under the jurisdiction of the CFTC.[8]  Whether Congress did so is a major question.

Under the Major Questions Doctrine, courts have "reason to hesitate before concluding that Congress meant to confer" agency authority in cases where the

---

[8] Kalshi's sports-betting contracts also violate other federal laws, including the Wire Act, 18 U.S.C. § 1084, the Illegal Gambling Business Act, 18 U.S.C. § 1955, and the Travel Act, 18 U.S.C. § 1952(a).  If Congress authorized sports betting via the CEA in 2010, then it also effectively limited the scope of these federal laws.

agency has asserted a "breadth" of authority over matters of "economic and political significance." *West Virginia v. EPA*, 597 U.S. 697, 721 (2022). In such cases, considering "both separation of powers principles and a practical understanding of legislative intent," there must be "clear congressional authorization." *Id.* at 723 (citation modified). Further, "Congress [does not] typically use oblique or elliptical language to empower an agency to make a radical or fundamental change to a statutory scheme." *Id.* (citation modified).

In effect, Kalshi's preemption argument would mean that the 2010 CEA amendments were intended to displace state and tribal gaming regulations, undermine tribal-state gaming compacts, legalize sports betting nationwide, and place sports betting under the regulatory jurisdiction of the CFTC, all at a time when federal law broadly prohibited sports betting. This is unquestionably a "radical" and "fundamental" overhaul to both PASPA and IGRA, and certainly raises concerns of "economic and political significance." *West Virginia*, 597 U.S. at 721. This Court therefore has significant "reason to hesitate" and should require "clear congressional authorization" before even considering Kalshi's preemption argument. *Id.* at 721, 724.[9]

---

[9] The Supreme Court has also held that "[w]hen an agency claims to discover in a long-extant statute an unheralded power to regulate 'a significant portion of the

First, Congress must be clear when it "alters the federal-state framework by permitting federal encroachment upon a traditional state power." *Solid Waste Agency v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 172–73 (2001). Here, gaming regulation, and even sports-betting regulation specifically, has been understood to be within traditional state power. *See Murphy v. NCAA*, 584 U.S. 453, 474, 481–85 (2018); *see also Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 737 (9th Cir. 2003). As the Supreme Court noted in *Murphy*, Congress has long structured federal criminal law to "respect the policy choices of the people of each State on the controversial issue of gambling." 584 U.S. at 484. And even when

American economy,' we typically greet its announcement with a measure of skepticism. We expect Congress to speak clearly if it wishes to assign to an agency decisions of vast 'economic and political significance.'" *Utility Air Reg. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159–60 (2000))). Here, Kalshi asserts that the CFTC's exclusive jurisdiction over its sports-betting contracts derives from such a "long-extant statute." Specifically, Kalshi claims that the CFTC's exclusive jurisdiction over its sports-betting contracts, and thus its preemptive authority over state (and, by extension, tribal and even federal) gaming regulation, extends not only from the 2010 CEA amendments and the addition of the term "swap," but also to the Commodity Futures Modernization Act of 2000's addition of the term "excluded commodity," and even as far back as the 1974 amendments to the CEA. *See* Appellant Br. at 14, 50 n.5, Dkt. No. 28; *id.* at 60 ("[W]hen Congress granted the CFTC exclusive jurisdiction over on-DCM trading in 1974, it was exceedingly clear that Congress was preempting state gaming laws as applied to those transactions."). Despite what Kalshi may claim, neither the 1974, 2000, nor 2010 CEA amendments "speak clearly" to a congressional intent to repeal key provisions of IGRA or to make the CFTC a gaming regulator.

23

Congress chose to prohibit sports betting nationally, it did so *through* state regulation, rather than by directly regulating private actors. *Id.* at 484–85.

Similarly, courts have long recognized tribes' inherent sovereign authority to regulate gaming on their lands. *See Cabazon*, 480 U.S. at 207–14. Though it imposes limited restrictions on this authority, IGRA still broadly advances tribes' "exclusive right to regulate [and offer] gaming activity" (including sports betting) on their Indian lands as a means of promoting tribal economic development and self-determination. *See* 25 U.S.C. §§ 2701(5), 2702(2); *W. Flagler*, 71 F.4th at 1062–63. And later-enacted statutes of general applicability—like the CEA— cannot repeal earlier-enacted legislation that is specifically designed to advance the United States' special relationship with tribes—like IGRA—without a clear statement from Congress. *See, e.g., Mancari*, 417 U.S. at 550.

Accordingly, because regulating gaming (including sports betting) has long been a traditional state and tribal power, Kalshi must show clear congressional language overturning that federal policy. But it cannot because none exists. Rather, the CEA *reinforces* the federal policy in favor of state gaming regulation by disclaiming preemption of state gaming laws. *See* 7 U.S.C. § 16(e). And nothing in the definition of "swap" indicates that Congress meant to overturn the entire field of sports-betting regulation or Indian gaming.

Second, sports betting has a "unique place in American history and society," and therefore its own "political history." *Cf. Brown & Williamson*, 529 U.S. at 159–60 (discussing the FDA's regulation of tobacco). Given this social and political history, at the time of the 2010 CEA amendments, Congress had already "created a distinct regulatory scheme" for sports betting: PASPA. *Cf. id.* The conflict between Kalshi's argument and the existence of PASPA in 2010 therefore indicates that Congress could not have intended to regulate sports betting in the way that Kalshi now claims. "Given this history and the breadth of the authority that [Kalshi] has asserted [the CFTC has]," this Court should not defer to Kalshi's "expansive construction" of the CEA. *Cf. id.* at 160.

Since the Supreme Court overturned PASPA in 2018, *see Murphy*, 584 U.S. at 486, several states have established regulatory schemes for sports betting under their traditional police powers. But that has no bearing on whether Congress's CEA amendments *in 2010* had the effect of obliterating PASPA (or IGRA), and the state laws on which it relied. In holding PASPA unconstitutional, the Supreme Court made no suggestion that Congress had *already* preempted all state gaming laws eight years earlier. *Id.* at 479–80. To the contrary, the Supreme Court concluded with an observation utterly incompatible with Kalshi's contention: "The legalization of sports gambling requires an important policy choice, but the choice is not ours to make. Congress can regulate sports gambling directly, but if it elects

not to do so, each State is free to act on its own." *Id.* at 486. In other words, Kalshi's deregulatory elephant was hidden in a statutory mousehole far too small for the Supreme Court to notice when deciding whether sports betting would be legal.

Ignoring history, context, and common sense, Kalshi presents an alternate reality in which a statutory scheme whose scope is limited to addressing the risk, discovery, and dissemination of commodity pricing information, *see* 7 U.S.C. § 5(a)–(b), governs nationwide sports betting. Kalshi therefore creates an imaginary world where Congress repealed key components of the comprehensive regulatory scheme set forth in IGRA, similar state law structures, and the then-federal policy in PASPA requiring states to prohibit sports betting. And Kalshi argues all of this happened without even a hint of legislative intent.

Kalshi's revisionist history cannot withstand even the slightest scrutiny. "It is absurd to think that Congress intended for DCMs to turn into nationwide gambling venues on every topic under the sun to the exclusion of state regulation and with no comparable federal regulator without ever mentioning that was the goal when Congress added swaps to the CEA in 2010." *Hendrick*, 817 F. Supp. 3d at 1031–32.

**III. Kalshi's Preemption Argument Would Violate the Private Nondelegation Doctrine.**

Kalshi's preemption argument turns on the extraordinary claim that Congress delegated the power to preempt state law to an interested private party simply by self-certifying its own sports-betting contracts and listing them on its exchange. The private non-delegation doctrine, however, guards against precisely the type of unchecked, privately exercised powers upon which Kalshi relies. *See Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936).

While the Supreme Court upholds congressional delegations of power to federal agencies with an intelligible principle, it applies a different standard when those delegations are to private entities. "[A] law … violates the private nondelegation doctrine when it allows non-governmental entities to govern." *FCC v. Consumers' Rsch.*, 606 U.S. 656, 697 (2025). Recently, the Supreme Court found that the permissibility of a private delegation depends on whether the agency retains oversight and ultimate decision-making authority over the private entity's actions. *Id.* at 693. There, the Court upheld the delegation to a private entity, but only because it merely "play[ed] an advisory role" and the final decision-making authority rested with the agency. *Id.*

In contrast, under Kalshi's theory, the CEA's self-certification provisions empower Kalshi—a private, for-profit entity—to oversee its own sports-betting

enterprise, yet simultaneously fail to provide any mechanism for advance public comment, mandatory agency oversight, or standards by which the CFTC may implement its discretion.[10]

Further, even according to Kalshi, its self-certifications are not merely advisory. Rather, they have the force of law and CFTC inaction is sufficient to trigger preemption. *See* Appellant Br. at 19, 21, 63, Dkt. No. 28. "The result of this regulatory scheme is that [Kalshi] can, without any [CFTC] review of its decision on the merits, effectively decide" to offer sports betting free from tribal and state regulation. *Cf. Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*, 121 F.4th 1314, 1328 (D.C. Cir. 2024). Consequently, construing the CEA to attribute legal effect on state law via Kalshi's self-certification would be unconstitutional—a construction that must be avoided. *See Bevan & Assocs., LPA, Inc. v. Yost*, 929 F.3d 366, 376–77 (6th Cir. 2019).

Moreover, Kalshi has a financial interest in self-certifying its own sports-betting contracts, regardless of such certifications' verity. And this financial interest is directly adverse to the sovereign and economic interests of tribes and

---

[10] *See Farewell Address of Commissioner Kristin N. Johnson*, CFTC (Sep. 3, 2025), https://www.cftc.gov/PressRoom/SpeechesTestimony/opajohnson25 (warning that the CFTC has "too few guardrails and too little visibility into the prediction market landscape").

states offering sports betting. The effects of Kalshi's self-certification go even further; in Kalshi's view, it can block tribes and states from regulating that which has long been within their sovereign authority to regulate, simply by listing sports-betting contracts on its exchange. "This is legislative delegation in its most obnoxious form; for it is not even delegation to an official or an official body, presumptively disinterested, but to private persons whose interests may be and often are adverse to the interests of others in the same business." *Carter Coal*, 298 U.S. at 311.

## CONCLUSION

For the foregoing reasons, the Tribal Amici respectfully request that the Court affirm the district court's decision.

DATED: June 11, 2026

Respectfully submitted,

/s/ Joseph H. Webster

Joseph H. Webster
Elizabeth A. Bower
Jens W. Camp
Alexandra K. Holden
HOBBS, STRAUS, DEAN & WALKER LLP
1899 L Street NW, Suite 1200
Washington, DC 20036
(202) 822-8282
jwebster@hobbsstraus.com
ebower@hobbsstraus.com
jcamp@hobbsstraus.com
aholden@hobbsstraus.com

*Counsel for Tribal Amici*

Bryan Newland
POWERS, PYLES, SUTTER & VERVILLE
PC
1250 Connecticut Ave NW, 8th Floor
Washington, DC 20036
(202) 349-4265
Bryan.Newland@powerslaw.com

*Counsel for Bay Mills Indian Community, Mohegan Tribe of Indians of Connecticut, Rincon Band of Luiseño Indians, and Santa Ynez Band of Chumash Mission Indians*

Scott Crowell
CROWELL LAW OFFICE
TRIBAL ADVOCACY GROUP PLLC
1487 W State Rte 89A, Suite 8
Sedona, AZ 86336
(425) 802-5369
scottcrowell@clotag.net

*Counsel for Rincon Band of Luiseño Indians, Santa Ynez Band of Chumash Mission Indians, and Spokane Tribe of the Spokane Reservation*

Michael Hoenig
YUHAAVIATAM OF SAN MANUEL NATION
422 1st Street SE
Washington, DC 20003
(909) 936-9684
Michael.Hoenig@sanmanuel-nsn.gov

*Counsel for Yuhaaviatam of San Manuel Nation and San Manuel Gaming and Hospitality Authority*

**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the type-volume limits of Rule 32(a) of the Federal Rules of Appellate Procedure and Circuit Rule 32(a) of the United States Court of Appeals for the Sixth Circuit because it contains 6499 words in proportionally spaced, 14 pt. Times New Roman font.

DATED: June 11, 2026                    /s/ Joseph H. Webster
                                                       Joseph H. Webster

**CERTIFICATE OF SERVICE**

I certify that on June 11, 2026, a copy of the foregoing was filed with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit via the Court's appellate CM/ECF electronic filing system, which will provide notice and service on all counsel of record for all parties.

DATED: June 11, 2026

/s/ Joseph H. Webster
Joseph H. Webster