No. 26-3196 / 26-5235

In The
# United States Court of Appeals
# for the Sixth Circuit

KALSHIEX LLC,

*Plaintiff-Appellant [26-3196],*

*Plaintiff-Appellee [26-5235],*

v.

MATTHEW T. SCHULER; THOMAS J. STICKRATH; SHEETAL BAJORIA; SCOTT P. BORGEMENKE; KEITH CHENEY; PENELOPE R. CUNNINGHAM; CHRISTOPHER SMITHERMAN; TRIFFON CALLOS; OHIO CASINO CONTROL COMMISSION; DAVE YOST, OHIO ATTORNEY GENERAL,

*Defendants-Appellees [26-3196]*

WILLIAM ORGEL, *in his official capacity as Chairman of the Tennessee Sports Wagering Council*; MARY BETH THOMAS, *in her official capacity as the Executive Director of the Tennessee Sports Wagering Council*; JONATHAN THOMAS SKRMETTI, *in his official capacity as Attorney General of Tennessee,*

*Defendants-Appellants [26-5235].*

On Appeal from the United States District Court
for the Southern District of Ohio
No. 2:25-cv-1165
Hon. Sarah D. Morrison

**REPLY BRIEF FOR APPELLANT KALSHIEX LLC
IN NO. 26-3196**

*Counsel listed on inside cover*

GRANT R. MAINLAND
ANDREW L. PORTER
NICOLE D. VALENTE
DAVIS CAMPBELL
MILBANK LLP
55 Hudson Yards
New York, NY 10001

MICHAEL J. HUNTER
MATTHEW L. JALANDONI
FLANNERY | GEORGALIS LLC
175 S. Third St., Ste. 285
Columbus, OH 43215

June 25, 2026

NEAL KUMAR KATYAL
    *Counsel of Record*
JOSHUA B. STERLING
COLLEEN E. ROH SINZDAK
WILLIAM E. HAVEMANN
SAMANTHA K. ILAGAN
MILBANK LLP
1101 New York Ave., NW
Washington, DC 20005
Telephone: (202) 835-7505
nkatyal@milbank.com

*Counsel for Plaintiff-Appellant
KalshiEX LLC in No. 26-3196*

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................1

ARGUMENT.......................................................................................... 3

I.  KALSHI'S CONTRACTS FALL WITHIN THE CFTC'S EXCLUSIVE
    JURISDICTION .................................................................................. 3

    A.    Kalshi's Contracts Are DCM-Traded Agreements ...................... 4

    B.    Kalshi's Contracts Are Swaps ..................................................... 6

    C.    Defendants' Reliance On Extratextual Canons Fails................ 18

II.  THE CEA PREEMPTS STATE GAMBLING LAW AS TO TRADING
     ON DCMS........................................................................................20

III. THE EQUITIES FAVOR KALSHI ................................................................31

CONCLUSION........................................................................................ 32

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

i

# TABLE OF AUTHORITIES

Page(s)

**CASES:**

*Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.,*
977 F.2d 1147 (7th Cir. 1992) ........................................ 1, 5, 25, 26, 28, 29

*Arizona v. United States,*
567 U.S. 387 (2012) .............................................................. 25, 27, 28

*Black v. Pension Benefit Guar. Corp.,*
983 F.3d 858 (6th Cir. 2020) ......................................................... 8

*Bob Jones Univ. v. United States,*
461 U.S. 574 (1983)................................................................... 29

*Branch v. Smith,*
538 U.S. 254 (2003) .............................................................. 29, 30

*CFTC v. Erskine,*
512 F.3d 309 (6th Cir. 2008)....................................................... 19

*Chi. Mercantile Exch. v. SEC,*
883 F.2d 537 (7th Cir. 1989)......................................................... 8

*Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.,*
162 F.4th 631 (6th Cir. 2025) .................................................. 21, 31

*Coventry Health Care of Mo., Inc. v. Nevils,*
581 U.S. 87 (2017)................................................................... 22

*Dickson v. Uhlmann Grain Co.,*
288 U.S. 188 (1933) .............................................................. 3, 27

*Facebook, Inc. v. Duguid,*
592 U.S. 395 (2021) .................................................................. 5

*Heart of Am. Grain Inspection Serv., Inc. v. Mo. Dep't of Agric.,*
123 F.3d 1098 (8th Cir. 1997)...................................................... 22

## TABLE OF AUTHORITIES—Continued

Page(s)

*Henson v. Santander Consumer USA Inc.*,
  582 U.S. 79 (2017) ...................................................................13

*Hughes v. Talen Energy Mktg., LLC*,
  578 U.S. 150 (2016) ................................................................ 22

*KalshiEX LLC v. Flaherty*,
  172 F.4th 220 (3d Cir. 2026) ...................................... 24, 26, 29

*Leist v. Simplot*,
  638 F.2d 283 (2d Cir. 1980) ...................................................1, 2

*Lockhart v. United States*,
  577 U.S. 347 (2016) ............................................................... 4, 5

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
  456 U.S. 353 (1982) .......................................................... 11, 24

*Monsanto Co. v. Durnell*,
  609 U.S. ----, No. 24-1068,
  2026 WL 1825691 (June 25, 2026) ................................... 22, 29

*Murphy v. NCAA*,
  584 U.S. 453 (2018).................................................................30

*Oklahoma v. Castro-Huerta*,
  597 U.S. 629 (2022).............................................................. 6, 28

*Oncale v. Sundowner Offshore Servs., Inc.*,
  523 U.S. 75 (1998) ...................................................................15

*Puerto Rico v. Franklin Cal. Tax-Free Tr.*,
  579 U.S. 115 (2016) .................................................................21

*Slaney v. Int'l Amateur Athletic Fed'n*,
  244 F.3d 580 (7th Cir. 2001) .............................................. 22

*TRW Inc. v. Andrews*,
  534 U.S. 19 (2001) ...................................................................14

# TABLE OF AUTHORITIES—Continued

Page(s)

*United States v. Stewart,*
  73 F.4th 423 (6th Cir. 2023).................................................................. 6

*United States v. Veloz-Alonso,*
  910 F.3d 266 (6th Cir. 2018) ......................................................... 29, 30

**STATUTES:**

7 U.S.C. §§

  1a(19)(iv) ........................................................................................20

  1a(47)(A)(ii) .................................................... 9, 10, 13, 14, 19

  1a(47)(A)(iii) ............................................................... 14, 15

  1a(47)(A)(iv)................................................................ 13, 14

  1a(47)(A)(vi)............................................................... 13, 14

  1a(47)(B) .................................................................... 13, 14

  2(a)(1)(A) ..............................................................4, 18, 23, 24

  2(e)................................................................................ 18

  5  ....................................................................................8

  7a-2(c)(5)(C) ............................................................... 7, 15

  7a-2(c)(5)(C)(i) ............................................................ 8, 30

  13a-2(1) ................................................................ 6, 24, 25, 26

  13a-2(7) ................................................................ 24, 25, 26

  16(e)(1) ......................................................................... 25

  16(e)(2) ......................................................................... 24

# TABLE OF AUTHORITIES—Continued

Page(s)

16(h) ........................................................................ 25

16(h)(2) ....................................................................19

27c(a) ................................................................. 24, 25

27f(b)...................................................................... 24

15 U.S.C. § 8302(d)(1) ...............................................14, 18

31 U.S.C. § 5361(b) ....................................................30

31 U.S.C. § 5362(1)(A) ............................................... 29

31 U.S.C. § 5362(1)(E)(ii) ........................................... 29

Ohio Rev. Code Ann. §§ 3775.10(C)-(D)........................... 28

**REGULATIONS:**

17 C.F.R. § 40.11 ...................................................... 27

17 C.F.R. § 40.11(c) ................................................... 27

Concept Release,
   73 Fed. Reg. 25,669 (May 7, 2008) ...................7, 12, 13, 16, 20

Event Contracts,
   89 Fed. Reg. 48,968 (June 10, 2024) ........................ 16, 17

Further Definition of "Swap,"
   77 Fed. Reg. 48,208 (Aug. 13, 2012)........................ 3, 18, 19

Prediction Markets,
   91 Fed. Reg. 35,806 (June 12, 2026)....2, 4, 9, 10, 12, 13, 15, 16, 27, 31, 32

**LEGISLATIVE MATERIAL:**

156 Cong. Rec. (daily ed. May 4, 2010) ...............................15

## TABLE OF AUTHORITIES—Continued

Page(s)

156 Cong. Rec. (daily ed. July 15, 2010) ...................................................... 8

H.R. Rep. No. 93-1383 (1974) ..................................................................... 26

H.R. Rep. No. 106-711, pt. 2 (2000) ...................................................... 24, 25

S. Rep. No. 93-1131 (1974) ......................................................................... 23

**OTHER AUTHORITIES:**

Andrew Ross Sorkin et al., *Hedging, not betting, on sports via
    prediction markets*, N.Y. Times DealBook (Feb. 10, 2026),
    https://perma.cc/VP2T-NLP5 ........................................................ 10, 11

Anna Spiegel, *Exclusive: This D.C. bar will pay your tab if Team USA
    wins a World Cup game*, Axios D.C. (June 17, 2026),
    https://perma.cc/9UU4-H679 ............................................................... 11

Anthony M. Diercks et al., *Kalshi and the Rise of Macro Markets*, Fed.
    Reserve Bd. (Feb. 12, 2026), https://perma.cc/9EY4-M3HY ................ 10

Antonin Scalia and Bryan A. Garner, *Reading Law: The Interpretation
    of Legal Texts* (2012) .............................................................................. 5

Ben Shimkus & Jack Newsham, *An NYC bar promised free drinks if the
    Knicks win.  Its owner is using Kalshi to hedge the risk.*, Bus. Insider
    (June 2, 2026), https://perma.cc/SFR4-EBKM .................................... 11

*Event*, Random House Webster's Unabridged Dictionary (2d ed. 2001) ....12

*Event*, Webster's New World Dictionary of American English (3d Coll.
    ed. 1988) ................................................................................................12

*Exclusive*, American Heritage Dictionary (1980) ...................................... 22

Kalshi, *Mandatory KYC and Surveillance*, https://kalshi.com/market-
    integrity/kyc-surveillance (last visited June 25, 2026) ..........................31

## TABLE OF AUTHORITIES—Continued

Page(s)

Kalshi, *Responsible Trading*,
https://help.kalshi.com/en/collections/18616607-responsible-
trading (last visited June 25, 2026)..........................................................31

Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58
Chi.-Kent L. Rev. 657 (1982) ................................................................16

*Occurrence*, Webster's New World Dictionary of American English (3d
Coll. ed. 1988)......................................................................................13

Paul Mueller, *The Knicks playoff run is a billion-dollar slam dunk for
New York*, Fast Co. (June 5, 2026), https://perma.cc/L4YX-7MGD ...... 9

**INTRODUCTION**

Defendants' brief confirms that a preliminary injunction is warranted. Their principal argument—that Kalshi's contracts are not swaps—rewrites the statutory text. Their theory that swaps must involve events *inherently* connected to financial consequences is invented out of whole cloth: The CEA requires "potential" financial consequences, not "inherent" ones. Their theory that an "outcome" cannot be an "event" is flatly wrong as a matter of plain meaning. And their theory that sports events categorically lack potential economic consequences is refuted by their own admission (at 33) that sports events are "big business." More fundamentally, Defendants cannot justify a system in which 50 states may subject DCMs to 50 different enforcement regimes based on their own narrow interpretation of the CFTC's jurisdiction—a recipe for the "total chaos" Congress sought to avoid. *Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1156 (7th Cir. 1992) (citation omitted).

Defendants' alternative argument—that the CEA does not preempt state law even if Kalshi's contracts are swaps—can be readily rejected. Their argument boils down to the assertion that "exclusive" means—in their own words (at 50, 53)—"concurrent." Quite the contrary, it has been undisputed for 50 years that the CFTC's exclusive jurisdiction "preempts the application

of state law." *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980). And Defendants' contention that the CEA preempts some laws, but not gaming laws, is equally mistaken. The Special Rule is unequivocal proof that Congress wanted the CFTC, not 50 different states, to regulate event contracts involving "gaming."

Defendants' position has only weakened since their brief was filed. The CFTC recently issued a Notice of Proposed Rulemaking ("NPRM") reiterating that the CEA "expressly preempts state laws" with respect to sports-event contracts on DCMs, adding that these contracts are "swaps" that serve "price discovery" functions and "allow market participants to hedge exposure to a wide array of events for which no traditional financial instrument otherwise exists." Prediction Markets, 91 Fed. Reg. 35,806, 35,807-08 (June 12, 2026) (citation modified). The NPRM makes clear that sports-event contracts are *not* (and never have been) categorically prohibited and that many sports-event contracts "can be operated consistent with the public interest." *Id.* at 35,836, 35,853. Allowing states to ban these contracts creates an obvious conflict.

Because the evidence of preemption is overwhelming, Defendants retreat to the argument that finding preemption here would make the CFTC the nation's only sports-betting regulator. But this is a strawman. The CEA

preempts state regulation of on-DCM trading, while leaving states free to regulate off-DCM transactions, including sports bets. A joint CFTC/SEC rule confirms that sports bets are not swaps because, unlike sports-event contracts, they are not traded on an organized exchange. Further Definition of "Swap," 77 Fed. Reg. 48,208, 48,247-48 (Aug. 13, 2012). And this Court's longstanding precedent confirms that only standardized, tradable instruments are derivatives.

Defendants cannot escape the startling implications of their position. If Defendants were correct, they could use state gambling laws to prohibit all event contracts, or even all futures contracts. Many states a century ago regulated futures trading as "gambling in grain." *Dickson v. Uhlmann Grain Co.*, 288 U.S. 188, 198 (1933). The 1974 CEA amendments ended that practice. But Defendants' position would let states restore it, upending the system of uniform federal regulation that has prevailed in this Nation for 50 years.

## ARGUMENT

### I. KALSHI'S CONTRACTS FALL WITHIN THE CFTC'S EXCLUSIVE JURISDICTION.

Defendants first contend that Kalshi's contracts are not swaps and therefore do not fall within the CFTC's exclusive jurisdiction. The CFTC has squarely rejected that position, which is mistaken on multiple grounds.

3

## A.    Kalshi's Contracts Are DCM-Traded Agreements.

To begin, the Court need not resolve whether Kalshi's contracts are swaps, because the CFTC's "exclusive jurisdiction" extends to "accounts, agreements …, *and* transactions involving swaps or contracts of sale of a commodity for future delivery …, traded or executed on a [designated] contract market." 7 U.S.C. § 2(a)(1)(A) (emphasis added).  Defendants do not dispute that Kalshi's contracts are "agreements" that are "traded or executed on a" DCM, which the statute places within the CFTC's "exclusive jurisdiction."  *Id.*  As the CFTC recently confirmed, the CEA's exclusive jurisdiction extends to all "transactions on[] CFTC-registered exchanges." 91 Fed. Reg. at 35,808.

Defendants argue (at 41-42) that Section 2(a)'s reference to "agreements" is qualified by the phrase "involving swaps or contracts of sale of a commodity for future delivery."   But, under the rule of the last antecedent, that qualifying phrase limits only "transactions"—not the more remote "agreements."  *See Lockhart v. United States*, 577 U.S. 347, 351 (2016) ("Qualifying words or phrases modify the words or phrases immediately preceding them and not words or phrases more remote" (citation omitted)).  The last-antecedent rule is especially apt given that a 30-word parenthetical separates "agreements" from "transactions." *See id.* (the

4

last-antecedent rule applies where it is "a heavy lift to carry the modifier across" all the individual entries in the list). Defendants rely (at 31) on *Facebook, Inc. v. Duguid*, 592 U.S. 395 (2021), but the qualifying phrase there "follow[ed] a comma." *Id.* at 403. Here, Congress declined to separate the qualifying phrase from the series with a comma, confirming that the qualifying phrase modifies only the last antecedent.

Defendants argue (at 42) that the parenthetical following "agreements" exhaustively sets forth the types of agreements "that fall within the CFTC's exclusive jurisdiction." But the parenthetical begins with "including," which "introduces examples, not an exhaustive list." Antonin Scalia and Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 132 (2012). It therefore does not limit "agreements."

Defendants fail to defend the regime they envision—in which states may circumvent the CEA by claiming that DCM-traded, CFTC-regulated instruments are not actually derivatives. The result would be parallel regulation of the exact same instruments by states and the CFTC—a recipe for "total chaos." *Am. Agric.*, 977 F.2d at 1156 (citation omitted). This difficulty would be compounded exponentially if state regulators could, as Defendants propose, scrutinize every contract offered on every DCM, contract-by-contract, to determine whether any of tens of thousands of

contracts may or may not be derivatives—all with the looming threat of criminal liability for DCMs if any regulator anywhere concludes that any such contract is not a derivative after all.

Defendants' true complaint is with the CFTC for permitting sports-event contracts under the CEA. But Congress forbade states from suing a "contract market" for violations of the CEA. 7 U.S.C. § 13a-2(1). Instead, Defendants may sue the CFTC, including by challenging the results of the CFTC's pending event-contracts rulemaking. But Defendants may not seek to impose criminal liability on Kalshi for offering trades that Kalshi's exclusive federal regulator has permitted.

### B.    Kalshi's Contracts Are Swaps.

Regardless, Kalshi's contracts are swaps. Defendants' contrary argument proceeds from the assertion (at 31) that this Court should "start with the goal of derivatives." That is a tell. Statutory interpretation "begins with the statutory text." *United States v. Stewart*, 73 F.4th 423, 425 (6th Cir. 2023). As the Supreme Court has "repeatedly" emphasized, "the text of a law controls over purported legislative intentions unmoored from any statutory text." *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 642 (2022). Defendants' arguments contradict the CEA's unambiguous text.

6

***Special Rule.***  The Special Rule is fatal to Defendants' position.  It gives the CFTC authority over "agreements, contracts, transactions, or swaps in excluded commodities," including those involving "gaming." 7 U.S.C. § 7a-2(c)(5)(C).  Defendants themselves describe (at 54) Kalshi's contracts as "gaming."  The Special Rule shows that Congress elected *not* to permit concurrent state regulation of "gaming" contracts, but instead gave the CFTC authority to bar them if—but only if—it "determine[s]" they "are contrary to the public interest." *Id.*

Defendants have no coherent response.  They assert (at 42-43) that the Special Rule describes event contracts as "agreements, contracts, transactions, *or* swaps," and that not all event contracts "are within the CFTC's exclusive jurisdiction."  But Defendants' categorical position—that *all* sports-event contracts are subject to state rather than CFTC jurisdiction—is irreconcilable with the text describing contracts involving "gaming" as "swaps" subject to CFTC jurisdiction.  Moreover, the Special Rule's reference to "agreements," "contracts," and "transactions" in addition to "swaps" reflects that event contracts may be structured as "futures" or "options." Concept Release, 73 Fed. Reg. 25,669, 25,669-71 (May 7, 2008).  It does not suggest, as Defendants assert (at 50), the existence of a category of instruments over which the CFTC and states have "concurrent" jurisdiction.

7

To the contrary, where "the CFTC has jurisdiction, its power is exclusive." *Chi. Mercantile Exch. v. SEC*, 883 F.2d 537, 548 (7th Cir. 1989).

Defendants posit (at 51) that the Special Rule is "better read as a backstop that supplements state law" by barring gaming contracts on DCMs. But that aspirational reading contradicts the text, which provides that the CFTC "may"—but need not—determine that contracts involving gaming are "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i); *see, e.g.*, *Black v. Pension Benefit Guar. Corp.*, 983 F.3d 858, 865 (6th Cir. 2020) ("permissive words"—such as "may"—"grant discretion" (citation modified)). Defendants rely (at 58) on floor statements supposedly showing that lawmakers sought to prevent "gambling" through event contracts. *See* 156 Cong. Rec. S5902, S5906-07 (daily ed. July 15, 2010). Such statements cannot override the statutory text. Regardless, those statements support Kalshi; they show that some legislators wanted to "restore *CFTC's* authority to prevent trading that is contrary to the public interest"—*not* to give concurrent authority to states. *Id.* at S5906 (emphasis added).[1]

---

[1] Defendants' one-sentence appeal (at 50) to the non-delegation doctrine also fails. They forfeited any non-delegation challenge by failing to make it below. And this action between Kalshi and Ohio is not the proper forum for a challenge to the *CFTC's* authority. The argument also fails on the merits because the CEA readily supplies the requisite intelligible principle by, for example, outlining the precise public interests derivatives markets serve. 7 U.S.C. § 5.

8

*"**Potential economic consequence.**"*  Defendants next assert that Kalshi's contracts are not swaps because sports events are not "associated with a potential financial, economic, or commercial consequence."  7 U.S.C. §1a(47)(A)(ii).  To support this argument, Defendants cite (at 32) a dictionary agreeing with Kalshi that "associate[d]" means "join[ed]" or "connect[ed]."  But in the very next sentence, Defendants jump to the conclusion that an association requires "a close or inherent relationship." That contradicts Defendants' own dictionary and the CEA's text, which requires association with "potential" economic consequences—the opposite of "close or inherent."

Defendants concede (at 33) that sports are "big business," but nonetheless claim that all sports events lack economic consequences.  That is self-evidently wrong.  As the CFTC has explained, "[s]ports teams are economic enterprises … that generate economic activity and materially affect both regional and national markets" with "billions" of dollars at stake.  91 Fed. Reg. at 35,807, 35,830.  To take one example, each 2026 New York Knicks "home playoff game was worth roughly $91 million" to New York City businesses, with the full postseason generating "as much as $832 million."[2]

---

[2] Paul Mueller, *The Knicks playoff run is a billion-dollar slam dunk for New York*, Fast Co. (June 5, 2026), https://perma.cc/L4YX-7MGD.

Other examples abound. Sports events have financial consequences for sponsors that pay substantial performance bonuses, advertisers with a financial stake in who performs well, television networks that benefit from exciting games, local businesses that profit from team wins—the list goes on. These are *actual* and *substantial* economic consequences—they easily qualify as "potential" economic consequences.

Defendants maintain (at 33) that derivatives "must serve meaningful risk-management or price-discovery interests." But the CEA requires only an association "with a potential financial consequence"—not that each transaction be used for hedging or price discovery. 7 U.S.C. § 1a(47)(A)(ii). Regardless, as the CFTC has explained, "event contracts that involve sporting events can be used for price discovery in a variety of ways," and "prediction markets allow market participants to hedge exposure to a wide array of events," including "sporting events." 91 Fed. Reg. at 35,807-08, 35,830 (citation modified); *see also* Anthony M. Diercks et al., *Kalshi and the Rise of Macro Markets*, Fed. Reserve Bd. (Feb. 12, 2026), https://perma.cc/9EY4-M3HY.

The record of hedging on Kalshi grows all the time. An insurance company "expects to hedge about $30 million annually through" Kalshi to help teams and sponsors "manage the financial risks of performance

incentives in athletes' and coaches' contracts."[3]  Businesses use Kalshi "to hedge" on promotions tied to whether particular teams win and by how much.[4]  Indeed, Defendants do not dispute that sportsbooks use Kalshi to hedge their exposure to sports events.  Defendants claim (at 44) that risks faced by sportsbooks do not count, but they offer no reason why hedging legitimate business risk should be excluded.  And while Defendants complain that these markets attract speculators, that is true of all derivatives:  The "liquidity of a futures contract, upon which hedging depends, is directly related to the amount of speculation that takes place." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 358 (1982).

Defendants argue (at 33) their extratextual gloss is needed to prevent "associated with" from becoming "meaningless."  But there is no such danger.  The swap definition excludes events without any prospect of financial consequences, subject to normal causation principles.  Kalshi accordingly does not offer trades on events that are commonly the subject of

---

[3] Andrew Ross Sorkin et al., *Hedging, not betting, on sports via prediction markets*, N.Y. Times DealBook (Feb. 10, 2026), https://perma.cc/VP2T-NLP5.

[4] Ben Shimkus & Jack Newsham, *An NYC bar promised free drinks if the Knicks win.  Its owner is using Kalshi to hedge the risk.*, Bus. Insider (June 2, 2026), https://perma.cc/SFR4-EBKM; Anna Spiegel, *Exclusive: This D.C. bar will pay your tab if Team USA wins a World Cup game*, Axios D.C. (June 17, 2026), https://perma.cc/9UU4-H679.

sportsbook bets—from the winner of a coin flip to the color of a Gatorade shower. And the CFTC is in the process of imposing still more limits by rulemaking—including limits on contracts that turn on "random chance" or "a discrete action, event, or occurrence in a game." 91 Fed. Reg. at 35,860.

Defendants suggest (at 35) this Court can affirm if it views *any* Kalshi contract as "not sufficiently associated with economic consequences." The Court should reject this bait-and-switch. Defendants maintained below that "Kalshi's sports-gaming products are not swaps"—period. Opp. to Prelim. Inj., R.31, PageID#393-395. The district court agreed. Defendants could have opposed a preliminary injunction only as to certain contracts they claimed were not swaps, which would have enabled Kalshi to respond. They chose instead to make a categorical argument. They cannot now demand that Kalshi's reply brief substantiate the economic consequences of thousands of unidentified contracts.

*"Events."* Defendants argue (at 35-37) that an "event" cannot be an "outcome." That contention is meritless. Dictionaries define "event" to include an "outcome." *E.g.*, *Event*, Random House Webster's Unabridged Dictionary (2d ed. 2001). Defendants' own dictionary (at 62) defines an "event" as "a happening or occurrence." *Event*, Webster's New World Dictionary of American English (3d Coll. ed. 1988). Nothing about these

12

definitions supports Defendants' attempt to exclude outcomes, which would contravene precedent and raise intractable interpretive difficulties. *See* 73 Fed. Reg. at 25,669 (event contracts may be based on "the outcome of particular entertainment events"); 91 Fed. Reg. at 35,863 ("every event contract stakes value on a contingent outcome").

Defendants note (at 35) the swap definition refers to " 'the occurrence' of 'an event' " and posit that "occurrence" and "event" must have different meanings.    But no one disputes that they have different meanings. "Occurrence" means "the act or fact of occurring," *Occurrence*, Webster's New World Dictionary of American English (3d Coll. ed. 1988), whereas "event" is the thing that occurs.  The general principle that "differences in language" generally "convey differences in meaning," *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 86 (2017), therefore supports Kalshi, not Defendants, because the swap definition refers to the "*extent of the occurrence* of an event *or contingency*," which underscores the breadth of the definition.  7 U.S.C. § 1a(47)(A)(ii) (emphases added).

*"Context."*    Everything about the six-part definition of "swap" evidences Congress's intent to define the term broadly.  Section 1a(47)(A)(iv) sweeps in any agreement "that is, or in the future becomes, commonly known to the trade as a swap."    Subsection (vi) captures "any combination or

13

permutation of" any agreement described in the other subparts. Meanwhile, Congress specified exclusions from the definition, *id.* § 1a(47)(B), and authorized the CFTC and SEC to "further define" swap by regulation, *see* 15 U.S.C. § 8302(d)(1), underscoring that it did not want courts to add limitations of their own. *See TRW Inc. v. Andrews*, 534 U.S. 19, 28 (2001) (where Congress enumerates express exceptions, courts generally should not imply additional ones).

Defendants are wrong (at 39) that adhering to Section 1a(47)(A)(ii)'s plain meaning would result in superfluity. Subpart (ii) captures "event"-based swaps not necessarily captured by other subparts. To be sure, subpart (ii) overlaps with other subparts, but overlap is inevitable even under Defendants' reading, because the swaps identified in subpart (iii)—such as "interest rate swap[s]" and "credit default swap[s]"—overlap entirely with subpart (iv), which includes any agreement "known to the trade as a swap." This necessary overlap confirms that Congress intended the term to apply broadly.

Defendants err in contending (at 39) that "surrounding" words must "cabin" the meaning of subsection 1a(47)(A)(ii) to events "inherent[ly]" associated with financial consequences. Subpart (iii) also includes

14

instruments like "weather swap[s]" and "metal swap[s]," but weather and metal are not inherently financial.

Defendants contend (at 40) that "[n]obody thought that 'sports betting gone wrong' caused the financial crisis." But statutes often reach beyond the "principal evil" that animated them, and "it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998). In any event, congressional debates in the runup to Dodd-Frank frequently referenced "gambling with credit default swaps" to explain why "Wall Street reform" was needed. 156 Cong. Rec. S3063 (daily ed. May 4, 2010) (statement of Sen. Boxer). Congress has always been aware of potential overlap between derivatives and gambling, and responded in Dodd-Frank by giving the CFTC jurisdiction over swaps involving "gaming." 7 U.S.C. § 7a-2(c)(5)(C).

***The CFTC's position.*** The CFTC's recent NPRM confirms that sports events "generate billions of dollars in economic activity" and that sports-event contracts are "swaps." 91 Fed. Reg. at 35,807. It further explains that many sports-event contracts "can be operated consistent with the public interest," *id.* at 35,836, while proposing to prohibit sports-event contracts that "present a particular risk of manipulation or market

15

disruption," *id.* at 35,829.   That exhaustive proposed regulation refutes Defendants' assertion of concurrent jurisdiction.

Defendants respond (at 10) by accusing the CFTC of changing positions.    But the CFTC has *always* maintained that its exclusive jurisdiction preempts state regulation of on-DCM trading.  In the 1970s, the CFTC recognized that the CEA "preempt[s]" state laws as to DCM-traded instruments—including laws that would bar futures as "illegal gambling contracts."  Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657, 700 (1982) (citation modified).  In 2008, the CFTC recognized that the "CEA supersedes and preempts other laws, including state and local gaming and bucket shop laws, with respect to transactions executed on ... a Commission-regulated market."  73 Fed. Reg. at 25,673.  And the CFTC told the D.C. Circuit two years ago—when litigating against Kalshi—that "due to federal preemption, event contracts never violate state law when they are traded on a DCM."  Appellant Br. 27, *KalshiEX v. CFTC*, No. 24-5205 (D.C. Cir. Oct. 16, 2024), 2024 WL 4512583.

The CFTC previously *proposed* prohibiting gaming contracts as contrary to the public interest under the Special Rule.  But that proposal, which was never implemented, depended on the premise that the CFTC possessed jurisdiction over those contracts in the first place.  It did not

suggest that states possessed jurisdiction—indeed, it made clear that the CFTC's "exclusive jurisdiction … preempt[s] the application of state law." Event Contracts, 89 Fed. Reg. 48,968, 48,977 & n.84 (June 10, 2024). The CFTC no longer seeks to categorically prohibit gaming contracts, but that is not a change in its understanding of its jurisdiction.

***D.C. Litigation.*** Defendants are wrong that Kalshi's position is inconsistent with its position before the D.C. Circuit. That litigation concerned whether Kalshi's election contracts involved gaming and thus could be subject to public-interest review under the Special Rule. Kalshi distinguished election contracts—which did not even trigger the Special Rule—from sports-event contracts and explained that the Special Rule "empower[ed] the CFTC to at least *review* the category of game-based contracts." Appellee Br. 45, *KalshiEX LLC v. CFTC*, No. 24-5205 (D.C. Cir. Nov. 15, 2024), 2024 WL 4802698. Kalshi never suggested that sports-event contracts fall outside of CFTC jurisdiction, and instead confirmed that "the CFTC's 'exclusive jurisdiction' over the derivatives markets preempts any state law that purports to prohibit the trading of a contract on a regulated exchange." *Id.* at 31. That is the same position Kalshi takes here.

17

### C.    Defendants' Reliance On Extratextual Canons Fails.

In contending that Kalshi's contracts are not within CFTC jurisdiction, Defendants rely heavily (at 27) on "the federalism canon and the major-questions doctrine." But Defendants' predicate for invoking these canons is a strawman. Defendants assert that treating Kalshi's contracts as swaps would eliminate *all* state authority to regulate gambling. That is emphatically incorrect.

As Kalshi explained in its opening brief (at 50-52), the CEA does not preempt all sports gambling laws. Instead, it makes the CFTC the sole regulator of on-DCM transactions while making clear that nothing in Section 2 shall otherwise "restrict" state authorities "from carrying out their duties and responsibilities in accordance with [state] laws." 7 U.S.C. § 2(a)(1)(A). Nor does the CEA govern transactions like sports bets that are not traded. Opening Br. 51. Section 2(e)'s general requirement that swaps be executed on-DCM therefore has no application to ordinary sports bets and poses no threat to state regulation of sports betting.

Defendants fail to engage with these arguments. They assume (at 29) without explanation that if Kalshi's contracts are swaps, then so are all sports bets. But that ignores the "key" distinction the CFTC has drawn—pursuant to an express delegation of authority, 15 U.S.C. §8302(d)(1)—between

18

instruments that are "traded on an organized market or over-the-counter" (like event contracts) and those that are not (like sports bets). 77 Fed. Reg. at 48,247-48. This Court has treated that tradability distinction as crucial in distinguishing between futures contracts (which must be traded on DCMs) and forward contracts (which need not be). *CFTC v. Erskine*, 512 F.3d 309, 325 (6th Cir. 2008) (contracts were forwards, not futures, when they were "not traded on an exchange" or "fungible"). Defendants do not respond.

Defendants' position (at 29) that tradability is irrelevant would have dramatic consequences. Most notably, state insurance regulation would vanish. Insurance contracts fall comfortably under the swap definition as Defendants read it because they allow the insured to recover if a financially significant "event" occurs. 7 U.S.C. § 1a(47)(A)(ii). But if insurance contracts are "swap[s]," they cannot be "considered to be insurance" or "regulated as … insurance contract[s]" under state law. *See id.* § 16(h)(2). Dodd-Frank did not replace insurance regulation with derivatives regulation. As the CFTC has recognized, an insurance contract is not a swap because "insurance products traditionally … are not traded on an organized market or over the counter." 77 Fed. Reg. at 48,214-15. The same rationale applies here.

The tradability distinction puts to rest Defendants' invocation of the federalism canon and major-questions doctrine. Preemption here would not

19

(at 28) cause states to "effectively lose their sports-betting authority," and would not "significant[ly] change" the balance of authority between the state and federal governments. Instead, recognition of preemption simply means states cannot regulate on-DCM trading, which has been uncontroversial for decades.[5]

## II. THE CEA PREEMPTS STATE GAMBLING LAW AS TO TRADING ON DCMS.

Defendants contend that the CEA does not preempt state law even as to instruments subject to the CFTC's exclusive jurisdiction. Late in their brief, however, Defendants concede (at 47) that the CEA *does* preempt "state regulation of traditional derivatives." That is a striking concession. It confirms that the CEA preempts the application of state laws to instruments subject to CFTC jurisdiction, and that Defendants' preemption arguments merely repackage their assertion that Kalshi's contracts are not swaps. Defendants' efforts to dispute preemption fail.

---

[5] While this Court need not resolve the issue, Defendants err in contending that Kalshi's contracts are not futures or options in "excluded commodities." Since 2000, excluded commodities have included intangibles, including "occurrence[s]" that are "associated with a financial, commercial, or economic consequence." 7 U.S.C. §1a(19)(iv). The CFTC therefore recognized in 2008 that "[e]vent contracts" can "exhibit the attributes of either options or futures contracts." 73 Fed. Reg. at 25,670. Defendants' argument (at 40) that estoppel prevents Kalshi from arguing that its contracts are swaps is meritless. An argument in the alternative is not a basis for estoppel.

***Express Preemption***.  The district court's only basis for rejecting express preemption was that Kalshi waived the argument.  Defendants do not defend that conclusion, no doubt because Kalshi has always argued that Congress preempted state law "expressly in the text of the CEA."  Mot. for Prelim. Inj., R.11, PageID#227.

Defendants rely (at 58-60) on a presumption against preemption.  But courts "do not invoke any presumption against pre-emption" where a statute "contains an express pre-emption clause."  *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016) (citation modified).  Defendants strain to distinguish *Puerto Rico* (at 59) on the ground that this case implicates "historic police powers."  But so did *Puerto Rico*, which involved "States' reserved powers over their municipalities"—another historic police power.  *Id*. at 121.  Defendants have even less to say about *Churchill Downs Technology Initiatives Co. v. Michigan Gaming Control Board*, 162 F.4th 631 (6th Cir. 2025), which held that "the presumption against preemption doesn't apply" because the "plain text" of federal law required preemption and "the regulation of *interstate* gambling isn't a traditional area of state regulation."  *Id*. at 641 n.5.  With no way to distinguish this holding, Defendants disparage it (at 59) as "*dicta*."  To the contrary, it was a holding necessary to the Court's conclusion that state law was preempted.

21

Defendants contend (at 46) that the grant of "exclusive jurisdiction" to the CFTC does not preempt state law. But of course it does. "Exclusive" means "[n]ot divided or shared with others." *Exclusive,* American Heritage Dictionary (1980). Defendants label (at 46) Section 2(a) "an unusual express-preemption provision," but preemption does not require "a particular linguistic formulation." *Coventry Health Care of Mo., Inc. v. Nevils*, 581 U.S. 87, 99 (2017). They attempt to distinguish (at 51-52) some exclusive-jurisdiction cases as involving courts rather than agencies, but fail to explain why that distinction matters. And they ignore cases holding that grants of "exclusive jurisdiction" *specifically to federal agencies* preempt state law. *See Heart of Am. Grain Inspection Serv., Inc. v. Mo. Dep't of Agric.*, 123 F.3d 1098, 1104 (8th Cir. 1997) (Congress intended "to preempt the field" by granting federal agency "exclusive" "jurisdiction" (citation modified)); *Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 595 (7th Cir. 2001) (statutory grant of "exclusive jurisdiction" to federal committee "preempted" state law). In fact, the Supreme Court has described "exclusive jurisdiction" as a synonym for preemption. *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 163 (2016); *see Monsanto Co. v. Durnell*, 609 U.S. ----, No. 24-1068, 2026 WL 1825691, at *5 (June 25, 2026) (state law preempted where Congress gave agency "comprehensive and exclusive authority").

22

Defendants contend (at 46) that the CFTC's exclusive jurisdiction "is arguably more about the relationship between federal actors." But (as the noncommittal phrasing suggests) that contention is mistaken. If state authorities could regulate on-DCM trading, the CFTC's jurisdiction would not be exclusive. For decades, every court to consider the question has rejected that possibility.

Defendants argue (at 47) that even if Section 2(a) is an express-preemption provision, "courts still must examine the scope of the preemption." But the scope of preemption is defined by the CEA's text: It covers "agreements" or "transactions involving swaps or [futures]" traded on a DCM. 7 U.S.C. § 2(a)(1)(A). That forecloses Defendants' attempt to carve some state laws out from the preempted field based on extratextual assumptions about legislative intent.

Defendants rely (at 47-48) on Section 2(a)(1)(A)'s savings clauses, but these clauses further undermine Defendants' position. The first clause confirms that "State" law is not "supersede[d]" *except as hereinabove provided* by the CFTC's exclusive jurisdiction (emphasis added). Congress designed the clause to ensure that "the Commission's jurisdiction, where applicable, supersedes State as well as Federal agencies." S. Rep. No. 93-1131, at 6 (1974). The second clause preserves "jurisdiction conferred on"

23

state courts, which confirms that the CFTC's exclusive regulatory jurisdiction does not interfere with state courts' adjudicatory jurisdiction.  *See KalshiEX LLC v. Flaherty*, 172 F.4th 220, 231 (3d Cir. 2026) (noting that state court jurisdiction "does not contravene" exclusive CFTC regulatory jurisdiction). Defendants cite (at 48) *Curran*, which noted that this savings clause preserved an "implied private remedy" recognized "under the CEA."  456 U.S. at 386.  But the existence of a private remedy to enforce the CEA does not suggest that states may ban trading on DCMs.  Indeed, the CEA specifically addresses the "[j]urisdiction of [s]tates," and prohibits them from enforcing the CEA against DCMs.  7 U.S.C. §§ 13a-2(1), (7).

Defendants contend (at 48) that "other express-preemption clauses" in the CEA are the exclusive sources of preemption.  But not even Defendants agree with that contention, because they concede (at 47) that the CEA preempts "state regulation of traditional derivatives" on DCMs, and none of the express-preemption provisions on which they rely applies to traditional derivatives on DCMs.  Rather, each of these clauses preempts state law as to transactions that *need not occur on DCMs*, which is why it was necessary to specify that state law is preempted.  Sections 16(e)(2) and 27f(b) preempt state "gaming" laws as to "excluded" transactions and certain "hybrid" instruments that can occur off-DCM.  *See* 7 U.S.C. § 27c(a) (excluding most

24

"hybrid" instruments from CEA coverage). Section 16(h) prevents states from regulating swaps as insurance—even if the swaps are traded over-the-counter rather than on a DCM. Congress's enactment of these provisions turned on its recognition that "the current" CEA already "supersedes and preempts" state laws as to "transactions conducted on a" DCM. H.R. Rep. No. 106-711, pt. 2, at 71 (2000). Defendants have no response.

Defendants cite (at 48-49) *Arizona v. United States*, 567 U.S. 387 (2012), for the proposition that "Congress's choice to expressly preempt only certain categories of state laws" shows that Congress did not otherwise intend preemption. But *Arizona* held effectively the opposite: "[T]he existence of an express preemption provision does *not* bar the ordinary working of conflict preemption principles" or "make it more difficult to establish the preemption of laws falling outside the clause." *Id.* at 406 (citation modified).

***Field Preemption***. Defendants dispute field preemption principally by citing CEA provisions that preserve a role for states. The answer to each provision is the same: They all preserve a role for states *outside* the preempted field of regulating on-DCM trading. States thus may regulate off-DCM trading. 7 U.S.C. § 16(e)(1). They may enforce the CEA against entities "other than a contract market." *Id.* § 13a-2(1). They may enforce their

25

"general civil or criminal antifraud statute[s]," *id.* § 13a-2(7), which "have little or no bearing upon the actual operation of the commodity futures markets" and thus do not involve impermissible "market regulation," *Am. Agric.*, 977 F.2d at 1156. And state contract law may govern the relationship between traders on DCMs, because this does not regulate DCMs at all. None of these provisions undermines the overwhelming evidence that Congress preempted the field of regulating trading on DCMs.

Defendants ignore this evidence. They do not address the Conference Report noting Congress's intent to "preempt the field." H.R. Rep. No. 93-1383, at 35 (1974). Nor do they explain why Congress carefully limited state jurisdiction over DCMs if Congress silently intended to allow states to declare open season on on-DCM trading. 7 U.S.C. § 13a-2(1). Nor can Defendants answer the mountain of precedent holding state law "preempted" when it would "directly affect trading on or the operation of a futures market." *Am. Agric.*, 977 F.2d at 1156-57.

Defendants argue (at 52) these cases do not hold that "preemption covers sports betting." But these cases *do* hold that the CEA preempts states from regulating on-DCM trading, regardless of manner. *See Flaherty*, 172 F.4th at 228-229 (explaining that the proper field is "the regulation of trading on a DCM" rather than the broader field of "gambling"). Defendants

26

wrongly speculate (at 52) that Congress would not have intended to preempt the application of state gambling laws. As Kalshi's opening brief explained (at 7-8, 60), dozens of states a century ago sought to prohibit derivatives trading as "gambling in grain." *Dickson*, 288 U.S. at 198. Congress's grant of exclusive jurisdiction to the CFTC ended that practice, but Defendants' argument here would allow states to restore it.

***Conflict Preemption***. Defendants dispute conflict preemption principally by claiming (at 54) that "federal law"—in the form of 17 C.F.R. § 40.11—makes it "illegal to offer swaps involving gaming" on DCMs. But the CFTC "has consistently applied § 40.11 to operate a discretionary review framework rather than a self-executing *per se* prohibition, because the opposite interpretation would violate the statute." 91 Fed. Reg. at 35,815. And Rule 40.11(c) allows the CFTC (not 50 states) to "approv[e] or disapprov[e]" any contract under the Special Rule. Regardless, the CFTC is replacing Rule 40.11 with a new rule clarifying that sports-event contracts are *not* categorically prohibited and that many sports-event contracts "can be operated consistent with the public interest." 91 Fed. Reg. at 35,813, 35,836. Defendants' effort to subject Kalshi to criminal liability for offering sports-event contracts would render the CFTC's public-interest

27

determination meaningless, squarely conflicting with Congress's chosen "method of enforcement." *Arizona*, 567 U.S. at 406.

Defendants next claim (at 54-55) that Ohio's prohibition on accepting out-of-state wagers does not conflict with the CEA's impartial-access requirement, even though the CFTC has made clear that it does. CFTC Amicus Br. 23-24, Dkt. No. 31. Defendants, however, identify no DCM that has ever offered contracts state-by-state. They point to Ohio laws (at 54) allowing in-state sportsbooks to arrange with out-of-state sportsbooks to "lay[ ] off" risk, Ohio Rev. Code Ann. §§ 3775.10(C)-(D), but that provision is irrelevant. Allowing every state to prohibit trading from all out-of-state users *is* discriminatory, resulting in 50 different siloed markets rather than the nationwide market Congress required.

Defendants finally contend (at 53-54) that their effort to regulate Kalshi does not conflict with the CFTC's exclusive jurisdiction because states often "exercise concurrent jurisdiction" with the federal government. But states *do not* exercise concurrent jurisdiction when the federal government's jurisdiction is exclusive. Indeed, *Castro-Huerta*, on which Defendants rely (at 54), upheld a state's concurrent jurisdiction *only* because the statute in question *did not* "say that federal jurisdiction is exclusive." 597 U.S. at 639. The CEA reflects Congress's recognition that contract markets could not

28

function if subject to "varying and potentially contradictory legal standards." *Am. Agric.*, 977 F.2d at 1156. That is not, as Defendants assert (at 53), a "generic uniformity concern[ ]"—it was the entire point of making the CFTC's jurisdiction exclusive. *See Monsanto*, 2026 WL 1825691, at *6 (state law preempted where Congress's goal of "[u]niformity" "would otherwise be impossible to achieve"). Allowing state-by-state regulation conflicts with the CEA by creating "exactly the patchwork that Congress replaced wholecloth by creating the CFTC." *Flaherty*, 172 F.4th at 230.

***No Implied Repeal.*** Defendants are wrong (at 55) that Kalshi's position would impliedly repeal other federal laws. Federal laws must be interpreted "in the context of the *corpus juris* of which they are a part, including later-enacted statutes." *Branch v. Smith*, 538 U.S. 254, 281 (2003) (plurality op.) (Scalia, J.). Congress in UIGEA made clear that the term "bet or wager" "does not include" "any transaction" conducted on "a registered entity" under the CEA, even if the transaction stakes something of value on "a sporting event." 31 U.S.C. §§ 5362(1)(A), (E)(ii). UIGEA's exclusion of on-DCM transactions is entitled "to great weight" in resolving the meaning of prior federal gambling statutes. *Bob Jones Univ. v. United States*, 461 U.S. 574, 587 n.10 (1983) (citation omitted). That is especially so given that interpreting IGRA and the Wire Act to prohibit trading on DCMs would

29

cause them to conflict with the CEA and UIGEA, violating the obligation to "regard each as effective" to the extent they "are capable of co-existence." *United States v. Veloz-Alonso*, 910 F.3d 266, 268 (6th Cir. 2018) (citation omitted).

Defendants note (at 56) that UIGEA does not "alter[]" or "limit[]" other "gambling" laws (quoting 31 U.S.C. § 5361(b)). But Kalshi agrees that UIGEA does not limit IGRA or the Wire Act—those laws never applied to on-DCM transactions. UIGEA instead simply "sheds light upon" their meaning. *Branch*, 538 U.S. at 281 (plurality op.). Defendants offer no plausible basis to believe that Congress exempted on-DCM transactions from the reach of UIGEA—the statute specifically addressing internet gambling—if it nonetheless intended those same transactions to be subject to criminal liability under other statutes.

Nor did Dodd-Frank render the now-invalidated PASPA (at 56) "meaningless." PASPA limited the ability of *states* to legalize sports gambling—wagers against the house that occur on sportsbooks. *Murphy v. NCAA*, 584 U.S. 453, 461 (2018). The CEA, by contrast, gave the CFTC discretion whether to permit trading on a specific type of derivative—event contracts that "involve" "gaming." 7 U.S.C. § 7a-2(c)(5)(C)(i).

30

## III.   THE EQUITIES FAVOR KALSHI.

Defendants' cursory treatment of the equities is unpersuasive.  They dismiss (at 63) Kalshi's harms as "economic burdens," but they do not dispute that these burdens are both substantial and irreparable.  Nor do they dispute that courts cannot "easily compensate a movant for loss of competitive position and goodwill." *Churchill Downs*, 162 F.4th at 643.

Defendants assert (at 6) Ohio's laws protect Ohioans, including by letting people "place themselves on a voluntary exclusion list" and preventing "improper sports-betting practices."  But this Court recently rejected a nearly identical appeal to a state's "interest in regulating gambling and its residents' interest in the protections of [state] law," explaining that "it's 'always in the public interest to prevent' constitutional violations." *Id.* at 642-643 (citation omitted).  In any event, Kalshi employs Know-Your-Customer procedures, voluntary opt-outs, self-exclusions, and deposit limits.[6]  Kalshi does not offer the categories of trades to which Defendants object, and the CFTC is proposing still more prohibitions. *See* 91 Fed. Reg.

---

[6] Kalshi, *Mandatory KYC and Surveillance*, https://kalshi.com/market-integrity/kyc-surveillance (last visited June 25, 2026); Kalshi, *Responsible Trading*, https://help.kalshi.com/en/collections/18616607-responsible-trading (last visited June 25, 2026).

31

at 35,836-37.  Thus, the question is not whether Kalshi should be subject to regulation, but by whom.  Congress's clear answer was the CFTC.

## CONCLUSION

This Court should reverse.

Dated: June 25, 2026

Respectfully submitted,

/s/ *Neal Kumar Katyal*

NEAL KUMAR KATYAL
JOSHUA B. STERLING
COLLEEN E. ROH SINZDAK
WILLIAM E. HAVEMANN
SAMANTHA K. ILAGAN
MILBANK LLP
1101 New York Ave., NW
Washington, DC 20005
Telephone: (202) 835-7505
nkatyal@milbank.com

GRANT R. MAINLAND
ANDREW L. PORTER
NICOLE D. VALENTE
DAVIS CAMPBELL
MILBANK LLP
55 Hudson Yards
New York, NY 10001

MICHAEL J. HUNTER
MATTHEW L. JALANDONI
FLANNERY | GEORGALIS LLC
175 S. Third St., Ste. 285
Columbus, OH 43215

*Counsel    for    Plaintiff-Appellant KalshiEX LLC  in 26-3196*

32

## CERTIFICATE OF COMPLIANCE

I certify that this reply complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,475 words, excluding the items exempted by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(b).

This brief complies with the typeface and typestyle requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word for Office 365 in 14-point Georgia font.

June 25, 2026

*/s/ Neal Kumar Katyal*
Neal Kumar Katyal

*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system on June 25, 2026.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

June 25, 2026

/s/ Neal Kumar Katyal
Neal Kumar Katyal

*Counsel for Plaintiff-Appellant KalshiEX LLC*

# DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

Pursuant to Sixth Circuit Rule 30(g), and in addition to the documents designated in Plaintiff-Appellant KalshiEX LLC's opening brief, Plaintiff-Appellant hereby designates the following relevant district court documents:

| Record Entry Number | Description | PageID |
|---|---|---|
| 31 | Resp. in Opp'n to Prelim. Inj. | 371-418 |