**Nos. 26-5235/ 26-3196**

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

KALSHIEX LLC,

*Plaintiff-Appellant [26-3196]*,
*Plaintiff-Appellee [26-5235]*,

v.

MATTHEW T. SCHULER; THOMAS J. STICKRATH; SHEETAL BAJORIA; SCOTT P. BORGEMENKE; KEITH CHENEY; PENELOPE R. CUNNINGHAM; CHRISTOPHER SMITHERMAN; TRIFFON CALLOS; OHIO CASINO CONTROL COMMISSION; DAVE YOST, *Ohio Attorney General*,

*Defendants-Appellees [26-3196]*,

WILLIAM ORGEL, *in his official capacity as Chairman of the Tennessee Sports Wagering Council*; MARY BETH THOMAS, *in her official capacity as the Executive Director of the Tennessee Sports Wagering Council*; JONATHAN THOMAS SKRMETTI, *in his official capacity as Attorney General of Tennessee*,

*Defendants-Appellants [26-5235]*.

On Appeal from the United States District Court
for the Middle District of Tennessee
No. 3:26-cv-34

## TENNESSEE APPELLANTS' REPLY BRIEF IN NO. 26-5235

*Counsel listed on inside cover*

Jonathan Skrmetti
 Attorney General & Reporter

Aaron L. Bernard
 Assistant Solicitor General
 *Counsel of Record*

Michael Wennerlund
 Assistant Attorney General

Walker Anderson
 Honors Fellow

OFFICE OF THE TENNESSEE
ATTORNEY GENERAL & REPORTER
P.O. Box 20207
Nashville, TN 37202
(615) 532-3234
Aaron.Bernard@ag.tn.gov

*Counsel for Defendants-Appellants.*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................ 1

ARGUMENT .....................................................................................2

I.    Kalshi is not likely to succeed on the merits. ...............................2

    A.    The CEA would have to speak more clearly to cover sports gambling. ...................................................................2

    B.    Kalshi's sports-event contracts are not lawful "swaps" under the CEA...................................................................10

        1.    The CFTC has jurisdiction over "swaps," not *any* contract traded on a DCM............................................ 10

        2.    Kalshi's sports-event contracts are not "swaps."......... 12

    C.    The CEA does not preempt Tennessee law. .........................20

        1.    The CEA does not expressly preempt Tennessee law ........................................................... 21

        2.    The CEA does not field preempt Tennessee law. ........ 25

        3.    There is no conflict preemption. ................................27

    D.    Kalshi is unlikely to demonstrate a cause of action or overcome Tennessee's sovereign immunity.........................32

II.    The remaining preliminary injunction factors favor Tennessee...33

III.    At minimum, the district court erred by granting broader relief than necessary. ...................................................................34

CONCLUSION .................................................................................34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Agric. Movement, Inc. v. Bd. of Trade of City of Chi.*,
977 F.2d 1147 (7th Cir. 1992) ........................................................24, 26

*Am. Energy Corp. v. Rockies Express Pipeline LLC*,
622 F.3d 602 (6th Cir. 2010) ..............................................................22

*Bates v. Dow Agro. LLC*,
544 U.S. 431 (2005) ..............................................................................28

*Bond v. United States*,
572 U.S. 844 (2014) ............................................................................3, 8

*Buetenmiller v. Macomb Cnty. Jail*,
53 F.4th 939 (6th Cir. 2022) ...............................................................12

*CFTC v. Erskine*,
512 F.3d 309 (6th Cir. 2008) .................................................................6

*Chevron v. Plaquemines Par.*,
146 S.Ct. 1052 (2026) ...........................................................................13

*Chi. Mercantile Exch. v. SEC*,
883 F.2d 537 (7th Cir. 1989) ...............................................................23

*Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.*,
162 F.4th 631 (6th Cir. 2025) ..............................................................20

*Cisco Sys., Inc. v. Doe I*,
No. 24-856, 2026 WL 1791225 (U.S. June 23, 2026) ......................21, 33

*Doe v. Lee*,
137 F.4th 569 (6th Cir. 2025) ..............................................................32

*Duke Energy Trading & Mktg., LLC v. Davis,*
  267 F.3d 1042 (9th Cir. 2001) .......................................................23

*FS Credit Opportunities Corp. v. Saba Capital Master*
  *Fund, Ltd*, 146 S.Ct. 1546 (2026) .............................................25, 32, 33

*FTC v. Ken Roberts Co.,*
  276 F.3d 583 (D.C. Cir. 2001) .......................................................23

*Fulgenzi v. PLIVA, Inc.,*
  711 F.3d 578 (6th Cir. 2013).........................................................31

*Heart of Am. Grain Inspection Serv., Inc. v. Mo. Dep't of Agric.,*
  123 F.3d 1098 (8th Cir. 1997).......................................................23

*Hencely v. Fluor Corp.,*
  146 S.Ct. 1086 (2026).................................................................32

*Hughes v. Talen Energy Mktg., LLC,*
  578 U.S. 150 (2016)...................................................................23

*John Doe Agency v. John Doe Corp.,*
  493 U.S. 146 (1989)...................................................................17

*KalshiEX, LLC v. Hendrick,*
  817 F.Supp.3d 1014 (D. Nev. 2025)........................................ 12, 16, 34

*Kansas v. Garcia,*
  589 U.S. 191 (2020)........................................................ 22, 25, 30, 32

*L.W. v. Skrmetti,*
  83 F.4th 460 (6th Cir. 2023) .......................................................2, 15

*Leist v. Simplot,*
  638 F.2d 283 (2d Cir. 1980) .........................................................23

*Merck Sharp & Dohme Corp. v. Albrecht,*
  587 U.S. 299 (2019)...................................................................31

iii

*Mississippi v. Louisiana,*
  506 U.S. 73 (1992)..................................................................22

*Monsanto Co. v. Durnell,*
  No. 24-1068, 2026 WL 1825691 (U.S. June 25, 2026)........................29

*N. Am. Derivatives Exch., Inc. v. Nevada,*
  815 F.Supp.3d 1169 (D. Nev. 2025)................................................ 13, 14

*Oneok, Inc. v. Learjet, Inc.,*
  575 U.S. 373 (2015)..............................................................20, 26

*Rasmussen v. Thomson & McKinnon Auchincloss
  Kohlmeyer, Inc.,* 608 F.2d 175 (5th Cir. 1979) ....................................24

*Sackett v. EPA,*
  598 U.S. 651 (2023)...................................................................3

*Salazar v. Paramount Glob.,*
  133 F.4th 642 (6th Cir. 2025) ............................................................17

*Slaney v. Int'l Amateur Ath. Fed'n,*
  244 F.3d 580 (7th Cir. 2001)..............................................................23

*Smith v. Montgomery Ward & Co.,*
  388 F.2d 291 (6th Cir. 1968)..............................................................12

*State ex rel. Dist. Att'y Gen. v. Crescent Amusement Co.,*
  95 S.W.2d 310 (Tenn. 1936)................................................................7

*Tennessee v. FCC,*
  832 F.3d 597 (6th Cir. 2016).........................................................8, 9

*Transcon. Gas Pipe Line Co. v. Pa. Env't Hearing Bd.,*
  108 F.4th 144 (3d Cir. 2024)............................................................22

iv

*United States v. Brien,*
   617 F.2d 299 (1st Cir. 1980) .................................................................23

*USFWS v. Sierra Club, Inc.,*
   592 U.S. 261 (2021) ..........................................................................27

*Va. Uranium, Inc. v. Warren,*
   587 U.S. 761 (2019) ..........................................................................30

*Watson v. RNC,*
   24-1260, 2026 WL 1855462 (U.S. June 29, 2026) .................... 13, 29, 31

*West Virginia v. EPA,*
   597 U.S. 697 (2022) ...........................................................................2

*Wyeth v. Levine,*
   555 U.S. 555 (2009) ............................................................... 21, 28, 31

**Federal Statutes**

7 U.S.C. §1a(47)(A) ............................................................... *passim*

7 U.S.C. §2 ..........................................................................................23

7 U.S.C. §2(a)(1)(A) ............................................................... *passim*

7 U.S.C. §2(a)(3) .................................................................................29

7 U.S.C. §2(e) ............................................................................. 1, 4, 5

7 U.S.C. §6(a) .......................................................................................4

7 U.S.C. §7a-2(c)(5)(C)................................................................ 18, 19

7 U.S.C. §7a-2(c)(5)(C)(i) .................................................................20

7 U.S.C. §13a-2(1)..............................................................................12

v

7 U.S.C. §16(e)(2) ........................................................................24

7 U.S.C. §16(h) ............................................................................24

7 U.S.C. §136v(b) .........................................................................29

7 U.S.C. §269 ...............................................................................23

16 U.S.C. §824d(a) .......................................................................23

18 U.S.C. §1084 ...........................................................................10

18 U.S.C. §1953(a) .......................................................................10

18 U.S.C. §1955(b)(1)(i) ..............................................................10

31 U.S.C. §5361(b) .........................................................................9

31 U.S.C. §5362(1)(E)(ii) ...............................................................9

## State Law

Tennessee Code Ann. §4-49-111(a) ..............................................30

## Regulations

17 C.F.R. §40.11(a) ................................................................27, 29

17 C.F.R. §40.11(a)(1) .................................................................27

17 C.F.R. § 38.4(b) .......................................................................12

## Dictionaries

*Webster's New Collegiate Dictionary* (7th ed. 1969) ..............................13

**Other Authorities**

Brett, *Kalshi 'Death Bet' Lawsuit Sparks Push To Ban
  Assassination Markets*, Forbes (Mar. 12, 2026) ....................................11

*Further Definition of "Swap,"*
  77 Fed. Reg. 48,208 (Aug. 13, 2012) ......................................................5

Gouker, *Are We Really Regulating Sports Betting With Just One
  CFTC Commissioner?*, Event Horizon (June 22, 2026) ........................29

Gouker, *Most Of Kalshi's Recent Volume Growth Comes From
  Parlays*, Event Horizon (May 6, 2026)...................................................14

Kalshi CFTC Comment Letter, (April 30, 2026) ...................................14

Oral Argument, *N. Am. Derivatives Exch., Inc. v. Nevada*,
  No. 25-7187 (9th Cir. Apr. 16, 2026) .............................................6, 28

*Prediction Markets; Public Interest Determinations*,
  91 Fed. Reg. 35,806 (June 12, 2026)....................................................28

## INTRODUCTION

Dodd-Frank didn't secretly legalize sports wagering nationwide. But as Kalshi tells it, that elephant is hidden in the mousehole of Dodd-Frank's generic "swap" definition.  That's wrong.  Since the dawn of the Republic, States have regulated gambling.  Dodd-Frank lacks the unmistakable clarity needed to undo that settled framework.

Kalshi bends over backwards to avoid the consequences of its argument, insisting its position doesn't hand all regulatory control over consumer sports betting to the CFTC.  But 7 U.S.C. §2(e) is clear—if Kalshi is right that "sports-event contracts" are "swaps," then all consumer sports bets *must* trade on a CFTC-designated contract market (DCM).

Good thing Kalshi is mistaken.  Kalshi's bets aren't "swaps" under Dodd-Frank.  Kalshi doesn't even contest (because it can't) that a large swath of its bets—like 30-leg parlays and mentions markets—have *no* economic consequences.  That credibility killing silence shows Kalshi isn't entitled to the district court's all-encompassing injunction.

Even if Kalshi's bets were "swaps" (they aren't), its claims still fail. The Commodity Exchange Act's (CEA) jurisdiction clause isn't an express preemption provision, nor is there implied field or conflict preemption.

1

## ARGUMENT

### I.   Kalshi is not likely to succeed on the merits.

To prevail, Kalshi must make "a clear showing" that (1) its sports-event contracts are swaps, (2) Tennessee law is preempted, and (3) it has a cause of action. *L.W. v. Skrmetti*, 83 F.4th 460, 471 (6th Cir. 2023) *aff'd sub nom. United States v. Skrmetti*, 605 U.S. 495 (2025). Kalshi isn't likely to succeed on *any* ground, let alone score that hat trick.

### A.   The CEA would have to speak more clearly to cover sports gambling.

The Supreme Court has repeatedly instructed that absent unmistakably clear text, courts shouldn't read a statute to delegate authority to an agency on a major question, displace traditional State authority, nor read statutes to impliedly repeal other laws. Yet Kalshi would have this Court do all three.

Under Kalshi's expansive readings of 7 U.S.C. §1a(47)(A)(ii)'s "swap" definition and the CEA's "exclusive jurisdiction" clause, *id.* §2(a)(1)(A), the CFTC would transform into the nation's sole sports wagering regulator. That question of "vast economic and political significance" requires an unambiguous congressional command. *West Virginia v. EPA*, 597 U.S. 697, 716 (2022) (citation omitted); *see* Tennessee-Br.34-

2

37. Unmistakable clarity is especially required because Kalshi's position "significantly alter[s] the balance between federal and state power," *Sackett v. EPA*, 598 U.S. 651, 679 (2023) (citation omitted), in an "area[] of traditional state responsibility." *Bond v. United States*, 572 U.S. 844, 858 (2014); *see* Tennessee-Br.37-38. And its reading would impliedly repeal longstanding federal wagering laws. Tennessee-Br.38-40.

Because Dodd-Frank's text cannot satisfy any clear statement requirement, these well-settled rules doom Kalshi's case. *Id.* at 40-41. Kalshi's arguments to the contrary fail to establish otherwise.

***Major Questions***. According to Kalshi, because the CFTC has authority only over "DCM-traded event contracts (but not off-DCM transactions)," its reading "does not result in an extraordinary grant of regulatory authority to the CFTC or use vague language to entrust to the CFTC decisions of vast economic and political significance." Kalshi-Br.49-50. (cleaned up). To justify that position, Kalshi repeatedly presses the distinction between what it terms "run-of-the-mill sports bets" and DCM-traded swaps. *Id.* at 48; *see id.* at 18, 24, 30-31, 53-54 (similar).

That distinction is illusory. Kalshi's position represents an earthquake to State regulation over *billions of dollars* in sports wagers.

3

*First*, Kalshi ignores 7 U.S.C. §2(e)'s requirement that consumer swaps be traded on a DCM. Dodd-Frank made it "unlawful for any person … to enter into a [consumer] swap unless the swap is entered into on, or subject to the rules of, a [DCM]." 7 U.S.C. §2(e); *id.* §6(a), 6(c)c (doing the same for futures and options). So if Kalshi is right that sports wagers satisfy Dodd-Frank's "swap" definition, they *must* be traded on a DCM. Tennessee-Br.35-36; *see* Gensler-Br.19. There could be no legal off-DCM sports bets. *Contra* Kalshi-Br.48-49.

Kalshi (at 48) tries to escape those consequences by arguing that "Section 2(a)(1)(A)'s savings clause" "leaves states free to regulate off-DCM transactions like bets offered by sportsbooks." But §2(e) makes it "unlawful for *any person*" "to enter into a [consumer] swap unless" it's on a DCM. 7 U.S.C. §2(e) (emphasis added). No individual or sports book *could* offer any such non-DCM wager. AGA-Tennessee-Br.21-22. Kalshi's promise of residual State authority is an empty one. *Id.*

Kalshi also (at 48-49) claims that under a CFTC rulemaking, off-DCM transactions are not "swaps." But the cited rule rejected "a bright-line test for determining whether a particular consumer or commercial arrangement is a swap." *Further Definition of "Swap,"* 77 Fed. Reg.

4

48,208, 48,248 (Aug. 13, 2012). Trading on a DCM is just one element in a multifactor test. *Id.* If anything, this proves that Kalshi's reading would make the CFTC the nation's sole sports wagering regulator because the agency would apply that multifactor test to *every* sports bet. *Contra* Kalshi-Br.48-49. Beyond that, Kalshi can't use this rule to contradict Dodd-Frank's plain text, which requires DCMs to trade *all* consumer swaps. 7 U.S.C. §2(e).

*Second*, Kalshi draws a meaningless distinction between its offerings and what it terms "run-of-the-mill sports bets," Kalshi-Br.48, arguing that its contract "prices [are] established by the market according to supply and demand" but "[n]ot so for sports bets, where the sportsbook is the counterparty." *Id.* at 49.[1]  And the CFTC says Tennessee's major questions argument "is a brick" because it doesn't account for the sportsbook-v.-market distinction. CFTC-Tennessee-Br.11.

But nothing in Dodd-Frank's "swap" definition, 7 U.S.C. §1a(47)(A), requires this distinction. *Id.* To the contrary, "[i]t is the terms of the instrument, not the type of counterparties that enter into it or the venue

---

[1] As a factual matter, this appears to be false. Kalshi often acts as the counterparty to retail traders. *See* AGA-Tennessee-Br.12; Better-Markets-Br.19-20.

5

in which it is entered, that determines whether it is a swap." Gensler-Br.18-19. Kalshi's reliance (at 49) on *CFTC v. Erskine*, 512 F.3d 309 (6th Cir. 2008), highlights the imagined nature of Kalshi's sportsbook-vs.-market distinction. That pre-Dodd-Frank case dealt with an "undefined" term, *id.* at 323, but Dodd-Frank has a detailed "swap" definition, 7 U.S.C. §1a(47)(A). And §1a(47)(A) says nothing about sportsbooks-vs.-markets.

Sports wagering, likewise, doesn't lend itself to this distinction. Not all sports bets involve a sportsbook. Pari-mutuel wagering, commonly used in horse racing, are pools of bets between parties. *See* Tennessee-Br.18. That's exactly what Kalshi facilitates—there is nothing novel about it. And courts have long rejected creative evasions of State gambling laws "even though" a scheme might be in "gentleman's dress." *State ex rel. Dist. Att'y Gen. v. Crescent Amusement Co.*, 95 S.W.2d 310, 311 (Tenn. 1936).

The upshot: Kalshi's made up sportsbook-vs.-market distinction is "sophistry to the nth degree." Oral Argument at 8:30-36, *N. Am. Derivatives Exch., Inc. v. Nevada*, No. 25-7187 (9th Cir. Apr. 16, 2026),

6

https://www.youtube.com/watch?v=JOCrxsSR-OU (hereinafter "Ninth Circuit Oral Argument").[2]

*Third*, regardless of the supposed on-vs.-off-DCM and sportsbook-vs.-market distinctions, this is a major questions case. *See* Tennessee-Br.36 n.3. A massively expanded role for the CFTC and the nationwide legalization of sports wagering are questions of "vast economic and political significance." *Contra* Kalshi-Br.49-50 (citation omitted).

Kalshi's few attempts to diminish the political and economic salience of this case are hard to take seriously. *For one*, sports wagering regulation has always been a politically significant issue. Tennessee-Br.34-35. And the political impact of this case is undeniable. The engagement of 43 States and dozens of tribes in this case alone belies Kalshi's 'nothing-to-see-here' attitude. *For two*, there are billions of dollars annually wagered on sports, and Kalshi itself devotes a lengthy portion of its swap argument to the various financial and economic consequences of sports wagering. Kalshi-Br.44-46. Although its sports-event contracts don't meet 7 U.S.C. §1a(47)(A)(ii)'s text, *see infra* 12-20, Kalshi

---

[2] The Coalition for Prediction Markets, of which "Kalshi is a [] member," CPM-Br.1 n.1, helpfully concedes that the sportsbook-vs.-market distinction has "no legal significance." *Id.* at 20.

7

cannot credibly rely on sports events' multi-billion-dollar economic impact yet still claim this isn't a major questions case. Because the legalization of sports gambling is a major question, Dodd-Frank would've had to speak clearly to effect it. It didn't. That fells Kalshi's case.

***Federalism***. Dodd-Frank likewise lacks the exceedingly clear language necessary to intrude so deeply into an "area[] of traditional state responsibility" like gambling regulation. *Bond*, 572 U.S. at 858; *see* Tennessee-Br.37-38; Ohio-Br.25-26; States-Br.13-16. Kalshi says almost nothing in response. Its brief contains a single reference in a conclusory assertion that "federalism[-based]" arguments "fail." Kalshi-Br.49. It doesn't meaningfully dispute the States' longstanding regulation of sports gambling.

On that score, Kalshi's barebones attempt to distinguish *Tennessee v. FCC*, 832 F.3d 597 (6th Cir. 2016), makes no sense. Kalshi (at 50) just repackages its erroneous express preemption argument that jurisdiction means preemption. That's wrong on its own terms. *See infra* 25-32. And it's even more erroneous in the context of the federalism "clear statement rule," which treats intrusions "with great skepticism" and counsels for "read[ing statutes] in a way that preserves a State's" historic powers.

8

*Tennessee*, 832 F.3d at 613 (citation omitted).  The same is true here.  *Id.* The federalism canon precludes Kalshi's reading that extinguishes so much historic State police power.

**_Implied Repeals_**.  Kalshi's rule would nullify much of existing federal gambling law, and it's impossible to square with *Murphy* and PASPA.  Yet Kalshi (at 31, 59) says the Unlawful Internet Gambling Enforcement Act (UIGEA) defines "bet or wager" to exclude transactions on designated contract markets.  *Id.* (citing 31 U.S.C. §5362(1)(E)(ii)).  Because UIGEA was passed later in time, Kalshi (at 59) says the Wire Act and IGRA should be construed "to exclude on-DCM trading."  But UIGEA, *by its own text*, doesn't "alter[]" or "limit[]" other federal or State "gambling" laws.  31 U.S.C. §5361(b).  Kalshi omits the parts of UIGEA's text that contradict its argument.  *See id.*[3]

In truth, the Wire Act and the IGRA have long tied federal illegality to state law.  *See* Tribes-Br.7-20.  That notion was central to the Supreme Court's decision in *Murphy*.  Tennessee-Br.39.  Indeed, Kalshi's position

---

[3] For that same reason, Kalshi's attempt (at 50) to distinguish *Brown & Williamson* using its skewed reading of UIGEA goes nowhere.

9

would legalize bets that are otherwise illegal under federal law, because they aren't lawful within their respective States. *Contra* 18 U.S.C. §1084; *id.* §§1953(a), 1955(b)(1)(i) (similar). Dodd-Frank lacks the unmistakable clarity to impliedly repeal these laws; for this reason too, Kalshi loses.

\* \* \*

Had Congress wanted to transfer sports gambling regulation (in whole or in part) to the CFTC, it would've used unmistakably plain language. Yet Kalshi points to no such clear language, just an aggressive reading of the generic "swap" definition and a jurisdictional clause. In the face of clear statement rules, that isn't enough. Tennessee-Br.40-41.

### B.  Kalshi's sports-event contracts are not lawful "swaps" under the CEA.

Clear statement rules aside, Kalshi fails to establish that any of its sports-events contracts are "swaps"—let alone that all of them are. But for Kalshi to prevail, it also must demonstrate that *all* of its sports-event contracts qualify as "swaps." Tennessee-Br.43. They do not.

#### 1.  The CFTC has jurisdiction over "swaps," not *any* contract traded on a DCM.

Kalshi (at 38) makes a threshold argument that "the CFTC's exclusive jurisdiction covers *all* DCM-traded instruments," regardless of

10

whether a contract falls within the statutory definition of a "swap." But the CEA says nothing of the sort. It grants the CFTC "exclusive jurisdiction" over "accounts, agreements … and transactions involving swaps or contracts of sale of a commodity for future delivery … traded or executed" on a DCM. 7 U.S.C. §2(a)(1)(A). The statute requires that a contract *both* "involv[e]" a "swap" *and* be traded on a DCM. *See* Ohio-Br.41-43; *cf.* Gensler-Br.16 n.15. Proving the point, if Kalshi (at 38) was right that "*all* DCM-traded instruments" trigger CTFC's exclusive jurisdiction, there would be no need for §2(a)(1)(A) to clarify that the "exclusive jurisdiction" extends only to specific accounts, agreements, and contracts, including "swaps" and nine other distinct agreements. *See* 7 U.S.C. §2(a)(1)(A) (covering "an 'option', 'privilege', 'indemnity', 'bid', 'offer', 'put', 'call', 'advance guaranty', or 'decline guaranty'").

When combined with Kalshi's preemption argument, the consequences of its position are striking. In its view, Kalshi (at 38) can list a murder-for-hire contract on its DCM, and the *only* possible consequence would be the CFTC removing the contract. This isn't a fanciful hypothetical. *Cf.* Brett, *Kalshi 'Death Bet' Lawsuit Sparks Push To Ban Assassination Markets,* Forbes (Mar. 12, 2026), https://perma.cc/63GW-W25M.

11

Under Kalshi's extreme position, no State could regulate that contract because it was listed on a DCM.[4]  That can't be right, and thankfully, it isn't.  Section 2(a)(1)(A)'s text doesn't command such an absurd result.

### 2.   Kalshi's sports-event contracts are not "swaps."

Kalshi's sports-events contracts don't meet Dodd-Frank's swap definition.[5]  They don't depend on the "occurrence," 7 U.S.C. §1a(47)(A)(ii), of a sports event, i.e., the event *taking place*.  Rather, they depend on the *result* of a sports event, i.e., its outcome.  *See* Tennessee-Br.25-27.  And these contracts aren't "associated with a potential financial, economic, or commercial consequence."  7 U.S.C. §1a(47)(A)(ii); Tennessee-Br.27-29.

---

[4] Kalshi's (at 39-40) invocation of the APA and 7 U.S.C. §13a-2(1) (at 29-30, 55) is no response because Tennessee seeks to enforce State law, not the CEA.  *See infra* 20-21, 26.

[5] Kalshi has consistently maintained that its sport-events contracts are swaps and certified them to the CFTC as such.  Bechtel-Decl.Ex.H, R.36-8, 420-21; *see* 17 C.F.R. § 38.4(b).  In a footnote Kalshi suggests now that they also might be "future[s]" or "option[s]."  Kalshi-Br.40 n.4.  That hail-mary fails three times over.  Kalshi's "mention [of] a possible argument in the most skeletal way" is forfeited.  *Buetenmiller v. Macomb Cnty. Jail*, 53 F.4th 939, 946 (6th Cir. 2022) (citation omitted).  Kalshi certified to the CFTC that its sports-event contracts are swaps.  *Smith v. Montgomery Ward & Co.*, 388 F.2d 291, 291 (6th Cir. 1968) (estoppel applies to representations made to agencies).  And Kalshi's contracts don't meet the more restrictive definitions of futures and options.  *KalshiEX, LLC v. Hendrick*, 817 F.Supp.3d 1014, 1032 n.8 (D. Nev. 2025).

Resisting that conclusion, Kalshi (at 40-41) argues at a high level of generality that Dodd-Frank's definition is "broad" so whatever its contracts are, they "fit comfortably within [the CEA's] definition." Kalshi-Br.40 (citation omitted). Rather than advance its own interpretation of §1a(47)(A)(ii)'s plain text, Kalshi (at 41-48) mostly attempts to poke holes in Tennessee's reading. Those efforts fail.

***Events vs. outcomes***. Kalshi (at 41) citing dictionaries says, "an outcome *is* an event." But it neglects to mention that using event to mean outcome is an "archaic" definition and has been so for nearly 50 years. Event, *Webster's New Collegiate Dictionary* (7th ed. 1969); *see N. Am. Derivatives Exch., Inc. v. Nevada* (*Crypto*), 815 F.Supp.3d 1169, 1182 (D. Nev. 2025) (same). And the last listed usage of 'event as outcome' in the CFTC's dictionary is from 1945. *See* CFTC-Ohio-Br.10 n.6. Statutory text "should be interpreted" using its "ordinary meaning at the time Congress enacted the statute." *Watson v. RNC*, No. 24-1260, 2026 WL 1855462, at *5 (U.S. June 29, 2026) (citation omitted). Kalshi offers no explanation for why Dodd-Frank should be interpreted with such a dated definition.

The sleight-of-hand with the dictionaries proves that no "ordinary reader[]," *Chevron v. Plaquemines Par.*, 146 S.Ct. 1052, 1061 (2026),

13

would say "'what was the occurrence of the event?' to ask for a player's rushing yard total." Tennessee-Br.27.[6]

The same reasoning thwarts Kalshi's newfound emphasis on "contingency." Kalshi (at 42) says a contingency "encompasses outcomes of sports events." But "a contingency is not who wins [the] game because that is an outcome." *Crypto*, 815 F.Supp.3d at 1183 n.9.

***Financial, economic, or commercial consequence.*** Kalshi's sports-event contracts aren't "associated with a potential financial, economic, or commercial consequence." 7 U.S.C. §1a(47)(A)(ii). Kalshi has no response to Tennessee's central argument that player props, parlays, and mentions markets have no consequence *at all*. *See* Tennessee-Br.29-30, 43. It just labels these bets as "cherry-pick[ed]." Kalshi-Br.45. That's not even close to right. Kalshi offers *billions* in parlay bets every month. Gouker, *Most Of Kalshi's Recent Volume Growth Comes From Parlays*, Event Horizon (May 6, 2026), https://perma.cc/3ZLQ-F7GE; AGA-Tennessee-Br.6-9, 11-12.

---

[6] Kalshi itself has seemingly embraced the distinction between events and outcomes. *See* Kalshi CFTC Comment Letter, (April 30, 2026), https://perma.cc/68X2-YVDK (listing bets on "weather events, political events, … [and] sports *outcomes"* as Kalshi products (emphasis added)).

The failure by Kalshi and its amici to offer *any* justification for parlays and mentions markets means Kalshi isn't entitled to the all-encompassing preliminary relief the district court ordered. *Skrmetti*, 83 F.4th at 471. Recall, Kalshi "maintains that *all of its contracts comply with the CEA*." Tennessee-Br.43 (emphasis added). Yet it has no defense for how "a parlay of announcers saying the words 'late hit,' 'pylon,' and 'turf'" meets the "swap" definition. *Id.* (cleaned up); *see also* Ohio-Br.33-34.

For the rest of its bets, Kalshi and the CFTC lean into the statute's use of "potential" to argue that any loose, attenuated connection between a sports outcome and a financial consequence fits the statutory definition. Kalshi-Br.42-45; CFTC-Tennessee-Br.8. But "potential" modifies consequences, and not "associated with." 7 U.S.C. §1a(47)(A)(ii). This doesn't loosen the requirement that the event's occurrence be closely connected with those potential consequences. *See* Tennessee-Br.29-30.

And even with respect to potential financial consequences, Kalshi has no limiting principle for what kinds of consequences qualify. It relies heavily on the example of "sportsbooks" supposedly hedging their economic risk. Kalshi-Br.45. But in all those circumstances, no economic risk predated placing the bet. The sportsbooks synthetically created risk

15

by placing a sports wager. If that satisfies the statute, then any bet can become a "swap" as long as someone places a second, opposite bet on its outcome. *See* AGA-Ohio-Br.17-18. In Kalshi's world, one could wager on the color of a Gatorade shower, or a coin toss, and then take out a 'swap' against the risk that the bet pays off. Nothing in the statute supports this limitless reading—it requires consequences be *associated with* (i.e., joined or connected to) the event, not merely exist. That notion of connection precludes Kalshi's boundless reading. *Contra* Kalshi-Br.46.

Finally, Kalshi (at 44) misrepresents Tennessee's position, which Kalshi once shared. *See Hendrick*, 817 F.Supp.3d at 1028, n.3 (discussing previous litigation). The full quote is: "Sports events do not have economic consequences outside the game itself *occurring*." *Compare* Tenn-Br.29 (emphasis added), *with* Kalshi Br.44 (cutting "occurring" without explanation). Kalshi's misleading quotation underscores the weakness of its position—nearly all, if not all, the economic consequences it points to (at 44) are a result of the event itself occurring. *See* Tennessee-Br.28.

***Context.*** What text makes clear, statutory context confirms. Despite this Court's explicit instruction to the contrary, Kalshi seeks to "scrutinize [the] statute atomistically—chopping it up and giving each

16

word the broadest possible meaning." *Salazar v. Paramount Glob.*, 133 F.4th 642, 650 (6th Cir. 2025)*; see* Tennessee-Br.31-32, 42-43 (citing *Salazar*). Kalshi has no real response. That silence on *Salazar* is fatal. This Court should apply its straightforward rule and reject Kalshi's reading.

The few points Kalshi does make on statutory context miss the mark. Kalshi (at 43) admits that its reading causes surplusage but claims "that overlap is compelled by the text." Even if 7 U.S.C. §1a(47)(A) "might have some belt-and-suspenders surplusage[,] … Kalshi's reading swallows the whole statute." Tennessee-Br.33. Nothing in the statute commands the *complete* redundancy that Kalshi imagines. And *contra* the CFTC's assertion, CFTC-Tennessee-Br.9-10, Tennessee doesn't read out §1a(47)(A)(ii). *See* Tennessee-Br.29-30 (discussing its application).

Kalshi tries to unmoor Dodd-Frank from its financial hedging context by noting that 7 U.S.C. §1a(47)(A)(iii)'s list of 22 "commonly known," *id.*, examples "includes swaps on 'weather,' 'energy,' and 'metal,' none of which is a financial measure, index, or instrument." Kalshi-Br. 47. But "these limited exemptions do not obscure the basic policy that" financial hedging "is the dominant objective of the Act," so they "must be narrowly construed." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989)

17

(citation omitted); *see* Tennessee-Br.32-33 (discussing financial hedging). Beyond that, §1a(47)(A)(iii)'s inclusion of "weather," "energy," or "metal" swaps doesn't suggest §1a(47)(A)(ii)'s event/consequences definition covers sports gambling, let alone a 30-leg parlay or mentions markets.

The same is true for Kalshi and its amici's repeated invocations of "weather swaps" against Tennessee's interpretation of §1a(47)(A)(ii). *See* Kalshi-Br.46-47; Paradigm-Br.28; CFTC-Tennessee-Br.3, 17; Digital-Chamber-Br.8, 11, 17, 33. That argument helps Tennessee—"weather swap[s]" are specifically enumerated in romanette iii's 22-part list. 7 U.S.C. §1a(47)(A)(iii)(XVII). Again, they have nothing to do with the romanette ii definition that Kalshi invokes. *Id.* §1a(47)(A)(ii). Kalshi and amici's reliance on weather swaps only highlights that their argument would collapse the *entire* statute, including the 22-part list, into §1a(47)(A)(ii). *See supra* 17.

***The Special Rule.*** Kalshi and the CFTC put great weight on §7a-2(c)(5)(C)'s "Special Rule," but that provision doesn't help them. Kalshi says (at 24) the "Special Rule's reference to '[e]vent contracts' involving 'gaming' as one type of 'swap[]'" is "irrefutable textual evidence" that its contracts are "within the CFTC's exclusive jurisdiction." But the special

18

rule isn't a further definition of "swap." It applies to *all "agreements, contracts, transactions, or swaps*," any of which could involve gaming. 7 U.S.C. §7a-2(c)(5)(C). (emphasis added). Rather than being "irrefutable textual evidence" of what "swap" means, Kalshi-Br.24, the Rule acts as a broad backstop to keep inappropriate transactions, masquerading as proper derivatives, off DCMs.

Unlike Kalshi, the CFTC seems to recognize that the Special Rule doesn't add to the "swap" definition. Nevertheless, it says the Special Rule evinces a congressional intent for the CFTC to regulate gaming contracts, so if Kalshi's contracts don't qualify, it would have a "null set" of regulatory jurisdiction. CFTC-Ohio-Br.14. Not so.

*For one*, the CFTC wouldn't have a "null set" of gaming contracts to review. It could cover any contract whose subject is gaming that actually meets the §1a(47)(A) "swap" definition. For example, a casino could hedge the financial risk of whether a poker tournament it plans to host actually takes place. *Contra* CFTC-Ohio-Br.14.

*For two*, that argument would mean Congress also gave the CFTC exclusive jurisdiction over "agreements, contracts, or transactions involv[ing]" "war," "terrorism," and "assassination." 7 U.S.C. §7a-

19

2(c)(5)(C)(i). Just as Dodd-Frank didn't secretly create a "Federal Bureau of Bookmaking," Tennessee-Br.34, it didn't convert the CFTC into the Department of War.

### C.   The CEA does not preempt Tennessee law.

This Court need not decide whether every Kalshi sports-event contracts is a "swap" under 7 U.S.C. §1a(47)(A)(ii), because as explained below, there is no preemption of Tennessee law. The legal inadequacy of Kalshi's preemption theory is sufficient to reverse the district court.

At the outset, Kalshi (at 51) is wrong about the presumption against preemption, claiming that because it offers bets to participants nationwide, it's engaged in *inter*state gambling. But the preemption inquiry speaks to "the *target* at which the state law *aims*." *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 385 (2015). How Kalshi structures its pari-mutuel wagers is unrelated to Tennessee's "earnest effort to regulate its residents' primary conduct." *Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.,* 162 F.4th 631, 639 (6th Cir. 2025). Tennessee law governs bettors physically located in state. That *intra*state regulation "lies at the heart of the state's police power." *KalshiEX LLC v. Schuler,*

20

2026 LX 220871, at *16 (6th Cir. April 24, 2026) (citation omitted) (*Schuler II*); *cf. Wyeth v. Levine*, 555 U.S. 555, 565 n.3 (2009).

### 1.    The CEA does not expressly preempt Tennessee law.

The CEA gives the CFTC "exclusive jurisdiction" to enforce the CEA over "transactions involving swaps" "executed" on a DCM. 7 U.S.C. §2(a)(1)(A).  As the motions panel correctly recognized, that jurisdictional grant is *not* an express preemption clause.  *Schuler II*, 2026 LX 220871, at *11-12; *see* Tennessee-Br.45-49.  The Supreme Court just confirmed the motions panel's holding: "a grant of jurisdiction" is "not [the] power to mold substantive law."  *Cisco Sys., Inc. v. Doe I*, No. 24-856, 2026 WL 1791225, at *6 (U.S. June 23, 2026) (citation omitted).  And "grants of jurisdiction alone ... are not themselves grants of lawmaking authority."  *Id.*  (citation omitted). That ends the game for express preemption.

Kalshi has no plain text argument that jurisdiction means preemption.  Kalshi-Br.26-33.  Nor does it rely on statutory context or interpretive canons.  *Id.*  It eschews these normal principles of statutory construction for inference, precedent, and legislative history.  None avails.

21

Kalshi says that §2(a)(1)(A)'s "[e]xcept as hereinabove provided" clause "enables a logical inference of preemption." Kalshi-Br.28 (citations omitted); *see* CFTC-Tennessee-Br.21-23 (similar). But "inference" is an implied preemption concept. *See Kansas v. Garcia,* 589 U.S. 191, 202-03 (2020). Those implied preemption arguments independently fail, *see infra* 25-32, but inference cannot convert a jurisdictional grant into an express preemption clause. If anything, there is good reason to doubt this inference, since separate express preemption clauses and saving clauses cut against preemption. Tennessee-Br.46-48.

Kalshi (at 27-28) cites precedent, but those cases are far afield. They mostly deal with the courts' jurisdiction,[7] or arise from different

---

[7] *Mississippi v. Louisiana,* 506 U.S. 73, 77-78 (1992); *Am. Energy Corp. v. Rockies Express Pipeline LLC*, 622 F.3d 602, 605 (6th Cir. 2010); *Transcon. Gas Pipe Line Co. v. Pa. Env't Hearing Bd.*, 108 F.4th 144, 151-152 (3d Cir. 2024).

statutory schemes[8] that don't have "exclusive jurisdiction" clauses.[9]  *See Schuler II*, 2026 LX 220871, at *11-12 (discussing these distinctions).

Kalshi (at 32) nevertheless claims there is "overwhelming authority supporting preemption" but that assertion doesn't bear a feather's weight of scrutiny.  No case it cites interpreted §2(a)(1)(A) to be an express preemption clause.  Indeed, most have nothing to do with preemption of State law at all.[10]  They by-and-large are jurisdictional disputes between agencies.[11]  This makes sense because what §2(a)(1)(A) "does is specify that the CFTC, and not the SEC, shall enforce the CEA."  Tennessee-

---

[8] *Slaney v. Int'l Amateur Ath. Fed'n*, 244 F.3d 580 (7th Cir. 2001).

[9] *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 163 (2016) (analyzing 16 U.S.C. §824d(a)); *Duke Energy Trading & Mktg., LLC v. Davis*, 267 F.3d 1042, 1056–58 (9th Cir. 2001) (same); *Heart of Am. Grain Inspection Serv., Inc. v. Mo. Dep't of Agric.*, 123 F.3d 1098, 1103 (8th Cir. 1997) (applying 7 U.S.C. §269 (1994)).

[10] *Leist v. Simplot*, 638 F.2d 283, 285 (2d Cir. 1980) (considering whether a "private cause of action exists for breach of the CEA").

[11] *United States v. Brien*, 617 F.2d 299, 310 (1st Cir. 1980) (no preemption of a federal criminal prosecution); *Chi. Mercantile Exch. v. SEC*, 883 F.2d 537, 550 (7th Cir. 1989) (per curiam) (7 U.S.C. "§2 carries no implicit preemptive force"); *FTC v. Ken Roberts Co.*, 276 F.3d 583, 592-93 (D.C. Cir. 2001) (similar).

Br.46.  And the few cases Kalshi cites (at 32) that held a *state law* preempted used implied theories like conflict preemption.[12]

What is more, every case Kalshi relies on (at 32), that actually found preemption of State law, *see supra* n.12, predates Dodd-Frank, the express preemption clauses, 7 U.S.C. §16(e)(2); 16(h), and landmark Supreme Court preemption cases like *Wyeth v. Levine*, so they offer little insight into the current text's preemptive force.  And Kalshi has no meaningful response to cases that *rejected* preemption from exclusive jurisdiction clauses, or statutes that enumerate both jurisdiction and preemption.  Tennessee-Br.45-46.

This dearth of precedent shows how just "radical" Kalshi's position is.  *Contra* Kalshi-Br.52.  Kalshi claims it's obvious that §2(a)(1)(A) is an *express* preemption clause, but points to no holding in the 52 years since the statute's passage to support that claim.  This Court shouldn't be the first.

---

[12] *Rasmussen v. Thomson & McKinnon Auchincloss Kohlmeyer, Inc.*, 608 F.2d 175, 178 (5th Cir. 1979) (per curiam) (The CEA "preempts all state laws *inconsistent* with its provisions." (emphasis added)); *Am. Agric. Movement, Inc. v. Bd. of Trade of City of Chi.*, 977 F.2d 1147, 1155 (7th Cir. 1992) (rejecting field preemption and applying conflict).

Retreating from §2(a)(1)(A)'s text, Kalshi resorts to legislative history and claims that "Senate drafters" believed the 1974 CEA's text "assure[d] that Federal preemption [wa]s complete." Kalshi-Br.29 (citation omitted); *see id.* at 13-15, 30, 34 (invoking committee reports).

To the extent legislative history may ever be helpful, Kalshi "models its misuse," *FS Credit Opportunities Corp. v. Saba Capital Master Fund, Ltd*, 146 S.Ct. 1546, 1557 (2026), by invoking the individual expectations of certain "Senate drafters," Kalshi-Br.29. Beyond that, Kalshi's focus on the legislative history surrounding the 1974 CEA, *id.* at 13-14, 29, 34, shows how far its argument strays from the text. As Kalshi admits, the CEA has repeatedly been amended to invite State participation and include separate express preemption clauses. *Cf. FS Credit,* 146 S.Ct. at 1556 (rejecting an argument that didn't account for subsequent amendments). That later enacted text forecloses express and field preemption. Tennessee-Br.46-51.

### 2. The CEA does not field preempt Tennessee law.

Field preemption is "rare," *Garcia*, 589 U.S. at 208, and Kalshi doesn't come close to meeting its demanding prerequisites. As the motions panel recognized, "Kalshi has not shown that this case is one of

25

those rare ones." *Schuler II*, 2026 LX 220871, at *15. The CEA contains numerous clauses affirmatively inviting State participation. *Id.* at *15-16 (collecting examples). And Courts usually reject field preemption where there has been analogous State participation. Tennessee-Br.49-50.

Kalshi narrows its preemption arguments to the "field" of "trading on DCMs." Kalshi-Br.33. But Tennessee sports wagering law isn't "aimed at," *Oneok*, 575 U.S. at 387, trading on DCMs, it simply prohibits wagering contracts that don't comply with State law. Tennessee-Br.50-51. Kalshi doesn't contest that state contract law is the underlying legal framework to *all of its contracts*. Kalshi-Br.55. So Kalshi and amici's policy arguments about disrupting derivatives trading slay a strawman.

This case, therefore, is nothing like Kalshi's (cited at 26, 35, 37) principal field preemption authority, *Arizona v. United States*. Because an immigration registration violation goes to federal immigration court, it's not a state law action. Other authority on which Kalshi (at 2, 32, 35, 36, 39, 54, 55) heavily relies, *Am. Agric. Movement*, 977 F.2d at 1155, echoes this point, holding that "Congress did not intend to preempt the field of futures trading." *Id.* So too here.

### 3.    There is no conflict preemption.

Kalshi says Tennessee law is conflict preempted because it's an obstacle to federal uniformity and enforcement discretion, and that it's impossible for Kalshi to comply with Tennessee's geography requirements. Kalshi-Br.35-38. That's wrong. But before even reaching these arguments, the conflict preemption claim fails because federal law forbids Kalshi's contracts. 17 C.F.R. §40.11(a)(1). So there is no conflict at all.

***Rule 40.11.*** Under 17 C.F.R. §40.11(a), Kalshi's contracts "shall not" be listed for trading. Tennessee-Br.52-54. Since federal and state law agree that Kalshi can't offer unlicensed, untaxed sports wagers, there is no conflict. *Id.*

Kalshi (at 56-57) doesn't explain how it complies with Rule 40.11's text that a DCM "shall not list for trading" a gaming contract. 17 C.F.R. §40.11(a). Instead, it says, "the CFTC has now proposed to replace Rule 40.11 with a new rule clarifying that sports-event contracts are *not* categorically prohibited." Kalshi-Br.56. But the CFTC has only proposed a change, and it may still "die[] on the vine" before "ripen[ing] into [a final] agency decision[.]" *Cf. USFWS v. Sierra Club, Inc.*, 592 U.S. 261, 272 (2021) (citation omitted); *see also id.* at 268.

There is good reason to think that the CFTC has not yet "settled on an approach." *See id.* at 272. Its proposed rule conflicts with its previous litigation representations, *including those in this appeal.* In its amicus brief, the CFTC says that a "*per se* prohibition would conflict with the requirements of the statute." CFTC-Tennessee-Br.27 (citation omitted). But the proposed rule appears to ban categories of bets on player injuries, little league games, and officiating. *See Prediction Markets; Public Interest Determinations*, 91 Fed. Reg. 35,806, 35,836-37 (June 12, 2026). And before the Ninth Circuit, the agency represented: "We take gaming to mean casino gambling and that sort of activity, it does not, it does not [sic], it does not [sic] mean an individual sporting event or outcome." Ninth Circuit Oral Argument at 1:01:50-1:02:02. Now the proposed rule says: "the meaning of 'game' relevant to the Special Rule encompasses … sports games[.]" *See* 91 Fed. Reg. at 35,825; *see also id.* at 35,863.

This Court should be "particularly dubious" when an agency so often changes its position. *See Bates v. Dow Agro. LLC*, 544 U.S. 431, 449 (2005). It's certainly entitled to no deference. *Wyeth*, 555 U.S. at 580

28

n.13; *see* States-Br.27-29.  Until there is final agency action,[13] this Court should only look to 17 C.F.R. §40.11(a).  And that bans Kalshi's contracts.

***Obstacle preemption.***  Kalshi says there is obstacle preemption because Tennessee sports wagering law "subverts Congress's aim of … a uniform set of regulations."  Kalshi-Br.35 (citation omitted).  But as the motions panel has already explained,  because "no statute yet known pursues its stated purpose at all costs,"  "generic uniformity concerns" aren't enough for obstacle preemption.  *Schuler II*, 2026 LX 220871, at *17 (citation omitted); *see Watson*, 2026 WL 1855462, at *8 (similar).  If uniformity is as important as Kalshi claims, why did Congress not include it in the statute?  *Contra Monsanto Co. v. Durnell*, No. 24-1068, 2026 WL 1825691, at *6 (U.S. June 25, 2026) (citing 7 U.S.C. §136v(b)'s

---

[13] The CFTC might not be presently capable of generating final agency action, since the five-member agency currently has only one commissioner.  Gouker, *Are We Really Regulating Sports Betting With Just One CFTC Commissioner?*, Event Horizon (June 22, 2026), https://perma.cc/VGM3-TU84.  Although the CEA has an unusual vacancy provision, "[a] vacancy … shall not impair the right of the remaining Commissioners to exercise all the powers of the Commission[,]" the statute seemingly requires *multiple* remaining "Commissioner*s*" for the CFTC to function.  7 U.S.C. §2(a)(3) (emphasis added).

"[u]niformity" provision).  Kalshi has no answer.  *See* Kalshi-Br.35-36. That silence cannot clear obstacle preemption's high bar.

Perhaps recognizing as much, Kalshi (at 37-38) shifts away from uniformity and argues that Tennessee law disturbs the "discretionary judgment Congress delegated to a federal agency."  But the "possibility that federal enforcement priorities might be upset is not enough to provide a basis for preemption."  *Garcia*, 589 U.S. at 212.  That is why "[i]nvoking some brooding federal interest or appealing to a judicial policy preference should never be enough to win preemption of a state law." *Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 767 (2019) (lead opinion of Gorsuch, J.).  After all, preemption isn't a "freewheeling judicial inquiry into whether a state statute is in tension with federal objectives."  *Garcia*, 589 U.S. at 202.  Yet that is what Kalshi seeks.

***Impossibility.***  Kalshi's impossibility argument is a narrow one.  It only points to one conflict (at 36): "Tennessee law would require Kalshi to limit access to persons 'physically located in' Tennessee. Tennessee Code Ann. §4-49-111(a)."  That's it.  Kalshi has forfeited any argument that it cannot pay taxes or implement consumer protections.  *See* Tennessee-Br.60-61.  So even if Kalshi succeeds, an injunction is warranted

30

*only* for the geographic requirement. *Id.*; *Watson*, 2026 WL 1855462, at *12 (same). Regardless, Kalshi doesn't meet the "demanding defense" of impossibility. *Wyeth*, 555 U.S. at 573.

*First*, as the motions panel already explained, Kalshi is wrong about what "impartial access" means. *See* Tennessee-Br.55-56. It's "an anti-discrimination command, not [] a limit on a facially neutral require-ment." *Schuler II*, 2026 LX 220871, at *18 (citation omitted).

*Second*, even if Kalshi was right, its preemption theory is legally insufficient. Its argument rests "on speculation that an agency might exercise [its] discretion" and "discipline Kalshi for complying with Ten-nessee law." Kalshi-Br.57. The Supreme Cout has "cautioned many times" that this "possibility of impossibility is not enough" for preemp-tion. *Merck Sharp & Dohme Corp. v. Albrecht*, 587 U.S. 299, 314 (2019) (citation omitted). This Court has applied that principle to reject preemp-tion. *Fulgenzi v. PLIVA, Inc.*, 711 F.3d 578, 584 (6th Cir. 2013). And here, "there is nothing more than a convenient litigating position, an-nounced in CFTC's amicus brief to suggest the CFTC would pursue en-forcement." Tennessee-Br.56 (cleaned up).

31

*Third*, preemption "must stem from either the Constitution itself or a valid statute enacted by Congress." *Hencely v. Fluor Corp.*, 146 S.Ct. 1086, 1093 (2026) (citation omitted). Yet Kalshi points to neither. The CFTC's ever shifting enforcement priorities aren't the "laws of the United States." *Garcia*, 589 U.S. at 212 (citation omitted).

### D. Kalshi is unlikely to demonstrate a cause of action or overcome Tennessee's sovereign immunity.

Kalshi brought this suit through the "Supremacy Clause," full stop. Compl., R.1, 21-22. Preliminary injunctions are a "tightly guarded remedy" reserved for "very clear cases." *Doe v. Lee*, 137 F.4th 569, 575 (6th Cir. 2025) (citation omitted). Ignoring binding Supreme Court precedent like *Armstrong* shouldn't be rewarded with an extraordinary remedy.

Kalshi now recognizes that the proper inquiry post-*Armstrong* is asking whether "the CEA implicitly withholds [a] cause of action." *Compare* Kalshi-Br.60, *with* Tennessee-Br.66 (making the same point). But it maintains (at 61) the CEA's exclusive private remedy doesn't foreclose its suit in equity.

That argument ignores the carefully drawn statutory scheme which gives "primary responsibility for ensuring compliance with [federal law]" to the *CFTC, States, and certain private plaintiffs*. *Cf. FS Credit*, 146

32

S.Ct. at 1554; *see also* Tennessee-Br.61, 63-64, 66 (discussing the CEA's remedial structure).  As the Supreme Court just held, "if Congress has created an alternative remedial structure, then *that alone* precludes the creation of a cause of action."  *Cisco*, 2026 WL 1791225, at *8 (cleaned up).  Kalshi points to no post-*Armstong* case where a court recognized an implied equitable right of action when Congress created such a detailed scheme. Tennessee-Br.63-64 (collecting cases rejecting Kalshi's position).

It's difficult to square Kalshi's position with the Supreme Court's recent rejection of causes of action in *FS Credit* and *Cisco*.  "Congress determines who may sue to enforce federal law," and this statutory scheme doesn't include Kalshi.  *FS Credit*, 146 S.Ct. at 1552.  Without a proper cause of action in equity, Kalshi cannot overcome Tennessee's sovereign immunity.  Tennessee-Br.65 & n.6.

## II.   The remaining preliminary injunction factors favor Tennessee.

Kalshi claims (at 61-62) that it hasn't changed positions from its prior litigation with the CFTC.  But that switch is well documented.  *See,*

33

*e.g.*, *Hendrick*, 817 F.Supp.3d at 1028 n.3; Mem.Op., R. 48, 870 n.1; Better-Markets-Br.10-11; Gensler-Br.17-18.

In all events, the balance of harms doesn't favor Kalshi. The company (at 62-63) says its recent voluntary choice to enact some consumer protections safeguards the public interest. But that just highlights the importance of Tennessee law, which *requires* such measures. Although Kalshi now admits that consumer protections are important, it could just as easily stop offering them to suit its business needs. The public interest is best served through Tennessee consumer protection law.

## III.    At minimum, the district court erred by granting broader relief than necessary.

Kalshi (at 63-64) doesn't defend the district court's order, which plainly violates Rule 65. Instead, it argues that the proposed order it submitted was acceptable. Kalshi-Br.63-64. But Tennessee is subject to the district court's order, *not* Kalshi's proposed draft. Mem.Op., R.48, 893; *see* Order, R.49, 894. No injunction is warranted, but if this Court disagrees, it must specify the provisions of Tennessee law that are actually preempted. Tennessee-Br.69-70.

## CONCLUSION

This Court should reverse the preliminary injunction.

34

Dated: July 7, 2026

Respectfully submitted,

Jonathan Skrmetti
  *Attorney General & Reporter*

*/s/ Aaron L. Bernard*
*Assistant Solicitor General*
*Counsel of Record*

Michael Wennerlund
  *Assistant Attorney General*

Walker Anderson
  *Honors Fellow*

OFFICE OF THE TENNESSEE
ATTORNEY GENERAL & REPORTER
P.O. Box 20207
Nashville, TN 37202
(615) 532-3234
Aaron.Bernard@ag.tn.gov

*Counsel for Defendants-Appellants*

35

## CERTIFICATE OF COMPLIANCE

This brief complies with the Court's type-volume limitations because it contains 6,491 words, excluding portions omitted from the Court's required word count.

This brief complies with the Court's typeface requirements because it has been prepared in Microsoft Word using fourteen-point Century Schoolbook font.

*/s/ Aaron L. Bernard*
AARON L. BERNARD


## CERTIFICATE OF SERVICE

On July 7, 2026, I filed an electronic copy of this brief with the Clerk of the Sixth Circuit using the CM/ECF system. That system sends a Notice of Docket Activity to all registered attorneys in this case. Under 6 Cir. R. 25(f)(1)(A), "[t]his constitutes service on them and no other service is necessary."

*/s/ Aaron L. Bernard*
AARON L. BERNARD