

# Milbank

**WILL HAVEMANN**
*Partner*
1101 New York Ave., N.W.  |  Washington, DC 20005
T: +1 (202) 835-7518
whavemann@milbank.com  |  milbank.com

August 11, 2026

**By Electronic Filing**

Kelly L. Stephens
Clerk of Court
U.S. Court of Appeals for the Sixth Circuit
540 Potter Stewart U.S. Courthouse
100 E. Fifth Street
Cincinnati, OH 45202-3988

> **Re:**  ***KalshiEX LLC v. Schuler, et al.*** **and** ***KalshiEX LLC v. Orgel, et al.*,**
> **Nos. 26-3196 and 26-5235 – FRAP 28(j) Letter**

Dear Ms. Stephens:

Kalshi writes to advise the Court of North Carolina Senate Bill 257 ("S.B. 257"), which was recently passed by the General Assembly of North Carolina and signed into law by North Carolina's governor.  The bill amends North Carolina's general statutes to recognize the CFTC's "exclusive federal regulatory authority" over any "prediction market registered and licensed by the [CFTC]"—including any DCM—"that offers event contracts, ***including sporting event contracts***."  S.B. 257 § 44.9(a) (emphasis added).  It also provides for a 6% tax on each prediction market operator's "net trading fee revenue apportionable to" North Carolina. *Id.*  The tax expressly "does not impose any license, registration, or other regulatory requirements or obligations of any kind on prediction markets." *Id.*

S.B. 257 illustrates the CEA's preservation of substantial state authority even as it preempts states from regulating trading on DCMs.  As Kalshi has explained, Section 2(a) of the CEA grants the CFTC "exclusive jurisdiction" over on-DCM transactions, preempting state law.  7 U.S.C. § 2(a)(1)(A); *see Schuler* Appellant's Br. 31-40; *Orgel* Appellee's Br. 26-35.  But that same provision also makes clear that, "[e]xcept as hereinabove provided" in that grant of exclusive jurisdiction, "nothing" in Section 2 "supersede[s] or limit[s] the jurisdiction" of state "regulatory authorities" or "restrict[s]" them "from carrying out their duties and responsibilities" under state law. 7 U.S.C. § 2(a)(1)(A).  That leaves states free to regulate off-DCM transactions, and it allows states to apply their laws in such a way that does not "directly affect trading on or the operation of a" DCM.  *Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1156 (7th Cir. 1992).

MILBANK LLP

NEW YORK | LOS ANGELES | WASHINGTON, D.C. | SÃO PAULO | FRANKFURT
LONDON | MUNICH | HONG KONG | SEOUL | SINGAPORE | TOKYO

S.B. 257 also undermines the *Orgel* Defendants' argument that "each day Kalshi refuses to pay wagering tax, it deprives Tennessee of revenue to fund its schools and remediate the problem gambling that Kalshi exacerbates." *Orgel* Appellants' Br. 68.  The CFTC's exclusive jurisdiction prevents states from regulating on-DCM trading, but it does not preclude states from imposing lawful taxes on revenues from trading on DCMs.

Respectfully submitted,

*/s/ William E. Havemann*
William E. Havemann

*Counsel for KalshiEX LLC, Appellant in No. 26-3196 and Appellee in No. 26-5235*


cc:    All Counsel (via ECF)
       Word Count: 330

2

**PREDICTION MARKET TRADING FEES TAX**

**SECTION 44.9.(a)**  Chapter 105 of the General Statutes is amended by adding a new Article to read:

"Article 2F.

"Tax on Prediction Markets.

"**§ 105-113.130.  Definitions.**

(1)    Board of trade. – Defined in 7 U.S.C. § 1a.

(2)    Derivatives clearing organization. – Defined in 7 U.S.C. § 1a.

(3)    Designated contract market. – A board of trade subject to the provisions of 17 C.F.R. Part 38.

(4)    Event contract. – A swap available for trading on a designated contract market or swap execution facility that is based upon the occurrence, extent of an occurrence, or contingency for which the event or contingency involves sports. The term does not include an occurrence, extent of an occurrence, or contingency involving a change in the price, rate, value, or levels of a commodity described under 7 U.S.C. § 1a(19)(i).

(5)    Futures commission merchant. – Defined in 7 U.S.C. § 1a.

(6)    Introducing broker. – Defined in 7 U.S.C. § 1a.

(7)    Net trading fee revenue. – Prediction market revenue less the following:

a.    Broker or market maker compensation.

b.    Promotional incentives, funds, or rebates.

c.    Platform fees or clearing fees charged by a derivatives clearing organization.

d.    Withdrawal fees.

(8)    Prediction market. – Any physical or electronic platform through which a consumer may buy, sell, or exchange event contracts. This term applies whether the platform is located within or outside of the State and includes any designated contract market that has obtained a license from the Commodity Futures Trading Commission or any other exchange, platform, or business that offers event contracts for trading which are in fact traded by a consumer located in the State.

(9)    Prediction market revenue. – Revenue actually received by a prediction market from the following sources:

a.    Trading, or taker, fees.

b.    Fees charged to liquidity providers placing resting orders.

c.    Commissions charged to any futures commission merchants, introducing brokers, or other affiliated, authorized, or licensed market participants, clearinghouses or clearing organizations, intermediaries, service providers, and market infrastructure participants.

(10)    Swap. – Defined in 7 U.S.C. § 1a.

(11)    Swap execution facility. – Defined in 7 U.S.C. § 1a.

"**§ 105-113.131.  Trading fees tax.**

(a)    Authority. – A prediction market registered and licensed by the Commodity Futures Trading Commission that offers event contracts, including sporting event contracts, to North Carolina residents may operate within the State lawfully as a result of its registration with the Commission and its compliance with the Commodity Exchange Act and its implementing regulations, which establish exclusive federal regulatory authority of the Commission over prediction markets.

(b)    Tax. – A tax is imposed on each operator of a prediction market at the rate of six percent (6%) of the operator's net trading fee revenue apportionable to the State. This tax does

not impose any license, registration, or other regulatory requirements or obligations of any kind on prediction markets.

(c)    Apportionment. – Revenue of a prediction market operator is apportionable to the State if it involves the trading of an event contract by a resident of the State, who is domiciled and present in the State at the time of the trade, on a prediction market that results in payment of trading fees by that resident.

(d)    Return. – Taxes levied by this Article are due when a return is required to be filed. The return is due on an annual basis. An annual return is due by the last day of the month following the calendar year covered by the return. A return is filed on a form prescribed by the Secretary.

(e)    Records. – A person who is required to file a return under this Article must keep a record of all documents used to determine information the taxpayer provides in a return. These records shall be open at all times for inspection by the Secretary or an authorized representative of the Secretary and shall be kept for the applicable period of statute of limitations as set forth under Article 9 of this Chapter."

**SECTION 44.9.(b)**  This section becomes effective January 1, 2027, and applies to net trading fee revenue received on or after that date.

**CLARIFY TRUST QUALIFICATIONS FOR PRESENT-USE VALUE**

**SECTION 44.10.(a)**  G.S. 105-277.2(4)c. reads as rewritten:

"c.    A ~~trust that meets all of the following conditions:~~trust, if all
1.    ~~It was created by an individual who owned the land and transferred the land to the trust.~~
2.    ~~All~~ of its beneficiaries are, directly or indirectly, individuals who are the creator of the trust or a relative of the creator. An individual is indirectly a beneficiary of a trust that owns the land if the individual is a beneficiary of another trust or a member of a business entity that has a beneficial interest in the trust that owns the land."

**SECTION 44.10.(b)**  An owner of property that lost its present-use value classification on or after January 1, 2026, and prior to the date this act becomes law, that qualifies for the continued use exception under G.S. 105-277.3(b2)(1) due to this section, may submit an application for continued use within 60 days of this act becoming law. If approved, the assessor shall reinstate the property's present-use value classification retroactive to the date the classification was revoked and, notwithstanding G.S. 105-380 and G.S. 105-381, any deferred taxes that were paid as a result of the revocation must be refunded to the property owner. The owner may appeal the final decision of the assessor to the county board of equalization and review as provided in G.S. 105-277.4(b1).

**SECTION 44.10.(c)**  This section is effective retroactive to January 1, 2026, and applies to property that lost its present-use value classification on or after that date.

**SAMPSON COUNTY LOCAL SALES TAX FOR EDUCATION**

**SECTION 44.11.(a)**  This section applies to Sampson County only.

**SECTION 44.11.(b)**  Subchapter VIII of Chapter 105 of the General Statutes is amended by adding a new Article to read:

"Article 43A.

"County Sales and Use Tax for Public Education.

"**§ 105-513.1.  Short title; purpose.**

This Article is the County Sales and Use Tax for Public Education. This Article gives the counties of this State an opportunity to obtain an additional source of revenue with which to meet their public education needs.