No. 26-3196 / 26-5235

IN THE

# United States Court of Appeals for the Sixth Circuit

KALSHIEX LLC,

*Plaintiff-Appellant* [26-3196],

*Plaintiff-Appellee* [26-5235],

v.

MATTHEW T. SCHULER; THOMAS J. STICKRATH; SHEETAL BAJORIA; SCOTT P. BORGEMENKE; KEITH CHENEY; PENELOPE R. CUNNINGHAM; CHRISTOPHER SMITHERMAN; TRIFFON CALLOS; OHIO CASINO CONTROL COMMISSION; DAVE YOST, OHIO ATTORNEY GENERAL,

*Defendants-Appellees* [26-3196],

WILLIAM ORGEL, *in his official capacity as Chairman of the Tennessee Sports Wagering Council*; MARY BETH THOMAS, *in her official capacity as the Executive Director of the Tennessee Sports Wagering Council*; JONATHAN THOMAS SKRMETTI, *in his official capacity as Attorney General of Tennessee*,

*Defendants-Appellants* [26-5235].

On Appeal from the United States District Court for the Southern District of Ohio, No. 2:25-cv-1165 (Hon. Sarah D. Morrison) [26-3196]

On Appeal from the United States District Court for the Middle District of Tennessee, No. 3:26-cv-34 (Hon. Aleta A. Trauger) [26-5235]

**PLAINTIFF KALSHIEX LLC'S PETITION FOR REHEARING AND REHEARING EN BANC**

*Counsel listed on inside cover*

GRANT R. MAINLAND
ANDREW L. PORTER
NICOLE D. VALENTE
DAVIS CAMPBELL
MILBANK LLP
55 Hudson Yards
New York, NY 10001

NEAL KUMAR KATYAL
*Counsel of Record*
JOSHUA B. STERLING
COLLEEN E. ROH SINZDAK
WILLIAM E. HAVEMANN
NATASHA R. KHAN
EZRA P. LOUVIS
SAMANTHA K. ILAGAN
MILBANK LLP
1101 New York Ave. NW
Washington, DC 20005
Telephone: (202) 835-7505
nkatyal@milbank.com


October 9, 2026


*Counsel for Plaintiff KalshiEX LLC*

## TABLE OF CONTENTS

Page

INTRODUCTION AND RULE 40(b)(2) STATEMENT .......... 1

BACKGROUND .......... 4

REASONS FOR REHEARING AND REHEARING EN BANC .......... 8

I. THE PANEL'S DECISION CONFLICTS WITH DECISIONS OF THIS COURT AND THE THIRD AND NINTH CIRCUITS .......... 8

II. THE PANEL'S DECISION IS WRONG AND UNTENABLE .......... 11

A. The Panel Erred In Holding That The CEA Does Not Expressly Preempt State Gambling Laws .......... 12

B. The Panel Erred In Holding That Kalshi's Contracts Are Not Swaps .......... 14

III. RECENT CFTC RULEMAKINGS WARRANT REHEARING .......... 19

CONCLUSION .......... 20

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

## TABLE OF AUTHORITIES

Page(s)

**CASES:**

*Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*,
977 F.2d 1147 (7th Cir. 1992) .................... 5

*Am. Energy Corp. v. Rockies Express Pipeline LLC*,
622 F.3d 602 (6th Cir. 2010) .................... 10, 12

*Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.*,
162 F.4th 631 (6th Cir. 2025) .................... 3, 10, 11

*Coinbase Fin. Mkts., Inc. v. Raoul*,
No. 1:25-cv-15406, 2026 WL 2969682
(N.D. Ill. Oct. 2, 2026) .................... 11, 14, 15, 16, 18

*Cothran v. Ellis*,
16 N.E. 646 (Ill. 1888) .................... 13

*Dickson v. Uhlmann Grain Co.*,
288 U.S. 188 (1933) .................... 3

*KalshiEX LLC v. Assad*,
--- F.4th ----, No. 25-7516, 2026 WL 2543846
(9th Cir. Aug. 28, 2026) .................... 2, 3, 9, 10, 11

*KalshiEX LLC v. Flaherty*,
172 F.4th 220 (3d Cir. 2026) .................... 2, 3, 4, 8, 9, 11

*Leist v. Simplot*,
638 F.2d 283 (2d Cir. 1980) .................... 13

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
456 U.S. 353 (1982) .................... 13, 16, 17

*Oklahoma v. Castro-Huerta*,
597 U.S. 629 (2022) .................... 3

Page(s)

*Piccolo v. CFTC*,
388 F.3d 387 (2d Cir. 2004) .......... 18

*Rice v. Santa Fe Elevator Corp.*,
331 U.S. 218 (1947) .......... 12

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
605 U.S. 168 (2025) .......... 18

*USPS v. Konan*,
607 U.S. 391 (2026) .......... 16

**STATUTES:**

7 U.S.C. §§

1a(19)(iv) .......... 4

1a(47)(A)(ii) .......... 4, 11, 15, 16

1a(47)(A)(iii) .......... 4

1a(47)(A)(iv) .......... 4

2(a) .......... 17

2(a)(1)(A) .......... 1, 4, 5, 11, 12

2(e) .......... 17

5(a) .......... 13

7(d) .......... 5

7(d)(3) .......... 18

7a-2(c)(1) .......... 5

7a-2(c)(5)(C) .......... 5, 15

## TABLE OF AUTHORITIES—Continued

Page(s)


15 U.S.C. § 8302(d)(1) .......................................................... 1, 2, 4, 19, 20

**RULES & REGULATIONS:**

17 C.F.R. § 38.251(a) ............................................................................ 18

Duncan Hermes, CFTCLTR No. 26-27,
Comm. Fut. L. Rep. (CCH) ¶ 35,722 (Sep. 22, 2026) ......................... 18, 19

*Further Definition of "Swap" – Inclusions*, CFTC RIN 3038-AF82
(Oct. 9, 2026), https://perma.cc/P76K-RJ58 ................................. 1, 2, 19

*Further Definition of "Swap" to Exclude Casino-Style Gambling Products*, CFTC RIN 3038-AF81 (Oct. 9, 2026),
https://perma.cc/8K55-4PXS .......................................................... 2, 19

Prediction Markets; Public Interest Determinations,
91 Fed. Reg. 35,806 (June 12, 2026) .................................. 5, 6, 14, 15, 18

**LEGISLATIVE MATERIALS:**

156 Cong. Rec. S5907 (daily ed. July 15, 2010) ........................................... 15

H.R. Rep. No. 93-975 (1974) ............................................................... 16, 17

H.R. Rep. No. 93-1383 (1974) (Conf. Rep.) .................................................. 5

H.R. Rep. No. 106-711, pt. 2 (2000) ............................................................ 12

**OTHER AUTHORITIES:**

Anthony M. Diercks et al., *Kalshi and the Rise of Macro Markets*,
Fed. Rsrv. Bd. Fin. & Econ. Discussion Series No. 2026-010 (Feb. 2026), https://perma.cc/9EY4-M3HY ...................................................... 7

Michael J. de la Merced, *Political Betting Markets See Vindication in Trump Victory*, N.Y. Times (Nov. 6, 2024),
https://perma.cc/4N9Y-KLQN ............................................................... 7

Page(s)

Sara Fischer, *Exclusive: CNN Strikes Prediction Data Partnership with Kalshi*, Axios (Dec. 2, 2025), https://perma.cc/E58P-FTTX ...........7

## INTRODUCTION AND RULE 40(b)(2) STATEMENT

It has been clear for 50 years that states cannot regulate trading on federal derivatives exchanges. The Commodity Exchange Act ("CEA") expressly says so—granting a federal agency, the Commodity Futures Trading Commission ("CFTC"), "exclusive jurisdiction" over instruments "traded or executed" on federally designated contract markets ("DCMs"). 7 U.S.C. § 2(a)(1)(A). Simply put, states can no more regulate trading on DCMs as gambling than they can apply those regulations to the New York Stock Exchange.

The panel's decision disregards the plain text, inviting wide-scale state prohibition of derivatives trading under state laws. The panel held that the CEA's exclusive jurisdiction is actually *concurrent*, permitting 50 different states to regulate DCMs despite Congress's manifest objective of a single national market. The panel further held that Kalshi's event contracts cannot be traded on DCMs at all because they are not "swaps," a conclusion that flouts the CEA's plain text and would upend a multibillion-dollar industry. And the panel reached these holdings after refusing to allow the CFTC, the federal agency whose jurisdiction is at stake, to be heard at argument.

A pair of late-breaking regulatory developments highlight why the agency should have been heard: Today, the CFTC issued a Notice of

Proposed Rulemaking invoking its express statutory authority to "further define" the term "swap," 15 U.S.C. § 8302(d)(1), to include "event contracts, including those based on sports-, politics-, cultural-, and weather-related events," *Further Definition of "Swap" – Inclusions* 1, CFTC RIN 3038-AF82 (Oct. 9, 2026), https://perma.cc/P76K-RJ58 ("NPRM"). The agency also issued an Interim Final Rule clarifying that the term "swap" does not cover "[c]asino-style gambling products," including state-licensed "[s]ports [w]agers" that are "not traded" on a DCM or other exchange. *Further Definition of "Swap" to Exclude Casino-Style Gambling Products* 40, CFTC RIN 3038-AF81 (Oct. 9, 2026), https://perma.cc/8K55-4PXS ("IFR").

The new rules vindicate Congress's judgment that trading on a federally-designated exchange—where the interstate market sets prices—is fundamentally different than betting against a bookmaker that can stack the odds in its own favor. The CEA places exchange trading on nationwide DCMs squarely within the CFTC's exclusive oversight; betting against a bookmaker remains fully subject to state regulation.

Even without these regulatory developments, the panel's decision cries out for rehearing en banc. It is irreconcilable with recent decisions of the Third and Ninth Circuits. *KalshiEX LLC v. Flaherty*, 172 F.4th 220, 229-231 (3d Cir. 2026); *KalshiEX LLC v. Assad*, --- F.4th ----, No. 25-7516, 2026 WL

2543846, at *7 (9th Cir. Aug. 28, 2026), *pet. for reh'g filed* (Sep. 9, 2026). It departs from this Court's precedent finding similar state laws preempted. *Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.*, 162 F.4th 631, 635 (6th Cir. 2025). It engages in textual gymnastics to reach a nakedly policy-driven outcome. And it would criminalize the conduct of every DCM currently listing sports contracts—from Kalshi to the Chicago Mercantile Exchange.

It is no secret what motivated this result: The panel viewed Kalshi's contracts as "gambling" that it assumed Congress wanted states to regulate. A39-40. But the panel was not free to "replace the actual text with speculation as to Congress' intent," *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 642 (2022) (citation omitted)—particularly because the panel's assumptions about congressional intent were flat wrong. States have *always* claimed that derivatives trading is akin to "gambling in grain." *Dickson v. Uhlmann Grain Co.*, 288 U.S. 188, 198 (1933). Congress silenced that claim when it gave the CFTC "exclusive jurisdiction," ending state efforts to regulate on-DCM trading while leaving states free to regulate off-DCM transactions like sports wagers against a bookmaker.

The panel embraced an extreme rationale that replaces the CEA's uniform scheme with "exactly the patchwork that Congress replaced

wholecloth by creating the CFTC." *Flaherty*, 172 F.4th at 230. This Court should grant rehearing en banc.

## BACKGROUND

1. The CEA establishes a comprehensive federal framework for trading derivatives on federally designated exchanges. Derivatives are financial instruments such as futures, options, and swaps that derive their price from an underlying commodity. The CEA defines commodities as anything from a bushel of wheat, to a sports jersey, to "an occurrence" associated with financial consequences. 7 U.S.C. § 1a(19)(iv). The CEA likewise broadly defines the derivatives traded on federal exchanges. A "swap," for example, includes not just traditional "interest rate" and "currency swap[s]," *id.* § 1a(47)(A)(iii), but also any contract providing for a payment "that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence," *id.* § 1a(47)(A)(ii). The definition also includes any contract that becomes "commonly known to the trade as a swap" "in the future." *Id.* § 1a(47)(A)(iv). And Congress instructed the CFTC and SEC to "further define the term[ ] 'swap' " by regulation. 15 U.S.C. § 8302(d)(1).

Preemption is the cornerstone of the CEA. Section 2(a)(1)(A) grants the CFTC "exclusive jurisdiction" over "agreements ..., and transactions

involving swaps" traded on federally regulated exchanges. Congress enacted this provision "to bring the markets under … uniform … regulation[ ]." *Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1156 (7th Cir. 1992). It intended to "preempt the field" of on-DCM trading. H.R. Rep. No. 93-1383, at 35 (1974) (Conf. Rep.).

To list a contract for trading under the CEA, an exchange must first be designated as a DCM by satisfying 23 "[c]ore principles" identified in the CEA and its implementing regulations. 7 U.S.C. § 7(d). Once designated, DCMs may list contracts after certifying that they comply with the CEA and its "regulations." *Id.* § 7a-2(c)(1).

Generally, the CFTC cannot prohibit a new contract unless it "would violate" the CEA or its regulations. *Id.* § 7a-2(c)(5)(B). But the CEA contains a "Special [R]ule" for "[e]vent contracts" (including "swaps") that "involve" certain activities, including "gaming." *Id.* § 7a-2(c)(5)(C). The CFTC "may" determine that such contracts "are contrary to the public interest" and bar them. *Id.*

In June 2026, the CFTC issued a Notice of Proposed Rulemaking to revise its regulations implementing the Special Rule. Prediction Markets; Public Interest Determinations, 91 Fed. Reg. 35,806 (June 12, 2026). The CFTC explained that event contracts serve "information aggregation, price

discovery, and price dissemination functions," and allow "market participants to hedge exposure to a wide array of events for which no traditional financial instrument otherwise exists," including "sporting events." *Id.* at 35,807-08 (citation modified). The CFTC proposed detailed criteria for evaluating whether contracts involve "gaming," and if so, whether they are "contrary to the public interest." *Id.* at 35,818, 35,836, 35,853. The agency "preliminarily believes" that many "sports event contracts" may be traded "consistent with the public interest." *Id.* at 35,836. It plans to complete its rulemaking before Thanksgiving. Fed. Pls.' Resp. at 2, *CFTC v. Johnson*, No. 26-4281 (9th Cir. Sep. 24, 2026), Dkt. No. 29.1.

2. Kalshi completed the rigorous process for becoming a DCM in 2020. A8. Kalshi offers event contracts related to climate, technology, popular culture, economics, sports, and more. Each contract has a yes (the event will occur) and a no (it will not) position. Like all derivative instruments, these contracts allow users to hedge their exposure to financially significant events, and they provide crowdsourced assessments of the likelihood those events will occur.

Today, anyone can visit Kalshi's website for up-to-the-minute data about events that matter to them. Kalshi's elections contracts have been more accurate than polling, and the Federal Reserve has touted its economic

contracts for their accuracy.[1] For that reason, many news outlets have partnered with Kalshi as a valuable source of information.[2]

3. In March 2025, the Ohio Casino Control Commission sent Kalshi a cease-and-desist letter asserting that Ohio law prohibits Kalshi's event contracts involving sports and demanding that Kalshi cease offering them in Ohio. A9. In January 2026, the Tennessee Sports Wagering Council followed suit. A11.

Kalshi responded by seeking preliminary injunctions. The Tennessee district court concluded that Kalshi's contracts are swaps subject to the CFTC's jurisdiction and that the CEA preempts state gambling laws as applied to trading on DCMs. A11. But the Ohio district court denied Kalshi relief, holding the opposite. A9.

This Court consolidated the appeals for argument but denied the CFTC's unopposed request to participate. After argument, the panel affirmed the Ohio decision and reversed the Tennessee decision, rejecting the CFTC's assertion of exclusive jurisdiction.

---

[1] Anthony M. Diercks et al., *Kalshi and the Rise of Macro Markets*, Fed. Rsrv. Bd. Fin. & Econ. Discussion Series No. 2026-010 (Feb. 2026), https://perma.cc/9EY4-M3HY; Michael J. de la Merced, *Political Betting Markets See Vindication in Trump Victory*, N.Y. Times (Nov. 6, 2024), https://perma.cc/4N9Y-KLQN.

[2] *See, e.g.*, Sara Fischer, *Exclusive: CNN Strikes Prediction Data Partnership with Kalshi*, Axios (Dec. 2, 2025), https://perma.cc/E58P-FTTX.

The panel first held that sports-event contracts are not swaps, reasoning that sports events are not "associated with a potential financial, economic, or commercial consequence" because they are not "inherently" connected to such consequences. A18-20. Applying a presumption against preemption, A33-34, the panel further concluded that the CEA displaces "direct enforcement and regulatory authority" over DCMs but not "ancillary regulations that only incidentally burden DCMs"—including state gambling laws banning certain swaps. A37-40. The panel also found no conflict preemption, reasoning that the CEA permits state-by-state regulation of nationwide DCMs. A46-47.

## REASONS FOR REHEARING AND REHEARING EN BANC

### I. THE PANEL'S DECISION CONFLICTS WITH DECISIONS OF THIS COURT AND THE THIRD AND NINTH CIRCUITS.

Rehearing is warranted because the panel's conclusion that states may ban Kalshi's contracts conflicts with decisions of the Third and Ninth Circuits and this Court's precedent.

1. The panel's decision squarely conflicts with the Third Circuit's decision correctly holding that the CEA preempts state regulation of Kalshi's contracts. All three judges recognized that event contracts—including those involving sports—"'fit comfortably within the statutory definition'" of "swap" because "the outcome of a sports event certainly can be associated

with a potential financial, economic, or commercial consequence" for numerous "stakeholders, including sponsors, advertisers, television networks, franchises, and local and national communities." *Flaherty*, 172 F.4th at 227-228 (quoting *id.* at 233 (Roth, J., dissenting)). Declining to apply a presumption against preemption, the Third Circuit further recognized that the CEA "preempts state laws that directly interfere with swaps traded on DCMs" and that "Kalshi's sports-related event contracts are swaps traded on a CFTC-licensed DCM." *Id.* at 226, 230. The court added that allowing states to regulate trading on DCMs conflicts with the CEA by producing "exactly the patchwork that Congress replaced wholecloth by creating the CFTC." *Id.* at 230.

The panel reached the opposite conclusion on every one of these points, noting it was "not persuaded" by *Flaherty*. A27.

2. The panel's decision also conflicts with the Ninth Circuit's holding that the CEA's grant of exclusive jurisdiction "expressly preempts state law regulating swaps 'traded or executed on' a DCM." *Assad*, 2026 WL 2543846, at *7 (citation omitted). Like the Third Circuit, the Ninth Circuit "decline[d] to apply any presumption against preemption" and focused instead on "the plain wording" of "exclusive jurisdiction," which could only mean that state regulation is preempted. *Id.* (citation modified). The panel disagreed. A37.

While the Ninth Circuit then held that Kalshi's contracts do not fall within the scope of the CFTC's "exclusive jurisdiction," that conclusion relied heavily on a soon-to-be-replaced CFTC regulation the court misconstrued to prohibit listing sports-event contracts on DCMs. *Assad*, 2026 WL 2543846, at *12; *see id.* at *19 (Lee, J., concurring). When the CFTC completes its rulemaking in the coming weeks, the Ninth Circuit's regulation-based reasoning will no longer apply.

3. The panel's decision also conflicts with this Court's precedent. As this Court explained in construing a statutory grant of "exclusive jurisdiction," "[e]xclusive means exclusive." *Am. Energy Corp. v. Rockies Express Pipeline LLC*, 622 F.3d 602, 605 (6th Cir. 2010). It therefore does not admit of the panel's extratextual exception for "ancillary regulations." A37.

The panel likewise departed from this Court's precedent by applying a "presumption against preemption" on the ground that states traditionally regulate "gambling." A33-34. In *Churchill Downs*, this Court appropriately refused to apply the presumption in holding that a federal statute preempted Michigan's gambling laws. The Court explained that since the statute's "plain text forecloses Michigan's interpretation, and since the regulation of *interstate* gambling isn't a traditional area of state regulation, the

presumption against preemption doesn't apply." 162 F.4th at 641 n.5. Precisely the same logic governs here.

## II. THE PANEL'S DECISION IS WRONG AND UNTENABLE.

The CEA's plain text preempts the application of state gambling laws to exchange-traded event contracts. Section 2(a)(1)(A) grants the CFTC "exclusive jurisdiction" over "agreements …, and transactions involving swaps or … future[s]" traded on DCMs.

As multiple courts have now recognized, the phrase "exclusive jurisdiction" leaves no room for states to exercise concurrent jurisdiction. *Assad*, 2026 WL 2543846, at *7; *Flaherty*, 172 F.4th at 228. In other words, it preempts state laws.

Event contracts fall readily within the CEA's preemptive scope because they are "swaps," a term the CEA defines to include "contract[s]" where payment depends "on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency" associated with a potential financial consequence. 7 U.S.C. § 1a(47)(A)(ii). This "clause reads about as broadly as it could." *Coinbase Fin. Mkts., Inc. v. Raoul*, No. 1:25-cv-15406, 2026 WL 2969682, at *7 (N.D. Ill. Oct. 2, 2026). It plainly captures event contracts—

including contracts involving sporting events associated with a "potential" financial consequence.[3]

The panel's contrary holdings contravene the clear statutory text and the views of the CFTC—which the panel ignored.

### A. The Panel Erred In Holding That The CEA Does Not Expressly Preempt State Gambling Laws.

The panel held that the CEA's grant of "*exclusive* jurisdiction" allows the application of "ancillary" state laws. A39 (emphasis added). That is plainly incorrect. "Exclusive means exclusive." *Am. Energy*, 622 F.3d at 605. The Supreme Court has held as much. *See Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 233-234 (1947).

In disagreeing, the panel defied 50 years of consistent precedent and practice. Since 1974, no state has been permitted to dictate what instruments may and may not be traded on DCMs. If state laws banning contracts the CFTC has approved are merely "ancillary" regulation, it is unclear what, if any, state regulation would be out-of-bounds. And if states can prohibit

[3] Regardless, the CEA's preemptive field goes beyond swaps, extending to all "agreements" traded on DCMs, 7 U.S.C. § 2(a)(1)(A); *see* H.R. Rep. No. 106-711, pt. 2, at 71 (2000) (the CEA "supersedes and preempts" state laws "in the case of transactions conducted on a registered entity"). Otherwise, states would have a roving license to apply their state laws to bar DCM trading whenever they believe certain contracts don't satisfy their interpretation of the swap definition.

CFTC-approved derivatives on CFTC-registered exchanges, a national market subject to uniform regulation would be pointless.

The panel nonetheless believed Congress must have intended to permit the application of state "gambling" laws to what it viewed as "sports betting." A39-40. That view is irreconcilable with text and history. States once derided *all* derivatives trading as "gambling" because it involved speculating on future prices and settling in cash. *E.g.*, *Cothran v. Ellis*, 16 N.E. 646, 647 (Ill. 1888). Ohio and Tennessee banned derivatives trading as gambling, as did many other states. Opening Br. Addendum, *Schuler* Dkt. No. 28. Congress gave the CFTC "exclusive jurisdiction" specifically to preempt these kinds of state gambling laws. *See Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980) (Friendly, J.).

In other words, there is no "gambling" exception to CEA preemption. Rather, Congress recognized that all trading has "hazards"—including the risk of market manipulation and liquidity problems—that demand nationwide oversight. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 360 (1982). Congress also recognized that trading on nationwide exchanges serves the "national public interest" by providing a means for hedging risk and "discovering prices." 7 U.S.C. § 5(a). Those

benefits can only be achieved by nationwide markets where competitively set prices reflect principles of supply and demand.

Kalshi's contracts serve precisely these "national public interest[s]." *Id.* Traders use Kalshi to hedge exposure to "a wide array of events for which no traditional financial instrument otherwise exists," including "sporting events." 91 Fed. Reg. at 35,807-08 (citation modified). And anyone with an internet connection can visit Kalshi's website to see the world's most accurate probabilistic data about events that matter.

Kalshi's contracts are therefore fundamentally distinct from state-regulated sports betting, which serves neither of these interests. And because the market sets the prices for Kalshi's contracts, they also avoid one of the chief problems state gambling laws address—bookmakers who stack the odds in their favor.

### B. The Panel Erred In Holding That Kalshi's Contracts Are Not Swaps.

1. The panel's interpretation of "swap" is equally problematic. The panel plucked out one type of event—sports—and concluded categorically that those events can never underlie swaps. But Congress did not define "swap" by reference to the subject matter of the underlying event, and there is no statutory language categorically excluding the types of events that may

underlie a swap. "[A] swap is a swap," regardless of whether it involves a sports event or some other event. *Raoul*, 2026 WL 2969682, at *10.

The Special Rule confirms that "event contracts" and "swaps" may involve "gaming." 7 U.S.C. § 7a-2(c)(5)(C). Congress was unquestionably aware that event contracts could involve gaming—including events like the "Super Bowl," 156 Cong. Rec. S5907 (daily ed. July 15, 2010) (statement of Sen. Lincoln)—and gave the CFTC, rather than the states, authority to permit or ban those contracts.

The panel concluded otherwise by holding that the swap definition covers only events "inherently" associated with financial consequences. A20. But "inherently" appears nowhere in the statute, which instead requires only "potential" financial consequences. 7 U.S.C. § 1a(47)(A)(ii). And sports events have *actual* economic consequences for sponsors, advertisers, broadcasters, team owners, and more. Those events "generate economic activity and materially affect both regional and national markets" with "billions" of dollars at stake. 91 Fed. Reg. at 35,807-08, 35,830 (citation modified).

The panel dismissed these financial consequences as "downstream." A20. But all consequences are "downstream"—that is what makes them consequences. As the panel itself acknowledged, many specifically

enumerated swaps, like weather swaps or metal swaps, "are not intrinsically associated with financial consequences," A23 n.7, underscoring the flaws in the panel's extratextual limit.

The panel suggested that Kalshi's interpretation would render other swap definitions superfluous. A23. But the "canon against surplusage is subordinate to the 'cardinal canon'" requiring application of the text as written. *USPS v. Konan*, 607 U.S. 391, 406 (2026) (citation omitted). Besides, Section 1a(47)(A)(ii) covers "events"; the other swap definitions do not. While there is some overlap, that is true of *all* the swap definitions. It would make no sense "to rely on the rule against legislative redundancies in construing statutory language that is a smorgasbord of redundancy, repetition, superfluity, duplication and redundancy." *Raoul*, 2026 WL 2969682, at *9 (citation omitted).

The panel maintained that the swap definition covers only events for which it would be "commonly understood that hedging risk and deriving pricing information" promotes "market stability." A24. Again, this policy-driven limit is nowhere in the text. The CFTC may consider hedging and price discovery in conducting public-interest review under the Special Rule—but that is a task Congress left to the CFTC rather than states. And while the panel appeared to believe speculation must be stamped out, the Supreme

Court and Congress have recognized that the "activity of speculators is essential to the operation of a futures market." *Curran*, 456 U.S. at 359 n.11 (quoting H.R. Rep. No. 93-975, at 138 (1974)).

2. The panel undertook to rewrite the CFTC's jurisdiction for fear that the CEA as written is "limitless." A24. But the statute itself imposes multiple limits, obviating the need for extratextual ones.

*First*, the CEA requires that retail swaps be "traded" on an exchange, 7 U.S.C. § 2(a), which necessarily means they must be *capable* of being traded. The CEA thus distinguishes instruments that are structured to be traded from those that are not. Event contracts are interstate transactions structured like all other derivatives, which means they must be traded on DCMs. Sportsbook bets, by contrast, are bilateral contracts transacted entirely within one state and priced by an in-house bookmaker, which means they need not be.

This limitation conclusively answers the panel's fear that adopting the plain meaning of "swap" would expose "countless Americans to potential criminal liability" for trading sports bets off exchange. A26; *see* 7 U.S.C. § 2(e). State-regulated sports bets are not swaps subject to the CEA's exchange-trading requirement, and neither Kalshi nor the CFTC has ever

contended otherwise. The CFTC made this clear to the panel, CFTC Amicus Br. 10-12, *Orgel* Dkt. No. 63, but the panel ignored its views.

*Second*, swaps must involve events "associated with" potential financial consequences. This excludes consequences "that are too tenuous, remote, or peripheral," and requires "some significance and materiality." *Raoul*, 2026 WL 2969682, at *8 (citation modified). One can readily imagine some events—including some sports events—that would flunk this test. But the fact that some sports events may lack the requisite association with financial consequences cannot be a basis for excluding *all* sports events. And the CFTC, with its relevant "competence and expertise," *Piccolo v. CFTC*, 388 F.3d 387, 391 (2d Cir. 2004) (per curiam), is best-positioned to evaluate whether a particular event is sufficiently associated with financial consequences, *see Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 182-183 (2025).

*Third*, the CEA and its implementing regulations prohibit DCMs from listing any contract readily susceptible to "manipulation." *See* 7 U.S.C. §7(d)(3); 17 C.F.R. §38.251(a). A swap would flunk this test if it depended on a readily manipulable occurrence. *Cf.* 91 Fed. Reg. at 35,866-67 (explaining the importance of preventing sports-event contracts that are readily susceptible to manipulation). The CFTC is actively policing this requirement

and recently issued guidance against listing certain contracts prone to manipulation. *See* Duncan Hermes, CFTCLTR No. 26-27, Comm. Fut. L. Rep. (CCH) ¶ 35,722 (Sep. 22, 2026). Kalshi is complying with that guidance.

## III. RECENT CFTC RULEMAKINGS WARRANT REHEARING.

On October 9, the CFTC issued two rules that confirm the limits on the swap definition and the need for rehearing.

*First*, the CFTC issued an interim final rule confirming that a "swap" "does not include," among other things, contracts that are "regulated as gaming or gambling under applicable State or Tribal law" and "not traded on a board of trade" or other "organized exchange." IFR, *supra*, at 40. The CFTC adopted this rule partially in response to the panel's decision, which reflected "the erroneous premise that if event contracts are swaps, then casino-style gambling products must also be swaps," leading the panel "to deviate from" the swap definition's "plain text." *Id.* at 9.

*Second*, pursuant to the CFTC's expressly delegated authority to "further define 'swap,'" the CFTC published an NPRM defining "swap" to include "[e]vent contracts, including those based on sports-, politics-, cultural-, and weather-related events." NPRM, *supra*, at 1, 8. The CFTC adopted the proposed rule given "widespread confusion" to "expressly clarify

that event contracts, including those based on sports[ ] … are swaps." *Id.* at 11; *see also* 15 U.S.C. § 8302(d)(1).

These rulemakings substantially undermine the panel's holding concerning the meaning of "swap." That provides another distinct reason for granting rehearing, on top of the many that existed even before these developments.

## CONCLUSION

The Court should grant rehearing or rehearing en banc.

Dated: October 9, 2026

Respectfully submitted,

*/s/ Neal Kumar Katyal*

NEAL KUMAR KATYAL
JOSHUA B. STERLING
COLLEEN E. ROH SINZDAK
WILLIAM E. HAVEMANN
NATASHA R. KHAN
EZRA P. LOUVIS
SAMANTHA K. ILAGAN
MILBANK LLP
1101 New York Ave. NW
Washington, DC 20005
Telephone: (202) 835-7505
nkatyal@milbank.com

GRANT R. MAINLAND
ANDREW L. PORTER
NICOLE D. VALENTE
DAVIS CAMPBELL
MILBANK LLP
55 Hudson Yards
New York, NY 10001

*Counsel for Plaintiff KalshiEX LLC*

## CERTIFICATE OF COMPLIANCE

I certify that this petition complies with the type-volume limitations of Fed. R. App. P. 40(d)(3)(A) because it contains 3,899 words, excluding the items exempted by Fed. R. App. P. 32(f).

I further certify that this petition complies with the typeface and type-style requirements of Fed. R. App. P. 32(c)(2) because it has been prepared using Microsoft Office Word for Office 365 in 14-point Times New Roman font.

Dated: October 9, 2026

*/s/ Neal Kumar Katyal*
Neal Kumar Katyal

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system on October 9, 2026.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: October 9, 2026

*/s/ Neal Kumar Katyal*
Neal Kumar Katyal

# ADDENDUM

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0272p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

---

KALSHIEX LLC,

*Plaintiff-Appellant* (26-3196),
*Plaintiff-Appellee* (26-5235),

*v.*

MATTHEW T. SCHULER; THOMAS J. STICKRATH; SHEETAL BAJORIA; SCOTT P. BORGEMENKE; KEITH CHENEY; PENELOPE R. CUNNINGHAM; CHRISTOPHER SMITHERMAN; TRIFFON CALLOS; OHIO CASINO CONTROL COMMISSION; DAVE YOST, Ohio Attorney General,

*Defendants-Appellees* (26-3196),

WILLIAM ORGEL, in his official capacity as Chairman of the Tennessee Sports Wagering Council; MARY BETH THOMAS, in her official capacity as the Executive Director of the Tennessee Sports Wagering Council; JONATHAN THOMAS SKRMETTI, in his official capacity as Attorney General of Tennessee,

*Defendants-Appellants* (26-5235).

Nos. 26-3196/5235

Appeals from the United States District Courts for the

Southern District of Ohio at Columbus,
No. 2:25-cv-01165—Sarah Daggett Morrison, District Judge;

---

Middle District of Tennessee at Nashville,
No. 3:26-cv-00034—Aleta Arthur Trauger, District Judge.

Argued: July 30, 2026

Decided and Filed: September 25, 2026

Before: CLAY, GIBBONS, and BLOOMEKATZ, Circuit Judges.

---

**COUNSEL**

**No: 26-3196**

**ARGUED:** William E. Havemann, MILBANK LLP, Washington, D.C., for Appellant. Mathura J. Sridharan, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellees. **ON BRIEF:** William E. Havemann, Neal Kumar Katyal, Joshua B. Sterling, Colleen E. Roh Sinzdak, Samantha K. Ilagan, MILBANK LLP, Washington, D.C., Grant R. Mainland, Andrew L. Porter, Nicole D. Valente, Davis Campbell, MILBANK LLP, New York, New York, Michael J. Hunter, Matthew L. Jaladoni, FLANNERY | GEORGALIS LLC, Columbus, Ohio, for Appellant. Mathura J. Sridharan, Zachery P. Keller, John F. Kerkhoff, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellees. Henry J. Dickman, M. Jordan Minot, Anne Stukes, U.S. COMMODITY FUTURES TRADING COMMISSION, Washington, D.C., Dominick V. Freda, BETTER MARKETS, INC., Washington, D.C., Kevin F. King, Matthew J. Glover, COVINGTON & BURLING LLP, Washington, D.C., Alyssa Howard, ZUCKERMAN SPAEDER LLP, Washington, D.C., Heidi Parry Stern, OFFICE OF THE NEVADA ATTORNEY GENERAL, Las Vegas, Nevada, Joseph H. Webster, Elizabeth A. Bower, Jens W. Camp, Alexandra K. Holden, HOBBS, STRAUS, DEAN & WALKER LLP, Washington, D.C., Michael Hoenig, YUHAAVIATAM OF SAN MANUEL NATION, Washington, D.C., Bryan Newland, POWERS, PYLES, SUTTER & VERVILLE PC, Washington, D.C., Scott Crowell, CROWELL LAW OFFICE, Sedona, Arizona, for Amici Curiae.

**No. 26-5235:**

**ARGUED:** Aaron L. Bernard, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellant. William E. Havemann, MILBANK LLP, Washington, D.C., for Appellee. **ON BRIEF:** Aaron L. Bernard, Michael Wennerlund, Walker Anderson, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellant. William E. Havemann, Neal Kumar Katyal, Joshua B. Sterling, Colleen E. Roh Sinzdak, Samantha K. Ilagan, MILBANK LLP, Washington, D.C., Grant R. Mainland, Andrew L. Porter, Nicole D. Valente, Davis Campbell, MILBANK LLP, New York, New York, for Appellee. Dominick V. Freda, BETTER MARKETS, INC., Washington, D.C., Joseph H. Webster, Elizabeth A. Bower, Jens W. Camp, Alexandra K. Holden, HOBBS, STRAUS, DEAN & WALKER LLP, Washington, D.C., Michael Hoenig, YUHAAVIATAM OF SAN MANUEL NATION, Washington, D.C., Bryan Newland, POWERS, PYLES, SUTTER & VERVILLE PC, Washington, D.C., Scott Crowell, CROWELL LAW OFFICE, Sedona, Arizona, Kevin F. King, Matthew J. Glover, COVINGTON & BURLING LLP, Washington, D.C., Heidi Parry Stern, OFFICE OF THE NEVADA ATTORNEY GENERAL, Las Vegas, Nevada, Stanford E. Purser, OFFICE OF THE UTAH ATTORNEY GENERAL, Salt Lake City, Utah, Elizabeth B. Prelogar, COOLEY LLP, Washington, D.C., Steven P. Lehotsky, LEHOTSKY KELLER COHN LLP, Washington, D.C., Renato Mariotti, PAUL HASTINGS LLP, Chicago, Illinois, for Amici Curiae.

---

**OPINION**

---

JULIA SMITH GIBBONS, Circuit Judge. Kalshi is a financial services company that operates a designated contract market (DCM), on which participants can buy and sell financial products known as "event contracts"—derivatives whose payoff depends on a specified event, occurrence, or value. Kalshi initially offered event contracts across a variety of fields, including climate, crypto, economics, politics, and popular culture. Then in early 2025, Kalshi began offering sports-event contracts on its exchange. These event contracts drew the attention of various state regulators, including Tennessee's and Ohio's sports-gambling regulators. After the Ohio Casino Control Commission (OCCC) and Tennessee Sports Wagering Council (TSWC) indicated that they intended to bring enforcement actions against Kalshi for offering these contracts in violation of their respective state's gambling laws, Kalshi filed suits in Ohio (*Schuler*) and Tennessee (*Orgel*). Kalshi sought preliminary injunctions on the basis that, as applied to Kalshi, these state laws are preempted by the Commodities Exchange Act (CEA), a federal law that gives a federal agency "exclusive jurisdiction" over "swaps" on DCMs. The Southern District of Ohio denied Kalshi's request, holding that (1) Kalshi failed to show that its sports-event contracts are "swaps" subject to the exclusive jurisdiction of the Commodity Futures Trading Commission (CFTC) and (2) even if it had made this showing, Kalshi still failed to establish that Ohio's sports gambling laws are preempted. By contrast, the Middle District of Tennessee granted Kalshi's motion, holding that Kalshi was likely to succeed on the merits because sports-event contracts are "swaps" and that conflict preemption applies.

We hold that Kalshi has not shown that its sports-event contracts satisfy the statutory definition of a "swap" so as to fall within the scope of the CFTC's "exclusive jurisdiction." And, even assuming that Kalshi's sports-event contracts are swaps, we alternatively hold that the CEA neither expressly nor impliedly preempts Ohio's or Tennessee's gambling laws. Thus, we affirm the Southern District of Ohio's denial of a preliminary injunction, vacate the Middle District of Tennessee's entry of a preliminary injunction, and remand for further proceedings consistent with this opinion.

## I.

### A.

Congressional regulation of commodities trading has evolved over time and reflects a pattern of "successively broadening the coverage of regulation by the addition of more and more commodities to the applicable legislation." *Dunn v. Commodity Futures Trading Comm'n*, 519 U.S. 465, 475 (1997). Congress passed the Grain Futures Act in 1922, which authorized the Secretary of Agriculture to supervise trading in grain futures on "contract markets." *Id.* at 476 n.11. In 1936, Congress "changed the name of th[is] statute to the Commodity Exchange Act, . . . add[ing] detailed provisions regulating trading in futures contracts." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 362 (1982). A futures contract is best defined as an "agreement to buy or sell a particular product or financial instrument at an agreed-upon price on an agreed-upon date in the future." *United States v. Chanu*, 40 F.4th 528, 532 (7th Cir. 2022).

The CEA established a framework for regulating derivatives markets in the United States. *See* 7 U.S.C. § 5(b). A derivative is a financial instrument or contract, such as a future, option, or swap, the price of which is "directly dependent upon (i.e., derived from) the value of one or more underlying securities, equity indices, debt instruments, commodities, other derivative instruments, or any agreed upon pricing index or arrangement[.]" CFTC, *Futures Glossary: A Guide to the Language of the Futures Industry*, https://perma.cc/5MFL-VNXT; *see also Derivative*, Black's Law Dictionary (12th ed. 2024). Derivatives are used to hedge financial risk and historically have been categorized as either: (1) futures contracts, or (2) options contracts, which "represent the opportunity to buy or sell products at a fixed price at a fixed time and place in the future." James M. Falvey & Andrew N. Kleit, *Commodities Exchanges & Antitrust*, 4 Berkeley Bus. L.J. 125, 126 (2007).

In 1974, Congress enacted the Commodity Futures Trading Commission Act, which established the CFTC as an independent federal agency to regulate derivatives. Pub. L. No. 93-463, 88 Stat. 1389 (1974); *see also* CFTC Act § 101, 88 Stat. at 1389. Soon after, Congress amended the CEA, vesting in the CFTC "exclusive jurisdiction" "with respect to" agreements and

transactions "involving swaps or contracts of sale of a commodity for future delivery . . . traded or executed on a [designated] contract market." 7 U.S.C. § 2(a)(1)(A). Then in 1982, Congress again amended the CEA, requiring futures to be traded on "centralized exchanges" known as DCMs. *Bloomberg L.P. v. Commodity Futures Trading Comm'n*, 949 F. Supp. 2d 91, 97 (D.D.C. 2013). DCMs are subject to CFTC oversight. Under CFTC rules, DCMs—like Kalshi—may self-certify in writing that the contracts or instruments they offer comply with the law and applicable regulations. *See* 7 U.S.C. § 7; *id.* § 7a-2(c)(1); 17 C.F.R. § 40.2. After a DCM files a self-certification with the CFTC, it can start offering contracts. 17 C.F.R. § 40.2; 7 U.S.C. § 7a-2(c)(1)–(2).

Although Congress has granted the CFTC an area of "exclusive jurisdiction," Congress also included a savings clause reserving other regulatory authorities' power—"[e]xcept as hereinabove provided" by that grant—in two key respects. First, the CEA does not "supersede or limit the jurisdiction . . . conferred on the Securities and Exchange Commission," other federal regulatory agencies, or "other regulatory authorities under the laws of the United States or of any State." 7 U.S.C. § 2(a)(1)(A). Second, it does not restrict those same regulatory authorities "from carrying out their duties and responsibilities in accordance with such laws." *Id.*

By the early 2000s, "swaps"—a new type of derivative—emerged, becoming "pervasive." *Inv. Co. Inst. v. U.S. Commodity Futures Trading Comm'n*, 891 F. Supp. 2d 162, 171 (D.D.C. 2012). Swaps are "financial contracts in which two counterparties agree to exchange or 'swap' payments with each other as a result of such things as changes in a stock price, interest rate or commodity price." SEC, The Regulatory Regime for Security-Based Swaps (2012), https://perma.cc/V2MF-86SA; *see also* Norman Menachem Feder, *Deconstructing Over-the-Counter Derivatives*, 2002 Colum. Bus. L. Rev. 677, 701–16 (2002). Swaps allow parties with exposure to particular risks—such as changing commodity prices—to mitigate the risk of that exposure by hedging against fluctuations in the price of whatever underlies the swap. *See* Feder, *Deconstructing Over-the-Counter Derivatives*, 2002 Colum. Bus. L. Rev. at 705; *Schuler*, CA6 R. 55, Gensler Amicus Br., at 4. For instance, a U.S.-based importer faces risk related to the value of the dollar because if the dollar's value falls, imports become more expensive. By entering into a currency swap (with, say, a European exporter who faces the reverse risk) and trading dollars for

euros, the importer can hedge against that risk: if the dollar's value rises, imports will be cheaper, making importing more profitable. And if the dollar's value falls, then the importer's increased costs will be offset by the increased relative value of their acquired euros. *See* Jeffrey Bozeel, *VIII. Currency Swaps*, 29 Rev. of Banking & Fin. Law 58, 59–60 (2009). In short, a "swap" is a transaction where two parties agree to exchange payments to mitigate financial risk. *See Power & Tel. Supply Co. v. SunTrust Banks, Inc.*, 447 F.3d 923, 926 n.1 (6th Cir. 2006).

Unlike futures and options contracts, swaps were originally traded almost entirely in unregulated "over-the-counter" markets, rather than in CFTC-regulated DCMs. *Bloomberg*, 949 F. Supp. 2d at 98. In those markets, "transactions [were] not required to be cleared," and derivatives dealers were "not required to register with the government," depriving market participants, federal regulators, and the public of information generally available on public trading venues. *Id.* Given the lack of regulatory oversight, over-the-counter derivatives "spiraled out of control and out of sight" and "contributed significantly to the global financial crisis in 2008," which eventually led to the passage of the Dodd-Frank Wall Street Reform & Consumer Protection Act (Dodd-Frank) in 2010. *Id.*; *see* Pub. L. No. 111-203, 124 Stat. 1376 (2010). Indeed, since its inception, Dodd-Frank's *raison d'être* has been to "promote the financial stability of the United States by improving accountability and transparency in the financial system." Pub. L. No. 111-203, 124 Stat. 1376 (2010).

As relevant here, Dodd-Frank brought swaps under the CFTC's jurisdiction, and required that, in most circumstances, they be traded on DCMs. 7 U.S.C. § 2(a)(1)(A), (e). The amendments include a six-part definition of "swap," with one subpart, which is at issue here, describing the financial instrument as "any agreement, contract, or transaction" that provides for "payment" dependent on "the occurrence . . . of an event" that is "associated with a potential financial, economic, or commercial consequence." *Id.* § 1a(47)(A)(ii).

Dodd-Frank also created a "Special Rule" that enables the CFTC to prohibit "event contracts" from being listed on DCMs if they involve certain activities, such as terrorism, war, or gaming. An event contract, also known as a "prediction" or "information" contract, is a type of

derivative contract where the "payoff is based on a specified event, occurrence, or value." CTFC, *Contracts & Products*, https://perma.cc/VQV4-5Y3M.

**B.**

At the time Dodd-Frank was enacted, the Professional and Amateur Sports Protection Act (PASPA) largely prohibited states from authorizing sports gambling. 28 U.S.C. §§ 3702, 3704(a). It was not until 2018 that the Supreme Court struck down PASPA. The Court held that PASPA's provision prohibiting state authorization of sports gambling violated the anticommandeering doctrine by dictating what a state legislature could or could not do, essentially putting it "under the direct control of Congress." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 474 (2018). The Court further explained that "Congress can regulate sports gambling directly, but if it elects not to do so, each State is free to act on its own." *Id.* at 486.

Since *Murphy*, a majority of the states have legalized sports gambling in some form. Karl E. Schneider, Cong. Rsch. Serv., IF12761, Sports Betting & Consumer Finance (2026). This legalization has led to a rapid expansion in sports gambling, spurring concerns over consumer protections and the impact on consumer finances given sports gambling's potentially addictive qualities. Some states have used tax revenues generated by sports gambling, amounting to more than 3.2 billion dollars just in the 2025 fiscal year,[1] to fund public programs including gambling addiction treatment.[2]

Relevant here, Ohio and Tennessee have legalized sports gambling. *See* 2021 Ohio House Bill 29; 2019 Tenn. Pub. Acts, ch. 50; Tenn. Code Ann. § 4-49-106(a). Under Ohio law, "sports gaming" means "accepting wagers on sporting events." Ohio Rev. Code § 3775.01(O)(1). Ohio requires entities offering "wagers on sporting events" to ensure those wagers are initiated, received, and completed within the state. Ohio Rev. Code §§ 3775.03(A), 3775.11(A), 3775.12(A). And bettors must be 21 years old. Tennessee law defines "interactive sports

---

[1]David Yaffe-Bellany & Sharon LaFraniere*, Clash Between Prediction Markets & States Sets Off a Furious Political Battle*, N.Y. Times (August 27, 2026), https://perma.cc/7GQ8-WJY9.

[2]Rob Simon, *Quarterly Summary of State & Local Tax Revenue Shows Nationwide Surge in Sports Betting Revenue*, U.S. Census Bureau, https://perma.cc/WAB8-LC3H.

wagering" as "placing a wager on a sporting event via the internet, a mobile device, or other telecommunications platform." Tenn. Code Ann. § 4-49-102(14). Similarly, Tennessee requires bettors to be 21 years old and "physically located in Tennessee." Tenn. Code Ann. §§ 4-49-102, 4-49-111. Both States' gaming laws also establish numerous requirements relating to licensing, tax obligations, and consumer protection. *E.g.*, *id.* § 4-49-117.

Kalshi does not currently comply with either State's gaming laws.

**C.**

Since 2020, Kalshi has registered as a DCM with the CFTC. On January 22, 2025, Kalshi self-certified and started listing sports-event contracts on its exchange. These contracts allow users to take positions on a range of sports-related "events." For example, "which teams will advance in the NCAA College Basketball Tournaments or who will win the U.S. Open Golf Championship." *Orgel*, DE 1, Compl., Page ID 16. Or how many corner kicks will be taken in a soccer game, if a sports broadcaster will say a particular word on air, or if a combination of multiple events (e.g., a player will get a block in the first quarter, that same player will score a three-pointer in the second quarter, and that player's team will be winning after the third quarter) will occur. This last type of contract is called a "parlay." *Schuler*, CA6 R. 36, Ohio Br., at 13–14. For each event contract, a trader can purchase a "yes" or "no" position. *Orgel*, DE 48, Mem. Op., Page ID 873. If the event described occurs, the "yes" positions are paid out; if not, the "no" positions are paid out. *See id.* Kalshi has marketed itself as "the first nationwide legal sports betting platform," claiming that "sports betting [is] legal in all 50 states on Kalshi." *See* Dustin Gouker, *Ten Times Kalshi Said People Could Bet On Things*, Event Horizon (April 3, 2025), https://perma.cc/CWK2-TZCV.

"Given the sports-event contracts' resemblance to sports betting," and the fact that Kalshi has not registered with state gaming or wagering regulators, various state agencies "began knocking on Kalshi's door[.]" *Schuler*, DE 69, Mem. Op. & Order, Page ID 894. Kalshi's sports-related event contracts have drawn the attention of various state regulators nationwide, spurring

numerous lawsuits that have yielded mixed results.[3] The procedural histories of *Schuler* and *Orgel* follow a similar trajectory, but for clarity we recite the history of each case separately.

**1.**

The OCCC, Ohio's sports-wagering regulator, sent Kalshi a cease-and-desist letter, putting it on notice that, "by offering 'event contracts' on sporting events to citizens located within the State of Ohio, without a sports gaming license," it was violating Ohio law. *Schuler*, DE 1-1, C&D Letter, Page ID 26. The OCCC also described Kalshi's "unlicensed and unlawful offering of sports gaming" to individuals under twenty-one years of age as "a flagrant disregard of Ohio's statutory gambling age limit." *Id.* at 27 (citing Ohio Rev. Code § 3775.99(A)(2)). Hence, it demanded that Kalshi "immediately cease offering these sports wagering products unlawfully in Ohio." *Id.* at 26. Kalshi responded by citing favorable district court decisions, explaining that as "a federally licensed exchange . . . authorized to operate its market in all 50 states," it could not "be regulated by Ohio or any other state." *Schuler*, DE 1-2, Kalshi Letter Resp., Page ID 29–30.

Separately, the OCCC warned various sportsbooks that "offering or facilitating the offering of unlicensed sports gaming in Ohio [would] call[] into question the reputation of the licensee and the integrity of sports gaming in Ohio." *Schuler*, DE 1-5, OCCC Letter to Sportsbooks, Page ID 57–59. The OCCC advised that it would "consider a licensee's choice to associate with a company operating illegally" in Ohio and "take administrative action against any licensee that [did]." *Id.* at 59. Kalshi characterized this measure as a "clear attempt . . . to limit [its] ability to conduct its business and enter into business relationships—including those with no impact on Ohio—because of the Commission's mistaken view that Kalshi is engaged in 'online sports gaming.'" *Schuler*, DE 1-6, Kalshi Resp. to OCCC's August 19 Letter, Page ID 62.

---

[3]Two of our sister circuits have ruled on substantially the same question presented here—reaching opposite results. The Third Circuit affirmed the District of New Jersey's order granting Kalshi's motion for a preliminary injunction. *KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 224 (3d Cir. 2026). And more recently, the Ninth Circuit affirmed the District of Nevada's order, which had dissolved Kalshi's preliminary injunction. *KalshiEX LLC v. Assad*, --- F.4th ---, 2026 WL 2543846, at *6 (9th Cir. Aug. 28, 2026). The appeal before the Fourth Circuit remains pending. *See KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667 (D. Md. Aug. 1, 2025) (denying Kalshi's motion for a preliminary injunction), *appeal docketed*, No. 25-1892 (4th Cir. Aug. 6, 2025).

Following the state's actions, Kalshi filed a complaint in the Southern District of Ohio against the OCCC, its Commissioners, and its Executive Director in their official capacities, and the Attorney General of Ohio (collectively, "Ohio"). Kalshi sought a declaratory judgment, under 28 U.S.C. §§ 2201–02, that Ohio Revised Code chs. "2915, 3767, 3775, any rules adopted thereunder, and any other Ohio law that is used in a manner to effectively regulate [Kalshi's] designated contract market violates the Supremacy Clause of the United States Constitution as applied to [Kalshi]."[4] *Schuler*, DE 1, Compl., Page ID 23. Concurrently with its complaint, Kalshi filed a motion for a preliminary injunction.

The Southern District of Ohio denied Kalshi's motion for a preliminary injunction, holding that Kalshi failed to make a "clear showing" that it was entitled to the "extraordinary preliminary injunctive relief" it sought. *Schuler*, DE 69, Op. & Order, Page ID 900. Specifically, the district court concluded that Kalshi failed to demonstrate a likelihood of success on the merits and that the balance of the equities and public interest weighed in Ohio's favor, given the State's interest in exercising its police power to promote the public welfare. Kalshi timely appealed, seeking a stay of the preliminary injunction pending appeal, which the court summarily denied. Separately, Kalshi filed an emergency motion in our circuit for an injunction pending appeal of the district court's order or an "emergency administrative stay" in the alternative. *Schuler*, CA6 R. 6, Kalshi Emerg. Mot., at 26.

A motions panel from our circuit denied Kalshi's request, holding that although Kalshi had raised serious questions on the merits, it had "shown at most only that the merits [were] in equipoise," which "d[id] not suffice to enjoin Ohio's gambling laws pending appeal because of Ohio's strong interest in enforcing the laws and the underlying public interests that the laws serve." *KalshiEX LLC v. Schuler*, 2026 WL 1295806, at *1 (6th Cir. Apr. 24, 2026) (per curiam). Specifically, the motions panel determined that the CEA's exclusive jurisdiction provision was not structured as a traditional preemption provision, reasoning that it would have been stated in clearer terms if it were intended to have forceful preemptive effect. *Id.* at *4. Additionally, the motions

[4]Ohio Revised Code chs. 2915, 3767, and 3775 outline Ohio's legal framework for "gambling," "public nuisances," and "sports gaming," respectively.

panel reasoned that the CEA's statutory features made field preemption unlikely, and Kalshi had not carried its burden of showing that conflict preemption exists. *Id.* at *5–6. The panel ordered that Kalshi's appeal be expedited before a merits panel.

**2.**

In Tennessee, the TSWC is the sports-wagering regulator tasked with enforcing and ensuring compliance with the Tennessee Sports Gaming Act (TSGA). In 2025, the TSWC sent the CFTC a letter informing it that CFTC-regulated entities' offering of sports-event contracts violates TSGA regulations. The state agency explained why Kalshi's sports-event contracts were unlawful: Kalshi "accepts a sum of money risked on the outcome of a sporting event without a valid license issued by the [TSWC]." *Schuler*, DE 1-1, C&D Letter, Page ID 28; *see* Tenn. Code Ann. § 4-49-101 *et seq.*; *see, e.g.*, Tenn. Comp. R. & Regs. 1350-02-.03. In early 2026, the TSWC sent Kalshi a cease-and-desist letter demanding that it halt offering sports-event contracts to customers in Tennessee.

Kalshi then filed a complaint in the Middle District of Tennessee against the TSWC, its Chairman and Executive Director, as well as the Attorney General of Tennessee (collectively, "Tennessee"). The district court entered a temporary restraining order the same day. After holding a hearing, the court granted in part and denied in part Kalshi's motion for a preliminary injunction. To start, the court found that sovereign immunity barred Kalshi's suit against TSWC, but that the suit could proceed with only the state officials as defendants. The court then decided that because Kalshi's sports-event contracts are "swaps" under the CEA and the CFTC has "exclusive jurisdiction" over "swaps," the CEA conflict-preempted Tennessee's regulation of Kalshi's sports-event contracts. *See Orgel*, DE 48, Mem. Op., Page ID 881–88 (citing 7 U.S.C. § 2(a)(1)(A)). Tennessee timely appealed,[5] and requested that *Orgel* be considered alongside *Schuler*.

[5]Only Orgel, Thomas, and Skrmetti, the Tennessee officials—not the TSWC—appealed the district court's order granting Kalshi a preliminary injunction.

**II.**

Courts apply a four-factor test to determine whether to grant a preliminary injunction. *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 326 (6th Cir. 2019). "To secure a preliminary injunction, a plaintiff 'must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *EOG Res., Inc. v. Lucky Land Mgmt., LLC*, 134 F.4th 868, 874 (6th Cir. 2025) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Because "a preliminary injunction is an extraordinary equitable remedy that is never awarded as of right," the movant "must make a clear showing that these factors favor him." *Id.* (citation modified). A preliminary injunction should thus "be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it[.]" *Fetch! Pet Care, Inc. v. Atomic Pawz Inc.*, 170 F.4th 546, 553 (6th Cir. 2026) (quoting *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002)).

We review a district court's decision to grant or deny a preliminary injunction for abuse of discretion, with legal questions reviewed de novo and factual findings reviewed for clear error. *Stryker Emp. Co. v. Abbas*, 60 F.4th 372, 380 (6th Cir. 2023) (citation omitted). We will only disturb the district court's decision "if it 'relied upon clearly erroneous findings of fact, improperly applied the governing law, or used an erroneous legal standard.'" *McGirr v. Rehme*, 891 F.3d 603, 610 (6th Cir. 2018) (quoting *Hunter v. Hamilton Cnty. Bd. of Elections*, 635 F.3d 219, 233 (6th Cir. 2011)). "A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 541 (6th Cir. 2007) (citation modified).

**III.**

We review de novo whether the movant is likely to succeed on the merits. *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (en banc). The thrust of Kalshi's argument on appeal is that the "CEA's plain text and every other marker of congressional

intent establish that only the CFTC may regulate trading on DCMs," so the States are thus prohibited from enforcing their gambling laws. *Schuler*, CA6 R. 28, Kalshi Br., at 29.

The parties contest three main issues: *First*, we consider whether Kalshi has a cause of action to challenge state enforcement efforts. We hold that it does. *Second*, we ask whether Kalshi's sports-event contracts constitute "swaps" under the CEA, which we determine is necessary for those contracts to come within the CEA's exclusive jurisdiction provision. We hold they do not. And *third*, we ask whether, assuming Kalshi's sports-event contracts are swaps for purposes of this analysis, the CEA expressly or impliedly preempts the States' gambling laws as applied to Kalshi's sports-event contracts. We hold that the States' gambling laws are neither expressly nor impliedly preempted.

**A.**

We begin by addressing the threshold issue of whether Kalshi has a cause of action to challenge state enforcement efforts, which was raised only by Tennessee. In its complaint, Kalshi asserted a single count—preemption based on the Supremacy Clause. Tennessee argued that Kalshi lacked a cause of action and that sovereign immunity barred its suit. The Middle District of Tennessee determined that Kalshi had a cause of action under *Ex parte Young*, 209 U.S. 123 (1908). It then determined that sovereign immunity barred Kalshi's suit against TSWC, the state agency, but allowed the suit to proceed against the state official defendants.

On appeal, Tennessee argues that the CEA's comprehensive enforcement scheme and exclusive remedial provisions displace any equitable cause of action, foreclosing Kalshi's ability to obtain relief. *See Orgel*, CA6 R. 24, Tenn. Br., at 61–66. For support, Tennessee relies on *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320 (2015). In *Armstrong*, the Supreme Court held that § 30(A) of the Medicaid Act expressed a clear "intent to foreclose equitable relief" by providing an exclusive "administrative remedy" and laying out an "unadministrable standard." *Id.* (citation modified). Kalshi argues that we have jurisdiction over suits to enjoin state officials from enforcing state laws that it claims are preempted by a federal statute. It further contends that *Armstrong* "does not preclude a cause of action where, as here, plaintiffs invoke federal jurisdiction 'not to enforce the federal law themselves, but to preclude a [state] from subjecting

them' to preempted laws." *Orgel*, CA6 R. 58, Kalshi Br., at 60 (alteration in original) (quoting *Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 146 (2d Cir. 2016)). We agree with Kalshi.

Whether a complaint alleges a cause of action is a question of law that we review de novo. *Vulcan Coals, Inc. v. Howard*, 946 F.2d 1226, 1228 (6th Cir. 1991). In *Armstrong*, the Supreme Court held that the Supremacy Clause is not "the source of any federal rights" and does not "create a cause of action." 575 U.S. at 324 (citation modified). But that limitation applies to circumstances in which a litigant seeks to "wield *Ex parte Young* as a cause-of-action-creating sword." *Mich. Corr. Org. v. Mich. Dep't of Corr.*, 774 F.3d 895, 906 (6th Cir. 2014). By contrast, a litigant has an equitable cause of action separate from the Supremacy Clause to seek an injunction where it claims that "federal law immunizes [it] from state regulation." *Armstrong*, 575 U.S. at 326; *see also Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 642–43 (2002). We may entertain "the pre-emptive assertion in equity of a defense that would otherwise have been available in the State's enforcement proceedings at law." *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 262 (2011) (Kennedy, J., concurring).

Kalshi's claims are also distinguishable from the circumstances that precluded the availability of equitable relief in *Armstrong*. There, "[n]o one . . . was attempting to prevent the enforcement of a state law." *Upside Foods Inc. v. Comm'r Dep't of Agric. & Consumer Servs.*, 171 F.4th 1239, 1252 (11th Cir. 2026). "Rather, *Armstrong* was about whether a medical provider could compel a state official to follow the medical provider's view of federal law in the way the officer administered a joint state-federal program." *Id.* Here, by contrast, Kalshi is not seeking to enforce a federal statute. Instead, it is "asking for the standard, well-established remedy of an injunction against" state law it claims is preempted. *Id.*

Nor does the CEA displace Kalshi's cause of action. To be sure, Tennessee points to a few "exclusive remedy" provisions that provide for three classes of plaintiffs to recover from violations under the CEA—(1) the CFTC, (2) the States, and (3) certain private parties. *See* 7 U.S.C. §§ 13a-1, 13a-2, 25(a)(2), (b)(5). But "nothing about" these provisions "precludes a plaintiff in equity

from seeking to enjoin the enforcement" of a potentially preempted state law. *See Upside Foods Inc.*, 171 F.4th at 1252.

For starters, § 13a-1 describes the CFTC's authority to "bring an action" to "enforce compliance" or "enjoin" an "act or practice" that violates the federal law governing commodity derivatives. 7 U.S.C. § 13a-1. Similarly, § 13a-2 outlines the States' ability to "bring a suit in equity or an action at law" to "enforce compliance" and "enjoin" unlawful acts or practices under this law. *Id.* § 13a-2. And sections 25(a)(2) and (b)(5) grant individuals "who sustain[] a loss as a result of any alleged violation" under this law a right to recover "actual damages." *Id.* § 25(a)(2), (b)(5). These provisions address a litigant's ability to "enforce or restrain violations" of the CEA and include terms whose ordinary meanings "are not broad enough to cover a lawsuit like this one that seeks to stop state officers not from breaking" the CEA, "but from enforcing a state law." *See Upside Foods Inc.*, 171 F.4th at 1252. Courts "routinely allow private plaintiffs to bring equitable preemption actions in relation to federal statutes that contain similar language." *See id.* (collecting cases). Kalshi is "advancing a constitutional defense" to a state enforcement action under Tennessee law; and while the CEA could have "define[d] the scope of a preemption defense," it does not foreclose our ability to adjudicate Kalshi's equitable preemption claims. *Id.* at 1253. Kalshi is thus entitled to bring its suit under *Ex parte Young*.[6]

**B.**

The parties next dispute whether Kalshi's sports-event contracts are subject to the CFTC's "exclusive jurisdiction," as provided in 7 U.S.C. § 2(a)(1)(A). Both parties agree that this provision extends to "accounts, agreements . . . and transactions involving swaps," so we first ask whether Kalshi's contracts satisfy the statutory definition of a swap under 7 U.S.C. § 1a(47). While the CEA provides six definitions for "swap," the parties focus on § 1a(47)(A)(ii), which contains three requirements. To qualify as a swap under this subsection, there must be (1) an "agreement, contract, or transaction . . . for any purchase, sale, payment, or delivery" that (2)

---

[6]For the same reasons, Kalshi's suit against the remaining Tennessee defendants is not barred by sovereign immunity. As Kalshi did not appeal the district court's dismissal of the TSWC from the case, we need not further address that issue.

depends on the "occurrence," "nonoccurrence," or "the extent of the occurrence" of an "event" that is (3) "associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). The first component is not at issue, so we address only the second and third components of the statutory definition.

While we agree with Kalshi that its sports-event contracts are conditioned on the occurrence of "event[s]," we conclude that Kalshi's contracts do not depend on events that are "associated with a potential financial, economic, or commercial consequence" within the meaning of the statute. *Id.* To reach that latter conclusion, we must resolve a dispute between the parties over what it means for an event to be "associated with a potential financial, economic, or commercial consequence" as that term is used in the CEA. Only the States' interpretation neatly fits § 1a(47)(A)(ii) into a working part of the statutory scheme; is consistent with the structure and context of the CEA; and avoids interpreting the statute in a manner that would expose millions of law-abiding Americans to criminal liability. Specifically, we hold that for an "event" to be "associated with a potential financial, economic, or commercial consequence," the event must be intrinsically associated with a financial consequence such that we can reasonably understand why hedging financial risk or ascertaining pricing information for the occurrence of that event would be desired and beneficial (e.g., a change in interest rates). Based on this reading, we hold that Kalshi's sports-event contracts are not swaps under the CEA. Unlike contracts based on financial values or instruments (e.g., interest rates or stock prices), Kalshi's sports-event contracts have only downstream economic consequences, assuming they have the potential to cause economic consequences at all. Thus, they are not "associated" with potential financial, economic, or commercial consequences, even if they may *eventually* lead to some down the line. Finally, we reject Kalshi's argument that, even if its contracts are not swaps, they are still subject to the CFTC's exclusive jurisdiction.

**1.**

We first consider the meaning of an "occurrence [or] nonoccurrence . . . of an event." 7 U.S.C. § 1a(47)(A)(ii). In arguing that Kalshi's sports-event contracts do not satisfy this statutory prong, the States attempt to distinguish between the "occurrence" of an "event" and the

*outcome* that flows from that event. According to the States, Kalshi's sports-event contracts are not swaps because they "depend on the *result*" rather than the mere "occurrence" of a sports event. *Orgel*, CA6 R. 24, Tenn. Br., at 25–26; *see also Schuler*, CA6 R. 36, Ohio Br., at 35–36 (emphasis in original). We are not persuaded.

To start, we note that many of Kalshi's sports-event contracts are hard to characterize as depending on the "outcome" of an event. Whether Lionel Messi scores a hat trick, for instance, is not easily understood as an "outcome." Nor is whether an announcer uses a particular word during a broadcast. But even setting these examples aside, we do not read "event" so narrowly as to exclude those events that could be categorized as "outcomes." When interpreting statutes, we must "give effect to the clear meaning of statutes as written." *Star Athletica, L.L.C. v. Varsity Brands, Inc.*, 580 U.S. 405, 414 (2017) (quoting *Estate of Cowart v. Nicklos Drilling Co*., 505 U.S. 469, 476 (1992)). Dictionaries commonly define an "event" to include an "outcome." *See, e.g.*, *Event*, Random House Webster's Unabridged Dictionary (2d. ed. 2001) (an "outcome, issue, or result of anything"); *Event*, Merriam-Webster's Online Dictionary (last visited Sep. 2, 2026) ("a postulated outcome, condition, or eventuality"). Indeed, in *Burrage v. United States*, the Supreme Court noted that "it is natural to say that one event is the outcome or consequence of another when the former would not have occurred but for the latter." 571 U.S. 204, 212 (2014).

By way of example, it would be reasonable to describe the Giants winning the Super Bowl as both an occurrence and an outcome, depending on how the "event" is defined. If the relevant event is the Giants winning the Super Bowl, then, in plain language, one might describe the Giants having won as that event having occurred. But if the relevant event is defined as the Super Bowl itself, then one would reasonably be expected to describe the Giants' victory as the outcome of the game. The proper terminology, then, seems to turn on how the event itself is defined. And because nothing in the statutory text provides a clear indication that the event must be defined to exclude outcomes, we decline to read such a limitation into the statutory definition ourselves.

The States contend that we should construe "event" to limit the word "occurrence" for practical reasons. Their proposed reading of the statute interprets "event" to encompass only happenings of a "relative significance," while "occurrence" covers "anything that happens or takes

place." *Schuler*, CA6 R. 36, Ohio Br., at 36. But it is much more natural in this context to read "occurrence" and "nonoccurrence" as qualifying whether "an event" happened, did not happen, or only partially happened. *See* 7 U.S.C. § 1a(47)(A)(ii). As we will address below, the meaning of "event" is limited by the requirement that it be "associated with a potential financial, economic, or commercial consequence," so we do not think the meaning of the word "event" itself provides the narrowing function the States suggest.

Our reading also does not render any statutory language superfluous. To be sure, we must strive to give each word in a statute independent meaning. *See Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 587 U.S. 601, 611 (2019). But the problem for the States is that § 1a(47)(A)(ii) does not use the word "outcome." Thus, the better reading of the statute is that "occurrence" merely clarifies that the provision's reach depends on whether an event happens in full, in part, or not at all. *See* 7 U.S.C. § 1a(47)(A)(ii). Accordingly, we reject the States' reading of "event" in § 1a(47)(A)(ii).

**2.**

Having concluded that Kalshi's sports-event contracts involve the "occurrence or nonoccurrence . . . of an event" under § 1a(47)(A)(ii), we next consider whether these events are "associated with a potential financial, economic, or commercial consequence." We conclude that they are not. The text, structure, and context of the CEA counsel us to read this part of § 1a(47)(A)(ii) narrowly. Importantly, our interpretation is also consistent with an approach that limits the potential criminal liability of millions of otherwise law-abiding Americans.

**i.**

As with all statutory interpretation questions, we begin with the text. *Nebraska v. Parker*, 577 U.S. 481, 488 (2016). To constitute a swap under § 1a(47)(A)(ii), a qualifying event must be "associated with a potential financial, economic, or commercial consequence."

We first consider whether the relevant language "has a plain and unambiguous meaning with regard to the particular dispute in the case." *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 100 (2012) (citation omitted). Specifically, we focus on what it means for an event to be

"*associated with* a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii) (emphasis added). Because the CEA does not define "associated with," we first look to the phrase's ordinary meaning. *See Mohamad v. Palestinian Auth.*, 566 U.S. 449, 454 (2012).

Kalshi contends that we should interpret the phrase "associated with" broadly. In common usage, an activity is indeed often "associated with" another thing if it is "related" or "connected" to it. *See, e.g.*, *Associate*, Merriam-Webster's Advanced Learner's English Dictionary (2008) (to "happen together or are related or connected in some way"); *Associate*, Oxford American Dictionary and Thesaurus (2d ed. 2009) (to "connect" or "relate" to). We have at times interpreted the ordinary meaning of a comparable phrase—"relating to"—broadly, "as the phrase is 'conspicuous for its breadth[.]'" *Ohio ex rel. Yost v. Ascent Health Servs., LLC*, 165 F.4th 999, 1009 (6th Cir. 2026) (quoting *FMC Corp. v. Holliday*, 498 U.S. 52, 58 (1990)). Applying its interpretation, Kalshi contends that its sports-event contracts are "associated with" financial consequences "for a broad ecosystem of stakeholders, 'including sponsors, advertisers, television networks, franchises, and local and national communities,'" resulting in "direct economic consequences for state-regulated sportsbooks themselves." *Schuler*, CA6 R. 28, Kalshi Br., at 47 (quoting *Flaherty*, 172 F.4th at 227–28).

But "associated with" can also require a close causal connection. *See, e.g.*, *Associated*, Merriam-Webster's College Dictionary (9th ed. 2003) (meaning "closely connected" or "closely related"); Webster's New Collegiate Dictionary 110 (9th ed. 1986) ("closely connected . . . with another" and "closely related . . . in the mind"). And in interpreting "relating to," a synonym of "associated with," the Supreme Court has rejected giving the phrase an ordinary meaning "so broad that it is meaningless." *Chevron USA Inc. v. Plaquemines Parish*, 608 U.S. 1, 11 (2026) (quoting *Rutledge v. Pham. Care Mgmt. Ass'n*, 592 U.S. 80, 93 (2020) (Thomas, J., concurring)). Instead, the "ordinary understanding" of the phrase "relating to" should "require[] a connection that is not tenuous, remote, or peripheral." *Id.* at 12 (quoting *Rutledge*, 592 U.S. at 93 (Thomas, J., concurring)). This may mean, as the States argue, that we must read the CEA's "associated with" language to limit the statutory definition to only those events that are commonly understood to be intrinsically economic or otherwise generally associated with having financial significance. In the

States' view, it is not enough that an event has an attenuated, downstream financial effect; the financial, economic, or commercial consequence must instead be one necessarily associated with the event, regardless of whether that consequence comes to fruition, such that we can reasonably understand why contracts dependent on that event would be beneficial for hedging financial risk and deriving pricing information. We agree with the States' reading of the statute.

We conclude that "associated with" is best read as requiring that the event be one inherently associated with a "financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). In doing so, we emphasize that we may not construe statutory language "in a vacuum." *Home Depot U.S.A., Inc. v. Jackson*, 587 U.S. 435, 441 (2019) (citation modified). Because "[o]ur duty . . . is to construe statutes, not isolated provisions," we must read statutory language in "context and with a view to [its] place in the overall statutory scheme." *Salazar v. Paramount Glob.,* 133 F.4th 642, 650 (6th Cir. 2025) (first quoting *King v. Burwell*, 576 U.S. 473, 486 (2015); then quoting *West Virginia v. EPA*, 597 U.S. 697, 721 (2022)). The best reading of the statute thus requires that the qualifying event be inherently associated with a "potential financial, economic, or commercial consequence," such that it would be common understanding that hedging financial risk or deriving pricing information for that event would be beneficial and would promote market stability. An event will be inherently associated with a financial consequence if it "itself has" such a consequence "without looking at externalities like potential downstream" consequences. *See KalshiEX, LLC v. Hendrick*, 817 F. Supp. 3d 1014, 1027 (D. Nev. 2025). Conversely, economic consequences that follow remotely from an event are not truly "associated with" that event. For example, a change in interest rates would have financial consequences. By contrast, who is named Super Bowl MVP would likely not have financial consequences; any consequences would depend on external, downstream events, such as a sponsor deciding to award the winner a prize.

If we were to adopt Kalshi's preferred approach, "associate with" would effectively have no force. At oral argument, for example, we asked Kalshi to explain how some of its sports-event contracts—like how many corner kicks were taken in a game or if an announcer said a particular word—could be associated with financial consequences. Kalshi conceded that to a "layperson" it might be "hard to see how certain of these contracts have economic consequences." Oral Argument at 19:06–19:17. However, Kalshi "caution[ed] the court" about relying on that

"intuition" in its decision-making process because sports is a "huge business" with inconspicuous economic consequences. *Id.* at 18:55–19:06.

But if we—or a "layperson"—cannot discern that a sports-event contract has potential economic consequences, then it would be a stretch to say such a contract is "associated" with potential economic consequences. The fact that such a contract may have a little-known downstream economic impact, as Kalshi emphasizes, does not answer the statutory interpretation question before us. Nor does it persuade us to read "associate with" so capaciously that the very fact that an industry is a "huge business" means any contract related to that industry satisfies the statutory test. Otherwise, under Kalshi's preferred interpretation, it is unclear what chance-based event contract, if any, would *not* result in some attenuated downstream financial consequence, at least until the CFTC says it does not. Even Kalshi's own example of a sports-event contract would not meet the statutory definition reveals this slippery slope: at the preliminary injunction hearing in *Orgel*, Kalshi's counsel represented that Kalshi would not offer a contract on the color of a "Gatorade shower" at the Super Bowl. *Orgel*, DE 47, Prelim. Hr. Tr., Page ID 831; *see also Schuler*, CA6, R. 70, Kalshi Br., at 12. However, Kalshi's reading of the statute would encompass a Gatorade-shower contract because it is conceivable that if a yellow Gatorade shower were broadcast, sales for that flavor would increase. It is also conceivable that if sales of yellow Gatorade increased, athletes sponsored by Gatorade might incur financial benefits.

Kalshi also argues that the inclusion of the word "potential" in the statute allows even distant financial consequences to meet the statutory test. But "potential" is better understood as modifying "consequence," not "associated with"—meaning the financial consequence need not actually come to fruition, but it still must be inherently associated with the event. Thus, we will not read "potential" to mean that any and all downstream, hypothetical, attenuated financial consequences satisfy the statutory definition.

For these reasons, we view "associate with" as requiring that the event be inherently associated with a financial consequence, such that it would be commonly understood that those kinds of contracts could be used to transfer financial risk or derive pricing information that could promote market stability.

**ii.**

A narrow reading of § 1a(47)(A)(ii) is also consistent with the broader context of the statute. Section 1a(47)'s other definitions for a "swap" support our interpretation. When considering statutory definitions in context, "we rely on the principle of *noscitur a sociis*—a word is known by the company it keeps—to 'avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress.'" *Yates v. United States*, 574 U.S. 528, 543 (2015) (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995)). Here, the surrounding definitions for a "swap" "refer almost exclusively to financial measures, indices, or instruments," that can be used to drive price discovery or that contemplate intrinsic financial risks that can be hedged against. *Hendrick*, 817 F. Supp. 3d at 1027.

For example, § 1a(47)(A)(iii) defines a swap as any "agreement, contract, or transaction" that "provides on an executory basis for the exchange, on a fixed or contingent basis, of 1 or more payments based on the value or level of 1 or more interest or other rates, currencies . . . indices, quantitative measures, or other financial or economic interests or property of any kind, or any interest therein based on the value thereof, *and that transfers*, as between the parties to the transaction, in whole or in part, *the financial risk associated with a future change in any such value or level*." 7 U.S.C. § 1a(47)(A)(iii) (emphasis added). The final clause of subpart (iii) suggests that the types of financial risks relevant to its definition are those "associated with" (i.e., closely related to) a "change" in the "value or level" of the underlying thing (i.e., the rate, or currency, or index) the parties are transacting about. The transaction, then, provides a method for "transfer[ring]" (i.e., shifting or offsetting) the financial risk associated with a future change from one party to another. Subpart (i) similarly defines a "swap" as an "agreement, contract, or transaction" that "is a put, call, cap, floor, collar, or similar option . . . for the purchase or sale, or based on the value, of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind." That these surrounding subsections define "swap" to include

financial transactions indicates that subpart (ii) was also meant to refer to events that are inherently associated with potential financial consequences.[7]

Moreover, our reading best gives effect to all the statute's "provisions, so that no part will be inoperative or superfluous, void, or insignificant." *Rubin v. Islamic Rep. of Iran*, 583 U.S. 202, 213 (2018) (quoting *Corley v. United States*, 556 U.S. 303, 314 (2009)). Lacking any concrete limiting principle, Kalshi's approach would make all five other statutory subparts, as well as the 22 types of transactions expressly referenced in subpart (iii), unnecessary. Each of those statutory subparts and types of transactions would fall within Kalshi's overbroad reading of § 1a(47)(A)(ii)—and would therefore be rendered superfluous—because each involves events that may have some downstream financial consequence. And we must strive to "avoid[] an 'unbounded interpretation'" that would "render superfluous" the other subparts of a "reticulated list." *BLOM Bank SAL v. Honickman*, 605 U.S. 204, 211 (2025) (quoting *Fischer v. United States*, 603 U.S. 480, 493 (2024)).

We acknowledge that our interpretation may also result in some surplusage, as an interest rate swap, for example, may meet the statutory definition of (i), satisfy our interpretation of (ii), and be expressly enumerated as a type of swap in (iii). *See Fischer*, 603 U.S. at 496. But "our construction [] creates substantially less" surplusage, *id.* (citation modified), and moreover, functions as the kind of belt-and-suspenders approach that the statute seems to explicitly intend. For example, (iv) defines a swap as "an agreement, contract, or transaction that is, or in the future becomes, commonly known to the trade as a swap." *Id.* § 1a(47)(A)(iv). That statutory definition reveals Dodd-Frank's intended purpose: to ensure that new forms of swaps were regulable as soon as they emerged, without requiring Congress to amend the Act. But the simple fact that a particular financial instrument could satisfy more than one of the statutory definitions provided for by the Act does not undercut our interpretation of the meaning of (ii).

---

[7]To be sure, some of the "commonly known" swaps enumerated in subpart (iii), such as weather swaps, are not intrinsically associated with financial consequences. But the fact that Congress defined "swap" to include a few particular such swaps does not change that the definitions, by and large, refer only to instruments that are. That Congress specifically enumerated non-financial events as swaps, given their historic and widely accepted association with economic risk, does not suggest that we should read § 1a(47)(A)(ii) broadly.

The CEA's surrounding statutory provisions also reinforce our reading. To target the housing crisis in Dodd-Frank, Congress directed the CFTC to consider in its swap rules, among other things, "price discovery" and "sound risk management practices[.]" 7 U.S.C. § 19(a)(2). To mitigate financial risk, markets may list "contracts that are not readily susceptible to manipulation." *Id.* § 7(d)(3). And to facilitate price discovery, markets must "make public daily information on settlement prices, volume, open interest, and opening and closing ranges for actively traded contracts," *id.* § 7(d)(8), as well as "provide a competitive, open, and efficient market and mechanism for executing transactions that protects the price discovery process," *id.* § 7(d)(9)(A). These provisions reflect Congress's broader efforts in the CEA to serve the "two critical functions" underlying derivatives markets: "hedging and price basing." *See* Concept Release on the Appropriate Regulatory Treatment of Event Contracts, 73 Fed. Reg. 25669, 25672 (May 7, 2008). These two critical functions provide relevant context for how to interpret (ii): that is, the categories of events must be sufficiently associated with financial consequences such that it would be commonly understood that hedging risk and deriving pricing information about those events could promote market stability.

Our conclusion also accords with the CEA's core purpose. In a "[f]indings and purpose" section, Congress explained that the CEA was enacted to protect the "national public interest by providing a means for managing and assuming price risks, discovering prices, or disseminating pricing information." 7 U.S.C. § 5(a). Indeed, as explained by amicus Coalition for Prediction Markets—in support of Kalshi—"[e]conomists have long touted the benefits of prediction markets." *Orgel*, CA6 R. 65, The Coal. for Prediction Mkts. Amicus Br., at 9. Quoting those economists, which amicus points out include Nobel Laureates, the "range" of benefits that stem from properly regulated prediction markets is "virtually limitless—from helping businesses make better investment decisions to helping governments make better fiscal and monetary policy decisions." *Id.* (quoting Kenneth J. Arrow et al., *Economics: The Promise of Prediction Markets*, 320 Science 877, 877 (2008)). And quoting economists at the Federal Reserve, amicus explains that prediction markets can act as a "source of real-time . . . data" for "informing monetary policy decisions" and "open new avenues for studying monetary policy transmission, market sentiment, and macroeconomic uncertainty." *Id.* at 14 (quoting Anthony M. Diercks et al., *Kalshi and the*

*Rise of Macro Markets*, Fin. & Econ. Discussion No. 2026-010, at 2, 34 (Bd. of Governors of Fed. Rsrv. Sys. 2026), https://perma.cc/8ETJ-RWLK). It is, therefore, difficult to see how determining the probability that a certain number of corner kicks will be taken in a given soccer game—or that a 30-leg parlay will hit—would serve advance those goals. And, indeed, amicus points to only three examples of how prediction markets have been used in sports itself. For example, amicus says that a Spanish soccer team "hedge[d] against the risk that it would be relegated from the top division of Spanish soccer"; that "[o]ther teams have used prediction markets to hedge against the risk of paying performance-based bonuses"; and that a bar offering free drinks if the Knicks won the first game of the NBA Finals hedged against the cost of those drinks. *Id.* at 16–17. These isolated examples are a far cry from establishing that sports-event contracts are inherently associated with a financial consequence or are commonly used to hedge risk and derive pricing information in any meaningful way.

Kalshi's reading would give the CFTC jurisdiction over event contracts that bear no relation to the goals Congress had in mind. *Cf.* Concept Release on the Appropriate Regulatory Treatment of Event Contracts, 73 Fed. Reg. at 25670 (May 7, 2008) (distinguishing other types of derivatives from event contracts that "primarily function as information aggregation vehicles," which "generally take the form of financial agreements linked to eventualities or measures that neither derive from, nor correlate with, market prices or broad economic or commercial measures"). We do not doubt that Congress intended for "swap" to have a flexible definition that could evolve. *See, e.g.*, *id.* § 1a(47)(A)(iv) (defining swap as "an agreement, contract, or transaction that is, *or in the future becomes*, commonly known to the trade as a swap" (emphasis added)). But without a limiting principle, § 1a(47)(A)(ii) would broadly extend the swap definition in a manner totally divorced from subpart (ii)'s "function within the broader statutory context." *Abramski v. United States*, 573 U.S. 169, 180 n.6 (2014).

**iii.**

As mentioned, Kalshi's proposed "interpretation of the statute would" also "attach criminal penalties to a breathtaking amount of commonplace [gambling] activity." *See Van Buren v. United States*, 593 U.S. 374, 393 (2021). The CEA makes it generally "unlawful for any person . . . to

enter into a swap unless the swap is entered into on" a federally regulated market. 7 U.S.C. § 2(e). Thus, as the States note, "if sports bets are swaps, they *must* take place on federal markets." *Schuler*, CA6 R. 36, Ohio Br., at 29.[8] That would include "every sports wager placed in a casino, on an online sports book, or between two friends at a bar." *Schuler*, CA6 R. 55, Gensler Amicus Br., at 19. And it would also include "sports wagers ostensibly permitted by PASPA." *Id.* Indeed, Kalshi's overbroad swap definition would likely cover all sorts of commonplace gambling activity that does not currently occur on federally regulated exchanges. It "would likely encompass virtually every kind of wager that could exist, including classic casino games and charity raffles." *Flaherty*, 172 F.4th at 233 (Roth, J., dissenting).

"[B]ecause the trading of swaps outside DCMs is illegal under 7 U.S.C. § 2(e), any individual who engages in gambling outside of a DCM would commit a felony were we to take the definition of swaps to its logical extreme." *Id.*; *see also KalshiEX, LLC v. Assad*, --- F.4th ---, 2026 WL 2543846, at *11 (9th Cir. Aug. 28, 2026) ("[Under Kalshi's reading], every person placing a sports bet at Caesar's Sportsbook (or anywhere else for that matter) is violating the CEA."). Kalshi's preferred approach would thus expose countless Americans to potential criminal liability for partaking in even the most unsophisticated, off-DCM gambling activity. The Supreme Court has cautioned that we should avoid interpreting statutes to "read[] incongruous breadth into opaque language in criminal statutes." *Dubin v. United States*, 599 U.S. 110, 130 (2023); *see, e.g.*, *id.* (rejecting a reading that "would sweep in the hour-inflating lawyer, the steak-switching waiter, the building contractor who tacks an extra $10 onto the price of the paint he purchased"); *Marinello v. United States*, 584 U.S. 1, 9–10 (2018) (rejecting a reading that risked "lack of fair warning and related kinds of unfairness" and "could apply to a person who pays a babysitter $41 per week in cash without withholding taxes, . . . leaves a large cash tip in a restaurant, fails to keep donation receipts from every charity to which he or she contributes, or fails to provide every record to an accountant" (citation omitted)). Our interpretation is consistent with this guidance.

---

[8]The Southern District of Ohio similarly noted these drastic consequences in the context of applying the absurdity doctrine. But rather than relying on this doctrine, we construe the effect that Kalshi's reading may have on 7 U.S.C. § 2(e)'s breadth to be one factor in concluding the subpart's ordinary meaning requires that the qualifying event inherently have a potential financial consequence. *See* W. Eskridge, Interpreting Law 72 (2016) (describing the absurdity doctrine as "an implementation of (rather than . . . an exception to) the ordinary meaning rule").

In response to this point, Kalshi argues that only tradable instruments would have to be traded on DCMs, so the CEA "leaves states free to regulate" and average Americans free to partake in "off-DCM transactions like bets offered by sportsbooks." *Schuler*, CA6 R. 28, Kalshi Br., at 50. But nothing in the statutory definition of a swap draws a distinction based on whether the instrument is tradable. *See* 7 U.S.C. § 1a(47). Nor does § 2(a)(1)(A) provide any such carveout for traditional sports bets, contrary to Kalshi's suggestion at oral argument. Oral Argument at 13:58–14:16. Section 2(a)(1)(A) itself applies to only those "accounts, agreements . . . , and transactions involving swaps" that are already "traded or executed" on DCMs. It does not, however, define what should go on those DCMs. Thus, the CEA's swap definition does not depend on the venue on which the swap was entered into—on-exchange or off-exchange. Instead, the instrument's terms determine whether it is a swap.

**iv.**

Based on this reading, Kalshi's sports-event contracts do not satisfy the statutory definition of a swap. There is no common understanding that its sports-event contracts pertain to events that inherently have "a potential financial, economic, or commercial consequence." *See* 7 U.S.C. § 1a(47)(A)(ii). Relying on the Third Circuit's decision in *Flaherty*, Kalshi argues that "'[t]he outcome of a sports event certainly can be associated with a potential financial . . . consequence' for a broad ecosystem of stakeholders, 'including sponsors, advertisers, television networks, franchises, and local and national communities.'" *Schuler*, CA6 R. 28, Kalshi Br., at 46–47 (alteration in original) (quoting 172 F.4th at 227–28). We are not persuaded. These "consequences" are too attenuated, indirect, and speculative to satisfy the statutory definition contained in subpart (ii). They rely on downstream actions and do not result from the occurrence or nonoccurrence of the sports events themselves. Nor do Kalshi's sports-event contracts concern the type of events that are commonly understood to require financial hedging or price discovery.

In fact, Kalshi has agreed with this conclusion in past litigation, conceding that its sports-event contracts have "no inherent economic significance," do not "have any real economic value," and "carry no economic risks." *Hendrick*, 817 F. Supp. 3d at 1028 n.3 (citation modified) (discussing Kalshi's previous litigation). The winner of a tennis match or the number of points

scored in a World Cup final may have some downstream financial consequences for various stakeholders in the sports community. But these events do not *inherently* have financial consequences, unlike a rising interest rate or debt default, as contemplated by § 1a(47)(A)(ii).

Kalshi's newfound arguments to the contrary are unpersuasive. Kalshi first contends that the "Special Rule's reference to '[e]vent contracts' involving 'gaming' as one type of 'swap[]'" is "irrefutable textual evidence" that its contracts are "within the CFTC's exclusive jurisdiction." *Orgel*, CA6 R. 58, Kalshi. Br., at 24 (alterations in original). It is true that the "Special Rule" permits the CFTC to find gaming-related event contracts "contrary to the public interest" and consequently prohibit them from being listed on a DCM. *See* § 7 U.S.C. 7a-2(c)(5)(C). However, the "Special Rule" definition of "event contracts" sweeps more broadly. Event contracts may consist of "agreements, contracts, transactions, *or* swaps." *Id.* (emphasis added). So just because the CFTC may prohibit gaming-related event contracts does not mean Kalshi's sports-event contracts are *necessarily* swaps. They may be regulated instead because they are an "agreement[]," "contract[]," or "transaction[]" that falls within the Special Rule's reach.

Second, Kalshi argues that sports, as an industry, has financial consequences for a large ecosystem of stakeholders, including advertisers and sponsors. As already previewed, we agree that some sports-events have financial consequences (albeit consequences that are attenuated or downstream). For example, as Kalshi notes, the Knicks championship run resulted in significant economic benefits to New York businesses, retailers, merchandisers, and sponsors. But under Kalshi's preferred reading, there is no limit to the type of chance-based contract that would constitute a swap under § 1a(47)(A)(ii), and most of the contracts it offers do not have as clearly resulting financial consequences as winning the NBA Finals might yield. For example, take the number of three-pointers the Memphis Grizzlies average this upcoming season. To be sure, one can conceivably concoct a hypothesis about how the Grizzlies' number of three-pointers may affect how likely they are to make the playoffs. And if the Grizzlies make the playoffs, the team's players, ownership, fans, and sponsors are likely to incur financial benefits. Or, even more attenuated, take Kalshi's parlay contracts, of which it offers billions of dollars' worth per month. Those contracts may, hypothetically, have down-the-line effects for the ecosystem of advertisers, sponsors, and the like. But that is not the relevant inquiry when determining the types of events

that are associated with financial consequences. Instead, we ask whether the events underlying Kalshi's sports-event contracts inherently have a financial consequence, not whether they have any tangential or hypothetical relation to a financial consequence at all—or even a likely one. In our view, Kalshi has not shown that its sports-event contracts meet that threshold.

Third, Kalshi stresses that prediction markets are sufficiently related to financial consequences because they reveal information about the likelihood of certain events. Kalshi claims that its sports-event contracts are "associated with" potential financial consequences because they facilitate "parties with economic incentives to predict accurately" the probabilities of various events, which has "significant predictive value." *Schuler*, CA6 R. 28, Kalshi Br., at 15, 21, 48–49. However, the CEA effectuates Congress's efforts to promote market stability by providing mechanisms to transparently derive price information and hedge financial risk; its endeavor is not to enable market actors to gauge likelihoods or probabilities more generally about economically nonsignificant events. *See* 7 U.S.C. § 5(a). For example, the benefit of having a derivatives market that can reasonably predict whether interest rates will rise or fall is that it allows affected companies (like lending banks) to hedge against the financial risks associated with that change in rates. By contrast, there is no conceivable reason why the market might need to know the probability that a broadcaster says a random word on air.

Here, as the CFTC explained two years ago, Kalshi's sports-event contracts generally lack any "underlying cash market with bona fide economic transactions to provide directly correlated price forming information." *See* Event Contracts, 89 Fed. Reg. at 48982 (June 10, 2024). "Rather, price forming information is either nonexistent, or driven by informational sources that are unregulated, have opaque underlying processes and procedures, and may not follow scientifically reliable methodologies." *Id.* (citation omitted). This diverges from "the informational sources used for pricing the vast majority of commodities underlying Commission-regulated derivatives contracts (*e.g.*, government issued crop forecasts, weather forecasts, federal government economic data, market-derived supply and demand metrics for commodities, market-based interest rate curves)." *Id.* Thus, the "economic impact of an occurrence (or non-occurrence)" of Kalshi's sports-event contracts are generally "too diffuse and unpredictable to correlate to direct and

quantifiable changes in the price of commodities or other financial assets or instruments, limiting the[ir] hedging and price-basing utility." *Id.* at 48981.

Because the events underlying Kalshi's sports-event contracts do not inherently have "a potential financial, economic, or commercial consequence," we conclude that Kalshi's sports-event contracts do not constitute swaps under § 1a(47)(A)(ii).[9]

**3.**

We also reject Kalshi's argument that even if its sports-event contracts are not swaps, they are nevertheless subject to the CFTC's exclusive jurisdiction.

Under 7 U.S.C. § 2(a)(1)(A), the CFTC has "exclusive jurisdiction with respect to accounts, agreements . . . , and transactions involving swaps or contracts of sale of a commodity for future delivery . . . , traded or executed on a [DCM]." Kalshi now claims the rule of last antecedent applies here. Hence, in Kalshi's view, the "limiting clause"—"involving swaps or contracts of sale of a commodity for future delivery"—modifies only "transactions" and not "accounts" or "agreements." *Orgel*, CA6 R. 58, Kalshi Br., at 39. So, Kalshi contends that any "account[]" or "agreement[]" "traded or executed on a DCM" falls within the CFTC's jurisdiction. *See id.* (citation modified). Accordingly, Kalshi argues that its sports-event contracts are subject to the CFTC's exclusive jurisdiction—even if they are not "transactions involving swaps" —because they are "accounts" or "agreements" traded on a DCM. *See* 7 U.S.C. § 2(a)(1)(A).

As a facial matter, we disagree. Under the series-qualifier canon, "'[w]hen there is a straightforward, parallel construction that involves all nouns or verbs in a series,' a modifier at the end of the list 'normally applies to the entire series.'" *Facebook, Inc. v. Duguid*, 592 U.S. 395, 402–03 (2021) (quoting A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts

[9]The States also argue that Kalshi's reading implicates three clear statement rules: (1) the major questions doctrine, (2) the federalism canon, and (3) the presumption against implied repeals. We note the appeal of applying these doctrines here: "adopting Kalshi's view that sports event contracts are swaps results in a reading of the CEA that gives the CFTC regulatory authority over sports betting—an area that has long been regulated by the States and Tribes." *Assad*, --- F.4th ---, 2026 WL 2543846, at *14. But because we resolve this issue on "straight-up statutory construction" grounds, we do not resort to these clear statement rules. *Learning Res., Inc. v. Trump*, 607 U.S. 229, 310 (2026) (Kagan, J., concurring).

147 (2012)). This canon applies here. "[T]he modifier at issue immediately follows a concise, integrated clause": "accounts, agreements . . . , and transactions." *Id.*; 7 U.S.C. § 2(a)(1)(A). Connected by the word "and," the clause "hangs together as a unified whole[.]" *Facebook*, 592 U.S. at 403 (quoting *Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund*, 583 U.S. 416, 440 (2018)).

Nor is 7 U.S.C. § 2(a)(1)(A) the type of statutory provision to which we would typically apply the rule of last antecedent. The Supreme Court has expressly "declined to apply the rule where, like here, the modifying clause appears after an integrated list." *Id.* at 404. The States' reading also does not "'stretch[] the modifier too far' by asking it to qualify a remote or otherwise disconnected phrase." *Cyan*, 583 U.S. at 440 (alteration in original) (quoting *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 342 (2005)).

We also note that Kalshi previously took the same position as we do here, which further supports our interpretation as the most natural reading of the clause. Cleverly, Kalshi now argues that its sports-event contracts do not need to satisfy the definition of swap to be subject to the CFTC's exclusive jurisdiction. In prior cases, however, Kalshi did not advance this interpretive view. Instead, Kalshi appears to have previously read the clause the same way we do. It did not contend that § 2(a)(1)(A) preempted all state law impacting *all* agreements traded on a DCM. It instead argued that its contracts "are 'agreements' and 'transactions' involving 'swaps,'" Pl.'s Resp. to Defs.' Mot. to Dismiss, *KalshiEX, LLC v. Hendrick*, No. 25-cv-575 (D. Nev.), 2025 WL 1779026, and that the "CEA grants the CFTC '*exclusive jurisdiction*' over all 'transactions involving swaps,'" Resp. Br. for Appellee at *23, *KalshiEX LLC v. Flaherty*, No. 25-1922 (3d Cir.), 2025 WL 2180409; *see also* Appellant's Opening Br., *KalshiEX, LLC v. Hendrick*, No. 25-7516 (9th Cir.), 2025 WL 4674748, at *13, *27; Pl.'s Reply in Supp. of Prelim. Inj., *KalshiEX LLC v. Martin*, No. 25-cv-1283 (D. Md.), 2025 WL 2550256. While it is understandable that Kalshi sharpened its arguments over time, its own interpretive evolution supports our conviction that reading "involving swaps" to modify "accounts, agreements . . . , and transactions" is the most natural reading.

Finally, this interpretation also makes more sense in the statutory context. Under Kalshi's proposed reading, the CFTC could exercise exclusive jurisdiction over "accounts" and

"agreements" even if those instruments did not involve "swaps or contracts of sale of a commodity for future delivery." *See* 7 U.S.C. § 2(a)(1)(A). But in § 2(a)(1)(D), the CEA similarly grants the SEC "jurisdiction and authority over security futures," "options on security futures," and "accounts," "agreements," and "transactions involving . . . a security futures product." It then follows that if we applied the rule of last antecedent to both subsections 2(a)(1)(A) and (D), the SEC would also be able to exercise "jurisdiction" over "accounts" and "agreements" generally, even if those instruments did not involve a "security futures product." These provisions would clash, as the CFTC and SEC would both have "jurisdiction" over "accounts" and "agreements." We do not think this was Congress's intention.

For the foregoing reasons, we hold that Kalshi's sports-event contracts do not constitute swaps as defined in the CEA and thus do not fall within the scope of the CFTC's exclusive jurisdiction.

**C.**

Our conclusion that Kalshi's sports-event contracts are not "swaps" ends the analysis because that necessarily means regulation of these contracts does not fall within the CFTC's "exclusive jurisdiction" as provided in § 2(a)(1)(A), and thus that federal law does not preempt application of the States' gambling laws. *See Assad*, --- F.4th ---, 2026 WL 2543846, at *16–17. However, even assuming Kalshi's sports-event contracts constitute swaps for the purposes of this analysis (or that § 2(a)(1)(A) covers all agreements traded on a DCM), we alternatively hold that the CEA neither expressly nor impliedly preempts the States' gambling laws. *First*, considering the scope and meaning of the CEA's "exclusive jurisdiction" provision, we hold that it does not expressly preempt the States' gambling laws. *Second*, we hold that the CEA does not impliedly preempt the States' laws through field or conflict preemption.

Congressional purpose "is the ultimate touchstone in every pre-emption case." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008) (citation modified). "Congress may indicate pre-emptive intent through a statute's express language or through its structure and purpose." *Id.* Three types of federal preemption exist: express, field, and conflict preemption. *Bibbo v. Dean Witter Reynolds, Inc.*, 151 F.3d 559, 562 (6th Cir. 1998).

On appeal, Kalshi argues that the Ohio and Tennessee gambling laws are preempted as applied under all three principles. We examine each in turn.

**1.**

We first address whether we should apply the presumption-against-preemption canon of construction to Kalshi's claims. "When addressing questions of express or implied pre-emption, we begin our analysis 'with the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Altria Grp.,* 555 U.S. at 77 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947) (alteration in original)); *see also Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005). This canon of construction is rooted in principles of federalism. It therefore "applies with particular force when Congress has legislated in a field traditionally occupied by the States." *Id.* And although Kalshi questions the history of state control over *interstate* gaming, the States contend that there is a long history of *intrastate* gambling regulation by states, which is what they seek to regulate.[10] *Orgel*, CA6 R. 24, Tenn. Br., at 51; *Schuler*, CA6 R. 36, Ohio Br., at 59; *see also KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667, 676 (D. Md. 2025) (explaining that "the question of whether the presumption 'particularly' applies" turns on whether the "state law governs conduct that has historically been subject to state regulation" (citation modified)).

There is a long history of states regulating intrastate gambling, and a history of federal gambling regulations tying federal illegality to state law. *Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.*, 162 F.4th 631, 635 (6th Cir. 2025) (noting that states have "traditionally regulated intrastate gambling activity like wagering"); *WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 302 (4th Cir. 2009) (observing that it is "well recognized that regulating gambling is at the core" of states' powers); *see also Murphy*, 584 U.S. at 484 (stating that the federal act applies "only if the underlying gambling is illegal under state

[10]Before 2018, when the Supreme Court struck down the PASPA, the interstate market for sports gambling was virtually non-existent. *See Murphy v. NCAA*, 584 U.S. 458, 462 (2018); *Schuler*, CA6 R. 36, Ohio Br., at 59–60. Any interstate market for gambling is new, even as regulated by federal law.

law"). Thus, the CEA regulates "a field traditionally occupied by the States," and the presumption against preemption "applies with particular force." *Altria*, 555 U.S. at 77.

The Supreme Court's opinion in *Commonwealth of Puerto Rico v. Franklin Cal. Tax-free Trust* is not to the contrary. There, the Court declined to apply the presumption against preemption when interpreting an express preemption clause. 579 U.S. 115, 125 (2016). But *Commonwealth of Puerto Rico* "did not address claims involving areas historically regulated by the states."[11] *Lupian v. Joseph Cory Holdings LLC*, 905 F.3d 127, 131 n.5 (3d Cir. 2018); *see also Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 771 n.9 (3d Cir. 2018). And although we always begin with the text when interpreting an express preemption provision, we recognize the presumption may provide a helpful interpretive tool that accounts for the unique historical backdrop when resolving any remaining textual ambiguity. This approach is consistent with traditional principles of federalism. *See Bond v. United States*, 572 U.S. 844, 858–59 (2014). We turn to interpreting the express preemption provision with this in mind.

**2.**

The Supremacy Clause states that the laws of the United States "shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Thus, state laws that conflict with federal law are "without effect." *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981). "Express preemption occurs when a federal statute or regulation explicitly indicates that it is preempting a specific type of state law." *Mich. First Credit Union v. T-Mobile USA, Inc.*, 108 F.4th 421, 430 (6th Cir. 2024) (citation modified). Hence, it "applies where Congress, through a statute's express language, declares its intent to displace state law." *Robbins v. New Cingular Wireless PCS, LLC*, 854 F.3d 315, 319 (6th Cir. 2017) (citation omitted).

**i.**

[11]The Ninth Circuit has recently "decline[d] to apply any presumption against preemption and instead 'focus[ed] on the plain wording'" of the statute. *Assad*, --- F.4th ---, 2026 WL 2543846, at *7 (quoting *Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094, 1101 (9th Cir. 2024)).

At issue here is the CEA—"a comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex." *Merrill Lynch*, 456 U.S. at 356 (citation modified). In relevant part, § 2(a)(1)(A) provides that the CFTC "[s]hall have exclusive jurisdiction . . . with respect to accounts, agreements . . . , and transactions involving swaps . . . traded or executed on" a DCM. 7 U.S.C. § 2(a)(1)(A). Section 2(a)(1)(A)'s first savings clause states that "[e]xcept as hereinabove provided, nothing contained in this section shall (I) supersede or limit the jurisdiction" of the SEC "or other regulatory authorities under the laws of the United States or of any State"; or (II) restrict the SEC "and such other authorities from carrying out their duties and responsibilities in accordance with such laws." *Id.* Its second savings clause states (without any limitation "as hereinabove provided"): "Nothing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State." *Id.*

We agree with the motions panel that § 2(a)(1)(A) would represent an unusual express preemption provision. The "exclusive jurisdiction" language used in the provision typically applies to limit courts' jurisdiction, rather than agencies' power to regulate or states' power to make law. *See Transcon. Gas Pipe Line Co., LLC v. Penn. Env't Hearing Bd.*, 108 F.4th 144, 151–52 (3d Cir.), *amended on denial of reh'g*, 110 F.4th 612 (3d Cir. 2024) ("The explicit statutory conferral of exclusive jurisdiction to a federal court over a particular subject matter is a form of express preemption because it withdraws any concurrent jurisdiction that state courts may have over that same subject matter."); *see also Tafflin v. Levitt*, 493 U.S. 455, 459 (1990). The Securities Exchange Act of 1934, for example, grants "exclusive jurisdiction" to district courts (as opposed to state courts) over "violations" of its requirements. 15 U.S.C. § 78aa(a). That provision of the Securities Exchange Act, however, does not preempt state law; rather, that statute's separate express preemption provision does. *See id.* § 78bb(a)(3). That the term "exclusive jurisdiction" does not preempt all state laws in the Securities Exchange Act suggests that it does not do so in the CEA either and instead has a more limited effect.

A typical express preemption provision, unlike § 2(a)(1)(A), uses words such as "preempt" or "supersede" when referring to state law. *See e.g.*, 8 U.S.C. § 1324a(h)(2) ("Preemption - The provisions of this section preempt any State or local law imposing civil or criminal sanctions . . . upon those who employ, or recruit or refer for a fee for employment, unauthorized

[non-citizens].”); 12 U.S.C. § 25b(b) (“State consumer financial laws are preempted, only if . . .”); *id.* § 1831d (“[N]otwithstanding any State constitution or statute which is hereby preempted for the purposes of this section[.]”); 29 U.S.C. § 1144(a) (“[T]he provisions of this subchapter . . . shall supersede any and all State laws insofar as they . . . relate to any employee benefit plan.”). This provision instead grants the CFTC exclusive jurisdiction with regard to swaps on a DCM but does not specify what the CFTC has exclusive jurisdiction to do. Because the provision does not use the language Congress traditionally employs when it preempts state power to make laws, we are hesitant to impute an expansive meaning.

Indeed, the CEA itself contains more typical express preemption provisions. *See, e.g.*, 7 U.S.C. § 16(e)(2) (“This chapter shall supersede and preempt the application of any State or local law that prohibits or regulates gaming or the operation of bucket shops . . . ”); *id.* § 16(h) (“A swap . . . may not be regulated as an insurance contract under the law of any State.”); *id.* § 27f(b) (“Preemption – Sections 27 to 27f of this title shall supersede and preempt the application of any State or local law that prohibits or regulates gaming or the operation of bucket shops . . . ”).

Because Congress did not use this language in § 2(a)(1)(A), we believe that Congress did not mean to “withdraw” the States’ power to enact or regulate state law altogether. If it had, it likely would have included a typical express preemption provision, as it usually does and as it did elsewhere in the CEA. These provisions underscore that Congress did not expressly preempt state gaming law in § 2(a), because Congress knew how to draft an express preemption provision but chose not to there. *See Bates v. United States*, 522 U.S. 23, 29–30 (1997); *see also Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 517 (1992) (“Congress’ enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted.”).

However, that does not mean § 2(a)(1)(A) lacks any force in displacing state regulatory authority. We recognize that § 2(a)(1)(A) embodies an express decision to carve out a specific sphere for the CFTC since the plain meaning of “exclusive” necessarily implies the exclusion of others from participation; single; or sole. *See Exclusive*, American Heritage Dictionary (5th ed. 2022) (“Not divided or shared with others”; “sole”; “incompatible”). Because § 2(a)(1)(A)’s second savings clause expressly preserves federal and state court jurisdiction—with no “as

hereinabove provided" exception—the exclusive jurisdiction provision cannot be read as limiting courts' adjudicative jurisdiction. Furthermore, the first savings clause—reserving other regulatory authorities' jurisdiction "except as provided"—strongly suggests that the grant of "exclusive jurisdiction" was intended to have some displacing effect, even against state regulators; otherwise, there would have been no need to reserve other authorities' power. But that raises the question: What state authority is the provision intending to displace?

**ii.**

In our view, the exclusive jurisdiction provision displaces direct enforcement and regulatory authority pertaining to the licensing and operation of DCMs. But ancillary regulations that only incidentally burden DCMs do not come within the provision's substantive scope. As noted, the provision's differences from normal preemption provisions (including those included elsewhere in the CEA) counsel in favor of a narrow interpretation. A close look at the provision's text confirms this view.

The text of § 2(a)(1)(A) shows that the provision's focus is on delineating responsibility among regulatory bodies, including state regulatory bodies—not on preempting state law. As the motions panel noted, § 2(a)(1)(A) "identifies the governing *agency* (the CFTC rather than the SEC or a state regulator), not the governing *law*." *Schuler*, 2026 WL 1295806, at *4; 7 U.S.C. § 2(a)(1)(A). For another, § 2(a)(1)(A) cross-references other sections of the CEA and other statutes that establish additional rules for how the CFTC is to share jurisdiction with other agencies, such as the SEC and Federal Reserve. *See, e.g.*, 7 U.S.C. § 2(a)(1)(A) (referencing § 2(a)(1)(C)(i), (C)(iii), and (D)(i)). These cross-references suggest that § 2(a)(1)(A)'s primary purpose is clarifying the jurisdictional boundaries between the CFTC and other agencies, not between the federal government and the states. Likewise, as other courts have observed in considering this provision, the legislative history indicates that § 2(a)(1)(A) was intended to delineate jurisdictional boundaries among regulatory entities. *See Merrill Lynch*, 456 U.S. at 386 ("The purpose of the exclusive-jurisdiction provision in the bill passed by the House was to separate the functions of the Commission from those of the Securities and Exchange Commission and other regulatory agencies." (citation modified)); *see also FTC v. Ken Roberts Co.*, 276 F.3d 583, 588 (D.C. Cir.

2001) ("The aim of this provision, according to one of its chief sponsors, was to 'avoid unnecessary, overlapping and duplicative regulation,' especially as between the Securities and Exchange Commission and the new CFTC." (quoting 120 Cong. Rec. H34,736 (Oct. 9, 1974))).

Additionally, the use of "jurisdiction" in § 2(a)(1)(A)'s savings clause shows that the CFTC's "exclusive jurisdiction" was not meant to extend to every exercise of regulatory authority that might affect transactions on a DCM, however attenuated the effect. The first savings clause contains two parts: the first part preserves "the jurisdiction" of the SEC and "other regulatory authorities under the laws of the United States or of any State," while the second part provides that the SEC "and such other authorities" may "carry[] out their duties and responsibilities in accordance with such laws." 7 U.S.C. § 2(a)(1)(A). The separation of "jurisdiction" from other "duties and responsibilities" means that "jurisdiction" does not cover every duty and responsibility of the SEC and state authorities. If it did, there would have been no need to include a separate clause protecting agencies' ability to perform those "duties and responsibilities"; the clause protecting their "jurisdiction" would have sufficed. And if "jurisdiction" does not cover every "duty and responsibility" in the sense in which it is used in the savings clause, then it does not do so in the sense in which it is used in the "exclusive jurisdiction" clause, either. That is because courts presume that "a given term is used to mean the same thing throughout a statute," and that presumption is more powerful when the term appears in the same part of a statute. *See Miss. ex rel. Hood v. AU Optronics Corp.*, 571 U.S. 161, 171 (2014) (quoting *Brown v. Gardner*, 513 U.S. 115, 118 (1994) (noting that this presumption is "at its most vigorous when a term is repeated within a given sentence")).

Considering these reasons to construe the "exclusive jurisdiction" provision narrowly, we conclude that the jurisdiction that § 2(a)(1)(A) preserves in the CFTC and denies other agencies—and states—is direct regulatory and enforcement authority over licensing and operation of transactions involving swaps. The CFTC's "jurisdiction" encompasses the core subject matter of the CEA's "comprehensive regulatory structure." *Merrill Lynch*, 456 U.S. at 356 (quoting H.R. Rep. No. 93-975, p.1 (1974)). That scheme requires, among other things, that exchanges adhere to certain access requirements, 17 C.F.R. § 38.151; accept responsibility to prevent market manipulation, *see id.* § 38.250; and make public certain information, *id.* § 38.400, before they can

be designated by the CFTC and list derivatives contracts, *see* 7 U.S.C. §§ 2(e), 6(a), 7(a). And the scheme imposes numerous other requirements on designated exchanges, such as reporting obligations, 17 C.F.R. § 38.450; liquidity standards, *id.* § 38.1101(a)(2); and more. These sorts of regulations are at the heart of the CEA's scheme—and are thus the sorts of regulations that fall within the narrow scope of the exclusive jurisdiction provision. *Cf. Am. Agric. Movement, Inc. v. Bd. of Tr. of City of Chi.*, 977 F.2d 1147, 1155–56 (7th Cir. 1992) (interpreting § 2(a)(1)(A) and holding that CEA preempts state law with respect to "actual operation of the commodity futures markets").

Enforcement of state laws that only incidentally burden DCMs or on-DCM transactions involving swaps, by contrast, is not preempted by the exclusive jurisdiction provision. Because the exclusive jurisdiction provision is narrow, ancillary laws that only indirectly affect the subject matter at the core of the CFTC's jurisdiction do not fall within the scope of that provision. *Cf., e.g.*, *Ken Roberts Co.*, 276 F.3d at 592 (exclusive jurisdiction provision does not preempt FTC's power to regulate "marketing of investor-education courses that leads only tangentially to the actual purchase of futures"); *cf. also Dayton Power & Light Co. v. FERC*, 126 F.4th 1107, 1130 (6th Cir. 2025) ("state actions indirectly affecting a federally regulated field are not necessarily preempted"). Indeed, Kalshi's own rulebook belies its assertion that § 2(a)(1)(A) preempts every state law that affects "*any* instrument traded or executed on a DCM." *Schuler*, CA6 R. 28, Kalshi Br., at 31. That rulebook itself provides that lawsuits Kalshi users bring against Kalshi are governed by New York law. And some elements of New York law—such as, for instance, rules governing contract formation—would necessarily affect how instruments are traded and executed on Kalshi. Kalshi itself therefore contemplates that state law will, in at least some instances, be properly applied to on-DCM trades.

**iii.**

The state gambling laws that the States seek to enforce do not directly regulate the licensure and operation of transactions on DCMs—but only incidentally burden those functions—and therefore are not blocked by § 2(a)(1)(A). The laws impose no restrictions on the designation or operation of contract markets as such. Instead, they regulate sports betting. Their effects on DCMs

are limited—and are felt only because DCMs like Kalshi have decided to offer event contracts that "are virtually indistinguishable from" sports bets. *Flaherty*, 172 F.4th at 232 (Roth, J., dissenting). They are therefore not preempted.

Principles of federalism further support our conclusion. Courts should not assume "a significant change in the sensitive relation between" federal and state governments in an area of "traditional state authority." *Bond*, 572 U.S. at 858–59. Indeed, the Supreme Court requires "Congress to enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power" in such an area. *Sackett v. EPA*, 598 U.S. 651, 679 (2023). The CEA's exclusive jurisdiction provision does not meet that high bar with respect to state gambling laws.[12]

Accordingly, we hold that the CEA does not expressly preempt the States' sports-betting laws because those laws do not directly regulate DCMs but have only incidental effects on them.

**3.**

We also reject Kalshi's argument that field preemption applies. "Field preemption is the principle that States may not regulate conduct 'in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance.'" *Churchill Downs*, 162 F.4th at 638 (quoting *Arizona v. United States*, 567 U.S. 387, 399 (2012)). In other words, Congress can enact "a framework of regulation so pervasive" that it leaves "no room for the States to supplement it," *Torres v. Precision Indus., Inc.*, 995 F.3d 485, 491 (6th Cir. 2021) (citation modified), such as immigration registration, nuclear safety, and international relations, *see Arizona*, 567 U.S. at 401; *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 212 (1983); A. Scalia & B. Garner, Reading Law: The Interpretation of

---

[12]Although we do not express any opinion about the recent decision in *United States v. Minnesota*, we note that our conclusion is consistent with its reasoning. --- F. Supp. 3d ---, 2026 WL 2150211 (D. Minn. July 27, 2026). In that case, the district court held that a Minnesota prediction market statute was likely "at least in part expressly preempted by 7 U.S.C. § 2(a)(1)(A)'s exclusive jurisdiction provision." *Id.* at *15. But unlike the state laws at issue here, Minnesota's prediction market statute criminalized various acts related to operating prediction markets, which were defined broadly as "system[s] that allow[] consumers to place a wager on the future outcome of a specified event." *Id.* at *4 (citation modified). As the court noted in distinguishing our circuit's motion panel's holding, the case did "not concern any effort by Minnesota to apply its existing sports-betting laws to Kalshi." *Id.* at *10 n.17. To the contrary, "Minnesota's prediction market statute applie[d] to far more than sports-related event contracts." *Id.*

Legal Texts 290–291 (2013). But as we have explained, "[b]ecause preemption can trammel upon state sovereignty, courts apply a 'strong presumption' against implied preemption in fields that States traditionally regulate." *Torres*, 995 F.3d at 491 (quoting *Merrick v. Diageo Americas Supply, Inc.*, 805 F.3d 685, 694 (6th Cir. 2015)). And it is only "in rare cases" that the Supreme Court has found that Congress has "'legislated so comprehensively' in a particular field that it 'left no room for supplementary state legislation[.]'" *Kansas v. Garcia*, 589 U.S. 191, 208 (2020) (quoting *R. J. Reynolds Tobacco Co. v. Durham County*, 479 U.S. 130, 140 (1986)).

The Supreme Court has noted "the importance of considering the target at which the state law aims in determining whether that law is pre-empted." *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 385 (2015). A "federally occupied field can cover a narrow subject, so long as Congress intended to exclusively regulate that field." *Churchill Downs*, 162 F.4th at 638. Therefore, "to determine whether Congress has implicitly ousted the States from regulating in a particular field," we generally "must first identify the field in which this is said to have occurred." *Garcia*, 589 U.S. at 208. We need not do so here, however, because Kalshi has not shown that the CEA preempts any relevant field.

Kalshi argues that the CEA preempts the field of on-DCM trading.[13] Even assuming that Kalshi is right that on-DCM trading is the relevant field, we disagree that Congress has occupied it entirely.

For one thing, the CEA's exclusive jurisdiction provision indicates that Congress did not intend to occupy the entire field. Because a preemption provision "defines [a] statute's preemptive reach," such a provision "implies that matters beyond that reach are not preempted." *Torres*, 995 F.3d at 491 (quoting *Cipollone*, 505 U.S. at 517). As discussed above, the exclusive jurisdiction provision displaces states' direct regulatory and enforcement authority over on-DCM transactions but sweeps no broader. That provision therefore "provides a 'reliable indicium of congressional

[13] As an initial matter, we are concerned that this definition is too narrow. It is not lost on us that a party can describe a field in a very circumscribed manner, point to several regulations in that small field, then claim Congress has occupied it such that even tangential state regulations that touch upon the field are nullified. But we need not determine the proper field because, as noted, Congress did not intend to completely preempt state power with respect to either the narrow field of on-DCM trading or the broader field of futures trading.

intent with respect to state authority'" over on-DCM transactions. *Cipollone*, 505 U.S. at 517 (quoting *Malone v. White Motor Corp.*, 435 U.S. 497, 505 (1978)). So there "is no need"—indeed, no justification—"to infer congressional intent" to further preempt state law. *Id.* (quoting *Cal. Fed. Savings & Loan Ass'n v. Guerra*, 479 U.S. 272, 282 (1987)). In other words, that the exclusive jurisdiction provision displaces certain state regulatory and enforcement authority over on-DCM transactions—but otherwise reserves state power, including with respect to on-DCM transactions—shows that Congress did not intend to occupy the entire field of on-DCM trading.

Section 2(a)(1)(A)'s savings clauses similarly provide support for this conclusion. A savings clause usually signals that Congress does not mean to preempt the field. *See Farina v. Nokia Inc.*, 625 F.3d 97, 121 (3d Cir. 2010) ("The presence of a savings provision 'is fundamentally incompatible with complete field preemption; if Congress intended to preempt the entire field . . . there would be nothing . . . to 'save,' and the provision would be mere surplusage.'" (quoting *In re NOS Commc'ns*, 495 F.3d 1052, 1058 (9th Cir. 2007))); *Her Majesty the Queen In Right of the Province of Ontario v. City of Detroit*, 874 F.2d 332, 343 (6th Cir. 1989) (A "savings clause negates the inference that Congress left no room for state causes of action" (citation modified)). As discussed, § 2(a)(1)(A) includes multiple savings clauses. It reserves everything other than jurisdiction over direct regulation and enforcement of on-DCM transactions. It also states that "[n]othing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State." *Id.* These savings clauses—like the exclusive jurisdiction provision—suggest that Congress explicitly delineated a carefully calibrated scheme, and we should not imply additional preemption beyond what is provided by the text of the Act.

Further, another provision of the CEA shows that Congress reserved certain powers to states, including with regard to on-DCM transactions. Section 13a-2(7) provides that "authorized State official[s]" can "proceed[] in State court on the basis of an alleged violation of any general civil or criminal antifraud statute of such State." 7 U.S.C. § 13a-2(7). The provision contains no exception for on-DCM transactions. Had Congress "occupied the *entire* field of" on-DCM trading, it would not have preserved states' abilities to enforce their general fraud laws against even on-DCM transactions. *See Torres*, 995 F.3d at 492 (alteration in original).

Kalshi's own rulebook also confirms that Congress did not occupy the field of on-DCM trading. As noted, the rulebook provides that suits against Kalshi by Kalshi users are governed by New York law. Some provisions of New York law therefore govern trades on Kalshi, meaning that, by Kalshi's own rules, state law regulates at least some aspects of on-DCM trading.

Nor do we think that Congress has occupied the broader field of futures trading.[14] Kalshi argues that the CEA preempts the field by laying out a "comprehensive scheme that displaces state regulation." *Schuler*, CA6 R. 28, Kalshi Br., at 38. Kalshi argues that "Congress used the phrase 'exclusive jurisdiction' rather than specifying individual preempted state laws precisely because it sought broadly to preempt the field." *Id.* Kalshi further contends that the "CEA's field-preemptive text is confirmed by Congress's adoption of 'a comprehensive regulatory structure' to oversee the 'futures trading complex.'" *Id.* at 39 (quoting *Merrill Lynch*, 456 U.S. at 356).

These arguments are unpersuasive. To begin, as discussed, the CEA contains both an express preemption provision and multiple savings clauses, indicating that Congress did not intend to preempt the field beyond what the text explicitly provides.

Moreover, the CEA expressly contemplates state involvement in its scheme, indicating that Congress did not intend to entirely occupy the field of futures trading. For example, 7 U.S.C. § 13-a2, titled "Jurisdiction of States," permits state officials to bring enforcement actions on behalf of state residents against unlawful practices that may adversely affect the interests of state residents relating to off-DCM transactions. Additionally, § 16(e)(1) states that "[n]othing in this chapter shall supersede or preempt" state law regulating several types of transactions, including transactions "not conducted on or subject to the rules of a regulated entity or exempt board of trade." *Id.* § 16(e)(1). And as noted, § 13a-2(7) allows state officials to pursue violations "of any general civil or criminal antifraud statute" in state court. *Id.* § 13a-2(7). If Congress had intended to occupy the entire field of futures trading, it presumably would not have expressly granted the states authority to enforce federal law governing that field or expressly stated that state law could

---

[14]We also agree with the Ninth Circuit that "Congress has explicitly not occupied the field of gambling" writ large, because it has "declar[ed] that 'the States should have the primary responsibility for determining what forms of gambling may legally take place within their borders.'" *Assad*, --- F.4th ---, 2026 WL 2543846, at *17 (quoting 15 U.S.C. § 3001(a)(1)).

still apply to certain futures transactions. *See Dayton Power & Light*, 126 F.4th at 1129 (no field preemption where statute "teem[s] with references to state involvement").

Kalshi also points to the Special Rule. It argues that, because the Special Rule allows "*the CFTC* (not the states)" to "decide whether event contracts involving 'gaming' or conduct proscribed by state law should be barred from exchanges," it leaves no room for the States to exercise control. *Schuler*, CA6 R. 28, Kalshi Br., at 40 (emphasis in original). The Special Rule authorizes but does not require the CFTC to prohibit a DCM from listing covered contracts for trading if it determines that they are "contrary to the public interest" by involving either "activity that is unlawful under any Federal or State law" or "gaming." *Id.* § 7a-2(c)(5)(C)(i)(I), (V). But concluding that the Special Rule *excludes* regulation (or prohibition) by other authorities goes a step too far.

On the contrary, the Special Rule "is much better read as a backstop that supplements state law." *Schuler*, CA6 R. 36, Ohio Br., at 50–51. In fact, we think that it suggests that the CFTC may consider not only federal but also state law vis-à-vis the legality of a DCM's conduct. As previously noted, when the CFTC adopted the Special Rule via 17 C.F.R. § 40.11 in 2011, federal law largely prohibited sports gambling. *See Murphy*, 584 U.S. at 458. Thus, it is difficult to imagine that Congress intended the CFTC to exclusively regulate whether sports-event contracts could be on DCMs, when those contracts did not even exist at the time.

Lacking the grounds necessary for field preemption, we conclude that Kalshi has failed to establish that field preemption applies.

**4.**

Federal law can also impliedly preempt state law if "compliance with both federal and state regulations is a physical impossibility" or if state law "stands as an obstacle to the accomplishment and execution of the full purposes" of federal law. *Arizona*, 567 U.S. at 399 (citation omitted). Conflict preemption may "be present when 'Congress has not entirely displaced state regulation over the matter in question.'" *In re Ford Motor Co. F-150 & Ranger Truck Fuel Econ. Mktg. & Sales Pracs. Litig.*, 65 F.4th 851, 859–60 (6th Cir. 2023) (quoting *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 248 (1984)). In that case, "state law may be preempted to the extent it actually

conflicts with federal law, that is, when it is impossible to comply with both state and federal law." *Id.* at 860 (citation modified). State law may also be preempted if it "stands as an obstacle to the accomplishment of the full purposes and objectives of Congress." *Id.* "In other words, if the state law would cause the federal law's operation to be frustrated and its provisions to be refused their natural effect, the state law must yield to the regulation of Congress." *Torres*, 995 F.3d at 492 (citation modified). And "[w]hile recognized as separate categories, these two forms of implied preemption are not 'rigidly distinct.'" *Matthews v. Centrus Energy Corp.*, 15 F.4th 714, 720 (6th Cir. 2021) (quoting *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 n.5 (1990)). We address impossibility and obstacle preemption in turn.

**i.**

To Kalshi, this is a "quintessential" case of impossibility preemption where federal law "'forbids what the state law requires.'" *Schuler*, CA6 R. 28, Kalshi Br., at 43 (quoting *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 460 (2012)). Kalshi contends that complying with Ohio's geographic requirement that "all sports wagers are initiated, received, and completed within the state" is "impossible for federally regulated DCMs that match traders with other traders nationwide through a 'non-discretionary automated trade matching and execution algorithm.'" *Id.* at 42 (quoting 7 U.S.C. § 1a(51)(A)). Kalshi likewise claims that "abiding by Tennessee law would violate CFTC regulations" because "DCMs are required to provide 'impartial access to their markets and services.'" *Orgel*, CA6 R. 58, Kalshi Br., at 37 (quoting 17 C.F.R. § 38.151(b) (citation modified)).

We are not persuaded. Like the motions panel, we conclude there is no impossibility preemption because the "impartial-access regulations do not appear to require a designated contract market like Kalshi to offer any 'particular market' for the event contracts it lists." *Schuler*, 2026 WL 1295806, at *6 (quoting *Flaherty*, 172 F.4th at 239 (Roth, J., dissenting)). Instead, the regulations mandate "'impartial' 'access' to whatever 'market(s)' the entity offers." *Id.* (quoting 17 C.F.R. §§ 37.202(a), 38.151(b)). Specifically, 17 C.F.R. § 38.151(b)'s purpose is "to prevent DCMs from using discriminatory access requirements as a competitive tool against certain participants" and "to avoid the creation of exclusive membership standards that focus on high net

worth." Core Principles & Other Requirements for Designated Contract Markets, 75 Fed. Reg. 80,572, 80,579 & n.51 (Dec. 22, 2010). This does not suggest that event contracts must be available in *all* states, but that "[a]ccess to a DCM should be based on the financial and operational soundness of a participant, rather than discriminatory or other improper motives." *Id.* at 80,579.

Moreover, the next subsection states that a DCM must provide "[c]omparable fee structures for members, persons with trading privileges and independent software vendors receiving equal access to, or services from, the" DCM, 17 C.F.R. § 38.151(b)(2), which further shows that this regulation is about economic rather than geographical impartiality. *See United States v. Gillispie*, 929 F.3d 788, 790 (6th Cir. 2019) ("The whole-text canon calls . . . on the judicial interpreter to consider the entire text, in view of its structure and of the physical and logical relation of its many parts."). The CEA Special Rule confirms this logic, as it enables the CFTC to prohibit a DCM from listing event contracts that involve an "activity that is unlawful under any . . . State law." 7 U.S.C. § 7a-2(c)(5)(C)(i)(I), (ii). This language necessarily implies that certain event contracts may be listed in *some* states but not in others. Otherwise, a single state could "effectively ban" an event contract in the remaining states. *Schuler*, 2026 WL 1295806, at *6. And if federal law allows certain event contracts to be listed in some states but not others, then it is possible for Kalshi to comply with Ohio's geographic requirement without running afoul of that law.

Notably, "[o]ther companies have also complied with both the federal impartial-access requirement and state sports-gaming laws by using geofencing to create a market for participants in one State and then giving impartial access to those individuals."[15] Kalshi responds that although some companies have geofenced, "*other DCMs* have not." *Schuler*, CA6 R. 28, Kalshi Br., at 61 (alteration in original). This difficulty, however, does not prove impossibility. Kalshi complains that geofencing is "technically challenging, time-consuming, and expensive." *Schuler*, DE 11-6, Sottile Decl., Page ID 284. But "expensive does not mean impossible." *Schuler*, 2026 WL 1295806, at *13.

[15] One example is Sporttrade, which New Jersey mentioned in its appeal before the Third Circuit. *Flaherty*, 172 F.4th at 239 n.53 (Roth, J., dissenting).

**ii.**

We next turn to obstacle preemption. The Supreme Court has explained that the obstacle preemption analysis "does not justify a freewheeling judicial inquiry into whether a state statute is in tension with federal objectives" because "such an endeavor would undercut the principle that it is Congress rather than the courts that preempts state law." *Chamber of Com. v. Whiting*, 563 U.S. 582, 607 (2011) (quoting *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 111 (1992)). Accordingly, there is a "high threshold" for determining that a state law presents an obstacle to the purposes and objectives of the federal law. *Id.* (quoting *Gade*, 505 U.S. at 111). Kalshi has not cleared this threshold.

Kalshi argues that the States' gaming laws "subvert[]" Congress's objective to bring futures markets "under a uniform set of regulations." *Schuler*, CA6 R. 28, Kalshi Br., at 41 (quoting *Am. Agric*., 977 F.2d at 1156). But "[l]egislation is, after all, the art of compromise, the limitations expressed in statutory terms often the price of passage, and no statute yet known pursues its stated purpose at all costs." *Henson v. Santander Consumer USA Inc*., 582 U.S. 79, 89 (2017) (citation modified); *see also Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 778 (2019) ("In disregarding [] legislative compromises, we may only wind up displacing perfectly legitimate state laws on the strength of purposes that only we can see, that may seem perfectly logical to us, but that lack the democratic provenance the Constitution demands before a federal law may be declared supreme." (citation modified)). Here, the CEA's "preservation of state regulation" through its multiple savings clauses show that uniformity is far from a goal that the statute seeks to "accomplish[] at all costs." *Pac. Gas & Elec. Co*., 461 U.S. at 222 (citation modified).

This conclusion is bolstered by applying the same logic that explains why the States' gaming laws do not fall within § 2(a)(1)(A)'s preemptive scope. The "patchwork of state regulations," *Flaherty*, 172 F.4th at 230, that Congress sought to preempt includes only those that directly target the licensing and operation of DCMs, not ancillary laws that may incidentally burden contracts relating to a subject matter traditionally within the field of state control. As discussed above, the States' gaming laws do not directly target the licensing and operation of

DCMs. They are thus not the sorts of laws that Congress sought to preempt, and their application to Kalshi does not subvert Congress's goals.[16]

And since gambling regulation "lies at the heart of the state's police power," *Artichoke Joe's California Grand Casino v. Norton*, 353 F.3d 712, 737 (9th Cir. 2003) (citation modified), it is the states, rather than the federal government, that are best suited to regulate sports betting. After all, federal law has generally "defer[red] to, and even promote[d], differing gambling policies in different States." *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 187 (1999).

Kalshi further asserts that allowing state prosecution would "conflict with Congress's chosen 'method of enforcement.'" *Orgel*, CA6 R. 58, Kalshi Br., at 58 (quoting *Arizona*, 567 U.S. at 406). For support, it points (again) to the Special Rule, which it argues vests the CFTC with the sole "authority to prohibit [gaming] contracts if they are 'contrary to the public interest.'" *Id.* (quoting 7 U.S.C. § 7a-2(c)(5)(C)(i)). Kalshi is correct that the CFTC has the discretion to prohibit such contracts. But that does not mean that the CFTC has the *sole* discretion to do so. Instead, as we have explained, the Special Rule is better interpreted as a backstop, supplying an additional review mechanism for contracts involving not only "gaming," but also "terrorism," "assassination," "war," or other "activity that is unlawful under Federal or State law." 7 U.S.C. § 7a-2(c)(5)(C). That the Special Rule expressly contemplates the CFTC looking to state law to determine whether to prohibit certain contracts indicates that Congress envisioned a role for the states in this process. To conclude otherwise would commit to the CFTC's discretion the sole power to prohibit contracts that implicate serious matters of public concern, including matters traditionally left to the states. Considering the CEA's two savings clauses and lack of a broad preemption provision, we do not think Congress intended to displace all state authority to regulate

[16]The fact that Kalshi's sports-event contracts do not meet the statutory definition of a "swap" also underscores why regulation of those contracts does not present an obstacle to Congress's purpose. In Kalshi's own words, the CEA "establish[ed] a uniform national framework for derivatives trading" to "maximize[] [the] hedging and price-discovery benefits" that yield from the "wisdom of crowds." *Schuler*, CA6 R. 28, Kalshi Br., at 6. Since Kalshi's sports-event contracts do not fall within that regulatory framework in the first place—in part because they do not generally shift financial risk or otherwise provide price information—state laws regulating those contracts do not thwart the purpose of the CEA.

these contracts.

We thus conclude that conflict preemption does not block the States' gaming laws.

Accordingly, we hold that Kalshi has failed to establish a likelihood of success under all preemption principles.

**IV.**

"[W]here there is no likelihood of either success on the merits or irreparable harm, an injunction is unwarranted—regardless of the showing on the other factors." *Union Home Mortg. Corp. v. Cromer*, 31 F.4th 356, 366 (6th Cir. 2022) (citation modified); *see also Child Evangelism Fellowship of Ohio, Inc. v. Cleveland Metro. Sch*., 600 F. App'x 448, 452–53 (6th Cir. 2015) ("Because [movant] cannot demonstrate a likelihood of success on the merits of its claim, we need not consider the other preliminary injunction factors.").

Since we hold that Kalshi has not shown a likelihood of success on the merits and therefore cannot carry its "burden of proving that the circumstances clearly demand" a preliminary injunction, *Serv. Emps. Int'l Union Loc. 1 v. Husted*, 698 F.3d 341, 344 (6th Cir. 2012) (quoting *Overstreet*, 305 F.3d at 573), we reject its motion without reaching the other preliminary injunction factors.

**V.**

For the reasons above, we affirm the Southern District of Ohio's denial of Kalshi's motion for a preliminary injunction, vacate the Middle District of Tennessee's grant of Kalshi's motion, and remand for further proceedings consistent with this opinion.