ORAL ARGUMENT HELD ON JULY 30, 2026
No. 26-3196 / 26-5235

# United States Court of Appeals for the Sixth Circuit

KALSHIEX, LLC,

Plaintiff-Appellant [26-3196],

Plaintiff-Appellee [26-5235],

v.

MATTHEW T. SCHULER, THOMAS J. STICKRATH; SHEETAL BAJORIA; SCOTT P. BORGEMENKE; KEITH CHENEY; PENELOPE R. CUNNINGHAM; CHRISTOPHER SMITHERMAN; TRIFFON CALLOS; OHIO CASINO CONTROL COMMISSION; DAVE YOST, Ohio Attorney General,

Defendants-Appellees [26-3196],

WILLIAM ORGEL, in his official capacity as Chairman of the Tennessee Sports Wagering Council; MARY BETH THOMAS, in her official capacity as the Executive Director of the Tennessee Sports Wagering Council; JONATHAN THOMAS SKRMETTI, in his official capacity as Attorney General of Tennessee,

Defendants-Appellants [26-5235].

On Appeal from the United States District Court
for the Southern District of Ohio,
No. 2:25-cv-1165 (Morrison, J.)

On Appeal from the United States District Court
for the Middle District of Tennessee,
No. 3:26-cv-34 (Trauger, J.)

## AMICUS BRIEF OF THE COMMODITY FUTURES TRADING COMMISSION IN SUPPORT OF APPELLEE'S PETITION FOR REHEARING OR REHEARING EN BANC

*COUNSEL LISTED ON INSIDE COVER*

TYLER S. BADGLEY
GENERAL COUNSEL
M. JORDAN MINOT
DEPUTY GENERAL COUNSEL
HENRY J. DICKMAN
SENIOR ASSISTANT GENERAL COUNSEL
ANDREW J. WEISBERG
SENIOR ASSISTANT GENERAL COUNSEL
**U.S. COMMODITY FUTURES TRADING COMMISSION**
1155 21st Street, N.W.
Washington, DC 20581
(202) 418-5574
aweisberg@cftc.gov

October 16, 2026

# TABLE OF CONTENTS

IDENTITY AND INTEREST OF AMICI CURIAE .................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................... 2

ARGUMENT ................................................................................................................ 4

I. The panel decision created a circuit split on the preemptive effect of the CEA ................................................................................. 4

II. The panel's decision exacerbates the circuit split on whether sports event contracts are "swaps" ..................................................... 7

CONCLUSION ........................................................................................................ 11

## TABLE OF AUTHORITIES

<u>Cases</u>


*American Agric. Movement v. Board of Trade*,
977 F.2d 1147 (7th Cir. 1992) .......... 5

*CFTC v. Van Dyke*,
No. 1:26-cv-3369 (S.D.N.Y.) .......... 4

*Coinbase Fin. Markets, Inc. v. Raoul*, No. 25-cv-15406,
2026 WL 2969682 (N.D. Ill. October 2, 2026) .......... 9, 10

*Cothran v. Ellis*,
16 N.E. 646 (Ill. 1888) .......... 6

*KalshiEX, LLC v. Assad*, __ F.4th ___, No. 25-7516,
2026 WL 2543846 (9th Cir. Aug. 28, 2026) .......... 2–3, 5, 7–8, 9

*KalshiEX, LLC v. Flaherty*,
172 F.4th 220 (3d Cir. 2026) .......... 2–4, 5, 7

*United States v. Minnesota*, __ F. Supp. 3d __, No. 26-cv-2661,
2026 WL 2150211 (D. Minn. July 27, 2026) .......... 8–9

*United States v. Phillips*,
155 F.4th 102 (2d Cir. 2025) .......... 9

*United States v. Van Dyke*,
No. 26-cr-00156 (S.D.N.Y. Sept. 28, 2026) .......... 3


<u>Statutes</u>


7 U.S.C. § 1a .......... 2, 3, 7, 8, 9, 11

7 U.S.C. § 2 .......... 2, 5

7 U.S.C. § 5 .......... 4

7 U.S.C. § 7a-2 .......... 9

15 U.S.C. § 8302 .......... 10, 11

15 U.S.C. § 8321 .......... 9–10

Rule

Fed. R. App. P. 40 .......... 4

Regulation

17 C.F.R. §40.11 .......... 8

Legislative Material

H.R. Rep. No. 93-1383 (1974) (Conf. Report) .......... 6

Other Authorities

CFTC, *In re: George Anthony Devolder Santos*, CFTC Docket No. 26-05 (July 31, 2026) .......... 4

CFTC, Interim Final Rule Excluding Certain Activity from Definition of Swap ("IFR"), https://www.cftc.gov/media/14726/IFREventContractsSwapExclusion100926/download (Oct. 9, 2026) .......... 10

CFTC, Notice of Proposed Rulemaking Concerning the Inclusion of Certain Event Contracts in the Definition of Swap ("NPRM"), https://www.cftc.gov/media/14731/NRPM_EventContractsSwapInclusions100926/download (Oct. 9, 2026) .......... 11

Data Reporting Requirements for Certain Event Contracts, 91 FR 40,102 (proposed July 1, 2026) .......... 4

Prediction Markets; Public Interest Determinations, 91 Fed. Reg. 35,806 (proposed June 12, 2026) .......... 1

## IDENTITY AND INTEREST OF AMICI CURIAE

The Commodity Futures Trading Commission submits this brief in support of KalshiEX LLC's request for rehearing. This case concerns the meaning of the Commodity Exchange Act (CEA), which is exclusively administered by the CFTC. The CFTC is actively regulating event contracts traded on derivatives markets and bringing enforcement actions under the CEA. The Commission therefore has a significant interest in this Court recognizing that event contracts traded on designated contract markets (DCMs) fall under its exclusive jurisdiction.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Ohio and Tennessee have attempted to usurp the Commission's authority to regulate derivatives transactions on CFTC-registered exchanges, including by forcing DCMs to cease operating in their States. *See* A9, A11. A panel of this Court approved that effort, allowing States to ban derivatives transactions that, in a State's view, are used for gambling.

That decision was misguided. Event contracts, including sports-related event contracts, meet the CEA's definition of "swap" because the "event or contingency" on which the contract is based is "associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii); *see KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 223 (3d Cir. 2026) ("[A] plain reading of the [CEA's] text suggests that Kalshi's sports-related event contracts fit comfortably within the statutory definition [of a swap]."); *id.* at 233 (Roth, J., dissenting) (same). And, because "§ 2 preempts state regulation of swaps that are 'traded or executed' on a DCM," *KalshiEX, LLC v. Assad*, __ F.4th __, No. 25-7516, 2026 WL 2543846, at *7 (9th Cir. Aug. 28, 2026), the States' enforcement efforts are preempted.

The panel's decision warrants rehearing for two reasons. First, by holding that the CEA does not preempt state regulation of swaps traded on DCMs, the panel created a split with the other two circuits to have considered the CEA's preemptive effect. *Compare* A39 (holding that "[e]nforcement of state laws that only incidentally burden DCMs or on-DCM transactions involving swaps ... is not preempted by the exclusive

jurisdiction provision"), *with Assad*, 2026 WL 2543846, at *7 (CEA is expressly preemptive of state law), *and Flaherty*, 172 F.4th at 228 (CEA impliedly preempts state law). That conclusion opens the door for States to interfere with the CFTC's exclusive jurisdiction over *any* derivatives product, including those that have traded on CFTC-regulated exchanges for decades without controversy.

Second, the panel's decision departs from the CEA's definition of "swap." Although the panel is not the first to depart from the plain text, its reasoning deepens the existing circuit split by introducing a novel interpretation of the statute. The Ninth Circuit, while reaching the same bottom line, cabined its decision to sports and left open whether other event contracts, such as those predicated on elections, qualify as swaps. *Assad*, 2026 WL 2543846, at *12, *15 n.7.

The panel here, however, adopted a theory that "the event [must] be one *inherently* associated with a 'financial, economic, or commercial consequence.'" A20 (quoting 7 U.S.C. § 1a(47)(A)(ii)). That reasoning is not limited to sports. In fact, a criminal defendant has relied on the panel's "inherent" gloss to argue that the event contracts he insider-traded—relating to the ouster of Venezuelan President Nicolás Maduro—are not "swaps" and therefore not a valid predicate for commodity-fraud charges. *See United States v. Van Dyke*, No. 26-cr-00156, Dkt. No. 37 at 2 (S.D.N.Y. Sept. 28, 2026). And both the Sixth and Ninth Circuit decisions conflict with the Third Circuit's holding that the plain-text reading of the "swap" definition encompasses sports event contracts. *See Flaherty*, 172 F.4th at 228.

Rehearing is warranted because the panel's decision creates a circuit split on the CEA's preemptive scope and exacerbates a circuit split on the CEA's definition of swap—both of which are issues of exceptional nationwide importance. *See* Fed. R. App. P. 40(b)(2). Congress entrusted the CFTC to oversee national derivatives markets that are "affected with a national public interest." 7 U.S.C. § 5(a). That responsibility not only includes setting rules for the markets, *see, e.g.*, Data Reporting Requirements for Certain Event Contracts, 91 Fed. Reg. 40,102 (proposed July 1, 2026), but also holding wrongdoers accountable, *see, e.g.*, *CFTC v. Van Dyke*, No. 1:26-cv-3369 (S.D.N.Y.) (enforcement action for insider trading of Maduro event contracts); CFTC, *In re: George Anthony Devolder Santos*, CFTC Docket No. 26-05 (July 31, 2026) (imposing penalties on a former congressman for manipulative activity around State of the Union event contracts). The panel's decision—and the circuit split it exaggerates—frustrate the agency's congressionally-directed mission.

Consequently, the CFTC requests that this Court grant Kalshi's rehearing request.

## ARGUMENT

### I. The panel decision created a circuit split on the preemptive effect of the CEA

The panel decision marks the first time that a court of appeals has held that 7 U.S.C. § 2(a)(1)(A) does not preempt state law, at least with respect to "ancillary regulations that only incidentally burden DCMs." A37-39. That conclusion conflicts

with every other circuit court to have considered the CEA's preemptive effect. *See Assad*, 2026 WL 2543846, at *7 (CEA expressly preempts state law); *Flaherty*, 172 F.4th at 228 ("field and conflict preemption apply"); *American Agric. Movement v. Board of Trade*, 977 F.2d 1147, 1156-57 (7th Cir. 1992) ("application of state law [that] would directly affect trading on or the operation of a futures market … is preempted").

According to the panel, the focus of § 2(a)(1)(A) "is on delineating responsibility among regulatory bodies, including state regulatory bodies—not on preempting state law." A37. The panel concluded that the statute's "exclusive jurisdiction provision displaces" only "direct enforcement and regulatory authority pertaining to the licensing and operation of DCMs," not "ancillary regulations that only incidentally burden DCMs." *Id.*

The panel's novel "direct" versus "ancillary" dichotomy has no textual basis. But even if it did, it is hard to imagine a less "incidental[] burden" than the application of an entirely different regulatory regime that would shutter DCM operations. The panel nonetheless concluded that state law's "effects on DCMs are limited—and are felt only because ... event contracts ... are virtually indistinguishable from sports bets." A39-40 (internal quotation marks omitted). Yet that logic is circular: if a State can circumvent the CFTC's exclusive jurisdiction by declaring a derivative product to be a wager under state law, then the CEA has no preemptive effect at all.

The panel's holding also introduces significant uncertainty where previously there was none. Under both the Third and Ninth Circuit's decisions, if a transaction is

a "swap" traded on a DCM, there is no room for state law. Under this panel's rule, it becomes necessary to determine as a threshold matter whether a particular application of state law will "incidentally burden" a DCM or instead constitutes "direct enforcement." The panel offers little guidance on that question, and this Court should cut this extra-statutory superstructure off at the pass.

The panel's preemption holding creates significant risk for the CFTC and its registrants. If the CEA does not preempt state law, States could ban or regulate *any* kind of swap, option, or future that trades on a national derivatives exchange, including sports event contracts. States have a long history of using their gambling laws to do just that. *See*, *e.g.*, *Cothran v. Ellis*, 16 N.E. 646, 648 (Ill. 1888) ("[T]he option to sell or buy at a future time any grain or commodity ... shall be considered gambling contracts, and shall be void."). Congress established the CFTC and gave it "exclusive jurisdiction" precisely to prevent that scenario. *See, e.g.*, H.R. Rep. No. 93-1383, at 35-36 (1974) (Conf. Report) (explaining that the "exclusive grant of jurisdiction to the Commission" would "preempt the field insofar as futures regulation is concerned," and that "if any substantive State law regulating futures trading was contrary to or inconsistent with Federal law, the Federal law would govern"). So the panel's decision would resurrect "the patchwork that Congress replaced wholecloth by creating the CFTC." *Flaherty*, 172 F.4th 220 at 230. This Court should grant rehearing to correct that error.

## II. The panel's decision exacerbates the circuit split on whether sports event contracts are "swaps"

Although the panel is not the first to depart from the plain text in holding that sports event contracts are not "swaps," its reasoning deepens the existing circuit split by introducing a statutory interpretation that departs from both courts of appeals to have decided the issue.

A "swap" is a contract that makes payment (1) "dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency" that is (2) "associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A), (A)(ii). The Third Circuit adhered to the plain text of the statute, holding that "[t]he outcome of a sports event certainly can be associated with a potential financial, economic, or commercial consequence." *Flaherty*, 172 F.4th at 227. Even the dissent in that case agreed that "[a] plain reading of the Act's text suggests that Kalshi's sports-event contracts fit comfortably within the statutory definition." *Id.* at 233 (Roth, J., dissenting).

The Ninth Circuit took a different view. It held that sports events are not "swaps," but focused on sports-specific considerations. For example, the court indicated that the outcome of a sports contest is not naturally described as an "event." *Assad*, 2026 WL 2543846, at *9. The court further relied on a CFTC regulation that, in its view, prohibits sports event contracts. *Id.* at *14 (citing 17 C.F.R. § 40.11); *see also id.* at *19 (Lee, J., concurring) (explaining that "some unique sports events can be part of

a swap trade" but for § 40.11). And it held that the major-questions doctrine was triggered because of the historical and economic significance of sports gambling. *Id.* at *14-15. Given these sports-centric concerns, the Ninth Circuit deliberately reserved judgment on derivatives "such as ... emissions swap or ... weather swap[s], [which] do not refer to a financial instrument or measure" and remanded on whether election-based event contracts are swaps. *Id.* at *12, *15 n.7.

This Court's panel did not limit its reasoning to sports. Instead, it "conclud[ed] that 'associated with' is best read as requiring that the event be one *inherently* associated with a 'financial, economic, or commercial consequence.'" A20 (emphasis added) (quoting 7 U.S.C. § 1a(47)(A)(ii)). That grand redefinition of a "swap" is far more disruptive to markets and the federal regulatory scheme than the Ninth Circuit's decision. If the decision stands, any event contract that lacks "inherent" financial consequences will be beyond the purview of federal regulation in the Sixth Circuit.

Apart from its disruptive potential, the panel's statutory analysis is simply wrong. "Inherently" appears nowhere in the statutory "swap" definition, which is reason enough to reject it. *See United States v. Minnesota*, __ F. Supp. 3d __, No. 26-cv-2661, 2026 WL 2150211, at *13 (D. Minn. July 27, 2026) (rejecting extra-textual gloss that "ignores the plain language of the statutory definition of swap, which has no such limiting language"). The event or contingency underlying an event contract need only be "associated with" a "potential" economic consequence. Those modifiers may require

a "concrete and articulable" connection, *Coinbase Fin. Markets, Inc. v. Raoul*, No. 25-cv-15406, 2026 WL 2969682, at *8 (N.D. Ill. Oct. 2, 2026), but not an "inherent one."

Nor does "inherent" fit with the rest of the CEA. For one, "limit[ing] the reach of subparagraph (ii) risks making that provision do nothing more than reiterate what subparagraphs (i) and (iii) already accomplish: that reading would, in fact, create surplusage." *Minnesota*, 2026 WL 2150211, at *13. Moreover, the CEA's Special Rule specifies that swaps can "involve" events related to "terrorism," "assassination," "war," and "gaming," 7 U.S.C. § 7a-2(c)(5)(C)(i), none of which is inherently financial.[1] And finally, as even the Ninth Circuit had to admit, the CEA acknowledges "emissions swap[s]" and "weather swap[s]," which "do not refer to a financial instrument or measure." *Assad*, 2026 WL 2543846, at *12.

Congress deliberately "defined 'swap' broadly." *United States v. Phillips*, 155 F.4th 102, 113 (2d Cir. 2025). Not only is the § 1a(47)(A)(ii) language broad, but Congress also provided that a contract "that is, or in the future becomes, commonly known to the trade as a swap" is a swap, 7 U.S.C. § 1a(47)(A)(iv), as is "any combination or permutation of, or option on," enumerated categories of swaps, *id.* § 1a(47)(A)(vi). And Congress *still* worried its "swap" definition was not expansive enough, as it instructed the Commission to "adopt a rule to further define the term[] 'swap'" to avoid "eva[sion of] this subtitle." 15 U.S.C. § 8321(b); *see also id.* § 8302(d)(1) (CFTC and SEC have

[1] *See also* Prediction Markets; Public Interest Determinations, 91 Fed. Reg. 35,806 (proposed June 12, 2026).

authority to "further define the term[] 'swap'"). Narrowing the "swap" definition directly violates Congress's design.

The panel's concern that an "overbroad swap definition would likely cover all sorts of commonplace gambling activity that does not currently occur on federally regulated exchanges" is also unfounded. A26. The CEA "does not federalize all gambling, or even all sports gambling." *Raoul*, 2026 WL 2969682, at *10. And were there any doubt on that, since the panel's decision, the CFTC has issued an Interim Final Rule pursuant to its authority to further define swap, *see* 15 U.S.C. § 8302(d), that "affirms and codifies the Commission's longstanding position that casino-style gambling products, including sports-wagering contracts entered into on a sportsbook and casino games, are not swaps and do not fall within the CFTC's jurisdiction."[2] *Cf.* A26 (asserting that a plain-text reading of the CEA's swap definition "would include every sports wager placed in a casino, on an online sports book, or between two friends at a bar" (internal quotations omitted)). The IFR aligns with the CFTC's longstanding position that instruments historically regulated by states, such as insurance, are not "swaps," even though such instruments and swaps can achieve similar functions. IFR 17. The IFR has the force of law, so the panel's consequentialist fears are, quite simply, not the law.

---

[2] CFTC, Interim Final Rule Excluding Certain Activity from Definition of Swap, (Oct. 9, 2026), https://www.cftc.gov/media/14726/IFREventContractsSwap Exclusion 100926/download (hereinafter "IFR").

The CFTC has also issued a Notice of Proposed Rulemaking, again pursuant to its § 8302(d) authority, to "clarify that event contracts, including those based on sports-, politics-, cultural-, and weather-related events, are swaps within [its] jurisdiction."[3] The NPRM proposes that "[u]nder the plain language of the CEA, event contracts are implicated by four clauses of the 'swap' definition," including under 7 U.S.C. § 1a(47)(A)(ii) but also as binary options, 7 U.S.C. § 1a(47)(A)(i), as contracts "commonly known to the trade as a swap," *id.* § 1a(47)(A)(iv), and as "combination[s] or permutation[s] of, or option on, any agreement, contract, or transaction described in any of [the other swap definitions]," *id.* § 1a(47)(A)(vi). NPRM 7-8.

The IFR and NPRM do not change the Commission's position but nonetheless change the legal landscape. Congress expressly directed the Commission to further define "swap." 15 U.S.C. § 8302(d)(1). Thus, the IFR dispels the argument that all gambling will be forced onto CFTC-registered exchanges, which was a key premise of the panel's reasoning. And if the NPRM becomes a final rule, it will "provide[] an independent legal basis to deem [event] contracts as swaps" subject to the Commission's exclusive jurisdiction. NPRM 13. The Court should grant rehearing so that it can consider the effect of these significant developments.

---

[3] CFTC, Notice of Proposed Rulemaking Concerning the Inclusion of Certain Event Contracts in the Definition of Swap, (Oct. 9, 2026), https://www.cftc.gov/media/14731/NPRM_EventContractsSwapInclusions100926/download (hereinafter "NPRM").

## CONCLUSION

The Court should grant KalshiEX's petition for rehearing or rehearing en banc.

Dated: October 16, 2026

Respectfully Submitted,

*/s/ Andrew J. Weisberg*
Andrew J. Weisberg

TYLER S. BADGLEY
General Counsel
M. JORDAN MINOT
Deputy General Counsel
HENRY J. DICKMAN
Senior Assistant General Counsel
ANDREW J. WEISBERG
Senior Assistant General Counsel

U.S. Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, NW
Washington, DC 20581
Tel: (202) 418-5574
Fax: (202) 418-5567
tbadgley@cftc.gov
jminot@cftc.gov
hdickman@cftc.gov
astukes@cftc.gov
aweisberg@cftc.gov

## CERTIFICATE OF COMPLIANCE

I certify that, pursuant to Fed. R. App. P. 29(b)(4), the foregoing brief complies with the type-volume limitations, in that it has 2,586 words (excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 6th Cir. R. 32(b)(1)).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and type-style requirements of Fed. R. App. P. 32(a)(6) because this brief was prepared in proportionally spaced typeface using Microsoft Word 365 and is set in 14-point sized Garamond type style.

*/s/ Andrew J. Weisberg*

## CERTIFICATE OF SERVICE

I certify that on October 16, 2026, I electronically filed this Brief with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the CM/ECF system and thereby served all participants in the case who are registered CM/ECF users.

*/s/ Andrew J. Weisberg*